No. 2024-2350

# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

KOVE IO, INC.,

*Plaintiff-Appellee,*

v.

AMAZON WEB SERVICES, INC.,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois
No. 18-cv-08175 (Pallmeyer, C.J., and Kennelly, J.)

## JOINT APPENDIX

William M. Jay
GOODWIN PROCTER LLP
1900 N Street, N.W.
Washington, DC 20036
(202) 346-4000

Jesse Lempel
GOODWIN PROCTER LLP
100 Northern Ave.
Boston, MA 02210
(617) 570-1508

*Counsel for Appellant Amazon
Web Services, Inc.*

May 29, 2025

Courtland L. Reichman
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94605
(650) 623-1401

Khue V. Hoang
Jaime F. Cardenas-Navia
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
400 Madison Avenue, Suite 14D
New York, NY 10017
(650) 623-1401

*Counsel for Appellee Kove IO, Inc.*

*(additional counsel on inside cover)*

Christine E. Lehman
Adam Adler
Brian C. Baran
Savannah H. Carnes
REICHMAN JORGENSEN
LEHMAN & FELDBERG LLP
1909 K Street NW, Suite 800
Washington, DC 20006
(202) 894-7310


*Counsel for Appellee Kove IO, Inc.*

| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| | | **VOLUME I of III** | |
| 03/23/20 | 110 | Memorandum Order and Opinion denying Motion to Dismiss | 1-20 |
| 02/06/24 | 739 | Memorandum Opinion and Order | 21-89 |
| 03/21/24 | | Excerpts from the Transcript of March 21, 2024 Pretrial Hearing | 90-97 |
| 03/24/24 | 837 | Order on Plaintiff's Motion in Limine 7 | 98-101 |
| 04/09/24 | | Excerpt from the Transcript with Ruling and Jury Instructions | 102-128 |
| 08/20/24 | 928 | Memorandum Opinion and Order | 129-209 |
| 08/28/24 | 931 | Amended Judgment | 210-211 |
| Undated | | Trial Court Docket | 212-314 |
| 12/12/18 | 1 | Complaint | 315-351 |
| 04/05/19 | 38 | AWS's Memorandum in Support of Motion to Dismiss | 609-624 |
| 05/13/19 | 44 | Kove's Memorandum in Opposition to AWS's Motion to Dismiss | 647<br>654-658<br>661-662 |
| 05/28/19 | 45 | AWS's Reply in Support of Motion to Dismiss | 665-675 |
| 06/18/19 | 49 | Transcript of May 30, 2019 Hearing re Motion to Dismiss | 678-697<br>701-718 |
| 9/14/20 | 200 | Kove's Motion to Strike AWS's Invalidity Contentions | |

Documents marked with an asterisk (*) were filed under seal in the District Court and are included in the confidential appendix. Documents marked with a dagger (†) are public redacted versions of sealed documents; they are included in the nonconfidential appendix.

| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| 9/14/20 | 200-4 | Exhibit C, Decision Denying Institution of Inter Partes Review by the Patent Trial and Appeal Board of the United States Patent and Trademark Office, dated June 16, 2020, in Amazon Web Service, Inc., v. Kove IO, Inc., IPR2020-00276 (Paper 23) | 3573 3587-3589 |
| 10/13/20 | 219 | AWS's Opening Claim Construction Brief | 4816 4821-4827 |
| 10/13/20 | 221 | Notice of Allowability, Application No. 11/354,224, dated Mar. 8, 2020 | 5151-5153 |
| 10/13/20 | 221-1 | Amendment to Application No. 09/661,222, dated August 11, 2005 | 5724 5731-5733 |
| 10/13/20 | 221-2 | Amendment to Application No. 09/872,736, dated November 1, 2006 | 6175 6185-6186 |
| 11/24/20 | 247 | Kove's Response to AWS's Opening Claim Construction Brief | 6432-6433 6444-6445 |
| 8/11/21 | 382 | Joint Claim Construction Chart (Updated) | 7751 7756 |
| 11/19/21 | 477 | Excerpts of Transcript of July 23, 2021 Claim Construction Hearing | 10823 10826-10829 |
| 12/17/21 | 484 | Memorandum Opinion and Order regarding Claim Construction | 10943-10978 |
| 2/24/22 | 508 | AWS's Unopposed Motion for Leave to Amend Its Final Invalidity Contentions to Address the Court's Claim Construction Order (Dkt. 484) | |

Documents marked with an asterisk (*) were filed under seal in the District Court and are included in the confidential appendix. Documents marked with a dagger (†) are public redacted versions of sealed documents; they are included in the nonconfidential appendix.

| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| 2/24/22 | 508-1 | Exhibit A, Redline comparison of AWS's Third and Fourth Amended Final Unenforceability and Invalidity Contentions | 11829-11830 11836 |
| 9/29/22 | 686* 689† | AWS's Motion for Summary Judgment and Memorandum in Support | 18682-18683 18696-18701 18708-18714 |
| 9/29/22 | 687* 690† | AWS's Statement of Material Facts | 18727 18734-18755 |
| 9/29/22 | 690-1 | Exhibit 1, United States Patent No. 7,103,640, dated September 5, 2006 | 18792-18820 |
| 9/29/22 | 690-2 | Exhibit 2, United States Patent No. Patent No. 7,814,170, dated October 12, 2010 | 18822-18848 |
| 9/29/22 | 690-3 | Exhibit 3, United States Patent No. 7,233,978, dated June 19, 2007 | 18850-18884 |
| 9/29/22 | 690-43 | Exhibit 43, Exhibit L to Non-Final Office Action in Reexamination Response No. 90/019,034 ('978 patent), dated September 28, 2022. | 19233 |
| 11/06/23 | 699* 708† | Kove's Opposition to AWS's Motion for Summary Judgment and Cross Motions for Summary Judgment and to Exclude | 19574 19610-19628 19642-19647 |
| 11/06/23 | 709 | Plaintiff Kove IO, Inc.'s LR 56.1(b)(2) Response to Defendant AWS's LR 56.1(a)(2) Statement of Material Facts | |
| 11/06/23 | 709-42 | Exhibit K42, Excerpt from the Expert Report of Joseph B. Greene, dated July 3, 2023 | 20537 20547-20556 |

Documents marked with an asterisk (*) were filed under seal in the District Court and are included in the confidential appendix. Documents marked with a dagger (†) are public redacted versions of sealed documents; they are included in the nonconfidential appendix.

| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| 11/06/23 | 709-127 | Exhibit K127, Patent Owner's Reply to Office Action in *Ex Parte* Reexamination (90/019,034), dated September 28, 2022 | 24409 24441-24448 |
| 11/06/23 | 709-136 | Exhibit K136, Declaration of Michael Goodrich in Support of Kove's Reply to the Non-Final Office Action in Ex Parte Reexamination (90/019,034), dated June 28, 2022, executed on September 28, 2022 | 24628 24645-24652 |
| 11/06/23 | 709-137 | Exhibit K137, Declaration of Michael Goodrich in Support of Kove's Reply to the Non-Final Office Action in Ex Parte Reexamination (90/019,035), dated May 4, 2022, executed on August 11, 2022 | 24658 24667-24672 |
| 11/06/23 | 709-157 | Exhibit K157, Patent Owner's Reply to Office Action in Ex Parte Reexamination (90/019,034), Patent No. 7,233,978, dated Sept 28, 2022 | 25177 25251-25252 |
| 11/06/23 | 701* 710† | Kove's L.R. 56.1(b)(3) Statement of Additional Material Facts in Support of Opposition to Defendant's Motion for Summary Judgment | 25411 25421-25422 |
| 12/4/23 | 714* 722† | AWS's Reply in Further Support of Motion for Summary Judgment and Response to Kove's Motion for Summary Judgment | 25468-25470 25518-25521 |
| 12/4/23 | 717* 725† | AWS's Additional Statement of Material Facts | 26112-26115 |

Documents marked with an asterisk (*) were filed under seal in the District Court and are included in the confidential appendix. Documents marked with a dagger (†) are public redacted versions of sealed documents; they are included in the nonconfidential appendix.

| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| 12/12/23 | 728*<br>732† | Kove's Reply in Support of Cross-Motions for Summary Judgment and to Exclude | 26126-26127<br>26132-26135 |
| 02/09/24 | 741 | Order Regarding Trial Time Limits | 26195-26199 |
| **VOLUME II of III** | | | |
| 02/16/24 | 746 | AWS's Motion to Exclude Opinions of Dr. Goodrich and Mr. Bergman | |
| 02/16/24 | 746-10 | Exhibit 10, Notice of Allowability in Application No. 09/872,736 ('978 patent), dated February 13, 2007 | 26516-26518 |
| 02/16/24 | 745-11*<br>746-11 | Exhibit 11, Expert Report of Jim W. Bergman with Exhibits 1-21, Appendices A & B, dated July 3, 2023 | 26521-26912 |
| 02/26/24 | 784 | Final Pretrial Order | 28717<br>28730-28731 |
| 02/26/24 | 784-14 | Attachment 9B – Disputed Proposed Jury Instructions | 29171<br>29190-29192 |
| 03/07/24 | 808*<br>816† | Kove's Omnibus Motions in *Limine* | 30075-30076<br>30090-30096 |
| 03/07/24 | 808-7*<br>816-7† | Exhibit 6K, Rebuttal Expert Report of Dr. Ananth Grama, executed August 18, 2023 | 30256-30264 |
| 3/14/24 | 819*<br>827† | AWS's Response to Kove's Omnibus Motions *Limine* | 30309-30310<br>30322-30331 |
| 03/22/24 | 835 | AWS's Notice on Part Five of Kove's Motion in *Limine* No. 7 | 31117-31119 |
| 03/22/24 | 836 | Kove's Response to AWS's Notice Regarding Kove's Motion in *Limine* No. 7 | 31120-31121 |

Documents marked with an asterisk (*) were filed under seal in the District Court and are included in the confidential appendix. Documents marked with a dagger (†) are public redacted versions of sealed documents; they are included in the nonconfidential appendix.

| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| 03/31/24 | 852 | Kove's Notice of Final Claim Constructions for Jury Notebook and Final Jury Instructions | 31152-31154 |
| 04/10/24 | 876 | Jury Instructions | 32671-32705 |
| 04/10/24 | 881* | Verdict Form | 32707-32710 |
| 04/12/24 | 888 | Corrected Judgment | 32713-32714 |
| 05/08/24 | 902 | AWS's Motion for a New Trial Under Rule 59 | 32733-32734 32736-32750 |
| 05/08/24 | 902-1 | Exhibit A, Transcript of Proceedings, March 21, 2024 | 32754-32755 32846-32855 |
| 06/07/24 | 914 | Kove's Opposition to AWS's Post-Trial Motions | 33464-33465 33489-33492 |
| 06/21/24 | 920 | AWS's Reply in Support of Motion for a New Trial Under Rule 59 | 33531-33532 33534-33544 |
| 09/18/24 | 933 | Notice of Appeal | 33575-33576 |
| 04/01/24 | | Trial Transcript, Volume 1, April 1, 2024[1] | 33600 33605-33607 33788-33790 33804-33830 33832-33833 33842-33863 |
| 04/02/24 | | Trial Transcript, Volume 2, April 2, 2024 | 33913 33927-33929 33933-33937 33941-33953 33962-33964 |

[1] No docket number is provided for the transcripts, trial exhibits, and demonstratives located at Appx33600 through Appx42227, which were not entered on the docket.

Documents marked with an asterisk (*) were filed under seal in the District Court and are included in the confidential appendix. Documents marked with a dagger (†) are public redacted versions of sealed documents; they are included in the nonconfidential appendix.

| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| | | | 33967-33977 |
| | | | 33981-33985 |
| | | | 34006-34007 |
| | | | 34032 |
| | | | 34036 |
| | | | 34037-34041 |
| | | | 34054-34055 |
| | | | 34061-34071 |
| | | | 34084-34092 |
| | | | 34110-34111 |
| | | | 34118 |
| | | | 34136-34163 |
| | | | 34173-34177 |
| | | | 34179-34180 |
| | | | 34185-34186 |
| | | | 34190-34194 |
| | | | 34198-34203 |
| | | | 34209-34211 |
| **VOLUME III of III** | | | |
| 04/03/24 | | Trial Transcript, Volume 3, April 3, 2024 | 34275 |
| | | | 34278-34281 |
| | | | 34314-34328 |
| | | | 34331 |
| | | | 34339-34343 |
| | | | 34388-34390 |
| | | | 34394-34398 |
| | | | 34422-34424 |
| | | | 34468-34471 |
| | | | 34478-34479 |
| | | | 34484-34520 |

Documents marked with an asterisk (*) were filed under seal in the District Court and are included in the confidential appendix. Documents marked with a dagger (†) are public redacted versions of sealed documents; they are included in the nonconfidential appendix.

| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| | | | 34529-34530<br>34534-34543<br>34548 |
| 04/04/24 | | Trial Transcript - Volume 4, April 4, 2024 | 34609<br>34619-34622<br>34633-34634<br>34733-34839<br>34849-34853 |
| 04/05/24 | | Trial Transcript - Volume 5, April 5, 2024 | 34909-34910<br>34961-34969<br>35022-35025<br>35028-35037<br>35048-35062<br>35066-35068<br>35073-35082<br>35117-35121<br>35130-35135<br>35152-35153<br>35155-35164 |
| 04/08/24 | | Trial Transcript, Volume 6, April 8, 2024 | 35236-35237<br>35253<br>35271-35278<br>35284<br>35294-35306<br>35377-35383<br>35422-35423<br>35437-35442<br>35446<br>35449-35500 |

Documents marked with an asterisk (*) were filed under seal in the District Court and are included in the confidential appendix. Documents marked with a dagger (†) are public redacted versions of sealed documents; they are included in the nonconfidential appendix.

| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| 04/09/24 | | Trial Transcript, Volume 7, April 9, 2024 | 35570-35571<br>35596-35597<br>35697-35711<br>35719-35720<br>35725-35736<br>35743-35745<br>35764-35765<br>35770 |
| 04/10/24 | | Trial Transcript, Volume 8, April 10, 2024 | 35831-35832<br>35853-35857<br>35877-35903 |
| | | DTX-178, Goldilocks Pricing Update, June 18, 2015 | 36226-36231 |
| | | DTX-0388, Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, Control No. 90/019,035, August 11, 2022 | 36534<br>36555<br>36562-36563<br>36581 |
| | | 388DTX-0595, Demonstrative: Kove Profit and Loss Statement for Years 2005 through 2007 | 36821 |
| | | PTX-0053, Amazon Source Code: DynamoDB | 37217<br>37460 |
| | | PTX-0123 – Native Video File: AWS Object Storage Services | 37958 |
| | | PTX 0136, Level UP! Storage|Content, Undated | 37991 |
| | | PTX-0177, AWS Wiki: Understanding DynamoDB Throttling and How to Avoid It | 39066-39067 |

Documents marked with an asterisk (*) were filed under seal in the District Court and are included in the confidential appendix. Documents marked with a dagger (†) are public redacted versions of sealed documents; they are included in the nonconfidential appendix.

| Date | Dkt. | Document | Appx Pages |
|---|---|---|---|
| | | PTX-0217, 2012 Amazon S3 OP1, May 26, 2010 | 39241 |
| | | PTX-0218, Amazon S3 Storage Pricing, November 2012 | 39251 |
| | | PTX-0219, 2018 AWS Infrastructure Services OP1, October 10, 2017 | 39261 39263 |
| | | PTX-0220, The Value of a TB of Data in S3, May 21, 2019 | 39296 |
| | | PTX-0634, DynamoDB MetaData Scaling Options | 39584-39585 |
| | | PTX-0684, Native Video File: ECS Talk – S3 Under the Hood | 40490 |
| | | PTX-0692, AWS Wiki: S3 | 40497-40498 |
| | | PTX-0699, Deep Diving S3: Building Knowledge of S3 to Troubleshoot Effectively and Efficiently | 40529-40530 |
| | | PTX-0810, Location Service in Global Context, John Overton, October 29, 2002 | 40595-40614 |
| | | PTX-0812, 10 Emerging Technologies That Will Change Your World, *MIT Technology Review*, February 2004 | 40640-40660 |
| | | PTX-0914, Provisional applications 60/277,408 (Overton), March 19, 2001 | 40983 40988-40992 40995 |
| | | PTX-0934, Redis Pricing | 40999 |
| | | PTX-1597, Demonstrative – Summary of Opinions | 41336 |

Documents marked with an asterisk (*) were filed under seal in the District Court and are included in the confidential appendix. Documents marked with a dagger (†) are public redacted versions of sealed documents; they are included in the nonconfidential appendix.

| Date | Dkt. | Document | Appx Pages |
|------|------|----------|------------|
|  |  | Revised Demonstratives of Michael Goodrich, served on April 2, 2024 | 41436<br>41470<br>41502<br>41506-41507<br>41517<br>41520<br>41541<br>41558-41561<br>41629-41632<br>41650<br>41726 |
|  |  | Bergman Kove Demonstratives (ALT)_2, 4/3/2024 | 42076<br>42177-42179<br>42225-42227 |

Documents marked with an asterisk (*) were filed under seal in the District Court and are included in the confidential appendix. Documents marked with a dagger (†) are public redacted versions of sealed documents; they are included in the nonconfidential appendix.

**CONFIDENTIAL MATERIAL OMITTED**

Pages 26521-26912, 32707-32710, 36226-36231, 37217, 37460, 37958, 37991, 39066-39067, 39241, 39251, 39261, 39263, 39296, 39584-39585, 40490, 40497-40498, 40529-40530, 40595-40614 were filed under seal in the District Court subject to the protective order included in Volume I of the Appendix.

Portions of pages 18682, 18708-18714, 18727, 18734-18739, 19610, 25421-25422, 25468, 26112, 26127, 30256-30264, 30309, 30327, 30329-30330 were filed under seal in the District Court subject to the protective order included in Volume I of the Appendix.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **KOVE IO, INC.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )　　**No. 18 C 8175** |
| | ) |
| **AMAZON WEB SERVICES, INC.,** | )　　**Judge Rebecca R. Pallmeyer** |
| | ) |
| **Defendant.** | ) |

## MEMORANDUM ORDER AND OPINION

Plaintiff Kove IO, Inc., has sued Defendant Amazon Web Services, Inc. ("AWS"), alleging infringement of three patents disclosing a data storage network architecture that permits cloud-based storage of information on a large scale. AWS has moved to dismiss the suit, contending that the asserted claims violate the Patent Act, 35 U.S.C. § 101, because they are based on abstract ideas and do not contain an "inventive concept" sufficient to confer patent eligibility. For the following reasons, the court disagrees and denies Defendant's motion to dismiss [36].

## BACKGROUND

Plaintiff's allegations, assumed true for purposes of this analysis, establish the following:

Plaintiff Kove IO, Inc., is a Delaware corporation with its principal place of business in Chicago, Illinois. (Compl. [1] ¶ 6.) Defendant AWS is a Delaware corporation and is registered to do business in Illinois. (*Id.* ¶ 7.) There are three patents-in-suit: U.S. Patent No. 7,103,640 (the "'640 Patent"), No. 7,233,978 (the "'978 Patent"), and No. 7,814,170 (the "'170 Patent"),[1] all of which are owned by Plaintiff and name as inventors Dr. Stephen Bailey and Dr. John Overton, who serves as Plaintiff's chief executive officer. (*Id.* ¶¶ 5, 11.) The earliest application related to

---

[1]　As Defendant notes in a footnote (*see* Def.'s Mem. in Supp. of Mot. to Dismiss [38] at 2 n.2), Plaintiff alleges that Defendant infringed "at least" three claims, specifically identifying only one from each patent. (Compl. [1] ¶¶ 35, 57, 72.) Plaintiff implies that it may assert additional claims later on, apparently to avoid dismissal of the suit if this court were to grant Defendant's motion. (Pl.'s Mem. in Opp'n to Amazon's Mot. to Dismiss [44] at 7 n.5.) In this ruling the court addresses only the three identified claims.

Appx1

all three patents was filed on July 8, 1998. (*Id.* ¶¶ 20–22.) And each has the same subject matter as well: a distributed data storage technology that can be utilized in cloud computing. (*Id.* ¶¶ 1–2.)

Traditionally, storage systems would store both a data file itself as well as its corresponding location information, "which records where the data file is located on the network of servers and computers." (*Id.* ¶ 14.) This location information would be stored on a single server. A user seeking information from a particular data file would start by sending a request to that server. (*Id.* ¶ 15.) Such a process is akin to finding a book in the library by first checking the card catalog to see in which section and on which shelf the book is located. The problem with such a system, Plaintiff alleges [1], is that as the system grows, it "would someday contain so many unique data files that it would become impractical—if not impossible—to store the corresponding location information in one place." (*Id.* ¶ 16.) After all, a library's card catalog could become too unwieldy as more books are added to the library and stored in different locations. The patented distributed network system is aimed at overcoming such a problem, thus allowing storage systems to grow to a significant size. The distributed network achieves this by not only storing data files in different locations but storing location information across multiple servers, as well. (*Id.* ¶ 17.) Specifically, Plaintiff describes the patented system as using "hash values" that "correspond[ ] to the location information of data files" and that are distributed throughout the network. (*Id.* ¶ 18.) "Hash values" are assigned to a file based on a mathematical operation. (Ex. 1 to Compl. [1-1] at 3.) And the hash values are stored in a "hash table," in which each file is assigned to its own row, and the row stores the file's location. (*Id.*) These hash tables are distributed throughout different locations around a network. (*Id.*) "Each table points to other tables, so while the first hash table searched may not list the file you want, it will point to other tables that will eventually—but still within milliseconds—reveal the file's location." (*Id.*) In other words, a request from a user for a particular data file will be routed first to one server, but if that

2

Appx2

server does not have the location information, the request is quickly rerouted to another server, then another, and so on until the file is found.  (Compl. [1] ¶ 18.)

**The '170 Patent**

The '170 Patent, entitled "Network Distributed Tracking Wire Transfer Protocol," generally describes a system and method for storing and retrieving information, including "identification strings for specifying the identity of an entity in the distributed data collection, and location strings for specifying network locations of data associated with an entity."  (The '170 Patent, Ex. 6 to Compl., [1-6] col. 2 ll. 18–21.)  In order to hold a large number of files, "[t]he protocol accommodates variable length identifier and location strings," up to $2^{32}$-4 bytes in length.  (*Id.* at col. 2 ll. 21–22, col. 3 ll. 26–28.)  "Relationships between identification strings and location strings can be dynamically and spontaneously manipulated thus allowing the corresponding data relationships also to change dynamically, spontaneously, and efficiently"— that is, as the court understands this language, data repositories can always be added to the architecture and identifier/location mapping can update frequently as data files are altered or change locations. (*Id.* at col. 2 ll. 22–26.)  This patent contains a total of seventeen claims, of which three are independent claims and fourteen are dependent claims.  (*See id.* at col. 20 l. 58–col. 22 l.60.) Plaintiff alleges that Defendant has infringed Claim 1, which recites:

> 1.      A system for managing data stored in a distributed network, the system comprising:
>
> a data repository configured to store a data entity, wherein an identifier string identifies the data entity; and
>
> a data location server network comprising a plurality of data location servers, wherein data location information for a plurality of data entities is stored in the data location server network, at least one of the plurality of data location servers includes location information associated with the identifier string, each one of the plurality of data location servers comprises a processor and a portion of the data location information, the portion of the data location information included in a corresponding one of the data location servers is based on a hash function used to organize the data location information across the plurality of data location servers, and each one of the data location servers is configured to determine the at least one

3

Appx3

of the plurality of data location servers based on the hash function applied to the identifier string.

(*id.* at col. 20 l. 58–col. 21 l. 10.)

**The '640 Patent**

The '640 Patent, entitled "Network Distributed Tracking Wire Transfer Protocol," generally describes the same invention as that described in the '170 Patent. (The '640 Patent, Ex. 4 to Compl. [1–4] col. 1 ll. 25–30.) The '640 Patent contains a total of twenty-five claims, of which four are independent and twenty-one are dependent. (*id.* at col. 20 l. 48–col. 24 l. 15.) Plaintiff has alleged that Defendant has infringed Claim 18 of this patent, which adds to the patented system a "redirection mechanism" that "assist[s] the client"—meaning a computer connected to the network—"in identifying an alternative data location server in the event the client sends a request to the wrong server." (Pl.'s Mem. in Opp'n to Amazon's Mot. to Dismiss [44] at 10.) Claim 18 recites:

18. A system for retrieving data location information for data stored in a distributed network, the system comprising:

a data repository configured to store data, wherein the data is associated with an identifier string;

a client responsive to a data query to query a data location server for location information associated with the identifier string;

a data location server network comprising a plurality of data location servers, at least one of the plurality of data location servers containing location information associated with the identifier string, wherein each of the plurality of data location servers comprises computer executable code configured to execute the following steps in response to receiving a data location request from the client:

if the data location server contains the location string associated with the identification string provided in the data location request, the data location server transmits location information for use by the client to calculate a location of the data associated with the identification string;

if the data location server does not contain the location string associated with the identification string, the location server transmits a redirect message to the client, wherein the redirect message contains redirect information for use by the client to calculate a location of a different data location server in the plurality of data location servers, wherein the different data location server contains the location string.

(The '640 Patent at col. 22 l. 41–col. 23 l. 2.)

4

Appx4

**The '978 Patent**

The '978 Patent, entitled "Method and Apparatus for Managing Location Information in a Network Separate from the Data to Which the Location Information Pertains," generally describes the same invention as that in the '170 Patent and '640 Patent, but it adds "a type of load balancing, so that identifiers and location information can be moved to a different location server when certain performance criteria have been satisfied." (The '640 Patent, Ex. 5 to Compl. [1–5]; Pl.'s Mem. in Opp'n to Amazon's Mot. to Dismiss [44] at 10–11.) The patent includes thirty-one claims, including five independent and twenty-six dependent claims. (The '640 Patent at col. 25 l. 24– col. 28 l. 65.) Plaintiff alleges that Defendant has infringed Claim 17 of the '978 Patent, which discloses:

> 17. A method of scaling at least one of capacity and transaction rate capability in a location server in a system having a plurality of location servers for storing and retrieving location information, wherein each of the plurality of location servers stores unique set of location information of an aggregate set of location information, the method comprising:
> providing a transfer protocol configured to transport identifier and location information, the location information specifying the location of information related to the identifier;
> storing location information formatted according to the transfer protocol at a first location server;
> receiving an identifier and a location relevant to the identifier at the first location server;
> storing the received location in a location store at the first data location server, the location store comprising a plurality of identifiers, each identifier associated with at least one location, wherein the received location is associated with the received identifier in the location store; and
> transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit.

(*id.* at col. 27 ll. 19–43.)

**Defendant's Alleged Infringement**

Plaintiff identifies two of Defendant's products as infringing the patents-in-suit: Amazon Simple Storage Service ("Amazon S3") and DynamoDB. (Compl. [1] ¶ 26.) Defendant launched Amazon S3 in 2006, and it allows users to store data in the cloud. Defendant describes Amazon S3 as providing "highly scalable, reliable, and low-latency data storage infrastructure." (Press

Appx5

Release, Ex. 7 to Compl., [1-1] at 1.)  DynamoDB is a database service that Defendant says permits users to "create database tables that can store and retrieve any amount of data, and serve any level of request traffic."  (DynamoDB Developer Guide, Ex. 11 to Compl., [1-11] at 1.) Together, Amazon S3 and DynamoDB manage data stored in a distributed network, according to Plaintiff.  (Compl. [1] ¶ 37.)  "Amazon S3 stores objects in a 'File Repository,'" and each of those Amazon S3 objects is given a unique identifier string.  (*Id.* ¶ 38.)  DynamoDB tables house location information for those S3 objects.  (*Id.* ¶ 40.)  Moreover, according to Plaintiff, the DynamoDB tables, like the hash tables in the patented system, are distributed across multiple servers and organize data location information based on a hash function.  (*Id.* ¶¶ 76, 78.)  Likewise, when an Amazon S3 user requests to download a particular file or object, Defendant's system will send a request to a particular S3 location and, if that server is the wrong location, Amazon S3 will redirect the requester to a new location.  (*Id.* ¶¶ 79–80.)  This system is illustrated in the following figure that Plaintiff included with its complaint:



| | |
|---|---|
| 1 | The client makes a DNS request to get an object stored on Amazon S3. |
| 2 | The client receives one or more IP addresses for facilities that can process the request. |
| 3 | The client makes a request to Amazon S3 Facility B. |
| 4 | Facility B returns a redirect indicating the object is available from Location C. |
| 5 | The client resends the request to Facility C. |
| 6 | Facility C returns a copy of the object. |

(*Id.* ¶ 80.)[2]

---

[2]     In the figure, "DNS" stands for "Domain Name System," which refers to "[a] general purpose distributed, replicated, data query service chiefly used on Internet for translating

Appx6

Plaintiff initiated this suit on December 12, 2018, seeking damages and a permanent injunction for Defendant's alleged direct, indirect, and contributory infringement of its patents. *See* 35 U.S.C. § 271(a)–(c). Defendant moves to dismiss, contending that Claim 1 of the '170 Patent, Claim 18 of the '640 Patent, and Claim 17 of the '978 Patent are invalid because they are directed only to the abstract idea of data storage and lack an inventive concept.

## **DISCUSSION**

In deciding a motion to dismiss, the court accepts the well-pleaded factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff. *Kubiak v. City of Chi.*, 810 F.3d 476, 480–81 (7th Cir. 2016). Because every patent is presumed to be issued properly, *see* 35 U.S.C. § 282(a), a party challenging patent eligibility must point to clear and convincing evidence that the patent covers a patent-ineligible subject matter, *see Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011). A patent may be obtained for "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. The Supreme Court has long interpreted § 101 as implicitly excepting laws of nature, natural phenomena, and abstract ideas from patent protection. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) (citing *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013)). These are the "building blocks of human ingenuity," and affording them patent protection could "inhibit further discovery" and thereby "impede innovation." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 71, 85 (2012)).

Defendant argues that dismissal is necessary because the asserted patent claims concern only abstract ideas and are therefore invalid. When evaluating a § 101 challenge, the Supreme Court's opinion in *Alice* instructs the court to "first determine whether the claims at issue are

---

hostnames into Internet addresses." *Domain Name System*, Free On-Line Dictionary of Computing, http://foldoc.org/Domain+Name+System (last visited Mar. 16, 2020).

7

Appx7

directed to a patent-ineligible concept," *id.* at 218, and, if they are, then "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application," *id.* at 217 (quoting *Mayo*, 566 U.S. at 78–79). Although "it will ordinarily be desirable—and often necessary—to resolve claim construction issues prior to a § 101 analysis," that is not a hard-and-fast rule. *Bancorp Servs., LLC v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012). In fact, "evaluation of a patent claim's subject matter eligibility under § 101 can proceed even before a formal claim construction." *Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1374 (Fed. Cir. 2016). Because neither party has raised any claim construction issues yet,[3] the court may proceed and resolve eligibility for patenting as a matter of law. *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018) ("We have held that patent eligibility can be determined at the Rule 12(b)(6) stage."). As set forth below, the court finds that the asserted claims are not directed to a patent-ineligible concept, so Defendant's § 101 challenge fails.

The court's first task is to determine whether the asserted claims are "directed to" an abstract idea. There is no "definitive rule to determine what constitutes an 'abstract idea'"; instead, "both [the Federal Circuit] and the Supreme Court have found it sufficient to compare the claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1334 (Fed. Cir. 2016). Examples of abstract ideas include: the "formation and manipulation of economic relations," the "performance of certain financial transactions," and "data recognition and storage," *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1347 (Fed. Cir. 2014); indexing "various items using classifications, parameters, and values," *BSG Tech LLC v. BuySeasons, Inc.*, 899

---

[3] At oral argument, Plaintiff contended that part of Defendant's argument amounted to "undercover claim construction". (Oral Arg. Tr. [49] at 23:3–6.) Resolving this issue, however, is not necessary for the court's analysis of this motion.

Appx8

F.3d 1281, 1285–86 (Fed. Cir. 2018); mathematical algorithms, *Gottschalk v. Benson*, 409 U.S. 63, 64 (1972); and "accessing and distributing electronic documents using electronic document references," *Cloud Satchel, LLC v. Amazon.com, Inc.*, 76 F. Supp. 3d 553, 561–62 (D. Del. 2014), *aff'd mem.*, 667 Fed. App'x 1010 (Fed. Cir. 2015).

Following this precedent, courts have regularly found claims directed toward generating or manipulating data to be abstract. For example, in *A. Zahner Co. v. Hendrick Metal Prods., LLC*, 328 F. Supp. 3d 870, 880 (N.D. Ill. 2018), this court analyzed claims focused on "a method for collecting two types of data—an image and information about a surface—and then using a computer to convert that data into machine code that is usable for transferring the image to the surface." Considering everything from the title of the patent, its specification, and the language of the claims, the court noted that "[n]othing in the patent suggests a specific improvement over existing methods for generating machine code . . . or a 'specific improvement to computer functionality.'" *Id.* (quoting *Enfish*, 822 F.3d at 1338–39). That the patented method also resulted in the physical manipulation of a building material surface did not mean that the claims themselves were not "directed to" an abstract idea: "the physical manipulation of a surface is the *application* of the claimed process for generating machine code. As the Supreme Court made clear in *Alice*, '[s]tating an abstract idea while adding the words "apply it" is not enough for patent eligibility.'" *Id.* at 881 (quoting *Alice*, 573 U.S. at 223). In contrast, the Federal Circuit determined at *Alice* step one that the patent at issue in *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1259 (Fed. Cir. 2017), was not directed to an abstract idea. The district court had initially held that the claims—which purported to "creat[e] a memory system with programmable operational characteristics that can be tailored for use with multiple different processors without the accompanying reduction in performance"—"were directed to the 'abstract idea of categorical data storage.'" *Id.* at 1256–57. But the Federal Circuit reversed, reasoning that the claims were directed to "an improved computer memory system, not to the abstract idea of categorical data storage." *Id.* at 1259. As the *Visual Memory* court noted, the specification described the

9

Appx9

disadvantages of the prior art as well as the advantages of the claimed technology. *Id.* at 1259–60. The Federal Circuit acknowledged that "the concept of categorical data storage underlies" the patent's claims, "[b]ut this is not enough to doom a claim under § 101." *Id.* at 1262. After all, "all inventions at some level embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas." *Id.* (quoting *Mayo*, 566 U.S. at 71).

Zahner and *Visual Memory* are just two of the many post-*Alice* cases in which courts have considered § 101 challenges to patents concerning the use, manipulation, or configuration of data. Reviewing this precedent, including the cases relied on by both parties in their briefs and at oral argument, the court concludes that the asserted claims are not directed to an abstract idea.

Plaintiff argues that the Federal Circuit's opinion in *Enfish* controls, and the court agrees. At issue in *Enfish*, 822 F.3d at 1330, were two patents "directed to an innovative logical model for a computer database." Prior computer databases followed a "relational" model in which each characteristic of a particular object—*e.g.,* title, author, address—would be logged in a different table. *Id.* at 1331–32. The patented "self-referential" model, however, used only one table for all characteristics and "define[d] the table's columns by rows in the same table." *Id.* at 1332. In other words, if an additional column is needed, a new row can provide the label to be added to that new column. *See id.* at 1332–33. "In other situations, the row might define other characteristics of the column, such as the type of data that the column can hold." *Id.* at 1333. According to the specification, a self-referential database enables faster searching, more effective storage, and more flexibility in configuration than a relational one. *Id.* at 1333. Noting that *Alice* did not imply that "all improvements in computer-related technology are inherently abstract" or "that claims directed to software, as opposed to hardware, are inherently abstract," the Federal Circuit reasoned that *Alice* step one "asks whether the focus of the claims is on the specific asserted improvement in computer capabilities . . ., or, instead, on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Id.* at 1335–36. The court found the

10

Appx10

following claim (as well as two others) to be focused on a specific improvement in computer capabilities:

> 17. A data storage and retrieval system for a computer memory, comprising: means for configuring said memory according to a logical table, said logical table including:
>> a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;
>> a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and
>> means for indexing data stored in said table.

*Id.* at 1336 (quoting U.S. Patent No. 6,151,604.) The district court had concluded that this claim was simply directed to the abstract idea of storing, organizing, and retrieving information, but as the Federal Circuit observed, by "describing the claims at such a high level of abstraction and untethered from the language of the claims," the trial court improperly "all but ensure[d] that the exceptions to § 101 swallow the rule." *Id.* at 1337. "Here, the claims are not simply directed to *any* form of storing tabular data, but instead are specifically directed to a *self-referential* table for a computer database." *Id.* The Federal Circuit concluded its *Alice* step one analysis in these words:

> In sum, the self-referential table recited in the claims on appeal is a specific type of data structure designed to improve the way a computer stores and retrieves data in memory. The specification's disparagement of conventional data structures, combined with language describing the "present invention" as including the features that make up a self-referential table, confirm that our characterization of the "invention" for purposes of the § 101 analysis has not been deceived by the "draftman's art."

*Id.* at 1339.

This analysis from *Enfish* applies in the case before this court as well. The patents-in-suit here are directed toward a distributed storage system in which location information can be stored in multiple servers to reduce the processing time to find a data file. (Compl. [1] ¶¶ 16–17.) According to the patents' specifications, prior data storage systems enabled a user to search only for information stored in one server and "only data that are statically associated with that server

Appx11

are returned.  Disadvantageously, the search is also usually restricted to previously known systems.  The search is thus conducted only where the server knows in advance to look." ('640 Patent at col. 1 ll. 34–41.)  The invention disclosed in Plaintiff's patents, in contrast, connects multiple servers, each of which have the mapping between "identification strings" (the identifier for a particular data file) and the "location strings," which specify where a data file is located.  (*Id.* at col. 2 l. 66–col. 2 l. 7.)  When one of these location servers receives a request for a file from a computer or client connected to the network, it can redirect the client to a location server that "contain[s] information relevant to the entity identified in the query." ('978 Patent at col. 2 ll. 47–52.)  Unlike older, "static" data retrieval systems, which stored location information in a hierarchical index that needed periodic updates (Compl. [1] ¶ 13), the patented system is "dynamic" because, by distributing location information and identifier mapping across multiple servers, repositories holding data files can be added to the system "without the need to reprogram the database." (*Id.* at col. 2 l. 10.)

As in *Enfish*, not only do the patents' specifications explain how they improve on prior systems; the asserted claims also "focus on the specific asserted improvement in computer capabilities" and are not simply directed to "an 'abstract idea' for which computers are invoked merely as a tool."  *Enfish*, 822 F.3d at 1335–36.  As noted above, Claim 1 of the '170 Patent discloses a data storage system comprising "a data repository," which stores data entities, and a series of data location servers, all of which together hold the location information for the data entities.  The location information held by a particular location server is based on a hash function, which also permits a location server without a particular data file's location information to determine which location server would have that information.  (*See* the '170 Patent at col. 20 l. 58–col. 21 l. 10.)  Defendant urges that this claim "is directed to the abstract idea of storing data and location information in different places, and using a 'hash function' on an identifier to determine where the location information can be found." (Def.'s Mem. in Supp. of Mot. to Dismiss [38] at 8.)  The court does not adopt that dismissive characterization; Claim 1 is not directed at

12

Appx12

simply storing and locating information in different places. Rather, it is, as Plaintiff argues, directed to a specific network architecture that employs multiple location servers that organize location information based on a distributed hash table. And as in *Enfish*, 822 F.3d at 1337, the specification teaches how this architecture functions differently than—and improves upon— conventional systems.

A similar analysis applies to Claim 18 of the '640 Patent, which, as already noted, discloses a network architecture that is almost the same as that included in Claim 1 of the '170 Patent. (*See* the '640 Patent at col. 22 l. 41–col. 23 l. 2.) This claim adds one critical component: a "redirect message" from one data location server that permits the client to determine the location of a different data location server. That is, if a client requests a particular data file from a location server that does not have that file's location information, the location server will redirect the client to the proper location server. This redirect message is essential because it makes possible the distributed network architecture disclosed in the patents-in-suit. Defendant characterizes this claim as merely "directed to the abstract idea of storing location information in multiple places, with information at each place directing the user to the right place." (Def.'s Mem. in Supp. of Mot. to Dismiss [38] at 10.) Characterizing the claim at such a high level of abstraction, as the *Enfish* court noted, runs the risk of "all but ensur[ing] that the exceptions to § 101 swallow the rule." 822 F.3d at 1337. It is also "untethered from the language of the claim[ ]," *id.*, notably excluding mention of the "computer-executable code" that automatically redirects the client to the correct location server or the fact that the client uses the redirect message to calculate the location of a different data location server.

The court's conclusion is the same for Claim 17 of the '978 Patent. That claim describes a method for transferring identification strings and location strings from one location server to another when a particular "performance criterion" is met. (*See* the '978 Patent at col. 27 ll. 19– 43.) Subsequent claims in the patent define the performance criteria to include available storage space and transaction rate limit. (*See id.* at col. 28 ll. 12–16.) This enables one of the

13

Appx13

specification's claimed advantages over the prior art: it permits "on-the-fly addition and removal of data repositories," which makes possible the distributed network's growth in scale. (*Id.* at col. 2 ll. 1–10.) Defendant is incorrect to portray this claim as simply directed to "receiving and storing information, and transferring some location information to a different location based on a predetermined criteria." (Def.'s Mem. in Supp. of Mot. to Dismiss [38] at 6.) Like the claims discussed above, Claim 17 of the '978 Patent is, in the words of *Enfish*, 822 F.3d at 1336, "not directed to an abstract idea within the meaning of *Alice*. Rather, [it is] directed to a specific improvement" in the way networks operate.

In its reply brief and at oral argument, Defendant argues that *Enfish* is distinguishable because that case concerned a "means-plus-function" claim. (Def.'s Reply Br. in Supp. of Mot. to Dismiss [45] at 2; Oral Arg. Tr. [49] at 18:4–18.) "Means-plus-function" claims can be "construed to cover the corresponding structure . . . described in the specification." 35 U.S.C. § 112(f). According to Defendant, the *Enfish* court considered the specification when interpreting a claim only because it was reviewing a means-plus-function claim, and it is improper for this court to consider the patents' specifications when reviewing the asserted claims. Again, the court is not persuaded. The *Enfish* court did not limit its validity finding to "means-plus-function" claims. *See* 822 F.3d at 1337 (emphasis added) ("[T]he claims are not simply directed to *any* form of storing tabular data, but instead are specifically directed to a *self-referential* table for a computer database. For claim 17, this is reflected in step three of the 'means for configuring' algorithm described above. *For both pairs of claims 31 and 32, this is reflected in other claim language.*"). Indeed, nothing about the Federal Circuit's analysis was expressly limited to means-plus-function claims. And the Federal Circuit has elsewhere discussed and followed *Enfish* without suggesting that its holding is so limited. *See, e.g., Visual Memory*, 867 F.3d at 1258–60; *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1346–49 (Fed. Cir. 2017). In fact, despite Defendant's insistence that *Enfish* requires the court to focus exclusively on the claims' language, the Federal Circuit has frequently taken the specification into consideration at *Alice* step one—even for non-means-plus-

14

Appx14

function claims.[4] *See, e.g., Visual Memory*, 867 F.3d at 1261–62 (after discussing both the specification and the claim language, the court stated that its holding that the asserted claims were patent-eligible was "particularly proper on a motion to dismiss under Rule 12(b)(6), where all factual inferences drawn from the specification must be weighed in favor . . . of the non-moving party"); *id.* at 1260 (noting that, as in other cases in which the Federal Circuit has rejected § 101 challenges, "the specification discusses the advantages offered by the technological improvement").

Defendant also maintains that the claims are not "necessarily rooted in computer technology" because the data storage and retrieval protocol disclosed in them could be utilized by a library card catalogue. (Def.'s Mem. in Supp. of Mot. to Dismiss [38] at 6.) For instance, Defendant rewrites Claim 1 of the '170 Patent as follows, with the rewritten parts underlined:

> 1.  A system for managing <u>books stored in multiple libraries</u>, the system comprising:
>> a <u>library</u> that stores <u>a book</u>, wherein an <u>author</u> identifies the <u>book</u>;
>> a <u>group of card catalogues</u> comprising a plurality of <u>card catalogues</u>;
>> wherein <u>book</u> location information for a plurality of <u>books</u> is stored in the <u>group of card catalogues</u>;
>> at least one of the plurality of <u>card catalogues</u> includes location information associated with the <u>author</u>;
>> each one of the plurality of <u>card catalogues</u> comprises a <u>chart</u> and a portion of the <u>book</u> location information;
>> the portion of the <u>book</u> location information included in a corresponding one of the <u>card catalogues</u> is based on a hash function used to organize the <u>book</u> location information across the plurality of <u>card catalogues</u>;

---

[4]     In both of its briefs, Defendant cites *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329 (Fed. Cir. 2017), to support the proposition that the court should review only the claim language and not the specification when considering whether the claimed invention improves on prior art. (Def.'s Mem. in Supp. of Mot. to Dismiss [38] at 15; Def.'s Reply Br. in Supp. of Mot. to Dismiss [45] at 4.) The portion of the *Two-Way* opinion that Defendant cites, however, concerns the court's analysis at *Alice* step two—not *Alice* step one, where the Federal Circuit has been clear that the specification should be considered. *See Enfish*, 822 F.3d at 1335 (emphasis added) (quoting *Internet Patents Corp. v. Active Network*, 790 F.3d 1343, 1346 (Fed. Cir. 2015)) ("[T]he 'directed to' inquiry applies a stage-one filter to claims, *considered in light of the specification*, based on 'whether their character as a whole is directed to excluded subject matter.'"); *see also, e.g., In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612–13 (Fed. Cir. 2016) (discussing the patent specification as part of its *Alice* step one analysis).

Appx15

> each one of the <u>card catalogues' charts allows someone to</u> determine the at least one of the plurality of <u>card catalogues</u> based on the hash function applied to the <u>author</u>.

(*Id.* at 9.) But there are several problems with this analogy, as Plaintiff rightly points out. Defendant's suggested rewrite ignores the patents' specifications, which make clear that the invention is aimed at improving computer network storage. As explained above, conventional storage systems used hierarchical indices that could limit growth and slow down searches. It is not clear that this is a problem encountered by libraries or that the distributed card catalogue system in Defendant's rewrite would provide any improvement for them. *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014) (affirming finding of validity for a "claimed solution [that] is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks"). Moreover, endorsing Defendant's analogy could risk invalidating any claim concerning data storage or network architecture. *See Alice*, 573 U.S. at 217 ("[W]e tread carefully in construing this exclusionary principle lest it swallow all of patent law."); *cf. Enfish*, 822 F.3d at 1339 ("To hold otherwise risks resurrecting a bright-line machine-or-transformation test, or creating a categorical ban on software patents.") (citation omitted).

Nor is the court persuaded that the asserted claims' language is "so result-focused, so functional, as to effectively cover any solution to an identified problem." *Electr. Power Grp, LLC v. Alstom S.A.*, 850 F.3d 1250, 1356 (Fed. Cir. 2016). The Federal Circuit in *Electric Power* expressly contrasted the claims at issue in that case with those in *Enfish*:

> In *Enfish*, we applied the distinction [between computer-functionality improvements and uses of existing computers as tools in aid of processes focused on "abstract ideas"] to reject the § 101 challenge at stage one because the claims at issue focused not on asserted advances in uses to which existing computer capabilities could be put, but on a specific improvement—a particular database technique—in how computers could carry out one of their basic functions of storage and retrieval of data. The present case is different: the focus of the claims is not such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools.

Appx16

*Id.* at 1354 (citations omitted). The Federal Circuit's analysis of *Enfish* in that passage applies to the claims asserted in this case as well. Because they are "focused . . . on a specific improvement," the asserted claims are not so broad as to preempt future innovations in network storage, unlike those in *Electric Power*, 850 F.3d at 1356.

Finally, Defendant compares the asserted claims to those that have been invalidated in other cases. Careful analysis of those precedents, however, satisfies the court that they are either distinguishable from the present case or supportive of the conclusion that the asserted claims in this case are not directed to an abstract idea. For instance, Defendant cites *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 609 (Fed. Cir. 2016), which concerned a patent that "relates generally to an apparatus for recording of a digital image, communicating the digital image from the recording device to a storage device, and to administering the digital image in the storage device." The representative claim was, as the court noted, "drawn to the concept of classifying an image and storing the image based on its classification." *Id.* at 611. This claim did require the use of "a telephone unit" and a "server," but "the specification makes clear that the recited physical components merely provide a generic environment." *Id.* In contrast, the specifications of the patents at issue here describe the different servers used in the network architecture as more than generic because they explain how those machines function in the network and how they will interact. While the *TLI* patent "fails to provide any technical details for the tangible components," *id.* at 612, Plaintiff's patents describe, for example, how the distributed hash tables and redirect message work as well as how this network architecture is different from the prior art. And whereas the claims asserted in *TLI* were "not directed to a specific improvement to computer functionality," *id.* at 612, Plaintiff's patents are expressly aimed at improving on conventional data storage networks.[5] Further distinguishing the current case from *TLI* is that the patents-in-suit *are* "directed to a solution to a 'technological problem.'" *Id.* at 613.

---

[5] This also distinguishes *Cloud Satchel, LLC v. Amazon.com, Inc.*, 76 F. Supp. 3d 553 (D. Del. 2014), *aff'd mem.*, 667 Fed. App'x 1010 (Fed. Cir. 2015). In that case, the district

Appx17

Another case Defendant relies on is *BSG Tech LLC v. BuySeasons, Inc.*, 899 F.3d 1281, 1285–86 (Fed. Cir. 2018).  In that case, the Federal Circuit invalidated three patents "directed to a 'self-evolving generic index' for organizing information stored in a database," which "organizes information about various items using classifications, parameters, and values."  *Id.* at 1283.  A representative claim "recite[d] a method of indexing wherein a user adds data to a database using 'a mechanism for posting the data as parametized items' after receiving 'summary comparison usage information' about parameters and values selected by users."  *Id.* at 1286.  Unlike in the case at bar, the *BSG Tech* patent specification made clear that such databases predate the patent.  *Id.*  "Rather, the claim's 'focus' is guiding database users by presenting summary comparison information before they input data.  It amounts to having users consider previous item descriptions before they describe items to achieve more consistent item descriptions.  Whether labeled as a fundamental, long-prevalent practice or a well-established method of organizing activity, this qualifies as an abstract idea."  *Id.* (citation omitted).  That is, in contrast to Plaintiff's patents, the claims asserted in *BSG Tech* were not "necessarily rooted in computer technology" because they were not aimed at "a problem specifically arising in the realm of computer networks." *Id.* at 1286 (quoting *DDR*, 773 F.3d at 1257).  Likewise, the *BSG* patent recited only "a database structure slightly more detailed than a generic database," *id.* at 1287, but Plaintiff's patents here disclose an entirely new network architecture and protocol.  Noting that "the focus of BSG Tech's claims is unrelated to how databases function," the *BSG Tech* court compared its case with *Enfish* and *Visual Memory*: "The claims do not recite any improvement to the way in which such databases store or organize information analogous to the self-referential table in *Enfish* or the

---

court in Delaware held that certain patents concerning the transmission and storage of documents were invalid, reasoning that the steps recited in a representative system claim involved nothing more than a generic computer without any special programming.  *Id.* at 564.  That is unlike the instant case, in which the patents disclose a network architecture that improves on conventional systems and utilizes servers specially programmed to operate within that network.  Although *Cloud Satchel*, 76 F. Supp. 3d at 563–64, considered this issue under *Alice* step two, the Federal Circuit has noted that "analysis of whether there are arguably concrete improvements in the recited computer technology" can take place at *Alice* step one.  *See Enfish*, 822 F.3d at 1339.

Appx18

adaptable memory caches in *Visual Memory*." *Id.* at 1288. As this court reads Plaintiff's asserted claims, those claims—like those in *Enfish* and *Visual Memory* but unlike those in *BSG Tech*—do "focus[ ] on improved ways in which systems store and access data." *Id.*

Finally, *Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329 (Fed. Cir. 2017), is distinguishable. At issue in that case were patents that "generally relate to a system for streaming audio/visual data over a communications system like the internet." *Id.* at 1333. For example, a representative claim recited:

> 1.      A method for transmitting message packets over a communications network comprising the steps of:
> converting a plurality of streams of audio and/or visual information into a plurality of streams of addressed digital packets complying with the specifications of a network communication protocol, for each stream, routing such stream to one or more users,
> controlling the routing of the stream of packets in response to selection signals received from the users, and
> monitoring the reception of packets by the users and accumulating records that indicate which streams of packets were received by which users, wherein at least one stream of packets comprises an audio and/or visual selection and the records that are accumulated indicate the time that a user starts receiving the audio and/or visual selection and the time that the user stops receiving the audio and/or visual selection.

*Id.* at 1334–35 (quoting U.S. Patent No. 5,778,187). The Federal Circuit noted that this claim "require[d] the functional results of 'converting,' routing,' 'controlling,' 'monitoring,' and 'accumulating records,' but does not sufficiently describe how to achieve these results in a non-abstract way." *Id.* at 1337. As this court reads Plaintiff's asserted claims, in contrast, those claims do describe the patented network architecture as well as components that enable the distributed network to function, such as the redirect message. Similarly, unlike in *Two-Way*, 874 F.3d at 1338, where the asserted claims were not "directed to a scalable network architecture that itself leads to an improvement in the functioning system," the claims asserted here are directed to a network architecture, and the patents' specifications explain how that architecture improves on prior systems.

19

Appx19

Because the court has found that the asserted claims are not directed to an abstract idea under *Alice* step one, the court need not proceed to the second step of the *Alice* analysis. *Enfish*, 822 F.3d at 1339.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss [36] is denied.

ENTER:

Date:   March 23, 2020

REBECCA R. PALLMEYER
United States District Judge

20

Appx20

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KOVE IO, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 18 C 8175** |
| | ) | |
| **AMAZON WEB SERVICES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM OPINION AND ORDER**

MATTHEW F. KENNELLY, District Judge:

Kove IO, Inc. (Kove) has sued Amazon Web Services, Inc. (AWS) for infringing three of Kove's patents. The case is before the Court on the parties' respective motions for summary judgment on certain claims, defenses, and counterclaims. For the reasons set forth below, the Court grants both motions in part and denies both in part.

**Background**

Kove is a Chicago-based company that specializes in computer storage and data management technologies. Kove owns three data storage patents that it alleges AWS has infringed: U.S. Patent No. 7,103,640 (the '640 Patent), entitled "Network Distributed Tracking Wire Transfer Protocol"; U.S. Patent No. 7,814,170 (the '170 Patent), entitled "Network Distributed Tracking Wire Transfer Protocol"; and U.S. Patent No. 7,233,978 (the '978 Patent), entitled "Method and Apparatus for Managing Location Information in a Network Separate From the Data to Which the Location Information Pertains."

Appx21

## A.      Kove patents

The three patents-in-suit generally relate to systems and methods for managing the storage, search and retrieval of information across a computer network.  Dr. Stephen Bailey and Dr. John Overton are the named inventors on all three patents.

The '170 patent is a continuation of the '640 patent.  The two patents share a common specification.  The shared specification discloses that, at the time of invention, conventional computer networks included multiple restrictions that limited the capacity of data retrieval systems.  For example, a distributed data collection system stores and retrieves data among multiple machines connected by a single network.  Distributed data systems were traditionally indexed in a hierarchical fashion, which included indices that required periodic updates.  As the network became larger and more complex, the ordinary hierarchical indices became increasingly inefficient.  Additionally, generally a single centralized server stored the location information of data files.  As distributed data collection systems grew to include more data files, storing the corresponding location information in one place became increasingly impractical.

The invention claimed in the '640 and '170 patents provides a method for overcoming these limitations.  The patents are directed to and claim a method of "enabl[ing] hyper-scalable cloud storage and improv[ing] upon the scalability limitations of conventional storage systems."  Compl. ¶ 18.  Specifically, the claimed inventions provide a process by which a client[1] can send a data request to a location server, and if

---

[1] The Court has construed the term "client" to mean "a network-attached component (which may be software or hardware) that initiates update or lookup of identifier/location mappings from a location server with location request messages."  *See Kove IO, Inc. v. Amazon Web Servs., Inc.*, No. 18 C 8175, 2021 WL 5988928, at *18 (N.D. Ill. Dec. 17, 2021).

that location server does not contain location information for the requested data, it responds with a redirect message that specifies which location server contains the relevant location information. In contrast to conventional storage systems, the claimed technology utilizes hash values to quickly identify which location server contained the location information of a particular file. This process reduces the processing time for retrieving data files and increases efficiency for location server identification.

The '978 patent is a continuation-in-part of the '640 patent. The '978 patent addresses the challenge of "scaling system capabilities in a manner sufficient to handle variable demand for resources" in a network. Compl., Ex. 5 at 2:12-13. The invention claimed in the '978 patent "provides a system and method for managing data, using a transfer protocol, in a network environment." *Id.* at 2:19-21.

## B. AWS technology

DynamoDB (DDB) became available to the public in 2012. It enables users to create database tables to organize, store and retrieve items. DDB tables are distributed across partitions, allocations of storage that are internal to DDB. For DDB the user defines a primary key that serves as a unique identifier for a single item in the DDB table. DDB provides for two different kinds of primary keys. A simple primary key consists of a single partition key; a composite primary key includes a primary key and a sort key. If a table has a simple primary key, a user can read an item from a table by specifying the item's partition key value. If a table has a composite primary key, the user must specify both the partition key and sort key values. DDB "uses the partition key value as input to an internal hash function," and the output from this hash function yields the partition storing the data. Compl., Ex. 11 at 5. Data plane operations allow a

3

Appx23

user to perform various actions on data in a table. "GetItem" retrieves an individual item from a table, and "Query" retrieves all items with a specific partition key. *Id.* at 9.

In 2017, Kove and Amazon discussed a potential sale of XFM, a Kove product unrelated to the asserted patents. Overton attended at least three meetings with Amazon personnel during this time and did not discuss potential infringement of the patents-in-suit during these meetings.

## C.     Present lawsuit

On December 12, 2018, Kove brought suit against AWS for infringement. Specifically, Kove alleged that AWS had infringed claim 1 of the '170 patent, claim 18 of the '640 patent and claim 17 of the '978 patent. In response, AWS asserted counterclaims alleging non-infringement, unpatentability, unenforceability and invalidity.

On April 5, 2019, AWS filed a motion to dismiss, arguing that all three patents were directed to the abstract idea of data storage and were therefore invalid under 35 U.S.C. § 101. The Court (by Judge Pallmeyer) denied the motion, holding that based on the complaint's allegations, the claims of the patents were directed toward patent-eligible subject matter. *See Kove IO, Inc. v. Amazon Web Servs., Inc.*, 448 F. Supp. 3d 849, 858-59 (N.D. Ill. 2020).

On November 19, 2021, Amazon filed requests for *ex parte* reexamination of claims 1, 2, 6, 8, 9, 12 and 15 of the '170 patent ('035 reexamination), claims 17, 18 and 24 of the '640 patent ('036 reexamination) and claims 1, 3, 6, 10, 14, 17, 23, 24, 30 and 31 of the '978 patent ('034 reexamination). The United States Patent and Trademark Office (USPTO) granted all three requests. It subsequently upheld the patentability of the '640 and '170 patents. In the '034 reexamination, the USPTO initially issued an

4

Appx24

Office Action rejecting claims 1, 3, 6, 10, 14, and 31 of the '978 patent as unpatentable over prior art.  Kove responded to USPTO's Office Action, and USPTO subsequently upheld the patentability of claims 3, 6, 10, and 14 and issued a final rejection for claims 1 and 31. Amazon's additional reexamination requests for the '640 patent, the '170 patent, claims 3, 6, 10 and 14 of the '978 patent ('162 reexamination) and claims 17, 23, 24 and 30 of the '978 patent ('109 reexamination) are pending.  Amazon has also filed a petition with the Director of the USPTO to overturn the examiner's decision on claims 3, 10, and 14 of the '978 patent.

On December 17, 2021, the Court (again, by Judge Pallmeyer, to whom the case was then assigned) construed various disputed terms of the Kove patents.  *See Kove IO, Inc. v. Amazon Web Servs., Inc.*, No. 18 C 8175, 2021 WL 5988928, at *18 (N.D. Ill. Dec. 17, 2021).  Prior to the claim construction hearing, the parties agreed upon the proper construction of the term "location": "an encoding that is a member of a set of associations with an identifier in a location server, and that specifies where data pertaining to the entity identified by the identifier is stored."  *Id.* at *7.  In its ruling, the Court construed two terms that are particularly relevant to the present motions.  First, it held that the claim term "location server" requires "a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients."  *Id.* at *18.  Second, it held that the claim term "location information" should be construed differently across the three patents.  For the '640 and '170 patents, the term "location information" means "information pertaining to one or more locations of data and/or the identities of one or more location servers."  *Id.*  In contrast, for the '978 patent "location information" is defined as "one or more

5

Appx25

identifiers and their associated locations." *Id.*

Following the claim construction hearing, Kove added additional claims that it alleges AWS has infringed and continues to infringe upon. Kove now asserts claims 17, 18, and 24 of the '640 patent, claims 1, 2, 6, 8, 12 and 15 and the '170 patent, and claims 3, 6, 10, 14, 17, 23, 24 and 30 of the '978 patent. Def.'s Stmt. of Mat. Facts, Ex. 4 at 2.

Kove and AWS have both moved for summary judgment. AWS contends that further claim construction is required due to statements Kove made about the patents during the reexamination process. AWS also argues that it is entitled to summary judgment because the patents are invalid under section 101, or in the alternative because no reasonable jury could find that its products infringed Kove's patents or that Kove is entitled to enhanced damages. Kove has filed a cross-motion for summary judgment arguing that it is entitled to summary judgment on various invalidity defenses and that AWS cannot establish its equitable estoppel, waiver or inequitable conduct defenses.

### Discussion

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56). The moving party may accomplish this by showing that the nonmoving party will be unable to "establish the existence of an element essential to [the nonmoving] party's case, and on which [the nonmoving] party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322. Once the moving party has met its burden, "summary judgment

6

requires a non-moving party to respond to the moving party's properly supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of material fact for trial." *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) (citation omitted).

In analyzing cross-motions for summary judgment, the Court "view[s] all facts and inferences in the light most favorable to the nonmoving party on each motion." *Lalowski v. City of Des Plaines*, 789 F.3d 784, 787 (7th Cir. 2015) (citation omitted). The non-moving party is "only entitled to the benefit of inferences supported by admissible evidence, not those 'supported by only speculation or conjecture.'" *Grant*, 870 F.3d at 568 (quoting *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 599 (7th Cir. 2014)). A court's task is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999) (citation omitted).

## A.     Claim construction

AWS argues that additional claim construction is necessary to resolve a dispute between the parties regarding claim scope and ensure that both parties apply consistent understandings of the claim language. "When the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008). "[A] district court may (and sometimes must) revisit, alter, or supplement its claim constructions . . . to the extent necessary to ensure that final constructions serve their

purpose of genuinely clarifying the scope of claims for the finder of fact." *In re Papst Licensing Digital Camera Pat. Litig.*, 778 F.3d 1255, 1261 (Fed. Cir. 2015). The Court agrees that the parties dispute the scope of material claim terms and that further construction would clarify claim scope for the jury, so it grants AWS's request for further claim construction.

### 1.    Prosecution disclaimer/disavowal

Generally, claim terms are given their "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). The Federal Court has ruled that courts should depart from this general rule when 1) "a patentee sets out a definition and acts as his own lexicographer" or 2) "the patentee disavows the full scope of a claim term either in the specification or during prosecution" through a prosecution disclaimer. *Thorner v. Sony Comput. Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). The prosecution disclaimer doctrine applies to patent reexamination proceedings. *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017); *see C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 869 (Fed. Cir. 2004) (ruling patentee's statement during reexamination constituted clear disclaimer).

"[T]he doctrine of prosecution disclaimer ensures that claims are not construed one way in order to obtain their allowance and in a different way against accused infringers." *Aylus Networks*, 856 F.3d at 1360 (citation omitted). A disclaimer can arise through an argument made to induce the granting of a patent. *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

8

Appx28

AWS filed reexamination petitions regarding each of the Kove patents in suit. During the prosecution of the '640 patent, the examiner rejected claims 17, 18 and 24 as unpatentable in a Non-Final Office Action (NFOA). In its response to the NFOA, Kove distinguished the invention claimed in the '640 patent from prior art that the examiner had found rendered the asserted claims obvious. Kove argues that its statements distinguishing its invention from prior art do not qualify as a disclaimer because it was clarifying the existing scope of the claims rather than "narrowing the claims to less than what they otherwise would have been." Pl.'s Resp. Def.'s Mot. for Summ. J. at 33. This argument is unpersuasive.

The Federal Circuit has repeatedly affirmed that statements made by a patent holder in an attempt to distinguish an invention from prior art qualify as a disavowal. *See, e.g.*, *Regents of Univ. of Minn. v. AGA Med. Corp.*, 717 F.3d 929, 942 (Fed. Cir. 2013) ("When an applicant tells the PTO that a prior art reference lies outside the scope of his claim, he is bound by that argument.") (citing *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995)); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1273-75 (Fed. Cir. 2001) (affirming district court's reliance on statements distinguishing invention from prior art during prosecution for claim construction). Such statements may be considered a disavowal even if the patent holder did not expressly convey an intention to redefine or disavow a claim term. *Bell Atl. Network Servs.*, 262 F.3d at 1268.

According to Kove, "the claim language must claim something within its scope before it can be disclaimed." Pl.'s Resp. Def.'s Mot. for Summ. J. at 32. But prosecution disclaimer may be found where "the patentee has unequivocally disavowed

9

Appx29

a certain *meaning* to obtain his patent." *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) (emphasis added). And Federal Circuit precedent establishes that a patent holder can disavow an interpretation of a claim through "express representations" regarding the claim scope and meaning, even if the patentee's representations affirm the claim's original interpretation. *Bell Atl. Network Servs.*, 262 F.3d at 1268; *Genuine Enabling Tech. LLC v. Nintendo Co.*, 29 F.4th 1365, 1374-75 (Fed. Cir. 2022) (concluding that patent holder's clarification of scope of his invention to examiner constituted disavowal of claim scope); *Uship Intell. Props., LLC v. United States*, 714 F.3d 1311, 1314 (Fed. Cir. 2013) (holding that patentee's response to examiner clarifying that claims were directed to single invention demonstrated prosecution disclaimer).

Kove contends that even if the Court finds that a prosecution disclaimer applies, it may be applied only to the specific claims that the examiner considered during the reexamination process. Specifically, Kove argues that any alleged prosecution disclaimers would not apply to claims 6, 17, 23, 24 or 30 of the '978 patent because Kove did not make statements regarding those claims in the reexamination for the '034, '035, and '036 patents. Federal Circuit precedent squarely forecloses this argument, as "the prosecution history of a parent application may limit the scope of a later application using the same claim term." *Augustine Med., Inc. v. Gaymar Indus., Inc.*, 181 F.3d 1291, 1300 (Fed. Cir. 1999); *see also Omega Eng'g*, 334 F.3d at 1333 ("An interpretation asserted in the prosecution of a parent application can also affect . . . continuation-in-part applications.") (citing *Wang Labs., Inc. v. Am. Online Inc.*, 197 F.3d 1377, 1384, 1161, 1165 (Fed. Cir. 1999)). The '978 patent is a continuation-in-part of

10

Appx30

the '640 patent, and any disclaimers made during the prosecution of the '640 patent claims may therefore be applied to the claim terms of the '978 patent. *See Omega Eng'g*, 334 F.3d at 1333-34 (holding that disclaimer from prosecution of parent patent attaches to the construction of continuation-in-part patent). Thus all seventeen asserted claims are subject to further claim construction based on the prosecution history.

Furthermore, although Kove did not submit a response regarding claims 17, 23, 24 or 30 of the '978 patent during the '034 reexamination, it admits that the examiner issued a NFOA rejecting those same claims in the '109 reexamination. Def.'s Stmt. Mat. Facts ¶¶ 8-9. Kove later filed a response to the USPTO attempting to distinguish those claims from prior art. Those statements are now part of the prosecution history and can be used to evaluate whether Kove's statements constitute a prosecution disclaimer.

### 2. AWS's proposed claim construction

AWS asks the Court to further construe the asserted claims to require: "(1) location servers in non-hierarchical, cluster structures, where each location server (2) contains the relevant location information, or information to locate the relevant location information, and (3) can resolve the request in two or fewer steps." Def.'s Mot. for Summ. J. at 11.

### a. Non-hierarchical structures

The parties agree that during the '034, '035 and '036 reexaminations, Kove stated that at least twelve of the asserted claims require a "non-hierarchical" server

11

Appx31

configuration.[2]   Pl.'s Stmt. of Mat. Facts ¶ 5.  Kove contends, however, that these statements do not constitute a disclaimer because the scope of the patent never included hierarchical structures, and Kove was therefore affirming the claim scope rather than disavowing it.

The parties dispute whether the asserted claims originally covered hierarchical embodiments, but this dispute is immaterial.  A patent holder can disavow a claim meaning even if that meaning was not originally disclosed by the claim.  For example, in *In re Katz Interactive Call Processing Patent Litigation*, 639 F.3d 1303, 1324 (Fed. Cir. 2011), the Federal Circuit affirmed the district court's use of the patentee's statements addressing the meaning of a claim term during reexamination to support its claim construction.  In that case, a prior art reference used a password as a form of "personal identification data," and the examiner rejected the patent as obvious in view of this prior art.  *In re Katz*, 639 F.3d at 1324.  The patent holder responded to the examiner by explaining that the prior art reference used the term "personal identification data" in a manner different from the patent claim and asserted that a password could not qualify as "personal identification data" as defined by the patent.  *Id.*  In other words, the patent holder clarified the original meaning of the claim term "personal identification data" to distinguish the patent from prior art, and the Federal Circuit held that this clarification constituted a disavowal of the use of a password as personal identification data.  *See Id.*

Similarly, here, the examiner issued NFOAs rejecting certain claims of the

---

[2] Kove does not dispute that this statement applies to claims 17, 18 and 24 of the '640 patent, claims 1, 2, 6, 8 and 12 of the '640 patent, and claims 3, 6, 10 and 14 of the '978 patent.

patents-at-issue as obvious over prior art references.  Kove submitted responses

explaining that the patents claimed a location server configuration that was incompatible

with the prior art references' server structure.  Specifically, Kove stated that a "non-

hierarchical cluster configuration" is expressly or implicitly required by the initially

rejected claims of all three patents-at-issue.  *See* Pl.'s Stmt. of Add'l Mat. Facts ¶¶ 5, 8,

11.  None of the asserted claims that Kove identified as requiring a "non-hierarchical"

cluster configuration use that terminology to describe the location server structure.

Claim 17 of the '640 patent, for example, provides:

> 17. A system for retrieving data location information for data stored in a distributed network, the system comprising:
>
> a plurality of data repositories configured to store data, wherein the data is associated with a respective identifier string in each data repository;
> a data location server network having a plurality of data location servers, each of the plurality of data location servers containing location string associated with respective identifier strings and each of the plurality of data location servers having computer executable code configured to execute the following steps:
> in response to receiving a data location request from a client to retrieve a location string associated with an identification string provided in the data location request, transmitting a redirect message to the client if the identification string is not associated with a location string at the data location server, wherein the redirect message contains information for use by the client to calculate a location of a different data location server in the plurality of data location servers, wherein the different data location server contains the location string.

Def.'s Stmt. Mat. Facts, Ex. 38 at 2.

Despite the lack of express language regarding the hierarchical structure of the

data location server network, Kove's expert, Dr. Michael Goodrich, submitted a

declaration to the examiner opining that a person of ordinary skill in that art (POSITA)

would have understood claim 17's limitations to "require a nonhierarchical cluster

configuration as taught by the '640 patent."  Pl.'s Stmt. of Mat. Facts ¶ 6.  This non-

hierarchical configuration requirement, Kove contended, distinguished its claimed invention from prior art that "depends on a *hierarchical* structure where a client can only query to the node immediately 'above' or 'below' it in the 'tree.'"  Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, Ex. K134 at 23.  Kove made similar statements regarding the asserted claims of the '170 and '978 patents.  *See* Pl.'s Stmt. of Add'l Mat. Facts ¶¶ 4, 8, 11.

During the reexamination proceedings, Kove expressly described the location server structures required by at least twelve of the asserted patent claims as "non-hierarchical," and it used the "hierarchical" server structure of the prior art reference as a basis to differentiate it from the invention claimed in its patents.  Therefore, the prosecution disclaimer doctrine may be applied to Kove's statements, regardless of whether the claims originally included "hierarchical" server structures.

To constitute a disavowal, the disclaiming statements must be both "clear" and "unambiguous."  *Omega*, 334 F.3d at 1335.  "[W]ords or expressions of manifest exclusion or restriction" can demonstrate a clear disavowal of claim scope.  *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1326 (Fed. Cir. 2002).

Kove's statements to the USPTO during the reexamination proceedings clearly and unambiguously disavowed hierarchical location server structures.  During the '034, '035, '036 and '109 reexaminations, Kove stated that the invention claimed in the patents-at-issue allow for data access "through a non-hierarchical, limitlessly scalable, server structure."  Def.'s Stmt. of Mat. Facts ¶ 32; Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, Ex. 140 at 9.  In its responses to the USPTO's NFOA's, Kove repeatedly stated that the claims-at-issue for all three patents required a "non-hierarchical cluster

14

configuration."  *See* Def.'s Stmt. of Mat. Facts, Ex. 37 at 23; *Id.*, Ex. 35 at 25; *Id.*, Ex. 32 at 35.  Furthermore, Kove identified multiple features of the claims-at-issue that it argued expressly or impliedly require a non-hierarchical server structure, such as a "hash function" and "location servers that enable each server in the server network to know which location server contains the location(s) of the desired data."  Pl.'s Stmt. of Add'l Mat. Facts ¶ 8; Def.'s Stmt. of Mat. Facts ¶ 33.  Kove also asserted that the limitations in the claims-at-issue cannot be met by location servers that utilize hierarchical configurations.  *See, e.g.*, Pl.'s Stmt. of Add'l Mat. Facts, Ex. K127 at 37 ("A hierarchical configuration does not enable nodes to have such knowledge.").  In sum, Kove's reexamination statements clearly and unambiguously disavowed hierarchical location server configurations.  AWS's proposed construction, providing that location servers must be arranged in "non-hierarchical structures,"[3] is therefore appropriate.

Kove argues that claims 17, 23, 24, and 30 of the '978 patent should not be construed to require non-hierarchical configurations because Kove did not address these claims in its responses to the NFOAs issued in the '034, '035, and '036 reexaminations.  But the USPTO considered claims 17, 23, 24 and 30 of the '978 patent in the '109 reexamination.  And after the USPTO issued a nonfinal rejection of those

---

[3] AWS asks the Court to also find that location servers must be arranged in a "cluster" configuration.  But the definition of "cluster" as Kove used it in the reexamination proceedings is unclear.  One of Kove's statements to the examiner suggests that it considers the terms "hierarchical" and "cluster" synonymous.  *See* Mot. for Add'l Claim Construction, dkt. no. 539-4 at 35 ("[I]ndependent claims 10 and 14 and dependent claim 3 of the '978 patent require networks with *non-hierarchical* (or 'cluster') configurations.").  But Kove's expert also used the "cluster" terminology to describe what he describes as a "flat" topology.  Pl.'s Stmt. Add'l Mat. Facts, Ex. K53 ¶ 121.  Given the lack of clarify regarding the definition of "cluster," the Court will adopt only the "non-hierarchical" language included in AWS's proposed claim construction.

15

Appx35

patent claims, Kove filed a response stating that the invention, "as embodied in the claims of the '978 patent," allows client data access through a "non-hierarchical" server structure.  Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, Ex. K140 at 9.  Given that Kove used the same "non-hierarchical" language to describe the invention embodied by these four patent claims as it did for the claims in the related patents, its argument that a disclaimer should not apply because it was "silent as to these claims" lacks merit.  *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. at 35.  And because the '978 patent is a continuation-in-part of the '640 patent, Kove's disavowal of hierarchical server structures during the prosecution of the '640 patent is appropriately applied to the '978 patent. *See Omega Eng'g*, 334 F.3d at 1334 (concluding that disavowal made during prosecution of parent patent application applies to continuation-in-part patent).

Furthermore, claim terms are presumed to carry the same meaning throughout a patent.  *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001) ("[A] claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent.").  Kove's statements regarding claims 3, 10 and 14 of the '978 patent during the '034 reexamination can therefore be used to inform the construction of claims 6, 17, 23, 24, and 30 of the same patent.  This Court will "presume, unless otherwise compelled, that the same claim term in the same patent . . . carries the same construed meaning."  *Omega Eng'g*, 334 F.3d at 1334.

Kove has presented no evidence that leads to the conclusion that the location servers recited by claims 17, 23, 24, and 30 of the '978 patent should be construed differently from those in claims 3, 10 and 14 of that patent.  Notably, Kove does not argue that the "non-hierarchical" limitation does not apply to these claims.  Instead it

contends that it cannot have disavowed any claim scope for claims that were not included in its response to the USPTO's NFOA in the '034 reexamination. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. at 35. Only for claim 6 of the '978 patent does Kove argue that the "non-hierarchical" configuration requirement is not recited by the claim. But rather than relying on the claim language for this proposition, Kove simply asserts that it has "never made (and AWS does not cite) any statements about 'non-hierarchical' in relation to claim 6." *Id.* at 36.

AWS notes that in its response to the NFOA, Kove asserted that "[c]laim 6 depends from claim 1, and therefore is patentable over [prior art] for at least the same reasons discussed with respect to claim 1." Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, Ex. K127 at 69. But the portion of Kove's NFOA response that AWS cites does not include a clear and unambiguous disavowal of hierarchical structures regarding claim 1, and in fact, the term "non-hierarchical" does not appear at all on the cited page. *See* Def.'s Reply at 12 (citing Def.'s Stmt. of Mat. Facts, Ex. 32 at 15).

There is, however, other evidence in the record that supports construing claim 6 to also require a non-hierarchical server configuration. In the '034 reexamination, the examiner concluded that the prior art reference must not include the limitation required by claim 6, because if it did, "there would be no need to pass requests up and down a hierarchy of Names Servers; it could determine on its own the Names Server having the desired information and send the request directly to that Names Server." Def.'s Stmt. of Mat. Facts ¶ 41. An examiner's statements alone cannot be used as the basis for a disavowal. *Salazar v. Procter & Gamble Co.*, 414 F.3d 1342, 1345 (Fed. Cir. 2005). But "[s]tatements about a claim term made by an examiner during prosecution of an

application may be evidence of how one of skill in the art understood the term at the time the application was filed." *Id.* at 1347.  Here, the examiner's statements suggest that a POSITA would have understood claim 6 of the '978 patent to require a non-hierarchical location server configuration.  Furthermore, the construction of claim 6 of the '978 patent cannot be "divorced from the context" of the prosecution history of the related patents.  *Nystrom v. TREX Co.*, 424 F.3d 1136, 1144–45 (Fed. Cir. 2005).

In view of Kove's statements during the '109 reexamination, Kove's disavowal of the same claim term for other claims in the '978 patent, and the prosecution history of the '640 patent, this Court finds that the "non-hierarchical configuration" disclaimer applies to claims 6, 17, 23, 24, and 30 of the '978 patent.

Kove argues that the parties disagree on the meaning of the word "hierarchical." Pl.'s Resp. to Def.'s Stmt. of Mat Facts ¶ 56.  "Ultimately, the only meaning that matters in claim construction is the meaning in the context of the patent."  *Poly-Am., L.P. v. API Indus., Inc.*, 839 F.3d 1131, 1137 (Fed. Cir. 2016).  And a court will construe terms "only to the extent necessary to resolve the controversy."  *Jackson v. Casio PhoneMate, Inc.*, 166 F. Supp. 2d 1237, 1246 (N.D. Ill. 2001).

The Kove patents do not include a definition of "non-hierarchal."  But during the reexamination process, Kove repeatedly described what "non-hierarchical" meant in the context of the patent.  *See, e.g.*, Def.'s Stmt. of Mat. Facts, Ex. 32 at 40 ("[A]ny given server is able to return either the requested information or information useable by the client to locate the server with the requested information.").  Kove also provided multiple descriptions of servers in hierarchical configurations.  *See, e.g.*, Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, Ex. K131 at 25 ("Servers in hierarchically structured networks do

18

Appx38

not 'know' what's contained in other servers throughout the network."); Def.'s Stmt. of Mat. Facts, Ex. 32 at 36 ("[t]hese limitations cannot be met in hierarchical configurations . . . because location servers in tree-structures *do not necessarily store* information for finding the location server having the desired location information.").  Here, Kove "acted as [its] own lexicographer" in defining this claim term, and the Court therefore adopts Kove's definition.  *Thorner*, 669 F.3d at 1365.  AWS does not dispute Kove's definition of "non-hierarchical" and instead argues that the allegedly infringing products do not utilize the required non-hierarchical configuration.  *See* Def.'s Mot. for Summ. J. at 17-22.  The Court finds that no further construction of the term "non-hierarchical" is necessary.

During the reexamination proceedings, Kove clearly and unambiguously limited the asserted claims to location server structures that have a "non-hierarchical" configuration.  And Kove further argued that certain features of the claim limitations, such as a "redirect message," necessarily required these non-hierarchical configurations.  A construction allowing location server structures that include those with hierarchal configurations would inappropriately permit Kove to recapture claim scope that it disclaimed during examination.  The Court's previous construction of "location server" does not expressly reflect Kove's non-hierarchical topology limitation.  This Court therefore construes the claim term "plurality of location servers" to require "location servers in non-hierarchical structures."

### b.     Relevant location information

During the reexamination process, Kove asserted that claim 1 of the '170 patent includes a limitation that "requires **_each_** data location server in a data location network"

19

to be "configured to determine the data location server that contains the location information." Def.'s Stmt. of Mat. Facts, Ex. 35 at 33. Similarly, Kove stated during the '035 reexamination that claims 17 and 18 of the '640 patent "require every server in the network be able to return information for calculating the location of the server that contains the requested information." *Id.*, Ex. 37 at 10. And Kove also contended that the '978 claims require that "any given server is able to return either the requested information or information useable by the client to locate the server with the requested information." *Id.*, Ex. 32 at 40.

Judge Pallmeyer construed the term "location server" to mean, in relevant part, a "network-attached component that maintains a set of identifier/location mappings." *Kove*, 2021 WL 5988928, at *18. AWS asks this Court to further construe a non-hierarchical location server structure to require that "each location server contains the relevant location information, or information to locate the relevant location information." Def.'s Mot. for Summ. J. at 11.

Kove's description during the reexamination process of each location server's ability to determine the location of a data entity does not clearly and unambiguously mandate that each location server "contain" that information. Kove did describe the claimed invention of the patents-at-issue as one where "any first queried server will either have the requested information or will provide the client with the information to find the requested information in the client's next query." Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, K134 at 10. But Kove's description of its own invention as one where a server "has" this information does not disclaim any invention where a server, for example, does not "contain" the information but is able to produce it upon request.

20

Appx40

In addition, in its explanation of the claim limitations, Kove repeatedly states that the non-hierarchical server configuration "enables" or "allows for" a location server to either resolve a data location request or determine the location of the requested data, without conveying that the location server itself must store that information. *See* Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, K134 at 15. Kove consistently asserts that the servers must "be capable of" or "configured to" resolve these data location requests without any accompanying language indicating the servers must "contain" that information. *Id.* at 10; Def.'s Stmt. of Mat. Facts, Ex. 35 at 32. There is no reason to believe that a location server must "contain" the relevant location information in order to be enabled or configured to provide it. Kove's language is "amenable to multiple reasonable interpretations," and a finding of disclaimer is therefore not appropriate. *Mass. Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2016) (citation omitted). The Court therefore overrules AWS's argument that Kove disavowed location servers that do not "contain" the relevant location information or information to locate the relevant location information.

Even if AWS were correct that these statements represent a clear and unmistakable disavowal of claim scope, inclusion of AWS's requested language would be redundant. Kove has conceded that the mandate that "each server in the server network" must be enabled to "return the requested information" or "know which location server contains the location(s) of the desired data" is disclosed by the "non-hierarchical configuration" that the claims require. Def.'s Stmt. of Mat. Facts ¶ 33; *see also Id.* ¶ 34 ("These limitations cannot be met in hierarchical configurations . . . because each location server in tree-structures do not necessarily store information for finding the

21

Appx41

location server having the desired location information.").  Construing the term further in the manner AWS suggests would be unnecessary.  *See U.S. Surgical Corp.*, 103 F.3d at 1568 ("Claim construction . . .  is not an obligatory exercise in redundancy.").  The Court therefore declines to construe location servers in a non-hierarchical configuration as requiring each location server to contain location information in the manner AWS suggests.

### c.  Two or fewer steps

AWS asks the Court to construe a non-hierarchal configuration of location servers to mean that all location severs are capable of providing the requested location information "in no more than two steps."  Def.'s Reply at 14-15.  AWS supports its argument by pointing to two statements that Kove made during the reexamination proceedings.  First, in the '034, '035 and '036 reexaminations, Kove stated that for all three patents-at-issue, "[t]he structured relationships of the invention allow clients to access data in distributed environments through a non-hierarchical, limitlessly scalable, server structure that enables retrieval of requested information in not more than two iterations."  Def.'s Stmt. of Mat Facts ¶ 32.  Second, Kove stated in the '109 reexamination that "the location servers in the network do not have to execute any extraneous steps for determining or identifying a given entity when re-solving a location query."  *Id.* ¶ 9.

These statements are not sufficient to constitute a clear and unmistakable disavowal of any location information retrieval process that does not take place in two or fewer steps.  Kove's statement that "the location servers in the network do not have to execute any extraneous steps" is referring to the steps taken for identifying a unique

22

Appx42

entity, not the steps for finding the relevant location information.  Def.'s Stmt. of Mat Facts., Ex. 10 at 11.  Additionally, Kove's assertion that its claimed invention "enables" or "allows" a particular process does not mandate a finding that the claims of that invention *require* that process to occur.  To hold Kove to this one-sentence general description of its invention, with no limiting language, would be importing a limitation into the claim that it does not include.  *See Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011) ("It is well settled that the role of a district court in construing claims is not to redefine claim recitations or to read limitations into the claims.").

In conclusion, AWS's claim construction proposal is granted to the extent that "plurality of location servers" will be construed to include only those arranged in "non-hierarchical configurations."

**B.     AWS's motion for summary judgment**

AWS moves for summary judgment of noninfringement on all seventeen asserted claims.  AWS also seeks summary judgment on Kove's willful infringement and enhanced damages claims.

**1.     Noninfringement**

"To support a summary judgment of noninfringement it must be shown that, on the correct claim construction, no reasonable jury could have found infringement on the undisputed facts or when all reasonable factual inferences are drawn in favor of the patentee."  *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1371 (Fed. Cir. 2002). The infringement analysis includes two steps.  "The first step is determining the meaning and scope of the patent claims asserted to be infringed.  The second step is

23

Appx43

comparing the properly construed claims to the device accused of infringing." *Duncan Parking Techs., Inc. v. IPS Group, Inc.*, 914 F.3d 1347, 1360 (Fed. Cir. 2019). "[I]nfringement must be shown literally or equivalently for each limitation; general assertions of facts, general denials, and conclusory statements are insufficient to shoulder the non-movant's burden." *TechSearch*, 286 F.3d at 1372.

AWS provides non-infringement arguments under both Judge Pallmeyer's original claim construction and AWS's own new proposed construction. AWS contends that it is entitled to summary judgment under the original claim construction order because its accused products do not have "location servers" as required by the asserted claims. *See* Def.'s Mot. for Summ. J. at 22-29. Because the Court partially adopted AWS's claim construction proposal, for the infringement analysis, it will assume that the products do have location servers and only address AWS's argument regarding whether these alleged location servers employ a "non-hierarchical" configuration.

AWS argues that it does not infringe any of the asserted claims because none of the accused products include non-hierarchical topologies. Kove argues that both S3 and DDB include non-hierarchical configurations of components that they allege qualify as location servers. Both parties rely heavily on the testimony of expert witnesses to support their infringement positions. The Court finds that there are genuine factual disputes material to whether the accused products meet the "non-hierarchical" configuration limitation of the asserted claims and that AWS is therefore not entitled to summary judgment of no infringement.

Kove identifies S3's Keymap Function Coordinators (KFCs) and DDB's Metadata

24

Appx44

Nodes (MNs)[4] as the alleged location servers within the accused products. Kove contends that the KFCs and MNs are arranged in a non-hierarchical configuration. According to Goodrich, KFCs and MNs are non-hierarchical because "requests from clients . . . are sent directly to the correct [KFC or MN]," they "are not structured in layers with respect to each other," and "requests to a [KFC or MN] are not passed through other [KFCs or MNs] on different hierarchical levels (as there is no such thing)." Pl.'s Stmt. of Mat. Facts ¶¶ 122-23.

AWS disputes Kove's characterization of its products. AWS contends that both S3 and DDB are arranged into seventeen "hierarchical regions" and that within those regions there is an additional layer of hierarchy called "availability zones." Def.'s Mot. for Summ. J. at 17. AWS also contends that the S3 and DDB components are organized into hierarchies, as S3's iNodes and DDB's partitions are arranged in a hierarchical "tree structure." *Id.* at 20-21. Kove responds that its claim of infringement is solely focused on S3 and DDB's availability zones and/or regions, and therefore any evidence related to hierarchies that exist outside of these zones/regions or among the products' components is irrelevant. Pl.'s Resp. to Def.'s Mot. for Summ. J. at 43-44.

The Court agrees that much of the evidence AWS presents in support of its non-infringement argument is immaterial. For example, AWS argues that S3 and DDB contain "many different components that are themselves organized into additional logical hierarchies." Def.'s Reply at 18. Kove stated during the '036 reexamination that

---

[4] Kove also identified Brick Managers (BMs) within DDB as an alleged location server for claims 17, 23, 24 and 30 of the '978 patent. But Kove admits that BMs do not employ a "non-hierarchical" configuration. Because the Court has construed all seventeen asserted claims to require local servers in a non-hierarchical configuration, it only addresses Kove's arguments regarding KFCs and MNs as alleged location servers.

25

Appx45

the limitations of the asserted claims of the '640 patent allow "[a] client [to] send a query to any server in the network" through a process by which the *server* "is configured to return a message to the client . . . ."  Pl.'s Stmt. of Add'l Mat. Facts, K134 at 23. Similarly, in the '035 reexamination, Kove explained that the asserted claims of the '170 patent require that "location servers" are capable of returning "redirect messages," and that these redirect message limitations demonstrate that the claims recite a non-hierarchical configuration.  Pl.'s Stmt. of Add'l Mat. Facts, K131 at 26.   It is clear that the non-hierarchical configuration recited in the claims is directed to the configuration of the location servers, and the hierarchical structure of components other than the alleged location servers is therefore immaterial.

Similarly, AWS contends that "S3 and DDB both divide their data storage systems into geographical hierarchies, including at least one layer of 17 regions, plus another layer dividing those regions into availability zones."  Def.'s Reply at 18.  But Kove's infringement contentions are not about the "data storage systems."  According to Kove, its infringement argument hinges on whether the alleged location servers within the S3 and DDB availability zones are arranged in a non-hierarchical topology, and it contends that a genuine factual dispute exists regarding whether KFCs and Metadata Nodes are arranged hierarchically.  Pl.'s Resp. Def.'s Mot. for Summ. J. at 43-44.  The pertinent question is whether S3 or DDB contain location server structures or configurations where the servers are arranged in a non-hierarchical topology.

Kove's expert Goodrich opined that both S3 and DDB have multiple location servers that are arranged in a non-hierarchical topology within an availability zone. AWS asks the Court to disregard Goodrich's testimony, contending that Kove's focus

26

Appx46

only on the topology within the availability zones is "clearly at odds with the claim construction mandated by the claims themselves, the written description, and the prosecution history."  Def.'s Mot. for Summ. J. at 18-19 (citing *Phillips*, 415 F.3d at 1318).  But Goodrich's infringement analysis is consistent with the prosecution history and the Court's previous claim construction.

During the reexamination proceedings, Kove distinguished the prior art by asserting that the asserted claims required "a non-hierarchical cluster configuration of locations servers in a network."  *See, e.g.*, Def.'s Stmt. of Mat. Facts., Ex. 32 at 35. Kove stated that this configuration "enable[s] each server in the server network to know which location server contains the location(s) of the desired data."  Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, K131 at 25.  But Kove did not argue that this non-hierarchical configuration was necessary for *every* location server network, or that the non-hierarchical configuration must apply to location servers outside the network.  And AWS has not adduced evidence establishing that the existence of hierarchical structures in other aspects of S3 or DDB negate the "non-hierarchical" claim limitation in a manner that renders the products noninfringing.  *See Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695 F.3d 1285, 1305 (Fed. Cir. 2012) (affirming summary judgment of noninfringement because additional element materially changed allegedly infringing object).  Kove's infringement theory may, as AWS contends, rely on what AWS refers to as a single layer of S3 and DDB's hierarchy.  See Def.'s Mot. for Summ. J. at 18.  But the existence of hierarchical configurations outside that one layer does not defeat Kove's infringement claim.  *SunTiger, Inc. v. Sci. Rsch. Funding Grp.*, 189 F.3d 1327, 1336 (Fed. Cir. 1999) ("If a claim reads merely on a part of an accused device, that is

27

Appx47

enough for infringement.").

Kove's expert Goodrich contends that each group of two or more location servers within availability zones or "regions that share a namespace" constitutes "a system" of location servers. Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, Ex. K54 ¶ 80. AWS instead describes the availability zones as "at least one level of hierarchy," which then "combine with lower levels" to create a hierarchical structure. Def.'s 2d Am. Infringement Contentions, dkt. no. 588, Ex. 2 at 90-91. AWS also describes each region as "a branch on a broader hierarchical tree." Def.'s Mot. for Summ. J. at 18. But as long as the location servers within an availability zone or region are arranged in a non-hierarchical configuration, the accused products may infringe upon Kove's patents even if those zones and/or regions are arranged hierarchically in relation to other components of S3 or DDB.

When there is "specific, plausible and detailed testimony by dueling expert witnesses," summary judgment is typically inappropriate. *Total Containment, Inc. v. Intelpro Corp.*, 217 F.3d 852, 852 (Fed. Cir. 1999). Drawing all reasonable inferences in Kove's favor, a reasonable juror could accept Kove's description of the accused products as well as Goodrich's testimony and conclude that S3 and DDB contain a plurality of location servers within the availability zones that are arranged in a non-hierarchical configuration and therefore infringe Kove's patents.

In his rebuttal report AWS's expert, Dr. Ananth Grama, asserts that DDB employs a hierarchical structure. Def.'s Stmt. of Mat. Facts, Ex. 8 ¶ 334-37. His conclusion is based on the DDB source code, which he contends demonstrates a "parent-child structure" within DDB's MNs. *Id*. Kove has moved to exclude the portions of Grama's

28

Appx48

report that explain this "parent–child" relationship (paragraphs 336-337) on the ground that AWS failed to disclose this theory or its allegedly supporting source code in its noninfringement contentions. *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. at 46-47. Kove argues that AWS's introduction of this theory was untimely and that Kove did not have an appropriate opportunity to address it.

AWS says that it put Kove on notice of its theory in its non-infringement contentions, but the citations it includes in this section of its reply brief do not support this.[5] AWS also argues that Kove had access to the DDB source code prior to receiving Grama's rebuttal report and even cited this same source code in its own infringement contentions. *See* Def.'s Reply at 21. But simply having access to the DDB source code is insufficient to put Kove on notice of how AWS planned to use that source code to establish noninfringement. And AWS's descriptions of DDB as organized in a "hierarchical 'tree'" structure do not fully convey the parent-child theory that Dr. Grana describes in his report. The Court therefore grants Kove's motion to exclude Dr. Grama's testimony regarding the alleged "parent–child" structure among DDB's Metadata Nodes. *See Medline Indus., Inc. v. C.R. Bard, Inc.*, 511 F. Supp. 3d 883, 890 (N.D. Ill. 2021) ("[T]he proper remedy for the disclosure of a previously undisclosed

---

[5] AWS cites "Dkt. 596 at 8" for the contention that "Amazon incorporated this theory into its non-infringement contentions at the first opportunity, over nine months ago," Def.'s Reply at 21. But page 8 of docket number 596, AWS's March 23, 2023 Motion for Leave to Amend its Final Invalidity Contentions, does not contain any language regarding DDB or a hierarchical structure. *See* Def.'s Mot. for Leave to Amend Final Invalidity Contentions at 8. AWS also cites "Ex. 95," with no accompanying page number, for a quote that it says it included in its contentions: "Kove cannot show how DDB satisfies this element, because it doesn't. DDB is organized as a hierarchical 'tree.'" Def.'s Reply at 21. But Exhibit 95 to AWS's Statement of Additional Material Facts does not include the quote AWS included in its Reply Brief. *See* Def.'s Stmt. of Add'l Mat. Facts, Ex. 95.

[invalidity or infringement] theory or argument in either party's expert report is preclusion.").

### 2. Willful infringement and enhanced damages

Under Section 284 of the Patent Act, courts are permitted to award "damages up to three times the amount found or assessed" for patent infringement cases. 35 U.S.C. § 284. "[T]he issue of punishment by enhancement is for the court and not the jury," *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020), though a jury makes the underlying determination of willful infringement. The Supreme Court has noted that this enhanced damages punishment is "not to be meted out in a typical infringement case" but is instead "reserved for egregious cases typified by willful misconduct." *Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 579 U.S. 93, 103, 106 (2016). Courts should consider "the particular circumstances of each case in deciding whether to award [enhanced] damages." *Id.* at 106; *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021) ("Discretion remains with the district court to determine whether the conduct is sufficiently egregious to warrant enhanced damages.").

A patent holder can establish willfulness by proving, by a preponderance of evidence, that the defendant "had a specific intent to infringe at the time of the challenged conduct." *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 987 (Fed. Cir. 2021). "Knowledge of the asserted patent is necessary . . . for a finding of willfulness." *Id.* at 988.

Kove argues that a reasonable jury could find that AWS willfully infringed the Kove patents both before and after it filed suit. There is a split in authority among

30

district courts on the issue of whether knowledge of a patent gained from the infringement complaint can serve as knowledge of the patent in support of a post-suit infringement claim. *See ESCO Grp. LLC v. Deere & Co.*, No. CV 20-1679, 2023 WL 4199413, at *7-8 (D. Del. June 22, 2023) (collecting cases). In the absence of Federal Circuit guidance, this Court has concluded that the complaint can provide the required knowledge for a post-suit willful infringement claim. *See MG Freesites Ltd. v. ScorpCast LLC*, 651 F. Supp. 3d 744, 760-61 (D. Del. 2023) (Kennelly, J.). In alignment with this previously stated view, Kove may rely on the filing of the complaint to establish AWS's knowledge of infringement for the period following the filing of the lawsuit.

Turning to Kove's pre-suit willful infringement claim, it is undisputed that Kove did not send Amazon a letter or any other notice of potential infringement prior to filing the complaint in the instant case. AWS contends that it is entitled to summary judgment of no willful infringement[6] because Kove has not presented evidence "that any Amazon employees relevant to this lawsuit, such as those involved with developing, managing, or selling the accused products, knew of Kove's patents-in-suit before this matter." Def.'s Mot. for Summ. J. at 30. Kove argues that a reasonable jury could find that AWS willfully infringed its patents.

AWS argues that it had no knowledge of Kove or its patents before Kove filed its complaint in this case. *See* Def.'s Stmt. of Mat. Facts ¶ 91. But Kove contends that

---

[6] AWS also contends that it is entitled to summary judgment on enhanced damages because Kove did not directly address section 284 in its response brief and therefore waived opposition to AWS's enhanced damages argument. Def.'s Reply at 42-43. But "willfulness is a component of enhancement," *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021). Kove's willfulness argument in its response brief is therefore sufficient to establish that it did not waive its section 284 claim.

31

Appx51

Amazon's past patent applications support a finding that AWS had knowledge of the patents-at-issue years prior to this lawsuit.

For example, in August 2011, the USPTO issued an initial rejection of an Amazon patent application, finding that each claim of the Amazon patent was anticipated by Kove's '978 patent. Amazon responded to the USPTO's initial rejection of its application by cancelling 21 of the rejected claims and attempting to explain how the remaining claims were distinct from the '978 patent. In its response, Amazon stated that "[a]pplicants have evaluated the portions of [the '978 patent] cited in the Office Action, and indeed the entirety of [the '978 patent]." Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, Ex. K90 at ATI_KOVE_0000417. Dr. Sivasubramanian, the named inventor of this patent, "managed the development" of DDB. Def.'s Reply at 32; Def.'s Resp. Pl.'s Stmt, Mat. Facts ¶ 60. It is also undisputed that Amazon has cited to Kove's '170 patent over 200 times in past patent applications, and the '170 patent includes a claim of priority to the '640 patent application. Def.'s Resp. to Pl.'s Stmt. of Add'l Mat. Facts ¶ 58.

"[W]illfulness is an issue for the jury, not the district court." *Exmark Mfg. Co. Inc. v. Briggs & Stratton Power Prods. Grp., LLC*, 879 F.3d 1332, 1353 (Fed. Cir. 2018). And the factual dispute over whether AWS engineers had knowledge of the asserted patents prior to this instant case reflects that a genuine issue of material fact remains regarding whether AWS willfully infringed Kove's patents. *Abbott Lab'ys v. Grifols Diagnostic Sols. Inc.*, No. 19 C 6587, 2023 WL 6160182, at *23 (N.D. Ill. Sept. 20, 2023) ("The parties' differing views on the facts highlight that the question of willfulness remains one for the jury.").

32

Appx52

For these reasons, AWS is not entitled to summary judgment on Kove's enhanced damages claim.

## C. Kove's motion for summary judgment

Kove moves for summary judgment on AWS's 35 U.S.C. § 101 counterclaim and its defenses of double patenting, equitable estoppel, waiver, and inequitable conduct. Kove also contends in its motion that six of AWS's references do not qualify as prior art under 35 U.S.C. § 102.

### 1. Invalidity

A party challenging the validity of a patent has the burden of overcoming the presumption of validity found in 35 U.S.C. § 282. *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1359 (Fed. Cir. 2007). "That burden of proof never shifts to the patentee to prove validity." *Id.*

#### a. Section 101

AWS argues that the '640, '170 and '978 patents are invalid under 35 U.S.C. § 101 because they fail to claim patentable subject matter. The statute provides that an individual who "invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" may obtain a patent. 35 U.S.C. § 101. In *Alice Corporation Pty. Ltd. v. CLS Bank International*, 573 U.S. 208 (2014), the Supreme Court adopted a two-step test for determining patent eligibility under section 101. The first step asks whether the claims as a whole "are directed to" a "patent-ineligible concept[]," such as an abstract idea. *Alice*, 573 U.S. at 217-18. If, and only if, the claims are directed to a patent-ineligible concept, the court proceeds to step two, which requires consideration of "the elements

33

Appx53

of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo Collaborative Servs. v. Prometheus Lab'ys, Inc.*, 566 U.S. 66, 79, (2012)).

The Federal Circuit has "routinely held software claims patent eligible under *Alice* step one when they are directed to improvements to the functionality of a computer or network platform itself." *Uniloc USA, Inc. v. LG Elecs. USA, Inc.*, 957 F.3d 1303, 1307 (Fed. Cir. 2020). If the court finds that the focus of the claim is a "specific and concrete technological advance" under *Alice* step one, the "inquiry ends and the claim is eligible." *ADASA Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 908 (Fed. Cir. 2022).

Judge Pallmeyer previously considered the eligibility of the patents at issue and rejected AWS's argument that the asserted claims were not directed to patent-eligible subject matter. *See Kove IO, Inc. v. Amazon Web Servs., Inc.*, 448 F. Supp. 3d 849 (N.D. Ill. 2020). AWS argued in its motion to dismiss—as it does in response to Kove's summary judgment motion—that the asserted claims are directed towards abstract ideas and lack an inventive concept that warrants patent eligibility. *Id.* at 2-12. The Court denied AWS's motion to dismiss, concluding that the three claims asserted at the time were distinguishable from previous cases where claims directed at generating or manipulating data were considered abstract. *Kove*, 448 F. Supp. 3d at 857, 864. Instead, the Court found that the asserted claims in Kove's patent were similar to those at issue in *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016). In that case, the Federal Circuit held that the claims of two patents directed to computer database models were focused on a "specific asserted improvement in computer capabilities"

34

Appx54

rather than an abstract idea "for which computers are invoked merely as a tool." *Enfish*, 822 F.3d at 1336. The Court applied *Enfish* to the asserted claims and held that the information in the patents' specifications, specifically the descriptions of how the claimed invention improved on conventional data retrieval systems, demonstrated that the claims were directed to an improvement in computer capabilities and therefore were not abstract. *See Kove*, 448 F. Supp. 3d at 859. After finding that the asserted claims were not directed to an abstract idea, the Court did not apply the second step of the *Alice* inquiry. *Id.* at 864.

Kove argues that it is entitled to summary judgment because the law of the case doctrine bars this Court from reconsidering the subject matter eligibility of the patents. "The authority of a district judge to reconsider a previous ruling in the same litigation . . . is governed by the doctrine of the law of the case." *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571-72 (7th Cir. 2006). "[T]he doctrine [of the law of the case] posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 815–16 (1988) (citation omitted). Application of this doctrine is discretionary, and a court may decline to follow the law of the case "if there is a compelling reason, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous." *Santamarina*, 466 F.3d at 572.

AWS does not dispute that the issue of patent eligibility that it plans to argue at trial is identical to the issue it raised in its prior motion to dismiss. Instead, AWS argues that the Court should revisit its prior section 101 eligibility decision in light of various developments in the record. The Court finds these arguments unpersuasive.

35

Appx55

Although a patent eligibility inquiry may include underlying factual issues, "[p]atent eligibility under 35 U.S.C. § 101 is ultimately an issue of law." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1365 (Fed. Cir. 2018). In particular, *Alice* step one is a purely legal inquiry. *CardioNet, LLC v. InfoBionic, Inc*, 955 F.3d 1358, 1372 (Fed. Cir. 2020).

Because this Court did not proceed to the second step of the *Alice* inquiry in its previous section 101 analysis, its eligibility decision was a legal determination and thus should not be disturbed absent clear error or another compelling justification. Even in the sole case AWS relies on for its proposition that this Court should revisit its patent eligibility decision, that court clarified that it was reconsidering only step two of the *Alice* inquiry and acknowledged that "step one of the Alice analysis debatably answers a purely legal question." *Personalized Media Commc'ns, LLC v. Apple, Inc.*, No. 15-cv-1366, 2021 WL 2696561, at *2 n.4 (E.D. Tex. Jan. 29, 2021).

AWS cites the later claim construction order as a basis for revisiting the section 101 issue. Although the Federal Circuit has recognized that resolving claim construction disputes may be necessary for evaluating patent subject matter eligibility, "claim construction is not an inviolable prerequisite to a validity determination under § 101." *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012). And this Court's claim construction order did not materially impact its earlier Rule 12(b)(6) analysis, as the claims remain directed to a dynamic data retrieval system that includes "multiple location servers that organize location information based on a distributed hash table," a "redirect message" and other "specific improvements" in the operation of computer networks. *Kove IO, Inc.*, 448 F. Supp. 3d at 859-60.

36

Appx56

AWS contends that the Court should revisit its eligibility decision due to additional developments in the record. For example, Kove is asserting fourteen additional claims that were not considered in the Court's order denying the motion to dismiss. But in finding that the claimed inventions were "aimed at improving computer network storage," the Court also considered the content of the patent specifications. *See Id.* at 861-64. Though Kove is asserting multiple new claims, these claims have the same specifications as the claims that were at issue at the time of the earlier section 101 eligibility inquiry.

AWS also directs the Court's attention to its experts' conclusions that the content of the asserted claim limitations is routine and conventional. Def.'s Resp. Pl.'s Mot. for Summ. J. at 45-46. But the alleged novelty of the asserted claims is irrelevant to the question of whether they are directed to an abstract idea. *See Diamond v. Diehr*, 450 U.S. 175, 188-89 (1981) ("The 'novelty' of any element or steps in a process, or even of the process itself, is of no relevance in determining whether the subject matter of a claim falls within the § 101 categories of possibly patentable subject matter."). And the Court need not consider testimony from AWS's experts, or any other extrinsic evidence, in evaluating whether the claims are directed towards patent eligible subject matter. *See CardioNet, LLC*, 955 F.3d at 1372 ("Alice step one presents a legal question that can be answered based on the intrinsic evidence.").

The application of the law of the case doctrine is discretionary. The Court finds that there are no changed circumstances or new facts in the record that warrant departing from the law of the case doctrine. The Court therefore grants Kove's motion for summary judgment on § 101 patent eligibility.

37

Appx57

### b. Double patenting

AWS contends that claims 3, 6, 10, 14, 17, 23, 24, and 30 of '978 patent are invalid for obviousness-type double patenting. Kove responds that AWS has not provided evidence to support its double-patenting claim and that the double patenting opinions of AWS's invalidity expert are inadmissible.

Obviousness-type double patenting is a judicially created doctrine meant to "prevent the extension of the term of a patent . . . by prohibiting the issuance of the claims in a second patent not patentably distinct from the claims of the first patent." *Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, 689 F.3d 1368, 1376 (Fed. Cir. 2012) (quoting *In re Longi*, 759 F.2d 887, 892 (Fed. Cir. 1985)). "Under obviousness-type double patenting, a patent is invalid when it is merely an obvious variation of an invention disclosed and claimed in an earlier patent by the same inventor." *Georgia-Pac. Corp. v. U.S. Gypsum Co.*, 195 F.3d 1322, 1326 (Fed. Cir. 1999). To determine whether there is obviousness-type double patenting, a court performs a 2-step test. First, the court determines "the differences in the claims of the earlier and later patents." *Eli Lilly & Co. v. Teva Parenteral Medicines, Inc.*, 845 F.3d 1357, 1375 (Fed. Cir. 2017). Second, the court "determine[s] if the alleged infringer has proven by clear and convincing evidence that the claims are not patentably distinct." *Id.* "A later patent claim is not patentably distinct from an earlier claim if the later claim is obvious over, or anticipated by, the earlier claim." *Id.*

To support this conclusion, he created two comparison charts that include a column containing claim limitations of the '978 patent alongside a corresponding column with portions of claims and specifications of the '640 and '170 patents. *See* Pl.'s Resp.

38

Appx58

to Def.'s Stmt. of Mat. Facts, Ex. K9; *Id.*, Ex. K10.  Greene's comparison charts contain

colored highlighting identifying the limitation language that Greene considers to be

identical among the claims:

| U.S. Patent No. '978 Patent Claims | '640 Patent Claims and Specification |
|---|---|
| [1.preamble]. A system having a plurality of location servers for managing location information and providing location information to location queries, the system comprising: | [18] A system for retrieving data location information for data stored in a distributed network, the system comprising . . . a client responsive to a data query to query a data location server for location information associated with the identifier string; a data location server network comprising a plurality of data location servers . . . |

Greene Expert Invalidity Report, App'x E-1, dkt. no. 700-9 at 2 (highlighting in original).

These color-coded charts, AWS contends, support Greene's opinion that "each and

every claim limitation in the asserted '978 Patent claims is explicitly disclosed by the

'640 Patent and '170 Patent."  Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, Ex. K42 ¶ 288;

Def.'s Stmt. of Add'l Mat. Facts ¶ 20.

Kove has moved to strike paragraphs 278-289 and Appendix E of Greene's

expert invalidity report, arguing that his opinions are deficient under Federal Rule of

Civil Procedure 26.  Rule 26 provides that for expert witness testimony, a written export

report must contain "a complete statement of all opinions the witness will express and

the basis and reasons for them."  FED. R. CIV. P. 26(a)(2)(B)(i).  Kove contends that

Greene's "conclusory opinions" regarding obviousness-type double patenting are

inadequate disclosures that "leav[e] Kove without notice of Mr. Greene's actual opinions

(if any) or his intended testimony at trial."  Pl.'s Mot. for Summ. J. at 68.

In support of its motion to strike, Kove cites multiple cases where a court ruled an

expert's patent obviousness opinions deficient under Rule 26.  But in each of the cases

that Kove cites, the court excluded the testimony of an expert who sought to provide

evidence of statutory obviousness under 35 U.S.C. § 103, not non-statutory

obviousness-type double patenting. *See Innogenetics, N.V. v. Abbott Lab'ys*, 512 F.3d 1363, 1373 (Fed. Cir. 2008) (affirming district court's determination that expert report was insufficient to support jury finding of obviousness under § 103); *Align Tech., Inc. v. 3Shape A/S*, No. CV 17-1646, 2020 WL 4926164, at *9-10 (D. Del. Aug. 14, 2020) (striking expert's § 103 obviousness opinion as conclusory); *Finjan, Inc. v. Sophos, Inc.*, No. 14-CV-01197, 2016 WL 4560071, at *7 (N.D. Cal. Aug. 22, 2016) (same).

The obviousness-type double patenting analysis is "analogous to an obviousness analysis under 35 U.S.C. § 103." *Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1361 (Fed. Cir. 2009). But one key difference is that "double patenting does not require inquiry into a motivation to modify the prior art." *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 999 (Fed. Cir. 2009). Thus Greene's failure to describe "why a person of ordinary skill in the art would be motivated to combine the various limitations from different claims," Pl.'s Mot for Summ. J. at 68, does not render his obviousness-type double patenting opinions inadmissible.

Kove also objects to Greene's use of the '640 and '170 patent specifications in his comparison charts. "Because nonstatutory double patenting compares earlier and later claims, an earlier patent's disclosure is not available to show nonstatutory double patenting." *Geneva Pharms., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1385 (Fed. Cir. 2003). Generally, when performing an obviousness-type double patenting analysis, the earlier patent's specification is "considered only to the extent necessary to construe its claims." *Eli Lilly & Co.*, 689 F.3d at 1378–79. AWS is correct that there are exceptions to the general rule that limits obviousness-type double patenting analysis to the content of the claims. But none of the circumstances that gave rise to the

40

Appx60

exceptions articulated in the cases AWS cited are present in this case.

For example, in *Sun Pharmaceutical Industries, Ltd. v. Eli Lilly & Co.*, 611 F.3d 1381 (Fed. Cir. 2010), the patentee developed an antiviral compound for treating cancer. After acquiring an initial patent that described the compound's potential cancer fighting utility in the specification, the patent holder then was issued a second patent with claims for methods of using the compound to treat cancer. *Id.* at 1383-84. The court held the second patent invalid for obviousness-type double patenting. It limited consideration of the earlier patent's specification to "the situation in which an earlier patent claims a compound, disclosing the utility of that compound in the specification, and a later patent claims a method of using that compound for a particular use described in the specification of the earlier patent." *Id.* at 1385. Similarly, in *Geneva Pharmaceuticals,* the patentee had patented methods of using a clavulanic acid composition to treat bacterial infections. *Geneva Pharms., Inc.*, 349 F.3d at 1383. The patentee subsequently obtained a patent that disclosed in the specification the utility of clavulanic acid compositions for treating antibiotic-resistant patients. *Id.* The Federal Circuit held the patent claims invalid for double patenting given its precedent recognizing that "a claim to a method of using a composition is not patentably distinct from an earlier claim to the identical composition in a patent disclosing the identical use." *Id.* at 1385-86.

Here, the exception to the general rule outlined in *Sun Pharmaceutical* and *Geneva Pharmaceuticals* does not apply because the '978 patent does not claim a method for a particular use that was disclosed in the specifications of the '640 and '170 patents. *See Eli Lilly & Co.*, 689 F.3d at 1379-80 (distinguishing *Sun Pharmaceutical*

41

Appx61

and *Geneva Pharmaceuticals* in declining to apply exception to bar on use of specification in obviousness-type double patenting analysis).  AWS asserts that Greene utilized the specifications of the prior patents to "show that Kove has repeatedly used the same language to describe its purported inventions."  Def.'s Resp. to Pl.'s Mot. for Summ. J. at 54.  Greene's inclusion of the specifications in his comparison table, however, appears to utilize them as prior art.  For example, one of his tables includes a

| U.S. Patent No. '978 Patent Claims | '170 Patent Claims and Specification |
| --- | --- |
| [30] The method of claim 17, wherein transferring a portion of the identifiers and associated locations to a second location server when a performance criterion of the first data location server reaches a predetermined performance limit further comprises monitoring the performance criterion and automatically transferring the portion of identifiers and associated locations when the first location server reaches the predetermined limit. | 8. The system of claim 6, wherein each of a plurality of location servers in the network stores only a portion of the data location information.<br><br>13. The system of claim 9, wherein the location query identifying the desired entity comprises a unique identifier for the desired entity, and wherein the programming logic stored on the location server further comprises programming logic configured to apply an index function to the unique identifier to retrieve at least a portion of the locations associated with the unique identifier in the indexed location store.<br><br>"As those skilled in the art will appreciate, the Transmission Control Protocol (TCP) is a connection-oriented protocol that is part of a universally implemented subset of the Internet Protocol (IP) suite. TCP provides reliable, bi-directional stream data transfer. TCP also implements adaptive congestion avoidance to ensure data transfer across a heterogeneous network with various link speeds and traffic levels." (Col. 11:55-61) |

side-by-side comparison of claim 30 of the '978 patent and claim 8, claim 13 and the specification of the '170 patent:

Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, Ex. K10 at 12 (highlighting in original).  Greene's highlighting directly maps the language of the '170 patent specification onto the language of the '978 patent claim.  Furthermore, the portion of the '170 patent specification that AWS cites is describing a preferred embodiment of the invention, and claims are not confined to the features of a preferred embodiment.  *See Burke, Inc. v. Bruno Indep. Living Aids, Inc.*, 183 F.3d 1334, 1341 (Fed. Cir. 1999) ("An attribute of the preferred embodiment cannot be read into the claim as a limitation.").  The Court agrees with Kove that Greene inappropriately used the patent specifications as prior art in his

obviousness-type double patenting analysis.

The other evidence AWS cites to support its obviousness-type double patenting argument employs an incorrect standard. For example, Greene contends that the patents "cover the same inventive concept" and "employ nearly the same language when describing the overview of the technology and patents at issue." Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, Ex. K42 ¶ 288. These assertions may be relevant to an analysis of whether the '978 patent is invalid on other grounds. *See In re Goodman*, 11 F.3d 1046, 1052 (Fed. Cir. 1993) ("If the claimed inventions are identical in scope, the proper rejection is under 35 U.S.C. § 101 because an inventor is entitled to a single patent for an invention."). But the assertion that the patents cover the same technology or contain similar specification language does not demonstrate that the *claims* of the later patent are patently indistinct from the *claims* of the earlier patents. *See Phillips Petroleum Co. v. U.S. Steel Corp.*, 604 F. Supp. 555, 560 (D. Del. 1985) ("Patents which issue from co-pending applications may, however, overlap with respect to the information they disclose without necessarily resulting in double patenting.").

Greene also notes that Kove has asserted that certain claims of the '978 patent were "constructively reduced . . . to practice" based on the filing of the '640 patent. Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, Ex. K42 ¶ 289. "Constructive reduction to practice means a described and enabled anticipation under 35 U.S.C. 102(g)(1), in a patent application of the subject matter of a count." *Storer v. Clark*, 860 F.3d 1340, 1344 (Fed. Cir. 2017). Constructive reduction to practice and obviousness-type double patenting are two distinct legal doctrines, as reduction to practice is typically used to determine "priority of invention between two or more parties claiming the same patentable

43

Appx63

invention."  *Mycogen Plant Sci. v. Monsanto Co.*, 243 F.3d 1316, 1332 (Fed. Cir. 2001).

And though obviousness-type double patenting necessitates evaluation of a patent's

claims, constructive reduction to practice is evaluated based on the contents of a

patent's disclosure.  *See In re Lundak*, 773 F.2d 1216, 1220-23 (Fed. Cir. 1985)

(concluding that patent specification met constructive reduction to practice

requirements).  AWS cites no legal authority for the proposition that a constructive

reduction to practice renders a patent invalid due to obviousness-type double patenting.

In sum, the Court agrees with Kove that the portions of Greene's expert invalidity report

that rely on the specifications rather than the claims of the earlier patents, or address

AWS's unsupported "constructive reduction to practice" argument, should be excluded

and stricken.

Nevertheless, Greene's comparison chart and the portions of his report that

appropriately address obviousness-type double patenting are admissible.  Kove

contends that Greene failed to analyze the differences between the claims as required

by step one of the obviousness-type double patenting analysis.  But district courts have

recognized that similarities in language between claims are relevant in the obviousness-

type double patenting analysis.  *See Johnson Elec. Indus. Mfg., Ltd. v. Ametek, Inc.*,

850 F. Supp. 2d 342, 353 (D. Conn. 2006) ("The strikingly similar language between the

two claims suggests that claim 2 of the ′580 patent is obvious over claim 20 of the ′843

patent."); *Bausch & Lomb Inc. v. SBH Holdings LLC*, No. CV 20-1463-GBW, 2023 WL

9016157, at *4 (D. Del. Dec. 29, 2023) (noting linguistic similarities between patent

claims in obviousness-type double patenting analysis).  And Greene's comparison chart

conveys the basis for his double patenting opinion – namely, that he believes the claims

44

Appx64

of the '978 patent disclose every limitation of the asserted claims of the '640 and '170 patents.  AWS contends that Greene did not addresses differences between the claims in his expert report because, in his opinion, there are none.  Def.'s Resp. to Pl.'s Mot. for Summ. J. at 53.  The weight to be given his opinion is an issue for trial, not summary judgment.

AWS's invalidity contentions and Greene's expert report provide more than mere conclusory statements, and genuine disputes of material fact remain over whether or not the asserted claims of the '978 patent are invalid for obviousness-type double patenting.  At trial, AWS will bear the burden of establishing invalidity on double patenting grounds.  But as the party moving for summary judgment, Kove had the burden of proving the absence of a genuine issue for trial to support its motion.  Because there is evidence in the record to support AWS's double patenting claim, Kove's is not entitled to summary judgment on the obviousness-type double patenting defense.

### c.    Prior art references

Novelty is a critical element of patentability.  *In re Schoenwald*, 964 F.2d 1122, 1123 (Fed. Cir. 1992).  Under Section 102 of the 1952 Patent Act,[7] an individual is not entitled to a patent if the invention was anticipated by a prior invention.  *Net MoneyIN, Inc. v. VeriSign, Inc.*, 545 F.3d 1359, 1369 (Fed. Cir. 2008).  Anticipation is "the disclosure in the prior art of a thing substantially identical with the claimed invention."

---

[7] In 2011 Congress passed the Leahy-Smith America Invents Act (AIA), which amended 35 U.S.C. §102.  *SNIPR Techs. Ltd. v. Rockefeller Univ.*, 72 F.4th 1372, 1373 (Fed. Cir. 2023).  Because the patents-at-issue were filed before March 16, 2013, they are governed by the pre-AIA version of § 102.  *Id.* at 1376.

*Application of Schaumann*, 572 F.2d 312, 317 (C.C.P.A. 1978) (citation omitted). "[T]he [prior art] reference must describe the applicant's claimed invention sufficiently to have placed a person of ordinary skill in the field of the invention in possession of it." *In re Spada*, 911 F.2d 705, 708 (Fed. Cir. 1990).

The ultimate question of anticipation is not at issue here. Rather, Kove seeks only a determination that multiple references that AWS relies on for its anticipation defense do not qualify as prior art under section 102. Kove also moves to strike Greene's opinions associated with these allegedly inappropriate references.

### i. DNS/BIND

Kove and AWS disagree over which version of Domain Name System (DNS) AWS attempted to establish as "prior art" for its anticipation claims. DNS is a "distributed naming framework for internet resources." Pl.'s Stmt. of Mat. Facts ¶ 29. Berkeley Internet Name Domain (BIND) is an implementation of DNS. Kove contends that in its response brief, AWS vastly expanded the scope of one of its claimed prior art references by changing it from BIND 8.1 to DNS. AWS argues that it has always sought to establish DNS, not BIND 8.1, as the prior art reference upon which it relies to establish anticipation.

In its response to Kove's summary judgment motion, AWS states that its expert, Greene, opined that the DNS system, not BIND 8.1, is prior art under section 102(a), (b), and/or (f). Def.'s Resp. to Pl.'s Mot. for Summ. J. at 54-55. In his report, however, Greene initially states that his understanding is that "the DNS system is prior art" but then narrows the scope of this prior art by describing it as "[t]he DNS system (BIND version 8.1)." Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, Ex. K42 ¶ 220. In its response

46

Appx66

to Kove's statement of material facts, AWS asserts that "the BIND source code is used to establish the existence of a DNS system as prior art."  Def.'s Resp. to Pl.'s Stmt. of Mat. Facts ¶ 36.  But in another portion of its response, AWS admits Kove's assertion that "AWS alleges that one particular implementation–namely, BIND 8.1–is a prior art system that anticipates . . . the Asserted Claims."  Def.'s Resp. to Pl.'s Stmt. of Mat. Facts ¶ 32.  And in a March 13, 2023 email to Kove, AWS clarified that it did not seek to remove DNS from its contentions but that, instead, DNS would be relied upon as a "secondary reference" and to "provide evidence of the background knowledge and common sense of those of ordinary skill in that art," not that as a prior art reference in its own right.  Def.'s Final Am. Invalidity Contentions, dkt. no. 596-A at 2.

Ascertaining which version of DNS AWS seeks to assert as prior art is made more difficult because AWS does not provide a single piece of supporting documentation that comprehensively defines the DNS system.  Instead, AWS presents four references that it claims, together, "describe the prior art DNS system":  a 1998 book titled "DNS and BIND" (DNS & BIND), a 1987 "request for comments introducing domain style names and the domain name system" published by the Internet Engineering Task Force (RFC 1034), a 1999 paper titled "Distributed Web Caching System with Consistent Hashing" (Sherman) and another 1999 paper titled "Web Caching with Consistent Hashing" (Karger/Sherman).  Def.'s Resp. to Pl.'s Mot. for Summ. J. at 55; Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, Ex. K42 ¶ 220; Def.'s Final Am. Invalidity Contentions, dkt. no. 596-A at 4-6.  These documents were authored by different parties and allegedly describe different components of the DNS system.  And AWS concedes that the DNS & BIND book does not expressly mention BIND 8.1 and

47

that the publication of RFC 1034 predates the existence of BIND 8.1 by nearly a decade. Def.'s Resp. to Pl.'s Stmt. of Mat. Facts ¶¶ 46, 48. These admissions further obfuscate AWS's argument given that it stated in its invalidity claim chart that the "operation of [the BIND 8.1 version of DNS] is described" in all four documents. Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, Ex. K43 at 1.

Kove further asserts that through these four references, AWS is improperly arguing anticipation based on a combination of references rather than a single prior art reference. AWS argues that the dispute over whether these four documents properly describe the DNS system as its expert claims is an issue for trial. But whether a reference may be relied on as prior art is a preliminary question to be decided by the court. *Structural Rubber Prod. Co. v. Park Rubber Co.*, 749 F.2d 707, 721–22 (Fed. Cir. 1984).

"[R]eferences cannot be combined for purposes of anticipation." *Ciba-Geigy Corp. v. Alza Corp.*, 68 F.3d 487 (Fed. Cir. 1995). The Federal Circuit has ruled, however, that additional references may be used to "confirm the contents of the allegedly anticipating reference," *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1335 (Fed. Cir. 2002), or to "reveal what it would have meant to one of ordinary skill at the time the invention was made." *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 726 F.2d 724, 726 (Fed. Cir. 1984).

AWS contends that the documents should be considered a single prior art reference because they all "describe the same DNS system" and demonstrate "what a person skilled in the art would have understood DNS to be" rather than "fill[ing] in gaps in the primary references." Def.'s Resp. to Pl.'s Mot. for Summ. J. at 55. AWS also

48

Appx68

notes that the Federal Circuit has differentiated prior art from "extrinsic evidence used to support what is necessarily present in a prior art's teaching." *Monsanto Tech LLC v. E.I. DuPont de Nemours & Co.*, 878 F.3d 1336, 1345 (Fed. Cir. 2018). But as AWS acknowledges, the extrinsic evidence in *Monsanto* consisted solely of expert declarations that were "offered in support of the prior art already of record." *Id.*

In contrast, AWS is combining its references to establish the parameters of a single anticipatory prior art reference, which it interchangeably refers to as DNS or BIND 8.1. AWS's references were also authored at different times by different parties who had no involvement with the development of the prior art, which distinguishes them from those used in past cases in which a computer software system qualified as prior art based on testimony from the software developer, or a manual that was sold or shipped along with the software. *See, e.g.*, *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1363 (Fed. Cir. 2001) (citing testimony from prior art system's developer in anticipation analysis); *Stamps.com Inc. v. Endicia, Inc.*, 437 F. App'x 897, 901 (Fed. Cir. 2011) (accepting software and accompanying user guide as prior art reference).

The Court finds that the case Kove cites in support of its argument, *Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350 (Fed. Cir. 2008), is more analogous to the facts of this instant case. In *Kyocera*, the defendant introduced as prior art the GSM standard, a set of specifications for a particular mobile network. *Id.* at 1350. The GSM standard consisted of hundreds of individual specifications drafted by approximately ten different subgroups, each with its own title and separate page numbering. *Id.* at 1351. The Federal Circuit held that the GSM standard constituted "several prior art references with separate dates of creation" and therefore could not

49

Appx69

operate as a single prior art reference. *Id.* at 1351. AWS attempts to distinguish *Kyocera* by noting that in that case, "the relevant standard was so voluminous and disparate that no one person had read it in its entirety." Def.'s Resp. Pl.'s Mot. for Summ. J. at 56. This distinction is immaterial. The primary question in *Kyocera* was not whether the references were too voluminous to be considered prior art but rather whether, taken together, they qualified as "a coherent whole document that can be assigned a single prior art date of creation." *Kyocera Wireless Corp.*, 545 F.3d at 1352.

To allow AWS to utilize its four references in the manner it seeks would enable an alleged infringer to identify a system that existed prior to the claimed invention, selectively choose supporting documentation that describes that system in the manner that most closely fits the claims of the asserted patent, and present a combination of those documents to establish the system as prior art. This would undermine section 102's clear mandate that the party seeking to invalidate a patent on anticipation grounds must demonstrate that a *single* prior art reference or printed publication anticipated the claimed invention. *See Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000) ("[I]invalidity by anticipation requires that the four corners of a single, prior art document describe every element of the claimed invention."); *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1364 (Fed. Cir. 2008) ("[A]nticipation requires all elements of a claim to be disclosed within a single reference.").

Additionally, AWS's expert does not appear to be using the references in the manner that AWS claims. For example, in its invalidity chart for the '640 patent, AWS cites both RFC1034 and DNS & BIND as evidence of anticipation of claim 17:

50

Appx70

| U.S. Patent No. 7,103,640 | Domain Name System (DNS) and, for Claim 24, Karger '618/420 |
|---|---|
| [17.a] a plurality of data repositories configured to store data, wherein the data is associated with a respective identifier string in each data repository; | If this claim language is interpreted to cover the Accused Products, as Kove appears to contend, then DNS discloses this element, for example, as described below. |
| | "We should be able to use names to retrieve host addresses, mailbox data, and other as yet undetermined information. All data associated with a name is tagged with a type, and queries can be limited to a single type." (RFC1034, 3.) |
| | The name space is "used for hosts, mailboxes, etc." (*Id.*, 9). "A convention for mapping between object names and domain names [is needed as] [t]his describes how information about an object is accessed." (*Id.*) "The mailbox HOSTMASTER@SRI-NIC.ARPA is represented as a domain name by HOSTMASTER.SRI-NIC.ARPA." (*Id.*, 9-10.) |
| | *See also* Paul Albitz and Cricket Liu, DNS and BIND, O'Reilly & Associates, Inc., 3rd ed. 1998: "Every domain has a unique name." (p. 5, *see also* 7.) "Each host on a network has a domain name, which points to information about the host." (p. 6.) "[A] domain name uniquely identifies a single node in the tree." (p. 13.) "The hosts are … represented by domain names. … Domain names at the leaves of the tree generally represent individual hosts, and they may point to network addresses, hardware information, and mail routing information. Domain names in the interior of the tree can name a host *and* can point to information about the domain. Interior domain names … can represent both the domain that they correspond to and a particular host on the network. For example, *hp.com* is both the name of the Hewlett-Packard Company's domain and the domain name of a host that runs HP's main web server." (pp. 15-16, *see also* 19-20.) |

Pl.'s Stmt. of Mat. Facts, Ex. K45 at 2-3.

The inclusion of a block quote from DNS & BIND, with no accompanying analysis, sheds no light on how a POSITA would have understood the version of DNS or BIND 8.1 that AWS asserts as the prior art reference. And given that the authors of DNS & BIND suggest that the intended audience for the book includes those who have no knowledge of DNS or BIND, its utility as a tool for understanding the perspective of a POSITA is limited. *See* Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, Ex. K98 at x-xi (noting that most readers of the book will not be DNS experts). In addition, Greene's opinion regarding how a POSITA would understand DNS at the time of the invention cannot be used to prove that the prior art includes a claim limitation that is missing from the other references. *See Structural Rubber Prod. Co. v. Park Rubber Co.*, 749 F.2d 707, 716 (Fed. Cir. 1984) (rejecting party's attempt to use knowledge of one skilled in the art or additional reference to supply missing claim limitation). This court finds that the

51

Appx71

combination of AWS's DNS/BIND 8.1 references constitute an improper attempt to "combine the teachings of the references to build an anticipation [defense]." *Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1335 (Fed. Cir. 2002) (quoting *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 726 F.2d 724, 727 (Fed. Cir. 1984)).

As the nonmoving party, AWS receives the benefit of having reasonable inferences resolved in its favor for purposes of summary judgment. But this District's Local Patent Rules require meaningful disclosure of the defendant's defenses. *Wimo Labs LLC v. Polyconcept N.A, Inc.*, 358 F. Supp. 3d 761, 763 (N.D. Ill. 2019). "The Rules were not intended to create or tolerate clever loopholes." *Id.*

AWS has repeatedly expressly identified the BIND 8.1 version of DNS as the prior art reference. For example, in its Fifth and Final Amended Invalidity Contentions AWS listed "Domain Name System (DNS) as described in the next section" among twenty-five prior art references. Def.'s Final Am. Invalidity Contentions, dkt. no. 596-A at 6. In the referenced section, AWS stated that "BIND 8.1, a prior art Domain Name System (DNS) implementation anticipates and/or renders obvious claims of the Asserted Patents." Def.'s Final Am. Invalidity Contentions, dkt. no. 596-A at 7. Furthermore, in the invalidity charts appendaged to its final invalidity contentions, AWS asserted that claims 17 and 18 of the '640 patents and claims 6, 8 and 15 of the '170 patent "are anticipated by . . . the BIND 8.1 version of DNS." *See* Pl.'s Stmt. of Mat. Facts, Ex. K45 at 1; *Id.*, Ex. K44 at 1. AWS cannot circumvent its duty of meaningful disclosure by now claiming that DNS, not BIND 8.1, is the prior art reference it wishes to invoke. And because it did not respond to Kove's arguments regarding the deficiency of

52

Appx72

BIND 8.1 as a prior art reference in its reply brief, AWS has forfeited any challenge to Kove's motion on this point. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

For these reasons, the Court finds that DNS and BIND 8.1 do not qualify as prior art references for purposes of AWS's anticipation defense. The Court therefore grants Kove's motion to exclude Greene's invalidity opinions regarding DNS and BIND 8.1 as prior art.

### ii. Cache Resolver

Kove also objects to AWS's use of the Cache Resolver system as a prior art reference. But AWS's supporting references for the Cache Resolver system do not suffer from the same or similar deficiencies as the DNS/BIND 8.1 references. AWS relies on two documents, Sherman and Karger/Sherman, to define the Cache Resolver System. Kove agrees that the "are contemporaneous, share common authorship, and describe a system by that name." Pl.'s Reply at 76. And unlike the DNS/BIND 8.1 system, AWS clearly disclosed Cache Resolver as a prior art reference. The Court finds that Cache Resolver is a proper prior art reference under section 102 and that the Sherman and Karger/Sherman references can be used to "confirm the contents" of the Cache Resolver system. *Teleflex, Inc.*, 299 F.3d at 1335.

Kove also moves for the exclusion of Greene's invalidity opinions regarding Cache Resolver. Expert testimony on this point is allowed only to the extent that it "does not go beyond explaining what the [prior art] reference would have meant to those skilled in the art" at the time. *Ciba-Geigy Corp.*, 68 F.3d at 487.

Greene opines, with no supporting citation or explanation, that "[a]ll of the features and functionality of DNS are inherent to systems using DNS," including Cache Resolver. Pl.'s Resp. Def.'s Stmt. Mat. Facts, Ex. K42 ¶ 230. AWS argues that, because the Cache Resolver "inherently discloses the DNS system," Greene should be able to rely on the DNS/BIND 8.1 references to define the Cache Resolver System. Def.'s Resp. Pl.'s Mot. Summ. J at 56. Extrinsic evidence may be used to prove that the prior art inherently discloses the claim limitation, not that the prior art references inherently disclose each other's contents. *Cont'l Can Co. USA v. Monsanto Co.*, 948 F.2d 1264, 1268 (Fed. Cir. 1991). And resolution of disputed facts regarding inherency are inappropriate for summary judgment. *Id.* at 1269. Greene's opinions regarding DNS will be admitted to the extent that they demonstrate that a claim limitation not expressly disclosed is inherent to the Cache Resolver, but the DNS references cannot be used to expand the scope of the Cache Resolver as a prior art reference.

### iii. Boukobza, Karger '618 and Karger '420 patents

Kove contends that it is entitled to summary judgment on the claim that U.S. Patent No. 6,122,664 (Boukobza), U.S. Patent No. 6,430,618 (Karger '618) and U.S. Patent No. 6,553,420 (Karger '420) do not qualify as prior art under sections 102(a) or (b). In his expert invalidity report, Dr. Greene opined that these patents were prior art because their filing dates precede the priority dates of the asserted patents by more than one year. Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, Ex. K42 ¶ 204. Kove argues that to qualify as prior art, the patents' *issuance* dates, not the filing dates, must precede the priority dates of the Kove patents.

Appx74

For the purposes of sections 102(a) and (b), a patent is presumed to be invented as of its filing date and patented as of its issuance date. *See Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1577 (Fed. Cir. 1996) (noting that patent holder's evidence was sufficient to overcome presumption of filing date as date of invention). Patents issued from a chain of continuation and continuation-in-part applications may receive the benefit of the filing of an earlier application by claiming priority to the filing date of the original application. *Transco Prod. Inc. v. Performance Contracting, Inc.*, 38 F.3d 551, 556 (Fed. Cir. 1994). For purposes of section 102(f), "the party asserting invalidity must prove both prior conception of the invention by another and communication of that conception to the patentee." *Gambro Lundia AB v. Baxter Healthcare Corp.*, 110 F.3d 1573, 1576 (Fed. Cir. 1997). Therefore, to qualify as prior art under sections 102(a), (b) or (f), a patent must have been issued prior to the priority date of the patents in suit.

Boukobza was issued on September 19, 2000. Karger '618 and Karger '420 were issued on August 6, 2022 and April 22, 2003, respectively. AWS does not dispute that the priority dates of the asserted patents precede the issuance dates of the Boukobza, Karger '618 and Karger '420 patents. Def.'s Resp. to Pl's Stmt. of Mat. Facts ¶¶ 64, 66. Because the Boukobza, Karger '618 and Karger '420 patents were issued after the priority dates of the Kove patents, they cannot be prior art under sections 102(a) or (b). And if AWS contends that the issue of the Boukobza, Karger '618 and Karger '420 patents communicated the allegedly anticipated invention to the inventors of the patent-at-issue, then the patents cannot serve as prior art under section 102(f).

AWS attempts to rescue its anticipation defense regarding the Boukobza, Karger '618 and Karger '420 patents by arguing that its invalidity contentions are sufficient to

55

Appx75

support an argument that the patents are invalid under section 102(e).  The operative date for a prior art reference under section 102(e) is the date of "application," i.e. the filing date of the patent.  *See* 35 U.S.C. § 102(e)(2).  The Boukobza patent application was filed on June 27, 1997, the Karger '618 patent application was filed on March 13, 1998, and the Karger '420 patent application was filed on June 2, 1998.  Def.'s Stmt. Add'l Mat. Facts ¶¶ 26-29.  Kove does not claim a date of invention for its patents earlier than its priority dates of October 28, 1999 or June 2, 2000.  The facts in the record are sufficient to establish that Boukobza, Karger '618 and Karger '420 patents may qualify as prior art under section 102(e).

Kove argues that AWS's reliance on section 102(e) as a ground for invalidity based on anticipation amounts to an unauthorized amendment of its final invalidity contentions.  Greene did not include section 102(e) in his expert invalidity report, but AWS contends that it is not limited to the opinions of its expert witness.  AWS also failed, however, to include section 102(e) as a basis for invalidity in its final invalidity contentions.  In its invalidity charts, AWS asserted that "Karger '618/420 is prior art under pre-AIA 35 U.S.C. § 102(a), (b), and/or (f), e.g."  Def.'s Final Am. Invalidity Contentions, dkt. no. 596-A at 392.  AWS also contended that the Boukobza patent is "prior art under pre-AIA 35 U.S.C. § 102(a), (b), and/or (f)."  *Id.* at 518

AWS did not expressly include section 102(e) in its invalidity arguments regarding these three prior art references, but the references were included in the list of prior art items that AWS alleged "either anticipate or render obvious" the patents-in-suit. Def.'s Final Am. Invalidity Contentions, dkt. no. 596-A at 4-6.  Local Patent Rule (LPR) 2.3(b) requires a party asserting invalidity to include in its invalidity contentions "a

56

Appx76

detailed statement of whether it allegedly anticipates or renders obvious each asserted claim" and a chart identifying where specifically in each alleged item of prior art each element of each asserted claim is found" for each prior art reference.  N.D. ILL. LOCAL PATENT R. 2.3.  AWS has complied with the LPR requirements for prior art references in this instance.  Kove has not identified a provision in the Local Patent Rules that requires a party to identify the specific provisions within a statute upon which it plans to rely for its anticipation claims, and "limitations that do not exist should not be engrafted onto a statute or rule."  *Wimo Labs LLC*, 358 F. Supp. 3d at 766 (citing *Hart v. United States*, 910 F.2d 815, 817 (Fed. Cir. 1990)).  This Court concludes that AWS may rely on the Boukobza, Karger '618 and Karger '420 references as prior art for purposes of a section 102(e) defense.

### iv.      Steen

AWS asserts as prior art an article titled "Locating Objects in Wide-Area Systems" (Steen).  Def.'s Final Am. Invalidity Contentions, dkt. no. 596-A at 6.  Marteen van Steen is the lead author of the article, which was published in IEEE Communications Magazine.  AWS argues that Steen qualifies as a printed publication under section 102 and therefore can be used as prior art.

To qualify as a "printed publication" under § 102, a prior art reference must have been made "publicly accessible."  *In re Lister*, 583 F.3d 1307, 1311 (Fed. Cir. 2009) (quoting *In re Cronyn*, 890 F.2d 1158, 1160 (Fed. Cir. 1989)).  To be considered publicly accessible, the prior art reference must have been "disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter

57

Appx77

or art exercising reasonable diligence, can locate it." *Kyocera Wireless Corp.*, 545 F.3d at 1350.

AWS alleges that the face of the document, an archived table of contents from the January 1998 edition of IEEE Communications Magazine, and citations to the article by four other papers demonstrates that the article was published in 1998 and publicly accessible at the time. Def.'s Resp. to Pl.'s Mot. for Summ. J. at 58-59. Kove argues that no reasonable jury could find that the Steen article was publicly accessible, but this argument is unpersuasive.

Whether a prior art reference is publicly accessible is a question of fact. *Jazz Pharms., Inc. v. Amneal Pharms., LLC*, 895 F.3d 1347, 1356 (Fed. Cir. 2018). Kove has provided no evidence to counter the date on the face of the article, table of contents or academic citations but instead notes only AWS's failure to provide specific evidence of factors that have been used to demonstrate public accessibility in the past, such as the feasibility of indexing and other research tools to locate the reference. Pl.'s Reply at 16. But the case law regarding public accessibly is not as narrow as Kove suggests. *See GoPro, Inc. v. Contour IP Holding LLC*, 908 F.3d 690, 693 (Fed. Cir. 2018) ("We have interpreted § 102 broadly, finding that even relatively obscure documents qualify as prior art so long as the relevant public has a means of accessing them."); *In re Lister*, 583 F.3d at 1312 ("Neither cataloging nor indexing is a necessary condition for a reference to be publicly accessible."). The date on the face of the article and the table of contents are evidence of the article's publication date, and AWS indicates it intends to use the academic citations to establish that interested members of the relevant public could locate the Steen article. Based on the evidence in the record, the Court cannot

58

Appx78

conclude that no reasonable juror could find in AWS's favor. Kove's objections at best demonstrate that questions of fact remain regarding the public accessibility of the Steen article. Thus Kove is not entitled to a determination on summary judgment that the article cannot qualify as a prior art reference.

In conclusion, this Court holds that DNS/BIND 8.1 may not be used as prior art references; Cache Resolver qualifies as a prior art reference under section 102; and the Boukobza patent, Karger '618 patent and Karger '420 patents qualify as prior art references under section 102(e).

### 2. Equitable defenses

Kove also seeks summary judgment on AWS's defenses of equitable estoppel, waiver, and inequitable conduct. AWS contends that a ruling on it its equitable defenses are not appropriate at the summary judgment stage. But courts in this district have considered summary judgment motions on these equitable defenses, and the Federal Circuit has affirmed grants of summary judgment motions on such defenses. *See, e.g., Intercontinental Great Brands LLC v. Kellogg N. Am. Co.*, 869 F.3d 1336 (Fed. Cir. 2017) (affirming district court's grant of patentee's summary judgment motion on inequitable conduct defense); *Robertson Transformer Co. v. Gen. Elec. Co.*, 149 F. Supp. 3d 919, 934 (N.D. Ill. 2015), *opinion corrected*, 191 F. Supp. 3d 826 (N.D. Ill. 2016) (granting patentee's summary judgment motion on equitable estoppel and waiver defenses). The Court finds that consideration of Kove's summary judgment request is appropriate at this stage.

### a. Equitable estoppel and waiver

Equitable estoppel is a defense that acts as a complete bar to patent

59

Appx79

infringement. *John Bean Techs. Corp. v. Morris & Assocs., Inc.*, 887 F.3d 1322, 1327 (Fed. Cir. 2018). The three elements that the defendant must prove to establish equitable estoppel are:

> (1) misleading conduct, which may include not only statements and actions but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted.

*Mabus v. Gen. Dynamics C4 Sys., Inc.*, 633 F.3d 1356, 1359 (Fed. Cir. 2011) (quoting *Lincoln Logs Ltd. v. Lincoln Pre–Cut Log Homes, Inc.*, 971 F.2d 732, 734 (Fed. Cir. 1992)).

The first element, misleading conduct, "occurs when the alleged infringer is aware of the patentee or its patents, and knows or can reasonably infer that the patentee has known of the allegedly infringing activities for some time." *High Point SARL v. Sprint Nextel Corp.*, 817 F.3d 1325, 1330 (Fed. Cir. 2016). Misleading conduct can include "statements, action, inaction, or silence where there was an obligation to speak." *John Bean Techs. Corp.*, 887 F.3d at 1327. When the alleged infringer attempts to establish misleading conduct by silence alone, "mere silence must be accompanied by some *other* factor which indicates that the silence was sufficiently misleading as to amount to bad faith." *Id.* (quoting *Hemstreet v. Comput. Entry Sys. Corp.*, 972 F.2d 1290, 1295 (Fed. Cir. 1992)).

AWS contends that Kove misled AWS by not raising potential infringement concerns during communications between the companies that took place in 2017 and 2018. During his deposition, Overton testified that he never sent a potential infringement notice to AWS and was not aware of any other Kove employees who had done so. Def.'s Stmt. of Mat. Facts, Ex. 75 at 116:16-117:15; *Id.* at 324:17-326:4.

60

Appx80

Overton also acknowledged that an email he sent to an Amazon employee during communications over the sale of XFM contained a proposal stating that "Amazon and Kove could offer additional 10x-50x performance uptick to" multiple Amazon products, including DDB.  Def.'s Stmt. of Mat. Facts, Ex. 75 at 297:11-298:9; *id.*, Ex. 77 at KOV_00164170.

In cases in which courts have determined that the patentee's silence was misleading, the patentee's conduct typically involved a threat of litigation or an express objection to the allegedly infringing activities followed by years of silence.  *Ferring B.V. v. Allergan, Inc.*, 980 F.3d 841, 853 (Fed. Cir. 2020).  This set of facts is not always required for an equitable estoppel finding.  *ABB Robotics, Inc. v. GMFanuc Robotics Corp.*, 52 F.3d 1062, 1064 (Fed. Cir. 1995).  Nevertheless, the absence of evidence that Kove threatened an infringement action or raised a particular objection to the accused products significantly reduces the likelihood that a reasonable juror could infer that Kove's silence misled AWS.

In response to Kove's cross-motion for summary judgment, AWS notes that the parties dispute whether Kove's failure to mention the asserted patents during the XFM sale negotiations was intentional.  But intentional or not, silence can give rise to estoppel only if the patentee had a "clear duty to speak" or if its continued silence "reenforces the defendant's inference from the plaintiff's known acquiescence that the defendant will be unmolested."  *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1029 (Fed. Cir. 1992) (en banc) (*abrogated in part by SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods.*, LLC, 137 S. Ct. 954 (2017)).  AWS has not adduced evidence that Kove breached any duty to disclose the asserted patents amid

negotiations for the sale of an unrelated product. *See R2 Med. Sys., Inc. v. Katecho, Inc.*, 931 F. Supp. 1397, 1417-18 (N.D. Ill. 1996) (holding patentee's failure to raise potential infringement claim amid communications over safety concerns was not misleading conduct). And notably, AWS does not attempt to establish that it was aware of the asserted patents to support its equitable estoppel defense. In fact, to advance its argument that this Court should grant summary judgment of no willful infringement , AWS strongly contests Kove's allegation that it had any knowledge of the asserted patents prior to filing this lawsuit. Def.'s Mot. for Summ. J. at 30 ("And there's no evidence that any Amazon employees relevant to this lawsuit . . . knew of Kove's patents-in-suit before this matter.").

Even were the Court to find a genuine factual dispute regarding whether Kove's alleged silence was misleading, AWS still cannot survive summary judgment on its equitable estoppel defense because it has not adduced evidence of reliance or material prejudice. AWS argues that it "could have implemented a variety of non-infringing alternatives" if Kove had alleged infringement earlier. Def.'s Stmt. of Add'l Mat. Facts ¶ 12. But on reliance, the relevant question is not whether AWS would have acted differently if it was aware of the possibility of infringement action. Rather, the question is whether AWS relied upon Kove's conduct in deciding to develop the accused products in their current forms rather than pursue these non-infringing alternatives. *See Hemstreet v. Computer Entry Sys. Corp.*, 972 F.2d 1290, 1294 (Fed. Cir. 1992) (reversing summary judgment where alleged infringer had failed to establish its actions were taken in reliance upon patentee's conduct). There is no evidence in the record to support the conclusion that AWS took into account Kove's silence "in connection with

62

Appx82

taking some action." *Aspex Eyewear Inc. v. Clariti Eyewear, Inc.*, 605 F.3d 1305, 1311 (Fed. Cir. 2010) (citation omitted). Consequently, no reasonable juror could find that any actions taken regarding the accused products were taken due to its belief that the asserted patents would not be enforced. *See A.C. Aukerman Co.*, 960 F.2d at 1043 (noting that alleged infringer's ignorance of asserted patents undermined reliance claim).

Similarly, AWS fails to produce or identify evidence that creates a genuine factual dispute regarding whether it suffered material prejudice due to Kove's silence and/or inaction. Prejudice may consist of a change of economic position or a loss of evidence. *Id.* But AWS has not suggested that it suffered economic or evidentiary harm due to Kove's conduct. At best, AWS has offered evidence that if it had known that Kove might sue for infringement, AWS would have pursued alternate design options. But investment in the development of the allegedly infringing product is insufficient to demonstrate material prejudice. *Hemstreet*, 972 F.2d at 1294.

AWS relies upon the same set of operative facts to support its waiver defense as it did for its equitable estoppel defense. Sustaining a waiver defense requires "clear and convincing evidence that '[the patentee's] conduct was so inconsistent with an intent to enforce its rights as to induce a reasonable belief that such right has been relinquished.'" *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1348 (Fed. Cir. 2011) (alteration in original) (quoting *Qualcomm Inc. v. Broadcom Corp.*, 548 F.3d 1004, 1019 (Fed.Cir.2008)). The only conduct AWS points to is Kove's silence throughout the XFM sale negotiations. But AWS cites no legal authority to support the proposition that silence alone is sufficient to induce an alleged infringer to believe that

63

Appx83

the patentee is relinquishing its infringement enforcement rights.

Even drawing all reasonable inferences from the underlying facts in the light most favorable to AWS, no reasonable factfinder could rule in AWS's favor on its equitable estoppel or waiver defenses. This Court therefore grants Kove's motion for summary judgment on AWS's defenses of equitable estoppel and waiver.

**b.      Inequitable conduct**

AWS asserted an inequitable conduct counterclaim against Kove, arguing that Overton, the inventor, failed to disclose material prior art to the USPTO during the prosecution of the asserted patents. Specifically, AWS alleges that a 1997 article by David Karger entitled " Consistent Hashing and Random Trees: Distributed Caching Protocols for Relieving Hot Spots on the World Wide Web" was material to the approval of the asserted patents, and that Dr. Overton was aware of the article at the time the patent applications were submitted but deliberately did not disclose it to the USPTO. Kove contends that AWS has not presented sufficient evidence to permit a reasonable finding in its favor regarding inequitable conduct.

"Inequitable conduct is an equitable defense to patent infringement that, if proved, bars enforcement of a patent." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011). A patent applicant has engaged in inequitable conduct when the applicant breaches its duty of candor, good faith and honesty to the PTO. *Warner-Lambert Co. v. Teva Pharms. USA, Inc.*, 418 F.3d 1326, 1342 (Fed. Cir. 2005). This breach of duty occurs when the patent applicant "(1) misrepresented or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive the PTO." *Ohio Willow Wood Co. v. Alps S., LLC*, 735 F.3d 1333, 1344

64

Appx84

(Fed. Cir. 2013) (quoting *In re Rosuvastatin Calcium Patent Litig.*, 703 F.3d 511, 519 (Fed. Cir. 2012)).  As the party asserting inequitable conduct, AWS bears the burden of showing by "clear and convincing evidence" that the patent applicant "knew of the reference, knew that it was material, and made a deliberate decision to withhold it." *Therasense*, 649 F.3d at 1290.  In the absence of direct evidence, a court may rely on indirect and circumstantial evidence to infer intent to deceive.  *Id.*

Here, AWS points to two pieces of circumstantial evidence that it contends show that at least one of the inventors knew of the prior art reference.  First, AWS produced metadata that it asserts demonstrates that Dr. Overton saved a copy of the Karger article to his computer as early as January 1999.  During his deposition, Overton acknowledged that the metadata indicates that the document was created on January 3, 1999 and that he was the custodian of that document.  Pl.'s Stmt. of Mat. Facts, Ex. 85 at 709:9-710:15.  Second, AWS points to a 2005 letter Overton drafted to an investor. In the letter, Overton assured the investor that the hash table technology described in the Kove patents "predates al [sic] the MIT and Stanford research . . . ."  Def.'s Stmt. of Add'l Mat. Facts, Ex. 91 at 2.  AWS asserts that Overton's mention of "MIT and Stanford research" is an indirect reference to the research of Karger, who was an MIT professor at the time.  Def.'s Resp. to Pl.'s Mot. for Summ. J. at 49.

Kove disputes AWS's characterization of the metadata, noting that the date that the document was created does not prove that Overton possessed the document on that date.  And Kove disputes that Overton's mention of "MIT and Stanford research" can be construed as a reference to the Karger article.  Kove's expert also testified that he was uncertain if the Karger article "would ris[e] to the level of something that just

<div align="center">65</div>

<div align="center">Appx85</div>

would be known to a person of ordinary skill in the art generally." Pl.'s Resp. to Def.'s Stmt. of Add'l Mat. Facts ¶ 17. Given the divergent interpretations of the metadata and the letter, as well as the competing expert testimony, there is an issue of fact as to whether Overton knew of the Dr. Karger article at the time of the prosecution of the asserted patents.

Next, AWS has the burden of establishing that Overton was aware of the Karger article's materiality. A prior art reference is material if "in the absence of the withholding or misrepresentation," the USPTO's knowledge of the reference "would have prevented a patent claim from issuing." *Ohio Willow Wood Co.*, 735 F.3d at 1345.

To demonstrate knowledge of materiality, AWS relies on Greene's expert invalidity report. Greene opined that "a POSITA at this time would have considered this article highly relevant to the purported invention described in the Asserted Patents." Pl.'s Resp. to Def.'s Stmt. of Mat. Facts ¶ 232. But after briefly reviewing the Karger article, Overton testified that he didn't consider the reference "germane" to the asserted patents because the article described caching, and one of the critical components of Kove's patented technology was the *elimination* of caching. *Id.* at 732:14-733:12. The speculation of the party's respective expert witnesses shed little, if any, light on Overton's knowledge of materiality at the relevant time. But, drawing all reasonable inferences in favor of AWS, the 2005 letter may be understood to suggest that Overton was aware of similarities between the technology described in the Karger article and the asserted patents. His testimony that he considered the Karger research "very different" gives rise to a genuine factual dispute regarding whether he knew the reference was material. *See* Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, K37 at 717:15-20.

66

Appx86

Neither side presents direct evidence of but-for materiality, but AWS directs the court to the testimony of its expert witness. Greene opined that "[i]n [his] view, this article and Karger's work at MIT are material to the subject matter of the applications that became the Asserted Patents." Pl.'s Resp. to Def.'s Stmt. of Mat. Facts, Ex. K42 ¶ 231. Kove points to no contradictory evidence regarding materiality, and thus it has not shown the absence of a genuine dispute of material fact on this element.

Kove is correct that for AWS to prevail on its inequitable conduct defense, "specific intent to deceive must be the single most reasonable inference able to be drawn from the evidence." *Therasense*, 649 F.3d at 1290. But in *Therasense*, the Federal Circuit was setting forth the standard for proving inequitable conduct at trial, not at the summary judgment stage.

Kove cites *Baxter International, Inc. v. CareFusion Corp.*, No. 15 C 9986, 2022 WL 981115 (N.D. Ill. Mar. 31, 2022), for the proposition that a court must grant summary judgment in its favor if a reasonable jury would not be *required* to find specific intent to deceive. *See* Pl.'s Reply at 7. But some district courts have cast doubt on the proposition that, at the summary judgment stage, a nonmovant must offer evidence that would permit a reasonable finding that deceptive intent is the single most reasonable inference. *See, e.g.*, *Sysmex Corp. v. Beckman Coulter, Inc.*, No. CV 19-1642-JFB, 2022 WL 1503987, at *4 (D. Del. May 6, 2022) ("So [nonmovant] should not be required to prove its case now—i.e., it should not have to actually demonstrate that deceptive intent is the single most reasonable inference."); *Sprint Commc'ns Co. LP v. Charter Commc'ns, Inc.*, No. CV 17-1734-RGA, 2021 WL 982728, at *4 (D. Del. Mar. 16, 2021) (denying plaintiff's motion for summary judgment because genuine issues of material

67

Appx87

fact remained regarding specific intent to deceive).

The Court concludes that at this stage, AWS's burden is not as high as Kove contends. A reasonable factfinder could conclude that specific intent to deceive is the single most reasonable inference to draw from Overton's conduct. Thus Kove is not entitled to summary judgment on the inequitable conduct defense.

## Conclusion

For the foregoing reasons, the Court grants the defendant's motion for summary judgment in part and denies it in part [dkt. no. 686]. The Court allows the defendant's request for further claim construction, but only to the extent set out in the body of this opinion; denies the defendant's motion for summary judgment of non-infringement regarding the plaintiff's '640, '170 and '978 patents as well as on the question of willful infringement. The Court denies the defendant's motion to strike expert Goodrich's infringement analysis regarding hierarchical topologies. The Court grants-in part and denies-in part the plaintiffs' cross-motion for summary judgment [dkt. no. 699]. Specifically, the Court grants summary judgment for the plaintiff on the defenses of section 101 patent ineligibility, equitable estoppel, and waiver, as well as on the invalidity contentions relying on the "DNS" prior art reference; denies the plaintiff's motion for summary judgment on the defenses of inequitable conduct and double patenting; and grants the plaintiff's motion to strike expert Grama's "parent-child" hierarchical theory and expert Greene's double patenting opinions that rely on the patent specifications as prior art. The case is set for a telephonic status hearing on February 8, 2024 at 9:20 a.m. to discuss reasonable time limits for the jury trial set for April 1, 2024 and the schedule and other details for filing motions *in limine* and the final

68

Appx88

pretrial order.  The following call-in number will be used:  888-684-8852, access code 746-1053.

Date:   February 6, 2024

_____
MATTHEW F. KENNELLY
United States District Judge

69

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KOVE IO, INC.,                          )   Docket No. 18 C 8175
                                        )
                    Plaintiff,          )
                                        )
            vs.                         )
                                        )
AMAZON WEB SERVICES, INC., et al.,      )   Chicago, Illinois
                                        )   March 21, 2024
                    Defendants.         )   1:30 o'clock p.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MATTHEW F. KENNELLY

APPEARANCES:

For the Plaintiff:      REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
                        BY:  MR. COURTLAND REICHMAN
                             MS. GINA CREMONA
                             MR. ADAM ADLER
                             MR. JAIME FRANCISCO CARDENAS-NAVIA
                             MS. SAVANNAH CARNES
                        100 Marine Parkway, Suite 300
                        Redwood Shores, CA  94065
                        (650-623-1401

Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                        Official Court Reporter
                        219 S. Dearborn Street, Suite 2102
                        Chicago, Illinois  60604
                        (312) 435-5639

yesterday basically saying the things that I wanted to talk about, and it looks like one of the stipulations that got filed later yesterday maybe takes a couple of those off the table, but we can kind of sort that out as we go.

So my plan for this, I'm not going to issue written rulings on anything. There's just going to be a minute entry. My plan on this was to go through everything that I am prepared to rule on without hearing more argument, starting with the defendant's Daubert motions, then the plaintiff's Daubert motions, then the defendant's motions in limine, then the plaintiff's motions in limine, and then go back and talk about the ones that we need to talk about. So that's the plan.

And if we get -- if we get to something and it looks like I'm about to rule on something that has now been taken off the table by the stipulation, somebody jump up and say you don't need to rule on that, so it will save me a couple of minutes.

So you're going to want to order the transcript, but, you know, obviously feel free to take notes.

So I'm going to start with the defendant's Daubert motions. And Melissa, I'll get you something afterwards. You don't have to worry about keeping track as we go.

THE CLERK: Okay.

THE COURT: The first one has to do with the damages

expert, Bergman, B-E-R-G-M-A-N, and it's his bargaining -- what's referred to as his bargaining split opinion. Bottom line, I think the opinion is sufficiently explained and it's tied to the facts in the case as required by *Exmark Manufacturing Company v. Briggs & Stratton Power Products* which was a case cited by the defendants. I don't think this is a situation where Bergman has just recited factors and then pulled the number out of the air. I think he's explained it sufficiently. And, you know, to the extent there's not a precise formula, it's a hypothetical negotiation, and so there's some lack of precision that's kind of inherent in the process. So that motion's denied.

The next issue on Bergman has to do with what are referred to -- I'm just going by the titles here -- S3 and hashing limitations. So the plaintiff's, what I'll refer to as technical expert whose name is Goodrich, concludes that almost all of the benefits of something called cache, which I guess is spelled c-a-c-h-e, derived from hashing; and Bergman, the damages expert, in turn relies on that.

I think it's sufficiently supported. The fact that the defendant's expert differs is not a basis to exclude it. What this boils down to in my view is a dispute over where the benefits of the alleged infringing system were derived, and I don't think that's a basis for exclusion.

There are disputes about the analysis of claimed

non-infringing alternatives, but I think those are matters for cross-examination and argument about weight, not for exclusion.

The next opinion has to do with S3 and the scaling limitations. The argument is that Mr. Goodrich, upon whom Bergman relies, maybe it's Dr. Goodrich, I don't know, overstates the scaling claims value within S3. I think the plaintiff has the better of this argument as well. The non-infringing alternative that's considered by Goodrich and relied on by Bergman I think is sufficiently narrowed to address only the allegedly infringing aspects of S3.

The next issue has to do with DDB, which I think is sometimes referred to as DynamoDB, and that has to do with both hashing and scaling limitations. And, again, I think the analysis by Bergman is sufficiently explained and supported as based on alternatives, non-infringing alternatives that exclude only the claimed infringing features of DynamoDB.

There's a dispute over the extent to which the infringing features contribute to the value of the patent, but that's a basis for cross-examination and presentation of contrary evidence, not exclusion.

The rest of the Daubert motion has to do with Goodrich, the technical expert.

First is his opinion that -- regarding the non-hierarchical -- it has to do with the -- what's referred

one is moot now. 5 is moot. 6 is moot.

So now we're to 7 which was my least favorite one to deal with which is why we're doing it last. It probably would have been a reason to do it first.

Okay. So this is the whole amalgam of stuff where the contention is by the plaintiff that the defense -- and it's largely I think the expert Grama -- are planning to do or say things that are at odds with the claim construction. This is going to get a little tedious.

Why don't we take a five-minute break before we do it because we've been going for about an hour and a half. So just take a five-minute break and we'll pick it up right here.

(Short break.)

THE COURT: Okay. I think we got everybody back, so we're going to pick up with plaintiff's motion in limine number 7 and it's going to be kind of a mixed bag of me walking through it and then asking questions and then trying to make rulings.

So it's a series of points where Kove is saying that AWS is trying -- and I think it's -- in some instances, it's in proposed jury instructions, in some instances it's in the testimony of Dr. Grama, in some instances maybe it's both -- trying to change or add to claim constructions.

And I guess, you know, there's two things. Number one, the claim constructions are what they are, and witnesses

and lawyers don't get to contradict them at trial. But secondly, and this is a point I'll come back to in a second, if there's a dispute -- if there's still a dispute over what a claim means, I might be ticked off that it wasn't brought to my attention earlier, but it doesn't absolve me from needing to resolve it because kind of the paradigmatic error A1 that a judge in a case like this can permit is to allow experts to give differing claim constructions and have the jury figure it out. That's kind of a nice way of saying to the Federal Circuit, please tell us to do this all over again, which I don't think any rational person would want to invite.

So with that background, the first issue has to do with the term non-hierarchical. So the claim construction ruling was that the phrase plurality of location servers means location servers in a non-hierarchical structure. And then it was further stated that non-hierarchical, the term non-hierarchical meant, comma, as Kove had defined it, comma, that any given server can return the requested information or information usable by the client to locate the server that has the requested information.

So those are rulings that have been made. And the argument here is that AWS, and I think it's a jury instruction in this instance, changes the definition of non-hierarchical. And it's really the second part of it, the part after the "or" to require that a server would have to know, k-n-o-w, which

location server contains the location information of the desired data.

So my first reaction to that is, no, that's changing the claim construction, and I actually rejected that in the summary judgment ruling and it was ruled on I think pretty definitively -- not pretty definitely -- definitively in the claim construction ruling by Judge Pallmeyer.  That argument was lost.  It's not that the -- any given server has to know -- if it doesn't have the information itself, it has to know which one has it.  It's that it has to have information that can be used by the client to locate the server that has it.  And I don't know if that difference is significant, but it's a difference, and we're going to go with what the ruling was.

But here's my question because in the further discussion -- and this is one of these multiple terms that takes up the most space in the briefs.

This kind of comes from a suggestion that's made by AWS in the response.  So it's a question for Kove.  Can I include -- is there any reason why I can't include in the instructions, when we're talking about what claim terms mean, the definition of, quote, non-hierarchical, close quote, that you effectively say was determined, and that's non-hierarchical means any given server can return the requested information or information usable by the client to locate the server that has the requested information?  Is

there any reason why we can't include that in the definitions that are given to the jury in the instructions?

MR. CARDENAS-NAVIA: No, your Honor.

THE COURT: And does that not solve your problem? You kind of say in the response that it does, but I wasn't a hundred percent certain.

MR. SIGLER: We'd prefer the further construction, your Honor.

THE COURT: Yeah, I don't think the further construction is right. So that's the way we're going to go with it. We're going to include that definition of non-hierarchical in the instructions.

Okay. The second term has to do with identifier and location. Okay. So -- and, again, it helps me to just kind of put out there a summary of what I understand the arguments to be.

So according to Kove, Kove says that AWS wants to argue that only one location may be associated with each identifier. However, Kove says, on claim construction, the term identifier was interpreted to mean zero or more location strings are associated. So zero or more doesn't mean just one. It means zero or more than zero so AWS is wrong.

The response by AWS is that's not what we're arguing. And that's kind of where I lost the thread. So tell me what you think is wrong with Kove's argument on this. If you're

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KOVE IO, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 18 C 8175** |
| | ) | |
| **AMAZON WEB SERVICES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER ON PLAINTIFF'S MOTION IN LIMINE 7**

Kove's motion in limine 7 asks the Court to bar testimony and argument that Kove contends is contrary to the Court's construction of claim language. It is clear that a party may not contradict a claim construction made by the Court in presenting evidence or argument to the jury. *See, e.g., Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312, 1321 (Fed. Cir. 2009). During the final pretrial conference, the Court ruled on all of motion in limine 7 except for subpart 5.

Subpart 5 concerns the claim term "location." Judge Pallmeyer adopted the parties' agreed-upon construction of "location": "an encoding that is a member of a set of associations with an identifier in a location server, and that specifies where data pertaining to the entity identified by the identifier is stored." Dkt. no. 484 at 11. Kove argues that AWS's expert Dr. Ananth Grama is attempting to add to this a requirement that something cannot be a location (or location data) if the data moves but the location (or location data) stays the same, *see, e.g.*, Pl.'s Mots. In Limine, Ex. 6 (Grama report) ¶ 265, 1st sentence, and that a location must be "all that you need to find exactly the data that you're looking for." *Id.*, Ex. 7 (Grama deposition) at 216; *see also, e.g., id.* at 222,

Appx98

236-37.  Kove contends that besides imposing additional limitations upon the agreed-upon construction adopted by Judge Pallmeyer, Dr. Grama's position reads preferred embodiments—such as URL-based embodiments—out of the patents.

In response, AWS argues that Kove is trying to blur the distinction between "locations" and "identifers."  A location, AWS says, specifies where data is stored; an identifier is an encoding that identifies an individual entity.  *See* Dkt. no. 484 at 11.  But the claimed distinction is not really that stark:  as noted above, the definition of "location" that AWS agreed to during claim construction says it is "*an encoding* that is a member of a set of associations with an identifier in a location server, and that specifies where data pertaining to the entity identified by the identifier is stored."  In other words (as AWS concedes, *see* Def.'s Resp. to Pl.'s Mots. In Limine at 17-18), the location and the identifier are *both* used to find data.

Regarding Dr. Grama's testimony that something can't be a location unless it's "all that you need to find exactly the data that you're looking for," AWS has committed that it will not offer any such testimony or argument.  In a brief submission made after the final pretrial conference, AWS has affirmed that "[a]s stated in court, AWS agreed that Dr. Grama won't offer any opinion that a location must be all that you need to find exactly the data that you're looking for."  Dkt. no. 835 at 1.  That's definitive, and it takes that particular aspect of Kove's motion off the table.

In the same submission, however, AWS says it continues to "maintain[ ] that if data moves and the alleged location stays the same, that's relevant evidence of non-infringement and consistent with both the agreed 'location' construction and the embodiments Kove referenced at the hearing."  *Id.*  Put this way, the contention is

2

Appx99

contrary to—because it imposes an additional limitation upon—the construction adopted by Judge Pallmeyer.  And this motion doesn't involve (as AWS suggests) Kove asking for a new or additional claim construction.  Rather, Kove is simply asking the Court to hold AWS to the construction of "location" that it agreed to during the claim construction process, which *did not* include the purported additional limitation that AWS seems to want to advocate now.  The Court concludes that AWS forfeited any argument for a different or narrower contention when it agreed to the construction that Judge Pallmeyer adopted.

But it's not apparent to the Court that this fully resolves the dispute set out in the briefing on this part of motion in limine 7.  The particular opinion by Dr. Grama that AWS wants to advance is that what is called a "Blindex" in AWS's S3 product "does not change even when the location of the associated data on S3 changes, and so is not location data."  Pl.'s Mots. In Limine, Ex. 6 ¶ 265, 1st sentence.  The problem with this particular opinion, worded thusly, may be one of semantics.  By using the word "so" in the quoted passage, Dr. Grama seems to be saying that the Blindex is not location data *because* it does not change when the location of the data changes.  Read that way, Dr. Grama (and AWS) would indeed be adding an additional limitation to the construction of "location," which as the Court just noted AWS is not entitled to do.

But the precise point that AWS actually seems to be advancing is that a Blindex is not location data because it does not help identify (or specify) where data is stored. *See* Mar. 21, 2024 Tr. at 98 ("And essentially in S3, a Blindex is like a code name for a data object. *It's not something that tells you where the data for that object is located*.") (emphasis added).  If expressed that way, the opinion does not appear to the Court to

3

Appx100

be contrary to the claim construction or otherwise improper. So long as it is expressed and argued that way (and only that way), AWS may advance this point at trial. And, of course, Kove is entitled to advocate the converse of this point.

Date: March 24, 2024

_____
MATTHEW F. KENNELLY
United States District Judge

4

1713

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KOVE IO, INC.,                              )    Docket No. 18 C 8175
                                            )
                      Plaintiff,            )
                                            )
              vs.                           )
                                            )
AMAZON WEB SERVICES, INC., et al.,          )    Chicago, Illinois
                                            )    April 9, 2024
                      Defendants.           )    9:00 o'clock a.m.

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MATTHEW F. KENNELLY
VOLUME 7-A

APPEARANCES:

For the Plaintiff:      REICHMAN JORGENSEN LEHMAN & FELDBERG LLP
                        BY:  MR. COURTLAND REICHMAN
                             MS. CHRISTINE E. LEHMAN
                             MS. AMY L. RUHLAND
                             MS. SAVANNA CARNES
                             MS. KHUE HOANG
                             MR. JAIME FRANCISCO CARDENAS-NAVIA
                             MS. SHAWNA L. BALLARD
                        100 Marine Parkway, Suite 300
                        Redwood Shores, CA  94065
                        (650) 623-1401

Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                        Official Court Reporter
                        219 S. Dearborn Street, Suite 2102
                        Chicago, Illinois  60604
                        (312) 435-5639

scalable, it infringes?

MS. PHILLIPS: Scalable or available, durable, it has speed --

THE COURT: Okay.

MS. PHILLIPS: -- that it infringes.

THE COURT: Okay. Let me hear from plaintiff's counsel.

MS. CARNES: I'm sorry, your Honor.

Dr. Goodrich has been very clear in his testimony delineating between when he's talking about his infringement analysis. Last week when he testified, there was one part of his slide deck was, this is my opinion on infringement. And then he had a second transition point where he talked about, these are the technical benefits of the invention.

Just this morning on rebuttal, Dr. Goodrich testified why -- you know, why his analysis is that way. That the technical benefits do not go to infringement and that they go to Mr. Bergman's economic analysis.

So there is no confusion between those. And Dr. Goodrich has been very clear about the separation between those two parts of the opinion.

THE COURT: Yeah, I really don't see any plausible argument that this is going to confuse the jury in the infringement analysis. I mean, the difference between this or at least a difference between this and the instruction that's

currently at page 23 was the testimony that the instruction on page 23 -- I'm assuming this is part of why this instruction is being offered. If I'm wrong, you know, tell me. But -- well, you gave them an instruction that says, this testimony is relevant for this reason and not for the other reasons. We should get one too.

The difference is is that the evidence that was offered regarding the security features and the one-key and the two-key and the three-key was presented in a way that suggested or could reasonably be read to suggest that it was -- that it actually had something to do with infringement. I don't think the rest of this does. That's the difference. So I'm overruling that request for an instruction.

So the one other thing that's left then is this instruction -- this proposed instruction that I think -- I thought I said this before, maybe during the trial in a different context, as I'm going back to Kove's email now, and I'm going back up to the claim construction part of the jury instructions here on location.

So the proposal is to say, for all three patents, there's no requirements that the location have all the information necessary to find and retrieve the requested data. Additional information can be used to find and retrieve the data. There's also no requirement that the location must change when the servers storing the data changes.

So if somebody can just refresh my memory. Did I -- have I not said that at some point during the trial to the jury? No?

MS. CARNES: No, your Honor.

THE COURT: I know this came up. Did it come up in the motions in limine? What was it exactly? I just need a memory refresher.

MR. REICHMAN: It came up in motion in limine number 7.

THE COURT: It was the one that I wrote the little order on.

MR. REICHMAN: And those two are your holdings, your Honor.

THE COURT: It was the one that I wrote the little order on. Okay.

MS. PHILLIPS: Your Honor?

THE COURT: Just a second. You're going to get a chance to talk. If you want to name for me one time both sides haven't had a chance to discuss something, get your hand up right now and tell me. I got to just get my bearings first. I want to pull up that order.

Can somebody remind me what the docket number of that --

MS. PHILLIPS: 837, your Honor.

THE COURT: Thanks. Okay.

Now I got it up on my screen.

Okay.  Let me hear from defense counsel.

MS. PHILLIPS:  I'm sorry.

THE COURT:  That's you.

MS. PHILLIPS:  Thank you.

So the jury knows the requirements of the claim term based on the Court's construction.  It's AWS's position that there's no need to add confusing additional information.

THE COURT:  What's confusing about this?  You said "confusing additional information."

MS. PHILLIPS:  It talks about what's not required. And in your Honor's order on the motion in limine at docket 837, the Court stated that Dr. Grama could offer opinions that the Blindex is not location data because it doesn't help specify where the data is stored, and that follows the claim construction.

The way that the Blindex works suggests that the component doesn't specify where the data is stored.  And these additional -- these additional requirements -- sorry -- these additional sentences discussing what isn't required just amounts to more claim construction.

THE COURT:  Well, that's the -- that's the last sentence or the second sentence, not the first one, right? The thing you -- when you were discussing the Blindex, that relates to the second sentence of the proposal by Kove, not

the first, right?

MS. PHILLIPS: I think that's correct.

THE COURT: There is also no requirement that the location must change when the server storing the data changes.

Just a second.

Okay. Let me hear from plaintiff's counsel.

MR. REICHMAN: Thank you, your Honor.

There are, as I read it, two holdings in the order on page 2 is where, if you call it a holding, the Court took AWS's concession as that's definitive and takes this aspect off the table that they will not argue that it's all the information you need to find exactly the data that you're looking for. So it's a holding in the sense that they took their concession. But then the witnesses proceeded to testify, and at times I think your Honor found in violation of the order.

THE COURT: That's the first sentence of your proposal.

MR. REICHMAN: Yes, sir.

THE COURT: Okay. What about the second sentence?

MR. REICHMAN: The second sentence is dealt with in that paragraph, it begins in the bottom of page 2. In the same submission, AWS says it continues to maintain that if the data moves and the alleged location stays the same, that's relevant evidence of non-infringement. And it goes on.

The Court held that this position was forfeited, and they may not argue it. In this trial, we've heard evidence about that very point from the fact witnesses and, I believe, Dr. Grama.

THE COURT: Okay. So the thing that sticks in my mind regarding Dr. Grama's testimony relates to the first sentence, I think. And that's the thing that's quoted in your email from -- I guess it's page 1462 to 1463 of the transcript.

MR. REICHMAN: Yes, sir.

THE COURT: And so I think the first sentence is necessary because the -- what I can construe it as a commitment that was made at page 2 of that -- of docket number 837 -- I mean, I think that that was -- I think it didn't happen that way.

And so I think that on that -- I think the first sentence of this is appropriate because it just seems to me that there was some attempt, effort, whatever you want to call it, to testify to something that was at odds with the concessions and at odds with the claim construction.

So can you show me something where somebody has said something that would necessitate -- during the trial, in other words -- where somebody had said something that would necessitate the second of the two sentences that you proposed?

MR. REICHMAN: I can, your Honor. I can't here this

second.

THE COURT: That's what you got to do. This is when we're doing it.

MR. REICHMAN: I can tell you what it is, but I don't have the citation at this minute. I'll tell you what it was, is Dr. Vermeulen testified -- and we objected at the time contemporaneously -- about how the location information does not change when the location of the data moves. And we objected. And, you know, the ruling, as we understood it and followed it, was that he was just testifying as to how it works.

THE COURT: How the system works, right.

MR. REICHMAN: Right.

But, yet, these witnesses are being used quite expressly to inform the infringement analysis. And, in fact, as I recall it, there was a jury question on that exact point. So they got the picture, that that is a non-infringement position.

THE COURT: Does anybody remember what day Dr. Vermeulen testified? I think it was the third maybe.

MR. REICHMAN: Day three, I believe.

THE COURT: Yeah.

MR. REICHMAN: So we have it in the brief actually, your Honor, on footnote 11. We have the citation for this exact point.

THE COURT: What brief?

MR. REICHMAN: Sorry. The competing submissions for the instructions. I can just read it in, if you'd like, or show you where it is.

THE COURT: Just tell me a page.

MR. REICHMAN: Page -- on the completing submissions, is blue and red, page 10.

THE COURT: No, no. I'm looking for Dr. Vermeulen's testimony.

MR. REICHMAN: Page 807.

THE COURT: 807.

MR. REICHMAN: Line 3 through line 8.

THE COURT: All right. Let me just get there. 807.

MR. REICHMAN: And then there was a sidebar that followed.

THE COURT: Right. I'm just looking at it.

So this is April 3rd at page 807.

MR. REICHMAN: Yeah, and the sidebar is important, when you're ready.

THE COURT: Okay. Where is the sidebar?

MR. REICHMAN: 817.

THE COURT: 817.

MR. REICHMAN: 5-14.

THE COURT: Okay. I now recall this. The sidebar starts on 816 actually.

MR. REICHMAN: Okay. Thank you.

THE COURT: So if I was going to put this in here, where would it go?

MR. REICHMAN: I think it would go at the bottom of the table. You can just put it after --

THE COURT: But not in the location section of the table, but at the bottom -- it would kind of make that section pretty long if I added this to it.

MR. REICHMAN: It would. I think it's fine on the bottom.

THE COURT: Is there more that the defense wants to say on this?

Okay. Not hearing anything. Let me just see what it looks like here.

MS. PHILLIPS: Your Honor?

THE COURT: Yeah, go ahead.

MS. PHILLIPS: Dr. Vermeulen's testimony is not about infringement. And I believe that on cross, Kove's attorneys asked him if he was using the terms that he discussed as they were defined in the patents, and he said no. And he said he wasn't talking about infringement.

THE COURT: I get that. And that's why I concluded that it was not inadmissible, but, you know -- as an affirmative matter, but this got blurred during the examination of Dr. Vermeulen. That's what I concluded.

That's what's discussed at pages 816 and 817 of the transcript. And so to me, again, this is another place where there needs to be something said to avoid confusion.

I mean, I get that -- I get that, you know, in some circumstances you say what the claim term means, not what it doesn't mean. Having said that, there's plenty of times in claim constructions that we've all been involved in where the claims construction includes both. It means this, and it doesn't mean that. And so there's nothing inherently wrong with that.

And I think it's appropriate here because of things that were done during the examinations of witnesses that, you know, potentially butt up against the claim construction.

Let me just finish this typing this in here, and we'll see how it looks here and whether the language needs to be changed.

Actually, I think it makes more sense to put it here.

Okay. So I'm going to add it. I'm going to add it right in the chart. I don't think it's actually too long. It pertains to this one element here.

So now we're talking about the language. I may have made a single word change from that. So do you want to talk to me about the language on the defense side now that I've said I'm going to give this? Is that okay as is? Understanding that you're objecting to giving it at all, now

that I've decided to give it, is it okay the way it's worded there?

MS. PHILLIPS: Your Honor, the portion after the comma in the first sentence --

THE COURT: After the semicolon?

MS. PHILLIPS: I'm sorry. After the semicolon. "Additional information can be used to find and retrieve the data" is unnecessary.

THE COURT: Just linguistically that's probably right. I'm going to take that out.

Okay. Anything else?

MS. PHILLIPS: No, your Honor.

THE COURT: Okay. You okay with me taking that clause out?

MR. REICHMAN: Yes, sir.

THE COURT: Okay. I did not see -- let me just take this off my screen for a second.

I did not see any issues or problems raised on the verdict form, which I also sent yesterday.

Did anybody have anything you wanted to say about that?

MR. REICHMAN: None from the plaintiff, your Honor.

MS. PHILLIPS: Nothing from defense either.

THE COURT: Okay. So here's the plan then. So you can -- I'm going to send these out in a moment here. This

will be the final version.  I'm going to duplicate them so that they can be handed out to the jury after the testimony is done.  So we'll take a little break before we do that so I can just get everything together.  And then we'll just proceed that way.

So we'll resume here at 1:45 then.

MR. REICHMAN:  Thank you, your Honor.

MR. SALTMAN:  Your Honor, one quick housekeeping issue.

THE COURT:  Sure.

MR. SALTMAN:  During the cross-examination of Ms. Bennis, one of the licenses, the financial figures came out.  We didn't have an opportunity to seal the courtroom since it happened in realtime.  We'll be able to redact the transcript afterwards?

THE COURT:  Yeah.  What you should do is -- I know you guys have been getting daily copy.  You should let Carolyn know what the page and line numbers are, and that part can be redacted.  I actually noticed that as it happened.  It just happened too quick.

MR. SALTMAN:  Yes, your Honor.  Thank you.

(The trial was adjourned at 1:00 p.m. until 1:45 p.m. of this same day and date.)

awarded in terms of schedule and duration?

So what you'll see when you get the verdict form, which won't be until tomorrow, is it's one blank for damages. If the jury awards damages, you're just awarding an amount. It's not an amount per year or an amount over time or anything like that. So that will be for tomorrow.

Any follow-up based on those questions?

MR. ADLER: Nothing from us, your Honor.

THE COURT: Mr. Sigler?

MR. SIGLER: No, your Honor.

THE COURT: You're excused.

Any further witnesses or evidence for the plaintiff in rebuttal?

MR. REICHMAN: No, your Honor. The plaintiff rests its case.

THE COURT: All right. Anything further for either side?

MR. FISCH: No, your Honor.

THE COURT: Okay. So here's what we're going to do. You've only been out here 20 minutes so far, half an hour. I got the jury instructions ready. They're going to take about 40 minutes to read. We're going to go right into that. So what I'm going to do is -- take one and pass it along.

The first question is, why are you doing all that? Why are you giving them to us and reading them and putting

them up on the screen?  So one of the things about the law is we do a lot of things because we've always done them way.  And judges have been reading instructions before anybody had invented a xerox machine or, for that matter, a computer that projects.

Secondly, just on a more practical level, some people understand things better if they're seeing them and hearing them at the same time.  So this kind of covers all the bases.

Let me project my screen, and you can follow along wherever you want.

Okay.  Members of the jury, you've seen and heard all the evidence and -- actually, you haven't yet heard the arguments of the attorneys.  That's tomorrow.  So the first part of that sentence is wrong.  But now I'm going to instruct you on the law anyway.

You have two duties as a jury.  Your first duty is to decide the facts from the evidence in the case.  This is your job, and yours alone.

Your second duty is to apply the law that I give you to the facts.  You must follow these instructions, even if you disagree with them.  Each of the instructions is important, and you must follow all of them.

Perform these duties fairly and impartially.  Do not allow bias, public opinion, sympathy, or prejudice to influence you.

Nothing I say now, and nothing I said or did during the trial, is meant to indicate any opinion on my part about what the facts are or about what your verdict should be. In addition, during the trial, I may have asked witnesses questions myself. Do not assume that because I asked questions, I hold any opinion on the matters I asked about, or on what the outcome of the case should be.

The evidence consists of the testimony of the witnesses, the exhibits admitted in evidence, and the stipulations. A stipulation is an agreement between both sides that certain facts are true.

Certain things are not to be considered as evidence. I will list them for you:

First, if I told you to disregard any testimony or exhibits or struck any testimony or exhibits from the record, such testimony or exhibits are not evidence and must not be considered.

Second, anything you may have seen or heard outside the courtroom is not evidence and must be entirely disregarded. This includes any press, radio, Internet, or television reports you may have seen or heard. Such reports are not evidence, and your verdict must not be influenced in any way by such publicity.

Third, questions and objections or comments by the lawyers are not evidence. Lawyers have a duty to object when

they believe a question is improper.  You should not be influenced by any objection, and you should not infer from my rulings that I have any view as to how you should decide the case.

Fourth, the lawyers' opening statements and closing arguments to you are not evidence.  Their purpose is to discuss the issues and the evidence.  If the evidence as you remember it differs from what the lawyers said -- and I'll add or what they say in closing argument -- your memory is what counts.

Fifth, demonstratives, slides, and drawings used during testimony are not to be considered as evidence but only as an aid in understanding the evidence.

Any notes you have taken during this trial are only aids to your memory.  The notes are not evidence.  If you have not taken notes, you should rely on your independent recollection of the evidence and not be unduly influenced by the notes of other jurors.  Notes are not entitled to any greater weight than the recollections or impressions of each juror about the testimony.

You must decide whether the testimony of each of the witnesses is truthful and accurate in part, in whole, or not at all.  You also must decide what weight, if any, you give to the testimony of each witness.

In evaluating the testimony of any witness, including

any party to the case, you may consider, among other things:

The ability and opportunity the witness had to see, hear, or know the things that the witness testified about;

The witness's memory;

Any interest, bias, or prejudice the witness may have;

The witness's intelligence;

The manner of the witness while testifying;

And the reasonableness of the witness's testimony in light of all the evidence in the case.

During the trial, certain testimony was presented to you by deposition video and/or the reading of depositions. You should give this testimony the same consideration you would give it had the witnesses appeared and testified here in court.

You have heard witnesses give opinions about matters requiring special knowledge or skill. You should judge this testimony in the same way that you judge the testimony of any other witness. The fact that such -- it should say -- such a person has given an opinion does not mean that you're required to accept it. Give the testimony whatever weight you think it deserves, considering the reasons given for the opinion, the witness's qualifications, and all of the other evidence in the case.

In determining whether any fact has been proved, you

should consider all of the evidence bearing on the question regardless of who introduced it.

You should use common sense in weighing the evidence and consider the evidence in light of your own observations in life.

In our lives, we sometimes look at one fact and conclude from it that another fact exists. In law we call this an inference. A jury is allowed to make reasonable inferences. Any inference you make must be reasonable and must be based on the evidence in the case.

You may have heard the phrases "direct evidence" and "circumstantial evidence." Direct evidence is proof that does not require an inference, such as the testimony of someone who claims to have personal knowledge of a fact. Circumstantial evidence is proof of a fact, or a series of facts, that tends to show that some other fact is true.

As an example, direct evidence that it is raining would be testimony from a witness who says, I was outside a minute ago, and I saw it raining. An example of circumstantial evidence that it is raining would be the observation of someone entering a room carrying a wet umbrella.

The law makes no distinct between the weight to be given to either direct or circumstantial evidence. You should decide how much weight to give to any evidence. In reaching

your verdict, you should consider all the evidence in the case, including any circumstantial evidence.

At the beginning of the trial, I gave you some general information about patents and the patent system and a brief overview of the patent laws relevant to this case. I will now give you more detailed instructions about those aspects of patent law that specifically relate to this case.

You have been provided with a copy of the patents involved in this case. Please take a look at one of those -- let's say the '640 patent -- as I identify its different sections. I'll leave it to you whether you want to take that out or not. Other patents are also involved in this case. I'm using this particular patent as an example to describe the various parts of a patent.

The first page of the '640 patent provides identifying information, including the date the patent issued and the patent number along the top; the name of the inventor; the filing date; the assignee, which is the company or individual that owned the patent on the date it was issued; and a list of documents considered in the Patent Office during the time the patent was being sought.

The next part of the patent, which is sometimes referred to as the specification, begins with a brief statement about the subject matter of the invention, which is called an abstract. This is found on the first page.

Next are the drawings, which appear as Figures 1 to 13 on pages 3 to 14 of the patent. The drawings depict various aspects or features of the invention. They are described in words later in the patent.

A description of the invention appears next. In this portion of the patent, each page is divided into two columns, which are numbered at the top of the page. The lines on each page are also numbered. A description of the '640 patent begins at column 1, line 1, and continues to column 20, line 46. It includes a background section, a summary of the invention, and a detailed description of the invention, including some specific examples.

The description of the invention is followed by one or more numbered paragraphs, which are called the claims.

As you'll see in this case, we're dealing with certain claims only. Not all of them.

All right. Now I'm going to go on.

The claims of a patent are the numbered paragraphs at the end of the patent. The claims describe what the patent owner may prevent others from doing.

Claims are usually divided into parts or steps called limitations or requirements. For example, a claim that covers the invention of a table may describe the tabletop, four legs, and glue that holds the legs and the tabletop together. The tabletop, legs, and glue are each a separate limitation or

requirement of the claim.

In this case, we are concerned with Claim 18 of the '640 patent; Claims 1 and 2 of the '170 patent; and Claims 10, 17, and 30 of the '978 patent.  Kove contends that AWS infringed these claims.  AWS denies this.

To decide whether AWS infringed a particular claim of a particular patent, you must compare the patent claim to the accused product.  It is not appropriate to compare the specification section of the patent to the accused product.  In reaching your determination with respect to infringement, you must consider each claim of each patent separately.

There are two types of patent claims:  independent claims and dependent claims.  An independent claim stands on its own and does not refer to any other claim of the patent.  A dependent claim refers to at least one other claim in the patent.  A dependent claim includes each of the requirements of the other claims to which it refers, as well as the requirements in the dependent claim itself, even though it doesn't repeat those requirements of the other claims.

So earlier, a couple minutes ago, I described a hypothetical patent claim for a table that described the tabletop, four legs, and glue to hold the legs and the tabletop together.  That's an example of an independent claim, which I'll call Claim 1.  In that same hypothetical patent, a dependent claim, which I'll call Claim 2, might state, the

table of Claim 1, where the tabletop is square. In this situation, in order to infringe dependent Claim 2, it would not be enough for Kove to prove that AWS made a table with a square tabletop. Kove would also have to prove that, as stated in Claim 1, the table has four legs and glue to hold the legs and the tabletop together.

We're off of the patent now at this point.

When a patent claim uses the term -- so some of what you have in here are going to be definitions of terms. Okay.

When a patent claim uses the term "comprising," it means that the invention includes the listed requirements, but is not limited to those requirements.

If you find, for example, that the accused products include all of the elements of a particular claim, the fact that the accused products might include additional elements would not avoid infringement of the claim.

The owner of a patent has the right to prevent others from making, using, offering for sale, selling, and importing the invention covered by the patent. A product or process infringes a patent if that product or process is covered by at least one claim of the patent.

I will tell you the meaning of any disputed terminology in the patent claims. You must use the meanings I give you when you decide whether the patent is infringed.

So the next several pages are -- basically it's a

chart. And there's three columns on it. The first column says what claim of what patent we're referring to. The next column says the particular term. Sometimes it's a word, sometimes it's a phrase. And then the third column is the construction or the interpretation that I've given. So I'm back to the instruction.

I've provided you with a copy of the Kove patents. I have defined certain words and phrases in some of the claims. You must use these definitions in making your decision. The words and phrases I have defined are as follows.

So for the '978 patent, Claims 10, 17, and 30; the '170 patent, Claims 1 and 2; the '640 patent, Claim 18, the claim term "location," the construction is, an encoding that is a member of a set of associations with an identifier in a location server, and that specifies where data pertaining to the entity identified by the identifier is stored. There is no requirement that the location have all the information necessary to find and retrieve the requested data. There is also no requirement that the location must change when the servers storing the data change.

The next term is for -- it's the same three patents and patent claims, and it's the term "location information." For the '978 patent, that's been construed as meaning one or more identifiers and their associated locations. And for the '170 and '640 patents, it's been construed as meaning,

information pertaining to one or more locations of data and/or the identities of one or more location servers.

The next term covers the same patent claims. It's the term "location server." And that's been construed as, a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients.

Next term covers the same patent claims.

By the way, hang on a second. There's one more. Yeah, we're going to get to one in here where I had to add something in writing. Let me just -- have you found a place where there's a handwritten addition yet? Yeah. It's on page 16 I think. Are we on page 16?

So let me tell you why that is. I screwed up. Okay? At the very top of page 16, you'll see what you're seeing on the screen now except 30 is written in in handwriting. I realized that and it was called to my attention after we had printed these out. Between killing five more trees and handwriting it in, I decided to hand-write it in. So the handwriting is part of the instructions.

So let's see. We were at I think this one now. Hang on a second. Let me just make sure I haven't skipped over anything. Yeah, we're here. So we're now on page 17.

Same patent claims. The terms "plurality of location servers" and "plurality of data location servers." That's

been construed as meaning location servers in non-hierarchical structures, and non-hierarchical means any given server is able to return either the requested information or information usable by the client to locate the server with the requested information.

Next set of terms, again, involves the same patents. And the terms are identifier/identifier string/and identification string, and that's been construed as meaning a unique encoding that identifies an individual entity, and with which zero or more location strings are associated in a location server.

The next term -- the next term just concerns one claim of one patent. It's the '978 patent, Claim 17. And for that claim, the preamble after the word "having," and you'll see this when you look at it, limits the claim. So the preamble is part of the claim basically.

Next one concerns the '640 patent, Claim 18. It's the term "client." And that has been construed as meaning a network-attached component (which may be software or hardware) that initiates update or lookup of identifier/location mappings from a location server with location request messages.

And we're getting down to the last couple.

'170 patent, Claims 1 and 2. The phrase "based on a hash function used to organize the data location information

across the plurality of data location servers...based on the hash function applied to the identifier string," it's been construed as meaning: The portion of the data location information included in a corresponding one of the data location servers is based on a hash function that maps identifier strings to one or more of the data location servers, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string.

The last one, '170 patent, Claim 2, the term "hash table" has been construed as meaning a data structure that stores values in a table, where values are stored and retrieved by applying a hash function to an input and using the function result as an index into the table.

All right. We're off the definitions now. Definitions of claim terms.

When I say a particular party must prove something by a preponderance of the evidence or when I use the expression "if you find," or "if you decide," this is what I mean: When you've considered all the evidence in the case, you must be persuaded that it's more probably true than not true.

You're going to hear at some point the phrase a "person of ordinary skill." The person of ordinary skill in the art -- art is just the term that patent lawyers use to

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KOVE IO, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 18 C 8175 |
| | ) | |
| AMAZON WEB SERVICES, INC., | ) | |
| | ) | |
| Defendant. | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

Kove IO, Inc. (Kove) brought this lawsuit in 2018 against Amazon Web Services, Inc. (AWS) for infringing three of Kove's patents. In response, AWS asserted various affirmative defenses and counterclaims. The Court granted in part and denied in part both parties' motions for summary judgment. *See Kove IO, Inc. v. Amazon Web Servs., Inc.*, No. 18 C 8175, 2024 WL 450028 (N.D. Ill. Feb. 6, 2024).

In April 2024, the case was tried before a jury, which found in favor of Kove on its patent infringement claims but declined to find willful infringement. The jury awarded Kove $525,000,000 in lost royalty damages. Both parties challenge the judgment. AWS has moved under Federal Rule of Civil Procedure 50(b) for judgment as a matter of law (JMOL) on infringement and damages. In the alternative, AWS has moved under Rule 59(a) for a new trial based on particular rulings by the Court and on the question of damages.[1] Kove has moved to amend the judgment to include pre-judgment and post-

---

[1] For patent cases, the standards for motions for judgment as a matter of law and motions for a new trial are determined by regional circuit law. *Finisar Corp. v. DirecTV Group*, 523 F.3d 1323, 1328 (Fed. Cir. 2008).

judgment interest.  Kove has also moved for attorneys' fees under 35 U.S.C. § 285.

The Court addresses each request in turn.

## Background

**A.      Kove's patents**

 Kove is a Delaware corporation with its principal place of business in Chicago,

Illinois.  Kove is the owner of the three patents-in-suit: U.S. Patent Nos. 7,103,640 ('640

Patent); 7,814,170 ('170 Patent); and 7,233,978 ('978 Patent).  The patents generally

relate to the storage, search, and retrieval of data across large computer networks.

The '170 patent is a continuation of the '640 patent.  Both the '640 and the '170

patents claim systems for "enabl[ing] hyper-scalable cloud storage and improv[ing] upon

the scalability limitations of conventional storage systems."  Compl. ¶ 18.  The patents

are directed towards addressing various constraints that limit the speed, capacity, and

efficiency of conventional data retrieval systems.  For example, distributed data

collection systems store and retrieve data from multiple machines connected through a

single network.  At the time of invention, distributed data systems were generally

arranged in a hierarchical configuration that included indices that required periodic

updates.  As the network became larger and more complex, these hierarchical indices

became increasingly inefficient.  Additionally, servers within these data collection

systems typically were unable to find and retrieve data located in other servers

throughout the network.  The inventions claimed in the patents-in-suit provide a method

for overcoming these constraints.

The preferred embodiment of the inventions "provides a network distributed

tracking wire transfer protocol in a networked environment."  '640 pat., col. 2, lns. 12-14;

2

Appx130

'170 pat., col. 2, lns. 14-16.  A "client" queries one or more location servers in the network distributed tracking protocol (NDTP) server constellation for information about the location of data.  An NDTP server responds to the query with location information, and the client uses that information to retrieve the desired data.  If a particular location server does not contain the desired location information, the client sends a request to a location server, and the location server will respond with a redirect message that identifies the location server that contains the relevant information.  This network distributed tracking wire transfer protocol also includes identification strings specifying the identity of the data and location strings specifying the location of the data within the network.  The patents disclose a process by which the relationships between identification and location information are able to "change dynamically, spontaneously, and efficiently."  '640 pat., col. 2, lns. 23-24; '170 pat., col. 2, lns. 24-25.

The '978 patent is a continuation-in-part of the '640 patent and discloses "a system and method for storing and retrieving location information across a network."  Compl., Ex. 5 at 1.  The specification explains that a redirect mechanism "permit[s] the distribution of identifiers to location mappings across members of an NDTP server cluster" containing multiple location servers.  '978 pat., col. 2, lns. 11-13.  The '978 patent is directed to "scaling system capabilities in a manner sufficient to handle variable demand for resources."  '978 pat., col. 2, lns. 12-16.  In contrast to conventional storage systems, the claimed technology allows for the quick and accurate identification of location servers that contain the location information of a particular file across large data storage networks.

3

Appx131

**B.      AWS's products**

AWS is a subsidiary of Amazon that specializes in cloud-computing platforms and services.  Kove has identified two cloud-based AWS products that it believes infringe on its patents: Amazon Simple Storage Service (S3) and DynamoDB (DDB).  S3 provides storage for companies building Internet applications and the product currently serves over two million websites.  Tr. at 1264:4-1265:4.  The pieces of data stored within S3 are called "blobs."  S3 contains three key parts: the web server, the keymap system, and the volume system.  The web server receives initial requests for data in the form of put requests, for storing data, and get requests, for retrieving data.  The volume system stores the data objects within S3 and contains two main components: R2D2s, which are data repositories, and the Blob Assembler, which is used to assemble the data.  The keymap system stores information about the data and consists of keymap functional coordinators (KFCs) and brick managers (BMs).  While BMs store the entire keymap, KFCs store a subset of the keymap for objects in a local cache.  The below diagram, taken from an Amazon video presentation, shows the basic architecture of S3:

4



PTX 685 at 9:11.

DDB enables users to create database tables to store, manage, and retrieve data items.  In DDB, data is stored in tables, and tables are divided into partitions.  Data requests are received by the request router.  A request router can fulfill a limited number of data requests using information stored in a local cache.  If the request router does not contain the necessary information, then it communicates with multiple components to fulfill the request, including storage nodes and metadata nodes. The following Amazon diagram demonstrates the general structure of DDB and its components:

5



PTX 823.

## C.     Present lawsuit

Kove filed suit against AWS in December 2018, alleging willful infringement of multiple claims in the '170, '640, and '978 patents.  In response, AWS asserted numerous counterclaims including invalidity and unenforceability.  In April 2019, AWS filed a motion to dismiss arguing that the three patents were invalid under 35 U.S.C. § 101.  The Court (by Judge Pallmeyer) denied AWS's motion to dismiss.  *See Kove IO, Inc. v. Amazon Web Servs., Inc.*, 448 F. Supp. 3d 849 (N.D. Ill. 2020).

On November 19, 2021, Amazon filed requests with the United States Patent and Trademark Office (USPTO) to reexamine multiple claims of the patents-in-suit.  The USPTO granted Amazon's requests and subsequently upheld the patentability of the '640 and '170 patents.  The USPTO later issued a final rejection for claims 1 and 31 of the '978 patent.  Amazon has filed additional reexamination requests, which are currently pending.

In December 2021, the Court (by Judge Pallmeyer) construed numerous terms

6

Appx134

within the patents-in-suit. Prior to the claim construction hearing, the parties agreed to constructions of the following terms:

| Claim term | Construction |
| --- | --- |
| Location | an encoding that is a member of a set of associations with an identifier in a location server, and that specifies where data pertaining to the entity identified by the identifier is stored |
| Identifier/identifier string/identification string | a unique encoding that identifies an individual entity, and with which zero or more location strings are associated in a location server |
| Hash table | a data structure that stores values in a table, where values are stored and retrieved by applying a hash function to an input and using the function result as an index into the table |

See *Kove IO, Inc. v. Amazon Web Servs., Inc.*, No. 18 C 8175, 2021 WL 5988928, at *7 (N.D. Ill. Dec. 17, 2021). The Court construed the remaining claim terms as follows:

| Claim term | Construction |
| --- | --- |
| Location information | '978 patent: one or more identifiers and their associated locations<br><br>'170/'640 patent: information pertaining to one or more locations of data and/or the identities of one or more location servers |
| Location server | a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients |
| Client | a network-attached component (which may be software or hardware) that initiates update or lookup of identifier/location mappings from a location server with location request messages |
| "based on a hash function used to organize the data location information across the plurality of data location servers ... based on the hash function applied to the identifier string" | the portion of the data location information included in a corresponding one of the data location servers is based on a hash function that maps identifier strings to one or more of the data location servers, and |

7

Appx135

| | each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string |
| --- | --- |
| "data pertaining to the entity" | data pertaining to a person or thing (real, digital, or abstract) distinct from that data |

*Id.* at *18.

AWS later moved for summary judgment on each of Kove's claims. Kove filed a cross-motion for summary judgment. The Court denied AWS's motion for summary judgment on the issues of non-infringement and willful infringement. *See Kove IO, Inc.*, 2024 WL 450028, at *11-16. This Court also granted summary judgment in Kove's favor on AWS's defenses of patent ineligibility, equitable estoppel, and waiver, and denied Kove's request for summary judgment on AWS's remaining defenses of inequitable conduct and double patenting. *Id.* at *16-27. Prior to the final pretrial conference, the parties filed a joint stipulation to narrow the issues for trial by reducing the number of asserted claims and the number of bases for certain of AWS's invalidity defenses. Dkt. no. 832 at 1. AWS also agreed to drop its inequitable conduct and double patenting defenses. *Id.* Five days before opening arguments, AWS dropped its remaining invalidity defenses. On the first day of trial, Kove dropped additional claims. The remaining claims at issue at trial were claims 1 and 2 of the '170 patent, claim 18 of the '640 patent, and claims 10, 17 and 30 of the '978 patent. Claim 18 of the '640 patent and claim 10 of the '978 patent were asserted only as to DDB.

**C.     Evidence at trial**

The case was tried before a jury in April 2024. The jury heard testimony from multiple fact and expert witnesses and was shown numerous exhibits.

8

### 1. Expert testimony on infringement

Kove's infringement expert, Dr. Michael Goodrich, opined that S3 and DDB infringe upon the Kove patents. To develop his opinions, Dr. Goodrich reviewed Amazon technical documents, product literature, deposition testimony, training videos, and source code. At trial, Dr. Goodrich testified that KFCs and BMs are location servers because they store location information for objects that are stored in R2D2s. He explained that KFCs are able to identify which other KFC stores a specific set of location data through a hash function. He further explained that a unique identifier is entered as an input into the consistent hash ring, and that the output identifies the correct KFC. Tr. at 558:1-9. He further stated that BMs use a "tree function" to find the BM that contains the requested data. *Id.* at 558:13-23. Dr. Goodrich also explained that iNodes are a "location" within the meaning of the asserted patents because they contain a Blindex, which in turn contains the volume ID and the blob ID for a particular object. According to Dr. Goodrich, "the volume ID tells you the volumes of where you're going to store that on the R2D2s, and then the blob ID is the ID for this particular blob of data that's being stored." *Id.* at 559:1-14. Dr. Goodrich also walked the jury through every asserted claim in the patents-in-suit and explained why he believes the accused products meet the requirements of those claims. *See, e.g.*, *id.* at 567:14-568:3.

Dr. Grama, AWS's infringement expert, testified that the accused products failed to satisfy various limitations of the asserted claims, including the "location server," "identifier," and "location" requirements. At trial, Dr. Grama provided his non-infringement opinion on each asserted claim of the patents-in-suit. *See, e.g.*, *id.* at 1511:5-1514:10. He testified that within DDB, a component called the "ALF," rather

than the metadata nodes, identify which metadata node contains the requested item. *Id.* at 1468:2-14. He further testified that a partition key cannot be a unique encoding that identifies an individual entity because it is "a key for the entire partition." *Id.* at 1459:14-23. Turning to S3, Dr. Grama stated that an iNode is "an internal name or a label" rather than a location. *Id.* at 1483:12-19. Dr. Grama testified that KFCs "maintain a very, very small fraction of the total data" and therefore cannot satisfy the limitation that each identifier is associated with at least one location. *Id.* at 1504:15-1505:10. He also disputed Dr. Goodrich's description of the consistent hash ring and stated that iNodes are not assigned to KFCs based on a hash function. He explained that KFCs "figure out what node is being accessed" and if the node is not available in the cache, "it goes to the brick manager . . . brings it back to the KFC, and keeps it there." *Id.* at 1499:18-1500:7. Dr. Grama concluded that neither S3 nor DDB infringe upon the asserted patents.

### 2. Expert testimony on damages

Kove described the benefits of distributed storage products using the acronym "SADS," which stands for "speed, availability, durability, and scalability." *Id.* at 430:1-3. Karim Fanous, one of Kove's expert witnesses, testified that these benefits are important to distributed database users and that customers are willing to pay more to access these benefits. Jim Bergman, Kove's damages expert, testified that to perform his damages analysis he consulted with Dr. Goodrich and Fanous and reviewed expert reports, deposition testimony, financial information, and industry research. He stated that for his damages analysis he calculated the potential cost of a royalty, which is "a payment for the right to use somebody's property." *Id.* at 1012: 20-1013:7. He

10

Appx138

explained that a royalty can be structured as a lump-sum royalty, which is paid upfront, or a running royalty, where payments are made over time based on the frequency of use. *Id.* at 1013:8-12. Bergman stated that he used a running royalty structure for his analysis because it has a better chance of "capturing the appropriate amount of use and the value of that use." *Id.* 1013:24-1014:12. He opined that, based on his analysis, in a hypothetical negotiation between the parties AWS would have agreed to pay between 50% and 100% of its quantifiable benefits from use of the patents for a license agreement. *Id.* at 1104:5-18. He also opined that a reasonable royalty payment to Kove falls between $517 million and $1.034 billion, *id.* at 1010:7-13, and a reasonable lump sum payment would be between $320 million and $700 million. *Id.* at 1911:1-1912:1.

AWS's damages expert, Alyssa Bennis, also estimated the amount that the parties would have agreed on in a hypothetical negotiation for a license agreement to practice Kove's patents. Bennis opined that AWS would have agreed to a lump sum, up-front payment of no more than $5.25 million. *Id.* at 1643:10-16. After offering her opinion on the damages amount, Bennis testified that Bergman's analysis focused too heavily on Amazon's alleged use of the patents and that his damages calculations were "wildly overstated." *Id.* at 1645:21-1646:4; 1675:5-13.

## Discussion

### A. AWS's motion for judgment as a matter of law

AWS has moved for judgment as a matter of law on all of Kove's claims. Under Federal Rule of Civil Procedure 50(b), judgment as a matter of law is appropriate if the Court "finds that a reasonable jury would not have a legally sufficient evidentiary basis"

11

to support a verdict for the nonmovant. FED. R. CIV. P. 50(a)(1). To determine whether the jury verdict had a legally sufficient evidentiary basis, the court must "construe the evidence strictly in favor of the party who prevailed before the jury, *Passananti v. Cook County*, 689 F.3d 655, 659 (7th Cir. 2012), and "draw[] all reasonable inferences in the light most favorable to [the non-moving party]." *Kossman v. Ne. Ill. Reg'l Commuter R.R. Corp.*, 211 F.3d 1031, 1036 (7th Cir. 2000). The court also "disregard[s] all evidence favorable to the moving party that the jury [was] not required to believe." *Passananti*, 689 F.3d at 659 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)). In reviewing the record, a court must neither "make credibility determinations" nor "weigh the evidence." *Passananti*, 689 F.3d at 659. Rather, a court must simply "determine whether a reasonable jury could have found in favor of" the prevailing party. *Harvey v. Off. of Banks & Real Est.*, 377 F.3d 698, 707 (7th Cir. 2004).

"Overturning a jury verdict is a hard row to hoe." *Zelinski v. Columbia 300, Inc.*, 335 F.3d 633, 638 (7th Cir. 2003) (citation omitted). Furthermore, "[i]nfringement is a question of fact.*" i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 849 (Fed. Cir. 2010). "[T]he task of determining whether the construed claim reads on the accused product is for the finder of fact." *PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998).

In its Rule 50(b) motion, AWS addresses three issues. First, AWS argues that there was insufficient evidence that the accused products satisfy various claim limitations of the patents-in-suit. Second, AWS challenges the testimony of one of Kove's infringement experts, Dr. Goodrich. Finally, AWS asks the Court to vacate the jury's damages award.

### 1. Location/location server/identifier limitations

Each of the patents-in-suit contains system claims that require a "location," "location server," and "identifier." AWS contends that Kove failed to present evidence at trial that would allow a reasonable jury to conclude that the accused products satisfy these limitations. "[T]he failure to meet a single limitation is sufficient to negate infringement of the claim." *Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1535 (Fed. Cir. 1991).

Prior to claim construction, the parties agreed that "location" means "an encoding that is a member of a set of associations with an identifier in a location server, and that specifies where data pertaining to the entity identified by the identifier is stored." *Kove IO, Inc.*, 2021 WL 5988928, at *7. They also agreed that the term "identifier" means "a unique encoding that identifies an individual entity, and with which zero or more location strings are associated in a location server." *Id.* Judge Pallmeyer ruled that the proper construction of the term "location server" is "a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients." *Id.* at 11-12.

AWS argues that S3 does not contain a "location" as defined by the claim construction, and therefore KFCs and BMs cannot be location servers. At trial, Dr. Goodrich testified that within S3, there are data structures called "iNodes" and that these iNodes contain a component, the "Blindex," that has a volume ID and a blob ID. Tr. at 559:1-14. He explained that "the volume ID tells you the volumes of where you're going to store [data] on the R2D2s, and then the blob ID is the ID for this particular blob of data that's being stored." *Id.* Dr. Goodrich opined that the combination of the volume

13

ID and blob ID "specifies where a data object is stored," and therefore is a "location." *Id.* at 583:20-584:2. The jury viewed Amazon materials that refer to iNodes as "locations" or indicate that the data within an iNode is used to "tell S3 where the object is stored." *See Id.* at 582:14-583:19; 585:22-586:4. For example, Kove presented an excerpt of a video that features James Sorenson, an Amazon engineer, describing an iNode as a component that demonstrates "where your object is stored." *Id.* at 583:12-19.

AWS contends that Dr. Goodrich's testimony was "conclusory." Def.'s Rule 50(b) Mot. at 2. On the contrary, Dr. Goodrich explained his conclusions at length, and he supplemented his opinion with S3 source code, deposition testimony, and various Amazon documents. *See* Tr. at 559:15-23; 584:21-585:21; 587:18-22. AWS does not identify any specific deficiencies with Dr. Goodrich's testimony and simply notes that AWS's witnesses with "first-hand knowledge" testified that a Blindex is "analogous to a label" and therefore is not a location. Def.'s Rule 50(b) Mot. at 2. AWS presented this argument to the jury, *see* Tr. at 1292:22-1293:1, and the jury disagreed. The existence of competing testimony is insufficient to overturn the jury's verdict unless the evidence "make[s] only one finding on the point reasonable." *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1168 (Fed. Cir. 2015). That is not the case here. Goodrich opined that the combination of the volume ID and the blob ID within the Blindex "specifies where the entity identified by the identifier is stored." Tr. at 584:21-585:21. The jury also viewed an Amazon wiki page that stated that the Blindex "tells us here the data is stored for a given object within the Storage layer." *Id.* at 585:22-586:6; PTX 699. Given Kove's competing evidence, it was not unreasonable for the jury to conclude that a

14

Appx142

Blindex is a location.

Additionally, "[c]redibility determinations . . . are jury functions, not those of a judge." *Reeves,* 530 U.S. at 150. AWS provides no legal authority to support its proposition that a jury's verdict must be consistent with the testimony provided by individuals with "first-hand" knowledge of an accused product in order to be reasonable or sustainable. And "[w]here there is substantial evidence for a reasonable jury finding, it is not our function to second guess or reevaluate the weight given to that evidence." *MobileMedia Ideas LLC*, 780 F.3d at 1168. The jury heard sufficient evidence from which it reasonably could conclude that S3 satisfies the location and location server requirements of all asserted claims.

AWS also asserts that DDB has "no location and no unique identifier mapped to a location in the Metadata Nodes" and therefore does not qualify as a location server. Def.'s Rule 50(b) Mot. at 3. As discussed above, the Court (by Judge Pallmeyer) construed "location server" to require "a network-attached component that maintains a set of identifier/location mappings." *Kove IO, Inc.*, 2021 WL 5988928, at *11-12. It is undisputed that there are two kinds of primary keys within DDB: a simple primary key consisting of a single partition key and a composite primary key that contains a partition key and a sort key. Dr. Goodrich opined that these "primary keys" serve as identifiers because they uniquely identify items within tables in DDB. Tr. at 638:13-639:8. Dr. Goodrich also opined that the storage node IDs within DDB meet the "location" requirement. Dr. Goodrich explained that AWS engineers left comments on the DDB source code explaining how the technology works. The jury viewed one comment stating that the "node endpoint is the logical ID to uniquely identify an endpoint." *Id.* at

15

653:8-24. Dr. Goodrich explained that the endpoint "encapsulates both the logical ID and the physical endpoint address." *Id.* Additionally, the jury viewed an excerpt of deposition testimony from Sorenson, who identified "node IDs'" as a "piece of information" that is related to the location. *Id.* at 652:24-653:7.

Dr. Goodrich testified that identifiers are mapped to locations within DDB because the metadata nodes "store this mapping that starts from the primary key, which then is hashed . . . into the partition ID, which then is mapped to the storage node." *Id.* at 1776:16-24. AWS objects to this testimony as "evasive." Def.'s Rule 50(b) Reply at 3. But this was not the only point in Dr. Goodrich's testimony where he discussed the relationship between primary keys and storage node IDs. *See* Tr. at 650:25-651:17. He explained that a partition key, which is contained in both simple and compound primary keys, is put into a hash function that "organizes the way that data is spread across both the storage nodes and the metadata nodes." *Id.* at 666:10-23. Dr. Goodrich also walked the jury through a portion of DDB source code that he said demonstrates the process by which the hash function is used to determine the item's partition ID, and the partition ID is then used to locate the correct storage node ID or metadata node. *Id.* at 667:8-668:7.

AWS asserts that Kove is conflating primary keys and partition keys. But Dr. Goodrich clearly explained to the jury the difference between primary keys and partition keys. Tr. at 635:11-636:21. He also explained that his opinion concerning the mappings between primary keys and storage node IDs was based in part on the presence of partition keys within primary keys. *Id.* at 854:4-15. On cross-examination, when asked if "metadata nodes contain a mapping of partition IDs to storage node IDs,"

16

Appx144

Dr. Grama responded, "[t]hat is correct." *Id.* at 1577:22-25. Given the jury's verdict, this Court infers that the jury found Dr. Goodrich's testimony on how this limitation is met through the presence of partition keys in primary keys persuasive and credible, as it was entitled to do. In its reply brief, AWS also contends that the slides Dr. Goodrich used to support his testimony regarding primary keys and partition keys within DDB were "misleading." Def.'s Rule 50(b) Mot. Reply at 2. But "the jury was assessing the weight and credibility of Dr. [Goodrich]'s expert testimony," not his slides. *Aqua Connect, Inc. v. TeamViewer US, Inc.*, No. 181572, 2023 WL 6387791, at *4 (D. Del. Sept. 29, 2023) (noting that expert's demonstrative slides were not admitted into evidence or provided to the jury). It was not unreasonable for the jury to credit Dr. Goodrich's opinion that DDB met the "identifier," "location," and "mapping" requirements.

AWS also suggests that to maintain mappings of primary keys to storage node IDs, metadata nodes must "use the primary key." Def.'s Rule 50(b) Reply at 4. But there is no requirement in the claim limitation that the location servers must "use" the identifier competent. To the extent AWS wishes to clarify the definition of the word "maintain" as used in the Kove patents, this suggestion is untimely because AWS did not seek claim construction on this word. The Court never construed the word "maintain" to mean "use." And "[w]hen a claim phrase is not construed, we defer to the jury's view of the claim element unless that view is contrary to the only reasonable view of the claim element." *VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1341 (Fed. Cir. 2023). AWS's definition of "maintain" is not the only reasonable view of the claim language, and AWS cites no support for its proposition that the term "maintain" requires

17

Appx145

"use."  *See Merriam-Webster Online Dictionary*, https://www.merriam-webster.com/dictionary/maintain (defining "maintain" as "to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline.").

AWS's points out that its own witnesses disputed portions of Dr. Goodrich's testimony.  But "[i]t was up to the jury to determine credibility and resolve conflicts in the evidence."  *Wash World Inc. v. Belanger Inc.*, 666 F. Supp. 3d 808, 822 (E.D. Wis. 2023).  AWS had the opportunity to challenge Dr. Goodrich's testimony on this issue during cross-examination.  *See* Tr. at 851:21-854:15.  The jury heard AWS's experts' opinion on why the accused products do not satisfy this limitation, and it was entitled to determine that Kove's witnesses were more persuasive.  Based on the trial record, the jury reasonably could determine that metadata nodes maintain mappings of primary keys to storage node IDs.

Finally, AWS attempts to adopt by reference over a dozen pages of arguments included in the briefs it submitted in support of its summary judgment motion.  Def.'s Rule 50(b) Mot. at 3-4.  "Adopting by reference arguments in documents other than in the brief dealing with the particular point under consideration not only provides an effective means of circumventing the page limitations on briefs . . . but unnecessarily complicates the task of the . . . judge."  *Miller UK Ltd. v. Caterpillar, Inc.*, 292 F.R.D. 590, 592–93 (N.D. Ill. 2013) (cleaned up).  This Court deems any arguments incorporated by reference waived.  *See Hudgins v. Total Quality Logistics, LLC*, No. 16 C 7331, 2024 WL 1618363, at *6 (N.D. Ill. Apr. 15, 2024) (Kennelly, J.) (rejecting party's attempt to incorporate arguments by reference).

For the foregoing reasons, AWS is not entitled to judgment as a matter of law on

18

Appx146

the location/location server/identifier limitations.

### 2. Non-hierarchical limitation

At summary judgment, this Court found that all asserted claims require a "plurality of location servers" in a "non-hierarchical" configuration. *Kove IO, Inc.*, 2024 WL 450028, at *9. This Court adopted the definition of non-hierarchical that Kove presented to the USPTO during the reexamination process and concluded that the term means "any given server is able to return either the requested information or information usable by the client to locate the server with the requested information." Jury Instructions at 17. AWS argues that S3 and DDB cannot meet this limitation because the alleged location servers are configured hierarchically. AWS asserts that the jury heard testimony confirming the hierarchical configuration of the accused products from witnesses with "first-hand knowledge of the systems," but it does not provide examples of such testimony. *See* Def.'s Rule 50(b) Mot. at 4. AWS cannot meet its burden by "relying on the Court to sift through the trial record to determine what testimony (or lack thereof) supports [its] position." *Brooks v. City of Chicago*, No. 13 C 3090, 2018 WL 4404626, at *2 (N.D. Ill. Sept. 17, 2018).

Additionally, Dr. Goodrich testified that S3[2] satisfies this claim limitation. He explained that within S3, KFCs are able to return an iNode (which contains a location) to a web server (the client) upon request if the iNode is stored in the local cache. Tr. at 571:23-572:4. He further testified that even if the location is not stored in its local

---

[2] AWS asserts that its argument applies to both S3 and DDB. Def.'s Rule 50(b) Mot. at 4 ("As AWS has explained, S3 and DDB are both configured hierarchically."). But it only addresses Dr. Goodrich's testimony about KFCs and BMs, which are components of S3. *See id.* at 5-6.

19

Appx147

cache, the KFC can still return the iNode by communicating with a BM. *Id.* at 572:24-573:16. The jury viewed an excerpt of deposition testimony from Seth Markle, an AWS engineer, where he stated that when the KFC receives a key, it first checks to see if it has the key in its cache, and if it does, it "returns the iNode from its cache." *Id.* at 572:11-19. The jury also viewed a portion of S3 source code, which Dr. Goodrich stated demonstrated that KFCs "can access the consistent hasher to determine which KFC is assigned to a cache with any given iNode." *Id.* at 575:9-576:1. Dr. Goodrich also testified that the process by which a BM returns location information in response to a request from a KFC satisfies this claim limitation. *Id.* at 609:1-18.

AWS provides three reasons why it contends Kove's evidence was legally insufficient, but none are persuasive. First, in support of its argument, AWS again attempts to incorporate arguments from its summary judgment briefing. Def.'s Rule 50(b) Mot. at 4 n.23. "[T]hese arguments incorporated by reference are inadequate and undeveloped and are therefore waived." *United States v. Williams*, 218 F. Supp. 3d 730, 741 (N.D. Ill. 2016).

Second, AWS contends that Dr. Goodrich improperly "relied on the alleged location servers in a particular grouping or region as the required 'plurality of location servers.'" Def.'s Rule 50(b) Mot. at 5. But the portion of Dr. Goodrich's testimony that AWS cites contains no discussion of the "plurality of location servers" limitation. *See Id.* n. 24 (citing Tr. at 763-64). Moreover, at summary judgment this Court considered and rejected AWS's argument that it was improper for Kove's infringement contentions to rely on groupings of location servers within a specific zone or region. *Kove IO, Inc.*, 2024 WL 450028, at *13 ("[A]s long as the location servers within an availability zone or

20

Appx148

region are arranged in a non-hierarchical configuration, the accused products may infringe upon Kove's patents even if those zones and/or regions are arranged hierarchically in relation to other components of S3 or DDB.").

Third, AWS asserts that Goodrich "admitted" at trial that the location servers he identified as being grouped in a plurality "wouldn't have all the information necessary to satisfy this Court's claim constructions." Def.'s Rule 50(a) Mot. at 5. But that is not a fair description of Dr. Goodrich's testimony. AWS first points to Dr. Goodrich's confirmation that SkyNet, a component of S3, "knows where every volume in the system is located." Tr. at 812:18-20. But in response to the very next question from AWS's counsel, Goodrich rejected the assertion that SkyNet, rather than the Blindex, specifies where data is stored within S3. *Id.* at 812:21-23. Dr. Goodrich further explained that because "the volume ID is sufficient to now say where the location is," that component of the Blindex along with the blob ID qualifies as a location. *Id.* at 813:2-7. Dr. Goodrich's direct rebuttal of AWS's contentions is far from an "admission" that the accused products do not meet the limitation at issue. Similarly, AWS cites to Dr. Goodrich's statement confirming that if a KFC does not have the requested iNode, it "goes to a Brick Manager." *Id.* at 841:2-4. But Dr. Goodrich repeatedly disputed the assertion that this process evidences a hierarchical configuration among KFCs and BMs. Dr. Goodrich testified that BMs and KFCs are connected though "communication paths" rather than different layers of a hierarchy. *Id.* at 841:10-18; 567:14-25. Although AWS's witnesses testified that the KFCs and BMs are arranged in a hierarchical manner, the jury was entitled to reject that evidence. AWS is not entitled to judgment as a matter of law based on the asserted claims' "non-hierarchical" requirement.

21

### 3. Other claim limitations

AWS argues that Kove failed to show that the accused products meet other limitations of the asserted claims. But in doing so, AWS largely ignores the standard of review for judgment as a matter of law. For multiple claims, AWS contends that JMOL is warranted based solely on Dr. Grama's testimony disputing opinions professed by Dr. Goodrich. *See, e.g.*, Def.'s Rule 50(b) Mot. at 7 (hash function limitations); *Id.* at 9 (transfer limitations). "[B]ut the jury was in the best position to determine whether it found Dr. [Goodrich] or Dr. [Grama] more persuasive." *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1045 (Fed. Cir. 2016). AWS can only prevail on its motion if it demonstrates that no reasonable jury could have decided as this jury did. AWS has failed to do so. This Court finds that the jury's findings on each of the limitations AWS identifies were supported by sufficient evidence.

### a. Redirect and plurality of location servers

AWS contends that there was no evidence that DDB met the "client" and "redirect" limitations in claim 18 of the '640 patent and claim 10 of the '978 patent. Claim 18 requires that if a location server does not contain the requested location string, it "transmits a redirect message to the client" containing information that can be used to calculate the correct data location server. '640 pat., col. 22, lns. 62-65. Likewise, claim 10 requires that each location server is able to return a redirect message "compris[ing] information for finding a location server having location information related to the desired identifier." '978 pat., col. 26, lns. 36-45. AWS contends that Kove "failed to show that the redirect message contains information to calculate a location of a different data location server and information that contains a location string" and presented "no

evidence showing the required transmission is 'to the client.'"  Def.'s Rule 50(b) Reply at 7-8.

Dr. Goodrich testified that DDB infringes on claim 18 of the '640 patent and claim 10 of the '978 patent.  For claim 18, he explained that "the client is the request routers. The location servers are the metadata nodes, and the data repository is the storage nodes."  Tr. at 671:18-23.  He stated that when a request router receives a request for an item in a table, the request router will first consider if the applicable location data is available in the local cache.  If not, the request router will contact the metadata node, and the metadata node will send back to the request router metadata that includes the storage node ID (the location).  He testified that the information that is sent back to the request router, the client, satisfies the "redirect message" requirement.  *Id.* at 658:6-659:3.  Dr. Goodrich further testified that the information in the redirect message includes "a metadata node ID with a host and a port," which tells the client "which other metadata node now to go to finish this process."  *Id.*  He explained that this functionality was consistent with his analysis of DDB source code.  *Id.* at 656:17-657:3.  Dr. Goodrich relied on the same evidence when testifying about the "redirect message" limitation in claim 10.  *Id.* at 679:22-680:9.

The only basis for overturning the jury's verdict that AWS offers is the testimony of Dr. Grama, who stated that, based on his analysis of the storage node source code, DDB does not utilize a "redirect message."  *See Id.* at 1476:9-1479:11.  But the jury was not required to credit Dr. Grama's testimony.  *Apple Inc.*, 839 F.3d at 1045.  The Court finds that Kove presented sufficient evidence from which the jury could find that DDB satisfies the "client" and "redirect message" limitations.

AWS also relies on the purported lack of evidence of transmission of location information to support its argument that Kove failed to show that the accused products satisfy the "plurality of location servers" limitation. At the summary judgment stage, the Court construed the patents' "plurality of location servers" language to require location servers in a "non-hierarchical" configuration, meaning "any given server is able to return either the requested information or information useable by the client to locate the server with the requested information." *See* Jury Instructions at 17. Dr. Goodrich testified that within DDB, if a metadata node does not have the desired location information, it will send metadata to the request router that allows the client to find the correct metadata node. Tr. at 657:4-659:13. Likewise, for S3, Dr. Goodrich explained that any given BM is able to return requested location information, and if a KFC does not have the information necessary to resolve a get request, it will query a BM and then send the appropriate location information to the web server. *Id.* at 609:9-15; 609:19-610:4. Dr. Goodrich supported his testimony with an Amazon training video and S3 source code. *See id.* at 610:5-611:11.

AWS notes that Dr. Goodrich confirmed during cross-examination that KFCs do not store location information for every request. See Tr. at 840:10-14. But AWS does not explain how this testimony supports its argument regarding non-infringement. The non-hierarchical structure limitation is met if each location server is enabled to return the requested location information *or* information that the client can use to find the server that contains that information. Given Dr. Goodrich's testimony that a KFC maintains its ability to send location information to the web server even if the location information is not available in its local cache, *see id.* at 571:21-576:9; 1777:16-23, KFCs can meet the

24

"non-hierarchical" configuration requirement even if they do not store the location information necessary to resolve every get request.

AWS does not acknowledge Kove's evidence and asks the Court to find in its favor solely on the basis of competing testimony from its own expert witness. But "[i]t was within the province of the jury to weigh the testimony presented by both sides and make its finding." *GlaxoSmithKline LLC v. Teva Pharms. USA, Inc.*, 7 F.4th 1320, 1329 (Fed. Cir. 2021).

### b. Non-hierarchical structure

In support of its argument that JMOL is warranted on various claim constructions related to the "non-hierarchical" structure required by the asserted patents, AWS rehashes its arguments regarding Dr. Goodrich's testimony related to the "plurality of location servers" claim limitation and his supposed admission that location servers do not store the necessary information to meet this claim limitation. The Court fully addressed these arguments above and need not repeat its legal analysis here. AWS also asserts, with no explanation or citation to supporting evidence, that Kove "failed to show" or "never showed" that the accused products satisfy various specific limitations. *See* Def.'s Rule 50(b) Mot. at 7-8. As the Seventh Circuit has stated, "it is not this court's responsibility to research and construct the parties' arguments." *Draper v. Martin*, 664 F.3d 1110, 1114 (7th Cir. 2011) (citation omitted); *see also Illinois Tamale Co. v. El-Greg, Inc.*, No. 16 C 5387, 2019 WL 4395139, at *10 (N.D. Ill. Sept. 13, 2019) (Kennelly, J.) (finding Rule 50(b) movant's argument waived based on bare assertion that nonmovant had failed to meet its burden at trial). AWS's remaining arguments with respect to this limitation are underdeveloped and therefore waived. *Trs. of Chicago*

25

Appx153

*Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Tr. Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 789 (7th Cir. 2007).

### c.    Hash function

Dr. Grama's testified that DDB "didn't apply a hash function to the partition key (the accused identifier) and thus didn't meet the 'based on a hash function' requirement of '170 patent claims 1 and 2." Def.'s Rule 50(b) Mot. at 7. AWS asserts that Kove failed to rebut Dr. Grama's testimony. But Kove's expert witness expressly rebutted Dr. Grama's opinion through his description of DDB functionality. Dr. Goodrich testified that DDB takes the partition key portion of a primary key and "put[s] it into a hash function." Tr. at 666:10-23. Dr. Goodrich then identified a portion of DDB source code that served as the basis for this opinion, stating that the partition key is the input for the hash function, and the output is the partition ID, which is used to identify the correct location server. *Id.* at 667:8-668:7. "[F]aced with competing expert testimony," the jury was free to credit Kove's expert over AWS's expert. *Intell. Ventures I LLC v. Motorola Mobility LLC*, 870 F.3d 1320, 1327 (Fed. Cir. 2017).

AWS also contends that S3 does not infringe on these claims because, as Dr. Grama testified, "KFCs didn't distribute iNodes according to a hash function." Def.'s Rule 50(b) Mot. at 7. The scope of claims 1 and 2 are not as narrow as AWS suggests. The relevant claim language reads, "the portion of the data location information included in a corresponding one of the data location servers is based on a hash function used to organize the data location information across the plurality of data location servers." *Kove IO, Inc.*, 2021 WL 5988928, at *4. Judge Pallmeyer construed the "based on a hash function" language to include the requirement that the portion of the data location

26

information is "based on a hash function that maps identifier strings to one or more of the data location servers."  *Id.* at *15.  AWS provides no support for its contention that a limitation requiring the use of a hash function to "organize" location information across location servers includes a requirement that the hash function be used to "distribute" the locations themselves.  *See id.* ("Claim 1 is not limited to any particular manner of organizing data based on a hash function.").

Furthermore, Dr. Goodrich testified that S3 satisfies this claim requirement because within S3, a consistent hash function is used to map identifier strings to location servers and determine which KFC stores the desired location data.  Tr. at 556:21-558:9; 599:10-24.  Dr. Goodrich presented to the jury a comment on S3 source code files explaining that S3 "map[s] an item to a bucket by hashing the item."  *Id.* at 598:10-24.  The jury also viewed a presentation by Jason McHugh, an Amazon engineer, stating that hash functions are used to "determine where on the consistent hashing circle that machine lives."  *Id.* at 597:6-11.  Dr. Goodrich's testimony provided sufficient evidence for the jury to reasonably conclude that S3 meets the "based on a hash function" requirement.

### d. Performance limit

AWS argues that Kove "failed to show" that the accused products infringe on claim 17 and 30 of the '978 patent.  Def.'s Rule 50(b) Mot. at 9.  The relevant portion of claim 17 requires each location server to be able to "transfer a portion" of identifiers and their associated locations to another location server "when a performance criterion of the first location server reaches a predetermined performance limit."  '978 pat., col. 27, lns. 40-43.  Likewise, claim 30 requires the automatic transfer of identifiers/locations

27

Appx155

when the first data location server reaches a predetermined performance limit. '978 pat., col. 28, lns. 37-44. AWS asserts that within DDB, data is transferred manually by engineers based on their technical judgment rather than according to a predetermined performance limit.

The trial record supports the jury's verdict. The jury viewed deposition testimony from AWS engineer James Sorenson, who testified that partitions within DDB can split into two. He stated that this process leaves "part of the data resid[ing] on the original node" while "part of the data will be moved to new nodes." Tr. at 683:15-684:3. The jury also saw deposition testimony from AWS engineer Donal Walsh, who stated that data can be transferred between metadata nodes for load balancing purposes. *Id.* at 684:8-22. Dr. Goodrich stated that load balancing "has to do with these predetermined thresholds that either happen because of transactions getting too hot or the disc drives getting too full." *Id.* at 684:23-685:1. He further explained that predetermined performance limits are demonstrated through the use of metadata alarms, which are triggered when input/output operations exceed a certain value or storage within the disc space reaches a certain capacity. *Id.* at 685:20-686:4. Dr. Goodrich also testified that based on his analysis of DDB source code, metadata is transferred among metadata nodes based on different performance levels that are met when a metadata node "fails, is non-responsive, is corrupt, is being retired or removed from the fleet, or is overloaded." *Id.* at 686:11-21. A reasonable jury could have concluded that the partition split process that occurs for load balancing purposes satisfies the "predetermined performance limits" requirement.

AWS also contends that Kove failed to present evidence of the same

28

Appx156

requirement being met in S3. AWS's sole piece of supporting evidence is one line from Dr. Grama's testimony where he stated, "this notion of predetermined performance limit triggering transferring does not happen either in KFCs." *Id.* at 1508:13-5; Def.'s Rule 50(b) Mot. at 9. Dr. Grama's non-infringement conclusions alone are insufficient for this Court to find in AWS's favor. *See Milwaukee Elec. Tool Corp. v. Snap-On Inc.*, 288 F. Supp. 3d 872, 882 (E.D. Wis. 2017) ("[Rule 50(b) movant] seems to think it can succeed if it shows merely that it could have convinced the jury to go its way, but this is no reason to disturb the jury's determinations.").

Based on the trial record, there is no basis for this Court to substitute its judgment for that of the jury. This Court therefore denies AWS's motion for judgment as a matter of law on non-infringement.

### 4. Dr. Goodrich's testimony

AWS argues that no reasonable jury could rely on Dr. Goodrich's opinions. First, AWS asserts that Dr. Goodrich "confirmed at trial" that he relied on other individuals to "review AWS's source code" and "draft the source code appendices to his [infringement] report." Def.'s Rule 50(b) Mot. at 9.

AWS provides an incomplete description of Dr. Goodrich's testimony. Dr. Goodrich testified that he asked Dr. Babb, a researcher at MIT, to review AWS's source code to "do a preliminary analysis that identified which source code files would be relevant." Tr. at 762:2-10. But after Dr. Babb completed his preliminary analysis, Dr. Goodrich spent two days reviewing the source code in person at AWS's counsels' office and then spent "additional time" reviewing the source code on a USB drive. *Id.* at 761:17-20. Furthermore, although Dr. Babb wrote the first draft of the source code

appendix included in Dr. Goodrich's expert report, Dr. Goodrich stated that he edited that appendix "based on [his] analysis so that it comprises [his] opinions in this matter." *Id.* at 763:13-15; 764:7-11. AWS has not shown that this departed from typical practice for experts in similar patent infringement cases or, for that matter, other cases involving voluminous, complex, or technical evidence. *See Zelinski*, 335 F.3d at 640 (noting party's failure to present evidence that the expert's methodology was atypical). In any event, Dr. Goodrich fully explained his source code review process to the jury, and the jury ultimately found his testimony credible. It was not unreasonable for the jury to rely on Dr. Goodrich's source code analysis.

Second, AWS contends that Goodrich's testimony "consisted largely of conclusory statements" that various materials support his infringement contentions. Def.'s Rule 50(b) Mot. at 9. In support of this contention, AWS cites Goodrich's testimony confirming that he did not present to the jury any portion of DDB source code that refers to a primary key. *See* Tr. at 852:13-20. But this portion of Dr. Goodrich's testimony does not contain an assertion that the source code supports his infringement opinions, so it is unclear how it relates to AWS's argument regarding the "conclusory" nature of Dr. Goodrich's testimony. And Dr. Goodrich supported his primary key opinions using other sources of evidence, including internal Amazon documents. *See id.* at 638:10-639:5. Additionally, Dr. Goodrich reviewed AWS source code and explained how it supported his infringement conclusions at multiple points during his over ten hours of testimony. *See, e.g.*, *id.* at 667:8-668:7; 1172:24-1173:15.

Third, AWS argues that Kove's counsel improperly suggested that the jury should disregard the source code. AWS's description of events is incomplete. During closing

30

Appx158

argument Kove's counsel made the following statement:

> Their case in many ways comes down to this whole say-so thing, telling you what to think without showing you the evidence. And even the source code. The source code is the best evidence. I agree. Sure is. But guess what? Y'all can't read it. I can't read it either, just for the record. Okay? But they can and they went through it, and there's nothing in there that's inconsistent with the documents. If these documents were wrong in some material way, wouldn't they have told you that? Wouldn't they have pointed it out? Wouldn't they have used some of these documents?

*Id.* at 2016:7-17. Kove's counsel did not suggest that the jury should ignore the source code when weighing the evidence in the case. Rather, counsel simply acknowledged that many, if not all, of the jury members lacked the technical expertise necessary to fully comprehend the source code and argued that the testimony of AWS engineers who did review the source code was consistent with various documents presented to the jury. AWS does not explain how it was prejudiced by this argument, nor does it present any evidence from which this Court could find that "there is a reasonable probability that the verdict of a jury has been influenced" in an inappropriate way. *DeRance, Inc. v. PaineWebber Inc.*, 872 F.2d 1312, 1327 (7th Cir. 1989) (quoting *City of Cleveland v. Peter Kiewit Sons' Co.*, 624 F.2d 749, 756 (6th Cir. 1980)). The jury was instructed that the attorneys' opening and closing arguments are not evidence. Jury Instructions at 3. Furthermore, multiple witnesses acknowledged that the source code is important evidence, and one of Kove's expert witnesses referred to the source code as the "ground truth." Tr. at 774:22-775:3. And AWS did not object to counsel's statements during the trial. "Having failed to seek a cure at the time, it is in a poor position to object to an allegedly improper remark in its post-trial briefs." *Third Wave Techs., Inc. v. Stratagene Corp.*, 405 F. Supp. 2d 991, 1010 (W.D. Wis. 2005).

Finally, AWS contends that Dr. Goodrich overstated the extent to which his

31

Appx159

descriptions of the accused products were consistent with the testimony of AWS engineers Dr. Allan Vermeulen, Seth Markle, and Timothy Rath. For example, AWS points to Dr. Goodrich's testimony that it was "undisputed" that each iNode contains a Blindex. *See* Tr. at 1745:5-8. But testimony from AWS engineers support rather than undermine Dr. Goodrich's testimony. Dr. Vermeulen testified that "the iNode is actually the data structure that contains the Blindex." *Id.* at 1290:17-1291:13. Markle also confirmed that the Blindex is the "most important field" within an iNode. *Id.* at 1364:7-11. AWS also directs the Court's attention to Dr. Goodrich's statement that he agreed with AWS witness testimony that KFCs provide the correct information if they are alive and respond to a request. [3] *See id.* at 1753:9-16. But AWS does not cite any statements from Dr. Goodrich that contradict his testimony. And Dr. Goodrich's testimony that KFCs respond to requests by either providing the volume ID and blob ID of the data or with the information they receive from a BM isn't inconsistent with the notion that a functioning KFC will always provide the correct answer to a data request. *See id.* at 561:2-562:4.

AWS also takes issue with Goodrich's statement that hearing testimony from AWS engineers about how the accused products operate did not change his infringement opinions. *See id.* at 1741:6-11. But Dr. Goodrich explained that his infringement opinions remained the same because the engineers did not analyze the Court's claim constructions and "admitted that they didn't read the patents." *Id.* at 1741:12-17. Furthermore, as noted above, Dr. Goodrich's disagreement with AWS's

---

[3] Kove's counsel attributed this statement to Markle, but Rath is the AWS engineer that testified that "as long as the KFC is alive and responds," it provides the "correct answer" to a request for data. *Id.* at 1384:17-1385:3.

engineers does not show that his testimony is inherently unreliable or that a jury would be unreasonable to credit his opinions. The jury reasonably could have decided that, because the AWS engineers did not read the patents, the persuasive value of their testimony on infringement issues was limited. Alternatively, the jury reasonably could have come to the independent conclusion that, despite AWS's witnesses' assertions to the contrary, their testimony did provide support for Goodrich's infringement opinions. For example, Dr. Vermeulen testified that the Blindex is a "label that describes the data." Tr. at 1292:22-1. He also testified that the Blindex contains both a volume ID and a blob ID, *id.* at 1314:17-25, and that the volume ID "is the data in the Blindex that allows you to find the correct R2D2s" where the data is stored. *Id.* at 1350:3-12. Based on Dr. Vermeulen's testimony that the Blindex contains information about the R2D2 where the data is stored, the jury reasonably could have (and based on the verdict, apparently did) conclude that the Blindex was more than simply a "label."

"When reviewing a jury verdict, the question is not whether the jury believed the right people, but only whether it was presented with a legally sufficient amount of evidence from which it could reasonably derive its verdict." *Zelinski*, 335 F.3d at 638 (citation omitted). The jury reasonably relied on Dr. Goodrich's testimony in reaching its verdict.

### 5.    Damages

AWS argues that Kove did not provide sufficient evidence to support the jury's damages award. The Federal Circuit has stated that when "reviewing damages awards in patent cases," a court must "give broad deference to the conclusions reached by the finder of fact." *Monsanto Co. v. McFarling*, 488 F.3d 973, 981 (Fed. Cir. 2007). The

33

Federal Circuit has also instructed that a jury's damages award "must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence or based only on speculation or guesswork." *Id.* (citation omitted). AWS contends that judgment as a matter of law should be awarded because Bergman failed to properly apportion his damages calculation to exclude the value of non-patented features in the accused products, improperly relied on an AWS project document for his damages analysis, and did not sufficiently explain the basis for his bargaining split opinions.

### a. Apportionment

Under 35 U.S.C. § 284, "damages awarded for patent infringement must reflect the value attributable to the infringing features of the product, and no more." *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (internal quotation omitted). This aspect of damages law is reflected through the principle of apportionment, which requires "separat[ing] the value of the allegedly infringing features from the value of all other features." *Id*.

AWS contends that Bergman's damages analysis contained incorrect assumptions about S3's functionalities. But each of the allegedly inaccurate assumptions AWS raises are explained and supported by Bergman's reliance on Kove's experts to gain a better understanding of the features of the accused products.

To analyze the technical benefits that the Kove patents provided to the accused products, Kove's experts considered the "non-infringing alternative" that AWS would need to implement to avoid infringing on the patents. Tr. at 701:11-24. AWS asserts that Bergman's non-infringing alternative improperly required customers to manage their own data because he "incorrectly assumed that S3's ability to scale derives solely from

34

infringing features." Def.'s Rule 50(b) Mot. at 12. Bergman testified that his understanding of the scaling ability of KFCs and BMs came from Dr. Goodrich. Tr. at 1186:17-24. Bergman testified that this understanding was that "without access to the KFC scaling claims[,] . . . AWS would not have access to the KFC cache and . . . all of the [data] requests would go to the brick manager." *Id.* at 1047:25-1048:7. This understanding is the basis for Bergman's conclusion that without scaling claims, S3 would no longer be able to offer automatic partitioning and customers would have to partition their data manually. *Id.* at 1069:3-21; 1076:2-10. Bergman further testified that removing the benefits of the scaling claims from S3 would result in "increased costs, decreased availability, increased latency, and a decrease in system durability." *Id.* at 1048:23-1049:2. Bergman also stated that his understanding is that KFCs are only able to locate iNodes within the cache due to benefits derived from the patent hashing claims. *Id.* at 1047:17-24. He explained that without the use of hash functions or hash tables to distribute iNodes, no requests would reach the KFC cache and all requests would therefore go to the BMs. *Id.* at 1047:25-1048:7. Bergman's understanding of S3's functionality is consistent with Dr. Goodrich's testimony. *Id.* at 702:14-703:4 (explaining benefits of hashing claims for S3); 713:16-24 (describing consequences of removing KFC cache); 731:3-732:13 (explaining impact of scaling claims on S3 functionality); 732:15-733:22 (describing consequences of removing scaling claims).

Similarly, Dr. Goodrich is the source of Bergman's underlying assumptions regarding "how often KFCs in S3 transfer iNodes when attributing damages to the KFC cache." Def.'s Rule 50(b) Mot. at 12. Dr. Goodrich testified that Amazon's internal testing revealed that 80% of requests that reach the KFC level are resolved by the KFC

<div align="center">35</div>

<div align="center">Appx163</div>

cache, while the remaining 20% go to the BM level. *Id.* at 707:11-21. Bergman explained that to develop a non-infringing alternative, he worked with Dr. Goodrich to stimulate a model where the "cache hit ratio," or the percentage of requests that are resolved by the KFC cache without reaching the BMs, decreased from 80% to 0%. *Id.* at 1053:6-1-54:6. Dr. Grama also used this 80% hit ratio number when explaining the functionality of the KFC cache. *Id.* at 1503:3-12. Although AWS may have offered contradicting evidence about S3's functionality, Bergman was entitled to rely on Dr. Goodrich's expert opinions to develop his damages analysis.

AWS argues that Bergman failed to properly apportion damages to DDB because it was based on the incorrect assumption that 100%, rather than .25%, of get requests infringe. Kove argues that AWS forfeited this argument by failing to include it in its Rule 50(a) motion. This Court agrees. The Seventh Circuit has stated that "[b]ecause the Rule 50(b) motion is only a renewal of the preverdict motion, it can be granted only on grounds advanced in the preverdict motion." *Thompson v. Mem'l Hosp. of Carbondale*, 625 F.3d 394, 407 (7th Cir. 2010) (citation omitted); *Andy Mohr Truck Ctr., Inc. v. Volvo Trucks N. Am.*, 869 F.3d 598, 605 (7th Cir. 2017) ("[I]f a party raises a new argument in its Rule 50(b) motion that was not presented in the Rule 50(a) motion, the non-moving party can properly object."). At trial, AWS moved for judgment as a matter of law under Rule 50(a). In its Rule 50(a) motion, AWS argued that Bergman "failed to explain how he apportioned damages to the allegedly infringing features." Def.'s Rule 50(a) Mot. at 14. But the only examples of this failure that AWS cited were related to S3, not DDB. Specifically, AWS asserted that Bergman had incorrectly attributed the total value of S3's KFC cache to the '170 patent claims and omitted S3's index system from his non-

36

Appx164

infringing alternative for other claims. *See* Def.'s Rule 50(a) Mot. at 14. AWS did not discuss get requests or DDB in its Rule 50(a) motion and this argument is therefore forfeited. *Webster v. CDI Indiana, LLC,* 917 F.3d 574, 578 (7th Cir. 2019).

The Court finds AWS is not entitled to judgment as a matter of law with respect to damages based on Bergman's apportionment opinions.

### b. Goldilocks

To determine the value of the scaling claims to S3, Bergman reviewed Amazon documents related to a storage class product called "Goldilocks." S3 contains multiple storage classes, including the standard infrequent access storage class (SIA) and the one zone IA storage class (one zone). Tr. at 1615:4-25. While the SIA stores data in multiple zones, the one zone stores data within a single zone. *Id.* Goldilocks is an SIA product that AWS developed as a potential competitor to a Google product called Nearline. *Id.* at 1070:10-1071:2; 1681:1-18. The jury viewed an Amazon document indicating that AWS estimated that Goldilocks merited a 20 to 30 percent price premium over Nearline. *Id.* at 1071:3-15. The same document also stated that the price premium was "warranted" due to the "AWS brand" as well as "slight product differences." *Id.* Bergman concluded that Goldilocks's seamless tiering functions, which eliminated a customer's need to manually partition their own data, accounted for a 20% price difference between Goldilocks and Nearline. *Id.* at 1070:10-1071:2.

To gain a better understanding of Goldilocks's features and how they relate to the patents' scaling claims, Bergman relied on Kove experts Karim Fanous and Dr. Goodrich. Dr. Goodrich testified that if S3 were unable to scale within the BMs, the alternative would be a process called "manual partitioning," which would require

37

Appx165

customers to manually track, transfer, and manage their own data rather than having S3 automatically partition the data. *Id.* at 733:9-22. Dr. Goodrich further testified that he considered manual partitioning an effective means of approximating the benefits of the patents' scaling claims. *Id.* at 733:23-734:1. Dr. Goodrich explained that he compared a Goldilocks to a manual portioning service in order to assess the effects of removing the scaling claims from S3. *Id.* at 733:23-735:15. Similarly, Fanous testified that although there is no non-scalable version of S3, he approximated the pricing differences between a manual and automatic partitioning system by comparing Google Nearline to Goldilocks. *Id.* at 454:3-20.

AWS asserts that Bergman "failed to consider" various differences between Goldilocks and Nearline in his analysis. Def.'s Rule 50(b) Mot. at 13. But Bergman testified that it was the "compilation of all of the evidence," rather than solely AWS's estimate, that informed his conclusions about the price difference between Goldilocks and Nearline. Tr. at 1200:13-1201:2. While testifying, Bergman reviewed multiple Amazon documents that described features of S3 and Goldilocks. He stated that one of the "key features" of Goldilocks was "seamless tiering," which allows the system to "move data within a storage class without having the customer have to do it." *Id.* at 1070:2-16. Bergman also cited an Amazon document identifying seamless tiering as "one of our key differentiators from Nearline." *Id.* at 1070:10-1071:2. The same document also highlighted seamless tiering as a "core feature" of Goldilocks. *Id.* Bergman cited an additional Amazon document stating, "[w]e believe our proposed product definition is slightly better than Google's Nearline product because customers do not have to change their application to point to a new bucket." *Id.* at 1071:3-15.

<div align="center">38</div>

<div align="center">Appx166</div>

Fanous's testimony also supported Bergman's conclusions. Fanous testified that he considered multiple differences between Goldilocks and Nearline and concluded that "storage class" was the biggest distinction between the two products. *Id.* at 455:4-7. He explained that although both products moved objects across tiers, in Goldilocks, "the movement happens automatically," and in Nearline, "the end user has to move her data" manually in a manner "similar to some of the operations you would be doing if you were manually partitioning." *Id.* at 455:8-19. Furthermore, S3 manager Christoph Bartenstein testified that scalability is an important feature for S3 customers. *Id.* at 1633:3-9. Testimony from both parties' witnesses supported Bergman's conclusion that seamless tiering was a core feature of Goldilocks and contributed to its price premium over Nearline.

To the extent AWS argues that Bergman should have considered the impact of other features on the price difference, AWS is simply rehashing a contention that was presented to the jury at trial. During cross-examination, Bergman was asked about an AWS document that stated listed multiple features that AWS believed supported Goldilocks's pricing premium, including "S3 lifecycle, IAM, KMS, and other AWS integration with S3." *Id.* at 1197:2-7. Bergman stated that he relied on other evidence that describes seamless tiering as the core difference between Nearline and Goldilocks. AWS's witnesses also questioned Bergman's methodology. Bennis testified that Bergman's damages model was "inherently overstated" because he failed to account for "other elements that help drive the price premium." *Id.* at 1681:1-24. The jury was entitled to credit Bergman's testimony over Bennis's in reaching its verdict. *Rehco LLC v. Spin Master Ltd.*, No. 13-CV-2245, 2020 WL 7025091, at *7 (N.D. Ill. Nov. 30, 2020)

39

Appx167

("[T]he jury was free to accept or reject aspects of the evidence and to credit the testimony it found most credible.").

### c. Bargaining split

The most common approach to determining reasonable royalty damages is the hypothetical negotiation approach. *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). This approach "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Id.* at 1324. Developing a hypothetical negotiation analysis "necessarily involves an element of approximation and uncertainty." *Id.* at 25 (citation omitted). That said, the Federal Circuit has cautioned that damages "must not be left to conjecture by the jury. They must be proved, and not guessed at." *Promega Corp. v. Life Techs. Corp.*, 875 F.3d 651, 660 (Fed. Cir. 2017) (quoting *Philp v. Nock*, 84 U.S. 460, 462 (1873)).

One method of calculating a reasonable royalty rate is "through a proper analysis of the *Georgia–Pacific* factors." *Exmark Mfg. Co. v. Briggs & Stratton Power Prod. Grp., LLC*, 879 F.3d 1332, 1349 (Fed. Cir. 2018) (citing *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970)). "The standard *Georgia–Pacific* reasonable royalty analysis takes account of the importance of the inventive contribution in determining the royalty rate that would have emerged from the hypothetical negotiation." *Id.* (citation omitted).

Bergman testified that his analysis covered a damages period from 2012 until the patents' expiration in 2018. When asked which *Georgia-Pacific* factors he considered, he carefully explained the four factors that were related to his bargaining split analysis:

40

quantified benefits, unquantifiable benefits, benefits to other AWS products, and AWS's typical licensing practices.  Tr. at 1095:24-1096:19.  Bergman stated that the quantified benefits included the $1 billion in profit that he contended Amazon earned from Kove's patents during the damages period.  *Id.* at 1097:6-8.  For unquantified benefits, Bergman referenced Dr. Goodrich's testimony regarding the benefits that the Kove patents provided to AWS's products.  *See id.* at 689:22-700:23 (explaining technical benefits that the patents-in-suit provide to AWS).  Bergman noted that "the parties of the hypothetical negotiation would know about these benefits and would take them into account."  *Id.* at 1097:13-1098:5.

Regarding benefits to other AWS services, Bergman explained that he considered the extent to which AWS's use of S3 is "driving business in other [AWS] services."  *Id.* at 1098:14-1099:5.  Bergman quoted from multiple AWS documents discussing how S3 drives customers to use other AWS services.  For example, Bergman read from a 2012 AWS document describing how customers tend to "move their compute," or their computing resources, "close to their data, which will generate additional revenue and margin" for AWS.  *Id.* at 1099:6-20.  He also read from another AWS document that stated, "for each terabyte of data in S3 we sell, we generate direct revenue of $22 based on public pricing and up to $31 in indirect revenue."  *Id.* at 1100:24-1101:9.  An additional AWS document Bergman reviewed stated that ""[c]ustomers who spend $1 storing data in AWS spend 4 to $7 on other AWS services."  *Id.* at 1101:10-1101:21.  When asked how the additional four to seven dollars AWS received every $1 spent on S3 storage impacted his quantified benefits analysis, Bergman stated that AWS received "between 4 billion and 7 billion dollars in additional

41

profit from other services" as well as the "billion dollars in additional benefit directly attributable to S3 and DDB." *Id.* at 1101:22-1102:6

Bergman further testified that he evaluated AWS's investment decision-making process by viewing deposition testimony from AWS employees indicating that the company prioritizes potential growth over direct profits. *Id.* at 1102:7-1104:4. He also showed the jury a quote from Swami Sivasubramanian, DDB's general manager, who stated that AWS is willing to develop technology "even if it results in zero" as long as it addresses a "critical need" for AWS customers. *Id.* at 1103:17-22.

Bergman concluded that:

> [T]aking into account the fact that this is profit that would basically disappear but for a license, understanding the significant downstream impacts associated with S3 revenue, those unquantifiable benefits that we've been talking about this entire time, as well as an understanding of how AWS typically goes about making investment decisions, it's my opinion that it would be at least 50 percent and even all the way up to a hundred percent of that quantifiable benefit.

*Id.* at 1104:5-15.

AWS argues that Bergman failed to sufficiently support his bargaining split opinions. Specifically, AWS challenges Bergman's testimony that in a hypothetical negotiation "the parties would've agreed that Kove would receive at least 50%, and up to 100%, of the incremental profits attributable to the use of the patents-in-suit." Def.'s Mot. for New Trial at 15. In support of its argument, AWS cites the Federal Circuit's decision in *Exmark.* In that case, the defendant argued that the plaintiff's damages expert's opinion should have been excluded because she did not sufficiently explain how she reached her proposed bargaining split. *Exmark Mfg. Co.*, 879 F.3d at 1347. At trial, the expert discussed each of the *Georgia-Pacific* factors, explained her

42

Appx170

understanding of the benefits that the asserted patent provided to the accused product, and stated that negotiators would have recognized these benefits. *Id.* at 1349-50. She also noted that these benefits were related to *Georgia-Pacific* factors nine and ten. *Id.* at 1350. The expert subsequently "concluded with little explanation" that the parties would have agreed to a 5% reasonable royalty rate. *Id.* at 1349.

The Federal Circuit held that "a superficial recitation of the *Georgia–Pacific* factors, followed by conclusory remarks, [cannot] support the jury's verdict." *Id.* at 1350 (citation omitted). The court also noted that "[w]hile mathematical precision is not required, some explanation of both why and generally to what extent the particular factor[s] impact[ ] the royalty calculation is needed." *Id.* at (citation omitted). The Federal Circuit concluded that the district court erred by admitting the damages expert's report because it "failed to adequately tie the expert's proposed reasonable royalty rate to the facts of this case," and the court ordered a new trial on the issue of damages. *Exmark Mfg. Co.*, 879 F.3d at 1349.

In this case, by contrast, the Court overruled AWS's pretrial motion seeking to exclude Bergman's bargaining split testimony, concluding that his testimony on that point was sufficiently explained in his written report. His testimony at trial, though not as detailed as the extended discussion of the relevant considerations in his Rule 26(a)(2) report—likely, in part, due to time limits imposed on the parties' trial presentations—laid out in detail the relevant factors and explained how they factored into his ultimate conclusion regarding the bargaining split. AWS focuses on Bergman's opinion that in a hypothetical negotiation, Kove would end up with a royalty consisting of at least 50% and as much as 100% of the incremental profits from AWS's use of the patents, arguing

43

Appx171

in substance that this cannot possibly make sense.  But that is a bit of a diversion, because the baseline number does not account for the significant, and much larger, benefit that AWS derived from its use of the patents that is not captured in the profit figure.  As Kove notes, this included, according to Bergman, $4 billion to $7 billion In profits from convoyed and add-on sales attributable to AWS's infringement.  *See* Tr. at 1101:10-1102:6.  Bergman then relied on testimony from AWS decision makers to the effect that AWS would be willing to give up its quantified profits from direct infringement for the long-term gain from its use of the Kove patents.  In other words, Bergman explained how he reached his bargaining split opinion; he did not simply pull it out of the air.  It is true that he did not reduce it to a formula.  But neither *Exmark Manufacturing Co.* or any other case requires that sort of precision; we are talking about a *hypothetical negotiation* here, not a mathematical formula or a chemical equation.  The Federal Circuit has made it clear that assessment of damages "does not demand absolute precision but may involve some degree of approximation and uncertainty."  *EcoFactor, Inc. v. Google LLC*, 104 F.4th 243, 254 n.6 (Fed. Cir. 2024) (internal quotation marks omitted).

   Given that Bergman fully examined and explained the *Georgia-Pacific* factors as applied to the circumstances of the case, this is not a situation in which a party's damages expert "plucked" its proposed royalty rate "out of nowhere."  *Exmark Mfg. Co.*, 879 F.3d at 1351.

        For the foregoing reasons, the Court denies AWS's motion for judgment as a matter of law with respect to damages.

<div align="center">44</div>

<div align="center">Appx172</div>

**B.      AWS's motion for a new trial**

AWS alternatively moves for a new trial on all of Kove's claims and, alternatively, on the question of damages.  "A motion for a new trial can be granted when the district court—in its own assessment of the evidence presented—believes that the verdict went against [its] manifest weight."  *Abellan v. Lavelo Prop. Mgmt., LLC*, 948 F.3d 820, 831 (7th Cir. 2020) (citation omitted); *see also Estate of Burford v. Accounting Practice Sales, Inc.*, 851 F.3d 641, 646 (7th Cir. 2017)  ("A new trial should be granted only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience.").  "[A] court will set aside a verdict as contrary to the manifest weight of the evidence only if no rational jury could have rendered the verdict."  *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012).

**1.      Claim construction**

**a.      Location**

As noted above, the parties agreed prior to claim construction that a "location" within the meaning of the Kove patents is an encoding that "specifies where data pertaining to the entity identified by the identifier is stored."  *Kove IO, Inc.*, 2021 WL 5988928, at *7.  In support of its motion for summary judgment, AWS argued that an iNode could not satisfy the parties' agreed upon construction of "location" in part because "the Blindex," a component within iNodes, "always stays the same once it has been created."  Def.'s Mot. for Summ. J. at 25.  Kove argued in its response brief that AWS's argument improperly narrowed the scope of the claim terms.  *See* Pl.'s Resp to Def.'s Mot. for Summ. J. at 9-10.  Because this Court partially adopted AWS's claim

45

Appx173

construction proposal, it did not address the parties' dispute over the "location" requirement at the summary judgment stage. *Kove IO, Inc.*, 2024 WL 450028, at *11.

In its Motion *in Limine* No. 7, Kove sought to exclude evidence related to AWS's location-based non-infringement arguments at trial. Specifically, Kove objected to AWS's contentions that (1) a location must be "all that you need to find exactly the data that you're looking for" and (2) "something cannot be a location if the data moves but the location stays the same." Dkt. no. 808 at 16. After the final pretrial conference, AWS abandoned the first contention and stated that "Dr. Grama won't offer any opinion that a location must be all that you need to find exactly the data you're looking for." Dkt. no. 837 at 2. On AWS's second contention, the Court argued that AWS's position was contrary to the construction adopted by Judge Pallmeyer and that AWS had forfeited any argument for its preferred construction when it agreed to the construction that Judge Pallmeyer adopted. *Id.* at 3. This Court concluded, however, that AWS could advance the argument that "a Blindex is not location data because it does not help identify (or specify) where data is stored." *Id.*

AWS asserts that it was unfairly prejudiced by the exclusion of Dr. Grama's testimony in relation to whether a Blindex can provide location information given that it is a static component that does not change when the data moves. In support of its argument, AWS cites *Innogenetics, N.V. v. Abbott Laboratories*, 512 F.3d 1363 (Fed. Cir. 2008). In that case, the Federal Circuit reviewed a district court's determination that an expert's testimony rested on an incorrect understanding of the court's construction of the word "genotyping." *Id.* at 1376. The court had construed "a method of genotyping" as a method that "distinguishes" among types of hepatitis C virus (HCV) and "classifies"

the HCV.  *Id.* at 1377.  During his testimony, the expert stated that a patent disclosed methods that "distinguish" between groups of HCV.  *Id.* at 1376.  Opposing counsel objected to this testimony, arguing that the expert's use of the term "distinguish" was improper because the expert, in his report, defined a "method of genotyping" as "the process of detecting and classifying" different HCV strains.  *Id.*  The district court found that the expert's testimony rested on an incorrect understanding of the construction of the word "genotyping" and granted JMOL on that basis.  *Id.*  The Federal Circuit reversed, noting that the dispute "seem[ed] to turn upon [the expert's] use of the words 'detect' and 'classify' and the district court's use of the words 'distinguish' and 'classify' in its construction of a 'method of genotyping.'"  *Id.* at 1377.  Because it "discern[ed] no difference in meaning between the definition of genotyping used by [the expert] and the one adopted by the district court," the Federal Circuit found that the expert witness's report and trial testimony were both consistent with the district court's claim construction.  *Id.* at 1377-78.

This case is distinguishable.  The Court's ruling on the exclusion of Dr. Grama's testimony was based on the substance of his opinions, not the particular language he used.  In particular, the Court found that AWS's assertion that an encoding cannot specify where data is stored if it remains static when the data moves "is contrary to— because it imposes an additional limitation upon—the construction adopted by Judge Pallmeyer."  Dkt. no. 837 at 2-3.  Furthermore, AWS does not point to any evidence in the record to support a finding that the construction for which it advocates is required by the language of the claims.  In support of its argument, AWS only cites the abstract of the '978 patent, which states that "[t]he data location is a key question when a

Appx175

distributed database has highly dynamic, and even spontaneous, data distribution properties." *See* Def.'s Mot. for New Trial at 3-4 (citing '978 pat., col. 1, lns. 65-67). This general description of the importance of locating data in a distributed database system in the "background" section of the patent is insufficient to import a new limitation into the claims.

Neither the claims nor the specifications of the patents-in-suit indicate that Kove intended to limit a "location" solely to components that change when the data moves. And, as AWS notes, an expert's infringement opinion is only admissible to the extent that it conforms with the Court's construction of the claims. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) ("[A] court should discount any expert testimony that is clearly at odds with the claim construction.") (internal quotation omitted); *see also* Def.'s Mot. for New Trial at 2 (citing *Innogenetics, N.V.*, 512 F.3d at 1377). In his expert report, Dr. Grama asserted that a Blindex "does not change even when the location of the associated data on S3 changes, and so is not location data." Dkt. no. 808, Ex. 7 ¶ 265. This Court excluded Dr. Grama's opinion because it added an additional limitation to the parties' agreed upon construction of the term "location," not due to a mere dispute over "semantics." *See Innogenetics, N.V.*, 512 F.3d at 1377. Furthermore, the jury heard testimony confirming that a Blindex is static. Dr. Goodrich acknowledged that a Blindex stays the same when the data moves. *See* Tr. at 1258:14-21 ("And the R2D2s that are associated with that volume ID and the blob ID can change, but the volume ID and the blob ID stay the same."). In sum, AWS was not prejudiced, let alone unfairly prejudiced, by the exclusion of testimony that contradicted the Court's construction of the asserted claims.

<div align="center">48</div>

<div align="center">Appx176</div>

AWS contends that Dr. Goodrich's trial testimony provides further support for its argument that a Blindex cannot be a location. In response to a question about why he excluded SkyNet from his analysis, Dr. Goodrich responded:

> [W]e actually have to go back to the definition of location . . . . So just to kind of like set the stage a little bit, there's lots of different locations that we can be talking about and what location means.
>
> So, for example, in the physical world, the location where I'm staying, my hotel room is in the Palmer House hotel. I'm not going to tell you my room number, but it's also a room number inside the Palmer House hotel. So that character string, Palmer House, those letters, and my room number is a location. That's where I'm staying. That is a location. But it's what we would refer to as, I think, a logical location. Just that string by itself doesn't tell you how to get to my hotel room.
>
> So point of that is that from the Court's claim construction that we have here in the juror notebook, what we're calling a location doesn't have to have all the information you need in order to find the requested data. It just has to be able to specify where data pertaining to the entity is stored. So you can use other things to get you there, but that information has to be able to help you find it. Otherwise, it's not a location.

Tr. at 1255:6-12:1258:21.

AWS states that "S3's Blindex fundamentally differs from the hotel room number in Dr. Goodrich's example." Def.'s Mot. for New Trial at 6. AWS misunderstands Dr. Goodrich's analogy. Dr. Goodrich used this analogy to illustrate the difference between a layperson's definition of location and the "logical location" that is disclosed by the patents. For the purposes of his analogy, he testified that "the character string, Palmer House, those letters, and my room number is a location." Tr. at 1255:15-20. In other words, Dr. Goodrich suggested that the *combination* of the name of the hotel, Palmer House, *and* his room number at the hotel served as the "location" in order to illustrate that, as AWS conceded prior to the pre-trial conference, an entity can constitute a "location" under the Court's claim construction even if it does not provide all of the

Appx177

information needed to locate the data.

AWS asserts that Kove's definition of "location" is too broad. But AWS does not acknowledge that the definition of "location" it advocates for is quite narrow. Building off of Dr. Goodrich's hotel analogy, if Dr. Goodrich was assigned to room 801 on the eighth floor of the Palmer House, but then is moved to the room next door, room 802, then his room number would change, but his floor number would stay the same. If the Court adopts AWS's argument regarding the scope of the term "location," then the floor number of Dr. Goodrich's room cannot be a location because it stayed the same even while his room number changed. Although this result may not be consistent with the ordinary meaning of "location," AWS has not demonstrated that it is inconsistent with the language of the asserted claims. And whether the floor number (or, in technical terms, the iNode containing a Blindex) "specifies where the data is stored" is a question of infringement, not claim construction.

AWS also challenges the Court's sustaining of Kove's objection to Dr. Grama's testimony regarding whether a storage node ID constitutes a "location." Dr. Grama testified that a storage node ID does not satisfy the claims' "location" requirement because it provides only a partition, and "if I tell you where an entire partition is, you have absolutely no way of locating where a single row in that table is." Tr. at 1462:2-9. Dr. Grama's suggestion that the identification of a partition alone is insufficient to locate the data runs directly afoul of AWS's commitment not to offer testimony that a location must be "all that you need" to find the desired data. AWS confirms this by arguing in its reply brief that "under the controlling 'location' construction, the 'location' must at least specify that row of data." Def.'s Mot. for New Trial Reply at 2. But AWS agreed that it

<div align="center">50</div>

<div align="center">Appx178</div>

would not offer an argument at trial that a location must be all you need to locate the data. AWS "offers no reason for relieving it of the consequences of its own agreement." *Third Wave Techs., Inc.*, 405 F. Supp. 2d at 999. Dr. Grama's testimony was properly excluded.

The same motion in *limine* ruling provides the basis for precluding AWS's questioning regarding a statement that Dr. Goodrich made to the USPTO during the reexamination process. At trial, AWS asked Dr. Goodrich whether it was his opinion that the location is "updated if data is moved in the data repositories." Tr. at 808:2-4. AWS asked this question with the intention of arguing that although Dr. Goodrich testified that a Blindex can provide location data despite never changing, he "provided the opposite opinion at the Patent Office on what the patent means" when it refers to a location. *Id.* at 816:17-22. AWS argues that the Court should have allowed it to present Dr. Goodrich's allegedly inconsistent prior statements. But AWS acknowledged at trial that whether or not the location changes when data moves "was the subject the motion in *limine* was about." *Id.* at 817:6-8. As the Court explained at trial, allowing this line of questioning would have allowed AWS to "get in through the back door" a point that it "couldn't bring in through the front door." *Id.* at 817:9-15. In other words, AWS could not circumvent the Court's motion in *limine* ruling excluding its contention that a location must change when the data moves by cross-examining a witness about that same contention.

AWS asserts that Dr. Goodrich and Kove improperly "implied to the jury" that its non-infringement theory "relied on the Blindex merely not including 'extra information.'" Mot. for New Trial at 6. In both portions of testimony that AWS cites, Dr. Goodrich

explain that he did not find it necessary to include SkyNet in his infringement analysis because he found that the Blindex was sufficient to meet the "location" limitation of the asserted claims. *See* Tr. at 1257:15-1258:3; 810:21-25.  This testimony does not support AWS's assertion that Dr. Goodrich misrepresented its non-infringement contentions to the jury.  And Dr. Goodrich made it clear that he considered whether the alleged location specifies where data is stored when developing his analysis.  *See Id.* at 585:22-586:4 ("The Blindex tells us where the data is stored for a given object within the storage layer.").  AWS points to no testimony from Dr. Goodrich suggesting that he applied a definition of "location" that is inconsistent with the Court's claim construction.

AWS also contends that the Court modified the "location" construction at the end of the trial by modifying the jury instructions.  "An erroneous instruction regarding claim interpretation that affects the jury's decision on infringement is grounds for a new trial." *Ecolab, Inc. v. Paraclipse, Inc.*, 285 F.3d 1362, 1373 (Fed. Cir. 2002).  "[T]o warrant a new trial, [AWS] must show that the erroneous jury instruction was in fact prejudicial." *Id.* at 1374.  If the error "could not have changed the result, the erroneous instruction is harmless."  *Id.* (quoting *Environ Prod., Inc. v. Furon Co.*, 215 F.3d 1261, 1266 (Fed. Cir. 2000)).

During the charge conference, the Court accepted Kove's proposal to add to the claim construction provided in the jury instructions that "[t]here is no requirement that the 'location' have all the information necessary to find and retrieve the requested data." Tr. at 1869:20-1870; *see* Jury Instructions at 15. This language was added to reaffirm, not modify, the Court's existing claim construction. AWS agreed before trial that it would not argue that a "location" as defined by the patents must be "all that you need to find

<div align="center">52</div>

<div align="center">Appx180</div>

exactly the data that you're looking for."  Dkt. no. 837 at 2.  AWS's argument that the language in the jury instructions indicating that the location does not need to have all of the information necessary to locate the data is somehow materially different from the Court's statement that a location need not have all the information needed to locate the data lacks merit.  And as noted above, AWS has not shown that the claim construction on which the instruction was based was erroneous.

As the Court explained in denying motion for judgment as a matter of law, ample evidence was presented at trial to support a finding that the iNode is a location.  Dr. Goodrich acknowledged that the Blindex does not change even if the data moves.  *Id.* at 1258:14-21 ("[T]he R2D2s that are associated with that volume ID and the blob ID can change, but the volume ID and the blob ID stay the same."); 807:2-23.  He opined, however, that the volume ID and the blob ID within the Blindex qualify as a "location" within the meaning of the patent claims.  *Id.* at 805:1-5.  At trial, Dr. Grama argued that the iNode cannot be a location because the Blindex does not contain location data.  *See, e.g.*, *Id.* at 1493:18-1494:1 (testifying that the Blindex source code does not indicate that it helps specify where data is stored).  The jury's resolution of this conflicting testimony in Kove's favor was not against the manifest weight of the evidence.

### b.    Non-hierarchical

AWS contends that the jury's infringement finding was based on an erroneous construction of "non-hierarchical" and that the Court's construction allowed Kove to recapture claim language that it had forfeited through a prosecution disclaimer.

At summary judgment, this Court found that during reexamination proceedings,

Kove clearly disclaimed hierarchical location server configurations and determined that the claims-at-issue for all three patents required location servers in a "non-hierarchical cluster configuration."  *Kove IO, Inc.*, 2024 WL 450028, at *5-9.  This Court also found that further construction of the term "non-hierarchical" was unnecessary because Kove had "acted as [its] own lexicographer" by describing the meaning of the term in the context of the patents during the reexamination process.  *Id.* at 9 (quoting *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)).  The Court concluded that the claim term "plurality of location servers" required "location servers in non-hierarchical structures."  *Kove IO, Inc.*, 2024 WL 450028, at *9.

AWS argues that the definition of the term "non-hierarchical" included in the jury instructions "doesn't accurately reflect Kove's disclaimer."  Def.'s Mot. for New Trial at 10.  AWS fails to acknowledge, however, that the definition of the term "non-hierarchical" included in the jury instructions was adopted, word-for-word, from the description of non-hierarchical structures that Kove provided to the USPTO during the reexamination process.  *See* Def.'s Stmt. of Facts, Ex. 32 at 40.  And AWS offers no support for the proposition that it was prejudiced by the construction presented to the jury.

AWS contends that the Court "separated" the non-hierarchical requirements from the "plurality of location servers" claim term.  Def.'s Mot. for New Trial at 9.  But in the jury instructions, the term "plurality of location servers/plurality of data location servers" was defined as requiring "location servers in non-hierarchical structures."  Dkt. no. 876 at 17.  Given that the term "non-hierarchical" was included in the "plurality of location servers" definition, AWS's contention that the jury instructions "separated" the two

54

Appx182

concepts is unpersuasive.

AWS also argues that the Court improperly limited questioning of Dr. Goodrich regarding statements he made during the reexamination process. At trial, AWS attempted to elicit testimony from Dr. Goodrich regarding statements he made to the USPTO about the meaning of the term "non-hierarchical." During the reexamination of the '170 patent, Goodrich submitted a declaration stating that a person of ordinary skill in the art (POSITA) would understand that certain requirements of the claim terms, such as a hash function, mandated a "non-hierarchical clustering approach." Tr. at 824:15-825:1. AWS quoted this declaration during its cross-examination of Dr. Goodrich; Kove objected to this questioning as inconsistent with the Court's claim construction. *Id.* at 825:2-4. At sidebar, AWS argued that its line of questioning was "not claim construction" and instead focused on Dr. Goodrich's contention that "non-hierarchical structures are different than tree structures." *Id.* at 826:7-9; 826:22-24. This Court sustained Kove's objection. *Id.* at 827:16-24.

AWS asserts that there was "no substantive reason" to exclude Dr. Goodrich's prior statement about "tree" structures. But the Court sustained the objection under Federal Rule of Evidence 403. Tr. at 827:16-24. Rule 403 provides for the exclusion of evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." FED. R. EVID. 403. AWS conceded at trial that Dr. Goodrich's statements to the USPTO were made prior to the Court's claim construction of the term "non-hierarchical." *See* Tr. at 826:10-20. As the Court noted when it sustained Kove's objection, "the problem is that you'd

55

Appx183

have to go back and recreate -- recreate, you know, what the ground rules were at the time and what was being proposed and what the state of affairs was." *Id.* at 828:12-19. The jury was instructed to analyze infringement based on the Court's construction of non-hierarchical, which was not in effect at the time of the reexaminations of the Kove patents. The potential for juror confusion and the waste of time required to, in effect, set the scene, substantially outweighed the relatively minimal probative value of Dr. Goodrich's previous statements. There was no error, let alone an error that actually prejudiced AWS.

### 2. Damages

AWS moves for remittitur, or in the alternative, a new trial to redetermine damages. "A court may vacate a jury's damages award only if it is 'against the clear or great weight of the evidence.'" *Sioux Steel Co. v. Prairie Land Mill Wright Servs.*, No. 16-CV-2212, 2023 WL 5804194, at *8 (N.D. Ill. Sept. 7, 2023) (quoting *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995)). In reviewing a jury verdict, this Court must "accord substantial deference to the jury's assessment" of damages. *Spina v. Forest Preserve Dist. of Cook Cnty.*, 207 F.Supp.2d 764, 771 (N.D. Ill. 2002) (citing *Ramsey v. Am. Air Filter Co.*, 772 F.2d 1303, 1313 (7th Cir.1985)). The damages inquiry is confined to three questions: "whether the award is 'monstrously excessive'; whether there is no rational connection between the award and the evidence, indicating that it is merely a product of the jury's fevered imaginings or personal vendettas[;] and whether the award is roughly comparable to awards made in similar cases." *Farfaras v. Citizens Bank & Tr. of Chicago*, 433 F.3d 558, 566 (7th Cir. 2006) (citation omitted).

AWS challenges the damages award on several bases, many of which this Court

56

Appx184

considered in ruling on its motion for judgment as a matter of law.

### a. Excessive

AWS argues that the damages award is excessive because it "exceeded AWS's revenue from S3 get requests and took nearly all profit from DDB." Def.'s Mot. for New Trial at 13. In support of its argument, AWS cites *Shockley v. Arcan, Inc.*, 248 F.3d 1349 (Fed. Cir. 2001). In *Shockley*, the defendant argued that the plaintiff's damages expert had not sufficiently supported his opinion regarding projected lost profits. 248 F.3d at 1362. The expert's calculations assumed that, without infringement, the defendant would have sold 80,000 units of the accused product per year over the next fifteen years to a specific buyer. *Id.* at 1363. But the expert admitted that his projected number of units sold was "an assumption without factual underpinnings" because it was based on "the number of sales that [defendant] told him to assume it would have made." *Id.* Furthermore, the defendant's salesperson testified that the defendant had attempted to sell many products to the potential buyer the expert referenced for many years with no success. *Id.* The Federal Circuit vacated the jury's damages award, concluding that the plaintiff's expert had "used a benchmark without any basis in economic reality." *Id.* The *Shockley* court also stated that the jury had "assume[d] continued demand and growth rates, profit margins, and other market factors against the clear weight of the evidence." *Id.* at 1363.

That case is distinguishable, however, because the jury award was based on a reasonable royalty rate rather than future lost profits. "[F]uture lost profits are inherently speculative" and therefore "require a different level of reliable economic evidence" than the factors upon which a reasonable royalty rate is based. *Japan Cash Mach. Co. v.*

Appx185

*MEI, Inc.*, No. 2:05-CV-01433-RCJ, 2009 WL 10316043, at *34 (D. Nev. Sept. 18, 2009), *aff'd*, 400 F. App'x 563 (Fed. Cir. 2010) (distinguishing *Shockley*, 248 F.3d at 1349).

Furthermore, the fact that the damages amount exceeds AWS's revenue for the accused products is insufficient to demonstrate that the award was monstrously excessive. Kove presented evidence that the operating profits for the accused products were not an appropriate measure of total damages. Bergman testified that he believed AWS would agree to pay more the revenue gained from external DDB customers for a license because "internal customers are the significant majority of use on these systems." Tr. at 1125:6-20; 1031:7-24 ("The internal usage far surpasses the amount of external usage. So Amazon itself is using this significantly more than even its third-party customers."). Because AWS's reported operating profits only accounted for external customers, Bergman analyzed the value of internal use of S3 and DDB by assuming that the internal customers derived a similar value from the infringing products as the external customers. *Id.* at 1034:4-19. Bergman explained how he performed this analysis, which included reviewing how much AWS charges its biggest external customers for use of its products. *Id.* at 1034:20-1038:23. Additionally, the jury heard testimony that both S3 and DDB drove consumer demand for other AWS products. *See id.* at 1098:14-1100:23. Taken together, this evidence supports a conclusion that AWS would have agreed to pay more than the operating profits of the accused products in order to obtain a license for the Kove patents.

Furthermore, Bergman based his calculations on actual data rather than projections. He testified that revenue for S3 during the damages period was about

58

Appx186

$8.64 billion, and $1.1 billion for DDB. *Id.* at 1032:24-1033:3. Bergman further testified that customer usage of both S3 and DDB grew "exponentially" over time. *Id.* at 1031:25-1032:10. These numbers were based on financial information provided by Amazon, such as the company's profit-and-loss statements, not pure speculation. *Id.* at 1032:13-23. This Court cannot conclude that his calculations had no "basis in economic reality." *Shockley*, 248 F.3d at 1363.

"[E]stimating a reasonable royalty is not an exact science." *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015). And the defendant's revenue over the damages period is not the only relevant factor in determining a reasonably royalty. *See Lucent Techs., Inc.*, 580 F.3d at 1324 ("[A]warding damages through litigation attempts to assess 'the difference between [the patentee's] pecuniary condition after the infringement, and what his condition would have been if the infringement had not occurred.'" (quoting *Yale Lock Mfg. Co. v. Sargent*, 117 U.S. 536, 552 (1886)); *Panduit Corp. v. Stahlin Bros. Fibre Works*, 575 F.2d 1152, 1159 (6th Cir. 1978) ("Among the relevant facts are: what plaintiff's property was, to what extent defendant has taken it, its usefulness and commercial value as shown by its advantages over other things and by the extent of its use.") (internal quotation omitted). This Court concludes that the jury's verdict is not excessive.[4]

---

[4] AWS states that due to Kove's failure to meet its evidentiary burden a "remittitur or new trial is warranted." Def.'s Mot. for New Trial at 13. But its remittitur argument is confined to a single sentence stating that "the new trial should be conditional on Kove not accepting a remitted award of $5.25 million—i.e., the maximum of the range provided by Ms. Bennis, which the jury seemed to multiply to reach $525 million." Def.'s Mot. for New Trial at 15. First of all, the contention that the jury applied a 100-times multiplier to Bennis's testimony is wildly speculative; it's far more likely that the jury accepted and adopted the low end of the range argued by the prevailing side's expert,

### b. Apportionment

AWS asserts that Kove "provided no evidence as to how the undisputed 99.75% of get requests that are served by the request router infringe or could be the basis for any damages" in light of the fact that "[n]one of those requests ever go to the Metadata Nodes, the accused location servers." Def.'s Mot. for New Trial at 13. AWS argues that because only .25% of get requests reach the location servers in DDB, Bergman's damages calculation should have been reduced by 99.75%. This argument is unpersuasive.

To calculate adequate damages for DDB's infringement on the patents, Bergman compared the value of DDB to the value of a hypothetical non-infringing alternative. He testified that his understanding from Dr. Goodrich was that "but for access to these patents, DynamoDB would not have access to the partition map cache." Tr. at 1080:4-11. He explained that currently the partition map cache resolves get requests 99.75% of the time, and in the non-infringing system, "100% of those requests [would be] going to the metadata nodes." *Id.* at 1080:12-21. Bergman stated that to compare the value of DDB to the non-infringing alternative, he reviewed an AWS document demonstrating that it had performed a "quantifiable analysis to consider what the cost impact would be by taking out that partition map cache." *Id.* at 1080:22-1081:1. AWS's analysis demonstrated that removing the partition map cache would result in between $571 million and nearly $700 million in costs in order to "add additional equipment to be able to support the operations that that cache has," which Bergman stated would result in up

---

Bergman. That aside, because the Court has concluded that the jury's damages award is not excessive, there is no basis to order a remittitur.

60

to $1 billion in extra costs over the entire damages period. *Id.* at 1080:2-17.

AWS's assertion that the 99.75% of get requests that are resolved through the partition map cache cannot be the basis for a damages award ignores Kove's evidence that the functionality of the partition map cache depends in part on the practice of the claims of the Kove patents. Dr. Goodrich testified that request routers are only able to store data locations through the use of a hash function. He stated that without the hashing claims of the patents-in-suit, the partition map cache would contain "hundreds of terabytes of data" and "each request router would store only .007 percent of all the location data," which would require "that effectively all the get requests would have to go to the metadata nodes" rather than the partition map cache. *Id.* at 738:22-739:10. He also quoted from an Amazon document detailing its analysis of the consequences of having all get requests sent to the metadata nodes. The document stated that "[t]he metadata hardware footprint would have to scale up 1500 times to handle an L-1 partition map cache failure today." *Id.* at 739:22-740:9. Dr. Goodrich explained that a partition map cache failure would prevent access to the partition map cache, and as a result "you have to blow up the metadata node fleet like crazy." *Id.* at 740:10-15.

"As a substantive matter, it is the 'value of what was taken' that measures a 'reasonable royalty' under 35 U.S.C. § 284." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018) (citation omitted). The expert testimony and Amazon documents Kove presented at trial indicate that a substantial part of the "value" of the Kove patents to DDB is the ability to use a hash function in order to support the partition map cache. Bergman confirmed at trial that he held this opinion despite understanding that the request routers, which contain the

61

Appx189

partition map cache, are not the component of DDB that Kove alleged satisfied the patents' "location server" requirement. *See* Tr. at 1205:3-12. This opinion is not against the manifest weight of the evidence because in the non-infringing alternative Bergman developed, *none* of the get requests would be sent to the partition map cache, and *all* get requests would be sent to the metadata nodes. Therefore, Bergman's damages calculation evaluated the impact of requiring every get request to be sent to the metadata nodes, not just the value of the .25% of requests that reach the metadata nodes.

Furthermore, on both direct and cross-examination, Bergman was asked why he didn't reduce his proposed damages award for DDB by 99.75% to reflect the number of get requests that do not reach the metadata nodes. On cross- examination he stated that he did not agree that calculating the damages award based on the proportion of get requests that reach the metadata nodes was an "appropriate way to do the analysis." *Id.* at 1205:25-1206:8; *see id.* at 1081:20-1082:2. Bergman's apportionment opinions were supported by Kove's evidence regarding the functionality of the accused technology and therefore are distinct from the opinions that the Federal Circuit has found to have been "plucked out of thin air." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 69 (Fed. Cir. 2012). Bergman's apportionment opinions related to DDB were not against the manifest weight of the evidence.

AWS also seeks a new trial based on Bergman's apportionment of multiple features of S3. As the Court discussed in denying AWS's motion for judgment as a matter of law on the same issue, Bergman stated multiple times at trial that he relied on Kove's other expert witnesses to gain an understanding of the functionality of the

62

Appx190

accused products and the benefits the Kove patents provided to those products. *See, e.g.*, Tr. at 1186:17-24 (explaining that his understanding about how KFCs and BMs transfer iNodes came from Dr. Goodrich). This reliance was also the basis for Bergman's consideration of each of the functions of S3 that AWS identifies. *See* Tr. at 1047:17-1048:7 ("[I]t's my understanding that S3 uses hashes and hash tables in the KFC fleet to locate cached iNodes, which is what contains location information for objects."); 1064:24-1065:4 ("It's my understanding from Dr. Goodrich that the scaling claims provide the ability for S3 to transfer location information between location servers when one of those servers reaches a predetermined performance limit."); 1186:17-23 ("That's my understanding based on my . . . based on Dr. Goodrich."). AWS does not point to any evidence that calls into question Bergman's calculations and simply cites multiple portions of Bergman's testimony that it asserts demonstrates Bergman's flawed understanding of the accused products. Def.'s Mot. for New Trial at 14. This is insufficient to demonstrate that Bergman's apportionment conclusions were against the manifest weight of the evidence.

AWS is not entitled to a new trial based on Kove's apportionment evidence.

### c.     Goldilocks

AWS argues that Bergman's testimony related to Amazon's "Goldilocks" product was inadequate for the same reasons it argues there was no legally sufficient basis for his testimony. As discussed above, this argument lacks merit. Bergman explained that he relied on Dr. Goodrich and Fanous to understand the features of each product. Tr. at 1199:22-1200:12. He applied a 20% price premium to AWS's Goldilocks over Google's Nearline despite differences between the two products based on this

63

Appx191

understanding as well as AWS documents comparing the two products. At trial Bergman discussed a document outlining AWS's internal valuation of its product over Nearline. Tr. at 1071:3-15. Bergman also reviewed multiple AWS documents identifying seamless tiering as a key distinction between Goldilocks and Nearline. *Id.* at 1070:10-1071:2. Bergman provided ample support for his opinion that seamless tiering was a core distinction between the two products that accounted for at least part of the price difference.

AWS notes that one of its witnesses testified about features of the products that it believes Bergman failed to consider. *See* Def.'s Mot. for New Trial at 15. The fact that AWS offered competing expert testimony is insufficient to demonstrate that the jury's verdict was irrational or not factually supported. And even if this Court were to find AWS's expert more persuasive than Kove's, this Court cannot grant a new trial "just because it believes the jury got it wrong." *Whitehead v. Bond*, 680 F.3d 919, 928 (7th Cir. 2012). AWS has offered no evidence that Bergman's Goldilocks testimony, individually or in connection with Bergman's other alleged errors, demonstrates that the jury verdict was against the manifest weight of the evidence.

### d. Bargaining split

This Court has concluded that Bergman's bargaining split opinions did not provide a basis for granting judgment as a matter of law on damages. For similar reasons, Bergman's analysis does not support granting AWS's motion for a new trial. Bergman explained to the jury the quantified and unquantified benefits that AWS received from use of Kove's patents, the impact of the use of the Kove patents on the growth of other AWS services and the significant resulting benefits to AWS, and AWS's

64

Appx192

typical business practices with respect to licensing agreements. Tr. at 1097:6-1104:4. As noted above, Bergman's analysis was rooted in the facts of the case, not on "speculation or guesswork." *Lucent Techs., Inc.*, 580 F.3d at 1335.

The jury had ample credible evidence supporting its decision on damages, and its damages award was not against the manifest weight of the evidence. This Court therefore denies AWS's motion for a new trial on damages.

## C. Kove's motion to amend the judgment and for attorneys' fees

### 1. Pre- and post-judgment interest

Kove requests an award of prejudgment interest and postjudgment interest on all damages incurred prior to and after the Court's entry of judgment. An award of prejudgment interest under 35 U.S.C. § 284 "serves to make the patent owner whole, since his damages consist not only of the value of the royalty payments but also of the forgone use of the money between the time of infringement and the date of the judgment." *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 656 (1983). The Supreme Court has held that "prejudgment interest should ordinarily be awarded absent some justification for withholding such an award." *Id.* at 657.

AWS argues that this Court should not award prejudgment interest because Kove is responsible for delaying the case's resolution. The parties also disagree about the proper calculation for a prejudgment interest award in this case.

#### a. Delay

A court may limit or deny prejudgment interest "where the patent owner has been responsible for undue delay in prosecuting the lawsuit." *Gen. Motors Corp.*, 461 U.S. at 657. But "[a]bsent prejudice to the defendants, any delay by [the patentee] does not

<div align="center">65</div>

<div align="center">Appx193</div>

support the denial of prejudgment interest." *Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc.*, 246 F.3d 1336, 1362 (Fed. Cir. 2001).

AWS argues that Kove unduly delayed prosecuting its claims by waiting to bring suit for nearly four years after it began considering a suit against AWS for patent infringement. Dr. John Overton, one of the inventors of the Kove patents, testified that he began discussing potential patent infringement litigation with attorneys sometime in 2014 or 2015 and that some of those discussions were about a potential lawsuit against AWS. Tr. at 368:23-369:4; 372:7-16. He also testified that the patents' co-inventor, Dr. Steph Bailey, analyzed various Amazon products while researching potential infringement cases based on the patents. *Id.* at 381:24-382:9. Additionally, Dr. Overton stated that throughout 2017 and 2018 Kove had communications with AWS about the potential sale of a Kove memory product unrelated to the patents-in-suit. *Id.* at 373:21-374:9. When asked if he thought it would have been "fair" to inform AWS of potential infringement during these communications, Overton responded:

> This is a complicated thing. You're trying to -- we're a small company. Amazon is the largest company in the world. You do your best to make the best judgments possible on how to advance the interests that are mutually beneficial, so you do your best. And it did not make any sense to say to them that we were considering the lawsuit, and if something else had happened and we had done business, maybe there would have been different outcomes. I can't speculate all the ways that one would evaluate something like this.
>
> But we were considering at this time, yes, that they were infringing or we believed so, whatever that is, we were considering the lawsuit, yes, and we were also considering that we could do business. You know, the specifics of that, it's very dynamic.

*Id.* at. 376:15-377:6. Kove did not attempt to inform AWS of its patents or any potential infringement until it filed the present suit in December 2018.

Appx194

AWS argues that Kove's conduct is similar to the actions of the plaintiff in *Crystal Semiconductor Corp.* In that case, the defendant adduced evidence that the plaintiff unduly delayed filing via the testimony of the plaintiff's former president, who stated that the company had sent letters to over thirty companies notifying them of potential infringement but intentionally excluded the defendants. *Crystal Semiconductor Corp.*, 246 F.3d at 1362. The same witness also explained that the plaintiff did not file suit because it wanted to establish a "business relationship" with a company that had a relationship with the defendants. *Id.* The Federal Circuit found that the plaintiff's "self-serving" delay in initiating the suit was a "litigation tactic." *Id.* The court also concluded that the delay "caused the damages owed by [defendants] to escalate" and "resulted in prejudice to the defendants." *Id.* The Federal Circuit affirmed the district court's denial of prejudgment interest. *Id.*

Kove argues that AWS's reliance on *Crystal* is misplaced because that case is "irreconcilable" with the Supreme Court's decision in *SCA Hygiene Products Aktiebolag v. First Quality Baby Products, LLC*, 580 U.S. 328 (2017). In that case, the Supreme Court held that a defendant could not assert a laches defense against a patent infringement claim that was brought within the damages period outlined in 35 U.S.C. § 286. *Id.* at 346. Kove does not cite, nor is this Court aware of, any binding or persuasive authority indicating this bar on laches as an affirmative defense to liability also precludes denial or limitation of prejudgment interest on a damage award once liability is established. *See Milwaukee Elec. Tool Corp.*, 288 F. Supp. 3d at 907 ("Plaintiffs do not explain the connection between laches and Section 284, and the Court is not satisfied that they have much to do with each other."). And since the

Appx195

decision in *SCA Hygiene Products Aktiebolag*, the Federal Circuit has continued to cite *Crystal Semiconductor Corp.* and apply the undue delay standard in determining issues relating to prejudgment interest. *See Kaufman v. Microsoft Corp.*, 34 F.4th 1360, 1375 (Fed. Cir. 2022) (describing how the facts of the case were distinct from those present in *Crystal Semiconductor Corp.*).

The evidence in the record supports a finding that Kove unduly delayed in bringing suit such that prejudgment interest should be limited. It is undisputed that Kove was aware of a possible claim for infringement against AWS at least four years before it filed its complaint in this case. District courts have considered whether the plaintiff has offered a justification for its delay in filing suit when determining whether to award prejudgment interest. *See, e.g.*, *Kaneka Corp. v. SKC Kolon PI, Inc.*, 198 F. Supp. 3d 1089, 1124 (C.D. Cal. 2016) ("[Plaintiff] offers no compelling explanation for why, after it was aware of a possible claim for infringement, it waited four years to file suit."); *Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, 707 F. Supp. 2d 737, 767 (N.D. Ohio 2010) ("Plaintiffs fail to offer any justification (or even explanation) for this substantial delay."). Aside from its efforts to build a business relationship with the defendant, which the Federal Circuit rejected as a legitimate reason for delay in *Crystal Semiconductor Corp.*, Kove has offered no explanation for why it waited until 2018 to file suit despite knowing as early as 2014 that AWS's products potentially infringed on its patents.

AWS has also adduced evidence that it was prejudiced by Kove's undue delay. The Federal Circuit has stated that a defendant's bare assertion that it could have modified its products to avoid infringement is insufficient to demonstrate prejudice.

68

Appx196

*Kaufman*, 34 F.4th at 1375.  Here, AWS offers more than a general statement that it could have implemented noninfringing alternatives.  Scott Hayden, the president of Amazon Technologies, Inc., testified that the company "respect[s] the intellectual property rights of others," and he stated that upon notification that it may be infringing AWS would "enter a negotiation or we would stop doing what we were doing."  Tr. at 989:8-13.  Hayden further testified that although AWS did not believe that it infringed on the Kove patents, it still would have been willing to pay for a license to practice those patents because the company has "taken licenses to things that we don't infringe because it helps us avoid the cost of litigation."  Tr. at 991:12-19.  Based on the evidence regarding AWS's business practices regarding potentially infringing products, it is reasonable to conclude that AWS was prejudiced by the delay.

That said, the Court is not persuaded that this delay warrants denying prejudgment interest in full.  Awarding prejudgment interest is "the rule, not the exception."  *Crystal Semiconductor Corp.*, 246 F.3d at 1361.  And though Overton's testimony indicates that the desire to establish a business relationship impacted the timing of the lawsuit, unlike the defendant in *Crystal*, AWS has not adduced evidence that Kove's delay was a litigation tactic or that Kove was selectively enforcing its patent rights.  The Court will therefore limit prejudgment interest to the period between Kove's filing of the complaint to the date of the judgment.  *See Milwaukee Elec. Tool Corp.*, 288 F. Supp. 3d at 907 (awarding prejudgment interest "only from the institution of suit until the entry of judgment.").

Kove also argues that, because the Court disposed of AWS's equitable estoppel and waiver defenses at summary judgement, AWS cannot rely on evidence regarding

69

Appx197

"the same alleged delay based on the same circumstances" to limit prejudgment interest. Pl.'s Mot. to Amend the J. Reply at 3. But the standard for establishing material prejudice as required to prevail on an equitable estoppel or waiver defense is distinct from the standard for proving prejudice due to an undue litigation delay. Specifically, to demonstrate material prejudice, a defendant typically has to demonstrate "a change of economic position or loss of evidence" resulting from the plaintiff's conduct. *A.C. Aukerman Co. v. R.L. Chaides Const. Co.*, 960 F.2d 1020, 1043 (Fed. Cir. 1992), *abrogated on other grounds by SCA Hygiene Prods. Aktiebolag*, 580 U.S. 328. In contrast, to demonstrate prejudice due to undue delay, a defendant need only show that it "would have mitigated its damages but for the delay." *MHL Custom, Inc. v. Waydoo USA, Inc.*, No. CV 21-0091-RGA, 2023 WL 5805889, at *7 (D. Del. Sept. 7, 2023).

The Court concludes that Kove is entitled to prejudgment interest for the period from the filing of its complaint through the entry of judgment.

### b. Calculation

Kove argues that it is entitled to prejudgment interest calculated at the prime rate, compounded monthly. AWS, on the other hand, argues that the prejudgment interest award should be compounded quarterly at the 52-week Treasury Bill (T-Bill) rate. Regional circuit law is the controlling authority on calculation of prejudgment interest. *See Transmatic, Inc. v. Gulton Indus., Inc.*, 180 F.3d 1343, 1347-48 (Fed. Cir. 1999).

### i. Rate

In this circuit, the prime rate is the preferred rate for prejudgment interest awards. *See Gorenstein Enters., Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir.

70

Appx198

1989) ("[W]e suggest that district judges use the prime rate for fixing prejudgment interest where there is no statutory interest rate."); *First Nat. Bank of Chi. v. Standard Bank & Tr.*, 172 F.3d 472, 480 (7th Cir. 1999) ("We hold today that to . . . award something other than the prime rate is an abuse of discretion, unless the district court engages in such a refined calculation."). The Seventh Circuit has required district courts to use the prime rate in the absence of a "statutorily defined rate" or a process of "refined rate-setting" that can be used to determine a "more accurate market rate for interest." *Frey v. Coleman*, 903 F.3d 671, 682 (7th Cir. 2018) (internal quotation omitted).

The majority of courts in this Circuit have followed this mandate. *See, e.g.*, *Raffel Sys., LLC v. Man Wah Holdings LTD, Inc.*, No. 18 CV 1765, 2023 WL 3375853, at *23 (E.D. Wis. May 11, 2023) ("I see no reason to depart from the general practice in the circuit of using the prime rate to calculate prejudgment interest."); *ABS Glob., Inc. v. Inguran, LLC*, No. 14 C 503, 2020 WL 2405380, at *8 (W.D. Wis. May 12, 2020) ("[C]onsistent with the Federal and Seventh Circuit's practice, this court generally awards pre-judgment interest at the prime rate."); *Ameritox, Ltd. v. Millennium Health, LLC*, No. 13 C 832, 2016 WL 9460661, at *3 (W.D. Wis. July 18, 2016) ("[T]he court will follow the practice approved by the Federal Circuit and Seventh Circuit, which is also consistent with its own practice, by awarding prejudgment interest based on the prime rate."); *see also Aero Prod. Int'l, Inc. v. Intex Recreation Corp.*, No. 02 C 2590, 2004 WL 2091996, at *2 (N.D. Ill. Sept. 16, 2004), *aff'd*, 466 F.3d 1000 (Fed. Cir. 2006) ("[T]he Treasury Bill rate would not adequately compensate Plaintiffs.). AWS points to a small number of cases where courts in this district have departed from this approach. *See*

71

Appx199

*Black & Decker Inc. v. Robert Bosch Tool Corp.*, No. 04 C 7955, 2006 WL 3359349, at *11 (N.D. Ill. Nov. 20, 2006), *vacated*, 260 F. App'x 284 (Fed. Cir. 2008).  But AWS has not produced any evidence to support the application of any rate other than the prime rate.  *See Milwaukee Elec. Tool Corp.*, 288 F. Supp. 3d at 908 (E.D. Wis. 2017) ("The parties have not supplied authorities, evidence, or argument that equips the Court to engage in the nuanced rate-setting analysis needed to depart from the prime rate.").

The Court concludes that the prime rate is the appropriate prejudgment interest rate.

### ii.    Compounding

The parties dispute whether interest should be compounded monthly or quarterly.  During discovery, AWS produced three running royalty license agreements with other businesses that included a commitment to make payments on a quarterly basis.  *See* Def.'s Resp. to Pl.'s Mot. to Amend the J., Ex. 6 at AMZ_KOVE_000088426; Ex. 7 at AMZ_KOVE_000089327; Ex. 8 at AMZ_KOVE_000087899.  AWS's past license agreements containing a quarterly payment schedule weigh in favor of awarding prejudgment interest compounded on a quarterly basis as well.  *See Trading Techs. Int'l, Inc. v. IBG LLC*, No. 10 C 715, 2022 WL 103894, at *3 (N.D. Ill. Jan. 11, 2022) (applying quarterly compounding based on defendant's business practices with other licensees); *Kolcraft Enters., Inc. v. Chicco USA, Inc.*, No. 09 C 3339, 2019 WL 4242482, at *19 (N.D. Ill. Sept. 6, 2019*), aff'd sub nom. Kolcraft Enters., Inc. v. Artsana USA, Inc.*, 819 F. App'x 939 (Fed. Cir. 2020) (same).

Kove argues that its proposal to compound interest on a monthly basis better "reflects reality," but it does not connect its proposal to the facts of this case and cites

72

only non-patent cases in support of its argument. *See* Pl.'s Mot. to Amend the J. Reply at 6-8. Other courts in this district have concluded that monthly compounding is an appropriate standard outside the context of a patent infringement case. *See* Pl.'s Mot. to Amend the J. Reply at 7 n. 3 (listing cases). But quarterly compounding has been determined to be an appropriate standard for interest in patent infringement suits. *Milwaukee Elec. Tool Corp.*, 288 F. Supp. 3d at 909 (identifying quarterly compounding as the "ordinary approach to interest calculation"); *Bayer Healthcare LLC v. Baxalta Inc.*, No. 16-CV-1122-RGA, 2019 WL 4016235, at *7 (D. Del. Aug. 26, 2019), *aff'd*, 989 F.3d 964 (Fed. Cir. 2021) ("[I]t seems that standard industry practice includes interest . . . compounded quarterly.").

This Court concludes that Kove is entitled to prejudgment interest at the prime rate, compounded quarterly, for the period following Kove's filing of the lawsuit. AWS's damages expert Bennis calculated prejudgment interest for the period from December 12, 2018 through April 10, 2014 using the prime rate and quarterly compounding. She concluded that the correct amount using these parameters is $147,706,733. The parties are directed to update this calculation and are to file a joint statement on the correct amount by August 30, 2024.

AWS does not challenge the award of postjudgment interest in this case, and indeed, postjudgment interest is provided for by statute. Kove is entitled to postjudgment interest under 28 U.S.C. § 1961.[5]

---

[5] The applicable postjudgment interest rate is "equal to the weekly average 1-year constant maturity Treasury yield . . . for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961(b). The parties agree that the applicable rate for the week of April 1, 2024 was 5.04%. Bennis Decl. ¶ 7.

73

Appx201

**2.      Attorneys' fees**

Under 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party" in a patent infringement lawsuit.  An exceptional case is "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014).  Determining whether a case is considered "exceptional" requires "considering the totality of the circumstances," as "[t]here is no precise rule or formula for making these determinations."  *Id.*  A district court may consider factors such as "frivolousness, motivation, objective unreasonableness of a case's factual or legal components, and the need in particular circumstances to advance considerations of compensation and deterrence."  *Univ. of Utah v. Max-Planck-Gesellschaft zur Foerderung der Wissenschaften e.V.*, 851 F.3d 1317, 1322 (Fed. Cir. 2017).  An award of attorneys' fees is "limited to circumstances in which it is necessary to prevent a 'gross injustice' or bad faith litigation."  *Microsoft Corp. v. WebXchange Inc.*, 715 F. Supp. 2d 598, 603 (D. Del. 2010) (quoting *Forest Labs., Inc. v. Abbott Labs.*, 339 F.3d 1324, 1329 (Fed. Cir. 2003)).  A party must prove entitlement to attorneys' fees by a preponderance of the evidence.  *Octane Fitness*, 572 U.S. at 557.

Kove argues that this case is exceptional because AWS engaged in various instances of misconduct, including dropping its affirmative defenses on the eve of trial, introducing new infringement theories at trial, and violating various pretrial rulings.

74

Appx202

### 1. Affirmative defenses

AWS originally asserted twelve affirmative defenses against Kove. This Court ruled in Kove's favor on several of the defenses at summary judgment. *Kove IO, Inc. v. Amazon Web Servs., Inc.*, 2024 WL 450028, at *18-30. Shortly before the final pretrial conference, AWS dropped its inequitable conduct and double patenting defenses. And five days before opening arguments, AWS dropped its remaining defenses. AWS contends that it declined to pursue these defenses at trial for "strategic reasons." Def.'s Resp. to Pl.'s Mot. for Fees at 12. Kove asserts that AWS attempted to secure a tactical advantage by "driving up litigation costs, delaying trial, and distracting from the matters legitimately in dispute." Pl.'s Mot. for Fees at 13.

In support of its argument, Kove cites *GoTV Streaming, LLC v. Netflix, Inc.*, No. 2:22-CV-07556-RGK-SHK, 2024 WL 1832389 (C.D. Cal. Mar. 26, 2024). That case is distinguishable. There the court considered whether the defendant's abandonment of its invalidity defenses shortly after the trial began made the case exceptional. Although the defendant insisted that it dropped its defenses as part of a reasonable trial strategy, the plaintiff contended that the defendant "feigned pursuit of the defense to distract Plaintiff and waste its resources." *Id.* at *7. In determining that the defendant's conduct merited a fee award, the court noted that the plaintiff had presented "several instances of suspicious conduct," including the defendant's disinterest in streamlining its invalidity defenses and the lack of attention paid to invalidity during the defendant's opening statement. *Id.* at *8.

Here, Kove points to no evidence to support its contention that AWS's conduct was motivated by malicious intent rather than ordinary trial strategy. And Kove cites no

<div align="center">

75

Appx203

</div>

legal authority demonstrating that the pursuit of affirmative defenses alone, in the absence of evidence that those defenses "lacked substantive strength," is sufficient to render a case exceptional. *SRI Int'l, Inc. v. Cisco Sys., Inc.*, No. CV 13-1534-RGA, 2020 WL 1285915, at *4 (D. Del. Mar. 18, 2020), *aff'd in part, rev'd in part on other grounds*, 14 F.4th 1323 (Fed. Cir. 2021) (noting that invalidity defenses that the defendant dropped shortly before trial were weak); *Tinnus Enters., LLC v. Telebrands Corp.*, 369 F. Supp. 3d 704, 720 (E.D. Tex. 2019) ("[Defendant] knew its inequitable conduct claim was weak because it barely survived Plaintiffs' initial motion to dismiss."); *EagleView Techs., Inc. v. Xactware Sols., Inc.*, 522 F. Supp. 3d 40, 61-62 (D.N.J. 2021) (describing the defendant's attempts to re-litigate defenses that were previously rejected by the court). In the absence of evidence that Kove acted with an improper motive, this Court concludes that AWS's abandonment of its invalidity defenses did not rise to the level of "exceptional" conduct.

### 2. New infringement theories

Kove argues that AWS attempted to raise new non-infringement arguments for the first time at trial. In its opening statement, AWS differentiated S3 and DDB from the Kove patents by emphasizing the accused products' "security" features and "one-key system." Specifically, AWS stated, "[s]ecurity, security, security, ladies and gentlemen. That's what defines the decision choices that we're going to hear about that separates the patents from S3 and the patents from DDB." Tr. at 226:9-13. AWS also noted that the patents teach a "one-key system" with "no security," Tr. at 216:8-10, and contrasted that system with S3's two-key system and DDB's three-key system. *Id.* at 218:8-14; 222:11-16. The Court later issued an instruction clarifying that AWS offered testimony

76

regarding AWS's security features and multi-key systems "to explain how its products work and why it developed those products the way it did," and that this testimony was "not to be considered in determining whether AWS's accused products infringe Kove's patents." *Id.* at 1352:4-1353:2.

It is unclear whether Kove is arguing that AWS (1) improperly pursued a meritless non-infringement position or (2) engaged in bad-faith litigation conduct by introducing a previously undisclosed non-infringement theory at trial. If Kove's argument is the former, it is unpersuasive. To determine whether a case is exceptional under section 285, the court examines the "substantive strength of the party's litigating position," not the "correctness or eventual success of that position." *SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1348 (Fed. Cir. 2015). During the Court's consideration of the corrective instruction, AWS stated that the purpose of its testimony was to highlight that security, rather than other benefits such as scaling, was the primary factor motivating the company's design decisions. Tr. at 1235:10-1236:6. Based on AWS's explanation, the Court removed from the curative instruction language indicating that these design choices had "no bearing" on the jury's infringement analysis, recognizing that the decisions that underline the design of a product can be relevant to infringement. AWS's position that the decision choices for S3 and DDB bore some relation to infringement was not frivolous or objectively unreasonable. *See Greatbatch Ltd. v. AVX Corp.*, No. CV 13-723-LPS, 2017 WL 3085055, at *3 (D. Del. July 20, 2017) (ruling that design decisions for allegedly infringing product were probative of whether infringement occurred). Although AWS's position was ultimately a losing one, it was not "so substantively weak as to render this case exceptional." *Ferring Pharms. Inc. v. Par*

Appx205

*Pharm., Inc.*, No. 1:15-CV-00173-RGA, 2018 WL 6696040, at *1 (D. Del. Dec. 19, 2018).

If Kove's argument is the latter, it likewise lacks merit. During its opening statement, AWS noted that its witnesses would share the security features of the accused products and explain why security is vital to their functionality. Tr. at 219:1-21. AWS later mentioned the accused products' security and multi-key system features in the context of its description of the "decision choices" that motivated the products' design. Tr. at 226:9-13. This Court issued a corrective instruction to clarify the distinction between testimony describing AWS products' features and testimony tying those features to the parties' infringement contentions. But AWS's actual theories of non-infringement focused on the language of the claim limitations, not security or multi-key systems. And as Kove notes, "the core dispute at trial was not how the products worked, but whether that functionality infringed." Pl.'s Mot. for Fees Reply at 14. Following this Court's instruction, AWS continued to reference security and multi-key systems in the context of the design choices for the accused products rather than as direct evidence of non-infringement. *See e.g.*, Tr. at 1340:2-5. Kove had the opportunity to object to these questions, and it chose not to do so. *Id.* at 1339:1-5. Kove also had the opportunity to question witnesses on cross-examination about these design choices examination. Based on these facts, the Court finds that AWS did not pursue the litigation in an unreasonable manner by its reference to security and multi-key system features.

Kove also asserts that AWS "misstated the law" by implying that the jury could find non-infringement if it concluded that the accused products were "different" from the

78

Appx206

patents. Pl.'s Mot. for Fees at 7. Specifically, during its opening statement, AWS stated that the "test for infringement or non-infringement" is whether the accused products are "doing the same thing or something different than the patents, same or different." Tr. at 209: 209:24-210:5. AWS repeated this "same or different" language throughout its opening statement. *See, e.g.*, *id.* at 223:3-9; 227:13-14. But AWS did not ask any of its expert witness to provide their infringement analysis using this "same or different" language, and in its closing statement AWS expressly stated that same or different is "not the legal standard." *Id.* at 1950:8-14. There is no basis for a finding that AWS's "same or different" phrase was meant to confuse the jury with an incorrect recitation of patent law.

### 3. Pretrial ruling violations

Kove asserts that AWS's trial conduct included "serial attempts to undo the Court's claim construction rulings." Pl.'s Mot. for Fees at 8. Kove notes that AWS continuously raised claim construction arguments prior to the trial. This case involved numerous complicated issues, and it included a number of claim construction disputes. Because "district courts may engage in rolling claim construction," AWS's attempts to resolve perceived disputes over the language of the claim limitations cannot be considered "exceptional." *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1377 (Fed. Cir. 2005) (citation omitted). AWS's claim construction requests were not so unreasonable as to warrant the shifting of attorneys' fees.

Additionally, Kove contends that AWS litigated this case in an unreasonable manner by repeatedly violating this Court's claim construction and motion *in limine* rulings. In support of its argument, Kove cites *Tinnus Enterprises, LLC*. But the

79

Appx207

defendants in that case engaged in a far more egregious pattern of litigation misconduct than what is apparent here, including the filing of "numerous unmeritorious motions" and "sanctionable discovery misconduct." *Tinnus Enters., LLC*, 369 F. Supp. 3d at 745. The court in *Tinnus Enterprises, LLC* also noted that the defendants "flagrantly and continuously violated motions *in limine* and sustained objections." *Id.* But the conduct at issue there involved the introduction of inadmissible evidence through witness questioning and the continued solicitation of the same prohibited testimony from the same witness after the court sustained multiple objections. *Id.* at 720-722.

Although this Court sustained at trial multiple objections relating to *in limine* rulings, there is no indication that AWS lacked a good faith belief that its questioning was in compliance with the Court's previous rulings. And rather than constantly attempting to elicit prohibited testimony as the defendants did in *Tinnus Enterprises, LLC*, AWS generally rephrased its questions following objections, Tr. at 835:1-8; moved on to a new topic, *id.* at 1463:17-1464:7; or withdrew the question. *Id.* at 836:1-6. And none of AWS's arguments involved "positions contrary to its own evidence or prior statements," which is generally found in cases imposing attorney's fees based on litigation conduct. *BroadSoft, Inc. v. CallWave Commc'ns, LLC*, No. CV 13-711-RGA, 2019 WL 3750817, at *6 (D. Del. Aug. 8, 2019). Furthermore, the court in *Tinnus Enterprises, LLC* noted that the jury's willfulness finding "further support[ed] a finding that this case is exceptional." *Tinnus Enters.*, 369 F. Supp. 3d at 746. Here, there is no willfulness finding to further support Kove's exceptionality argument. *See LG Display Co. v. AU Optronics Corp.*, 722 F. Supp. 2d 466, 474 (D. Del. 2010).

Finally, Kove asserts that "AWS's repeated flouting of the Court's rulings

80

Appx208

necessitated a corrective instruction."  Pl.'s Mot. for Fees at 13.  On the contrary, the Court's corrective instructions with respect to claim construction were issued to "avoid confusion," not penalize AWS for its conduct.  Tr. at 1876:22-1877:3.

Based on the totality of the circumstances, this Court denies Kove's motion to declare this case exceptional and for an award of attorneys' fees.

### Conclusion

For the foregoing reasons, the Court denies AWS's  motions for judgment as a matter of law [dkt. nos. 870, 891, 901] and its motion for a new trial [dkt. no. 902].  The Court grants in part Kove's motion to amend the judgment and for attorneys' fees [dkt. no. 909] with respect to the pre- and post-judgment interest, but otherwise denies that motion.  The parties' joint statement regarding prejudgment interest as described in this order is to be filed by no later than August 27, 2024.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  August 20, 2024

81

Appx209

ILND 450 (Rev. 10/13): Judgment in a Civil Action

**IN THE UNITED STATES DISTRICT COURT
FOR THE
NORTHERN DISTRICT OF ILLINOIS**

Kove,

Plaintiff(s),

v.

Amazon,

Defendant(s).

Case No.  18 C 8175
Judge Matthew F. Kennelly

## AMENDED JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐ in favor of plaintiff(s)
and against defendant(s)
in the amount of $         ,

which ☐ includes        pre–judgment interest.
☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

---

☐ in favor of defendant(s)
and against plaintiff(s)
.

Defendant(s) shall recover costs from plaintiff(s).

---

☒ other: (a) On Count 1 of plaintiff's complaint, finding infringement by defendant of U.S. Patent No. 7,814,170; (b) On Count 2 of plaintiff's complaint, finding infringement by defendant of U.S. Patent No. 7,233,978; (c) On Count 3 of plaintiff's complaint, finding infringement by defendant of U.S. Patent No. 7,103,640. (d) The infringement was not willful. (e) Defendant's counterclaims 1 through 13, asserting non-infringement; invalidity; unpatentability; and unenforceability of the three patents in suit, as well as double patenting, are all dismissed with prejudice. (f) Damages are awarded in favor of the plaintiff and against the defendant in the amount of $525,000,000 plus prejudgment interest in the amount of $147,706,733, for a total of $672,706,733, plus postjudgment interest at the statutory rate accruing as of April 10, 2024.

---

This action was *(check one)*:

☐ tried by a jury with Judge      presiding, and the jury has rendered a verdict.
☐ tried by Judge      without a jury and the above decision was reached.
☒ decided by Judge Matthew F. Kennelly on a motion

Appx210

Date:   8/28/2024                                    Thomas G. Bruton, Clerk of Court

                                                     Melissa Astell , Deputy Clerk

**United States District Court**
**Northern District of Illinois - CM/ECF NextGen 1.8 (rev. 1.8.1) (Chicago)**
**CIVIL DOCKET FOR CASE #: 1:18-cv-08175**

| | |
|---|---|
| Kove IO, Inc. v. Amazon Web Services, Inc. | Date Filed: 12/12/2018 |
| Assigned to: Honorable Matthew F. Kennelly | Date Terminated: 04/10/2024 |
| Cause: 35:271 Patent Infringement | Jury Demand: Both |
| | Nature of Suit: 830 Patent |
| | Jurisdiction: Federal Question |

**Plaintiff**

| | | |
|---|---|---|
| Kove IO, Inc. | represented by | **Brian C. Baran**<br>REICHMAN JORGENSEN LEHMAN &<br>FELDBERG LLP<br>1909 K Street, NW<br>Suite 800<br>Washington, DC 20006<br>(202) 894-7310<br>Fax: Pro Hac Vice<br>Email: bbaran@reichmanjorgensen.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Courtland Reichman**<br>Reichman Jorgensen Lehman & Feldberg<br>LLP<br>100 Marine Parkway<br>Suite 300<br>Redwood Shores, CA 94065<br>(650) 623-1401<br>Fax: Pro Hac Vice<br>Email: creichman@reichmanjorgensen.com<br>*LEAD ATTORNEY*<br>*PRO HAC VICE*<br>*ATTORNEY TO BE NOTICED*<br><br>**Gina Cremona**<br>REICHMAN JORGENSEN LEHMAN &<br>FELDBERG LLP<br>100 Marine Parkway<br>Suite 300<br>Redwood Shores, CA 94065<br>(650) 623-1401<br>Fax: Pro Hac Vice<br>Email: gcremona@reichmanjorgensen.com<br>*LEAD ATTORNEY* |

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Matulewicz-Crowley**
Reichman Jorgensen Lehman & Feldberg
LLP
400 Madison Avenue
Suite 14d
New York, NY 10017
650-523-1401
Email: mmatulewicz-
crowley@reichmanjorgensen.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Navid Bayar**
Reichman Jorgensen Lehman & Feldberg
LLP
100 Marine Parkway, Suite 300
Suite 300
Redwood City, CA 94065-1046
650-623-1401
Email: nbayar@reichmanjorgensen.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Renato Thomas Mariotti**
Paul Hastings LLP
71 S. Wacker Drive
45th Floor
Chicago, IL 60606
312-499-6005
Fax: 312-698-7437
Email: renatomariotti@paulhastings.com
*TERMINATED: 06/29/2024*
*LEAD ATTORNEY*

**Adam Adler**
Reichman Jorgensen Lehman & Feldberg
LLP
1909 K St, NW
Suite 800
Washington, DC 20006
(605) 623-1480
Fax: Pro Hac Vice
Email: aadler@reichmanjorgensen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aisha Mahmood Haley**
Reichman Jorgensen Lehman & Feldberg
LLP

Appx213

1909 K St, NW
Suite 800
Washington, DC 20006
202-894-7310
Email: ahaley@caldwellcc.com
*TERMINATED: 02/04/2023*
*PRO HAC VICE*

**Amy L. Ruhland**
Reichman Jorgensen Lehman & Feldberg
LLP
515 Congress Avenue
Suite 1900
Austin, TX 78701-4653
737-227-3102
Fax: 650-560-3501
Email: aruhland@reichmanjorgensen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Ariane Mann**
REICHMAN JORGENSEN LEHMAN &
FELDBERG LLP
1909 K Street, NW
Suite 800
Washington, DC 20006
(202) 894-7310
Fax: Pro Hac Vice
Email: amann@reichmanjorgensen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bahrad Sokhansanj**
The Law Office of Bahrad Sokhansanj
9808 Regent St.
Apt. 5
Los Angeles, CA 90034
(650) 623-1401
Fax: Pro Hac Vice
Email: bahrad@bahradlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christine E Lehman**
Reichman Jorgensen Lehman & Feldberg
LLP
Suite 800
1909 K St, NW
Washington, DC 20006
(202) 894-7311
Fax: Pro Hac Vice
Email: clehman@reichmanjorgensen.com
*ATTORNEY TO BE NOTICED*

**Holly Hannah Campbell**
Paul Hastings LLP
71 South Wacker Drive
Suite 4500
Chicago, IL 60601
872-243-4709
Email: hollycampbell@paulhastings.com
*TERMINATED: 06/29/2024*

**Ian Washburn**
Irell & Manella LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067
(310) 203-7108
Fax: Pro Hac Vice
Email: iwashburn@irell.com
*TERMINATED: 03/01/2024*
*PRO HAC VICE*

**Jaime Francisco Cardenas-Navia**
Reichman Jorgensen Lehman & Feldberg
LLP
400 Madison Avenue
Ste 14d
New York, NY 10017
650-623-1401
Email: jcardenas-
navia@reichmanjorgensen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jason Sheasby**
Irell & Manella LLP
1800 Avenue of the Stars
Suite 900
Los Angeles, CA 90067
(310) 203-7096
Fax: Pro Hac Vice
Email: jsheasby@irell.com
*TERMINATED: 02/22/2024*
*PRO HAC VICE*

**Jennifer Estremera**
Reichman Jorgensen Lehman & Feldberg
LLP
100 Marine Parkway, Suite 300
Redwood Shores, CA 94065
(650) 623-1401
Fax: Pro Hac Vice
Email: jestremera@reichmanjorgensen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joachim Steinberg**
Brown George Ross O'Brien Annaguey &
Ellis LLP
44 Montgomery Street, Suite 1280
San Francisco, CA 94104
917-575-6244
Fax: Pro Hac Vice
Email: jsteinberg@crowell.com
*TERMINATED: 09/23/2020*
*PRO HAC VICE*

**Karlanna Lewis**
Reichman Jorgensen Lehman & Feldberg
LLP
100 Marine Parkway
Suite 300
Redwood City, CA 94065
(650) 623-1401
Fax: Pro Hac Vice
Email: klewis@reichmanjorgensen.com
*TERMINATED: 08/29/2024*
*PRO HAC VICE*

**Kate M Falkenstien**
Blue Peak Law Group
3790 El Camino Real
Ste Pmb 846
Palo Alto, CA 94306
281-972-3036
Email: kate@bluepeak.law
*TERMINATED: 10/01/2022*
*PRO HAC VICE*

**Khue Hoang**
Reichman Jorgensen Lehman & Feldberg
LLP
400 Madison Avenue,
Suite 14d
New York, NY 10017
650-623-1401
Email: khoang@reichmanjorgensen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mateo Fowler**
MZF Law Firm, PLLC
1211 W. 6th Street
Suite 600-143
Austin, TX 8703
(281) 543-5172
Fax: Pro Hac Vice
Email: mateofowler@mzflaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael G Flanigan**
Crowell & Moring LLP
3 Embarcadero Center
26 Fl.
San Francisco, CA 94111
415-365-7244
Email: mflanigan@crowell.com
*TERMINATED: 02/07/2023*

**Michael Walton Marvin**
Reichman Jorgensen Lehman & Feldberg
LLP
750 Third Avenue
Suite 2400
New York, NY 10017
(646) 970-2652
Fax: Pro Hac Vice
Email: mmarvin@reichmanjorgensen.com
*TERMINATED: 11/29/2021*
*PRO HAC VICE*

**Naveed S Hasan**
Reichman Jorgensen Lehman & Feldberg
LLP
1909 K Street, NW
Suite 800
Washington, DC 20006
(202) 894-7310
Fax: Pro Hac Vice
Email: nhasan@reichmanjorgensen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Philip Eklem**
Reichman Jorgensen Lehman & Feldberg
LLP
1909 K St, NW, Suite 800
Washington, DC 20006
(202) 894-7310
Fax: Pro Hac Vice
Email: peklem@reichmanjorgensen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Phillip Lee**
Reichman Jorgensen LLP
303 Twin Dolphin Drive, Suite 600
Redwood Shores, CA 94065
(650) 623-1401
Fax: Pro Hac Vice
Email: plee@reichmanjorgensen.com
*TERMINATED: 08/20/2019*
*PRO HAC VICE*

**Rahul Sarkar**
Reichman Jorgensen Lehman & Feldberg LLP
750 Third Ave
Suite 2400
New York, NY 10017
212 381 1965
Fax: Pro Hac Vice
Email: rsarkar@reichmanjorgensen.com
*TERMINATED: 06/08/2021*
*PRO HAC VICE*

**Sarah Jorgensen**
Reichman Jorgensen Lehman & Feldberg LLP
1201 West Peachtree Street, Suite 2300
Atlanta, GA 30309
(404) 609-1040
Fax: Pro Hac Vice
Email: sjorgensen@reichmanjorgensen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Savannah H. Carnes**
Reichman Jorgensen Lehman & Feldberg LLP
100 Marine Parkway
Suite 300
Redwood Shores, CA 94065
(202) 894-7452
Fax: Pro Hac Vice
Email: scarnes@reichmanjorgensen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shawna L Ballard**
Reichman Jorgensen Lehman & Feldberg LLP
100 Marine Parkway, Suite 300
Redwood City, CA 94065
(650) 623-1401
Fax: Not a member
Email: sballard@reichmanjorgensen.com
*ATTORNEY TO BE NOTICED*

**Steven Gordon Trubac**
Bryan Cave Leighton Paisner LLP
161 North Clark Street
Suite 4300
Chicago, IL 60601
(312) 602-5042
Fax: Not a member
Email: steve.trubac@bclplaw.com

*ATTORNEY TO BE NOTICED*

**Taylor Mauze**
Reichman Jorgensen Lehman & Feldberg LLP
515 Congress Avenue, Suite 1900
Austin, TX 78701
650-623-1401
Email: tmauze@reichmanjorgensen.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Wesley White**
Orrick Herrington & Sutcliffe LLP
51 W 52nd Street
10019
New York, NY 10019
212-506-5213
Email: wwhite@orrick.com
*TERMINATED: 03/21/2023*
*PRO HAC VICE*

## V.
**Defendant**

| | | |
|---|---|---|
| **Amazon Web Services, Inc.** | represented by | **Alan M. Fisch**<br>Fisch Sigler LLP<br>5301 Wisconsin Avenue NW<br>Fourth Floor<br>Washington, DC 20015<br>(202) 362-3500<br>Fax: Active<br>Email: alan.fisch@fischllp.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Jeffrey M. Saltman**
Fisch Sigler LLP
5301 Wisconsin Ave NW
Fourth Floor
Washington, DC 20015
(202) 362-3640
Fax: Pro Hac Vice
Email: jeffrey.saltman@fischllp.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adam Allgood**
RuyakCherian LLP
1901 L Street NW
Suite 700
Washington, DC 20036

202-838-1564
Fax: Pro Hac Vice
Email: adama@ruyakcherian.com
*TERMINATED: 12/27/2021*
*PRO HAC VICE*

**Adam Unikowsky**
Jenner & Block, Llp
1099 New York Ave, Nw
Washington, DC 20001
(617) 990-7636
Fax: Pro Hac Vice
Email: aunikowsky@jenner.com
*TERMINATED: 12/03/2020*

**Andew Landers Ramos**
Fisch Sigler LLP
5301 Wisconsin Avenue NW
Fourth Floor
Washington, DC 20015
(202) 362-3522
Fax: Pro Hac Vice
Email: andrew.ramos@fischllp.com
*TERMINATED: 05/02/2024*
*PRO HAC VICE*

**Brandon P. Evans**
Fisch Sigler LLP
5301 Wisconsin Ave NW
Ste. 400
Washington, DC 20015
202-362-3534
Fax: Not a member
Email: brandon.evans@fischllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth Bernard**
Fisch Sigler LLP
5301 Wisconsin Ave NW
Fourth Floor
Washington, DC 20015
(202) 362-3529
Fax: Pro Hac Vice
Email: elizabeth.bernard@fischllp.com
*TERMINATED: 09/27/2021*
*PRO HAC VICE*

**Ken Fung**
Fisch Sigler LLP
400 Concar Drive
San Mateo, CA 94402
(202) 362-3500
Fax: Pro Hac Vice

Appx220

Email: ken.fung@fischllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Lisa Noelle Phillips**
Fisch Sigler LLP
5301 Wisconsin Avenue NW
Fourth Floor
Washington, DC 20015
(202) 362-3521
Fax: Pro Hac Vice
Email: lisa.phillips@fischllp.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Glenn Babbitt**
Willkie Farr & Gallagher, LLP
300 N. LaSalle, 50th Fl.
Chicago, IL 60654
312-728-9070
Fax: Active
Email: mbabbitt@willkie.com
*TERMINATED: 04/15/2020*

**Michael Thomas Werner**
Jenner & Block
353 N. Clark St.
Chicago, IL 60654
3129234792
Fax: Not a member
Email: mwerner@jenner.com
*TERMINATED: 12/03/2020*

**R. William Sigler**
Fisch Sigler LLP
5301 Wisconsin Avenue NW
Fourth Floor
Washington, DC 20015
(202) 362-3500
Fax: Active
Email: bill.sigler@fischllp.com
*ATTORNEY TO BE NOTICED*

**Terri Lynn Mascherin**
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
(312)222-9350
Fax: Active
Email: tmascherin@jenner.com
*TERMINATED: 12/03/2020*

**Timothy Joseph Barron**
Jenner & Block LLP

353 N. Clark Street
Chicago, IL 60654
(312)222-9350
Fax: Active
Email: tbarron@jenner.com
*TERMINATED: 12/03/2020*

V.

**Respondent**

**Amazon.Com, Inc.**

**Respondent**

**Amazon Technologies, Inc.**

**Respondent**

**Amazon Technologies, Inc.**

**Respondent**

**Amazon.Com, Inc.**

**Respondent**

**Amazon Technologies, Inc.**

**Respondent**

**Amazon.Com, Inc.**

**Counter Claimant**

**Amazon Web Services, Inc.**                    represented by **Alan M. Fisch**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey M. Saltman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Adam Allgood**
(See above for address)
*TERMINATED: 12/27/2021*
*PRO HAC VICE*

**Adam Unikowsky**
(See above for address)
*TERMINATED: 12/03/2020*

**Brandon P. Evans**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth Bernard**
(See above for address)
*TERMINATED: 09/27/2021*
*PRO HAC VICE*

**Ken Fung**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Glenn Babbitt**
(See above for address)
*TERMINATED: 04/15/2020*

**Michael Thomas Werner**
(See above for address)
*TERMINATED: 12/03/2020*

**R. William Sigler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Terri Lynn Mascherin**
(See above for address)
*TERMINATED: 12/03/2020*

**Timothy Joseph Barron**
(See above for address)
*TERMINATED: 12/03/2020*

V.

**Counter Defendant**

**Kove IO, Inc.**         represented by **Courtland Reichman**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Matulewicz-Crowley**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Navid Bayar**
(See above for address)
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Renato Thomas Mariotti**

Appx223

(See above for address)
*TERMINATED: 06/29/2024*
*LEAD ATTORNEY*

**Adam Adler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Aisha Mahmood Haley**
(See above for address)
*TERMINATED: 02/04/2023*
*PRO HAC VICE*

**Ariane Mann**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bahrad Sokhansanj**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christine E Lehman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Gina Cremona**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Holly Hannah Campbell**
(See above for address)
*TERMINATED: 06/29/2024*

**Ian Washburn**
(See above for address)
*TERMINATED: 03/01/2024*
*PRO HAC VICE*

**Jaime Francisco Cardenas-Navia**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jason Sheasby**
(See above for address)
*TERMINATED: 02/22/2024*
*PRO HAC VICE*

**Jennifer Estremera**
(See above for address)

Appx224

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joachim Steinberg**
(See above for address)
*TERMINATED: 09/23/2020*
*PRO HAC VICE*

**Karlanna Lewis**
(See above for address)
*TERMINATED: 08/29/2024*
*PRO HAC VICE*

**Kate M Falkenstien**
(See above for address)
*TERMINATED: 10/01/2022*
*PRO HAC VICE*

**Khue Hoang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Mateo Fowler**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael G Flanigan**
(See above for address)
*TERMINATED: 02/07/2023*

**Michael Walton Marvin**
(See above for address)
*TERMINATED: 11/29/2021*
*PRO HAC VICE*

**Naveed S Hasan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Philip Eklem**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Phillip Lee**
(See above for address)
*TERMINATED: 08/20/2019*

**Rahul Sarkar**
(See above for address)
*TERMINATED: 06/08/2021*

*PRO HAC VICE*

**Sarah Jorgensen**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Shawna L Ballard**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Taylor Mauze**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Wesley White**
(See above for address)
*TERMINATED: 03/21/2023*
*PRO HAC VICE*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/12/2018 | 1 | COMPLAINT filed by Kove IO, Inc.; Jury Demand. Filing fee $ 400, receipt number 0752-15272980. (Attachments: # 1 Exhibit 1-25)(Mariotti, Renato) (Entered: 12/12/2018) |
| 12/12/2018 | 2 | CIVIL Cover Sheet (Mariotti, Renato) (Entered: 12/12/2018) |
| 12/12/2018 | 3 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Renato T. Mariotti (Mariotti, Renato) (Entered: 12/12/2018) |
| 12/12/2018 | 4 | NOTIFICATION of Affiliates pursuant to Local Rule 3.2 by Kove IO, Inc. (Mariotti, Renato) (Entered: 12/12/2018) |
| 12/12/2018 | 5 | Notice of Claims Involving Patents or Trademarks by Kove IO, Inc. (Mariotti, Renato) (Entered: 12/12/2018) |
| 12/13/2018 | | CASE ASSIGNED to the Honorable Rebecca R. Pallmeyer. Designated as Magistrate Judge the Honorable Sheila M. Finnegan. Case assignment: Random assignment. (jjr, ) (Entered: 12/13/2018) |
| 12/13/2018 | 6 | MAILED Patent report to Patent Trademark Office, Alexandria VA. (pk, ) (Entered: 12/13/2018) |
| 12/13/2018 | | SUMMONS Issued as to Defendant Amazon Web Services, Inc. in two different locations. (jjr, ) Modified on 12/13/2018 (jjr, ). (Entered: 12/13/2018) |
| 12/13/2018 | 7 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Michael G Flanigan (Flanigan, Michael) (Entered: 12/13/2018) |
| 12/14/2018 | 8 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Holly Hannah Campbell (Campbell, Holly) (Entered: 12/14/2018) |
| 12/14/2018 | 9 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-15277645. (Steinberg, Joachim) (Entered: 12/14/2018) |

| | | |
|---|---|---|
| 12/14/2018 | 10 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-15277689. (Jorgensen, Sarah) (Entered: 12/14/2018) |
| 12/14/2018 | 11 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-15277717. (Falkenstien, Kate) (Entered: 12/14/2018) |
| 12/14/2018 | 12 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-15279349. (Lee, Phillip) (Entered: 12/14/2018) |
| 12/14/2018 | 13 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-15279371. (Reichman, Courtland) (Entered: 12/14/2018) |
| 12/14/2018 | 14 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-15279444. (Estremera, Jennifer) (Entered: 12/14/2018) |
| 12/14/2018 | 15 | SUMMONS Returned Executed by Kove IO, Inc. as to Amazon Web Services, Inc. on 12/14/2018, answer due 1/4/2019. (Flanigan, Michael)(Docket Text Modified by Clerk's Office) Modified on 12/17/2018 (pk, ). (Entered: 12/14/2018) |
| 12/17/2018 | 16 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motions for leave to appear pro hac vice [9, 10, 11, 12, 13, 14] are granted. Mailed notice. (etv, ) (Entered: 12/17/2018) |
| 12/18/2018 | 17 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Initial status hearing set for 2/19/2019 at 09:00 AM, courtroom 2141. Mailed notice. (etv, ) (Entered: 12/18/2018) |
| 12/28/2018 | 18 | NOTICE of Motion by Michael G Flanigan for presentment of before Honorable Rebecca R. Pallmeyer on 1/3/2019 at 08:45 AM. (Attachments: # 1 Agreed Motion For Extension Of Time To Answer Or Otherwise Respond To The Complaint, # 2 Text of Proposed Order Proposed Order)(Flanigan, Michael) (Entered: 12/28/2018) |
| 01/02/2019 | 19 | MOTION by Plaintiff Kove IO, Inc. for extension of time to file answer regarding complaint 1 (Attachments: # 1 Text of Proposed Order Proposed Order)(Flanigan, Michael) (Entered: 01/02/2019) |
| 01/02/2019 | 20 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Agreed motion for extension of time to Answer or otherwise respond to the complaint 19 is granted to and including 2/18/2019, without an appearance. Initial status hearing set for 2/19/2019 is stricken. The parties are directed to appear through lead counsel for a pretrial conference pursuant to FED. R. CIV. P. 16. on 3/4/2019 at 9:00 AM. Counsel are requested promptly to meet face-to-face for a discussion of possible settlement and for preparation of a planning report. The form is accessible from the court's Internet site, www.ilnd.uscourts.gov. Such report shall be submitted to Judge Pallmeyer in chambers no later than two business days prior to the conference. Mailed notice. (etv, ) (Entered: 01/02/2019) |
| 02/01/2019 | 21 | ATTORNEY Appearance for Defendant Amazon Web Services, Inc. by Terri Lynn Mascherin (Mascherin, Terri) (Entered: 02/01/2019) |
| 02/01/2019 | 22 | ATTORNEY Appearance for Defendant Amazon Web Services, Inc. by Michael Glenn Babbitt (Babbitt, Michael) (Entered: 02/01/2019) |
| 02/01/2019 | 23 | ATTORNEY Appearance for Defendant Amazon Web Services, Inc. by Michael Thomas Werner (Werner, Michael) (Entered: 02/01/2019) |
| 02/01/2019 | 24 | MOTION by Defendant Amazon Web Services, Inc. for extension of time to file answer regarding complaint 1 / *Agreed Second Motion for Extension of Deadline for Responsive Pleading* (Mascherin, Terri) (Entered: 02/01/2019) |
| 02/01/2019 | 25 | NOTICE of Motion by Terri Lynn Mascherin for presentment of motion for extension of time to file answer 24 before Honorable Rebecca R. Pallmeyer on 2/5/2019 at 08:45 AM. |

| | | |
|---|---|---|
| | | (Mascherin, Terri) (Entered: 02/01/2019) |
| 02/04/2019 | 26 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Agreed second motion for extension of deadline for responsive plead 24 is granted to and including 3/4/2019, without an appearance. Rule 16 conference set for 3/4/2019 is stricken and reset to 3/19/2019 at 9:00 AM. Mailed notice. (etv, ) (Entered: 02/04/2019) |
| 02/19/2019 | 27 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-15500574. (Unikowsky, Adam) (Entered: 02/19/2019) |
| 02/20/2019 | 28 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion for leave to appear pro hac vice 27 is granted. Mailed notice. (etv, ) (Entered: 02/20/2019) |
| 02/28/2019 | 29 | MOTION by Plaintiff Kove IO, Inc. for extension of time *for Responsive Pleading and Rule 16 Conference* (Flanigan, Michael) (Entered: 02/28/2019) |
| 02/28/2019 | 30 | NOTICE of Motion by Michael G Flanigan for presentment of extension of time 29 before Honorable Rebecca R. Pallmeyer on 3/4/2019 at 09:00 AM. (Flanigan, Michael) (Entered: 02/28/2019) |
| 03/04/2019 | 31 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Agreed motion for extension of deadlines 29 is granted without an appearance. The deadline to answer or otherwise respond to Kove's Complaint extended to April 5, 2019; and the Rule 16 Conference set for 3/19/2019 is stricken and re-set to April 25, 2019 at 9:00 AM. Mailed notice. (etv, ) (Entered: 03/04/2019) |
| 03/25/2019 | 32 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-15632426. (Cardenas-Navia, Jaime) (Entered: 03/25/2019) |
| 03/26/2019 | 33 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion for leave to appear pro hac vice 32 is granted. Mailed notice. (etv, ) (Entered: 03/26/2019) |
| 03/27/2019 | 34 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: On the court's own motion Rule 16 conference set for 4/25/2019 is stricken and re-set to 4/30/2019 at 9:00 AM. Mailed notice. (etv, ) (Entered: 03/27/2019) |
| 04/05/2019 | 35 | Corporate Disclosure STATEMENT by Amazon Web Services, Inc. (Mascherin, Terri) (Entered: 04/05/2019) |
| 04/05/2019 | 36 | MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Defendant Amazon Web Services, Inc. (Mascherin, Terri) Modified on 10/21/2019 (ntf, ). (Entered: 04/05/2019) |
| 04/05/2019 | 37 | NOTICE of Motion by Terri Lynn Mascherin for presentment of Motion to Dismiss for Failure to State a Claim 36 before Honorable Rebecca R. Pallmeyer on 4/15/2019 at 09:00 AM. (Mascherin, Terri) (Entered: 04/05/2019) |
| 04/05/2019 | 38 | MEMORANDUM by Amazon Web Services, Inc. in support of Motion to Dismiss for Failure to State a Claim 36 (Attachments: # 1 Appendix A, # 2 Appendix B, # 3 Appendix C, # 4 Appendix D)(Mascherin, Terri) (Entered: 04/05/2019) |
| 04/11/2019 | 39 | MOTION by Defendant Amazon Web Services, Inc. to stay *discovery and suspend local patent rule deadlines pending ruling on motion to dismiss* (Mascherin, Terri) (Entered: 04/11/2019) |
| 04/11/2019 | 40 | NOTICE of Motion by Terri Lynn Mascherin for presentment of motion to stay 39 before Honorable Rebecca R. Pallmeyer on 4/15/2019 at 09:00 AM. (Mascherin, Terri) (Entered: 04/11/2019) |

| | | |
|---|---|---|
| 04/15/2019 | 41 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion hearing held on 4/15/2019. Defendant's motion to dismiss 36 is entered and continued for briefing. Response to be filed by or on 5/13/2019; reply to be filed by or on 5/28/2019; oral argument set for 5/30/2019 at 10:30 AM. Rule 16 conference set for 4/30/2019 is stricken. Defendant's motion to stay discovery and suspend local patent rule deadline 39 is granted in part and entered and continued in part; deadlines are suspending pending oral argument on motion to dismiss is granted except for Rule 26(a)(1) disclosures. Mailed notice. (etv, ) (Entered: 04/15/2019) |
| 05/07/2019 | 42 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Shawna L Ballard (Ballard, Shawna) (Entered: 05/07/2019) |
| 05/13/2019 | 43 | TRANSCRIPT OF PROCEEDINGS held on 4/15/19 before the Honorable Rebecca R. Pallmeyer. Order Number: 34635. Court Reporter Contact Information: Frances Ward - (312)435-5561 - wardofficialtranscripts@gmail.com.<br><br>IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.<br><br>Redaction Request due 6/3/2019. Redacted Transcript Deadline set for 6/13/2019. Release of Transcript Restriction set for 8/12/2019. (Ward, Frances) (Entered: 05/13/2019) |
| 05/13/2019 | 44 | RESPONSE by Kove IO, Inc.in Opposition to MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM by Defendant Amazon Web Services, Inc. 36 (Reichman, Courtland) (Entered: 05/13/2019) |
| 05/28/2019 | 45 | REPLY by Defendant Amazon Web Services, Inc. to Motion to Dismiss for Failure to State a Claim 36 (Mascherin, Terri) (Entered: 05/28/2019) |
| 05/30/2019 | 46 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Oral arguments heard on pending motion to dismiss. Mailed notice. (etv, ) (Entered: 05/31/2019) |
| 06/12/2019 | 47 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-15921160. (Lehman, Christine) (Entered: 06/12/2019) |
| 06/17/2019 | 48 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion for leave to appear pro hac vice 47 is granted. Mailed notice. (etv, ) (Entered: 06/17/2019) |
| 06/18/2019 | 49 | TRANSCRIPT OF PROCEEDINGS held on 5/30/19 before the Honorable Rebecca R. Pallmeyer. Order Number: 34918. Court Reporter Contact Information: Frances Ward - (312)435-5561 - wardofficialtranscripts@gmail.com.<br><br>IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.<br><br>Redaction Request due 7/9/2019. Redacted Transcript Deadline set for 7/19/2019. Release of Transcript Restriction set for 9/16/2019. (Ward, Frances) (Entered: 06/18/2019) |

| | | |
|---|---|---|
| 07/08/2019 | 50 | MOTION by Plaintiff Kove IO, Inc. for protective order *[JOINT MOTION FOR ENTRY OF AGREED PROTECTIVE ORDER]* (Attachments: # 1 Exhibit A)(Lee, Phillip) (Entered: 07/08/2019) |
| 07/08/2019 | 51 | NOTICE of Motion by Phillip Lee for presentment of motion for protective order 50 before Honorable Rebecca R. Pallmeyer on 7/15/2019 at 08:45 AM. (Lee, Phillip) (Entered: 07/08/2019) |
| 07/08/2019 | 52 | JOINT MOTION for Entry of Report of Parties Planning Meeting and Agreed Case Schedule by Kove IO, Inc. (Lee, Phillip) (Entered: 07/08/2019) |
| 07/08/2019 | 53 | *NOTICE OF JOINT MOTION for Entry of Report of Parties Planning Meeting and Agreed Case Schedule* NOTICE of Motion by Phillip Lee for presentment of before Honorable Rebecca R. Pallmeyer on 7/15/2019 at 08:45 AM. (Lee, Phillip) (Entered: 07/08/2019) |
| 07/10/2019 | 54 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Parties' joint motion for entry of report of parties' planning meeting and agreed case schedule 52 is granted. Parties' joint motion for entry of agreed protective order 50 is granted. Enter Protective Order. Motion hearing date of 7/15/19 is stricken. Notice mailed by judge's staff (ntf, ) Modified on 10/21/2019 (ntf, ). (Entered: 07/10/2019) |
| 07/10/2019 | 55 | PROTECTIVE Order. Signed by the Honorable Rebecca R. Pallmeyer on 7/10/2019. Notice mailed by judge's staff (ntf, ) (Entered: 07/10/2019) |
| 08/15/2019 | 56 | MOTION by Attorney Phillip Lee to withdraw as attorney for Kove IO, Inc.. No party information provided (Flanigan, Michael) (Entered: 08/15/2019) |
| 08/15/2019 | 57 | NOTICE of Motion by Michael G Flanigan for presentment of motion to withdraw as attorney 56 before Honorable Rebecca R. Pallmeyer on 8/27/2019 at 08:45 AM. (Flanigan, Michael) (Entered: 08/15/2019) |
| 08/20/2019 | 58 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motion to withdraw as counsel 56 is granted. Attorney Phillip Lee is given leave to withdraw as counsel for the Plaintiff. Motion hearing date of 8/27/19 is stricken. Notice mailed by judge's staff (ntf, ) (Entered: 08/20/2019) |
| 09/05/2019 | 59 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-16206647. (Hoang, Khue) (Entered: 09/05/2019) |
| 09/05/2019 | 60 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-16207746. (White, Wesley) (Entered: 09/05/2019) |
| 09/06/2019 | 61 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motions for leave to appear pro hac vice 59 and 60 are granted. Attorneys Khue Hoang and Wesley White are given leave to file appearance forms on behalf of Plaintiff. Notice mailed by judge's staff (ntf, ) (Entered: 09/06/2019) |
| 10/16/2019 | 62 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-16341311. (Sarkar, Rahul) (Entered: 10/16/2019) |
| 10/16/2019 | 63 | NOTICE by Michael G Flanigan of Change of Address (Flanigan, Michael) (Entered: 10/16/2019) |
| 10/16/2019 | 64 | NOTICE by Courtland Reichman of Change of Address (Reichman, Courtland) (Entered: 10/16/2019) |
| 10/16/2019 | 65 | NOTICE by Jennifer Estremera of Change of Address (Estremera, Jennifer) (Entered: 10/16/2019) |

| | | |
|---|---|---|
| 10/16/2019 | 66 | NOTICE by Shawna L Ballard of Change of Address (Ballard, Shawna) (Entered: 10/16/2019) |
| 10/16/2019 | 67 | NOTICE by Kate Falkenstien of Change of Address (Falkenstien, Kate) (Entered: 10/16/2019) |
| 10/16/2019 | 68 | NOTICE by Joachim Steinberg of Change of Address (Steinberg, Joachim) (Entered: 10/16/2019) |
| 10/18/2019 | 69 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motion for leave to appear pro hac vice 62 is granted. Attorney Rahul Sarkar is given leave to file an appearance form on behalf of Plaintiff. Notice mailed by judge's staff (ntf, ) (Entered: 10/18/2019) |
| 10/21/2019 | 70 | NOTICE by Christine E Lehman of Change of Address (Lehman, Christine) (Entered: 10/21/2019) |
| 10/29/2019 | 71 | MOTION by Plaintiff Kove IO, Inc. for extension of time (Attachments: # 1 Declaration of R. Sakar, # 2 Exhibit A, # 3 Exhibit B (Redacted), # 4 Exhibit C (Redacted), # 5 Exhibit D)(Hoang, Khue) (Entered: 10/29/2019) |
| 10/29/2019 | 72 | NOTICE of Motion by Khue Hoang for presentment of extension of time 71 before Honorable Rebecca R. Pallmeyer on 10/31/2019 at 08:45 AM. (Hoang, Khue) (Entered: 10/29/2019) |
| 10/29/2019 | 73 | SEALED DOCUMENT by Plaintiff Kove IO, Inc. *Exhibit B* (Hoang, Khue) (Entered: 10/29/2019) |
| 10/29/2019 | 74 | SEALED DOCUMENT by Plaintiff Kove IO, Inc. *Exhibit C* (Hoang, Khue) (Entered: 10/29/2019) |
| 10/29/2019 | 75 | MOTION by Plaintiff Kove IO, Inc. to seal *Exhibits B and C to Plaintiff's Motion to Extend the Case Schedule* (Hoang, Khue) (Entered: 10/29/2019) |
| 10/29/2019 | 76 | NOTICE of Motion by Khue Hoang for presentment of motion to seal 75 before Honorable Rebecca R. Pallmeyer on 10/31/2019 at 08:45 AM. (Hoang, Khue) (Entered: 10/29/2019) |
| 10/30/2019 | 77 | SEALED DOCUMENT. (mc, ) (Entered: 10/30/2019) |
| 10/30/2019 | 78 | RESPONSE by Defendant Amazon Web Services, Inc. to extension of time 71 - *Amazon Web Services, Inc.'s Opposition-In-Part to Kove's Motion to Extend the Case Schedule* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Mascherin, Terri) (Entered: 10/30/2019) |
| 10/31/2019 | 79 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion hearing held. Plaintiff's motion to extend case schedule 71 is granted in part and denied in part. Parties shall submit a revised proposed order extending the case schedule consistent with the court's comments on the record. Plaintiff's motion to seal 75 is granted. Notice mailed by judge's staff (ntf, ) (Entered: 10/31/2019) |
| 11/04/2019 | 80 | ORDER Granting In Part and Denying In Part Plaintiff's Motion to Extend The Case Schedule. Signed by the Honorable Rebecca R. Pallmeyer on 11/4/2019. Notice mailed by judge's staff (ntf, ) (Entered: 11/04/2019) |
| 11/25/2019 | 81 | TRANSCRIPT OF PROCEEDINGS held on 10/31/19 before the Honorable Rebecca R. Pallmeyer. Order Number: 36630. Court Reporter Contact Information: Frances Ward - (312)435-5561 - wardofficialtranscripts@gmail.com. |

| | | |
|---|---|---|
| | | IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.<br><br>Redaction Request due 12/16/2019. Redacted Transcript Deadline set for 12/26/2019. Release of Transcript Restriction set for 2/24/2020. (Ward, Frances) (Entered: 11/25/2019) |
| 03/05/2020 | 82 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-16798588. (Marvin, Michael) (Entered: 03/05/2020) |
| 03/06/2020 | 83 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motion for leave to appear pro hac vice 82 is granted. Attorney Michael Marvin is given leave to file an appearance form on behalf of Plaintiff. Notice mailed by judge's staff (ntf, ) (Entered: 03/06/2020) |
| 03/09/2020 | 84 | NOTICE by Khue Hoang of Change of Address (Hoang, Khue) (Entered: 03/09/2020) |
| 03/09/2020 | 85 | NOTICE by Jaime Francisco Cardenas-Navia of Change of Address (Cardenas-Navia, Jaime) (Entered: 03/09/2020) |
| 03/09/2020 | 86 | NOTICE by Rahul Sarkar of Change of Address (Sarkar, Rahul) (Entered: 03/09/2020) |
| 03/09/2020 | 87 | NOTICE by Wesley White of Change of Address (White, Wesley) (Entered: 03/09/2020) |
| 03/11/2020 | 88 | MOTION by Defendant Amazon Web Services, Inc. to seal *Motion to Compel* (Mascherin, Terri) (Entered: 03/11/2020) |
| 03/11/2020 | 89 | NOTICE of Motion by Terri Lynn Mascherin for presentment of motion to seal 88 before Honorable Rebecca R. Pallmeyer on 3/16/2020 at 09:00 AM. (Mascherin, Terri) (Entered: 03/11/2020) |
| 03/11/2020 | 90 | SEALED MOTION by Defendant Amazon Web Services, Inc. - *Motion to Compel Amendment of Final Infringement Contentions to Conform with Local Patent Rules* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit J, # 10 Exhibit K, # 11 Exhibit L)(Mascherin, Terri) (Entered: 03/11/2020) |
| 03/11/2020 | 91 | MOTION by Defendant Amazon Web Services, Inc. to compel *Amendment of Final Infringement Contentions to Conform with Local Patent Rules (Public Redacted Version)* (Attachments: # 1 Exhibits A-H and J-L, # 2 Exhibit I)(Mascherin, Terri) (Entered: 03/11/2020) |
| 03/11/2020 | 92 | NOTICE of Motion by Terri Lynn Mascherin for presentment of Sealed motion, 90 , motion to compel 91 before Honorable Rebecca R. Pallmeyer on 3/16/2020 at 09:00 AM. (Mascherin, Terri) (Entered: 03/11/2020) |
| 03/15/2020 | 93 | MOTION by Plaintiff Kove IO, Inc. to seal *Response to Motion to Compel* (Mariotti, Renato) (Entered: 03/15/2020) |
| 03/15/2020 | 94 | NOTICE of Motion by Renato T. Mariotti for presentment of motion to seal 93 before Honorable Rebecca R. Pallmeyer on 3/18/2020 at 08:45 AM. (Mariotti, Renato) (Entered: 03/15/2020) |

| 03/15/2020 | 95 | SEALED RESPONSE by Kove IO, Inc. to SEALED MOTION by Defendant Amazon Web Services, Inc. - *Motion to Compel Amendment of Final Infringement Contentions to Conform with Local Patent Rules* 90 (Hoang, Khue) (Entered: 03/15/2020) |
|---|---|---|
| 03/15/2020 | 96 | RESPONSE by Kove IO, Inc.in Opposition to MOTION by Defendant Amazon Web Services, Inc. to compel *Amendment of Final Infringement Contentions to Conform with Local Patent Rules (Public Redacted Version)* 91 *(Public Redacted Version)* (Hoang, Khue) (Entered: 03/15/2020) |
| 03/16/2020 | 97 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion hearing held. Defendant's motion to seal motion to compel 88 is granted. Plaintiff's motion to seal response to motion to compel 93 is granted. Motion hearing date of 3/18/2020 is stricken. Defendant's motions to compel 90 and 91 are granted as stated in court. Plaintiff is directed to file a revised claim chart. Parties are directed to submit a proposed schedule to this court's proposed order email inbox. Notice mailed by judge's staff (ntf, ) (Entered: 03/16/2020) |
| 03/16/2020 | 98 | ORDER Amended General Order 20-0012 IN RE: CORONAVIRUS COVID-19 PUBLIC EMERGENCY Signed by the Chief Judge Rebecca R. Pallmeyer on March 16, 2020. All open cases are impacted by this Amended General Order. See attached Order for guidance. Signed by the Honorable Rebecca R. Pallmeyer on 3/16/2020: Mailed notice. (td, ) (Entered: 03/17/2020) |
| 03/18/2020 | 99 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Joachim Steinberg (Steinberg, Joachim) (Entered: 03/18/2020) |
| 03/18/2020 | 100 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Kate Falkenstien (Falkenstien, Kate) (Entered: 03/18/2020) |
| 03/18/2020 | 101 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Courtland Reichman (Reichman, Courtland) (Entered: 03/18/2020) |
| 03/18/2020 | 102 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Jennifer Estremera (Estremera, Jennifer) (Entered: 03/18/2020) |
| 03/18/2020 | 103 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Christine E Lehman (Lehman, Christine) (Entered: 03/18/2020) |
| 03/18/2020 | 104 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Khue Hoang (Hoang, Khue) (Entered: 03/18/2020) |
| 03/18/2020 | 105 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Rahul Sarkar (Sarkar, Rahul) (Entered: 03/18/2020) |
| 03/18/2020 | 106 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Michael Walton Marvin (Marvin, Michael) (Entered: 03/18/2020) |
| 03/18/2020 | 107 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Wesley White (White, Wesley) (Entered: 03/18/2020) |
| 03/18/2020 | 108 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Jaime Francisco Cardenas-Navia (Cardenas-Navia, Jaime) (Entered: 03/18/2020) |
| 03/18/2020 | 109 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Sarah Jorgensen (Jorgensen, Sarah) (Entered: 03/18/2020) |
| 03/23/2020 | 110 | MEMORANDUM Opinion and Order. Defendant's motion to dismiss 36 is denied. Status hearing set for 4/30/2020 at 9:00 a.m. Signed by the Honorable Rebecca R. Pallmeyer on 3/23/2020. Notice mailed by judge's staff (ntf, ) (Entered: 03/23/2020) |

| | | |
|---|---|---|
| 03/27/2020 | 111 | MOTION by Plaintiff Kove IO, Inc. for extension of time *of Case Schedule* (Attachments: # 1 Text of Proposed Order of Case Schedule)(Hoang, Khue) (Entered: 03/27/2020) |
| 03/27/2020 | 112 | NOTICE of Motion by Khue Hoang for presentment of extension of time 111 before Honorable Rebecca R. Pallmeyer on 4/1/2020 at 08:45 AM. (Hoang, Khue) (Entered: 03/27/2020) |
| 03/30/2020 | 113 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Parties' joint motion for modification of case schedule 111 is granted. Parties are directed to submit their proposed order to the court's proposed order email address. Motion hearing date of 4/1/2020 is stricken. Notice mailed by judge's staff (ntf, ) (Entered: 03/30/2020) |
| 03/30/2020 | 114 | SCHEDULING ORDER. Signed by the Honorable Rebecca R. Pallmeyer on 3/30/2020. Notice mailed by judge's staff (ntf, ) (Entered: 03/30/2020) |
| 03/30/2020 | 115 | ORDER Seconded Amended General Order 20-0012 IN RE: CORONAVIRUS COVID-19 PUBLIC EMERGENCY Signed by the Chief Judge Rebecca R. Pallmeyer on March 30, 2020. All open cases are impacted by this Second Amended General Order. Amended General Order 20-0012, entered on March 17, 2020, and General Order 20-0014, entered on March 20, 2020, are vacated and superseded by this Second Amended General. See attached Order for guidance.Signed by the Honorable Rebecca R. Pallmeyer on 3/30/2020: Mailed notice. (docket1, ) (Entered: 03/31/2020) |
| 04/11/2020 | 116 | TRANSCRIPT OF PROCEEDINGS held on 3/16/20 before the Honorable Rebecca R. Pallmeyer. Order Number: 38310. Court Reporter Contact Information: Frances Ward - frances_ward@ilnd.uscourts.gov - (312)435-5561. <P>IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.</P> Redaction Request due 5/4/2020. Redacted Transcript Deadline set for 5/12/2020. Release of Transcript Restriction set for 7/10/2020. (Ward, Frances) (Entered: 04/11/2020) |
| 04/13/2020 | 117 | ATTORNEY Appearance for Defendant Amazon Web Services, Inc. by Timothy Joseph Barron (Barron, Timothy) (Entered: 04/13/2020) |
| 04/14/2020 | 118 | MOTION by Defendant Amazon Web Services, Inc. to withdraw *Appearance of Michael G. Babbitt* (Mascherin, Terri) (Entered: 04/14/2020) |
| 04/15/2020 | 119 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendant's motion to withdraw appearance of Michael G. Babbitt 118 is granted. Attorney Michael Glenn Babbitt is given leave to withdraw as counsel for Defendant. Notice mailed by judge's staff (ntf, ) (Entered: 04/15/2020) |
| 04/23/2020 | 120 | MOTION by Defendant Amazon Web Services, Inc. to seal *Motion to Conduct In Camera Review* (Mascherin, Terri) (Entered: 04/23/2020) |
| 04/23/2020 | 121 | NOTICE of Motion by Terri Lynn Mascherin for presentment of motion to seal 120 before Honorable Rebecca R. Pallmeyer on 4/27/2020 at 09:00 AM. (Mascherin, Terri) (Entered: 04/23/2020) |
| 04/23/2020 | 122 | SEALED MOTION by Defendant Amazon Web Services, Inc. - *Defendant's Motion to Conduct In Camera Review and to Compel Production* (Attachments: # 1 Exhibit A, # 2 Exhibit E, # 3 Exhibit N, # 4 Exhibit O)(Mascherin, Terri) (Entered: 04/23/2020) |

| 04/23/2020 | 123 | MOTION by Defendant Amazon Web Services, Inc. to Conduct In Camera Review and to Compel Production *(Public Redacted Version)* (Attachments: # 1 Exhibit A (Redacted), # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit F, # 6 Exhibit G, # 7 Exhibit H, # 8 Exhibit I, # 9 Exhibit J, # 10 Exhibit K, # 11 Exhibit L, # 12 Exhibit M, # 13 Exhibit P, # 14 Exhibit Q)(Mascherin, Terri) (Entered: 04/23/2020) |
|---|---|---|
| 04/23/2020 | 124 | NOTICE of Motion by Terri Lynn Mascherin for presentment of motion for miscellaneous relief, 123 , Sealed motion 122 before Honorable Rebecca R. Pallmeyer on 4/27/2020 at 09:00 AM. (Mascherin, Terri) (Entered: 04/23/2020) |
| 04/24/2020 | 125 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendant's motion to seal 120 and motions to conduct in camera review and to compel production 122 and 123 are taken under advisement. Plaintiff's response shall be filed by 4/30/2020. Defendant's reply in support shall be filed by 5/7/2020. The court will rule electronically. Motion hearing date of 4/27/2020 is stricken. Notice mailed by judge's staff (ntf, ) (Entered: 04/24/2020) |
| 04/24/2020 | 126 | SUPPLEMENT to Sealed motion 122 , motion for miscellaneous relief, 123 - *Defendant's Supplement to Motion to Conduct In Camera Review and to Compel Production* (Mascherin, Terri) (Entered: 04/24/2020) |
| 04/24/2020 | 128 | ORDER Third Amended General Order 20-0012 IN RE: CORONAVIRUS COVID-19 PUBLIC EMERGENCY Signed by the Chief Judge Rebecca R. Pallmeyer on April 24, 2020. All open cases are impacted by this Third Amended General Order. Parties are must carefully review all obligations under this Order, including the requirement listed in paragraph number 5 to file a joint written status report in most civil cases. See attached Order. Signed by the Honorable Rebecca R. Pallmeyer on 4/24/2020: Mailed notice. (docket4, ) (Entered: 04/27/2020) |
| 04/25/2020 | 127 | SUPPLEMENT to Sealed motion 122 , motion for miscellaneous relief, 123 / *Defendant's Corrected Supplement to Motion to Conduct in Camera Review and to Compel Production* (Attachments: # 1 Exhibit E)(Mascherin, Terri) (Entered: 04/25/2020) |
| 05/01/2020 | 129 | ANSWER to Complaint with Jury Demand , COUNTERCLAIM filed by Amazon Web Services, Inc. against Kove IO, Inc. - *Defendant and Counterclaimant Amazon Web Services, Inc.'s Answer, Additional Defenses and Counterclaims.* by Amazon Web Services, Inc.(Mascherin, Terri) (Entered: 05/01/2020) |
| 05/01/2020 | 130 | MOTION by Defendant Amazon Web Services, Inc. to seal *Memorandum In Support of Motion for Judgment on the Pleadings* (Mascherin, Terri) (Entered: 05/01/2020) |
| 05/01/2020 | 131 | MOTION by Defendant Amazon Web Services, Inc. for judgment on the pleadings (Mascherin, Terri) (Entered: 05/01/2020) |
| 05/01/2020 | 132 | MEMORANDUM by Amazon Web Services, Inc. in support of motion for judgment on the pleadings 131 *(Public Redacted Version)* (Attachments: # 1 Appendix A, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J)(Mascherin, Terri) (Entered: 05/01/2020) |
| 05/01/2020 | 133 | SEALED DOCUMENT by Defendant Amazon Web Services, Inc. - *Memorandum In Support of Defendant's Motion for Judgment on the Pleadings* (Attachments: # 1 Exhibit J)(Mascherin, Terri) (Entered: 05/01/2020) |
| 05/04/2020 | 134 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendant's motion to seal memorandum in support of motion for judgment on the pleadings 130 is granted. Notice mailed by judge's staff (ntf, ) (Entered: 05/04/2020) |
| 05/05/2020 | 135 | MOTION by Defendant Amazon Web Services, Inc. for Modification of Case Schedule *(Joint)* (Mascherin, Terri) (Entered: 05/05/2020) |

| | | |
|---|---|---|
| 05/07/2020 | 136 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Parties' joint motion for modification of case schedule 135 is granted. Enter Scheduling Order. Notice mailed by judge's staff (ntf, ) (Entered: 05/07/2020) |
| 05/07/2020 | 137 | SCHEDULING ORDER. Signed by the Honorable Rebecca R. Pallmeyer on 5/7/2020. Notice mailed by judge's staff (ntf, ) (Entered: 05/07/2020) |
| 05/08/2020 | 138 | MOTION by Plaintiff Kove IO, Inc. for Modification of Case Schedule *(Joint)* (Attachments: # 1 Text of Proposed Order)(Hoang, Khue) (Entered: 05/08/2020) |
| 05/11/2020 | 139 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendant's motion for judgment on the pleadings 131 is taken under advisement. Plaintiff's response shall be filed by 5/26/2020. Defendant's reply in support shall be filed by 6/9/2020. The court will rule electronically. Parties' joint motion for modification of case schedule 138 is granted as follows: Plaintiff's time to answer or otherwise plead in response to Amazon's Counterclaim is extended from May 22, 2020, to June 22, 2020. Notice mailed by judge's staff (ntf, ) (Entered: 05/11/2020) |
| 05/26/2020 | 140 | MOTION by Plaintiff Kove IO, Inc. for extension of time *to Respond to Motion for Judgment on the Pleadings (Unopposed)* (Hoang, Khue) (Entered: 05/26/2020) |
| 05/26/2020 | 141 | ORDER ORDER Fourth Amended General Order 20-0012 IN RE: CORONAVIRUS COVID-19 PUBLIC EMERGENCY Signed by the Chief Judge Rebecca R. Pallmeyer on May 26, 2020. This Order does not extend or modify any deadlines set in civil cases. For non-emergency motions, no motion may be noticed for presentment on a date earlier than July 15, 2020. See attached Order. Signed by the Honorable Rebecca R. Pallmeyer on 5/26/2020: Mailed notice. (docket5, ) (Entered: 05/26/2020) |
| 05/27/2020 | 142 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's unopposed motion for modification of case schedule 140 is granted. Date for Plaintiff to respond to AWS's Motion for Judgment on the Pleadings 131 is extended to May 29, 2020. Reply date is extended to June 12, 2020. Notice mailed by judge's staff (ntf, ) (Entered: 05/27/2020) |
| 05/28/2020 | 143 | MOTION by Plaintiff Kove IO, Inc. for Modification of Case Schedule (Unopposed) (Hoang, Khue) (Entered: 05/28/2020) |
| 05/28/2020 | 144 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's unopposed motion for modification of case schedule 143 is granted. Date for Plaintiff to respond to AWS's Motion to conduct in camera review and compel production 122 is extended to June 1, 2020. Reply date is extended to June 8, 2020. Parties are directed to file a joint status report by 6/26/2020. Notice mailed by judge's staff (ntf, ) (Entered: 05/28/2020) |
| 05/29/2020 | 145 | RESPONSE by Kove IO, Inc.in Opposition to MOTION by Defendant Amazon Web Services, Inc. for judgment on the pleadings 131 (Attachments: # 1 Exhibit A)(Reichman, Courtland) (Entered: 05/29/2020) |
| 06/01/2020 | 146 | RESPONSE by Kove IO, Inc.in Opposition to SEALED MOTION by Defendant Amazon Web Services, Inc. - *Defendant's Motion to Conduct In Camera Review and to Compel Production* 122 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Hoang, Khue) (Entered: 06/01/2020) |
| 06/05/2020 | 147 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-17085055. (Matulewicz-Crowley, Michael) (Entered: 06/05/2020) |
| 06/08/2020 | 148 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motion for leave to appear pro hac vice 147 is granted. Attorney Michael Matulewicz-Crowley is given leave to file an appearance form on behalf of Plaintiff. Notice mailed by judge's staff (ntf, ) (Entered: 06/08/2020) |

| 06/08/2020 | 149 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Michael Matulewicz-Crowley (Matulewicz-Crowley, Michael) (Entered: 06/08/2020) |
|---|---|---|
| 06/08/2020 | 150 | MOTION by Defendant Amazon Web Services, Inc. to seal *Reply In Support of Motion to Conduct In Camera Review* (Mascherin, Terri) (Entered: 06/08/2020) |
| 06/08/2020 | 151 | REPLY by Amazon Web Services, Inc. to response in opposition to motion, 146 - *Reply in Support of Motion to Conduct In Camera Review and to Compel Production (Public Redacted Version)* (Attachments: # 1 Exhibit R, # 2 Exhibit S, # 3 Exhibit T, # 4 Exhibit U, # 5 Exhibit V, # 6 Exhibit W, # 7 Exhibit X, # 8 Exhibit Y, # 9 Exhibit Z, # 10 Exhibit AA, # 11 Exhibit BB, # 12 Exhibit CC, # 13 Exhibit DD, # 14 Exhibit EE, # 15 Exhibit FF)(Mascherin, Terri) (Entered: 06/08/2020) |
| 06/08/2020 | 152 | SEALED REPLY by Amazon Web Services, Inc. to response in opposition to motion, 146 - *Reply in Support of Motion to Conduct In Camera Review and to Compel Production* (Attachments: # 1 Exhibit U, # 2 Exhibit W, # 3 Exhibit X, # 4 Exhibit Y, # 5 Exhibit EE, # 6 Exhibit FF)(Mascherin, Terri) (Entered: 06/08/2020) |
| 06/10/2020 | 153 | MOTION by Plaintiff Kove IO, Inc. for leave to file *Sur-Reply to Motion to Conduct In Camera Review* (Attachments: # 1 Exhibit 1)(Hoang, Khue) (Entered: 06/10/2020) |
| 06/11/2020 | 154 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motion for leave to file sur-reply 153 is granted. Notice mailed by judge's staff (ntf, ) (Entered: 06/11/2020) |
| 06/11/2020 | 155 | SUR-REPLY by Plaintiff Kove IO, Inc. to Sealed motion 122 (Attachments: # 1 Exhibit A)(Hoang, Khue) (Entered: 06/11/2020) |
| 06/12/2020 | 156 | REPLY by Defendant Amazon Web Services, Inc. to motion for judgment on the pleadings 131 / *Reply Brief in Support of Defendant's Motion for Judgment on the Pleadings* (Mascherin, Terri) (Entered: 06/12/2020) |
| 06/15/2020 | 157 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendant's motion to seal reply in support of motion to conduct in camera review 150 is granted. Notice mailed by judge's staff (ntf, ) (Entered: 06/15/2020) |
| 06/15/2020 | 158 | MOTION by Plaintiff Kove IO, Inc. for leave to file *Sur-Reply to Motion for Judgment on the Pleadings* (Hoang, Khue) (Entered: 06/15/2020) |
| 06/16/2020 | 159 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motion for leave to file sur-reply 158 is granted over Defendant's objection. Defendant has leave to file a sur-response, also limited to five pages, within seven days. Notice mailed by judge's staff (ntf, ) (Entered: 06/16/2020) |
| 06/19/2020 | 160 | SUR-REPLY by Plaintiff Kove IO, Inc. to motion for judgment on the pleadings 131 (Reichman, Courtland) (Entered: 06/19/2020) |
| 06/22/2020 | 161 | ANSWER to counterclaim by Kove IO, Inc.(Reichman, Courtland) (Entered: 06/22/2020) |
| 06/23/2020 | 162 | RESPONSE by Defendant Amazon Web Services, Inc. to sur-reply 160 / *Sur-Response In Support of Defendant's Motion for Judgment on the Pleadings* (Mascherin, Terri) (Entered: 06/23/2020) |
| 06/26/2020 | 163 | MOTION by Plaintiff Kove IO, Inc. for Modification of Case Schedule *(Joint)* (Attachments: # 1 Text of Proposed Order)(Hoang, Khue) (Entered: 06/26/2020) |
| 06/29/2020 | 164 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Parties' joint motion for modification of case schedule 163 is granted. Date for the parties' joint status report is extended to 7/6/2020. Notice mailed by judge's staff (ntf, ) (Entered: 06/29/2020) |

| | | |
|---|---|---|
| 07/02/2020 | 165 | MOTION by Plaintiff Kove IO, Inc. for Modification of Case Schedule (Joint) (Hoang, Khue) (Entered: 07/02/2020) |
| 07/06/2020 | 166 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's joint motion for modification of case schedule 165 is granted. Enter Scheduling Order. Notice mailed by judge's staff (ntf, ) (Entered: 07/06/2020) |
| 07/06/2020 | 167 | SCHEDULING ORDER. Signed by the Honorable Rebecca R. Pallmeyer on 7/6/2020. Notice mailed by judge's staff (ntf, ) (Entered: 07/06/2020) |
| 07/06/2020 | 168 | STATUS Report *[Joint]* by Kove IO, Inc. (Hoang, Khue) (Entered: 07/06/2020) |
| 07/07/2020 | 169 | STATUS Report *[Supplemental Joint]* by Kove IO, Inc. (Hoang, Khue) (Entered: 07/07/2020) |
| 07/10/2020 | 170 | ORDER Fifth Amended General Order 20-0012 IN RE: CORONAVIRUS COVID-19 PUBLIC EMERGENCY Signed by the Chief Judge Rebecca R. Pallmeyer on July 10, 2020. This Order does not extend or modify any deadlines set in civil cases. No motions may be noticed for in-person presentment; the presiding judge will notify parties of the need, if any, for a hearing by electronic means or in-court proceeding. See attached Order. Signed by the Honorable Rebecca R. Pallmeyer on 7/10/2020: Mailed notice. (Clerk4, Docket) (Entered: 07/10/2020) |
| 07/27/2020 | 171 | MOTION by Defendant Amazon Web Services, Inc. to seal - *Motion to Seal Second Motion to Compel Amendment of Final Infringement Contentions to Conform with Local Patent Rules* (Mascherin, Terri) (Entered: 07/27/2020) |
| 07/27/2020 | 172 | MOTION by Defendant Amazon Web Services, Inc. to compel - *Second Motion to Compel Amendment of Final Infringement Contentions to Conform with Local Patent Rules (Public Redacted Version)* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11)(Mascherin, Terri) (Entered: 07/27/2020) |
| 07/27/2020 | 173 | SEALED MOTION by Defendant Amazon Web Services, Inc. - *Second Motion to Compel Amendment of Final Infringement Contentions to Conform with Local Patent Rules* (Attachments: # 1 Exhibit 1, # 2 Exhibit 3, # 3 Exhibit 4, # 4 Exhibit 5, # 5 Exhibit 6, # 6 Exhibit 7, # 7 Exhibit 8, # 8 Exhibit 9, # 9 Exhibit 10, # 10 Exhibit 11)(Mascherin, Terri) (Entered: 07/27/2020) |
| 07/28/2020 | 174 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendant's motions to compel 172 and 173 are entered and continued. Plaintiff's response shall be filed by 8/6/2020. Defendant's reply in support shall be filed by 8/17/2020. Notice mailed by judge's staff (ntf, ) (Entered: 07/28/2020) |
| 07/28/2020 | 175 | MOTION by Plaintiff Kove IO, Inc. to seal *Motion to Compel Defendant to Produce Technical Documents and to Provide Supplemental Witnesses Under Rule 30(b)(6)* (Hoang, Khue) (Entered: 07/28/2020) |
| 07/28/2020 | 176 | SEALED MOTION by Plaintiff Kove IO, Inc. *to Compel Defendant to Produce Technical Documents and to Provide Supplemental Witnesses Under Rule 30(b)(6)* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10)(Hoang, Khue) (Entered: 07/28/2020) |
| 07/28/2020 | 177 | MOTION by Plaintiff Kove IO, Inc. to compel *Defendant to Produce Technical Documents and to Provide Supplemental Witnesses Under Rule 30(b)(6)(Public Redacted Version)* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 |

| | | |
|---|---|---|
| | | Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10)(Hoang, Khue) (Entered: 07/28/2020) |
| 07/29/2020 | 178 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendant's motions to compel 172 and 173 are entered and continued. Plaintiff's response is extended to 8/17/2020. Defendant's reply in support is extended to 9/4/2020. Plaintiff's motions to compel 175 , 176 , and 177 are entered and continued. Defendant's response shall be filed by 8/18/2020. Plaintiff's reply in support shall be filed by 9/4/2020. Notice mailed by judge's staff (ntf, ) (Entered: 07/29/2020) |
| 07/31/2020 | 179 | MOTION by Defendant Amazon Web Services, Inc. to amend/correct order 167 - *Agreed Motion to Amend Scheduling Order* (Attachments: # 1 Exhibit A)(Mascherin, Terri) (Entered: 07/31/2020) |
| 08/05/2020 | 180 | AMENDED SCHEDULING Order. Defendant's agreed motion to amend scheduling order 179 is granted. Signed by the Honorable Rebecca R. Pallmeyer on 8/5/2020. Notice mailed by judge's staff (ntf, ) (Entered: 08/05/2020) |
| 08/17/2020 | 181 | MOTION by Plaintiff Kove IO, Inc. to seal *Memorandum in Opposition to Defendant's Second Motion to Compel Amendment of Final Infringement Contentions* (Hoang, Khue) (Entered: 08/17/2020) |
| 08/17/2020 | 182 | SEALED RESPONSE by Kove IO, Inc. to SEALED MOTION by Defendant Amazon Web Services, Inc. - *Second Motion to Compel Amendment of Final Infringement Contentions to Conform with Local Patent Rules* 173 (Attachments: # 1 Declaration Dr. Michael T. Goodrich, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G)(Hoang, Khue) (Entered: 08/17/2020) |
| 08/17/2020 | 183 | MEMORANDUM by Kove IO, Inc. in Opposition to Sealed motion, 173 *Second Motion to Compel Amendment of Final Infringement Contentions to Conform with Local Patent Rules (Public Redacted Version)* (Attachments: # 1 Declaration Dr. Michael T. Goodrich, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G)(Hoang, Khue) (Entered: 08/17/2020) |
| 08/18/2020 | 184 | MOTION by Defendant Amazon Web Services, Inc. to seal *Opposition to Kove IO, Inc.'s Motion to Compel AWS to Produce Technical Documents and to Provide Supplemental Witnesses Under Rule 30(b)(6) and Declaration of Terri L. Mascherin* (Mascherin, Terri) (Entered: 08/18/2020) |
| 08/18/2020 | 185 | RESPONSE by Amazon Web Services, Inc.in Opposition to SEALED MOTION by Plaintiff Kove IO, Inc. *to Compel Defendant to Produce Technical Documents and to Provide Supplemental Witnesses Under Rule 30(b)(6)* 176 *(Public Redacted Version)* (Attachments: # 1 Declaration of Terri L. Mascherin, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11)(Mascherin, Terri) (Entered: 08/18/2020) |
| 08/18/2020 | 186 | SEALED RESPONSE by Amazon Web Services, Inc. to SEALED MOTION by Plaintiff Kove IO, Inc. *to Compel Defendant to Produce Technical Documents and to Provide Supplemental Witnesses Under Rule 30(b)(6)* 176 (Attachments: # 1 Declaration of Terri L. Mascherin, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 10)(Mascherin, Terri) (Entered: 08/18/2020) |
| 08/19/2020 | 187 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Parties' motions for leave to file under seal 181 and 184 are granted. Notice mailed by judge's staff (ntf, ) (Entered: 08/19/2020) |
| 08/24/2020 | 188 | MOTION by Plaintiff Kove IO, Inc. for extension of time *of Case Schedule* (Attachments: # 1 Text of Proposed Order)(Hoang, Khue) (Entered: 08/24/2020) |

| | | |
|---|---|---|
| 08/25/2020 | 189 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Parties' joint motion for modification of case schedule 188 is granted. Enter Amended Scheduling Order. Notice mailed by judge's staff (ntf, ) (Entered: 08/25/2020) |
| 08/25/2020 | 190 | AMENDED Scheduling Order. Signed by the Honorable Rebecca R. Pallmeyer on 8/25/2020. Notice mailed by judge's staff (ntf, ) (Entered: 08/25/2020) |
| 09/04/2020 | 191 | MOTION by Defendant Amazon Web Services, Inc. to seal *Reply Brief in Support of Second Motion to Compel Amendment of Final Infringement Contentions to Conform with Local Patent Rules* (Mascherin, Terri) (Entered: 09/04/2020) |
| 09/04/2020 | 192 | REPLY by Amazon Web Services, Inc. to SEALED MOTION by Defendant Amazon Web Services, Inc. - *Second Motion to Compel Amendment of Final Infringement Contentions to Conform with Local Patent Rules* 173 / *Reply Brief in Support of Second Motion to Compel Amendment of Final Infringement Contentions to Conform with Local Patent Rules (Public Redacted Version)* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Mascherin, Terri) (Entered: 09/04/2020) |
| 09/04/2020 | 193 | SEALED REPLY by Amazon Web Services, Inc. to SEALED MOTION by Defendant Amazon Web Services, Inc. - *Second Motion to Compel Amendment of Final Infringement Contentions to Conform with Local Patent Rules* 173 / *Reply Brief in Support of Second Motion to Compel Amendment of Final Infringement Contentions to Conform with Local Patent Rules* (Attachments: # 1 Exhibit 1)(Mascherin, Terri) (Entered: 09/04/2020) |
| 09/04/2020 | 194 | MOTION by Plaintiff Kove IO, Inc. to seal *Reply In Support of Motion to Compel Amazon Web Services, Inc. to Produce Technical Documents and to Provide Supplemental Witnesses Under Rule 30(b)(6)* (Hoang, Khue) (Entered: 09/04/2020) |
| 09/04/2020 | 195 | SEALED REPLY by Kove IO, Inc. to SEALED MOTION by Plaintiff Kove IO, Inc. *to Compel Defendant to Produce Technical Documents and to Provide Supplemental Witnesses Under Rule 30(b)(6)* 176 (Hoang, Khue) (Entered: 09/04/2020) |
| 09/04/2020 | 196 | REPLY by Plaintiff Kove IO, Inc. to Sealed motion, 176 *to Compel Defendant to Produce Technical Documents and to Provide Supplemental Witnesses Under Rule 30(b)(6) (Public Redacted Version)* (Hoang, Khue) (Entered: 09/04/2020) |
| 09/08/2020 | 197 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Parties' motions to seal their reply briefs 191 and 194 are granted. Notice mailed by judge's staff (ntf, ) (Entered: 09/08/2020) |
| 09/08/2020 | 198 | MOTION by Plaintiff Kove IO, Inc. for leave to file *sur-reply to Defendant's Second Motion to Compel Amendment of Final Infringement Contentions to Conform with Local Patent Rules* (Hoang, Khue) (Entered: 09/08/2020) |
| 09/10/2020 | 199 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motion for leave to file sur-reply to Defendant's Second Motion to Compel Amendment of Final Infringement Contentions to Conform with Local Patent Rules 198 is granted. Notice mailed by judge's staff (ntf, ) (Entered: 09/10/2020) |
| 09/14/2020 | 200 | MOTION by Plaintiff Kove IO, Inc. to strike *Amazon Web Services, Inc.'s Invalidity Contentions* (Attachments: # 1 Declaration of Jaime F. Cardenas-Navia, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K)(Hoang, Khue) (Entered: 09/14/2020) |
| 09/15/2020 | 201 | MOTION by Plaintiff Kove IO, Inc. to seal *Sur-Reply to Defendant's Second Motion to Compel Amendment of Final Infringement Contentions* (Hoang, Khue) (Entered: |

| | | |
|---|---|---|
| | | 09/15/2020) |
| 09/15/2020 | 202 | SEALED REPLY by Kove IO, Inc. to SEALED MOTION by Defendant Amazon Web Services, Inc. - *Second Motion to Compel Amendment of Final Infringement Contentions to Conform with Local Patent Rules* 173 *(Sur-Reply)* (Hoang, Khue) (Entered: 09/15/2020) |
| 09/15/2020 | 203 | SUR-REPLY by Plaintiff Kove IO, Inc. to Sealed motion, 173 *to Compel Amendment of Final Infringement Contentions (Public Redacted Version)* (Hoang, Khue) (Entered: 09/15/2020) |
| 09/16/2020 | 204 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motion for leave to file documents under seal 201 is granted. Notice mailed by judge's staff (ntf, ) (Entered: 09/16/2020) |
| 09/17/2020 | 205 | MOTION by Defendant Amazon Web Services, Inc. to amend/correct order 190 - *Agreed Motion to Amend Scheduling Order* (Attachments: # 1 Exhibit A)(Mascherin, Terri) (Entered: 09/17/2020) |
| 09/18/2020 | 206 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendant's agreed motion to amend scheduling order 205 is granted. Enter Amended Scheduling Order. Notice mailed by judge's staff (ntf, ) (Entered: 09/18/2020) |
| 09/18/2020 | 207 | AMENDED SCHEDULING Order. Signed by the Honorable Rebecca R. Pallmeyer on 9/18/2020. Notice mailed by judge's staff (ntf, ) (Entered: 09/18/2020) |
| 09/22/2020 | 208 | MOTION by Plaintiff Kove IO, Inc. to withdraw *appearance of Attorney Joachim B. Steinberg as counsel for Kove IO, Inc.* (Hoang, Khue) (Entered: 09/22/2020) |
| 09/23/2020 | 209 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motion to withdraw as counsel 208 is granted. Attorney Joachim Steinberg is given leave to withdraw as counsel. Notice mailed by judge's staff (ntf, ) (Entered: 09/23/2020) |
| 09/25/2020 | 210 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendant's response to Plaintiff's motion to strike 200 shall be filed by 10/9/2020. Plaintiff's reply in support shall be filed by 10/30/2020. Notice mailed by judge's staff (ntf, ) (Entered: 09/25/2020) |
| 10/02/2020 | 211 | MOTION by Plaintiff Kove IO, Inc. to seal *Exhibits K, L, and N to its Motion to Compel Defendant to Produce Financial Information* (Hoang, Khue) (Entered: 10/02/2020) |
| 10/02/2020 | 212 | MOTION by Plaintiff Kove IO, Inc. to compel *Defendant to Produce Financial Information* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N)(Hoang, Khue) (Entered: 10/02/2020) |
| 10/02/2020 | 213 | SEALED DOCUMENT by Plaintiff Kove IO, Inc. *Exhibits K, L, and N to its Motion to Compel Defendant To Produce Financial Information* (Hoang, Khue) (Entered: 10/02/2020) |
| 10/05/2020 | 214 | EXECUTIVE COMMITTEE ORDER: Case referred to the Honorable Sheila M. Finnegan. Signed by the Executive Committee on 10/5/2020. (sxb, ) (Entered: 10/05/2020) |
| 10/05/2020 | 215 | MINUTE entry before the Honorable Sheila M. Finnegan: Plaintiff's motion to compel Defendant to Produce Financial Information [212, 213], and motion to seal Exhibits K, L, and N 211 of the motion to compel are entered and continued. Defendant's consolidated response shall be filed by 10/23/2020. Plaintiff's reply in support shall be filed by 11/6/2020. Mailed notice (sxw, ) (Entered: 10/05/2020) |

| | | |
|---|---|---|
| 10/09/2020 | 216 | MOTION by Defendant Amazon Web Services, Inc. to amend/correct - *Amazon Web Services, Inc.'s Motion For Leave To Amend Its Final Invalidity Contentions* (Mascherin, Terri) (Entered: 10/09/2020) |
| 10/09/2020 | 217 | MEMORANDUM motion to amend/correct 216 , motion to strike, 200 by Amazon Web Services, Inc. - *AWS's Memorandum in Opposition to Kove IO, Inc.'s Motion to Strike AWS's Invalidity Contentions and in Support of Motion for Leave to Amend* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Mascherin, Terri) (Entered: 10/09/2020) |
| 10/13/2020 | 218 | MOTION by Defendant Amazon Web Services, Inc. to seal *Exhibit 1 to Opening Claim Construction Brief* (Mascherin, Terri) (Entered: 10/13/2020) |
| 10/13/2020 | 219 | OPENING CLAIM CONSTRUCTION BRIEF by Amazon Web Services, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Mascherin, Terri) (Entered: 10/13/2020) |
| 10/13/2020 | 220 | SEALED EXHIBIT by Defendant Amazon Web Services, Inc. - *Exhibit 1* regarding other 219 (Mascherin, Terri) (Entered: 10/13/2020) |
| 10/13/2020 | 221 | APPENDIX - *Joint Appendix* (Attachments: # 1 Appendix Part 2, # 2 Appendix Part 3)(Mascherin, Terri) (Entered: 10/13/2020) |
| 10/19/2020 | 222 | MOTION by Defendant Amazon Web Services, Inc. to compel *Responses to Discovery Requests Regarding Third-Party Litigation Funding* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8)(Mascherin, Terri) (Entered: 10/19/2020) |
| 10/20/2020 | 223 | MINUTE entry before the Honorable Sheila M. Finnegan: Defendant Amazon Web Services, Inc.'s motion to compel responses to discovery requests regarding third-party litigation funding 222 is taken under advisement. Plaintiff's response is due by 11/10/2020, and Defendant's reply by 11/24/2020.Mailed notice (sxw, ) (Entered: 10/20/2020) |
| 10/23/2020 | 224 | MOTION by Defendant Amazon Web Services, Inc. to amend/correct order 207 – *Joint Motion to Amend Scheduling Order* (Attachments: # 1 Exhibit A)(Mascherin, Terri) (Entered: 10/23/2020) |
| 10/23/2020 | 225 | MEMORANDUM by Amazon Web Services, Inc. in Opposition to motion to compel, 212 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Mascherin, Terri) (Entered: 10/23/2020) |
| 10/26/2020 | 226 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The referral of this case is expanded to include authority to extend pretrial deadlines. Defendant's joint motion to amend scheduling order 224 is referred to Judge Finnegan. Notice mailed by judge's staff (ntf, ) (Entered: 10/26/2020) |
| 10/29/2020 | 227 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendant's response to Plaintiff's motion to strike 200 shall be filed by 11/6/2020. Plaintiff's reply in support shall be filed by 11/27/2020. Notice mailed by judge's staff (ntf, ) (Entered: 10/29/2020) |
| 10/30/2020 | 228 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Minute entry dated 10/29/2020 227 is amended as follows: Plaintiff's response to Defendant's motion to amend 216 shall be filed by 11/6/2020. Defendant's reply in support shall be filed by 11/27/2020. Plaintiff's reply in support of Plaintiff's motion to strike 200 shall be filed by 11/6/2020. Notice mailed by judge's staff (ntf, ) (Entered: 10/30/2020) |
| 11/06/2020 | 229 | MOTION by Plaintiff Kove IO, Inc. to seal *Reply Brief In Support Of Motion to Compel Defendant To Produce Financial Information* (Falkenstien, Kate) (Entered: 11/06/2020) |
| 11/06/2020 | 230 | SEALED REPLY by Kove IO, Inc. to MOTION by Plaintiff Kove IO, Inc. to compel *Defendant to Produce Financial Information* 212 (Attachments: # 1 Declaration Kate |

| | | |
|---|---|---|
| | | Falkenstein, # 2 Exhibit A, # 3 Exhibit B)(Reichman, Courtland) (Entered: 11/06/2020) |
| 11/06/2020 | 231 | REPLY by Plaintiff Kove IO, Inc. to motion to compel, 212 *(Public Redacted Version)* (Attachments: # 1 Declaration of Kate Falkenstein, # 2 Exhibit A, # 3 Exhibit B)(Reichman, Courtland) (Entered: 11/06/2020) |
| 11/06/2020 | 232 | RESPONSE by Kove IO, Inc.in Opposition to MOTION by Defendant Amazon Web Services, Inc. to amend/correct - *Amazon Web Services, Inc.'s Motion For Leave To Amend Its Final Invalidity Contentions* 216 (Reichman, Courtland) (Entered: 11/06/2020) |
| 11/06/2020 | 233 | REPLY by Plaintiff Kove IO, Inc. to motion to strike, 200 *Defendant's Invalidity Contentions* (Reichman, Courtland) (Entered: 11/06/2020) |
| 11/09/2020 | 234 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motion for leave to file documents under seal 229 is granted. Notice mailed by judge's staff (ntf, ) (Entered: 11/09/2020) |
| 11/10/2020 | 235 | MINUTE entry before the Honorable Sheila M. Finnegan: By agreement of the parties, the briefing schedule on Defendant Amazon Web Services, Inc.'s motion to compel responses to discovery requests regarding third-party litigation funding 222 is extended as follows: Plaintiff's response is due by 11/17/2020, and Defendant's reply by 12/1/2020 Mailed notice (sxw, ) (Entered: 11/10/2020) |
| 11/12/2020 | 236 | NOTICE by Amazon Web Services, Inc. re MOTION by Defendant Amazon Web Services, Inc. to amend/correct order 207 - *Joint Motion to Amend Scheduling Order* 224 / *Joint Notice of Withdrawal of Joint Motion to Amend Scheduling Order* (Mascherin, Terri) (Entered: 11/12/2020) |
| 11/12/2020 | 237 | MOTION by Defendant Amazon Web Services, Inc. to amend/correct order 207 - *Joint Motion to Amend Scheduling Order* (Attachments: # 1 Exhibit A)(Mascherin, Terri) (Entered: 11/12/2020) |
| 11/13/2020 | 238 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The parties' proposed revised scheduling order assumes further briefing on claims construction issues, submission of a claims chart, and a further Markman hearing. The court expects to rule on claims construction without further briefing or hearing, and directs the parties to submit a proposed scheduling order with this understanding. Notice mailed by judge's staff (ntf, ) (Entered: 11/13/2020) |
| 11/13/2020 | 239 | Notice of Withdrawal of AWS's Motion to Compel Responses to Discovery Requests Regarding Third-Party Litigation Funding (Docket No. 222) by Amazon Web Services, Inc. (Mascherin, Terri) (Entered: 11/13/2020) |
| 11/13/2020 | 240 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Minute entry dated 11/13/2020 238 was entered in error and is vacated. Notice mailed by judge's staff (ntf, ) (Entered: 11/13/2020) |
| 11/16/2020 | 241 | MINUTE entry before the Honorable Sheila M. Finnegan: Joint Motion to Amend Scheduling Order 237 is granted. Enter Amended Scheduling Order. Mailed notice (sxw, ) (Entered: 11/16/2020) |
| 11/16/2020 | 242 | AMENDED SCHEDULING Order signed by the Honorable Sheila M. Finnegan on 11/16/2020.Mailed notice(sxw, ) (Entered: 11/16/2020) |
| 11/16/2020 | 243 | ATTORNEY Appearance for Counter Claimant Amazon Web Services, Inc., Defendant Amazon Web Services, Inc. by Alan M. Fisch (Fisch, Alan) (Entered: 11/16/2020) |
| 11/16/2020 | 244 | ATTORNEY Appearance for Counter Claimant Amazon Web Services, Inc., Defendant Amazon Web Services, Inc. by R. William Sigler (Sigler, R.) (Entered: 11/16/2020) |

| | | |
|---|---|---|
| 11/17/2020 | 245 | MINUTE entry before the Honorable Sheila M. Finnegan: In light of the Notice of Withdrawal of AWS's Motion to Compel Responses to Discovery Requests Regarding Third-Party Litigation Funding 222 , the motion is terminated as withdrawn. Mailed notice (sxw, ) (Entered: 11/17/2020) |
| 11/17/2020 | 246 | MINUTE entry before the Honorable Sheila M. Finnegan: In light of the Court granting the Joint Motion to Amend Scheduling Order 237 , the Joint Motion to Amend Scheduling Order 224 is denied as moot. Mailed notice (sxw, ) (Entered: 11/17/2020) |
| 11/24/2020 | 247 | Response to Amazon Web Services, Inc.'s Opening Claim Construction Brief by Kove IO, Inc. (Attachments: # 1 Declaration of Michael T. Goodrich, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G)(Reichman, Courtland) (Entered: 11/24/2020) |
| 11/25/2020 | 248 | REPLY by Amazon Web Services, Inc. to response in opposition to motion 232 - *Amazon Web Services, Inc.'s Reply Brief In Support Of Its Motion For Leave To Amend Its Final Invalidity Contentions* (Attachments: # 1 Exhibit D, # 2 Exhibit E, # 3 Exhibit F, # 4 Exhibit G, # 5 Exhibit H)(Mascherin, Terri) (Entered: 11/25/2020) |
| 12/01/2020 | 249 | MOTION by Defendant Amazon Web Services, Inc. to withdraw *counsel (Unopposed)* (Mascherin, Terri) (Entered: 12/01/2020) |
| 12/01/2020 | 250 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-17694342. (Saltman, Jeffrey) (Entered: 12/01/2020) |
| 12/01/2020 | 251 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-17694393. (Bernard, Elizabeth) (Entered: 12/01/2020) |
| 12/01/2020 | 252 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-17694415. (Allgood, Adam) (Entered: 12/01/2020) |
| 12/03/2020 | 253 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendant's motions for leave to appear pro hac vice 250 , 251 , and 252 are granted. Attorneys Jeffrey M. Saltman, Elizabeth Bernard, and Adam Allgood are given leave to file appearance forms on behalf of Defendant. Defendant's unopposed motion for withdrawal of counsel 249 is granted. Attorneys Adam Unikowsky, Michael Thomas Werner, Timothy Joseph Barron, and Terri Lynn Mascherin are given leave to withdraw as counsel for Defendant. Notice mailed by judge's staff (ntf, ) (Entered: 12/03/2020) |
| 12/03/2020 | 254 | ATTORNEY Appearance for Counter Claimant Amazon Web Services, Inc., Defendant Amazon Web Services, Inc. by Adam Allgood (Allgood, Adam) (Entered: 12/03/2020) |
| 12/03/2020 | 255 | ATTORNEY Appearance for Counter Claimant Amazon Web Services, Inc., Defendant Amazon Web Services, Inc. by Jeffrey M. Saltman (Saltman, Jeffrey) (Entered: 12/03/2020) |
| 12/03/2020 | 256 | ATTORNEY Appearance for Counter Claimant Amazon Web Services, Inc., Defendant Amazon Web Services, Inc. by Elizabeth Bernard (Bernard, Elizabeth) (Entered: 12/03/2020) |
| 12/08/2020 | 257 | MOTION by Counter Claimant Amazon Web Services, Inc., Defendant Amazon Web Services, Inc. to amend/correct order 242 *Agreed Motion for Modification of the Case Schedule* (Attachments: # 1 Exhibit A)(Sigler, R.) (Entered: 12/08/2020) |
| 12/08/2020 | 258 | MINUTE entry before the Honorable Sheila M. Finnegan: Agreed Motion for Modification of the Case Schedule 257 is granted. Enter Amended Scheduling Order. Mailed notice (sxw, ) (Entered: 12/08/2020) |

| | | |
|---|---|---|
| 12/08/2020 | 259 | AMENDED SCHEDULING Order signed by the Honorable Sheila M. Finnegan on 12/8/2020. Mailed notice(sxw, ) (Entered: 12/08/2020) |
| 12/31/2020 | 260 | MOTION by Defendant Amazon Web Services, Inc.Requesting Waiver of LR83.15 *(Unopposed)* (Attachments: # 1 Text of Proposed Order)(Sigler, R.) (Entered: 12/31/2020) |
| 01/04/2021 | 261 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Before the Court is Defendant Amazon Web Services, Inc.'s Unopposed Motion Requesting Waiver of LR83.15 Regarding Local Counsel. Having considered the motion and the fact that it is unopposed, it is hereby ORDERED that the motion is GRANTED, and the requirements of Local Rule 83.15 shall be waived for Amazon Web Services, Inc. Mailed notice (vcf, ) (Entered: 01/04/2021) |
| 01/05/2021 | 262 | REPLY by Counter Claimant Amazon Web Services, Inc., Defendant Amazon Web Services, Inc. *Claim Construction Brief* (Attachments: # 1 Exhibit 3 - Goodrich Deposition)(Sigler, R.) (Entered: 01/05/2021) |
| 01/12/2021 | 263 | MOTION by Plaintiff Kove IO, Inc. for leave to file *Additional Limited Briefing Regarding Claim Construction [Joint]* (Hoang, Khue) (Entered: 01/12/2021) |
| 01/13/2021 | 264 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion 263 is granted. Kove has leave to file a sur-reply on claims construction, not to exceed ten pages, on or before 1/25/2021. AWS has leave to submit a sur-response, not to exceed six pages, on or before 2/5/2021. Mailed notice. (jjr, ) (Entered: 01/13/2021) |
| 01/25/2021 | 265 | SUR-REPLY by Plaintiff Kove IO, Inc. to reply 262 *AWS's Reply Claim Construction Brief* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Hoang, Khue) (Entered: 01/25/2021) |
| 01/28/2021 | 266 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-17874608. (Lewis, Karlanna) (Entered: 01/28/2021) |
| 01/28/2021 | 267 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-17874669. (Eklem, Philip) (Entered: 01/28/2021) |
| 01/28/2021 | 268 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-17874686. (Adler, Adam) (Entered: 01/28/2021) |
| 01/29/2021 | 269 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motions for leave to appear pro hac vice 266 , 267 , and 268 are granted. Attorneys Karlanna Lewis, Philip Eklem, and Adam Adler are given leave to file appearance forms on behalf of Plaintiff. Notice mailed by judge's staff (ntf, ) (Entered: 01/29/2021) |
| 02/01/2021 | 270 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Karlanna Lewis (Lewis, Karlanna) (Entered: 02/01/2021) |
| 02/01/2021 | 271 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Adam Adler (Adler, Adam) (Entered: 02/01/2021) |
| 02/01/2021 | 272 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Philip Eklem (Eklem, Philip) (Entered: 02/01/2021) |
| 02/05/2021 | 273 | RESPONSE by Counter Claimant Amazon Web Services, Inc., Defendant Amazon Web Services, Inc. to sur-reply 265 */Sur-Response Claim Construction Brief* (Sigler, R.) (Entered: 02/05/2021) |
| 02/05/2021 | 274 | MINUTE entry before the Honorable Sheila M. Finnegan: Telephone status on motion hearing is set on 2/12/2021 at 3:00 p.m. The toll-free number for the hearing is 877-336-1831, access code 5995354. When you are connected to the conference system, please keep your phone on mute until your case is called so you do not interrupt ongoing |

| | | |
|---|---|---|
| | | hearings in other cases. When your case is called, remember to say your name whenever you speak. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions. Mailed notice (sxw, ) (Entered: 02/05/2021) |
| 02/10/2021 | 275 | MOTION by Plaintiff Kove IO, Inc. to seal *Exhibits B-D, F, H, J-L, Q-R, T, V-Z, and AA-FF to Declaration in Support of Motion to Compel Amazon Web Services, Inc. to Timely Provide a Witness Pursuant to Rule 30(b)(6)* (Hoang, Khue) (Entered: 02/10/2021) |
| 02/10/2021 | 276 | MOTION by Plaintiff Kove IO, Inc. to compel *Amazon Web Services, Inc. to Timely Provide a Witness Pursuant to Rule 30(b)(6)* (Attachments: # 1 Declaration of Jaime F. Cardenas-Navia with Exhibits A-GG (Public Redacted Version))(Hoang, Khue) (Entered: 02/10/2021) |
| 02/10/2021 | 277 | SEALED DOCUMENT by Plaintiff Kove IO, Inc. *Declaration of Jaime F. Cardenas-Navia in support of Motion to Compel with Exhibits A-GG* (Hoang, Khue) (Entered: 02/10/2021) |
| 02/11/2021 | 278 | MOTION by Plaintiff Kove IO, Inc.Modification of the Case Schedule *(Joint)* (Attachments: # 1 Text of Proposed Order)(Hoang, Khue) (Entered: 02/11/2021) |
| 02/12/2021 | 279 | STATUS Report *Joint Status Report on Claim Construction Pursuant to LPR 4.2* by Kove IO, Inc. (Attachments: # 1 Joint Claim Construction Chart)(Hoang, Khue) (Entered: 02/12/2021) |
| 02/12/2021 | 280 | MINUTE entry before the Honorable Sheila M. Finnegan: Magistrate Judge telephone status and motion hearing held on 2/12/2021. The Court grants six sealing and scheduling motions, and takes 4 motions under advisement, as follows: (a) Joint Motion for Modification of the Case Schedule 278 is granted, so initial fact discovery now closes on 4/30/2021; (b) Motions for Leave to File Documents Under Seal [120, 175, 211, 230, 275] are granted; (c) Defendant's Motion to Conduct In Camera Review and to Compel Production [122, 123] is taken under advisement. By 2/16/2021, Plaintiff to provide unredacted documents for in camera review (by email to Chambers_Finnegan@ilnd.uscourts.gov) ; (d) Plaintiff's Motion to Compel Amazon Web Services, Inc. to Timely Provide a Witness Pursuant to Rule 30(b)(6) 276 is taken under advisement. Defendant's response is due by 2/24/2021 and Plaintiff's reply by 3/3/2021; (e) Plaintiff's Motion to Compel Amazon Web Services, Inc. to Produce Technical Documents and to Provide Supplemental Witnesses Under Rule 30 (b)(6) [176, 177], and Plaintiff's Motion to Compel Amazon Web Services, Inc. to Produce Financial Information [212 & 213] are fully briefed and taken under advisement. Mailed notice (sxw) (Entered: 02/16/2021) |
| 02/16/2021 | 281 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Video Claim Construction Hearing set for 4/9/2021 at 10:00 a.m. Notices mailed by judge's staff (ntf, ) (Entered: 02/16/2021) |
| 02/18/2021 | 282 | TRANSCRIPT OF PROCEEDINGS held on 2/12/21 before the Honorable Sheila M. Finnegan. Order Number: 40151. Court Reporter Contact Information: Kathleen_Fennell@ilnd.uscourts.gov. <P>IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter/Transcriber or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.</P> Redaction Request due 3/11/2021. Redacted Transcript Deadline set for 3/22/2021. Release of Transcript Restriction set for 5/19/2021. (Fennell, Kathleen) (Entered: 02/18/2021) |

| | | |
|---|---|---|
| 02/18/2021 | 283 | Joint Claim Construction Chart (Updated) re [Dkt. 279] by Kove IO, Inc. (Hoang, Khue) (Entered: 02/18/2021) |
| 02/19/2021 | 284 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motions for leave to file under seal 120 , 171 are granted. Motions to conduct in camera review and compel production of certain documents identified as privileged 122 , 123 are referred to Magistrate Judge Finnegan. The court agrees with AWS that Kove's infringement contentions should be deemed limited to the explanations offered in Kove's response brief to AWS's second motion to compel amendment of final infringement contentions. That motion ( 172 , 173 ) is thus deemed withdrawn without prejudice. Should Kove seek to amend its final infringement contentions further, its motion for leave to do so would be granted only for good cause shown. Notice mailed by judge's staff (ntf, ) (Entered: 02/19/2021) |
| 02/24/2021 | 285 | MOTION by Counter Claimant Amazon Web Services, Inc., Defendant Amazon Web Services, Inc. to seal *Response to Motion to Compel and Exhibits* (Bernard, Elizabeth) (Entered: 02/24/2021) |
| 02/24/2021 | 286 | SEALED RESPONSE by Amazon Web Services, Inc. to MOTION by Plaintiff Kove IO, Inc. to compel *Amazon Web Services, Inc. to Timely Provide a Witness Pursuant to Rule 30(b)(6)* 276 (Attachments: # 1 Declaration of E. Bernard, # 2 Exhibit 1 - KOV_00037799-819, # 3 Exhibit 2 - KOV_00036030-44, # 4 Exhibit 3 - KOV_00030485-569, # 5 Exhibit 4 - Dep. Tr. of Sorenson, # 6 Exhibit 5 - Dep. Tr. of Markle, # 7 Exhibit 6 - Kove 10-2-20 Interrogatories, # 8 Exhibit 7 - 1-29-21 Letter, # 9 Exhibit 8 - 2-3-21 Email, # 10 Exhibit 9 - 2-5-21 Email, # 11 Exhibit 10 - 2-9-21 Email Chain, # 12 Exhibit 11 - 2-17-21 AWS Responses and Objections, # 13 Exhibit 12 - 2-19-21 Letter, # 14 Exhibit 13 - 2-22-21 Email)(Bernard, Elizabeth) (Entered: 02/24/2021) |
| 02/24/2021 | 287 | RESPONSE by Amazon Web Services, Inc.in Opposition to MOTION by Plaintiff Kove IO, Inc. to compel *Amazon Web Services, Inc. to Timely Provide a Witness Pursuant to Rule 30(b)(6)* 276 *[Redacted]* (Attachments: # 1 Declaration of E. Bernard, # 2 Exhibit 1 - [Redacted] KOV_00037799-819, # 3 Exhibit 2 - [Redacted] KOV_00036030-44, # 4 Exhibit 3 - [Redacted] KOV_00030485-569, # 5 Exhibit 4 - [Redacted] Dep. Tr. of Sorenson, # 6 Exhibit 5 - [Redacted] Dep. Tr. of Markle, # 7 Exhibit 6 - [Redacted] Kove 10-2-20 Interrogatories, # 8 Exhibit 7 - [Redacted] 1-29-21 Letter, # 9 Exhibit 8 - [Redacted] 2-3-21 Email, # 10 Exhibit 9 - 2-5-21 Email, # 11 Exhibit 10 - [Redacted] 2-9-21 Email Chain, # 12 Exhibit 11 - [Redacted] 2-17-21 AWS Responses and Objections, # 13 Exhibit 12 - [Redacted] 2-19-21 Letter, # 14 Exhibit 13 - 2-22-21 Email)(Bernard, Elizabeth) (Entered: 02/24/2021) |
| 02/24/2021 | 288 | MINUTE entry before the Honorable Sheila M. Finnegan: Defendant's Motion to Seal AWS's Opposition to Kove's Motion to Compel AWS to Timely Provide a Witness Pursuant to Rule 30(b)(6) (Dkt. 276) and Exhibits to the Declaration of Elizabeth Bernard 285 is granted. Mailed notice (sxw, ) (Entered: 02/24/2021) |
| 03/03/2021 | 289 | MOTION by Plaintiff Kove IO, Inc. to seal *Reply In Support of Motion to Compel Amazon Web Services, Inc. to Timely Provide a Witness Pursuant to Rule 30(b)(6) and Exhibits II and JJ to Reply* (Hoang, Khue) (Entered: 03/03/2021) |
| 03/03/2021 | 290 | SEALED REPLY by Kove IO, Inc. to MOTION by Plaintiff Kove IO, Inc. to compel *Amazon Web Services, Inc. to Timely Provide a Witness Pursuant to Rule 30(b)(6)* 276 (Attachments: # 1 Exhibit HH, # 2 Exhibit II, # 3 Exhibit JJ, # 4 Exhibit KK)(Hoang, Khue) (Entered: 03/03/2021) |
| 03/03/2021 | 291 | REPLY by Plaintiff Kove IO, Inc. to motion to compel, 276 *(Public Redacted Version)* (Attachments: # 1 Exhibit HH, # 2 Exhibit II, # 3 Exhibit JJ, # 4 Exhibit KK)(Hoang, Khue) (Entered: 03/03/2021) |

| | | |
|---|---|---|
| 03/04/2021 | 292 | MINUTE entry before the Honorable Sheila M. Finnegan: Plaintiff's Motion for Leave to File Reply and Exhibits Under Seal 289 is granted. Mailed notice (sxw) (Entered: 03/04/2021) |
| 03/04/2021 | 293 | NOTICE by Kove IO, Inc. *Notice of Change of Firm Name* (Hoang, Khue) (Entered: 03/04/2021) |
| 03/08/2021 | 294 | MOTION by Plaintiff Kove IO, Inc. to clarify *the Court's February 19, 2021 Minute Order (Dkt. No. 284)* (Hoang, Khue) (Entered: 03/08/2021) |
| 03/09/2021 | 295 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motion for clarification or reconsideration 294 is entered and continued for briefing as follows: Defendant's response shall be filed by 3/24/2021. Plaintiff's reply in support shall be filed by 4/2/2021. Notices mailed by judge's staff (ntf, ) (Entered: 03/09/2021) |
| 03/18/2021 | 296 | MINUTE entry before the Honorable Sheila M. Finnegan: Magistrate Judge telephone status and motion hearing is set for 3/24/2021 at 3 p.m. The toll-free number for the hearing is 877-336-1831, access code 5995354. When you are connected to the conference system, please keep your phone on mute until your case is called so you do not interrupt ongoing hearings in other cases. When your case is called, remember to say your name whenever you speak. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions. Mailed notice (sxw) (Entered: 03/18/2021) |
| 03/24/2021 | 297 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Video Claim Construction Hearing set for 4/9/2021 is stricken and re-set to 7/23/2021 at 10:00 a.m. Notice mailed by judge's staff (ntf, ) (Entered: 03/24/2021) |
| 03/24/2021 | 298 | MOTION by Counter Claimant Amazon Web Services, Inc., Defendant Amazon Web Services, Inc. to seal *Response to Motion to Clarify the Court's February 19, 2021 Minute Order* (Sigler, R.) (Entered: 03/24/2021) |
| 03/24/2021 | 299 | SEALED RESPONSE by Amazon Web Services, Inc. to MOTION by Plaintiff Kove IO, Inc. to clarify *the Court's February 19, 2021 Minute Order (Dkt. No. 284)* 294 (Attachments: # 1 Exhibit A - 2-26-21 E-Mail)(Sigler, R.) (Entered: 03/24/2021) |
| 03/24/2021 | 300 | RESPONSE by Amazon Web Services, Inc.in Opposition to MOTION by Plaintiff Kove IO, Inc. to clarify *the Court's February 19, 2021 Minute Order (Dkt. No. 284)* 294 *[Redacted]* (Attachments: # 1 Exhibit A - 2-26-21 E-Mail)(Sigler, R.) (Entered: 03/24/2021) |
| 03/24/2021 | 301 | MINUTE entry before the Honorable Sheila M. Finnegan: Magistrate Judge telephone status and motion hearing held on 3/24/2021. For reasons stated on the record: (1) Plaintiff's Motion to Compel Amazon Web Services, Inc. to Produce Technical Documents and to Provide Supplemental Witnesses Under Rule 30(b)(6) [176, 177] is granted in part and denied in part on the terms stated during the hearing; and (2) Plaintiff's Motion to Compel Amazon Web Services, Inc. to Timely Provide a Witness pursuant to Rule 30(b)(6) [276, 277] is denied, as is Defendant's request in its opposition brief for a protective order. By 3/31/2021, the parties are to confer and file a joint status report regarding the issues identified during the hearing. Defendant's unopposed oral motion to seal today's hearing transcript to allow Defendant an opportunity to designate portions of it as highly confidential under the protective order is granted. Mailed notice (sxw) (Entered: 03/24/2021) |
| 03/26/2021 | 302 | MINUTE entry before the Honorable Sheila M. Finnegan: Telephone motion hearing is set for 3/30/2021 at 3:30 p.m. for ruling on Defendant's motion to conduct in camera review and to compel production [122, 123]. The toll-free number for the hearing is 877- |

| | | |
|---|---|---|
| | | 336-1831, access code 5995354. When you are connected to the conference system, please keep your phone on mute until your case is called so you do not interrupt ongoing hearings in other cases. When your case is called, remember to say your name whenever you speak. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions. Mailed notice (sxw) (Entered: 03/26/2021) |
| 03/26/2021 | 303 | SEALED TRANSCRIPT OF PROCEEDINGS held on 3/24/21 before the Honorable Sheila M. Finnegan. Court Reporter Contact Information: Kathleen_Fennell@ilnd.uscourts.gov. (Fennell, Kathleen) (Entered: 03/26/2021) |
| 03/26/2021 | 304 | ORDER. Defendant's motion for judgment on the pleadings 131 is stricken without prejudice to renewal. The court directs the parties to be prepared to discuss the issues outlined in this order at the upcoming claim construction hearing. [For further details see order.] Signed by the Honorable Rebecca R. Pallmeyer on 3/26/2021. Notice mailed by judge's staff (ntf, ) (Entered: 03/26/2021) |
| 03/30/2021 | 305 | MINUTE entry before the Honorable Sheila M. Finnegan: Telephone motion hearing held on 3/30/2021. For reasons stated on the record, Defendant's Motion to Conduct In Camera Review and to Compel Production [122, 123] is granted in part and denied in part on the terms stated on the record. By 4/15/2021, plaintiff is to file affidavit of John Overton, and produce those portions of redacted documents that the Court found were not privileged attorney-client communications. Mailed notice (sxw) (Entered: 03/30/2021) |
| 03/30/2021 | 306 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-18073505. (Haley, Aisha) (Entered: 03/30/2021) |
| 03/31/2021 | 307 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's motion for leave to appear pro hac vice 306 is granted. Attorney Aisha Haley is given leave to file an appearance form on behalf of Plaintiff. Notice mailed by judge (ntf, ) (Entered: 03/31/2021) |
| 03/31/2021 | 308 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Aisha Mahmood Haley (Haley, Aisha) (Entered: 03/31/2021) |
| 03/31/2021 | 309 | STATUS Report *[Joint]* by Amazon Web Services, Inc. (Bernard, Elizabeth) (Entered: 03/31/2021) |
| 03/31/2021 | 310 | MINUTE entry before the Honorable Sheila M. Finnegan: The Court has reviewed the joint status report dated 3/31/2021. As agreed, Defendant is given until 4/14/2021 to produce responsive documents from sampling of wiki, and responses to 30(b)(6) written questions ordered during the 3/24/2021 hearing. Telephone status is set on 5/5/2021 at 10:30 a.m. The toll-free number for the hearing is 877-336-1831, access code 5995354. When you are connected to the conference system, please keep your phone on mute until your case is called so you do not interrupt ongoing hearings in other cases. When your case is called, remember to say your name whenever you speak. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions. Mailed notice (sxw) (Entered: 03/31/2021) |
| 03/31/2021 | 311 | TRANSCRIPT OF PROCEEDINGS held on 3/30/21 before the Honorable Sheila M. Finnegan. Order Number: 40448. Court Reporter Contact Information: Joseph Rickhoff, 312-435-5562, joseph_rickhoff@ilnd.uscourts.gov. <P>IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter/Transcriber or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov |

| | | |
|---|---|---|
| | | under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.</P> Redaction Request due 4/21/2021. Redacted Transcript Deadline set for 5/3/2021. Release of Transcript Restriction set for 6/29/2021. (Rickhoff, Joseph) (Entered: 03/31/2021) |
| 04/01/2021 | 312 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendant's motion to seal 298 is granted. Notice mailed by judge's staff (ntf, ) (Entered: 04/01/2021) |
| 04/02/2021 | 313 | MOTION by Plaintiff Kove IO, Inc. to seal *Reply Brief In Support Of Its Motion For Clarification Of Reconsideration Of The Court's February 19, 2021 Minute Order* (Hoang, Khue) (Entered: 04/02/2021) |
| 04/02/2021 | 314 | SEALED REPLY by Kove IO, Inc. to MOTION by Plaintiff Kove IO, Inc. to clarify *the Court's February 19, 2021 Minute Order (Dkt. No. 284)* 294 (Hoang, Khue) (Entered: 04/02/2021) |
| 04/02/2021 | 315 | REPLY by Plaintiff Kove IO, Inc. to motion to clarify 294 *(Public Redacted Version)* (Hoang, Khue) (Entered: 04/02/2021) |
| 04/06/2021 | 316 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendant's motion to seal Exhibit 1 to Opening Claim Construction Brief 218 is granted. Plaintiff's motion to file under seal Reply Brief In Support Of Its Motion For Clarification Of Reconsideration Of The Court's February 19, 2021 Minute Order 313 is granted. Notice mailed by judge's staff (ntf, ) (Entered: 04/06/2021) |
| 04/06/2021 | 317 | MOTION by Counter Claimant Amazon Web Services, Inc., Defendant Amazon Web Services, Inc. for extension of time to file *Rule 72 Objections [Unopposed]* (Attachments: # 1 Text of Proposed Order)(Sigler, R.) (Entered: 04/06/2021) |
| 04/06/2021 | 318 | MINUTE entry before the Honorable Sheila M. Finnegan: AWS's Unopposed Motion to Set the Deadline to Serve and File Rule 72 Objections 317 is granted. Rule 72 objections to the Magistrate Judge's 3/24/2021 oral order to be served and filed by 4/9/2021. Mailed notice (sxw) (Entered: 04/06/2021) |
| 04/07/2021 | 319 | REQUEST for Clerk of Court to refund filing fee in the amount of $150.00, receipt no. 0752-18073505, *regarding motion for leave to appear pro hac vice A. Haley filing fee $150* 306 . *Kove IO, Inc. v. Amazon Web Services, Inc.* (Hoang, Khue) (Entered: 04/07/2021) |
| 04/07/2021 | 320 | MOTION by Plaintiff Kove IO, Inc.for Modification of the Case Schedule *(Joint)* (Attachments: # 1 Text of Proposed Order)(Hoang, Khue) (Entered: 04/07/2021) |
| 04/08/2021 | 321 | AGREED AMENDED Scheduling Order signed by the Honorable Sheila M. Finnegan on 4/8/2021. Joint Motion for Modification of the Case Schedule 320 is granted. Initial fact discovery now closes on 7/29/2021. See Order for details. Mailed notice (sxw) (Entered: 04/08/2021) |
| 04/09/2021 | 322 | OBJECTIONS by Amazon Web Services, Inc. to order on sealed motion,,,, order on motion to compel,,,,,,,, telephone conference,,,, set deadlines,,, 301 *Pursuant to Rule 72(a)* (Attachments: # 1 Exhibit 1 - 2021-03-25 Letter)(Bernard, Elizabeth) (Entered: 04/09/2021) |
| 04/12/2021 | 323 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Telephone hearing on Defendant's objections to Judge Finnegan's March 24, 2021 order 322 is set for 4/20/2021 at 10:00 a.m. Members of the public and media will be able to call in to listen to this hearing. Instructions and a link to the conference number are located on Judge Pallmeyer's website. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of |

| | | |
|---|---|---|
| | | court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Notice mailed by judge's staff (ntf, ) (Entered: 04/12/2021) |
| 04/12/2021 | 324 | REFUND PROCESSED re *motion for leave to appear pro hac vice A. Haley filing fee $150* 306 *Kove IO, Inc. v. Amazon Web Services, Inc.* (Amount of $150.00, receipt no. 0752-18073505). (sm, ) (Entered: 04/12/2021) |
| 04/12/2021 | 325 | MOTION by Plaintiff Kove IO, Inc. for leave to file *Respond to AWS's Objection to March 24, 2021 Oral Order (Unopposed)* (Hoang, Khue) (Entered: 04/12/2021) |
| 04/14/2021 | 326 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff's unopposed motion for leave to respond to AWS's Objection to March 24, 2021 Oral Order 325 is granted as follows: Plaintiff's response shall be filed by 4/15/2021. Defendant's reply in support shall be filed by 4/19/2021. Notice mailed by judge's staff (ntf, ) (Entered: 04/14/2021) |
| 04/15/2021 | 327 | MOTION by Plaintiff Kove IO, Inc. to seal *Exhibits B to D to the Declaration of John Overton* (Cardenas-Navia, Jaime) (Entered: 04/15/2021) |
| 04/15/2021 | 328 | SEALED DOCUMENT by Plaintiff Kove IO, Inc. *Declaration of John Overton re MINUTE entry before the Honorable Sheila M. Finnegan: Telephone motion hearing held on 3/30/2021 (Dkt. No. 305)* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Cardenas-Navia, Jaime) (Entered: 04/15/2021) |
| 04/15/2021 | 329 | DECLARATION of John Overton regarding order on sealed motion,,, order on motion for miscellaneous relief,,, motion hearing,, 305 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Cardenas-Navia, Jaime) (Entered: 04/15/2021) |
| 04/15/2021 | 330 | MOTION by Plaintiff Kove IO, Inc. to seal *Response To Amazon Web Services, Inc. Objection to March 24, 2021 Oral Order and Exhibits 1 and 2 to Response* (Hoang, Khue) (Entered: 04/15/2021) |
| 04/15/2021 | 331 | SEALED RESPONSE by Kove IO, Inc. to objections, 322 *Response to Amazon Web Services, Inc. Objection to March 24, 2021 Oral Order* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Hoang, Khue) (Entered: 04/15/2021) |
| 04/15/2021 | 332 | RESPONSE by Plaintiff Kove IO, Inc. to objections, 322 *Response to Amazon Web Services, Inc. Objection to March 24, 2021 Oral Order (Public Redacted Version)* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Hoang, Khue) (Entered: 04/15/2021) |
| 04/16/2021 | 333 | MINUTE entry before the Honorable Sheila M. Finnegan: Plaintiff's motion for leave to file exhibits B - D to the Declaration of John Overton 327 is granted.Mailed notice (sxw, ) (Entered: 04/16/2021) |
| 04/19/2021 | 334 | REPLY by Counter Claimant Amazon Web Services, Inc., Defendant Amazon Web Services, Inc. to objections, 322 (Sigler, R.) (Entered: 04/19/2021) |
| 04/20/2021 | 335 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Telephone status hearing held. Plaintiff's motion for leave to file response and exhibits under seal 330 is granted. Defendant AWS's Rule 72(A) objection to Magistrate Judge Finnegan's March 24, 2021 order 322 is overruled, provided, however, that the deposition concerning Glacier products is limited to 2 hours. Notice mailed by judge's staff (ntf, ) (Entered: 04/20/2021) |
| 04/23/2021 | 336 | TRANSCRIPT OF PROCEEDINGS held on 4/20/21 before the Honorable Rebecca R. Pallmeyer. Order Number: 40579. Court Reporter Contact Information: Frances Ward - wardofficialtranscripts@gmail.com - (312)435-5561. |

| | | |
|---|---|---|
| | | IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.<br><br>Redaction Request due 5/14/2021. Redacted Transcript Deadline set for 5/24/2021. Release of Transcript Restriction set for 7/22/2021. (Ward, Frances) (Entered: 04/23/2021) |
| 05/05/2021 | 337 | MOTION by Counter Claimant Amazon Web Services, Inc., Defendant Amazon Web Services, Inc. to seal *Joint Status Report* (Bernard, Elizabeth) (Entered: 05/05/2021) |
| 05/05/2021 | 338 | SEALED DOCUMENT by Counter Claimant Amazon Web Services, Inc., Defendant Amazon Web Services, Inc. *Sealed Joint Status Report* (Bernard, Elizabeth) (Entered: 05/05/2021) |
| 05/05/2021 | 339 | STATUS Report *Public (Joint)* by Amazon Web Services, Inc. (Bernard, Elizabeth) (Entered: 05/05/2021) |
| 05/05/2021 | 340 | MINUTE entry before the Honorable Sheila M. Finnegan: Motion to Seal Joint Status Report 337 is granted. Mailed notice (sxw) (Entered: 05/05/2021) |
| 05/05/2021 | 341 | MINUTE entry before the Honorable Sheila M. Finnegan: Magistrate Judge telephone status hearing held on 5/5/2021 and continued to 5/28/2021 at 11:00 a.m. The parties report there are no issues pertaining to the production of wiki materials or other topics that require the Court's assistance at this time. The parties have complied with recent discovery orders. By 5/27/2021, the parties are to file a joint status report with update on production of wiki materials and other discovery. They should also indicate whether the status hearing on 5/28/2021 is necessary. If not, they may propose a new date. The toll-free number for the hearing is 877-336-1831, access code 5995354. Persons granted remote access to proceedings are reminded of the prohibition against recording and rebroadcasting of court proceedings. Violation of the prohibition may result in sanctions. Mailed notice (sxw) (Entered: 05/05/2021) |
| 05/27/2021 | 342 | STATUS Report *[Joint]* by Amazon Web Services, Inc. (Bernard, Elizabeth) (Entered: 05/27/2021) |
| 05/28/2021 | 343 | MINUTE entry before the Honorable Sheila M. Finnegan: The Court has reviewed the 5/27/2021 joint status report. At the parties' request, the telephone status hearing on 5/28/2021 is cancelled as unnecessary. If the Court requires argument on the remaining motion (Kove's Motion to Compel Financial Documents (Dkt. 212)), it will schedule a hearing. Parties are to file an updated joint status report by 6/24/2021. Mailed notice (sxw) (Entered: 05/28/2021) |
| 06/07/2021 | 344 | MOTION by Attorney Rahul Sarkar to withdraw as attorney for Kove IO, Inc.. No party information provided (Hoang, Khue) (Entered: 06/07/2021) |
| 06/07/2021 | 345 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-18324499. (Mauze, Taylor) (Entered: 06/07/2021) |
| 06/08/2021 | 346 | MINUTE entry before the Honorable Rebecca R. Pallmeyer:Attorney, Rahul Sarkar's motion to withdraw as attorney for Kove IO, Inc. 344 is granted. Attorney, Taylor Mauze's motion for leave to appear pro hac vice 345 is granted. Attorney, Taylor Mauze shall electronically file his appearance forthwith. (rbf, ) (Entered: 06/08/2021) |

| | | |
|---|---|---|
| 06/14/2021 | 347 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Taylor Mauze (Mauze, Taylor) (Entered: 06/14/2021) |
| 06/24/2021 | 348 | STATUS Report *(Joint)* by Amazon Web Services, Inc. (Sigler, R.) (Entered: 06/24/2021) |
| 06/25/2021 | 349 | MINUTE entry before the Honorable Sheila M. Finnegan: The Court has reviewed the joint status report dated 6/24/2021, indicating (in part) that Defendant's production of the Wikis is now complete, but there are new discovery disputes that may require the Court's assistance. By agreement and for the reasons stated in the JSR, the close of initial fact discovery is extended to 8/30/2021. The parties are to file an updated JSR by 7/30/2021, including proposed briefing schedules for unresolved discovery disputes if the disputes have not been resolved and motions have not yet been filed. Mailed notice (sxw) (Entered: 06/25/2021) |
| 06/25/2021 | 350 | MOTION by Plaintiff Kove IO, Inc. to seal *Motion to Compel Discovery and Exhibits* (Hoang, Khue) (Entered: 06/25/2021) |
| 06/25/2021 | 351 | SEALED MOTION by Plaintiff Kove IO, Inc. *Motion to Compel Discovery A. Jassy* (Attachments: # 1 Declaration of T. Mauze, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25)(Hoang, Khue) (Entered: 06/25/2021) |
| 06/25/2021 | 352 | MOTION by Plaintiff Kove IO, Inc. to compel *Discovery of A. Jassy (Public Redacted Version)* (Attachments: # 1 Declaration of T. Mauze, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25)(Hoang, Khue) (Entered: 06/25/2021) |
| 06/28/2021 | 353 | MINUTE entry before the Honorable Sheila M. Finnegan: Plaintiff Kove IO, Inc.'s Motion for Leave to File Motion and Exhibits Under Seal 350 is granted. The following briefing schedule is set as to Kove IO, Inc.'s Motion to Compel Discovery of Andrew Jassy [351, 352]: Response is due by 7/12/2021 and reply is due by 7/21/2021. Mailed notice (sxw) (Entered: 06/28/2021) |
| 06/28/2021 | 354 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court has reviewed Kove's motion for clarification 294 and observes that its understanding of the February 19 ruling 284 is consistent with Kove's: that is, after reviewing the parties' briefs on AWS's motion to compel amendment 173 , the court concluded that Kove had identified requested information in its Final Infringement Contentions. Kove is bound by the explanations in its response brief 182 , but so long as the information at issue appears in the final contentions, Kove is not limited to the specific evidence identified in the brief. Kove's Second Amended Final Infringement Contentions remain in effect (requiring good cause to amend). The court would not in any event have granted "sweeping relief" by way of a minute entry. Notices mailed by judge's staff. (rbf, ) (Entered: 06/28/2021) |
| 06/30/2021 | 355 | MOTION by Defendant Amazon Web Services, Inc. for extension of time to file response/reply as to order on motion to seal,, text entry,, set motion and R&R deadlines/hearings, 353 *Agreed Motion for Modification of Briefing Schedule* (Attachments: # 1 Text of Proposed Order)(Sigler, R.) (Entered: 06/30/2021) |
| 07/01/2021 | 356 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The parties' agreed motion for modification of briefing schedule 355 is granted. AWS's response to Kove's motion to |

| | | |
|---|---|---|
| | | compel discovery [351, 352] shall be filed by 07/19/2021; Kove's reply in support shall be filed by 07/30/2021. Notices mailed by judge's staff. (rbf, ) (Entered: 07/01/2021) |
| 07/07/2021 | 357 | MOTION by Defendant Amazon Web Services, Inc. for extension of time *of Case Schedule (Agreed)* (Attachments: # 1 Text of Proposed Order)(Sigler, R.) (Entered: 07/07/2021) |
| 07/09/2021 | 358 | AMENDED SCHEDULING Order signed by the Honorable Sheila M. Finnegan on 7/9/2021. Joint Motion for Modification of Case Schedule 357 is granted. Initial fact discovery now closes on 9/14/2021. See Order for details.Mailed notice(sxw, ) (Entered: 07/09/2021) |
| 07/14/2021 | 359 | ORDER signed by the Honorable Rebecca R. Pallmeyer: For the reasons discussed below, Plaintiff's motion to compel Defendant to produce financial information 212 is granted. (rbf, ) (Entered: 07/14/2021) |
| 07/19/2021 | 360 | MOTION by Defendant Amazon Web Services, Inc. to seal *AWS's Opposition to Kove's Motion to Compel Discovery of Andrew Jassy* (Sigler, R.) (Entered: 07/19/2021) |
| 07/19/2021 | 361 | SEALED RESPONSE by Amazon Web Services, Inc. to SEALED MOTION by Plaintiff Kove IO, Inc. *Motion to Compel Discovery A. Jassy* 351 (Attachments: # 1 Declaration Sigler Declaration, # 2 Exhibit A - Deposition Notice and Letter, # 3 Exhibit B - Kove 6-16-21 letter, # 4 Exhibit C - Kove 3d Am. Initial Disclosures, # 5 Exhibit D - Model Order, # 6 Exhibit E - Kove 5-21-20 email, # 7 Exhibit F - Kove 8-28-20 letter, # 8 Exhibit G - Kove 10-7-20 search terms, # 9 Exhibit H - Kove 10-12-20 letter, # 10 Exhibit I - Dec. 2020 to Jan. 2021 email chain, # 11 Exhibit J - AWS 1-27-21 letter, # 12 Exhibit K - Kove 2-3-21 letter, # 13 Exhibit L - AWS 2-9-21 letter, # 14 Exhibit M - AWS 1-15-21 letter, # 15 Exhibit N - Vermeulen Tr, # 16 Exhibit O - Kove first 30(b)(6) notice, # 17 Exhibit P - Kove supp 30(b)(6) notices)(Sigler, R.) (Entered: 07/19/2021) |
| 07/19/2021 | 362 | RESPONSE by Amazon Web Services, Inc.in Opposition to SEALED MOTION by Plaintiff Kove IO, Inc. *Motion to Compel Discovery A. Jassy* 351 *Public, Redacted* (Attachments: # 1 Declaration Sigler Declaration, # 2 Exhibit A - deposition notice and letter, # 3 Exhibit B - Kove 6-16-21 letter, # 4 Exhibit C - Kove 3d Am. Initial Disclosures, # 5 Exhibit D - Model Order, # 6 Exhibit E - Kove 5-21-20 email, # 7 Exhibit F - Kove 8-28-20 letter, # 8 Exhibit G - Kove 10-7-20 search terms, # 9 Exhibit H - Kove 10-12-20 letter, # 10 Exhibit I - Ex I - Dec. 2020 to Jan. 2021 email chain, # 11 Exhibit J - AWS 1-27-21 letter, # 12 Exhibit K - Kove 2-3-21 letter, # 13 Exhibit L - AWS 2-9-21 letter, # 14 Exhibit M - AWS 1-15-21 letter, # 15 Exhibit N - Vermeulen Tr, # 16 Exhibit O - Kove first 30(b)(6) notice, # 17 Exhibit P - Kove supp 30(b)(6) notices)(Sigler, R.) (Entered: 07/19/2021) |
| 07/20/2021 | 363 | MINUTE entry before the Honorable Sheila M. Finnegan: Defendant's Motion to Seal AWS's Opposition to Kove's Motion to Compel Discovery of Andrew Jassy 360 is granted. Mailed notice (sxw) (Entered: 07/20/2021) |
| 07/21/2021 | 364 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: By agreement of the parties, Video Claim Construction Hearing set 7/23/2021 at 10:00 a.m. is stricken and re-set to 7/23/2021 at 9:30 a.m. (TIME CHANGE ONLY). Mailed notice (cn). (Entered: 07/21/2021) |
| 07/23/2021 | 365 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Video claim construction hearing held on 07/23/2021. The court will issue a written order with its ruling by mail. Mailed notice. (rbf, ) (Entered: 07/23/2021) |
| 07/30/2021 | 366 | STATUS Report *Joint* by Kove IO, Inc. (Hoang, Khue) (Entered: 07/30/2021) |

| | | |
|---|---|---|
| 07/30/2021 | 367 | MINUTE entry before the Honorable Sheila M. Finnegan: The Court has reviewed the joint status report dated 7/30/2021. By agreement, motions regarding pending discovery disputes are to be filed no later than 8/20/2021, with responses filed within 14 days after the motion is filed, and replies filed within 10 days after the filing of the response. No further replies are permitted absent leave of Court. Mailed notice. (pk, ) Modified on 7/30/2021 (pk, ). (Entered: 07/30/2021) |
| 07/30/2021 | 368 | MOTION by Plaintiff Kove IO, Inc. to seal *Reply in support of Motion to Compel Discovery* (Hoang, Khue) (Entered: 07/30/2021) |
| 07/30/2021 | 369 | SEALED REPLY by Kove IO, Inc. to MOTION by Plaintiff Kove IO, Inc. to seal *Reply in support of Motion to Compel Discovery* 368 (Hoang, Khue) (Entered: 07/30/2021) |
| 07/30/2021 | 370 | REPLY by Kove IO, Inc. to sealed response,,, 361 , response in opposition to motion,,, 362 (Hoang, Khue) (Entered: 07/30/2021) |
| 08/02/2021 | 371 | MINUTE entry before the Honorable Sheila M. Finnegan: Plaintiff Kove IO, Inc.'s Motion for Leave to File Reply Under Seal 368 is granted. Mailed notice (sxw) (Entered: 08/02/2021) |
| 08/05/2021 | 372 | MINUTE entry before the Honorable Sheila M. Finnegan: The parties are to file an updated Joint Status Report by 9/13/2021. Mailed notice (sxw) (Entered: 08/05/2021) |
| 08/07/2021 | 373 | MOTION by Plaintiff Kove IO, Inc. to seal *Plaintiff Kove IO, Inc.'s Motion for Leave to File Motion and Exhibits* (Hoang, Khue) (Entered: 08/07/2021) |
| 08/07/2021 | 374 | SEALED MOTION by Plaintiff Kove IO, Inc. *for Unopposed Motion for Leave to File Addendum to Reply ISO Motion to Compel Jassy* (Attachments: # 1 Exhibit A - Addendum to Reply ISO Mtn Compel Jassy, # 2 Exhibit B - Decl. of T. Mauze ISO Addendum to Reply to Motion to Compel Jassy, # 3 Exhibit C - Rought Depo Transcript J. Barr)(Hoang, Khue) (Entered: 08/07/2021) |
| 08/07/2021 | 375 | MOTION by Plaintiff Kove IO, Inc. for leave to file *Addendum in Support of Reply in Support of Motion to Compel Discovery of Andrew Jassy* (Attachments: # 1 Exhibit A - [REDACTED VERSION] Addendum to Reply ISO Mtn Compel Jassy, # 2 Exhibit B - Decl. of T. Mauze ISO Addendum to Reply to Motion to Compel Jassy, # 3 Exhibit C - [REDACTED VERSION] Rought Depo Transcript J. Barr)(Hoang, Khue) (Entered: 08/07/2021) |
| 08/09/2021 | 376 | MINUTE entry before the Honorable Sheila M. Finnegan: Plaintiff Kove IO, Inc.'s Motion for Leave to File Motion and Exhibits Under Seal 373 is granted. Mailed notice (sxw) (Entered: 08/09/2021) |
| 08/09/2021 | 377 | MINUTE entry before the Honorable Sheila M. Finnegan: Kove IO, Inc.'s Unopposed Motion for Leave to File Addendum in Support of Reply in Support of Motion to Compel Discovery of Andrew Jessy [374, 375] is granted. By agreement, defendant is granted leave to file a sur-reply (2 page limit) to plaintiff's addendum by 8/16/2021.Mailed notice (sxw, ) (Entered: 08/09/2021) |
| 08/10/2021 | 378 | MOTION by Plaintiff Kove IO, Inc. to seal *Addendum in Support of Reply in Support of Motion to Compel Discovery of Andrew Jassy* (Mariotti, Renato) (Entered: 08/10/2021) |
| 08/10/2021 | 379 | SEALED DOCUMENT by Plaintiff Kove IO, Inc. *Addendum in Support of Reply in Support of Motion to Compel Discovery of Andrew Jassy* (Attachments: # 1 Exhibit B, # 2 Exhibit C)(Mariotti, Renato) (Entered: 08/10/2021) |

| | | |
|---|---|---|
| 08/10/2021 | 380 | Addendum by Kove IO, Inc. *Addendum in Support of Reply in Support of Motion to Compel Discovery of Andrew Jassy (Public Redacted Version)"* (Attachments: # 1 Exhibit B, # 2 Exhibit C)(Mariotti, Renato) (Entered: 08/10/2021) |
| 08/11/2021 | 381 | MINUTE entry before the Honorable Sheila M. Finnegan: Plaintiff Kove IO, Inc.'s Motion for Leave to File Motion and Exhibit Under Seal 378 is granted. Mailed notice (sxw) (Entered: 08/11/2021) |
| 08/11/2021 | 382 | Joint Claim Construction Chart (Updated) by Amazon Web Services, Inc. (Sigler, R.) (Entered: 08/11/2021) |
| 08/16/2021 | 383 | MOTION by Defendant Amazon Web Services, Inc. to seal *Sur-Reply to Addendum In Support of Reply* (Sigler, R.) (Entered: 08/16/2021) |
| 08/16/2021 | 384 | SEALED DOCUMENT by Defendant Amazon Web Services, Inc. *Sur-Reply to Addendum In Support of Reply* (Attachments: # 1 Exhibit AWS's 3rd Amended Initial Disclosures, # 2 Exhibit Kove's 7th 30(b)(6) Notice, # 3 Exhibit J. Barr Tr. Excerpts)(Sigler, R.) (Entered: 08/16/2021) |
| 08/16/2021 | 385 | Addendum by Amazon Web Services, Inc. *Sur-Reply to Addendum In Support of Reply* (Attachments: # 1 Exhibit Q - AWS's 3rd Amended Initial Disclosures, # 2 Exhibit R - Kove's 7th 30(b)(6) Notice, # 3 Exhibit S - J. Barr Tr. Excerpts)(Sigler, R.) (Entered: 08/16/2021) |
| 08/17/2021 | 386 | MINUTE entry before the Honorable Sheila M. Finnegan: Motion to Seal AWS's Sur-Reply to Kove's Addendum in Support of Reply 383 is granted. Mailed notice (sxw) (Entered: 08/17/2021) |
| 08/17/2021 | 387 | Motion by Kove IO, Inc. *Modification of Case Schedule (Joint)* (Attachments: # 1 Text of Proposed Order)(Hoang, Khue) (Entered: 08/17/2021) |
| 08/17/2021 | 388 | MINUTE entry before the Honorable Sheila M. Finnegan: Joint motion for modification of Case Schedule 387 is granted. By agreement, the case schedule is modified as follows: (1) the deadline to file motions regarding pending discovery disputes is extended to 9/2/2021. Responses are to be filed within fourteen (14) days after the opening motion is filed. Replies are to be filed within ten (10) days from the date the Response is filed. No further replies are permitted absent leave of Court; and (2) the deadline for the Close of Initial Fact Discovery is extended to 11/19/2021. In addition, to streamline the remaining discovery, the Court orders that the parties shall work cooperatively to expeditiously schedule and complete outstanding noticed depositions, including identifying designees and corresponding topics for 30(b)(6) depositions at least 10 days prior to their scheduled depositions. Mailed notice (sxw, ) (Entered: 08/17/2021) |
| 08/31/2021 | 389 | Agreed Motion to Extend Deadline by Kove IO, Inc. (Attachments: # 1 Text of Proposed Order)(Hoang, Khue) (Entered: 08/31/2021) |
| 08/31/2021 | | AGREED MOTION for extension of deadline. (sxw, ) (Entered: 08/31/2021) |
| 08/31/2021 | 390 | ORDER signed by the Honorable Sheila M. Finnegan on 8/31/2021. The parties' Agreed Motion to Extend Deadline 389 is granted. The deadline for motions regarding pending discovery disputes is extended to 9/9/2021. The parties will confer on an appropriate schedule for response and reply briefs, and shall submit a proposed schedule to the Court by 9/14/2021 at chambers_finnegan@ilnd.uscourtrs.gov.Mailed notice(sxw, ) (Entered: 08/31/2021) |
| 09/03/2021 | 391 | MOTION by Defendant Amazon Web Services, Inc. to seal *AWS's Motion to Compel Sufficient Time to Depose John K. Overton and Non-email ESI Documents and Attached Exhibits* (Sigler, R.) (Entered: 09/03/2021) |

| | | |
|---|---|---|
| 09/03/2021 | 392 | SEALED MOTION by Defendant Amazon Web Services, Inc. *to Compel Sufficient Time to Depose John K. Overton and Non-email ESI Documents* (Attachments: # 1 Declaration of R. Sigler, # 2 Exhibit A - Kove 2d Am Response Rogs 15-16, # 3 Exhibit B - Kove Response Rogs 22-25 (excerpt), # 4 Exhibit C - 2-12-20 AWS 30(b)(6) Notice, # 5 Exhibit D - 6-10-20 AWS 30(b)(6) Notice, # 6 Exhibit E - 5-20-21 AWS 30(b)(6) Notice, # 7 Exhibit F - 6-16-21 email chain, # 8 Exhibit G - AWS 7-27-21 letter, # 9 Exhibit H - 8-13-21 email chain, # 10 Exhibit I - Kove 6-16-21 letter, # 11 Exhibit J - AWS 6-30-21 letter, # 12 Exhibit K - AWS 7-19-21 letter, # 13 Exhibit L - Connolly Deposition Transcript Excerpt)(Sigler, R.) (Entered: 09/03/2021) |
| 09/03/2021 | 393 | MOTION by Defendant Amazon Web Services, Inc. to compel *Sufficient Time to Depose John K. Overton and Non-email ESI Documents* (Attachments: # 1 Declaration of R. Sigler, # 2 Exhibit A - Kove 2d Am Response Rogs 15-16, # 3 Exhibit B - Kove Response Rogs 22-25 (excerpt), # 4 Exhibit C - 2-12-20 AWS 30(b)(6) Notice, # 5 Exhibit D - 6-10-20 AWS 30(b)(6) Notice, # 6 Exhibit E - 5-20-21 AWS 30(b)(6) Notice, # 7 Exhibit F - 6-16-21 email chain, # 8 Exhibit G - AWS 7-27-21 letter, # 9 Exhibit H - 8-13-21 email chain, # 10 Exhibit I - Kove 6-16-21 letter, # 11 Exhibit J - AWS 6-30-21 letter, # 12 Exhibit K - AWS 7-19-21 letter, # 13 Exhibit L - Connolly Deposition Transcript Excerpt)(Sigler, R.) (Entered: 09/03/2021) |
| 09/03/2021 | 394 | MINUTE entry before the Honorable Sheila M. Finnegan: Motion to Seal AWS's Motion to Compel Sufficient Time to Depose John K. Overton and Non-Email ESI Documents and Attached Exhibits 391 is granted. Mailed notice (sxw) (Entered: 09/03/2021) |
| 09/08/2021 | 395 | MINUTE entry before the Honorable Sheila M. Finnegan: By agreement, the following briefing schedule is set on AWS's Motion to Compel Sufficient Time to Depose John K. Overton and Non-Email ESI Documents 393 : Plaintiff's response is due by 9/20/2021 and Defendant's reply is due by 9/29/2021. Mailed notice (sxw) (Entered: 09/08/2021) |
| 09/09/2021 | 396 | MOTION by Defendant Amazon Web Services, Inc. to seal *AWS's Motion for Protective Order and Exhibits Thereto* (Sigler, R.) (Entered: 09/09/2021) |
| 09/09/2021 | 397 | SEALED MOTION by Defendant Amazon Web Services, Inc. *for Protective Order* (Attachments: # 1 Declaration Of R. Sigler, # 2 Exhibit A - Kove's 10th Set of RFP's, # 3 Exhibit B - Kove's 7th 30(b)(6) Notice, # 4 Exhibit C - Kove's 9th Set of RFP's, # 5 Exhibit D - Objections to 7th 30(b)(6) Notice, # 6 Exhibit E - Objections to 9th Set of RFP's, # 7 Exhibit F - Objections to 6th 30(b)(6) Notice, # 8 Exhibit G - Aug. 27 Letter from AWS to Kove, # 9 Exhibit H - Kove's 1st 30(b)(6) Notice, # 10 Exhibit I - Objections to 8th Set of RFP's, # 11 Exhibit J - Dep. Tr. of J. Barr, # 12 Exhibit K - Dep. Tr. of A. Vermeulen, # 13 Exhibit L - Kove's Second Amended Response to Interrogatory No. 7, # 14 Exhibit M - AWS's Third Supplemental Rog Responses, # 15 Exhibit N - Objections to Kove's 5th 30(b)(6) Notice)(Sigler, R.) (Entered: 09/09/2021) |
| 09/09/2021 | 398 | MOTION by Defendant Amazon Web Services, Inc. for protective order (Attachments: # 1 Declaration Of R. Sigler, # 2 Exhibit A - Sealed Exhibit, # 3 Exhibit B - Sealed Exhibit, # 4 Exhibit C - Sealed Exhibit, # 5 Exhibit D - Sealed Exhibit, # 6 Exhibit E - Sealed Exhibit, # 7 Exhibit F - Sealed Exhibit, # 8 Exhibit G - Sealed Exhibit, # 9 Exhibit H - Sealed Exhibit, # 10 Exhibit I - Sealed Exhibit, # 11 Exhibit J - Sealed Exhibit, # 12 Exhibit K - Sealed Exhibit, # 13 Exhibit L -Sealed Exhibit, # 14 Exhibit M - Sealed Exhibit, # 15 Exhibit N - Objections to Kove's 5th 30(b)(6) Notice)(Sigler, R.) (Entered: 09/09/2021) |
| 09/09/2021 | 399 | MOTION by Plaintiff Kove IO, Inc. to seal *Motion for Protective Order Regarding Discovery into Litigation Funding* (Hoang, Khue) (Entered: 09/09/2021) |
| 09/09/2021 | 400 | SEALED MOTION by Plaintiff Kove IO, Inc. *for Protective Order Regarding Discovery into Litigation Funding* (Attachments: # 1 Declaration of Karlanna M. Lewis, # 2 Exhibit |

| | | |
|---|---|---|
| | | A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F)(Hoang, Khue) (Entered: 09/09/2021) |
| 09/09/2021 | 401 | MOTION by Plaintiff Kove IO, Inc. for protective order *regarding discovery into litigation funding (Public Redacted Version)* (Attachments: # 1 Declaration of Karlanna M. Lewis, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F)(Hoang, Khue) (Entered: 09/09/2021) |
| 09/09/2021 | 402 | MOTION by Plaintiff Kove IO, Inc. to seal *Motion to Enforce Compliance with Court Order and to Compel Various Discovery* (Hoang, Khue) (Entered: 09/09/2021) |
| 09/09/2021 | 403 | SEALED MOTION by Plaintiff Kove IO, Inc. *to Enforce Compliance with Court Order and to Compel Various Discovery* (Attachments: # 1 Declaration of Taylor N. Mauze, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20)(Hoang, Khue) (Entered: 09/09/2021) |
| 09/09/2021 | 404 | MOTION by Plaintiff Kove IO, Inc. to seal document *Motion to Compel Amazon Web Services to Produce Information Regarding Usage, Financial, And Hypothetical Negotiation Data* (Cardenas-Navia, Jaime) (Entered: 09/09/2021) |
| 09/09/2021 | 405 | SEALED MOTION by Plaintiff Kove IO, Inc. *Kove's Motion to Compel Amazon Web Services to Produce Information Regarding Usage, Financial, And Hypothetical Negotiation Data.* (Attachments: # 1 Declaration of T. Mauze, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Errata, # 34  Exhibit, # 35 Exhibit, # 36 Exhibit, # 37 Exhibit, # 38 Exhibit, # 39 Exhibit, # 40 Notice of Filing, # 41 Exhibit, # 42 Exhibit, # 43 Exhibit, # 44 Exhibit, # 45 Exhibit)(Cardenas-Navia, Jaime) (Entered: 09/10/2021) |
| 09/10/2021 | 406 | MOTION by Plaintiff Kove IO, Inc. to compel *Compel Amazon Web Services to Produce Information Regarding Usage, Financial, And Hypothetical Negotiation Data.* (Attachments: # 1 Declaration T. Mauze, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Exhibit, # 34 Exhibit, # 35 Exhibit, # 36 Exhibit, # 37 Exhibit, # 38 Exhibit, # 39 Exhibit, # 40 Exhibit, # 41 Exhibit, # 42 Exhibit, # 43 Exhibit, # 44 Exhibit, # 45 Exhibit)(Cardenas-Navia, Jaime) (Entered: 09/10/2021) |
| 09/10/2021 | 407 | MOTION by Plaintiff Kove IO, Inc.to Enforce Compliance with Court Order and to Compel Various Discovery *(Public Redacted Version)* (Attachments: # 1 Declaration of Taylor N. Mauze, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20)(Hoang, Khue) (Entered: 09/10/2021) |
| 09/10/2021 | 408 | MOTION by Plaintiff Kove IO, Inc. to seal document *Motion to Compel Hardware, Metrics, & Predecessor Product Information* (Cardenas-Navia, Jaime) (Entered: 09/10/2021) |

| | | |
|---|---|---|
| 09/10/2021 | 409 | SEALED MOTION by Plaintiff Kove IO, Inc. *Motion to Compel Hardware, Metrics, & Predecessor Product Information* (Attachments: # 1 Declaration of T. Mauze, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34, # 36 Exhibit 35)(Cardenas-Navia, Jaime) (Entered: 09/10/2021) |
| 09/10/2021 | 410 | MOTION by Plaintiff Kove IO, Inc. to compel *Hardware, Metrics, & Predecessor Product Information* (Attachments: # 1 Declaration T. Mauze, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34, # 36 Exhibit 35)(Cardenas-Navia, Jaime) (Entered: 09/10/2021) |
| 09/10/2021 | 411 | MOTION by Plaintiff Kove IO, Inc. for leave to file excess pages *in Briefing of Motion to Compel Amazon Web Services to Produce Information Regarding Usage, Financial, and Hypothetical Negotiation Data, Unopposed* (Hoang, Khue) (Entered: 09/10/2021) |
| 09/10/2021 | 412 | MINUTE entry before the Honorable Sheila M. Finnegan: The Court issues the following rulings: (1) Motion to Seal AWS's Motion for Protective Order Regarding 30(b)(6) Topic Nos. 84-85 and 87-88 and Requests for Production Nos. 219-21 and 223 396 is granted; (2) Plaintiff Kove IO, Inc.'s Motion for Leave to File Motion and Exhibit Under Seal 399 is granted; (3) Plaintiff Kove IO, Inc.'s Motion for Leave to File Motion and Exhibit Under Seal 402 is granted; (4) Plaintiff Kove IO, Inc.'s Motion for Leave to File Motion and Exhibit Under Seal 404 is granted; (5) Plaintiff Kove IO, Inc.'s Motion for Leave to File Motion and Exhibits Under Seal 408 is granted; (6) Kove IO, Inc.'s Unopposed Motion for Leave for Excess Pages in Briefing of Motion to Compel Amazon Web Services to Produce Information Regarding Usage, Financial, and Hypothetical Negotiation Data 411 is granted. Mailed notice (sxw) (Entered: 09/10/2021) |
| 09/10/2021 | 413 | MOTION by Plaintiff Kove IO, Inc. for extension of time to file *Motion To Compel Hardware, Metrics, & Predecessor Product Information, Unopposed* (Hoang, Khue) (Entered: 09/10/2021) |
| 09/13/2021 | 414 | Agreed Motion to Combine Joint Status Report with Proposed Briefing Schedule by Kove IO, Inc. (Hoang, Khue) (Entered: 09/13/2021) |
| 09/13/2021 | 415 | MINUTE entry before the Honorable Sheila M. Finnegan: Kove IO, Inc.'s Unopposed Motion to Deem Its Motion to Compel Hardware, Metrics, & Predecessor Product Information Timely Filed 413 is granted. Additionally, the Agreed Motion to Combine Joint Status Report with Proposed Briefing Schedule 414 is granted. By 9/14/2021, the parties are to file the updated joint status report that includes their combined proposed briefing schedule in connection with their pending discovery motions. Mailed notice (sxw) (Entered: 09/13/2021) |
| 09/14/2021 | 416 | STATUS Report *Joint* by Kove IO, Inc. (Attachments: # 1 Proposed Order)(Hoang, Khue) (Entered: 09/14/2021) |
| 09/17/2021 | 417 | MINUTE entry before the Honorable Sheila M. Finnegan: The Court has reviewed the joint status report of 9/14/2021. The Court grants the parties' request to coalesce briefing deadlines for all pending discovery motions on the schedule below, and to file a further |

| | | |
|---|---|---|
| | | joint status report by 10/29/2021. Responses to the following discovery motions are due by 10/7/2021, and replies are due by 10/28/2021: AWS's Motion to Compel Sufficient Time to Depose John K. Overton and Non-Email ESI Documents 393 ; AWS's motion for protective order regarding 30(b)(6) topic nos. 84-85 and 87-88 and requests for production nos. 219-21 and 223-26 [397, 398]; Kove IO Inc's motion for protective order regarding discovery into litigation financing [400, 401]; Kove IO Inc's motion to enforce compliance with court order and to compel various discovery [403, 407]; Kove's motion to compel AWS to produce information regarding usage, financial, and hypothetical negotiation data [405, 406]; and Kove IO Inc's motion to compel hardware, metrics & predecessor product information [409, 410]. Mailed notice (sxw) (Entered: 09/17/2021) |
| 09/17/2021 | 418 | ORDER signed by the Honorable Rebecca R. Pallmeyer: For the reasons discussed below, Plaintiff's motion to strike Defendant's invalidity contentions 200 is granted in part and denied in part, and Defendant's motion to amend its invalidity contentions 216 , by adding additional detail to its claim charts, is granted. (rbf, ) (Entered: 09/17/2021) |
| 09/24/2021 | 419 | MOTION by Defendant Amazon Web Services, Inc. to withdraw *Appearance of Elizabeth Bernard* (Sigler, R.) (Entered: 09/24/2021) |
| 09/27/2021 | 420 | MINUTE entry before the Honorable Rebecca R. Pallmeyer:Motion by defendant, Amazon Web Services, Inc. to withdraw appearance of Elizabeth Bernard 419 is granted. (rbf, ) (Entered: 09/27/2021) |
| 10/07/2021 | 421 | MOTION by Defendant Amazon Web Services, Inc. to seal *Opposition To Kove's Motion To Compel Production Of Information Regarding Usage, Financial, and Hypothetical Negotiation Data* (Sigler, R.) (Entered: 10/07/2021) |
| 10/07/2021 | 422 | SEALED DOCUMENT by Defendant Amazon Web Services, Inc. *Opposition To Kove's Motion To Compel Production Of Information Regarding Usage, Financial, and Hypothetical Negotiation Data* (Attachments: # 1 Declaration of C. Perumal, # 2 Declaration of R. William Sigler, # 3 Exhibit A - AMZ_KOVE_000065597, # 4 Exhibit B - AMZ_KOVE_000075781, # 5 Exhibit C - AMZ_KOVE_000087409, # 6 Exhibit D - AMZ_KOVE_000081659, # 7 Exhibit E - AMZ_KOVE_000087330, # 8 Exhibit F - AMZ_KOVE_000065650, # 9 Exhibit G - AMZ_KOVE_000081692, # 10 Exhibit H - AMZ_KOVE_000087408, # 11 Exhibit I - AMZ_KOVE_000463919, # 12 Exhibit J - AMZ_KOVE_000469322, # 13 Exhibit K - AMZ_KOVE_000463917, # 14 Exhibit L - AMZ_KOVE_000467853, # 15 Exhibit M - AMZ_KOVE_000467856, # 16 Exhibit N - AMZ_KOVE_000467855, # 17 Exhibit O - AWS's Supplemental Response to Kove's 7th Set of Interrogatories (Rog 22), # 18 Exhibit P - AWS's Third Supp. Response to First Set of Interrogatories (1-6) (Excerpted), # 19 Exhibit Q - AMZ_KOVE_000468059, # 20 Exhibit R - 2021-09-02 J. Saltman to A. Adler Response to August 31 Letter re Meet and Confer, # 21 Exhibit S - 2021-08-20 Letter from T. Mauze to AWS re Outstanding Discovery Issues, # 22 Exhibit T - 2021-08-27 E. Bernard to A. Adler re Today's Meet and Confer, # 23 Exhibit U - 2021-08-31 A. Adler Letter Re Aug 27 Meet and Confer, # 24 Exhibit V - Kove's First Set of RFPs, # 25 Exhibit W - AMZ_KOVE_000429830, # 26 Exhibit X - AMZ_KOVE_000429864, # 27 Exhibit Y - Kove's 6th Set of RFPs to AWS [134-183], # 28 Exhibit Z - Dkt. No. 55 in Fellowes, Inc. v. Aurora Corp. of Am., Case No. 07 C 7237 (N.D. Ill.))(Sigler, R.) (Entered: 10/07/2021) |
| 10/07/2021 | 423 | RESPONSE by Amazon Web Services, Inc.in Opposition to SEALED MOTION by Plaintiff Kove IO, Inc. *Kove's Motion to Compel Amazon Web Services to Produce Information Regarding Usage, Financial, And Hypothetical Negotiation Data.* 405 (Attachments: # 1 Declaration of R. William Sigler, # 2 Exhibit A - Filed Under Seal, # 3 Exhibit B - Filed Under Seal, # 4 Exhibit C - Filed Under Seal, # 5 Exhibit D - Filed Under Seal, # 6 Exhibit E - Filed Under Seal, # 7 Exhibit F - Filed Under Seal, # 8 Exhibit G - Filed Under Seal, # 9 Exhibit H - Filed Under Seal, # 10 Exhibit I - Filed |

| | | |
|---|---|---|
| | | Under Seal, # 11 Exhibit J - Filed Under Seal, # 12 Exhibit K - Filed Under Seal, # 13 Exhibit L - Filed Under Seal, # 14 Exhibit M - Filed Under Seal, # 15 Exhibit N - Filed Under Seal, # 16 Exhibit O - Filed Under Seal, # 17 Exhibit P - Filed Under Seal, # 18  Exhibit Q - Filed Under Seal, # 19 Exhibit R - Filed Under Seal, # 20 Exhibit S - Filed Under Seal, # 21 Exhibit T - Filed Under Seal, # 22 Exhibit U - Filed Under Seal, # 23  Exhibit V - Kove's First Set of RFPs, # 24 Exhibit W - Filed Under Seal, # 25 Exhibit X - Filed Under Seal, # 26 Exhibit Y - Filed Under Seal, # 27 Exhibit Z - Dkt. No. 55 in Fellowes, Inc. v. Aurora Corp. of Am., Case No. 07 C 7237 (N.D. Ill.))(Sigler, R.) (Entered: 10/07/2021) |
| 10/07/2021 | 424 | MOTION by Defendant Amazon Web Services, Inc. to seal *Opposition to Kove's Motion for Protective Order Regarding Discovery Into Litigation Financing* (Sigler, R.) (Entered: 10/07/2021) |
| 10/07/2021 | 425 | SEALED RESPONSE by Amazon Web Services, Inc. to MOTION by Plaintiff Kove IO, Inc. for protective order *regarding discovery into litigation funding (Public Redacted Version)* 401 (Attachments: # 1 Declaration of R. William Sigler, # 2 Exhibit A - 2020-11-09 Cardenas-Navia email RE Kove v AWS - Letter re Motion to Compel)(Sigler, R.) (Entered: 10/07/2021) |
| 10/07/2021 | 426 | RESPONSE by Amazon Web Services, Inc.in Opposition to MOTION by Plaintiff Kove IO, Inc. for protective order *regarding discovery into litigation funding (Public Redacted Version)* 401 (Attachments: # 1 Declaration of R. William Sigler, # 2 Exhibit A - Filed Under Seal)(Sigler, R.) (Entered: 10/07/2021) |
| 10/07/2021 | 427 | MOTION by Defendant Amazon Web Services, Inc. to seal *AWS's Opposition to Kove's Motion to Compel Hardware, Metrics, & Predecessor Product Information (Dkt. No. 409)* (Sigler, R.) (Entered: 10/07/2021) |
| 10/07/2021 | 428 | SEALED RESPONSE by Amazon Web Services, Inc. to SEALED MOTION by Plaintiff Kove IO, Inc. *Motion to Compel Hardware, Metrics, & Predecessor Product Information* 409 (Attachments: # 1 Declaration of R. Sigler, # 2 Exhibit A - AMZ_KOVE_000463912 - DynamoDB Profit and Loss Statement, # 3 Exhibit B - AMZ_KOVE_000463920 - S3 Global Profit and Loss Statement, # 4 Exhibit C - AWS's Supplemental Response to Kove's 7th Set of Interrogatories (Rog 22), # 5 Exhibit D - Walsh Transcript Excerpts, # 6 Exhibit E - AMZ_KOVE_000390559 - DynamoDB Request Rates per Region Over Daily Intervals, # 7 Exhibit F - 2020-10-15 Kove Letter M. Marvin to T. Barron re 10-8 Meet and Confer, # 8 Exhibit G - 2021-01-15 E. Bernard to J. Cardenas-Navia Discovery Letter, # 9 Exhibit H - 2021-01-29 E. Bernard to J. Cardenas-Navia Discovery Letter, # 10 Exhibit I - 2021-02-19 E. Bernard to J. Cardenas-Navia Discovery Letter, # 11 Exhibit J - 2021-08-20 E. Bernard to T. Mauze re Rog 14, # 12 Exhibit K - 2021-08-19 Kove Letter to AWS re D. Walsh Deposition, # 13 Exhibit L - AMZ_KOVE_000061805 - DynamoDB development document, # 14 Exhibit M - AMZ_KOVE_000437013 - S3 Operations document, # 15 Exhibit N - Kove's Second Amended Response to AWS's Rog 7, # 16 Exhibit O - AWS's Third Supp. Response to First Set of Interrogatories (1-6), # 17 Exhibit P - 2021-09-17 L. Phillips Letter to A. Adler re Broadcast Videos, # 18 Exhibit Q - Vermeulen Transcript Excerpt)(Sigler, R.) (Entered: 10/07/2021) |
| 10/07/2021 | 429 | MOTION by Plaintiff Kove IO, Inc. to seal *Kove IO, Inc.'s Opposition to Amazon Web Services, Inc.'s Motion to Compel Sufficient Time to Depose John K. Overton and Non-Email ESI Documents* (Hoang, Khue) (Entered: 10/07/2021) |
| 10/07/2021 | 430 | RESPONSE by Amazon Web Services, Inc.in Opposition to SEALED MOTION by Plaintiff Kove IO, Inc. *Motion to Compel Hardware, Metrics, & Predecessor Product Information* 409 (Attachments: # 1 Declaration of R. Sigler, # 2 Exhibit A - Filed Under Seal, # 3 Exhibit B - Filed Under Seal, # 4 Exhibit C - Filed Under Seal, # 5 Exhibit D - Filed Under Seal, # 6 Exhibit E - Filed Under Seal, # 7 Exhibit F - Filed Under Seal, # 8 Exhibit G - Filed |

| | | |
|---|---|---|
| | | Under Seal, # 9 Exhibit H - Filed Under Seal, # 10 Exhibit I - Filed Under Seal, # 11 Exhibit J - Filed Under Seal, # 12 Exhibit K - Filed Under Seal, # 13 Exhibit L - Filed Under Seal, # 14 Exhibit M - Filed Under Seal, # 15 Exhibit N - Filed Under Seal, # 16 Exhibit O - Filed Under Seal, # 17 Exhibit P - Filed Under Seal, # 18 Exhibit Q - Filed Under Seal)(Sigler, R.) (Entered: 10/07/2021) |
| 10/07/2021 | 431 | MOTION by Defendant Amazon Web Services, Inc. to seal *Opposition to Kove's Motion to Enforce Compliance with Court Order and To Compel Various Discovery (Dkt. 403)* (Sigler, R.) (Entered: 10/07/2021) |
| 10/07/2021 | 432 | SEALED RESPONSE by Amazon Web Services, Inc. to SEALED MOTION by Plaintiff Kove IO, Inc. *to Enforce Compliance with Court Order and to Compel Various Discovery* 403 (Attachments: # 1 Declaration of J. Saltman, # 2 Declaration of R. William Sigler, # 3 Exhibit A - AMZ_KOVE_000065143, # 4 Exhibit B - 2020-08-18 Garcia emails re Production, # 5 Exhibit C - A. Vermeulen Transcript Excerpts, # 6 Exhibit D - J. Barr Transcript Excerpts, # 7 Exhibit E - 2021-09-02 J. Saltman Letter to A. Adler re Meet and Confer, # 8 Exhibit F - 2021-08-31 A. Adler Letter Re Aug 27 Meet and Confer, # 9 Exhibit G - 2021-01-05 J. Cardenas-Navia Letter re Discovery Requests, Document Production, Rogs 18 & 22 and ESI, # 10 Exhibit H - AWS's Response to Kove's 6th Interrogatories, # 11 Exhibit I - 2021-01-28 and 2021-03-26 Amended Responses to Kove's Sixth Set of Interrogatories (No. 18), # 12 Exhibit J - 2021-07-23 Saltman Letter to J. Cardenas-Navia re Vogels Deposition, # 13 Exhibit K - AWS's Response to Kove's Seventh Set of Interrogatories (excerpt No. 22), # 14 Exhibit L - AWS's Supplemental Response to Kove's 7th Set of Interrogatories (Rog 22), # 15 Exhibit M - Kove's First Set of Rogs, # 16 Exhibit N - Kove R&Os to AWS's Second Set of ROGs (excerpt No. 11), # 17 Exhibit O - Kove OBJS & RESPS to AWS's ROGs 1-9 (excerpt No. 3), # 18 Exhibit P - Kove RO to AWS ROGs 20-21 (excerpt No. 20))(Sigler, R.) (Entered: 10/07/2021) |
| 10/07/2021 | 433 | RESPONSE by Amazon Web Services, Inc.in Opposition to SEALED MOTION by Plaintiff Kove IO, Inc. *to Enforce Compliance with Court Order and to Compel Various Discovery* 403 (Attachments: # 1 Declaration of R. William Sigler, # 2 Exhibit A - Filed Under Seal, # 3 Exhibit B - Filed Under Seal, # 4 Exhibit C - Filed Under Seal, # 5 Exhibit D - Filed Under Seal, # 6 Exhibit E - Filed Under Seal, # 7 Exhibit F - Filed Under Seal, # 8 Exhibit G - Filed Under Seal, # 9 Exhibit H - Filed Under Seal, # 10 Exhibit I - Filed Under Seal, # 11 Exhibit J - Filed Under Seal, # 12 Exhibit K - Filed Under Seal, # 13 Exhibit L - Filed Under Seal, # 14 Exhibit M - Kove's First Set of Rogs, # 15 Exhibit N - Kove R&Os to AWS's Second Set of ROGs (excerpt No. 11), # 16 Exhibit O - Kove OBJS & RESPS to AWS's ROGs 1-9 (excerpt No. 3), # 17 Exhibit P - Kove RO to AWS ROGs 20-21 (excerpt No. 20))(Sigler, R.) (Entered: 10/07/2021) |
| 10/07/2021 | 434 | SEALED RESPONSE by Kove IO, Inc. to SEALED MOTION by Defendant Amazon Web Services, Inc. *to Compel Sufficient Time to Depose John K. Overton and Non-email ESI Documents* 392 (Attachments: # 1 Declaration of Michael Marvin, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L)(Hoang, Khue) (Entered: 10/07/2021) |
| 10/07/2021 | 435 | RESPONSE by Kove IO, Inc.in Opposition to SEALED MOTION by Defendant Amazon Web Services, Inc. *to Compel Sufficient Time to Depose John K. Overton and Non-email ESI Documents* 392 (Attachments: # 1 Declaration of Michael Marvin, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C - Filed Under Seal, # 5 Exhibit D - Filed Under Seal, # 6 Exhibit E - Filed Under Seal, # 7 Exhibit F - Filed Under Seal, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K - Filed Under Seal, # 13 Exhibit L)(Hoang, Khue) (Entered: 10/07/2021) |

| | | |
|---|---|---|
| 10/07/2021 | 436 | MOTION by Plaintiff Kove IO, Inc. to seal *Kove IO, Inc.'s Response to AWS's Motion for Protective Order Regarding 30(b)(6) Topic Nos. 84-85 and 87-88 and Requests for Production Nos. 219-21 and 223-26* (Hoang, Khue) (Entered: 10/07/2021) |
| 10/07/2021 | 437 | SEALED RESPONSE by Kove IO, Inc. to SEALED MOTION by Defendant Amazon Web Services, Inc. *for Protective Order* 397 (Attachments: # 1 Declaration of T. Mauze, # 2 Exhibit A - SEALED, # 3 Exhibit B - SEALED, # 4 Exhibit C - SEALED, # 5 Exhibit D - SEALED, # 6 Exhibit E - SEALED, # 7 Exhibit F - SEALED, # 8 Exhibit G - SEALED, # 9 Exhibit H - SEALED, # 10 Exhibit I - SEALED, # 11 Exhibit J - SEALED, # 12 Exhibit K - SEALED, # 13 Exhibit L - SEALED, # 14 Exhibit M - SEALED, # 15 Exhibit N - SEALED, # 16 Exhibit O - SEALED, # 17 Exhibit P - SEALED, # 18 Errata Q - SEALED, # 19 Exhibit R - SEALED, # 20 Exhibit S - SEALED, # 21 Exhibit T - SEALED, # 22 Exhibit U - SEALED, # 23 Exhibit V - SEALED, # 24 Exhibit W - SEALED, # 25 Exhibit X - SEALED, # 26 Exhibit Y - SEALED, # 27 Exhibit Z - SEALED, # 28 Exhibit AA - SEALED, # 29 Exhibit AB - SEALED, # 30 Exhibit AC - SEALED, # 31 Exhibit AD - SEALED, # 32 Exhibit AE - SEALED, # 33 Exhibit AF - SEALED, # 34 Exhibit AG - SEALED, # 35 Exhibit AH - SEALED)(Hoang, Khue) (Entered: 10/07/2021) |
| 10/07/2021 | 438 | RESPONSE by Kove IO, Inc.in Opposition to SEALED MOTION by Defendant Amazon Web Services, Inc. *for Protective Order* 397 (Attachments: # 1 Declaration of T. Mauze, # 2 Exhibit A - Filed Under Seal, # 3 Exhibit B - Filed Under Seal, # 4 Exhibit C - Filed Under Seal, # 5 Exhibit D - Filed Under Seal, # 6 Exhibit E - Filed Under Seal, # 7 Exhibit F - Filed Under Seal, # 8 Exhibit G - Filed Under Seal, # 9 Exhibit H - Filed Under Seal, # 10 Exhibit I - Filed Under Seal, # 11 Exhibit J - Filed Under Seal, # 12 Exhibit K - Filed Under Seal, # 13 Exhibit L - Filed Under Seal, # 14 Exhibit M - Filed Under Seal, # 15 Exhibit N - Filed Under Seal, # 16 Exhibit O - Filed Under Seal, # 17 Exhibit P - Filed Under Seal, # 18 Exhibit Q - Filed Under Seal, # 19 Exhibit R - Filed Under Seal, # 20 Exhibit S - Filed Under Seal, # 21 Exhibit T - Filed Under Seal, # 22 Exhibit U - Filed Under Seal, # 23 Exhibit V - Filed Under Seal, # 24 Exhibit W - Filed Under Seal, # 25 Exhibit X - Filed Under Seal, # 26 Exhibit Y - Filed Under Seal, # 27 Exhibit Z - Filed Under Seal, # 28 Exhibit AA - Filed Under Seal, # 29 Exhibit AB - Filed Under Seal, # 30 Exhibit AC - Filed Under Seal, # 31 Exhibit AD - Filed Under Seal, # 32 Exhibit AE - Filed Under Seal, # 33 Exhibit AF - Filed Under Seal, # 34 Exhibit AG - Filed Under Seal, # 35 Exhibit AH - Filed Under Seal)(Hoang, Khue) (Entered: 10/07/2021) |
| 10/08/2021 | 439 | MINUTE entry before the Honorable Rebecca R. Pallmeyer:Defendant's motion(s) to seal 421 , 424 , 427 , 429 , 431 , 436 are granted. Mailed notice. (rbf, ) (Entered: 10/08/2021) |
| 10/15/2021 | 440 | MINUTE entry before the Honorable Sheila M. Finnegan: Plaintiff's motion to compel discovery of Andrew Jassy [351, 352] is granted in part and denied without prejudice in part. See Order for details. The separate Order is currently under seal to allow the parties an opportunity to review it to determine whether they believe any portions should remain sealed provided this is legally permissible. See, e.g., Jepsen, Inc. v. Makita Elec. Works, Ltd., 30 F.3d 854, 859 (7th Cir. 1994), and Pepsico, Inc. v. Redmond, 46 F.3d 29 (7th Cir. 1995). The Order will be unsealed on 10/22/2021 in the absence of a filing seeking to maintain the seal for specific portions of the Order. Mailed notice (sxw) (Entered: 10/15/2021) |
| 10/15/2021 | 441 | SEALED ORDER signed by the Honorable Sheila M. Finnegan on 10/15/2021. Mailed notice (sxw) (Entered: 10/15/2021) |
| 10/21/2021 | 442 | MOTION by Defendant Amazon Web Services, Inc. to seal *Limited Portions of the Court's October 15, 2021 Order* (Attachments: # 1 Exhibit A - Declaration of L. Rogers, # 2 Exhibit B - Redacted October 15, 2021 Order)(Sigler, R.) (Entered: 10/21/2021) |

| | | |
|---|---|---|
| 10/25/2021 | 443 | RESPONSE by Kove IO, Inc.in Opposition to MOTION by Defendant Amazon Web Services, Inc. to seal *Limited Portions of the Court's October 15, 2021 Order* 442 (Hoang, Khue) (Entered: 10/25/2021) |
| 10/26/2021 | 444 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number 0752-18806055. (Phillips, Lisa) (Entered: 10/26/2021) |
| 10/26/2021 | 445 | MINUTE entry before the Honorable Sheila M. Finnegan: Defendant's Motion to Maintain Under Seal Limited Portions of the Court's October 15, 2021 Order 442 is granted in part and denied in part. The motion is granted as to certain search terms, portions of certain emails, and portions of certain deposition testimony. The motion is otherwise denied for lack of a showing of good cause. "The Seventh Circuit has made clear that motions to seal must make a specific showing of good cause. Neither the parties' agreement to keep something secret nor the unadorned assertion that something is confidential demonstrates good cause to seal a document." Kotoklo v. Karpinski, No. 20 C 635, 2021 WL 4516362, at *2 (N.D. Ill. Apr. 12, 2021). In addition, any documents that "influence or underpin" a district court's judicial decision will be subject to greater scrutiny and may be unsealed and open to public view. See City of Greenville v. Syngenta Crop Prot., LLC, 764 F.3d 695, 698 (7th Cir. 2014) ("Public access depends on whether a document 'influenc[ed] or underpin[ned] the judicial decision."); Union Oil Co. v. Leavell, 220 F.3d 562, 567-68 (7th Cir. 2010) ("Documents that affect the disposition of federal litigation are presumptively open to public view, even if the litigants strongly prefer secrecy, unless a statute, rule, or privilege justifies confidentiality."). Here, Defendant's generic assertion that certain portions of the opinion recite sensitive information about ESI collection, AWS services, and the roles of AWS employees is insufficient to justify redacting those portions from the record. Mailed notice (sxw, ) (Entered: 10/26/2021) |
| 10/26/2021 | 446 | ORDER signed by the Honorable Sheila M. Finnegan on 10/15/2021 (Redacted Version). Mailed notice(sxw, ) (Entered: 10/26/2021) |
| 10/27/2021 | 447 | Joint Motion for Modification of Case Schedule by Kove IO, Inc. (Attachments: # 1 Text of Proposed Order)(Hoang, Khue) (Entered: 10/27/2021) |
| 10/28/2021 | 448 | MOTION by Defendant Amazon Web Services, Inc. to seal *Reply in Support of Its Motion for Protective Order Regarding 30(b)(6) Topics Nos. 84-85 and 87-88 and Requests for Production 219-21 and 223-26 (Dkt. 397)* (Sigler, R.) (Entered: 10/28/2021) |
| 10/28/2021 | 449 | SEALED REPLY by Amazon Web Services, Inc. to SEALED MOTION by Defendant Amazon Web Services, Inc. *for Protective Order* 397 (Attachments: # 1 Declaration of J. Saltman, # 2 Declaration of R. Sigler, # 3 Exhibit O - 2021-06-10 Letter from T. Mauze regarding AWS production, # 4 Exhibit P - AMZ_KOVE_000444922, # 5 Exhibit Q - AMZ_KOVE_000446222, # 6 Exhibit R - 2021-05-14 E. Bernard to Counsel re Kove Deficient Production, # 7 Exhibit S - 2021-03-22 E. Bernard to A. Adler Discovery Letter, # 8 Exhibit T - 2021-06-29 E. Bernard to Counsel re AWS's Document Production, # 9 Exhibit U - Vermeulen Transcript Excerpt, # 10 Exhibit V - AMZ_KOVE_000481098, # 11 Exhibit W - AMZ_Kove_000225664)(Sigler, R.) (Entered: 10/28/2021) |
| 10/28/2021 | 450 | REPLY by Defendant Amazon Web Services, Inc. to Sealed motion,,, 397 (Attachments: # 1 Declaration of J. Saltman, # 2 Declaration of R. Sigler, # 3 Exhibit O - Filed Under Seal, # 4 Exhibit P - Filed Under Seal, # 5 Exhibit Q - Filed Under Seal, # 6 Exhibit R - Filed Under Seal, # 7 Exhibit S - Filed Under Seal, # 8 Exhibit T - Filed Under Seal, # 9 Exhibit U - Filed Under Seal, # 10 Exhibit V - Filed Under Seal, # 11 Exhibit W - Filed Under Seal)(Sigler, R.) (Entered: 10/28/2021) |
| 10/28/2021 | 451 | MOTION by Defendant Amazon Web Services, Inc. to seal *Reply in Support of Its Motion to Compel Sufficient Time to Depose John K. Overton and Non-Email ESI* |

| | | |
|---|---|---|
| | | *Documents (Dkt. 393)* (Sigler, R.) (Entered: 10/28/2021) |
| 10/28/2021 | 452 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court adopts the parties' joint motion for modification of case schedule 447 . Enter Amended Scheduling Order. (rbf, ) (Entered: 10/28/2021) |
| 10/28/2021 | 453 | AMENDED SCHEDULING ORDER Signed by the Honorable Rebecca R. Pallmeyer on 10/28/2021.(rbf, ) (Entered: 10/28/2021) |
| 10/28/2021 | 454 | SEALED REPLY by Amazon Web Services, Inc. to MOTION by Defendant Amazon Web Services, Inc. to compel *Sufficient Time to Depose John K. Overton and Non-email ESI Documents* 393 (Attachments: # 1 Declaration of R. William Sigler, # 2 Exhibit M - KOV_00217927, # 3 Exhibit N - KOV_00217936, # 4 Exhibit O - KOV_00217027, # 5 Exhibit P - KOV_00064104, # 6 Exhibit Q - KOV_00063916, # 7 Exhibit R - September 16 2020 - Kove Privilege Log)(Sigler, R.) (Entered: 10/28/2021) |
| 10/28/2021 | 455 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: All matters relating to the referral of this case having been resolved, the referral is closed. Magistrate Judge Honorable Sheila M. Finnegan no longer referred to the case. (rbf, ) (Entered: 10/28/2021) |
| 10/28/2021 | 456 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Attorney Lisa Phillips' motion for leave to appear pro hac vice on behalf of defendant, Amazon Web Services, Inc. 444 is granted. Mailed notice. (rbf, ) (Entered: 10/28/2021) |
| 10/28/2021 | 457 | REPLY by Defendant Amazon Web Services, Inc. to motion to compel,, 393 (Attachments: # 1 Declaration of R. William Sigler, # 2 Exhibit M - FILED UNDER SEAL, # 3 Exhibit N - FILED UNDER SEAL, # 4 Exhibit O - FILED UNDER SEAL, # 5 Exhibit P - FILED UNDER SEAL, # 6 Exhibit Q - FILED UNDER SEAL, # 7 Exhibit R - FILED UNDER SEAL)(Sigler, R.) (Entered: 10/28/2021) |
| 10/28/2021 | 458 | MOTION by Plaintiff Kove IO, Inc. to seal *Kove IO, Inc.'s Reply in Support of Motion to Compel Hardware, Metrics, & Predecessor Product Information* (Hoang, Khue) (Entered: 10/28/2021) |
| 10/28/2021 | 459 | SEALED REPLY by Kove IO, Inc. to SEALED MOTION by Plaintiff Kove IO, Inc. *Motion to Compel Hardware, Metrics, & Predecessor Product Information* 409 (Attachments: # 1 Declaration of T. Mauze, # 2 Exhibit 36, # 3 Exhibit 37)(Hoang, Khue) (Entered: 10/28/2021) |
| 10/28/2021 | 460 | REPLY by Plaintiff Kove IO, Inc. to Sealed motion,,, 409 (Attachments: # 1 Declaration of T. Mauze, # 2 Exhibit 36, # 3 Exhibit 37)(Hoang, Khue) (Entered: 10/28/2021) |
| 10/28/2021 | 461 | MOTION by Plaintiff Kove IO, Inc. to seal *Kove IO, Inc.'s Reply Brief in Support of Motion to Enforce Compliance with Court Order and to Compel Various Discovery* (Hoang, Khue) (Entered: 10/28/2021) |
| 10/28/2021 | 462 | SEALED REPLY by Kove IO, Inc. to SEALED MOTION by Plaintiff Kove IO, Inc. *to Enforce Compliance with Court Order and to Compel Various Discovery* 403 (Attachments: # 1 Declaration of M. Marvin, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G)(Hoang, Khue) (Entered: 10/28/2021) |
| 10/28/2021 | 463 | REPLY by Plaintiff Kove IO, Inc. to Sealed motion,, 403 (Attachments: # 1 Declaration of M. Marvin, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G)(Hoang, Khue) (Entered: 10/28/2021) |
| 10/28/2021 | 464 | MOTION by Plaintiff Kove IO, Inc. to seal *Kove's Reply in Support of its Motion for Protective Order Regarding Discovery into Litigation Financing* (Hoang, Khue) (Entered: |

| | | |
|---|---|---|
| | | 10/28/2021) |
| 10/28/2021 | 465 | SEALED REPLY by Kove IO, Inc. to SEALED MOTION by Plaintiff Kove IO, Inc. *for Protective Order Regarding Discovery into Litigation Funding* 400 (Attachments: # 1 Declaration of K. Lewis, # 2 Exhibit G, # 3 Exhibit H)(Hoang, Khue) (Entered: 10/28/2021) |
| 10/28/2021 | 466 | REPLY by Plaintiff Kove IO, Inc. to Sealed motion, 400 (Attachments: # 1 Declaration of K. Lewis, # 2 Exhibit G, # 3 Exhibit H)(Hoang, Khue) (Entered: 10/28/2021) |
| 10/28/2021 | 467 | MOTION by Plaintiff Kove IO, Inc. to seal *Kove's Reply in Support of Its Motion to Compel Amazon Web Services to Produce Information Regarding Usage, Financial, and Hypothetical Negotiation Data* (Hoang, Khue) (Entered: 10/28/2021) |
| 10/28/2021 | 468 | SEALED REPLY by Kove IO, Inc. to SEALED MOTION by Plaintiff Kove IO, Inc. *Kove's Motion to Compel Amazon Web Services to Produce Information Regarding Usage, Financial, And Hypothetical Negotiation Data.* 405 (Attachments: # 1 Declaration of T. Mauze, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P, # 18 Exhibit Q, # 19 Exhibit R, # 20 Exhibit S, # 21 Exhibit T, # 22 Exhibit U)(Hoang, Khue) (Entered: 10/28/2021) |
| 10/28/2021 | 469 | REPLY by Plaintiff Kove IO, Inc. to Sealed motion,,, 405 (Attachments: # 1 Declaration of T. Mauze, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P, # 18 Exhibit Q, # 19 Exhibit R, # 20 Exhibit S, # 21 Exhibit T, # 22 Exhibit U)(Hoang, Khue) (Entered: 10/28/2021) |
| 10/29/2021 | 470 | STATUS Report *Joint* by Kove IO, Inc. (Hoang, Khue) (Entered: 10/29/2021) |
| 11/04/2021 | 471 | MOTION by Defendant Amazon Web Services, Inc. for leave to file *Additional Limited Briefing Regarding Financial Motion to Compel (Joint)* (Sigler, R.) (Entered: 11/04/2021) |
| 11/05/2021 | 472 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendant's motion(s) to seal [448,451] are granted. Plaintiff's motion(s) to seal [458, 461, 464, 467] are granted. Defendant's motion for leave to file additional limited briefing 471 is granted. Mailed notice. (rbf, ) (Entered: 11/05/2021) |
| 11/15/2021 | 473 | MOTION by Defendant Amazon Web Services, Inc. to seal *Sur-reply in Opposition to Kove's Motion to Compel Financial Information (Dkt. 405)* (Sigler, R.) (Entered: 11/15/2021) |
| 11/15/2021 | 474 | SEALED REPLY by Amazon Web Services, Inc. to SEALED MOTION by Plaintiff Kove IO, Inc. *Kove's Motion to Compel Amazon Web Services to Produce Information Regarding Usage, Financial, And Hypothetical Negotiation Data.* 405 *(Sur-reply)* (Attachments: # 1 Declaration of J. Saltman, # 2 Declaration of R. Sigler, # 3 Exhibit AA - AMZ_KOVE_000487437, # 4 Exhibit BB - AMZ_KOVE_000487436, # 5 Exhibit CC - 2021-10-29 L. Phillips Letter to T. Mauze re 10-25 Meet and Confer, # 6 Exhibit DD - AMZ_KOVE_000487423, # 7 Exhibit EE - AMZ_KOVE_000487422, # 8 Exhibit FF - AMZ_KOVE_000487435, # 9 Exhibit GG - AMZ_KOVE_000487433, # 10 Exhibit HH - AMZ_KOVE_000487434)(Sigler, R.) (Entered: 11/15/2021) |
| 11/15/2021 | 475 | SUR-REPLY by Defendant Amazon Web Services, Inc. to Sealed motion,,, 405 (Attachments: # 1 Declaration of J. Saltman, # 2 Declaration of R. Sigler, # 3 Exhibit AA - FILED UNDER SEAL, # 4 Exhibit BB - FILED UNDER SEAL, # 5 Exhibit CC - FILED UNDER SEAL, # 6 Exhibit DD - FILED UNDER SEAL, # 7 Exhibit EE – |

| | | |
|---|---|---|
| | | FILED UNDER SEAL, # 8 Exhibit FF - FILED UNDER SEAL, # 9 Exhibit GG - FILED UNDER SEAL, # 10 Exhibit HH - FILED UNDER SEAL)(Sigler, R.) (Entered: 11/15/2021) |
| 11/16/2021 | 476 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion to seal AWS's sur-reply in opposition to Kove's motion to compel production of information regarding usage, financial, and hypothetical negotiation data 473 is granted. (rbf, ) (Entered: 11/16/2021) |
| 11/19/2021 | 477 | TRANSCRIPT OF PROCEEDINGS held on 7/23/21 before the Honorable Rebecca R. Pallmeyer. Order Number: 41304. Court Reporter Contact Information: Frances Ward - wardofficialtranscripts@gmail.com - (312)435-5561.<br><br>IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings.<br><br>Redaction Request due 12/10/2021. Redacted Transcript Deadline set for 12/20/2021. Release of Transcript Restriction set for 2/17/2022. (Ward, Frances) (Entered: 11/19/2021) |
| 11/22/2021 | 478 | MOTION by Plaintiff Kove IO, Inc. to withdraw *appearance of Michael Marvin* (Reichman, Courtland) (Entered: 11/22/2021) |
| 11/24/2021 | 479 | MOTION by Plaintiff Kove IO, Inc. to seal *Kove's Sur-Reply in Support of Its Motion to Compel Amazon Web Services to Produce Information Regarding Usage, Financial, and Hypothetical Negotiation Date* (Hoang, Khue) (Entered: 11/24/2021) |
| 11/24/2021 | 480 | SEALED REPLY by Kove IO, Inc. to SEALED MOTION by Plaintiff Kove IO, Inc. *Kove's Motion to Compel Amazon Web Services to Produce Information Regarding Usage, Financial, And Hypothetical Negotiation Data.* 405 (Hoang, Khue) (Entered: 11/24/2021) |
| 11/24/2021 | 481 | SUR-REPLY by Plaintiff Kove IO, Inc. to Sealed motion,,, 405 *Sur-Reply in Support of Its Motion to Compel Amazon Web Services to Produce Information Regarding Usage, Financial, and Hypothetical Negotiation Date* (Hoang, Khue) (Entered: 11/24/2021) |
| 11/29/2021 | 482 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Attorney Michael Walton Marvin's motion to withdraw as counsel for plaintiff 478 is granted. Attorney Michael Walton Marvin terminated. (rbf, ) (Entered: 11/29/2021) |
| 11/30/2021 | 483 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Plaintiff, Kove IO's motion to seal Kove's Sur-Reply in Support of Its Motion to Compel Amazon Web Services to Produce Information Regarding Usage, Financial, and Hypothetical Negotiation Date Motion to seal 479 is granted. Mailed notice. (rbf, ) (Entered: 11/30/2021) |
| 12/17/2021 | 484 | MEMORANDUM Opinion and Order. Signed by the Honorable Rebecca R. Pallmeyer on 12/17/2021. Mailed notice. (as, ) (Entered: 12/17/2021) |
| 12/23/2021 | 485 | MOTION by Defendant Amazon Web Services, Inc. to withdraw *Appearance of Adam A. Allgood* (Sigler, R.) (Entered: 12/23/2021) |
| 12/27/2021 | 486 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendant's motion to withdraw the appearance of attorney Adam Allgood 485 is granted. Attorney Adam Allgood terminated. (rbf, ) (Entered: 12/27/2021) |

| | | |
|---|---|---|
| 12/28/2021 | 487 | NOTICE by Amazon Web Services, Inc. *of Related Proceedings* (Attachments: # 1 Exhibit A - '978 Kove Patent EPR Institution Decision-90019034, # 2 Exhibit B - '640 Kove Patent EPR Institution Decision-90019036)(Sigler, R.) (Entered: 12/28/2021) |
| 12/30/2021 | 488 | MOTION by Defendant Amazon Web Services, Inc. for order *regarding post-claim construction deadlines (Joint)* (Sigler, R.) (Entered: 12/30/2021) |
| 01/03/2022 | 489 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion 488 is granted. As proposed, the parties will exchange drafts of proposed affirmative amended contentions (in Word and with redlines) by January 27, 2022. Parties will meet and confer as needed over the next two weeks regarding whether proposed amendments are proper under LPR 3.4. Parties will file motions to amend their respective contentions as unopposed or opposed by February 24, 2022. Parties will propose a schedule for resolution of remaining case events within 14 days of the Court's ruling on the currently-pending discovery motions ([393, 397, 400, 403, 405, 409]). (rbf, ) (Entered: 01/03/2022) |
| 01/13/2022 | 490 | MOTION by Defendant Amazon Web Services, Inc. to stay *Case Pending Outcome of Ex Parte Reexaminations* (Attachments: # 1 Exhibit A - Reexamination operational statistics - FY 2021, # 2 Exhibit B - Ex Parte Reexamination Filing Data September 30, 2020, # 3 Exhibit C - Order in Reexamination No. 90/019,035, # 4 Exhibit D - Reexamination operational statistics - FY 2007-11)(Sigler, R.) (Entered: 01/13/2022) |
| 01/18/2022 | 491 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: The court adopts the parties' proposed briefing schedule on Amazon Web Services's motion to stay 490 as follows: Plaintiff's response shall be filed by 01/27/2022 and defendant's reply shall be filed by 02/03/2022. Mailed notice. (rbf, ) (Entered: 01/18/2022) |
| 01/19/2022 | 492 | MOTION by Plaintiff Kove IO, Inc. to seal *Motion to Enforce Compliance with Court Order and Exhibits* (Hoang, Khue) (Entered: 01/19/2022) |
| 01/19/2022 | 493 | SEALED MOTION by Plaintiff Kove IO, Inc. *Kove IO, Inc.'s Motion to Enforce Compliance with Court Order* (Attachments: # 1 Declaration of P. Eklem, # 2 Exhibit 1 - SEALED, # 3 Exhibit 2 - SEALED, # 4 Exhibit 3 - SEALED, # 5 Exhibit 4 - SEALED, # 6 Exhibit 5 - SEALED, # 7 Exhibit 6 - SEALED, # 8 Exhibit 7 - SEALED)(Hoang, Khue) (Entered: 01/19/2022) |
| 01/19/2022 | 494 | MOTION by Plaintiff Kove IO, Inc. to enforce *Compliance with Court Order* (Attachments: # 1 Declaration of P. Eklem, # 2 Exhibit 1 - REDACTED, # 3 Exhibit 2 - REDACTED, # 4 Exhibit 3 - REDACTED, # 5 Exhibit 4 - REDACTED, # 6 Exhibit 5 - REDACTED, # 7 Exhibit 6 - REDACTED, # 8 Exhibit 7 - REDACTED)(Hoang, Khue) (Entered: 01/19/2022) |
| 01/20/2022 | 495 | MINUTE entry before the Honorable Rebecca R. Pallmeyer:Plaintiff's motion to file under seal 492 is granted. Telephonic motion hearing as to motion to enforce compliance with court order 494 is set for 1/25/2022 at 10:30 a.m.. Members of the public and media will be able to call in to listen to this hearing. Instructions and a link to the conference number are located on Judge Pallmeyer's website. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. (rbf, ) (Entered: 01/20/2022) |
| 01/20/2022 | 496 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: This court's 1/20/2022 order 495 is amended to reflect that the telephonic motion hearing regarding plaintiff's motion to enforce is set for 01/28/2022 at 10:30 a.m. The remainder of the court's order 495 stands. (rbf, ) (Entered: 01/20/2022) |

| | | |
|---|---|---|
| 01/26/2022 | 497 | ORDER signed by the Honorable Rebecca R. Pallmeyer on 1/26/2022: For the reasons set forth in the attached Order, certain of the parties' discovery motions ( 392 393 , 397 398 , 400 401 , and 403 407 ) are granted in part and denied in part. That leaves two remaining, fully-briefed discovery motions. The parties appear to have narrowed their differences on one of these ( 405 406 ), and the court believes it would benefit from brief oral presentations on the other 409 410 ). As the court will hear oral argument on Kove's more recent motion to compel compliance with an earlier order ( 493 / 494 ]), the court reserves ruling on 405 / 406 and 409 / 410 and invites counsel to address, at that hearing, remaining issues relevant to these motions as well. Mailed notice (cn). (Entered: 01/26/2022) |
| 01/27/2022 | 498 | MOTION by Defendant Amazon Web Services, Inc. to seal *AWS's Opposition to Kove's Motion to Enforce Court Order (Dkt. 493/494)* (Sigler, R.) (Entered: 01/27/2022) |
| 01/27/2022 | 499 | SEALED RESPONSE by Amazon Web Services, Inc. to SEALED MOTION by Plaintiff Kove IO, Inc. *Kove IO, Inc.'s Motion to Enforce Compliance with Court Order* 493 , MOTION by Plaintiff Kove IO, Inc. to enforce *Compliance with Court Order* 494 (Attachments: # 1 Declaration of R. Sigler, # 2 Exhibit A - AWS 9-2-21 letter, # 3 Exhibit B - Kove 9-27-21 letter, # 4 Exhibit C - Kove 11-3-21 letter, # 5 Exhibit D - AWS 11-22-21 letter, # 6 Exhibit E - Kove 11-18-21 letter, # 7 Exhibit F - Kove 11-24-21 letter, # 8 Exhibit G - Kove 12-2-21 letter, # 9 Exhibit H - Kove 12-8-21 letter, # 10 Exhibit I - Kove 12-24-21 letter, # 11 Exhibit J - Kove 12-28-21 letter, # 12 Exhibit K - Kove 1-18-22 letter)(Sigler, R.) (Entered: 01/27/2022) |
| 01/27/2022 | 500 | RESPONSE by Amazon Web Services, Inc.in Opposition to SEALED MOTION by Plaintiff Kove IO, Inc. *Kove IO, Inc.'s Motion to Enforce Compliance with Court Order* 493 , MOTION by Plaintiff Kove IO, Inc. to enforce *Compliance with Court Order* 494 (Attachments: # 1 Declaration of R. Sigler, # 2 Exhibit A - Filed Under Seal, # 3 Exhibit B - Filed Under Seal, # 4 Exhibit C - Filed Under Seal, # 5 Exhibit D - Filed Under Seal, # 6 Exhibit E - Filed Under Seal, # 7 Exhibit F - Filed Under Seal, # 8 Exhibit G - Filed Under Seal, # 9 Exhibit H - Kove 12-8-21 letter, # 10 Exhibit I - Filed Under Seal, # 11 Exhibit J - Filed Under Seal, # 12 Exhibit K - Kove 1-18-22 letter)(Sigler, R.) (Entered: 01/27/2022) |
| 01/27/2022 | 501 | MOTION by Plaintiff Kove IO, Inc. to seal *Kove IO, Inc.'s Opposition to AWS's Motion to Stay* (Hoang, Khue) (Entered: 01/27/2022) |
| 01/27/2022 | 502 | SEALED RESPONSE by Kove IO, Inc. to MOTION by Defendant Amazon Web Services, Inc. to stay *Case Pending Outcome of Ex Parte Reexaminations* 490 (Attachments: # 1 Declaration of P. Eklem, # 2 Exhibit 1 - PUBLIC, # 3 Exhibit 2 - SEALED, # 4 Exhibit 3 - SEALED, # 5 Exhibit 4 - PUBLIC, # 6 Exhibit 5 - PUBLIC, # 7 Exhibit 6 - PUBLIC, # 8 Exhibit 7 - SEALED, # 9 Exhibit 8 - PUBLIC, # 10 Exhibit 9 - PUBLUC, # 11 Exhibit 10 - PUBLIC, # 12 Exhibit 11 - SEALED, # 13 Exhibit 12 - SEALED, # 14 Exhibit 13 - SEALED)(Hoang, Khue) (Entered: 01/27/2022) |
| 01/27/2022 | 503 | RESPONSE by Kove IO, Inc.in Opposition to MOTION by Defendant Amazon Web Services, Inc. to stay *Case Pending Outcome of Ex Parte Reexaminations* 490 (Attachments: # 1 Declaration of P. Eklem, # 2 Exhibit 1 - PUBLIC, # 3 Exhibit 2 - REDACTED, # 4 Exhibit 3 - REDACTED, # 5 Exhibit 4 - PUBLIC, # 6 Exhibit 5 - PUBLIC, # 7 Exhibit 6 - PUBLIC, # 8 Exhibit 7 - REDACTED, # 9 Exhibit 8 - PUBLIC, # 10 Exhibit 9 - PUBLIC, # 11 Exhibit 10 - PUBLIC, # 12 Exhibit 11 - REDACTED, # 13 Exhibit 12 - REDACTED, # 14 Exhibit 13 - REDACTED)(Hoang, Khue) (Entered: 01/27/2022) |
| 01/28/2022 | 504 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Telephonic motion hearing held regarding plaintiff's motions to compel [405, 406]. Both of plaintiff's motions to |

| | | |
|---|---|---|
| | | compel [405, 406 and 409, 410] are entered and continued until after subsequent production is made by defendant. Subsequent production shall be made by no later than 02/11/2022; Plaintiff has leave to take a further deposition on relevant discovery issues no later than 2/18/2022.. The court will issue a written ruling and will set another oral argument date, if necessary after the motion for a stay pending inter partes review 490 is fully briefed. (rbf, ) (Entered: 01/28/2022) |
| 02/02/2022 | 505 | TRANSCRIPT OF PROCEEDINGS held on 1/28/22 before the Honorable Rebecca R. Pallmeyer. Order Numbers: 42514, 42532. Court Reporter Contact Information: Frances Ward - wardofficialtranscripts@gmail.com - (312)435-5561. <br><br> IMPORTANT: The transcript may be viewed at the court's public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained through the Court Reporter or PACER. For further information on the redaction process, see the Court's web site at www.ilnd.uscourts.gov under Quick Links select Policy Regarding the Availability of Transcripts of Court Proceedings. <br><br> Redaction Request due 2/23/2022. Redacted Transcript Deadline set for 3/7/2022. Release of Transcript Restriction set for 5/3/2022. (Ward, Frances) (Entered: 02/02/2022) |
| 02/03/2022 | 506 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Defendant's motion to seal 498 is granted. Plaintiff's motion to seal 501 is granted. Mailed notice. (rbf, ) (Entered: 02/03/2022) |
| 02/03/2022 | 507 | REPLY by Defendant Amazon Web Services, Inc. to motion to stay, 490 (Attachments: # 1 Exhibit E - Kove 8-29-31 email)(Sigler, R.) (Entered: 02/03/2022) |
| 02/24/2022 | 508 | MOTION by Defendant Amazon Web Services, Inc. to amend/correct *its Final Invalidity Contentions to Address the Court's Claim Construction Order (Dkt. 484) (Unopposed)* (Attachments: # 1 Exhibit A)(Sigler, R.) (Entered: 02/24/2022) |
| 02/24/2022 | 509 | MOTION by Plaintiff Kove IO, Inc. to seal *Exhibit A to Motion to Amend its Final Infringement and Validity Contentions Under Seal* (Cardenas-Navia, Jaime) (Entered: 02/24/2022) |
| 02/24/2022 | 510 | SEALED MOTION by Plaintiff Kove IO, Inc. *Unopposed Motion to Amend its Final Infringement and Validity Contentions* (Attachments: # 1 Exhibit A - SEALED, # 2 Exhibit B)(Cardenas-Navia, Jaime) (Entered: 02/24/2022) |
| 02/24/2022 | 511 | MOTION by Kove IO, Inc. *Unopposed Motion to Amend its Final Infringement and Validity Contentions* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Cardenas-Navia, Jaime) (Entered: 02/24/2022) |
| 02/25/2022 | 512 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Motion for leave to amend 508 , 510 , 511 and motion for leave to file under seal 509 are granted.Mailed notice (mjc, ) (Entered: 02/25/2022) |
| 03/04/2022 | 513 | Joint Motion by Kove IO, Inc. *to Set Scheduling for Service of Responsive Contentions* (Hoang, Khue) (Entered: 03/04/2022) |
| 03/08/2022 | 514 | MINUTE entry before the Honorable Rebecca R. Pallmeyer: Enter Memorandum Opinion and Order. For the reasons provided, AWS's motion to stay the case 490 is granted. Pending motions are stricken without prejudice. The parties are directed to submit a written status report no later than September 7, 2022. Mailed notice (mjc, ) (Entered: 03/08/2022) |

| | | |
|---|---|---|
| 03/08/2022 | 515 | MEMORANDUM Opinion and Order Signed by the Honorable Rebecca R. Pallmeyer on 3/8/2022. Mailed notice(mjc, ) (Entered: 03/08/2022) |
| 04/13/2022 | 516 | NOTICE by Philip Eklem of Change of Address (Eklem, Philip) (Entered: 04/13/2022) |
| 04/14/2022 | 517 | EXECUTIVE COMMITTEE ORDER: Case reassigned to the Honorable Matthew F. Kennelly for all further proceedings In accordance with the provisions of IOP 13. Honorable Rebecca R. Pallmeyer no longer assigned to the case. Signed by Executive Committee on 4/14/2022. (jg, ) (Entered: 04/14/2022) |
| 04/14/2022 | 518 | NOTICE by Christine E Lehman of Change of Address (Lehman, Christine) (Entered: 04/14/2022) |
| 04/18/2022 | 519 | MINUTE entry before the Honorable Matthew F. Kennelly: This case has been reassigned to Judge Kennelly. A joint status report remains due on 9/7/2022. The case is set for a telephonic status hearing on 9/14/2022 at 8:50 AM, using call-in number 888-684-8852, access code 746-1053. (mk) (Entered: 04/18/2022) |
| 04/21/2022 | 520 | NOTICE by Adam Adler of Change of Address (Adler, Adam) (Entered: 04/21/2022) |
| 09/07/2022 | 521 | STATUS Report *[Joint]* by Kove IO, Inc. (Hoang, Khue) (Entered: 09/07/2022) |
| 09/08/2022 | 522 | NOTICE by Renato Thomas Mariotti of Change of Address (Mariotti, Renato) (Entered: 09/08/2022) |
| 09/14/2022 | 523 | MINUTE entry before the Honorable Matthew F. Kennelly: Telephonic status hearing held on 9/14/2022. Plaintiff's motion to lift the stay is due 9/23/2022. Defendant has until 10/7/2022 to file a response and the motion to stay regarding the second exam. Plaintiff's reply and response is due 10/21/2022. Defendant's reply on the motion to impose a stay regarding the second reexam is due 11/4/2022. A telephonic status hearing is set for 11/10/2022 at 9:00 a.m. The following call-in number will be used: 888-684-8852; access code 746-1053. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Mailed notice. (mma, ) (Entered: 09/14/2022) |
| 09/14/2022 | 524 | NOTICE by Holly Hannah Campbell of Change of Address (Campbell, Holly) (Entered: 09/14/2022) |
| 09/23/2022 | 525 | MOTION by Plaintiff Kove IO, Inc. to seal *Motion to Lift Stay and Exhibits Under Seal* (Hoang, Khue) (Entered: 09/23/2022) |
| 09/23/2022 | 526 | SEALED MOTION by Plaintiff Kove IO, Inc. *Motion to Lift Stay* (Attachments: # 1 Declaration of Khue V. Hoang, # 2 Exhibit 1 [SEALED], # 3 Exhibit 2 [SEALED], # 4 Exhibit 3 [SEALED], # 5 Exhibit 4 [PUBLIC], # 6 Exhibit 5 [PUBLIC])(Hoang, Khue) (Entered: 09/23/2022) |
| 09/23/2022 | 527 | MOTION by Plaintiff Kove IO, Inc.Motion to Lift Stay (Attachments: # 1 Declaration of Khue V. Hoang, # 2 Exhibit 1 [REDACTED], # 3 Exhibit 2 [REDACTED], # 4 Exhibit 3 [REDACTED], # 5 Exhibit 4 [PUBLIC], # 6 Exhibit 5 [PUBLIC])(Hoang, Khue) (Entered: 09/23/2022) |
| 09/30/2022 | 528 | MOTION by Attorney KATE FALKENSTIEN to withdraw as attorney for Kove IO, Inc.. No party information provided (Attachments: # 1 Text of Proposed Order)(Hoang, Khue) (Entered: 09/30/2022) |

| | | |
|---|---|---|
| 10/01/2022 | 529 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion to withdraw appearance of attorney Kate Falkenstien is granted. (mk) (Entered: 10/01/2022) |
| 10/07/2022 | 530 | RESPONSE by Amazon Web Services, Inc.in Opposition to SEALED MOTION by Plaintiff Kove IO, Inc. *Motion to Lift Stay* 526 *and Motion to Stay Pending Additional Reexamination* (Attachments: # 1 Declaration of R. William Sigler, # 2 Exhibit A – September 27, 2022 '170 Patent NIRC, # 3 Exhibit B - September 27-28, 2022 emails to Director Vidal, # 4 Exhibit C - September 29, 2022 '640 Patent NIRC)(Sigler, R.) (Entered: 10/07/2022) |
| 10/21/2022 | 531 | REPLY by Plaintiff Kove IO, Inc. to Sealed motion, 526 *Motion to Lift Stay* (Attachments: # 1 Declaration of Khue Hoang, # 2 Exhibit 6, # 3 Exhibit 7, # 4 Exhibit 8)(Hoang, Khue) (Entered: 10/21/2022) |
| 11/01/2022 | 532 | Notice Regarding Related Proceedings by Kove IO, Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Hoang, Khue) (Entered: 11/01/2022) |
| 11/04/2022 | 533 | Notice of Withdrawal of 530 Opposition to Kove's Motion to Lift Stay and Motion to Stay Pending Additional Reexamination and Consent to 526 Motion to Lift Stay by Amazon Web Services, Inc. (Sigler, R.) (Entered: 11/04/2022) |
| 11/05/2022 | 534 | MINUTE entry before the Honorable Matthew F. Kennelly: Plaintiff's motion to lift stay is granted in light of defendant's withdrawal of its opposition, and defendant's motion to stay pending additional reexamination has been withdrawn. The stay previously imposed in this case is hereby lifted. The parties are directed to confer regarding a schedule under this District's Local Patent Rules and are to file a joint status report setting out a proposed schedule (including dates corresponding to the various requirements under the Local Patent Rules) by 11/9/2022. (mk) (Entered: 11/05/2022) |
| 11/09/2022 | 535 | STATUS Report *[Joint]* by Kove IO, Inc. (Hoang, Khue) (Entered: 11/09/2022) |
| 11/10/2022 | 536 | MINUTE entry before the Honorable Matthew F. Kennelly: Telephonic status hearing held on 11/10/2022. Fact discovery cutoff date is extended to 3/17/2023. A telephonic status hearing is set for 1/17/2023 at 8:50 a.m. The parties are directed to file a joint status report by 1/10/2023. The following call-in number will be used for the hearing: 888-684-8852, access code 746-1053. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Mailed notice. (mma, ) (Entered: 11/10/2022) |
| 11/16/2022 | 537 | STATUS Report *[Joint]* by Kove IO, Inc. (Hoang, Khue) (Entered: 11/16/2022) |
| 11/18/2022 | 538 | MINUTE entry before the Honorable Matthew F. Kennelly: The Court has reviewed, multiple times, the pending discovery-related motions that were put on pause by the previously assigned judge at the time of the now-dissolved stay. Respectfully, both sides' submissions seriously over-complicate matters and do not explain (or, frankly, even try to explain) the issues that remain open and the key considerations on each side in a simple and straightforward way. The Court therefore sets those motions for a video oral argument on 11/29/2022 at 9:30 AM. The argument will last no more than 45 minutes total. Each side is strongly encouraged to do its best to explain its position(s) on the open issues simply and directly. Visual presentations, if the parties believe they would be beneficial, are welcomed. The parties are also strongly encouraged to make another effort to attempt to resolve the matters at issue in the motions by agreement and compromise in advance of the hearing. (mk) (Entered: 11/18/2022) |

| | | |
|---|---|---|
| 11/28/2022 | 539 | MOTION by Defendant Amazon Web Services, Inc. for order *on Additional Claim Construction* (Attachments: # 1 Declaration of R. William Sigler ISO Motion for Addl Claim Construction, # 2 Exhibit Ex. A: 8-4-22 Reply to Office Action ('640 reexam), # 3 Exhibit Ex. B: 8-11-22 Reply to Office Action ('170 reexam), # 4 Exhibit Ex. C: 9-28-22 Reply to Office Action ('978 reexam), # 5 Exhibit Ex. D: 5-11-22 Non-Final Office Action, # 6 Exhibit Ex. E: 5-4-22 Non-Final Office Action, # 7 Exhibit Ex. F: AWS-Kove email chain)(Sigler, R.) (Entered: 11/28/2022) |
| 11/28/2022 | 540 | Joint Motion to Set Briefing Schedule by Amazon Web Services, Inc. (Sigler, R.) (Entered: 11/28/2022) |
| 11/29/2022 | 541 | MINUTE entry before the Honorable Matthew F. Kennelly: Video motion hearing held on 11/29/2022. Motion to enforce compliance 493 is granted to the following extent: defendant is directed to comply with Judge Pallmeyer's order is by 12/30/2022. The parties are directed to continue to confer on the two motions to compel 405 409 consistent with the Court's instructions and are file a joint status report regarding the motions and follow-up discovery as well as proposed draft orders regarding both on 12/16/2022. The joint status report may not exceed 10 pages; the draft orders do not count against this limitation. The parties are to file a further joint status report regarding the motions to compel on 12/30/2022. A telephonic status hearing is set for 1/3/2023 at 8:45 a.m. The following call-in number will be used for the hearing: 888-684-8852, access code 746-1053. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Mailed notice. (mma, ) (Entered: 11/29/2022) |
| 11/30/2022 | 542 | MINUTE entry before the Honorable Matthew F. Kennelly: Joint motion to set briefing schedule 540 is granted. Response to motion for additional claim construction 539 is due by 12/19/2022; reply to response is due by 1/3/2023; surreply is due by 1/10/2023. The page limits will be as set forth in the joint motion. (mk) (Entered: 11/30/2022) |
| 12/07/2022 | 543 | MOTION by Plaintiff Kove IO, Inc. to seal *Slide Deck on Pending Motions* (Hoang, Khue) (Entered: 12/07/2022) |
| 12/07/2022 | 544 | SEALED DOCUMENT by Plaintiff Kove IO, Inc. *[Slide Deck on Pending Motions]* (Hoang, Khue) (Entered: 12/07/2022) |
| 12/07/2022 | 545 | REDACTED Slide Deck on Pending Motions by Kove IO, Inc. (Hoang, Khue) (Entered: 12/07/2022) |
| 12/08/2022 | 546 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion for leave to file slide deck under seal 543 is granted. (mk) (Entered: 12/08/2022) |
| 12/15/2022 | 547 | Joint Motion to Extend Time to File Status Report by Kove IO, Inc. (Hoang, Khue) (Entered: 12/15/2022) |
| 12/15/2022 | 548 | Joint Motion to Extend Briefing Schedule by Kove IO, Inc. (Hoang, Khue) (Entered: 12/15/2022) |
| 12/17/2022 | 549 | MINUTE entry before the Honorable Matthew F. Kennelly: Joint motion to extend time to file status report 547 is granted; due date is extended to 12/19/2022. Joint motion to extend briefing schedule 548 is also granted: due date for plaintiff's response is extended to 12/21/2022; due date for defendant's reply is extended to 1/3/2023; and due date for plaintiff's surreply is extended to 1/12/2023. (mk) (Entered: 12/17/2022) |

| | | |
|---|---|---|
| 12/19/2022 | 550 | MOTION by Defendant Amazon Web Services, Inc. to seal *Joint Status Report* (Sigler, R.) (Entered: 12/19/2022) |
| 12/19/2022 | 551 | SEALED DOCUMENT by Defendant Amazon Web Services, Inc. *Joint Status Report* (Attachments: # 1 Exhibit Ex. A - Proposed JSR Order (Kove), # 2 Exhibit Ex. B - Proposed JSR Order (AWS))(Sigler, R.) (Entered: 12/19/2022) |
| 12/19/2022 | 552 | STATUS Report *(Joint)* by Amazon Web Services, Inc. (Attachments: # 1 Exhibit Ex. A - PUBLIC Proposed JSR Order (Kove), # 2 Exhibit Ex. B - PUBLIC Proposed JSR Order (AWS))(Sigler, R.) (Entered: 12/19/2022) |
| 12/21/2022 | 553 | RESPONSE by Plaintiff Kove IO, Inc. *to AWS's Motion for Additional Claim Construction Briefing 539* (Hoang, Khue) (Entered: 12/21/2022) |
| 12/22/2022 | 554 | NOTICE by Khue Hoang of Change of Address *for Reichman Jorgensen Lehman & Feldberg LLP's New York Office* (Hoang, Khue) (Entered: 12/22/2022) |
| 12/22/2022 | 555 | NOTICE by Jaime Francisco Cardenas-Navia of Change of Address *for Reichman Jorgensen Lehman & Feldberg LLP's New York office* (Cardenas-Navia, Jaime) (Entered: 12/22/2022) |
| 12/22/2022 | 556 | NOTICE by Michael Matulewicz-Crowley of Change of Address *for Reichman Jorgensen Lehman & Feldberg LLP's New York office* (Matulewicz-Crowley, Michael) (Entered: 12/22/2022) |
| 12/22/2022 | 557 | MINUTE entry before the Honorable Matthew F. Kennelly: The deadline for the reply brief is extended to 1/5/2023. Mailed notice. (mma, ) (Entered: 12/22/2022) |
| 12/23/2022 | 558 | NOTICE by Taylor Mauze of Change of Address (Mauze, Taylor) (Entered: 12/23/2022) |
| 12/23/2022 | 559 | NOTICE by Wesley White of Change of Address *for Reichman Jorgensen Lehman & Feldberg LLP's New York office* (White, Wesley) (Entered: 12/23/2022) |
| 12/27/2022 | 560 | MINUTE entry before the Honorable Matthew F. Kennelly: The parties are directed to provide to Judge Kennelly's proposed order e-mail address (a link to which appears on his web page) Word versions of their respective proposed orders that accompanied the 12/19/2022 joint status report. (mk) (Entered: 12/27/2022) |
| 12/29/2022 | 561 | ANNUAL REMINDER: Pursuant to Local Rule 3.2 (Notification of Affiliates), any nongovernmental party, other than an individual or sole proprietorship, must file a statement identifying all its affiliates known to the party after diligent review or, if the party has identified no affiliates, then a statement reflecting that fact must be filed. An affiliate is defined as follows: any entity or individual owning, directly or indirectly (through ownership of one or more other entities), 5% or more of a party. The statement is to be electronically filed as a PDF in conjunction with entering the affiliates in CM/ECF as prompted. As a reminder to counsel, parties must supplement their statements of affiliates within thirty (30) days of any change in the information previously reported. This minute order is being issued to all counsel of record to remind counsel of their obligation to provide updated information as to additional affiliates if such updating is necessary. If counsel has any questions regarding this process, this LINK will provide additional information. Signed by the Executive Committee on 12/29/2022: Mailed notice. (tg, ) (Entered: 12/29/2022) |
| 12/30/2022 | 562 | ORDER ON OUTSTANDING DISCOVERY MOTIONS, signed by the Honorable Matthew F. Kennelly on 12/30/2022. In addition, the motion for leave to file the status report under seal is granted 550 . (mk) (Entered: 12/30/2022) |

| 12/30/2022 | 563 | MOTION by Plaintiff Kove IO, Inc. to seal *Joint Status Report* (Hoang, Khue) (Entered: 12/30/2022) |
|---|---|---|
| 12/30/2022 | 564 | SEALED DOCUMENT by Plaintiff Kove IO, Inc. *Joint Status Report* (Attachments: # 1 Exhibit A [SEALED], # 2 Exhibit B [SEALED], # 3 Exhibit C [SEALED])(Hoang, Khue) (Entered: 12/30/2022) |
| 12/30/2022 | 565 | STATUS Report *(Joint)* by Kove IO, Inc. (Attachments: # 1 Exhibit A [REDACTED], # 2 Exhibit B [REDACTED], # 3 Exhibit C [REDACTED])(Hoang, Khue) (Entered: 12/30/2022) |
| 12/31/2022 | 566 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion to file status report under seal 563 is granted. A redacted version of the status report is to be filed in the public record. (mk) (Entered: 12/31/2022) |
| 12/31/2022 | 567 | MINUTE entry before the Honorable Matthew F. Kennelly: At the Court's instance, in light of the fact that the Court has ruled on the outstanding discovery disputes, the telephonic status hearing set for 1/3/2023 is vacated and reset to 1/13/2023 at 9:10 AM, using call-in number 888-684-8852, access code 746-1053. The surreply due on 1/12/2023 must be filed by no later than 12:00 noon on that date. (mk) (Entered: 12/31/2022) |
| 01/03/2023 | 568 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number AILNDC-20194652. (Carnes, Savannah) (Entered: 01/03/2023) |
| 01/04/2023 | 569 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion of Savannah Carnes to appear pro hac vice 568 is granted. (mk) (Entered: 01/04/2023) |
| 01/05/2023 | 570 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number AILNDC-20205377. (Bayar, Navid) (Entered: 01/05/2023) |
| 01/05/2023 | 571 | REPLY by Defendant Amazon Web Services, Inc. *In Support of #539 Motion for Additional Claim Construction* (Sigler, R.) (Entered: 01/05/2023) |
| 01/09/2023 | 572 | REQUEST for Clerk of Court to refund filing fee in the amount of 300.00, receipt no. AILNDC-20205097; AILNDC-20205125, (Hoang, Khue) (Entered: 01/09/2023) |
| 01/10/2023 | 573 | MINUTE entry before the Honorable Matthew F. Kennelly: At the Court's instance, the telephonic status hearing set for 9:10 AM on 1/13/2023 is advanced to 9:00 AM on that same date, using call-in number 888-684-8852, access code 746-1053. (mk) (Entered: 01/10/2023) |
| 01/10/2023 | 574 | REFUND PROCESSED re REQUEST for Clerk of Court to refund filing fee in the amount of 300.00, receipt no. AILNDC-20205097; AILNDC-20205125. (lw, ) (Entered: 01/10/2023) |
| 01/10/2023 | 575 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion of Navid Bayar to appear pro hac vice 570 is granted. (mk) (Entered: 01/10/2023) |
| 01/10/2023 | 576 | STATUS Report *[Joint]* by Kove IO, Inc. (Ballard, Shawna) (Entered: 01/10/2023) |
| 01/11/2023 | 577 | MINUTE entry before the Honorable Matthew F. Kennelly: The Court has reviewed the parties' joint status report. Any status hearing set for 1/17/2023 has already been vacated. The parties should be prepared to discuss their request for a discovery extension at the status hearing set for 1/13/2023. The Court anticipates ruling on the motion for additional claim construction at that same hearing. (mk) (Entered: 01/11/2023) |

| | | |
|---|---|---|
| 01/12/2023 | 578 | SUR-REPLY by Plaintiff Kove IO, Inc. to motion for order,, 539 *Kove IO, Inc.'s Surreply in Opposition to AWS's Motion for Add'l Claim Construction Briefing* (Hoang, Khue) (Entered: 01/12/2023) |
| 01/13/2023 | 579 | MINUTE entry before the Honorable Matthew F. Kennelly: Telephonic status hearing held on 1/13/2023. Defendant's motion for additional claim construction 539 is denied without prejudice to the presentation of the claim construction arguments during briefing on summary judgment. Fact discovery is extended to 5/5/2023. No further requests to extend the stay will be entertained. By no later than 1/20/2023, the parties are directed to file a joint status report that provides a proposal for expert disclosures and deadlines for expert depositions. The parties are directed to file a joint status report that provides an update on discovery by 3/28/2023. The Court will set a further status hearing at a later date. Mailed notice. (mma, ) (Entered: 01/13/2023) |
| 01/14/2023 | 580 | MINUTE entry before the Honorable Matthew F. Kennelly: The minute entry dated 1/13/2023 (dkt. 579) is corrected to read as follows. Telephonic status hearing held on 1/13/2023. Defendant's motion for additional claim construction 539 is denied without prejudice to the presentation of the claim construction arguments during briefing on summary judgment. Fact discovery is extended to 5/5/2023. No further requests to extend **this date** will be entertained. By no later than 1/20/2023, the parties are directed to file a joint status report that provides a proposal for expert disclosures and deadlines for expert depositions. The parties are directed to file a joint status report that provides an update on discovery by 3/28/2023. The Court will set a further status hearing at a later date. (mk) (Entered: 01/14/2023) |
| 01/20/2023 | 581 | STATUS Report *[Joint]* by Kove IO, Inc. (Hoang, Khue) (Entered: 01/20/2023) |
| 01/21/2023 | 582 | MINUTE entry before the Honorable Matthew F. Kennelly: The Court enters the following schedule as proposed by the parties with one potential modification. Rule 26(a)(2) disclosures by party with burden of proof on an issue are due 6/20/2023; rebuttal 26(a)(2) disclosures are due 8/4/2023; expert depositions are to be completed by 9/1/2023. Regarding summary judgment, the Court wishes to make clear that considering the likelihood that both parties will move for summary judgment on at least some claims and/or defenses, there will be only 4 summary judgment briefs altogether, not 6 or 8. Motion for summary judgment by the party filing a more comprehensive motion (to be resolved by the parties well in advance) is to be filed by 9/29/2023; response/cross-motion is to be filed by 11/3/2023; reply/response is to be filed by 11/29/2023; and reply on the cross-motion is to be filed by 12/20/2023. The parties should not expect any extensions of any part of this schedule given the age of the case. (mk) (Entered: 01/21/2023) |
| 02/02/2023 | 583 | MOTION by Attorney Aisha Mahmood Haley to withdraw as attorney for Kove IO, Inc.. No party information provided (Reichman, Courtland) (Entered: 02/02/2023) |
| 02/04/2023 | 584 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion to withdraw appearnce of Aisha Mahmood Haley as attorney 583 is granted. (mk) (Entered: 02/04/2023) |
| 02/06/2023 | 585 | MOTION by Attorney Michael G. Flanigan to withdraw as attorney for Kove IO, Inc.. No party information provided (Reichman, Courtland) (Entered: 02/06/2023) |
| 02/07/2023 | 586 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion to withdraw appearance of attorney Michael G. Flanigan is granted 585 . (mk) (Entered: 02/07/2023) |
| 03/17/2023 | 587 | MOTION by Defendant Amazon Web Services, Inc. to seal *Amazon's Unopposed Motion for Leave to Amend Its Final Non-Infringement Contentions* (Sigler, R.) (Entered: 03/17/2023) |

| | | |
|---|---|---|
| 03/17/2023 | 588 | SEALED MOTION by Defendant Amazon Web Services, Inc. *for Leave to Amend Its Final Non-Infringement Contentions (Unopposed)* (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Sigler, R.) (Entered: 03/17/2023) |
| 03/17/2023 | 589 | MOTION by Defendant Amazon Web Services, Inc. to amend/correct *Amazon's Unopposed Motion for Leave to Amend Its Final Non-Infringement Contentions* (Attachments: # 1 Exhibit A - Filed Under Seal, # 2 Exhibit B - Filed Under Seal)(Sigler, R.) (Entered: 03/17/2023) |
| 03/17/2023 | 590 | MOTION by Plaintiff Kove IO, Inc. to seal *Exhibit C to Kove's Unopposed Motion to Amend its Final Validity and Infringement Contentions* (Cardenas-Navia, Jaime) (Entered: 03/17/2023) |
| 03/17/2023 | 591 | SEALED MOTION by Plaintiff Kove IO, Inc. *(Unopposed) to Amend its Final Validity and Infringement Contentions* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C - SEALED - Part 1, # 4 Exhibit C - SEALED - Part 2, # 5 Exhibit C - SEALED - Part 3)(Cardenas-Navia, Jaime) (Entered: 03/17/2023) |
| 03/17/2023 | 592 | MOTION by Plaintiff Kove IO, Inc. to amend/correct *(Unopposed) to Amend its Final Validity and Infringement Contentions* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C)(Cardenas-Navia, Jaime) (Entered: 03/17/2023) |
| 03/19/2023 | 593 | MINUTE entry before the Honorable Matthew F. Kennelly: Motions to file under seal and unopposed motions to amend contentions are granted 587 588 589 590 591 592 . Redacted versions of the amended contentions are to be filed in the public record. (mk) (Entered: 03/19/2023) |
| 03/20/2023 | 594 | MOTION by Attorney Wesley White to withdraw as attorney for Kove IO, Inc.. No party information provided (Reichman, Courtland) (Entered: 03/20/2023) |
| 03/21/2023 | 595 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion by Wesley White to withdraw as attorney for Kove IO, Inc. is granted 594 . (mk) (Entered: 03/21/2023) |
| 03/23/2023 | 596 | MOTION by Defendant Amazon Web Services, Inc. to amend/correct *Amazon's Motion for Leave to Amend its Final Invalidity Contentions* (Attachments: # 1 Exhibit A - Amazon's Fifth Amended Unenforceability and Invalidity Contentions, # 2 Exhibit B - February 13, 2023 Kove Email to Amazon, # 3 Exhibit C - March 6, 2023 Kove Email to Amazon, # 4 Exhibit D - March 9, 2023 Kove Email to Amazon, # 5 Exhibit E - February 8, 2023 Kove Email to Amazon, # 6 Exhibit F - March 13, 2023 Amazon Email to Kove)(Sigler, R.) (Entered: 03/23/2023) |
| 03/24/2023 | 597 | MINUTE entry before the Honorable Matthew F. Kennelly: Any objection to defendant's motion to amend its invalidity contentions must be filed by 3/31/2023. No reply unless requested by the Court. Telephonic motion hearing, unless the Court deems it unnecessary, is set for 4/4/2023 at 9:20 AM, using call-in number 888-684-8852, access code 746-1053. (mk) (Entered: 03/24/2023) |
| 03/27/2023 | 598 | NOTICE by Amazon Web Services, Inc. *Amazon's Notice of Filing Public Versions of Sealed Exhibits to Unopposed Motion for Leave to Amend its Final Non-infringement Contentions* (Attachments: # 1 Exhibit A to Amazon's Unopposed Motion to Amend its Final Non-infringement Contentions (Redacted), # 2 Exhibit B to Amazon's Unopposed Motion to Amend its Final Non-infringement Contentions (Redacted))(Sigler, R.) (Entered: 03/27/2023) |
| 03/27/2023 | 599 | NOTICE by Kove IO, Inc. *Kove IO, Inc.'s Notice of Filing Public Version of Sealed Exhibit C to Unopposed Motion for Leave to Amend Its Final Infringement Contentions* (Attachments: # 1 REDACTED Kove's 4th Amended Final Infringement Contentions, # 2 Exhibit C |

| | | |
|---|---|---|
| | | (REDACTED) - Part 1, # 3 Exhibit C (REDACTED) - Part 2, # 4 Exhibit C (REDACTED) - Part 3)(Cardenas-Navia, Jaime) (Entered: 03/27/2023) |
| 03/28/2023 | 600 | MOTION by Plaintiff Kove IO, Inc. to seal *Plaintiff Kove IO, Inc.'s Motion for Leave to File Motion, Declaration, and Exhibits Under Seal* (Reichman, Courtland) (Entered: 03/28/2023) |
| 03/28/2023 | 601 | SEALED MOTION by Plaintiff Kove IO, Inc. *Kove IO, Inc.'s Motion to Compel The Deposition of Andrew Jassy* (Attachments: # 1 Declaration of Savannah Carnes, # 2 Exhibit A [SEALED], # 3 Exhibit B [SEALED], # 4 Exhibit C [SEALED], # 5 Exhibit D [SEALED], # 6 Exhibit E [SEALED], # 7 Exhibit F [SEALED], # 8 Exhibit G [SEALED], # 9 Exhibit H [SEALED], # 10 Exhibit I [SEALED], # 11 Exhibit J [SEALED], # 12 Exhibit K [SEALED], # 13 Exhibit L [SEALED], # 14 Exhibit M [SEALED], # 15 Exhibit N [SEALED], # 16 Exhibit O [PUBLIC], # 17 Exhibit P [PUBLIC], # 18 Exhibit Q [SEALED], # 19 Exhibit R [SEALED], # 20 Exhibit S [SEALED], # 21 Exhibit T [SEALED], # 22 Exhibit U [SEALED], # 23 Exhibit V [SEALED], # 24 Exhibit W [PUBLIC])(Reichman, Courtland) (Entered: 03/28/2023) |
| 03/28/2023 | 602 | MOTION by Plaintiff Kove IO, Inc. to compel *The Deposition of Andrew Jassy* (Attachments: # 1 Declaration of Savannah Carnes, # 2 Exhibit A [UNDER SEAL], # 3 Exhibit B [UNDER SEAL], # 4 Exhibit C [UNDER SEAL], # 5 Exhibit D [UNDER SEAL], # 6 Exhibit E [UNDER SEAL], # 7 Exhibit F [UNDER SEAL], # 8 Exhibit G [UNDER SEAL], # 9 Exhibit H [UNDER SEAL], # 10 Exhibit I [UNDER SEAL], # 11 Exhibit J [UNDER SEAL], # 12 Exhibit K [UNDER SEAL], # 13 Exhibit L [UNDER SEAL], # 14 Exhibit M [UNDER SEAL], # 15 Exhibit N [UNDER SEAL], # 16 Exhibit O [PUBLIC], # 17 Exhibit P [PUBLIC], # 18 Exhibit Q [UNDER SEAL], # 19 Exhibit R [UNDER SEAL], # 20 Exhibit S [UNDER SEAL], # 21 Exhibit T [UNDER SEAL], # 22 Exhibit U [UNDER SEAL], # 23 Exhibit V [UNDER SEAL], # 24 Exhibit W [PUBLIC])(Reichman, Courtland) (Entered: 03/28/2023) |
| 03/28/2023 | 603 | STATUS Report *[Joint]* by Kove IO, Inc. (Reichman, Courtland) (Entered: 03/28/2023) |
| 03/29/2023 | 604 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion to file under seal 600 is granted. Response to motion to compel deposition 601 is to be filed by 4/5/2023. No reply unless requested by the Court. (mk) (Entered: 03/29/2023) |
| 03/29/2023 | 605 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number AILNDC-20487177. (Mann, Ariane) (Entered: 03/29/2023) |
| 03/29/2023 | 606 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number AILNDC-20488901. (Sokhansanj, Bahrad) (Entered: 03/29/2023) |
| 03/29/2023 | 607 | MOTION by Defendant Amazon Web Services, Inc. for extension of time *(Unopposed)* (Sigler, R.) (Entered: 03/29/2023) |
| 03/29/2023 | 608 | MOTION by Plaintiff Kove IO, Inc. to seal *Plaintiff Kove IO, Inc.'s Motion for Leave to File Motion and Exhibits Under Seal* (Reichman, Courtland) (Entered: 03/29/2023) |
| 03/29/2023 | 609 | SEALED MOTION by Plaintiff Kove IO, Inc. *to Enforce Third-Party Amazon.com's and Amazon Technologies, Inc.'s Compliance with Subpoenas* (Attachments: # 1 Declaration of Navid Bayar, # 2 Exhibit A [PUBLIC], # 3 Exhibit B [PUBLIC], # 4 Exhibit C [SEALED], # 5 Exhibit D [SEALED], # 6 Exhibit E [SEALED], # 7 Exhibit F [SEALED], # 8 Exhibit G [SEALED], # 9 Exhibit H [SEALED], # 10 Exhibit I [SEALED], # 11 Exhibit J [SEALED], # 12 Exhibit K [SEALED], # 13 Exhibit L [SEALED], # 14 Exhibit M [SEALED], # 15 Exhibit N [SEALED], # 16 Exhibit O [SEALED])(Reichman, Courtland) (Entered: 03/29/2023) |

| | | |
|---|---|---|
| 03/29/2023 | 610 | MOTION by Plaintiff Kove IO, Inc. to compel *Third-Party Amazon.com's and Amazon Technologies, Inc.'s Compliance with Subpoenas* (Attachments: # 1 Declaration of Navid Bayar, # 2 Exhibit A [PUBLIC], # 3 Exhibit B [PUBLIC], # 4 Exhibit C [UNDER SEAL], # 5 Exhibit D [UNDER SEAL], # 6 Exhibit E [UNDER SEAL], # 7 Exhibit F [UNDER SEAL], # 8 Exhibit G [UNDER SEAL], # 9 Exhibit H [UNDER SEAL], # 10 Exhibit I [UNDER SEAL], # 11 Exhibit J [UNDER SEAL], # 12 Exhibit K [UNDER SEAL], # 13 Exhibit L [UNDER SEAL], # 14 Exhibit M [UNDER SEAL], # 15 Exhibit N [UNDER SEAL], # 16 Exhibit O [UNDER SEAL])(Reichman, Courtland) (Entered: 03/29/2023) |
| 03/30/2023 | 611 | MINUTE entry before the Honorable Matthew F. Kennelly: Motions to appear pro hac vice 605 606 are granted. Defendant's motion for a one-day extension to 4/6/2023 at 5:00 PM to file its response to plaintiff's motion to compel deposition is also granted. Plaintiff has filed an additional motion to compel 609 . The response to that motion is to be filed by 4/7/2023. No reply unless requested by the Court. Telephonic motion hearing on the motion to compel deposition and the newly-filed motion to compel (unless deemed unnecessary by the Court) is set for 4/14/2023 at 11:00 AM, using call-in number 888-684-8852, access code 746-1053. The Court will not entertain any further extensions to any of these deadlines. In addition, given the impending fact discovery cutoff date, which the Court does not intend to extend, the deadline for filing any further motions relating to fact discovery is 4/7/2023. The Court does not intend by this to dispense with the requirement to meet and confer in good faith prior to filing a discovery motion and will insist on compliance with that requirement. In addition, the Court advises that, on all pending and yet-to-be-filed discovery motions, it intends to invoke the fee-shifting provisions of Fed. R. Civ. P. 37(a) vis-a-vis the non-prevailing party on any such motion. (mk) (Entered: 03/30/2023) |
| 03/30/2023 | 612 | Notice of Related Proceeding by Amazon Web Services, Inc. (Attachments: # 1 Exhibit Exhibit A)(Sigler, R.) (Entered: 03/30/2023) |
| 03/30/2023 | 613 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number AILNDC-20494804. (Cremona, Gina) (Entered: 03/30/2023) |
| 03/30/2023 | 614 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number AILNDC-20495373. (Fowler, Mateo) (Entered: 03/30/2023) |
| 03/31/2023 | 615 | RESPONSE by Kove IO, Inc. to MOTION by Defendant Amazon Web Services, Inc. to amend/correct *Amazon's Motion for Leave to Amend its Final Invalidity Contentions* 596 (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Cardenas-Navia, Jaime) (Entered: 03/31/2023) |
| 04/01/2023 | 616 | MINUTE entry before the Honorable Matthew F. Kennelly: Motions to appear pro hac vice 613 614 are granted. (mk) (Entered: 04/01/2023) |
| 04/04/2023 | 617 | MINUTE entry before the Honorable Matthew F. Kennelly: Telephonic motion hearing held on 4/4/2023. Plaintiff's motion to amend the invalidity contention 596 is granted for the reasons stated on the record. The parties are directed to file a joint status report by 6/29/2023. A telephonic status hearing is set for 7/6/2023 at 8:50 a.m. The following call-in number will be used for the hearing: 888-684-8852, access code 746-1053. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Mailed notice. (mma, ) (Entered: 04/04/2023) |
| 04/04/2023 | 618 | Notice of Related Proceedings by Amazon Web Services, Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Sigler, R.) (Entered: 04/04/2023) |

| | | |
|---|---|---|
| 04/05/2023 | 619 | MOTION by Plaintiff Kove IO, Inc. to supplement *Motion to Enforce Third-Party Amazon.com's and Amazon Technologies, Inc.'s Compliance with Subpoenas* (Bayar, Navid) (Entered: 04/05/2023) |
| 04/06/2023 | 620 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion to supplement 619 is granted. (mk) (Entered: 04/06/2023) |
| 04/06/2023 | 621 | MOTION by Defendant Amazon Web Services, Inc. to seal document *Opposition to Kove's Second Motion to Compel Discovery of Andrew Jassy* (Fisch, Alan) (Entered: 04/06/2023) |
| 04/06/2023 | 622 | SEALED DOCUMENT by Defendant Amazon Web Services, Inc. *Opposition to Kove's Second Motion to Compel Discovery of Andrew Jassy* (Attachments: # 1 Declaration of Alan M. Fisch, # 2 Exhibit 1 - Letter from A. Fisch to C. Reichman, # 3 Exhibit 2 - A. Henry Deposition Transcript Excerpts, # 4 Exhibit 3 - Letter from C. Reichman, # 5 Exhibit 4 - A. Vermeulen Deposition Transcript Excerpts, # 6 Exhibit 5 - J. Barr Deposition Transcript Excerpts)(Fisch, Alan) (Entered: 04/06/2023) |
| 04/06/2023 | 623 | RESPONSE by Amazon Web Services, Inc.in Opposition to MOTION by Plaintiff Kove IO, Inc. to compel *The Deposition of Andrew Jassy* 602 (Attachments: # 1 Declaration of Alan M. Fisch, # 2 Exhibit 1 - Filed Under Seal, # 3 Exhibit 2 - Filed Under Seal, # 4 Exhibit 3 - Filed Under Seal, # 5 Exhibit 4 - Filed Under Seal, # 6 Exhibit 5 - Filed Under Seal)(Fisch, Alan) (Entered: 04/06/2023) |
| 04/07/2023 | 624 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion for leave to file under seal 621 is granted. (mk) (Entered: 04/07/2023) |
| 04/07/2023 | 625 | MOTION by Respondents Amazon.Com, Inc., Amazon Technologies, Inc. to seal document (Sigler, R.) (Entered: 04/07/2023) |
| 04/07/2023 | 626 | SEALED DOCUMENT by Respondents Amazon Technologies, Inc., Amazon.Com, Inc. *Opposition and Motion to Quash Kove's Third-Party Subpoenas* (Attachments: # 1 Declaration of R. William Sigler, # 2 Exhibit 1 - 2021-11-16 L. Phillips Letter Response to Kove's Amazon.com Subpoena, # 3 Exhibit 2 - 2021-11-16 L. Phillips Letter Response to Kove's Amazon Technologies Subpoena, # 4 Exhibit 3 - 2021-12-02 P. Eklem Letter to L. Phillips Re Third Party Subpoenas, # 5 Exhibit 4 - 2021-12-14 L. Phillips Letter to P. Eklem re Amazon Subpoenas, # 6 Exhibit 5 - 2021-12-24 P. Eklem Letter Re Third Party Subpoenas, # 7 Exhibit 6 - 2022-12-06 Kove Letter Re Subpoenas to Amazon Entities, # 8 Exhibit 7 - 2023-02-09 L. Phillips Letter to N. Bayar re Feb 2 m&c Subpoena Issues, # 9 Exhibit 8 - 2023-01-13 Letter re Amazon Entities Subpoenas, # 10 Exhibit 9 - 2022-01-10 Kove Letter Re 1-7-2021 Meet and Confer)(Sigler, R.) (Entered: 04/07/2023) |
| 04/07/2023 | 627 | RESPONSE by Amazon Technologies, Inc., Amazon.Com, Inc.in Opposition to MOTION by Plaintiff Kove IO, Inc. to compel *Third-Party Amazon.com's and Amazon Technologies, Inc.'s Compliance with Subpoenas* 610 *and Motion to Quash* (Attachments: # 1 Declaration of R. William Sigler, # 2 Exhibit 1 - 2021-11-16 L. Phillips Letter Response to Kove's Amazon.com Subpoena, # 3 Exhibit 2 - 2021-11-16 L. Phillips Letter Response to Kove's Amazon Technologies Subpoena, # 4 Exhibit 3 - Filed Under Seal, # 5 Exhibit 4 - Filed Under Seal, # 6 Exhibit 5 - Filed Under Seal, # 7 Exhibit 6 - Filed Under Seal, # 8 Exhibit 7 - Filed Under Seal, # 9 Exhibit 8 - Filed Under Seal, # 10 Exhibit 9 - Filed Under Seal)(Sigler, R.) (Entered: 04/07/2023) |
| 04/07/2023 | 628 | MOTION by Plaintiff Kove IO, Inc. to seal *Motion and Exhibits Under Seal* (Adler, Adam) (Entered: 04/07/2023) |
| 04/07/2023 | 629 | SEALED MOTION by Plaintiff Kove IO, Inc. *to Compel AWS to Provide Corporate Testimony on Two Discrete Issues* (Attachments: # 1 Exhibit A [UNDER SEAL], # 2 Exhibit B [UNDER SEAL], # 3 Exhibit C [UNDER SEAL], # 4 Exhibit D [UNDER |

| | | |
|---|---|---|
| | | SEAL], # 5 Exhibit E [UNDER SEAL], # 6 Exhibit G [UNDER SEAL], # 7 Exhibit H [UNDER SEAL], # 8 Exhibit I [UNDER SEAL], # 9 Exhibit M [UNDER SEAL], # 10 Exhibit N [UNDER SEAL], # 11 Exhibit R [UNDER SEAL], # 12 Exhibit S [UNDER SEAL], # 13 Exhibit T [UNDER SEAL], # 14 Exhibit U [UNDER SEAL])(Adler, Adam) (Entered: 04/07/2023) |
| 04/07/2023 | 630 | MOTION by Plaintiff Kove IO, Inc. to compel *AWS to Provide Corporate Testimony on Two Discrete Issues* (Attachments: # 1 Declaration of Adam Adler, # 2 Exhibit A [UNDER SEAL], # 3 Exhibit B [UNDER SEAL], # 4 Exhibit C [UNDER SEAL], # 5 Exhibit D [UNDER SEAL], # 6 Exhibit E [UNDER SEAL], # 7 Exhibit F [PUBLIC], # 8 Exhibit G [UNDER SEAL], # 9 Exhibit H [UNDER SEAL], # 10 Exhibit I [UNDER SEAL], # 11 Exhibit J [PUBLIC], # 12 Exhibit K [PUBLIC], # 13 Exhibit L [PUBLIC], # 14 Exhibit M [UNDER SEAL], # 15 Exhibit N [UNDER SEAL], # 16 Exhibit O [PUBLIC], # 17 Exhibit P [PUBLIC], # 18 Exhibit Q [PUBLIC], # 19 Exhibit R [UNDER SEAL], # 20 Exhibit S [UNDER SEAL], # 21 Exhibit T [UNDER SEAL], # 22 Exhibit U [UNDER SEAL], # 23 Exhibit V [PUBLIC], # 24 Exhibit W [PUBLIC])(Adler, Adam) (Entered: 04/07/2023) |
| 04/08/2023 | 631 | MINUTE entry before the Honorable Matthew F. Kennelly: Defendant's motion to file response under seal 625 is granted. Defendant must file under seal a complete copy of the sealed version, including all exhibits, unless it has already done so. Plaintiff's motion for leave to file motion and exhibits under seal 628 is granted. Plaintiff must file under seal a complete copy of the sealed version, including all exhibits. Response to motion to compel 629 is to be filed by 4/13/2023 at 4:00 PM. Telephonic hearing is set for 4/14/2023 at 11:00 AM, using call-in number 888-684-8852, access code 746-1053. (mk) (Entered: 04/08/2023) |
| 04/12/2023 | 632 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number AILNDC-20532565. (Fung, Ken) (Entered: 04/12/2023) |
| 04/13/2023 | 633 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion of Ken Fung to appear pro hac vice 632 is granted. (mk) (Entered: 04/13/2023) |
| 04/13/2023 | 634 | MINUTE entry before the Honorable Matthew F. Kennelly: Plaintiff has not complied with the Court's order to file under seal a complete version of its latest motion to compel including EVERY exhibit - not just the under-seal exhibits as plaintiff did when it originally filed the motion. The motion will be denied if plaintiff does not comply within the next 20 minutes (i.e. by 1:00 PM Central time today). (mk) (Entered: 04/13/2023) |
| 04/13/2023 | 635 | SEALED MOTION by Plaintiff Kove IO, Inc. *to Compel AWS to Provide Corporate Testimony on Two Discrete Issues* (Attachments: # 1 Declaration of Adam Adler, # 2 Exhibit A [SEALED], # 3 Exhibit B [SEALED], # 4 Exhibit C [SEALED], # 5 Exhibit D [SEALED], # 6 Exhibit E [SEALED], # 7 Exhibit F [PUBLIC], # 8 Exhibit G [SEALED], # 9 Exhibit H [SEALED], # 10 Exhibit I [SEALED], # 11 Exhibit J [PUBLIC], # 12 Exhibit K [PUBLIC], # 13 Exhibit L [PUBLIC], # 14 Exhibit M [SEALED], # 15 Exhibit N [SEALED], # 16 Exhibit O [PUBLIC], # 17 Exhibit P [PUBLIC], # 18 Exhibit Q [PUBLIC], # 19 Exhibit R [SEALED], # 20 Exhibit S [SEALED], # 21 Exhibit T [SEALED], # 22 Exhibit U [SEALED], # 23 Exhibit V [PUBLIC], # 24 Exhibit W [PUBLIC])(Adler, Adam) (Entered: 04/13/2023) |
| 04/13/2023 | 636 | MOTION by Defendant Amazon Web Services, Inc. to seal *Amazon's Opposition to Kove's Motion to Compel Corporate Testimony* (Sigler, R.) (Entered: 04/13/2023) |
| 04/13/2023 | 637 | SEALED DOCUMENT by Defendant Amazon Web Services, Inc. *Amazon's Opposition to Kove's Motion to Compel Corporate Testimony (Dkt. 629)* (Attachments: # 1 Declaration of R. Sigler ISO Opposition to Kove's MTC Corporate Testimony, # 2 Exhibit 1 - 2021-03-30 Email from A. Adler to J. Saltman, # 3 Exhibit 2 - 2021-04-01 |

| | | |
|---|---|---|
| | | Email chain between parties, # 4 Exhibit 3 - 2023-01-31 Letter from N. Bayar to J. Saltman, # 5 Exhibit 4 - 2021-10-04 Letter from T. Mauze to J. Saltman [SEALED], # 6 Exhibit 5 - 2021-08-10 Letter from E. Bernard to P. Eklem [SEALED], # 7 Exhibit 6 - 2021-08-23 Letter from P. Eklem to J. Saltman [SEALED], # 8 Exhibit 7 - Additional correspondence on 30(b)(6) deposition [SEALED], # 9 Exhibit 8 - 2023-03-30 Letter from J. Saltman to A. Adler [SEALED], # 10 Exhibit 9 - 2021-06-04 Excerpts from Vermeulen Deposition Transcript [SEALED])(Sigler, R.) (Entered: 04/13/2023) |
| 04/13/2023 | 638 | RESPONSE by Amazon Web Services, Inc.in Opposition to SEALED MOTION by Plaintiff Kove IO, Inc. *to Compel AWS to Provide Corporate Testimony on Two Discrete Issues* 629 (Attachments: # 1 Declaration of R. Sigler ISO Opposition to Kove's MTC Corporate Testimony, # 2 Exhibit 1 - 2021-03-30 Email from A. Adler to J. Saltman, # 3 Exhibit 2 - 2021-04-01 Email chain between parties, # 4 Exhibit 3 - 2023-01-31 Letter from N. Bayar to J. Saltman, # 5 Exhibit 4 - Filed Under Seal, # 6 Exhibit 5 - Filed Under Seal, # 7 Exhibit 6 - Filed Under Seal, # 8 Exhibit 7 - Filed Under Seal, # 9 Exhibit 8 - Filed Under Seal, # 10 Exhibit 9 - Filed Under Seal)(Sigler, R.) (Entered: 04/13/2023) |
| 04/14/2023 | 639 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion to file response under seal 636 is granted. It appears that defendant has already filed a complete version under seal and a redacted version in the public record. (mk) (Entered: 04/14/2023) |
| 04/14/2023 | 640 | MINUTE entry before the Honorable Matthew F. Kennelly: Telephonic motion hearing held on 4/14/2023. Oral rulings made on the plaintiff's motions to compel. The plaintiff's motion to compel the deposition 601 602 is granted. The deposition is limited to one hour and will take place in the city or town the Mr. Jassy's office is, or some other place designated by the defendant. The deposition must take place before the conclusion of discovery. Plaintiff's motion to compel to enforce [609 610 is denied as to the reasons stated more fully on the record. Plaintiff' motion to compel AWS 629 630 635 is granted as to the reasons stated on the record. Case remains set for a telephonic status hearing on 7/6/2023 617 . Mailed notice. (mma, ) (Entered: 04/14/2023) |
| 04/15/2023 | 641 | MINUTE entry before the Honorable Matthew F. Kennelly: The minute entry dated 4/14/2023 640 is corrected to read as follows. Telephonic motion hearing held on 4/14/2023. Oral rulings made on the plaintiff's motions to compel. The plaintiff's motion to compel the deposition of Andrew Jassy 601 602 is granted to the following extent: plaintiff may take the deposition of Mr. Jassy limited to one hour in the city or town of Mr. Jassy's office, or another convenient location designated by the defendant. The deposition must take place before the deadline for completing fact discovery. Plaintiff's motion to enforce subpoenas 609 610 is denied for the reasons stated on the record. Plaintiff's motion to compel AWS to provide corporate testimony on two issues 629 630 635 is granted to the extent stated on the record. The case remains set for a telephonic status hearing on 7/6/2023 617 with a joint status report to be filed as previously ordered. (mk) (Entered: 04/15/2023) |
| 04/27/2023 | 642 | MOTION by Defendant Amazon Web Services, Inc. to seal document *(Notice)* (Sigler, R.) (Entered: 04/27/2023) |
| 04/27/2023 | 643 | SEALED DOCUMENT by Defendant Amazon Web Services, Inc. *Notice of Compliance with Orders* (Sigler, R.) (Entered: 04/27/2023) |
| 04/27/2023 | 644 | Notice by Amazon Web Services, Inc. *of Compliance with Orders* (Sigler, R.) (Entered: 04/27/2023) |
| 04/28/2023 | 645 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion to file under seal 642 is granted. (mk) (Entered: 04/28/2023) |
| 04/28/2023 | 646 | MOTION by Plaintiff Kove IO, Inc. to amend/correct *(Unopposed) to Amend Its Final Validity Contentions* (Attachments: # 1 Exhibit A)(Cardenas-Navia, Jaime) (Entered: |

| | | |
|---|---|---|
| | | 04/28/2023) |
| 04/29/2023 | 647 | MINUTE entry before the Honorable Matthew F. Kennelly: Unopposed motion to amend final validity contentions 646 is granted. (mk) (Entered: 04/29/2023) |
| 05/17/2023 | 648 | Notice of Related Proceedings by Amazon Web Services, Inc. (Attachments: # 1 Exhibit A)(Sigler, R.) (Entered: 05/17/2023) |
| 05/23/2023 | 649 | MOTION by Plaintiff Kove IO, Inc. for extension of time *Regarding Expert Discovery Deadlines [Joint Motion]* (Attachments: # 1 Text of Proposed Order)(Hoang, Khue) (Entered: 05/23/2023) |
| 05/24/2023 | 650 | MINUTE entry before the Honorable Matthew F. Kennelly: The parties' joint motion to extend certain expert discovery-related deadlines 649 is granted, based on the express representation that this does not and will not affect any other deadlines set by the Court. The deadline for opening Rule 26(a)(2) disclosures is extended to 7/3/2023, the deadline for rebuttal Rule 26(a)(2) disclosures is extended to 8/18/2023, and the deadline for completing expert depositions is extended to 9/8/2023. (mk) (Entered: 05/24/2023) |
| 06/20/2023 | 651 | MOTION by Defendant Amazon Web Services, Inc. to seal document *Motion to Compel Deposition of John Overton* (Sigler, R.) (Entered: 06/20/2023) |
| 06/20/2023 | 652 | SEALED DOCUMENT by Defendant Amazon Web Services, Inc. *Motion to Compel Deposition of John Overton* (Attachments: # 1 Declaration of R. William Sigler ISO Motion to Compel Overton Deposition, # 2 Exhibit A - J. Overton Deposition Transcript Excerpts [SEALED], # 3 Exhibit B - 2023-05-24 B. Sigler Letter to J. Cardenas-Navia re Overton Deposition [SEALED], # 4 Exhibit C - 2023-06-05 J. Cardenas-Navia Letter to B. Sigler re Overton Deposition [SEALED])(Sigler, R.) (Entered: 06/20/2023) |
| 06/20/2023 | 653 | MOTION by Defendant Amazon Web Services, Inc. to compel *Deposition of John Overton* (Attachments: # 1 Declaration of R. William Sigler ISO Motion to Compel Overton Deposition, # 2 Exhibit A - J. Overton Deposition Transcript Excerpts [PUBLIC], # 3 Exhibit B - 2023-05-24 B. Sigler Letter to J. Cardenas-Navia re Overton Deposition [PUBLIC], # 4 Exhibit C - 2023-06-05 J. Cardenas-Navia Letter to B. Sigler re Overton Deposition [PUBLIC], # 5 Exhibit D - Ex Parte Reexamination Interview Summary [PUBLIC], # 6 Exhibit E - Excerpts from Kove's Seventh Amended Interrogatory Responses [PUBLIC])(Sigler, R.) (Entered: 06/20/2023) |
| 06/24/2023 | 654 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion to file under seal 651 is granted. Response to defendant's motion to compel deposition 651 is to be filed by 6/29/2023. No reply is permitted unless the Court asks for a reply. Telephonic motion hearing is set for 7/6/2023 at 8:50 AM, using call-in number 888-684-8852, access code 746-1053. The Court reserves the right to vacate the hearing if it determines a hearing is not needed. (mk) (Entered: 06/24/2023) |
| 06/29/2023 | 655 | MOTION by Defendant Amazon Web Services, Inc. to seal document *Joint Status Report* (Sigler, R.) (Entered: 06/29/2023) |
| 06/29/2023 | 656 | SEALED DOCUMENT by Defendant Amazon Web Services, Inc. *Joint Status Report* (Sigler, R.) (Entered: 06/29/2023) |
| 06/29/2023 | 657 | STATUS Report *(Joint)* by Amazon Web Services, Inc. |

| | | |
|---|---|---|
| | | (Sigler, R.) (Entered: 06/29/2023) |
| 06/29/2023 | 658 | MOTION by Plaintiff Kove IO, Inc. to seal *Kove's Opposition to Amazon's Motion to Compel Additional Time to Depose John K. Overton and Exhibits* <br><br> (Hoang, Khue) (Entered: 06/29/2023) |
| 06/29/2023 | 659 | SEALED DOCUMENT by Plaintiff Kove IO, Inc. *Opposition to Amazon's Motion to Compel Additional Time to Depose John K. Overton (Dkt. 652)* (Attachments: # 1 Declaration of Gina H. Cremona, # 2 Exhibit 1 [SEALED], # 3 Exhibit 2 [SEALED], # 4 Errata 3 [SEALED], # 5 Exhibit 4 [SEALED], # 6 Exhibit 5 [SEALED])(Hoang, Khue) (Entered: 06/29/2023) |
| 06/29/2023 | 660 | RESPONSE by Plaintiff Kove IO, Inc. to sealed document, 652 *in Opposition to Amazon's Motion to Compel Additional Time to Depose John K. Overton* (Attachments: # 1 Declaration of Gina H. Cremona, # 2 Exhibit 1 [FILED UNDER SEAL], # 3 Exhibit 2 [FILED UNDER SEAL], # 4 Exhibit 3 [FILED UNDER SEAL], # 5 Exhibit 4 [FILED UNDER SEAL], # 6 Exhibit 5 [FILED UNDER SEAL])(Hoang, Khue) (Entered: 06/29/2023) |
| 06/30/2023 | 661 | MINUTE entry before the Honorable Matthew F. Kennelly: The Court has reviewed the parties' joint status report. They are to be prepared to discuss at the 7/6/2023 status 'hearing the anticipated length of trial and to set a trial date. In addition, the motions to file under seal 658 655 will be addressed at the status hearing. The Court has become concerned regarding the overdesignation of material for filing under seal. (mk) (Entered: 06/30/2023) |
| 07/05/2023 | 662 | Notice of Related Proceeding by Amazon Web Services, Inc. (Attachments: # 1 Exhibit A - 9000109 Reexam Office Action Response (978 Patent))(Sigler, R.) (Entered: 07/05/2023) |
| 07/06/2023 | 663 | MINUTE entry before the Honorable Matthew F. Kennelly: Telephonic status and motion hearings held on 7/6/2023. Defendant's motion to compel 653 is granted in part. The defendants are given an additional 3 hours for the Rule 30(b)(1) and 30(b)(6) depositions of Dr. Overton. Dr. Overton is to appear on a date to be agreed upon by the parties that may not be later than 7/31/2023. Motions for leave to file briefs 655 658 under seal are denied for the reasons stated on the record. Jury trial of approximately two weeks (with specific time limits to be set later) is set for 4/4/2024 at 9:15 a.m. Pretrial conference is set for 3/21/2024 at 1:30 p.m. Final Pretrial Order is due 2/26/2024. A telephonic status hearing is set for 9/8/2023 at 8:45 a.m. The parties are directed to file a joint status report on 9/1/2023. The following call-in number will be used for the hearing: 888-684-8852; access code 746-1053. Mailed notice. (mma, ) (Entered: 07/06/2023) |
| 07/13/2023 | 664 | STATUS Report *(Re-filed)* by Amazon Web Services, Inc. <br>(Sigler, R.) (Entered: 07/13/2023) |
| 07/17/2023 | 665 | MOTION by Plaintiff Kove IO, Inc. to seal *Renewed Motion for Leave to File Kove's Opposition to Amazon's Motion to Compel Additional Time to Depose John K. Overton and Exhibits* <br>(Cremona, Gina) (Entered: 07/17/2023) |
| 07/17/2023 | 666 | SEALED DOCUMENT by Plaintiff Kove IO, Inc. *Opposition to Amazon's Motion to Compel Additional Time to Depose John K. Overton* (Attachments: # 1 Declaration of Gina H. Cremona, # 2 Exhibit 1, # 3 Exhibit 2 [SEALED], # 4 Exhibit 3 [SEALED], # 5 Exhibit 4, # 6 Exhibit 5)(Hoang, Khue) (Entered: 07/17/2023) |

| | | |
|---|---|---|
| 07/17/2023 | 667 | RESPONSE by Plaintiff Kove IO, Inc. to sealed document, 652 *in Opposition to Amazon's Motion to Compel Additional Time to Depose John K. Overton* (Attachments: # 1 Declaration of Gina H. Cremona, # 2 Exhibit 1, # 3 Exhibit 2 [REDACTED], # 4 Exhibit 3 [REDACTED], # 5 Exhibit 4, # 6 Exhibit 5)(Hoang, Khue) (Entered: 07/17/2023) |
| 07/18/2023 | 668 | MINUTE entry before the Honorable Matthew F. Kennelly: Renewed motion for leave to file opposition memorandum under seal 665 is granted. (mk) (Entered: 07/18/2023) |
| 08/18/2023 | 669 | NOTICE by Taylor Mauze of Change of Address *for Reichman Jorgensen Lehman & Feldberg LLP's Austin office* (Mauze, Taylor) (Entered: 08/18/2023) |
| 08/23/2023 | 670 | MINUTE entry before the Honorable Matthew F. Kennelly: The docket entry for 7/6/2023 663 is corrected to reflect that the case is set for a jury trial of approximately two weeks (with specific time limits to be set later) for 4/2/2024 at 9:15 a.m. (mk) (Entered: 08/23/2023) |
| 08/24/2023 | 671 | MINUTE entry before the Honorable Matthew F. Kennelly: The Court once again got the previously-set trial date wrong in its docket entry, for which it apologizes. The approximately two-week jury trial in this case is set for **Monday, April 1, 2024 at 9:15 AM**. (mk) (Entered: 08/24/2023) |
| 08/25/2023 | 672 | NOTICE by Navid Bayar of Change of Address *for Reichman Jorgensen Lehman & Feldberg LLP's Austin office* (Bayar, Navid) (Entered: 08/25/2023) |
| 08/31/2023 | 673 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number AILNDC-20992583. *of Naveed S. Hasan* (Hasan, Naveed) (Entered: 08/31/2023) |
| 09/01/2023 | 674 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion by Naveed S. Hasan to appear pro hac vice 673 is granted. (mk) (Entered: 09/01/2023) |
| 09/01/2023 | 675 | STATUS Report *(Joint)* by Amazon Web Services, Inc. (Sigler, R.) (Entered: 09/01/2023) |
| 09/02/2023 | 676 | MINUTE entry before the Honorable Matthew F. Kennelly: The Court has reviewed the parties' joint status report, which discusses summary judgment briefing, Daubert motions, and settlement. The Court considers the proposed summary judgment extended page limitations to be excessive (100 pages total per side). The Court will approve the proposal, however, but only with this limitation: if a party's position supporting or opposing summary judgment includes a contention under Daubert, Federal Rule of Evidence 702, or otherwise that the expert testimony disclosed and/or offered by the opposing party should not be considered, then the arguments on this (as well as the opposing party's counterarguments) must be included in the summary judgment briefing, within the page limits the parties have proposed (40/80/60/20). Regarding Rule 56.1 statements of fact, the moving party is limited to 100, and the opposing party is limited to 65. The Court approves the parties' proposal regarding requests to file material under seal. The telephonic status hearing set for 8:45 AM on 9/8/2023 is vacated and reset to 8:40 AM on that date, using call-in number 888-684-8852. The Court is keeping the status hearing on the calendar only in the event that the parties have questions regarding the rulings contained in this order. If they do not, they should jointly communicate this to the courtroom deputy clerk by 12:00 noon on 9/7/2023, and in that event the Court will vacate the status hearing. (mk) (Entered: 09/02/2023) |
| 09/06/2023 | 677 | MINUTE entry before the Honorable Matthew F. Kennelly: Pursuant to the communication with the courtroom deputy clerk, the telephonic status hearing set for |

| | | |
|---|---|---|
| | | 9/8/2023 is vacated. Mailed notice. (mma, ) (Entered: 09/06/2023) |
| 09/08/2023 | 678 | MOTION by Plaintiff Kove IO, Inc. to seal *Motion for Sanctions for Spoliation of Evidence and Exhibits Under Seal*<br><br>(Reichman, Courtland) (Entered: 09/08/2023) |
| 09/08/2023 | 679 | SEALED MOTION by Plaintiff Kove IO, Inc. *Motion for Sanctions for Spoliation of Evidence* (Attachments: # 1 Declaration of Dr. Michael T. Goodrich, # 2 Declaration of Savannah Carnes ISO Kove's Motion for Sanctions for Spoliation of Evidence, # 3 Exhibit A, # 4 Exhibit B, # 5 Exhibit C, # 6 Exhibit D, # 7 Exhibit E, # 8 Exhibit F, # 9 Exhibit G, # 10 Exhibit H, # 11 Exhibit I, # 12 Exhibit J, # 13 Exhibit K, # 14 Exhibit L, # 15 Exhibit M, # 16 Exhibit N, # 17 Exhibit O, # 18 Exhibit P, # 19 Exhibit Q, # 20 Exhibit R, # 21 Exhibit S, # 22 Exhibit T, # 23 Exhibit U, # 24 Exhibit V, # 25 Exhibit W, # 26 Exhibit X, # 27 Exhibit Y, # 28 Exhibit Z, # 29 Exhibit AA, # 30 Exhibit BB, # 31 Exhibit CC, # 32 Exhibit DD, # 33 Exhibit EE, # 34 Exhibit FF, # 35 Exhibit GG, # 36 Exhibit HH, # 37 Exhibit II, # 38 Exhibit JJ, # 39 Exhibit KK, # 40 Exhibit LL, # 41 Exhibit MM, # 42 Exhibit NN, # 43 Exhibit OO, # 44 Exhibit PP, # 45 Exhibit QQ, # 46 Exhibit RR, # 47 Exhibit SS, # 48 Exhibit TT, # 49 Exhibit UU)(Reichman, Courtland) (Entered: 09/08/2023) |
| 09/09/2023 | 680 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion for leave to file motion for sanctions under seal 678 is provisionally granted pursuant to the procedure proposed by the parties in their 9/1/2023 status report (dkt. 675). The Court sets the matter for a telephonic hearing on 9/13/2023 at 8:50 AM, using call-in number 888-684-8852, access code 746-1053. The Court needs to know more about how the motion for sanctions interrelates with the anticipated dispositive motions in this case. (mk) (Entered: 09/09/2023) |
| 09/13/2023 | 681 | MINUTE entry before the Honorable Matthew F. Kennelly: Telephonic status hearing held on 9/13/2023. Briefing on the motion for sanctions is stayed pending the resolution of dispositive motions. Mailed notice. (mma, ) (Entered: 09/13/2023) |
| 09/14/2023 | 682 | MOTION by Defendant Amazon Web Services, Inc. to seal *Kove's Motion for Sanctions for Spoliation of Evidence and Certain Materials in Support*<br><br>(Attachments: # 1 Declaration of Lisa Phillips in Support of Amazon's Motion to Seal Kove's Motion for Sanctions for Spoliation of Evidence and Certain Materials in Support)(Sigler, R.) (Entered: 09/14/2023) |
| 09/14/2023 | 683 | MOTION by Defendant Amazon Web Services, Inc. for sanctions *for Spoliation of Evidence filed by Kove IO, Inc. (Public Version)* (Attachments: # 1 Declaration of Dr. Michael T. Goodrich, # 2 Declaration of Savannah Carnes in Support of Kove IO, Inc.'s Motion for Sanctions for Spoliation of Evidence, # 3 Exhibit A (Public Version), # 4 Exhibit B (Public Version), # 5 Exhibit C (Public Version), # 6 Exhibit D (Public Version), # 7 Exhibit E (Public Version), # 8 Exhibit F (Public Version), # 9 Exhibit G (Public Version), # 10 Exhibit H (Public Version), # 11 Exhibit I (Public Version), # 12 Exhibit J (Public Version), # 13 Exhibit K (Public Version), # 14 Exhibit L (Public Version), # 15 Exhibit M (Public Version), # 16 Exhibit N (Public Version), # 17 Exhibit O (Public Version), # 18 Exhibit P (Public Version), # 19 Exhibit Q (Public Version), # 20 Exhibit R (Public Version), # 21 Exhibit S (Public Version), # 22 Exhibit T (Public Version), # 23 Exhibit U (Public Version), # 24 Exhibit V (Public Version), # 25 Exhibit W (Public Version), # 26 Exhibit X (Public Version), # 27 Exhibit Y (Public Version), # 28 Exhibit Z (Public Version), # 29 Exhibit AA (Public Version), # 30 Exhibit BB (Public Version), # 31 Exhibit CC (Public Version), # 32 Exhibit DD (Public Version), # 33 Exhibit EE (Public Version), # 34 Exhibit FF (Public Version), # 35 |

| | | |
|---|---|---|
| | | Exhibit GG (Public Version), # 36 Exhibit HH (Public Version), # 37 Exhibit II (Public Version), # 38 Exhibit JJ (Public Version), # 39 Exhibit KK (Public Version), # 40 Exhibit LL (Public Version), # 41 Exhibit NN (Public Version), # 42 Exhibit OO (Public Version), # 43 Exhibit PP (Public Version), # 44 Exhibit QQ (Public Version), # 45 Exhibit RR (Public Version), # 46 Exhibit TT (Public Version), # 47 Exhibit UU (Public Version))(Sigler, R.) (Entered: 09/14/2023) |
| 09/15/2023 | 684 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion to seal 682 is granted. (mk) (Entered: 09/15/2023) |
| 09/29/2023 | 685 | MOTION by Defendant Amazon Web Services, Inc. to seal *Motion for Summary Judgement and Statement of Material Facts* <br><br> (Sigler, R.) (Entered: 09/29/2023) |
| 09/29/2023 | 686 | SEALED MOTION by Defendant Amazon Web Services, Inc. *for Summary Judgment* (Sigler, R.) (Entered: 09/29/2023) |
| 09/29/2023 | 687 | SEALED DOCUMENT by Defendant Amazon Web Services, Inc. *Statement of Material Facts* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50, # 51 Exhibit 51, # 52 Exhibit 52, # 53 Exhibit 53, # 54 Exhibit 54, # 55 Exhibit 55, # 56 Exhibit 56, # 57 Exhibit 57, # 58 Exhibit 58, # 59 Exhibit 59, # 60 Exhibit 60, # 61 Exhibit 61, # 62 Exhibit 62, # 63 Exhibit 63, # 64 Exhibit 64, # 65 Exhibit 65, # 66 Exhibit 66, # 67 Exhibit 67, # 68 Exhibit 68, # 69 Exhibit 69, # 70 Exhibit 70, # 71 Exhibit 71, # 72 Exhibit 72, # 73 Exhibit 73, # 74 Exhibit 74, # 75 Exhibit 75, # 76 Exhibit 76, # 77 Exhibit 77, # 78 Exhibit 78, # 79 Exhibit 79, # 80 Exhibit 80, # 81 Exhibit 81, # 82 Declaration Of Bill Sigler ISO Motion for Summary Judgment)(Sigler, R.) (Entered: 09/29/2023) |
| 10/05/2023 | 688 | MOTION by Defendant Amazon Web Services, Inc. to seal *Motion for Summary Judgment and Statement of Material Facts* <br> (Attachments: # 1 Declaration J. Saltman Dec. ISO Motion for Leave)(Sigler, R.) (Entered: 10/05/2023) |
| 10/05/2023 | 689 | MOTION by Defendant Amazon Web Services, Inc. for summary judgment <br> (Sigler, R.) (Entered: 10/05/2023) |
| 10/05/2023 | 690 | Statement of Material Facts (Public Version) STATEMENT by Amazon Web Services, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 |

| | | |
|---|---|---|
| | | Exhibit 47, # <u>48</u> Exhibit 48, # <u>49</u> Exhibit 49, # <u>50</u> Exhibit 50, # <u>51</u> Exhibit 51, # <u>52</u> Exhibit 52, # <u>53</u> Exhibit 53, # <u>54</u> Exhibit 54, # <u>55</u> Exhibit 55, # <u>56</u> Exhibit 56, # <u>57</u> Exhibit 57, # <u>58</u> Exhibit 58, # <u>59</u> Exhibit 59, # <u>60</u> Exhibit 60, # <u>61</u> Exhibit 61, # <u>62</u> Exhibit 62, # <u>63</u> Exhibit 63, # <u>64</u> Exhibit 64, # <u>65</u> Exhibit 65, # <u>66</u> Exhibit 66, # <u>67</u> Exhibit 67, # <u>68</u> Exhibit 68, # <u>69</u> Exhibit 69, # <u>70</u> Exhibit 70, # <u>71</u> Exhibit 71, # <u>72</u> Exhibit 72, # <u>73</u> Exhibit 73, # <u>74</u> Exhibit 74, # <u>75</u> Exhibit 75, # <u>76</u> Exhibit 76, # <u>77</u> Exhibit 77, # <u>78</u> Exhibit 78, # <u>79</u> Exhibit 79, # <u>80</u> Exhibit 80, # <u>81</u> Exhibit 81, # <u>82</u> Declaration B. Sigler Dec. ISO Motion For Summary Judgment)(Sigler, R.) (Entered: 10/05/2023) |
| 10/06/2023 | <u>691</u> | MINUTE entry before the Honorable Matthew F. Kennelly: Defendant's motion for leave to file under seal <u>688</u> is granted; previous motion to file under seal <u>685</u> is moot. Defendant is to file a complete version of its submission under seal and a redacted version in the public record. In addition, defendant is directed to deliver a USB drive with the unredacted version to Judge Kennelly's chambers (Room 2188). (mk) (Entered: 10/06/2023) |
| 10/18/2023 | <u>692</u> | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number AILNDC-21233371.<br><br>(Washburn, Ian) (Entered: 10/18/2023) |
| 10/19/2023 | <u>693</u> | MINUTE entry before the Honorable Matthew F. Kennelly: Motion by Ian Washburn to appear pro hac vice <u>692</u> is granted. (mk) (Entered: 10/19/2023) |
| 10/23/2023 | <u>694</u> | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number BILNDC-21248500.<br><br>(Sheasby, Jason) (Entered: 10/23/2023) |
| 10/24/2023 | <u>695</u> | MINUTE entry before the Honorable Matthew F. Kennelly: Motion by Jason Sheasby to appear pro hac vice <u>694</u> is granted. (mk) (Entered: 10/24/2023) |
| 11/03/2023 | <u>696</u> | MOTION by Plaintiff Kove IO, Inc. for extension of time *(Unopposed Emergency Motion for Extension of Deadlines)*<br><br>(Attachments: # <u>1</u> Text of Proposed Order)(Hoang, Khue) (Entered: 11/03/2023) |
| 11/03/2023 | <u>697</u> | MINUTE entry before the Honorable Matthew F. Kennelly: Plaintiff's unopposed emergency motion for extension of time <u>696</u> is granted. The deadline date for the plaintiff's response and cross-summary judgment motion is moved to 11/6/2023. Deadline for the defendant's reply and response to cross-motion for summary judgment is extended to 12/4/2023. Due date for the plaintiff's reply on the cross-motion is moved to 12/22/2023. Each of these submissions must be filed by 4:30 p.m. on the due date. Mailed notice. (mma, ) (Entered: 11/03/2023) |
| 11/06/2023 | <u>698</u> | MOTION by Plaintiff Kove IO, Inc. to seal *Opposition to AWS's Motion for Summary Judgment and Cross Motions for Summary Judgment and to Exclude and Exhibits*<br><br>(Reichman, Courtland) (Entered: 11/06/2023) |
| 11/06/2023 | <u>699</u> | SEALED RESPONSE *(Plaintiff Kove IO, Inc.'s Opposition to AWS's Motion for Summary Judgment [Dkt. 686] and Cross Motions for Summary Judgment and to Exclude* (Reichman, Courtland) (Entered: 11/06/2023) |
| 11/06/2023 | <u>700</u> | SEALED DOCUMENT by Plaintiff Kove IO, Inc. *Response to Defendant Amazon Web Services, Inc.'s Statement of Material Facts* (Attachments: # <u>1</u> Exhibit K1, # <u>2</u> Exhibit ) |

| | | |
|---|---|---|
| | | K2, # 3 Exhibit K3, # 4 Exhibit K4, # 5 Exhibit K5, # 6 Exhibit K6, # 7 Exhibit K7, # 8 Exhibit K8, # 9 Exhibit K9, # 10 Exhibit K10, # 11 Exhibit K11, # 12 Exhibit K12, # 13 Exhibit K13, # 14 Exhibit K14, # 15 Exhibit K15, # 16 Exhibit K16, # 17 Exhibit K17, # 18 Exhibit K18, # 19 Exhibit K19, # 20 Exhibit K20, # 21 Exhibit K21, # 22 Exhibit K22, # 23 Exhibit K23, # 24 Exhibit K24, # 25 Exhibit K25, # 26 Exhibit K26, # 27 Exhibit K27, # 28 Exhibit K28, # 29 Exhibit K29, # 30 Exhibit K30, # 31 Exhibit K31, # 32 Exhibit K32, # 33 Exhibit K33, # 34 Exhibit K34, # 35 Exhibit K35, # 36 Exhibit K36, # 37 Exhibit K37, # 38 Exhibit K38, # 39 Exhibit K39, # 40 Exhibit K40, # 41 Exhibit K41, # 42 Exhibit K42, # 43 Exhibit K43, # 44 Exhibit K44, # 45 Exhibit K45, # 46 Exhibit K46, # 47 Exhibit K47, # 48 Exhibit K48, # 49 Exhibit K49, # 50 Exhibit K50, # 51 Exhibit K51, # 52 Exhibit K52, # 53 Exhibit K53, # 54 Exhibit K54, # 55 Exhibit K55, # 56 Exhibit K56, # 57 Exhibit K57, # 58 Exhibit K58, # 59 Exhibit K59, # 60 Exhibit K60, # 61 Exhibit K61, # 62 Exhibit K62, # 63 Exhibit K63, # 64 Exhibit K64, # 65 Exhibit K65, # 66 Exhibit K66, # 67 Exhibit K67, # 68 Exhibit K68, # 69 Exhibit K69, # 70 Exhibit K70, # 71 Exhibit K71, # 72 Exhibit K72, # 73 Exhibit K73, # 74 Exhibit K74, # 75 Exhibit K75, # 76 Exhibit K76, # 77 Exhibit K77, # 78 Exhibit K78, # 79 Exhibit K79, # 80 Exhibit K80, # 81 Exhibit K81, # 82 Exhibit K82, # 83 Exhibit K83, # 84 Exhibit K84, # 85 Exhibit K85, # 86 Exhibit K86, # 87 Exhibit K87, # 88 Exhibit K88, # 89 Exhibit K89, # 90 Exhibit K90, # 91 Exhibit K91, # 92 Exhibit K92, # 93 Exhibit K93, # 94 Exhibit K94, # 95 Exhibit K95, # 96 Exhibit K96, # 97 Exhibit K97, # 98 Exhibit K98, # 99 Exhibit K99, # 100 Exhibit K100, # 101 Exhibit K101, # 102 Exhibit K102, # 103 Exhibit K103, # 104 Exhibit K104, # 105 Exhibit K105, # 106 Exhibit K106, # 107 Exhibit K107, # 108 Exhibit K108, # 109 Exhibit K109, # 110 Exhibit K110, # 111 Exhibit K111, # 112 Exhibit K112, # 113 Exhibit K113, # 114 Exhibit K114, # 115 Exhibit K115, # 116 Exhibit K116, # 117 Exhibit K117, # 118 Exhibit K118, # 119 Exhibit K119, # 120 Exhibit K120, # 121 Exhibit K121, # 122 Exhibit K122, # 123 Exhibit K123, # 124 Exhibit K124, # 125 Exhibit K125, # 126 Exhibit K126, # 127 Exhibit K127, # 128 Exhibit K128, # 129 Exhibit K129, # 130 Exhibit K130, # 131 Exhibit K131, # 132 Exhibit K132, # 133 Exhibit K133, # 134 Exhibit K134, # 135 Exhibit K135, # 136 Exhibit K136, # 137 Exhibit K137, # 138 Exhibit K138, # 139 Exhibit K139, # 140 Exhibit K140, # 141 Exhibit K141, # 142 Exhibit K142, # 143 Exhibit K143, # 144 Exhibit K144, # 145 Exhibit K145, # 146 Exhibit K146, # 147 Exhibit K147, # 148 Exhibit K148, # 149 Exhibit K149, # 150 Exhibit K150, # 151 Exhibit K151, # 152 Exhibit K152, # 153 Exhibit K153, # 154 Exhibit K154, # 155 Exhibit K155, # 156 Exhibit K156, # 157 Exhibit K157, # 158 Exhibit K158, # 159 Exhibit K159, # 160 Exhibit K160, # 161 Exhibit K161, # 162 Exhibit K162, # 163 Exhibit K163, # 164 Exhibit K164, # 165 Exhibit K165, # 166 Exhibit K166, # 167 Declaration of Savannah Carnes ISO Pltf's Opposition to AWS's MSJ and Cross Motions for Summary Judgment and to Exclude)(Reichman, Courtland) (Entered: 11/06/2023) |
| 11/06/2023 | 701 | SEALED DOCUMENT by Plaintiff Kove IO, Inc. *Statement of Additional Material Facts ISO Pltf's Opposition to Def's MSJ* (Reichman, Courtland) (Entered: 11/06/2023) |
| 11/06/2023 | 702 | SEALED DOCUMENT by Plaintiff Kove IO, Inc. *Statement of Material Facts in Support of Plaintiff's Cross Motions for Summary Judgment and to Exclude* (Reichman, Courtland) (Entered: 11/06/2023) |
| 11/07/2023 | 703 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion to file under seal 698 is granted. Redacted versions of the submissions are to be promptly filed in the public record. In addition, the Court advises that each party must deliver to Judge Kennelly's chambers (Room 2188) a USB drive containing the unredacted (i.e., under seal) version of its summary judgment submissions. Each exhibit should be bookmarked. (mk) (Entered: 11/07/2023) |
| 11/09/2023 | 704 | MOTION by Defendant Amazon Web Services, Inc. for extension of time to file *Public Versions* |

| | | (Attachments: # 1 Text of Proposed Order)(Saltman, Jeffrey) (Entered: 11/09/2023) |
|---|---|---|
| 11/10/2023 | 705 | MINUTE entry before the Honorable Matthew F. Kennelly: Defendant's motion for an extension of time to 11/15/2023 to file public record versions 704 is granted. (mk) (Entered: 11/10/2023) |
| 11/15/2023 | 706 | MOTION by Plaintiff Kove IO, Inc. to seal *its Opposition to AWS's Motion for Summary Judgment and Cross Motions for Summary Judgment and to Exclude, and Exhibits*<br><br>(Attachments: # 1 Declaration of Savannah Carnes in Support of Redactions, # 2 Declaration of Lisa Phillips in Support of Redactions)(Reichman, Courtland) (Entered: 11/15/2023) |
| 11/15/2023 | 707 | MOTION by Plaintiff Kove IO, Inc. to seal *(Motion for Leave to File Certain Exhibits Non-Electronically with the Clerk and to Seal Certain Exhibits Not Filed Electronically)*<br><br>(Reichman, Courtland) (Entered: 11/15/2023) |
| 11/15/2023 | 708 | RESPONSE by Plaintiff Kove IO, Inc. *(Opposition to AWS's Motion for Summary Judgment and Cross Motions for Summary Judgment and to Exclude)* (Reichman, Courtland) (Entered: 11/15/2023) |
| 11/15/2023 | 709 | Plaintiff Kove IO, Inc.'s LR 56.1(b)(2) Response to Defendant Amazon Web Services, Inc.'s LR 56.1(a)(2) Statement of Material Facts STATEMENT by Kove IO, Inc. (Attachments: # 1 Exhibit K1 (PUBLIC), # 2 Exhibit K2 (PUBLIC), # 3 Exhibit K3 (PUBLIC), # 4 Exhibit K4 (PUBLIC), # 5 Exhibit K5 (PUBLIC), # 6 Exhibit K6 (PUBLIC), # 7 Exhibit K7 (PUBLIC), # 8 Exhibit K8 (PUBLIC), # 9 Exhibit K9 (PUBLIC), # 10 Exhibit K10 (PUBLIC), # 11 Exhibit K11 (PUBLIC), # 12 Exhibit K12 (PUBLIC), # 13 Exhibit K13 (PUBLIC), # 14 Exhibit K14 (PUBLIC), # 15 Exhibit K15 (PUBLIC), # 16 Exhibit K16 (PUBLIC), # 17 Exhibit K17 (PUBLIC), # 18 Exhibit K18 (PUBLIC), # 19 Exhibit K19 (PUBLIC), # 20 Exhibit K20 (PUBLIC), # 21 Exhibit K21 (PUBLIC), # 22 Exhibit K22 (PUBLIC), # 23 Exhibit K23 (PUBLIC), # 24 Exhibit K24 (PUBLIC), # 25 Exhibit K25 (PUBLIC), # 26 Exhibit K26 (PUBLIC), # 27 Exhibit K27 (PUBLIC), # 28 Exhibit K28 (PUBLIC), # 29 Exhibit K29 (PUBLIC), # 30 Exhibit K30 (PUBLIC), # 31 Exhibit K31 (PUBLIC), # 32 Exhibit K32 (PUBLIC), # 33 Exhibit K33 (PUBLIC), # 34 Exhibit K34 (PUBLIC), # 35 Exhibit K35 (SEALED), # 36 Exhibit K36 (PUBLIC), # 37 Exhibit K37 (PUBLIC), # 38 Exhibit K38 (PUBLIC), # 39 Exhibit K39 (PUBLIC), # 40 Exhibit K40 (PUBLIC), # 41 Exhibit K41 (PUBLIC), # 42 Exhibit K42 (PUBLIC), # 43 Exhibit K43 (PUBLIC), # 44 Exhibit K44 (PUBLIC), # 45 Exhibit K45 (PUBLIC), # 46 Exhibit K46 (PUBLIC), # 47 Exhibit K47 (PUBLIC), # 48 Exhibit K48 (PUBLIC), # 49 Exhibit K49 (PUBLIC), # 50 Exhibit K50 (PUBLIC), # 51 Exhibit K51 (PUBLIC), # 52 Exhibit K52 (PUBLIC), # 53 Exhibit K53 (SEALED), # 54 Exhibit K54 (SEALED), # 55 Exhibit K55 (PUBLIC), # 56 Exhibit K56 (PUBLIC), # 57 Exhibit K57 (PUBLIC), # 58 Exhibit K58 (PUBLIC), # 59 Exhibit K59 (PUBLIC), # 60 Exhibit K60 (SEALED), # 61 Exhibit K61 (PUBLIC), # 62 Exhibit K62 (PUBLIC), # 63 Exhibit K63 (SEALED), # 64 Exhibit K64 (SEALED), # 65 Exhibit K65 (SEALED), # 66 Exhibit K66 (PUBLIC), # 67 Exhibit K67 (SEALED), # 68 Exhibit K68 (PUBLIC), # 69 Exhibit K69 (SEALED), # 70 Exhibit K70 (SEALED), # 71 Exhibit K71 (SEALED), # 72 Exhibit K72 (SEALED), # 73 Exhibit K73 (SEALED), # 74 Exhibit K74 (SEALED), # 75 Exhibit K75 (SEALED), # 76 Exhibit K76 (SEALED), # 77 Exhibit K77 (SEALED), # 78 Exhibit K78 (SEALED), # 79 Exhibit K79 (SEALED), # 80 Exhibit K80 (SEALED), # 81 Exhibit K81 (SEALED), # 82 Exhibit K82 (SEALED), # 83 Exhibit K83 (SEALED), # 84 Exhibit K84 (SEALED), # 85 Exhibit K85 (SEALED), # 86 Exhibit K86 (SEALED), # 87 Exhibit K87 (SEALED), # 88 Exhibit K88 (SEALED), # 89 Exhibit K89 (PUBLIC), # 90 Exhibit K90 (PUBLIC), # 91 Exhibit K91 (PUBLIC), |

| | | |
|---|---|---|
| | | # 92 Exhibit K92 (PUBLIC), # 93 Exhibit K93 (PUBLIC), # 94 Exhibit K94 (PUBLIC), # 95 Exhibit K95 (PUBLIC), # 96 Exhibit K96 (PUBLIC), # 97 Exhibit K97 (PUBLIC), # 98 Exhibit K98 (PUBLIC), # 99 Exhibit K99 (PUBLIC), # 100 Exhibit K100 (PUBLIC), # 101 Exhibit K101 (PUBLIC), # 102 Exhibit K102 (PUBLIC), # 103 Exhibit K103 (PUBLIC), # 104 Exhibit K104 (PUBLIC), # 105 Exhibit K105 (PUBLIC), # 106 Exhibit K106 (PUBLIC), # 107 Exhibit K107 (PUBLIC), # 108 Exhibit K108 (SEALED), # 109 Exhibit K109 (SEALED), # 110 Exhibit K110 (SEALED), # 111 Exhibit K111 (SEALED), # 112 Exhibit K112 (SEALED), # 113 Exhibit K113 (SEALED), # 114 Exhibit K114 (SEALED), # 115 Exhibit K115 (SEALED), # 116 Exhibit K116 (SEALED), # 117 Exhibit K117 (SEALED), # 118 Exhibit K118 (SEALED), # 119 Exhibit K119 (SEALED), # 120 Exhibit K120 (SEALED), # 121 Exhibit K121 (SEALED), # 122 Exhibit K122 (SEALED), # 123 Exhibit K123 (SEALED), # 124 Exhibit K124 (SEALED), # 125 Exhibit K125 (SEALED), # 126 Exhibit K126 (PUBLIC), # 127 Exhibit K127 (PUBLIC), # 128 Exhibit K128 (PUBLIC), # 129 Exhibit K129 (PUBLIC), # 130 Exhibit K130 (PUBLIC), # 131 Exhibit K131 (PUBLIC), # 132 Exhibit K132 (PUBLIC), # 133 Exhibit K133 (PUBLIC), # 134 Exhibit K134 (PUBLIC), # 135 Exhibit K135 (PUBLIC), # 136 Exhibit K136 (PUBLIC), # 137 Exhibit K137 (PUBLIC), # 138 Exhibit K138 (PUBLIC), # 139 Exhibit K139 (PUBLIC), # 140 Exhibit K140 (PUBLIC), # 141 Exhibit K141 (PUBLIC), # 142 Exhibit K142 (PUBLIC), # 143 Exhibit K143 (PUBLIC), # 144 Exhibit K144 (PUBLIC), # 145 Exhibit K145 (PUBLIC), # 146 Exhibit K146 (PUBLIC), # 147 Exhibit K147 (PUBLIC), # 148 Exhibit K148 (PUBLIC), # 149 Exhibit K149 (PUBLIC), # 150 Exhibit K150 (PUBLIC), # 151 Exhibit K151 (PUBLIC), # 152 Exhibit K152 (SEALED), # 153 Exhibit K153 (SEALED), # 154 Exhibit K154 (SEALED), # 155 Exhibit K155 (SEALED), # 156 Exhibit K156 (PUBLIC), # 157 Exhibit K157 (PUBLIC), # 158 Exhibit K158 (SEALED), # 159 Exhibit K159 (PUBLIC), # 160 Exhibit K160 (PUBLIC), # 161 Exhibit K161 (SEALED), # 162 Exhibit K162 (PUBLIC), # 163 Exhibit K163 (PUBLIC), # 164 Exhibit K164 (SEALED), # 165 Exhibit K165 (PUBLIC), # 166 Exhibit K166 (PUBLIC), # 167 Declaration of Savannah Carnes ISO Pltf's Opposition to AWS's MSJ and Cross Motions for Summary Judgment and to Exclude)(Reichman, Courtland) (Entered: 11/15/2023) |
| 11/15/2023 | 710 | STATEMENT by Kove IO, Inc. *of Additional Material Facts in Support of Pltf's Opposition to Def's Motion for Summary Judgment* (Reichman, Courtland) (Entered: 11/15/2023) |
| 11/15/2023 | 711 | STATEMENT by Kove IO, Inc. *Plaintiff Kove IO, Inc.'s Statement of Material Facts in Support of Pltf's Cross Motions for Summary Judgment and to Exclude* (Reichman, Courtland) (Entered: 11/15/2023) |
| 11/16/2023 | 712 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion to file under seal 706 is granted. A complete version of plaintiff's submission, including the sealed exhibits, is to be filed under seal, and a redacted version is to be filed in the public record. Motion to file certain exhibits non-electronically and under seal 707 is also granted. (mk) (Entered: 11/16/2023) |
| 12/04/2023 | 713 | MOTION by Defendant Amazon Web Services, Inc. to seal *its Reply in Further Support of Motion for Summary Judgment and Response to Kove's Motion for Summary Judgment and Materials in Support*<br><br>(Sigler, R.) (Entered: 12/04/2023) |
| 12/04/2023 | 714 | SEALED REPLY by Amazon Web Services, Inc. to sealed response 699 , SEALED MOTION by Defendant Amazon Web Services, Inc. *for Summary Judgment 686 -- Amazon's Reply in Further Support of Motion for Summary Judgment and Response to Kove's Motion for Summary Judgment* (Sigler, R.) (Entered: 12/04/2023) |

| | | |
|---|---|---|
| 12/04/2023 | 715 | SEALED RESPONSE by Amazon Web Services, Inc. to sealed document 701 – *Response to Kove's Statement of Additional Material Facts* (Attachments: # 1 Exhibit 82, # 2 Exhibit 83, # 3 Exhibit 84, # 4 Exhibit 85, # 5 Exhibit 86, # 6 Exhibit 87, # 7 Exhibit 88, # 8 Exhibit 89, # 9 Exhibit 90, # 10 Exhibit 91, # 11 Exhibit 92, # 12 Exhibit 93, # 13 Exhibit 94, # 14 Exhibit 95, # 15 Exhibit 96, # 16 Exhibit 97, # 17 Exhibit 98, # 18 Exhibit 99, # 19 Exhibit 100, # 20 Exhibit 101, # 21 Exhibit 102, # 22 Declaration of R. William Sigler in Support of Amazon's Reply in Further Support of Motion for Summary Judgment and Response to Kove's Motion for Summary Judgment)(Sigler, R.) (Entered: 12/04/2023) |
| 12/04/2023 | 716 | SEALED RESPONSE by Amazon Web Services, Inc. to sealed document 702 -- *Response to Kove's Statement of Material Facts* (Sigler, R.) (Entered: 12/04/2023) |
| 12/04/2023 | 717 | SEALED DOCUMENT by Defendant Amazon Web Services, Inc. -- *Additional Statement of Material Facts in Support of Opposition to Kove's Cross-Motion for Summary Judgment* (Sigler, R.) (Entered: 12/04/2023) |
| 12/05/2023 | 718 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion for leave to file under seal 713 is granted. A complete copy of defendant's submission, including all exhibits, is to be filed under seal, and a redacted version is to be filed in the public record. The required submission of a USB drive with the submission to Judge Kennelly's chambers should include only the complete, unredacted version. (mk) (Entered: 12/05/2023) |
| 12/07/2023 | 719 | MOTION by Defendant Amazon Web Services, Inc. for extension of time *for Filing Public Versions (Unopposed)* (Attachments: # 1 Proposed Order)(Sigler, R.) (Entered: 12/07/2023) |
| 12/08/2023 | 720 | MINUTE entry before the Honorable Matthew F. Kennelly: Defendant's motion for extension of time to file public versions 719 is granted. (mk) (Entered: 12/08/2023) |
| 12/12/2023 | 721 | MOTION by Defendant Amazon Web Services, Inc. to seal *its Reply in Further Support of Motion for Summary Judgment, Response to Kove's Motion for Summary Judgment, and Certain Materials in Support* (Attachments: # 1 Declaration of Lisa Phillips ISO Redactions)(Sigler, R.) (Entered: 12/12/2023) |
| 12/12/2023 | 722 | REPLY by Defendant Amazon Web Services, Inc. *in Further Support of Motion for Summary Judgment and Response to Kove's Motion for Summary Judgment (Public Version)* (Sigler, R.) (Entered: 12/12/2023) |
| 12/12/2023 | 723 | RESPONSE by Defendant Amazon Web Services, Inc. *Response to Kove's Statement of Additional Material Facts (Public Version)* (Attachments: # 1 Exhibit 82, # 2 Exhibit 83, # 3 Exhibit 84, # 4 Exhibit 85, # 5 Exhibit 86, # 6 Exhibit 87, # 7 Exhibit 88, # 8 Exhibit 89, # 9 Exhibit 90, # 10 Exhibit 91, # 11 Exhibit 92, # 12 Exhibit 93, # 13 Exhibit 94, # 14 Exhibit 95, # 15 Exhibit 96, # 16 Exhibit 97, # 17 Exhibit 98, # 18 Exhibit 99, # 19 Exhibit 100, # 20 Exhibit 101, # 21 Exhibit 102)(Sigler, R.) (Entered: 12/12/2023) |
| 12/12/2023 | 724 | RESPONSE by Defendant Amazon Web Services, Inc. *Response to Kove's Statement of Material Facts (Public Version)* (Sigler, R.) (Entered: 12/12/2023) |
| 12/12/2023 | 725 | STATEMENT by Amazon Web Services, Inc. *of Additional Material Facts (Public Version)* (Sigler, R.) (Entered: 12/12/2023) |
| 12/13/2023 | 726 | MINUTE entry before the Honorable Matthew F. Kennelly: Defendant's motion for leave to file under seal 721 is granted. A complete version of defendants' submission, including all exhibits, is to be filed under seal, and a redacted version is to be filed in the public |

| | | |
|---|---|---|
| | | record. The required USB drive to be delivered to Judge Kennelly's chambers is to be a complete copy of the unredacted version. (mk) (Entered: 12/13/2023) |
| 12/22/2023 | 727 | MOTION by Plaintiff Kove IO, Inc. to seal *Reply in Support of Cross-Motions for Summary Judgment and to Exclude and Exhibit Under Seal* (Reichman, Courtland) (Entered: 12/22/2023) |
| 12/22/2023 | 728 | SEALED REPLY by Kove IO, Inc. to reply, 714 *Plaintiff Kove IO, Inc.'s Reply in Support of Cross-Motions for Summary Judgment and to Exclude* (Reichman, Courtland) (Entered: 12/22/2023) |
| 12/22/2023 | 729 | SEALED RESPONSE by Kove IO, Inc. to sealed document 717 *Kove IO, Inc.'s LR 56.1(c)(2) Response to Amazon's LR 56.1(b)(3) Addt'l Statment of Material Facts* (Attachments: # 1 Exhibit K167, # 2 Declaration of Philip Eklem in Support of Kove IO, Inc.'s Reply in Support of Cross Motions for Summary Judgment and to Exclude)(Reichman, Courtland) (Entered: 12/22/2023) |
| 12/23/2023 | 730 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion for leave to file reply provisionally under seal 727 is granted. A redacted version is to be filed in the public record. (mk) (Entered: 12/23/2023) |
| 12/28/2023 | 731 | MOTION by Plaintiff Kove IO, Inc. to seal *Its Reply in Support of Cross Motions for Summary Judgment and to Exclude* (Attachments: # 1 Declaration of Lisa Phillips ISO Amazon's Redactions to Kove's Reply)(Reichman, Courtland) (Entered: 12/28/2023) |
| 12/28/2023 | 732 | REPLY by Plaintiff Kove IO, Inc. *in Support of Cross-Motions for Summary Judgment and to Exclude* (Reichman, Courtland) (Entered: 12/28/2023) |
| 12/28/2023 | 733 | RESPONSE by Plaintiff Kove IO, Inc. *to Amazon Web Services, Inc.'s LR 56.1(b)(3) Additional Statement of Materials Facts* (Attachments: # 1 Exhibit K167, # 2 Declaration of Philip Eklem in Support of Kove IO, Inc.'s Reply in Support of Cross Motions for Summary Judgment and to Exclude)(Reichman, Courtland) (Entered: 12/28/2023) |
| 12/28/2023 | 734 | ANNUAL REMINDER: Pursuant to Local Rule 3.2 (Notification of Affiliates), any nongovernmental party, other than an individual or sole proprietorship, must file a statement identifying all its affiliates known to the party after diligent review or, if the party has identified no affiliates, then a statement reflecting that fact must be filed. An affiliate is defined as follows: any entity or individual owning, directly or indirectly (through ownership of one or more other entities), 5% or more of a party. The statement is to be electronically filed as a PDF in conjunction with entering the affiliates in CM/ECF as prompted. As a reminder to counsel, parties must supplement their statements of affiliates within thirty (30) days of any change in the information previously reported. This minute order is being issued to all counsel of record to remind counsel of their obligation to provide updated information as to additional affiliates if such updating is necessary. If counsel has any questions regarding this process, this LINK will provide additional information. Signed by the Executive Committee on 12/28/2023: Mailed notice. (tg, ) (Entered: 12/28/2023) |
| 12/29/2023 | 735 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion to seal reply 731 is granted. A redacted version is to be filed in the public record, and a complete version, including all exhibits, is to be filed under seal. The required USB drive to be delivered to chambers (Room 2188) must be a complete copy of the under-seal version, including all exhibits. (mk) (Entered: 12/29/2023) |

| | | |
|---|---|---|
| 12/29/2023 | 736 | EXHIBIT by Plaintiff Kove IO, Inc. (1 black thumb drive DE 700-108, 109, 110, 116, 120-122,161 Exhibits K108, K109, K110, K116, K720-122,K161) (tg, ) (Entered: 01/02/2024) |
| 12/29/2023 | 737 | EXHIBIT by Plaintiff Kove IO, Inc. (1 black thumb drive DE 700-107Exhibit K107)(tg, ) (Entered: 01/02/2024) |
| 02/05/2024 | 738 | [Joint] Schedule by Kove IO, Inc. (Reichman, Courtland) (Entered: 02/05/2024) |
| 02/06/2024 | 739 | MEMORANDUM OPINION AND ORDER signed by the Honorable Matthew F. Kennelly on 2/6/2024: For the reasons stated in the accompanying Memorandum Opinion and Order, the Court grants the defendant's motion for summary judgment in part and denies it in part [dkt. no. 686]. The Court allows the defendant's request for further claim construction, but only to the extent set out in the body of this opinion; denies the defendant's motion for summary judgment of non-infringement regarding the plaintiff's '640, '170 and '978 patents as well as on the question of willful infringement. The Court denies the defendant's motion to strike expert Goodrich's infringement analysis regarding hierarchical topologies. The Court grants-in part and denies-in part the plaintiffs' cross-motion for summary judgment [dkt. no. 699]. Specifically, the Court grants summary judgment for the plaintiff on the defenses of section 101 patent ineligibility, equitable estoppel, and waiver, as well as on the invalidity contentions relying on the "DNS" prior art reference; denies the plaintiff's motion for summary judgment on the defenses of inequitable conduct and double patenting; and grants the plaintiff's motion to strike expert Grama's "parent-child" hierarchical theory and expert Greene's double patenting opinions that rely on the patent specifications as prior art. The case is set for a telephonic status hearing on February 8, 2024 at 9:20 a.m. to discuss reasonable time limits for the jury trial set for April 1, 2024 and the schedule and other details for filing motions in limine and the final pretrial order. The following call-in number will be used: 888-684-8852, access code 746-1053. (mk) (Entered: 02/06/2024) |
| 02/08/2024 | 740 | MINUTE entry before the Honorable Matthew F. Kennelly: Telephonic status hearing held on 2/8/2024. The Court adopts the parties' proposed joint schedule for preparing and filing the final pretrial order (dkt. 738 at pp. 4-5). Daubert motions are due 2/16/2024 and are limited to 25 pages total; responses are due 2/23/2024 and are limited to 25 pages total; replies are due 3/1/2024 and are limited to 12 pages total. Plaintiff's spoliation motion (either the current version or a revised and shortened version) is included in the 25 pages. Motions in limine and responses are limited to 20 pages per side in the aggregate as proposed by the parties. The parties are directed to file status report regarding mediation discussions by 2/20/2024. The parties have leave to file the report under seal. Case remains set for a pretrial conference on 3/21/2024 663 . Mailed notice. (mma, ) (Entered: 02/08/2024) |
| 02/09/2024 | 741 | ORDER REGARDING TRIAL TIME LIMITS, signed by the Honorable Matthew F. Kennelly on 2/9/2024. (mk) (Entered: 02/09/2024) |
| 02/14/2024 | 742 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number AILNDC-21638248.<br><br>(Ruhland, Amy) (Entered: 02/14/2024) |
| 02/15/2024 | 743 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion by Amy Ruhland to appear pro hac vice 742 is granted. (mk) (Entered: 02/15/2024) |
| 02/16/2024 | 744 | MOTION by Defendant Amazon Web Services, Inc. to seal *Motion to Exclude Opinions of Dr. Goodrich and Mr. Bergman* |

| | | |
|---|---|---|
| | | (Attachments: # 1 Declaration by J. Saltman In Support of Motion for Leave)(Sigler, R.) (Entered: 02/16/2024) |
| 02/16/2024 | 745 | SEALED MOTION by Defendant Amazon Web Services, Inc. to strike *Opinions of Dr. Goodrich and Mr. Bergman*<br><br>(Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Declaration of R. William Sigler In Support of Motion to Exclude Opinions of Dr. Goodrich and Mr. Bergman)(Sigler, R.) (Docket Text Modified by Clerk's Office on 2/16/2024.) (ym, ). (Entered: 02/16/2024) |
| 02/16/2024 | 746 | MOTION by Defendant Amazon Web Services, Inc. to strike *Opinions of Dr. Goodrich and Mr. Bergman*<br><br>(Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Declaration of R. William Sigler In Support of Motion to Exclude Opinions of Dr. Goodrich and Mr. Bergman)(Sigler, R.) (Entered: 02/16/2024) |
| 02/16/2024 | 747 | MOTION by Plaintiff Kove IO, Inc. to seal *Motion for Sanctions for Spoliation of Evidence and Motion to Exclude Certain Expert Opinions*<br><br>(Reichman, Courtland) (Entered: 02/16/2024) |
| 02/16/2024 | 748 | SEALED MOTION by Plaintiff Kove IO, Inc. *Motion for Sanctions for Spoliation of Evidence and Motion to Exclude Certain Expert Opinions* (Attachments: # 1 Declaration of Dr. Michael T. Goodrich, # 2 Exhibit 1 to Declaration of Dr. Michael T. Goodrich, # 3 Declaration of Savannah Carnes ISO Kove IO, Inc.'s Motion for Sanctions and to Exclude Certain Expert Options, # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit D, # 8 Exhibit E, # 9 Exhibit F, # 10 Exhibit G, # 11 Exhibit H, # 12 Exhibit I, # 13 Exhibit J, # 14 Exhibit K, # 15 Exhibit L, # 16 Exhibit M, # 17 Exhibit N, # 18 Exhibit O, # 19 Exhibit P, # 20 Exhibit Q, # 21 Exhibit R, # 22 Exhibit S, # 23 Exhibit T, # 24 Exhibit U, # 25 Exhibit V, # 26 Exhibit W, # 27 Exhibit X, # 28 Exhibit Y, # 29 Exhibit Z, # 30 Exhibit AA, # 31 Exhibit BB, # 32 Exhibit CC, # 33 Exhibit DD, # 34 Exhibit EE, # 35 Exhibit FF, # 36 Exhibit GG, # 37 Exhibit HH, # 38 Exhibit II, # 39 Exhibit JJ, # 40 Exhibit KK, # 41 Exhibit LL, # 42 Exhibit MM, # 43 Exhibit NN, # 44 Exhibit OO, # 45 Exhibit PP, # 46 Exhibit QQ, # 47 Exhibit RR, # 48 Exhibit SS, # 49 Exhibit TT, # 50 Exhibit UU, # 51 Exhibit VV, # 52 Exhibit WW, # 53 Exhibit XX, # 54 Exhibit YY, # 55 Exhibit ZZ - Part 1, # 56 Exhibit ZZ - Part 2, # 57 Exhibit AAA, # 58 Exhibit BBB, # 59 Exhibit CCC, # 60 Exhibit DDD, # 61 Exhibit EEE, # 62 Exhibit FFF, # 63 Exhibit GGG, # 64 Exhibit HHH, # 65 Exhibit III, # 66 Exhibit JJJ, # 67 Exhibit KKK, # 68 Exhibit LLL, # 69 Exhibit MMM, # 70 Exhibit NNN)(Reichman, Courtland) (Entered: 02/16/2024) |
| 02/18/2024 | 749 | MINUTE entry before the Honorable Matthew F. Kennelly: Motions for leave to file under seal 744 747 are granted. Redacted versions are to be filed in the public record. The under-seal version filed in CMECF must be a complete and unredacted version of the party's submission, including all exhibits. In addition, each party is directed to submit to Judge Kennelly's chambers (Room 2188), at or shortly after the time of filing, a USB drive with the complete, under-seal version of its Daubert motion/motion in limine submissions, including responses. A copy of the final pretrial order is likewise to be submitted to chambers on a USB drive. Finally, plaintiff's previously-filed motion for sanctions 679 683 is terminated without prejudice based upon the refiling of the motion. (mk) (Entered: 02/18/2024) |

| | | |
|---|---|---|
| 02/19/2024 | 750 | MOTION by Plaintiff Kove IO, Inc. to bifurcate *Amazon's Inequitable Conduct and OTDP Defenses*<br><br>(Attachments: # 1 Exhibit A)(Reichman, Courtland) (Entered: 02/19/2024) |
| 02/20/2024 | 751 | MINUTE entry before the Honorable Matthew F. Kennelly: Response to plaintiff's motion to bifurcate 750 is to be filed by 2/27/2024. No reply may be filed unless requested by the Court. Telephonic motion hearing, unless deemed unnecessary by the Court, is set for 3/4/2024 at 9:05 AM, using call-in number 888-684-8852, access code 746-1053. (mk) (Entered: 02/20/2024) |
| 02/20/2024 | 752 | SEALED DOCUMENT by Defendant Amazon Web Services, Inc. *Joint Status Report* (Sigler, R.) (Entered: 02/20/2024) |
| 02/21/2024 | 753 | MINUTE entry before the Honorable Matthew F. Kennelly: At the request of defendant's counsel, the telephonic motion hearing set for 3/4/2024 is vacated and reset to 3/5/2024 at 9:15 a.m. The following call-in number will be used: 888-684-8852; access code 746-1053. Mailed notice. (mma, ) (Entered: 02/21/2024) |
| 02/21/2024 | 754 | MOTION by Attorney Jason Sheasby to withdraw as attorney for Kove IO, Inc.. No party information provided<br><br>(Reichman, Courtland) (Entered: 02/21/2024) |
| 02/22/2024 | 755 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion by Jason Sheasby to withdraw as attorney for Kove IO, Inc. is granted 754 . (mk) (Entered: 02/22/2024) |
| 02/22/2024 | 756 | MOTION by Plaintiff Kove IO, Inc. to seal *Kove IO's Motion for Sanctions for Spoliation of Evidence and Motion to Exclude Certain Expert Opinions*<br>(Attachments: # 1 Declaration of Jeffrey Saltman ISO AWS'S Redactions to Kove's Motion for Sanctions, # 2 Declaration of Savannah Carnes ISO Kove's Redactions to Exhibit OO)(Reichman, Courtland) (Entered: 02/22/2024) |
| 02/22/2024 | 757 | MOTION by Plaintiff Kove IO, Inc. for sanctions *for Spoliation of Evidence and Motion to Exclude Certain Expert Opinions*<br><br>(Attachments: # 1 Declaration of Dr. Michael T. Goodrich, # 2 Exhibit 1 to Declaration of Dr. Michael T. Goodrich, # 3 Declaration of Savannah Carnes ISO Kove IO, Inc.'s Motion for Sanctions and to Exclude Certain Expert Opinions, # 4 Exhibit A, # 5 Exhibit B, # 6 Exhibit C, # 7 Exhibit D, # 8 Exhibit E, # 9 Exhibit F, # 10 Exhibit G, # 11 Exhibit H, # 12 Exhibit I, # 13 Exhibit J, # 14 Exhibit K, # 15 Exhibit L, # 16 Exhibit M, # 17 Exhibit N, # 18 Exhibit O, # 19 Exhibit P, # 20 Exhibit Q, # 21 Exhibit R, # 22 Exhibit S, # 23 Exhibit T, # 24 Exhibit U, # 25 Exhibit V, # 26 Exhibit W, # 27 Exhibit X, # 28 Exhibit Y, # 29 Exhibit Z, # 30 Exhibit AA, # 31 Exhibit BB, # 32 Exhibit CC, # 33 Exhibit DD, # 34 Exhibit EE, # 35 Exhibit FF, # 36 Exhibit GG, # 37 Exhibit HH, # 38 Exhibit II, # 39 Exhibit JJ, # 40 Exhibit KK, # 41 Exhibit LL, # 42 Exhibit MM, # 43 Exhibit NN, # 44 Exhibit OO, # 45 Exhibit PP, # 46 Exhibit QQ, # 47 Exhibit RR, # 48 Exhibit SS, # 49 Exhibit TT, # 50 Exhibit UU, # 51 Exhibit VV, # 52 Exhibit WW, # 53 Exhibit XX, # 54 Exhibit YY, # 55 Exhibit ZZ - Part 1, # 56 Exhibit ZZ - Part 2, # 57 Exhibit AAA, # 58 Errata BBB, # 59 Exhibit CCC, # 60 Exhibit DDD, # 61 Exhibit EEE, # 62 Exhibit FFF, # 63 Exhibit GGG, # 64 Exhibit HHH, # 65 Exhibit III, # 66 Exhibit JJJ, # 67 Exhibit KKK, # 68 Exhibit LLL, # 69 Exhibit MMM, # 70 Exhibit NNN)(Reichman, Courtland) (Entered: 02/22/2024) |
| 02/22/2024 | 758 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion to file under seal 756 is granted. (mk) (Entered: 02/22/2024) |

| | | |
|---|---|---|
| 02/23/2024 | 759 | MOTION by Defendant Amazon Web Services, Inc. to seal *its Response to Kove's Motion for Sanctions and to Exclude*<br><br>(Sigler, R.) (Entered: 02/23/2024) |
| 02/23/2024 | 760 | SEALED RESPONSE by Amazon Web Services, Inc. to SEALED MOTION by Plaintiff Kove IO, Inc. *Motion for Sanctions for Spoliation of Evidence and Motion to Exclude Certain Expert Opinions* 748 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Declaration of R. William Sigler In Support of AWS's Response to Kove's Motion for Sanctions and to Exclude)(Sigler, R.) (Entered: 02/23/2024) |
| 02/23/2024 | 761 | MOTION by Plaintiff Kove IO, Inc. to seal *its Opposition to AWS's Motion to Exclude Opinions of Dr. Goodrich and Mr. Bergman and Exhibits Under Seal*<br><br>(Reichman, Courtland) (Entered: 02/23/2024) |
| 02/23/2024 | 762 | SEALED RESPONSE by Kove IO, Inc. to MOTION by Defendant Amazon Web Services, Inc. to strike *Opinions of Dr. Goodrich and Mr. Bergman*<br><br>745 (Attachments: # 1 Declaration of Savannah Carnes in Support of Kove IO, Inc.'s Opposition to Amazon Web Services, Inc.'s Motion to Exclude Opinions of Dr. Goodrich and Mr. Bergman, # 2 Exhibit OOO, # 3 Exhibit PPP, # 4 Exhibit QQQ, # 5 Exhibit RRR, # 6 Exhibit SSS - Part 1, # 7 Exhibit SSS - Part 2, # 8 Exhibit TTT, # 9 Exhibit UUU, # 10 Exhibit VVV, # 11 Exhibit WWW, # 12 Exhibit XXX, # 13 Exhibit YYY, # 14 Exhibit ZZZ, # 15 Exhibit AAAA, # 16 Exhibit BBBB, # 17 Exhibit CCCC, # 18 Exhibit DDDD, # 19 Exhibit EEEE, # 20 Exhibit FFFF, # 21 Exhibit GGGG, # 22 Exhibit HHHH, # 23 Exhibit IIII, # 24 Exhibit JJJJ)(Reichman, Courtland) (Entered: 02/23/2024) |
| 02/24/2024 | 763 | MINUTE entry before the Honorable Matthew F. Kennelly: Motions for leave to file under seal 759 761 are granted. Redacted versions of the filings are to be filed in the public record, and complete versions, including all exhibits, are to be filed under seal. (mk) (Entered: 02/24/2024) |
| 02/26/2024 | 764 | MOTION by Plaintiff Kove IO, Inc. to seal *Final Pretrial Order and Attachments*<br><br>(Reichman, Courtland) (Entered: 02/26/2024) |
| 02/26/2024 | 765 | SEALED DOCUMENT by Plaintiff Kove IO, Inc. *Final Pretrial Order* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 4A, # 6 Exhibit 4B, # 7 Exhibit 5, # 8 Exhibit 5A, # 9 Exhibit 5B, # 10 Exhibit 7A, # 11 Exhibit 7B, # 12 Exhibit 8, # 13 Exhibit 9A, # 14 Exhibit 9B)(Reichman, Courtland) (Entered: 02/26/2024) |
| 02/27/2024 | 766 | MOTION by Defendant Amazon Web Services, Inc. to seal *its Response to Kove's Motion to Bifurcate*<br><br>(Sigler, R.) (Entered: 02/27/2024) |
| 02/27/2024 | 767 | SEALED RESPONSE by Amazon Web Services, Inc. to MOTION by Plaintiff Kove IO, Inc. to bifurcate *Amazon's Inequitable Conduct and OTDP Defenses* 750 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Declaration of R. William Sigler in Support of AWS's Response to Kove's Motion to Bifurcate)(Sigler, R.) (Entered: 02/27/2024) |
| 02/27/2024 | 768 | MINUTE entry before the Honorable Matthew F. Kennelly: Motions to file under seal 764 766 are granted. Redacted versions are to be filed in the public record. In addition, |

| | | |
|---|---|---|
| | | the parties are to provide to Judge Kennelly's chambers (Room 2188) a USB drive containing the sealed version of the final pretrial order--unless they have already done so. (mk) (Entered: 02/27/2024) |
| 02/27/2024 | 769 | MOTION by Plaintiff Kove IO, Inc. for leave to file *Reply Brief in Support of its Motion to Bifurcate*<br><br>(Reichman, Courtland) (Entered: 02/27/2024) |
| 02/28/2024 | 770 | MINUTE entry before the Honorable Matthew F. Kennelly: Plaintiff's motion for leave to file a reply 769 is granted, to the following extent: plaintiff may file a reply of no more than 5 pages by no later than 2/29/2024. (mk) (Entered: 02/28/2024) |
| 02/29/2024 | 771 | MOTION by Attorney IAM WASHBURN to withdraw as attorney for Kove IO, Inc.. No party information provided<br><br>(Reichman, Courtland) (Entered: 02/29/2024) |
| 02/29/2024 | 772 | MOTION by Plaintiff Kove IO, Inc. to seal *Kove's Opposition to Amazon's Motion to Exclude Opinions of Dr. Goodrich and Mr. Bergman*<br><br>(Attachments: # 1 Declaration of Jeffrey Saltman ISO AWS's Redactions to Kove's Opposition to Amazon's Motion to Exclude Opinions of Dr. Goodrich and Mr. Bergman)(Reichman, Courtland) (Entered: 02/29/2024) |
| 02/29/2024 | 773 | RESPONSE by Plaintiff Kove IO, Inc. to sealed response,,, 762 *REDACTED Kove's Opposition to Amazon's Motion to Exclude Opinions of Dr. Goodrich and Mr. Bergman* (Attachments: # 1 Exhibit OOO (PUBLIC), # 2 Exhibit PPP (PUBLIC), # 3 Exhibit QQQ (PUBLIC), # 4 Exhibit RRR (PUBLIC), # 5 Exhibit SSS Part 1 (PUBLIC), # 6 Exhibit SSS Part 2 (PUBLIC), # 7 Exhibit TTT (PUBLIC), # 8 Exhibit UUU (PUBLIC), # 9 Exhibit VVV (PUBLIC), # 10 Exhibit WWW (PUBLIC), # 11 Exhibit XXX (PUBLIC), # 12 Exhibit YYY (PUBLIC), # 13 Exhibit ZZZ (PUBLIC), # 14 Exhibit AAAA (PUBLIC), # 15 Exhibit BBBB (PUBLIC), # 16 Exhibit CCCC (PUBLIC), # 17 Exhibit DDDD (PUBLIC), # 18 Exhibit EEEE (PUBLIC), # 19 Exhibit FFFF (PUBLIC), # 20 Exhibit GGGG (PUBLIC), # 21 Exhibit HHHH (PUBLIC), # 22 Exhibit IIII (PUBLIC), # 23 Exhibit JJJJ (PUBLIC))(Reichman, Courtland) (Entered: 02/29/2024) |
| 02/29/2024 | 774 | MOTION by Defendant Amazon Web Services, Inc. to seal *its Response to Kove's Motion for Sanctions and to Exclude*<br><br>(Attachments: # 1 Declaration of G. Cremona in Support of Kove's Redactions to Exhibit 3 to AWS's Response, # 2 Declaration of J. Saltman in Support of AWS's Redactions to its Response to Kove's Motion for Sanctions and to Exclude)(Sigler, R.) (Entered: 02/29/2024) |
| 02/29/2024 | 775 | RESPONSE by Defendant Amazon Web Services, Inc. to motion for sanctions,,,,,, 757 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Declaration of R. William Sigler In Support of AWS's Response to Kove's Motion for Sanctions and to Exclude)(Sigler, R.) (Entered: 02/29/2024) |
| 02/29/2024 | 776 | MOTION by Plaintiff Kove IO, Inc. to seal *Reply ISO Its Motion to Bifurcate Amazon's Inequitable Conduct and OTDP Defenses and Exhibits*<br><br>(Reichman, Courtland) (Entered: 02/29/2024) |

| | | |
|---|---|---|
| 02/29/2024 | 777 | SEALED REPLY by Kove IO, Inc. to MOTION by Plaintiff Kove IO, Inc. to bifurcate *Amazon's Inequitable Conduct and OTDP Defenses* 750 (Attachments: # 1 Declaration of Savannah Carnes, # 2 Exhibit B [SEALED], # 3 Exhibit C [SEALED], # 4 Exhibit D [SEALED], # 5 Exhibit E [SEALED], # 6 Exhibit F [SEALED], # 7 Exhibit G [SEALED], # 8 Exhibit H [SEALED], # 9 Exhibit I [SEALED])(Reichman, Courtland) (Entered: 02/29/2024) |
| 03/01/2024 | 778 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion by Ian Washburn to withdraw as attorney for Kove IO, Inc. is granted 771 . Motions to file under seal 772 774 776 are also granted. Complete versions of the filings, including all exhibits, are to be filed under seal, and redacted versions are to be filed in the public record. (mk) (Entered: 03/01/2024) |
| 03/01/2024 | 779 | MOTION by Defendant Amazon Web Services, Inc. to seal *its Reply in Support of its Motion to Exclude* (Sigler, R.) (Entered: 03/01/2024) |
| 03/01/2024 | 780 | SEALED REPLY by Amazon Web Services, Inc. to MOTION by Defendant Amazon Web Services, Inc. to strike *Opinions of Dr. Goodrich and Mr. Bergman* 745 (Attachments: # 1 Exhibit 13, # 2 Declaration of R. William Sigler in Support of AWS's Reply to its Motion to Exclude)(Sigler, R.) (Entered: 03/01/2024) |
| 03/01/2024 | 781 | MOTION by Defendant Amazon Web Services, Inc. to seal *Motion to Compel* (Sigler, R.) (Entered: 03/01/2024) |
| 03/01/2024 | 782 | SEALED MOTION by Defendant Amazon Web Services, Inc. *to Compel Depositions and Agreements* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Declaration of R. William Sigler ISO Motion to Compel)(Sigler, R.) (Entered: 03/01/2024) |
| 03/01/2024 | 783 | MOTION by Plaintiff Kove IO, Inc. to seal *Final Pretrial Order and Attachments* (Attachments: # 1 Declaration of Jeffrey Saltman ISO AWS's Redactions to the Final Pretrial Order)(Reichman, Courtland) (Entered: 03/01/2024) |
| 03/01/2024 | 784 | PROPOSED Pretrial Order *REDACTED* 765 (Attachments: # 1 Exhibit 1 (PUBLIC), # 2 Exhibit 2 (PUBLIC), # 3 Exhibit 3 (PUBLIC), # 4 Exhibit 4 (PUBLIC), # 5 Exhibit 4A (REDACTED), # 6 Exhibit 4B (REDACTED), # 7 Exhibit 5 (PUBLIC), # 8 Exhibit 5A (REDACTED), # 9 Exhibit 5B (REDACTED), # 10 Exhibit 7A (PUBLIC), # 11 Exhibit 7B (PUBLIC), # 12 Exhibit 8 (PUBLIC), # 13 Exhibit 9A (PUBLIC), # 14 Exhibit 9B (PUBLIC))(Reichman, Courtland) (Entered: 03/01/2024) |
| 03/01/2024 | 785 | MOTION by Plaintiff Kove IO, Inc. to seal *Reply ISO Its Motion for Sanctions for Spoliation of Evidence and Motion to Exclude Certain Expert Opinions* (Reichman, Courtland) (Entered: 03/01/2024) |
| 03/01/2024 | 786 | SEALED REPLY by Kove IO, Inc. to SEALED MOTION by Plaintiff Kove IO, Inc. *Motion for Sanctions for Spoliation of Evidence and Motion to Exclude Certain Expert Opinions* 748 (Attachments: # 1 Declaration of Savannah Carnes, # 2 Exhibit KKKK (SEALED), # 3 Exhibit LLLL (SEALED), # 4 Exhibit MMMM (SEALED), # 5 Exhibit NNNN (SEALED))(Reichman, Courtland) (Entered: 03/01/2024) |

| | | |
|---|---|---|
| 03/02/2024 | 787 | MINUTE entry before the Honorable Matthew F. Kennelly: Motions to file under seal 779 781 783 785 are granted; redacted versions are to be filed in the public record, and complete versions, including all exhibits, are to be filed under seal. In addition, by no later than 3/5/2024, the parties are to cooperate and deliver to Judge Kennelly's chambers (Room 2188) a single USB drive that contains all of both sides' complete, under-seal versions of motion in limine/Daubert/spoliation/other pending motions, responses, and replies, as well as the final pretrial order. This supersedes any earlier direction on submitting USB drives to chambers. (mk) (Entered: 03/02/2024) |
| 03/02/2024 | 788 | MINUTE entry before the Honorable Matthew F. Kennelly: Defendant's motion to compel 782 is set for a hearing by video at the existing hearing date and time of 3/5/2024 at 9:15 AM. If plaintiff wishes to file a response to the motion, it must be filed by 12:00 PM Chicago time on 3/4/2024. No reply may be filed. (mk) (Entered: 03/02/2024) |
| 03/02/2024 | 789 | MINUTE entry before the Honorable Matthew F. Kennelly: The telephonic hearing set for 9:15 AM on 3/5/2024 is converted to a video hearing at that same date and time. A video invitation will be sent to counsel in advance of the hearing. (mk) (Entered: 03/02/2024) |
| 03/04/2024 | 790 | MINUTE entry before the Honorable Matthew F. Kennelly: Video motion hearing scheduled for March 5, 2024 at 9:15 a.m. Members of the public and media will be able to call in to listen to this hearing. The call-in number is (650) 479-3207 and the call-in ID is 23116545199##. Counsel of record will receive an email invitation prior to the start of the video hearing with instructions to join the video conference. Persons granted remote access to proceedings are reminded of the general prohibition against photographing, recording, and rebroadcasting of court proceedings. Violation of these prohibitions may result in sanctions, including removal of court issued media credentials, restricted entry to future hearings, denial of entry to future hearings, or any other sanctions deemed necessary by the Court. Mailed notice. (mma, ) (Entered: 03/04/2024) |
| 03/04/2024 | 791 | MOTION by Plaintiff Kove IO, Inc. to seal *Response to AWS's Motion to Compel Depositions and Other Discovery Based On Kove's Production of New Information* (Reichman, Courtland) (Entered: 03/04/2024) |
| 03/04/2024 | 792 | SEALED RESPONSE by Kove IO, Inc. to SEALED MOTION by Defendant Amazon Web Services, Inc. *to Compel Depositions and Agreements* 782 (Attachments: # 1 Declaration of Jennifer Estremera, # 2 Exhibit A (SEALED), # 3 Exhibit B (SEALED), # 4 Exhibit C (SEALED), # 5 Exhibit D (SEALED), # 6 Exhibit E (SEALED), # 7 Exhibit F (SEALED), # 8 Exhibit G (SEALED), # 9 Exhibit H (SEALED), # 10 Exhibit I (SEALED))(Reichman, Courtland) (Entered: 03/04/2024) |
| 03/04/2024 | 793 | SEALED RESPONSE by Kove IO, Inc. to SEALED MOTION by Defendant Amazon Web Services, Inc. *to Compel Depositions and Agreements* 782 *[CORRECTED] Response to AWS's Motion to Compel Depositions and Other Discovery Based On Kove's Production of New Information* (Attachments: # 1 Declaration of Jennifer Estremera, # 2 Exhibit A (SEALED), # 3 Exhibit B (SEALED), # 4 Exhibit C (SEALED), # 5 Exhibit D (SEALED), # 6 Exhibit E (SEALED), # 7 Exhibit F (SEALED), # 8 Exhibit G (SEALED), # 9 Exhibit H (SEALED), # 10 Exhibit I (SEALED))(Reichman, Courtland) (Entered: 03/04/2024) |
| 03/04/2024 | 794 | MOTION by Defendant Amazon Web Services, Inc. to seal *Response to Kove's Motion to Bifurcate AWS's Inequitable Conduct and OTDP Defenses* (Attachments: # 1 Declaration of J. Saltman ISO Motion for Leave to File Bifurcation Motion Response Under Seal)(Saltman, Jeffrey) (Entered: 03/04/2024) |

| 03/04/2024 | 795 | RESPONSE by Defendant Amazon Web Services, Inc. to motion to bifurcate 750 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Declaration of R. Sigler ISO AWS's Response to Kove's Motion to Bifurcate)(Sigler, R.) (Entered: 03/04/2024) |
|---|---|---|
| 03/05/2024 | 796 | MINUTE entry before the Honorable Matthew F. Kennelly: Motions for leave to file under seal 791 794 are granted; redacted versions of the submissions are to be filed in the public record. (mk) (Entered: 03/05/2024) |
| 03/05/2024 | 797 | MINUTE entry before the Honorable Matthew F. Kennelly: Video motion hearing held on 3/5/2024. Plaintiff's motion to bifurcate 750 is granted for the reasons stated on the record. The defenses of inequitable conduct and obviousness-type double patenting are bifurcated given both sides' agreement that these are issues for the Court. The evidence relating to these defenses will be elicited after the jury has been excused on the date(s) that the witnesses bearing on these defenses are testifying before the jury. The Court may make a modest modification to the parties' jury trial time allocations based on the removal of these issues from the jury's consideration. Defendant's motion to compel 782 is denied for the reasons stated on the record. Case remains set for an in-person pretrial conference on 3/21/2024 at 1:30 p.m. 663 . Mailed notice. (mma, ) (Entered: 03/05/2024) |
| 03/06/2024 | 798 | MINUTE entry before the Honorable Matthew F. Kennelly: The Court directed the parties to deliver to chambers (Room 2188) a single USB drive that included "all of both sides' complete, under-seal versions of motion in limine/Daubert/spoliation/other pending motions, responses, and replies, as well as the final pretrial order." The Court has examined the USB drive that was delivered on 3/5/2024. It appears to include the entirety of the final pretrial order and the briefing on Daubert motions, the motion to bifurcate, and the motion to compel, but it does not include the motions in limine or the spoliation motion and related briefing. In addition, the materials that were delivered have each attachment as a separate PDF file, which is now how the materials were filed with the Clerk, and which makes downloading cumbersome. Counsel are directed to deliver to chambers (Room 2188) by 9:00 tomorrow (3/7/2024) a single USB drive that actually  includes everything the Court's order directed. In addition, each filing should be on the USB drive the way it was actually filed with the Clerk, in other words each docket entry should be its own single PDF file that includes all exhibits/attachments, with each exhibit/attachment bookmarked within the single PDF file. Also, at this point there is no need to include the motion to bifurcate or the motion to compel, as the Court has already ruled on those motions. (mk) (Entered: 03/06/2024) |
| 03/07/2024 | 799 | MOTION by Defendant Amazon Web Services, Inc. to seal *Reply ISO its Motion to Exclude* (Attachments: # 1 Declaration of J. Saltman ISO Motion to Seal AWS's Reply ISO Motion to Exclude)(Saltman, Jeffrey) (Entered: 03/07/2024) |
| 03/07/2024 | 800 | REPLY by Defendant Amazon Web Services, Inc. to motion to strike, 746 (Attachments: # 1 Exhibit 13, # 2 Declaration of R. William Sigler in Support of AWS's Reply to its Motion to Exclude)(Sigler, R.) (Entered: 03/07/2024) |
| 03/07/2024 | 801 | MOTION by Plaintiff Kove IO, Inc. to seal *Reply ISO Its Motion for Sanctions for Spoliation of Evidence and Motion to Exclude Certain Expert Opinions* (Attachments: # 1 Declaration of Jeffrey Saltman ISO AWS's Redactions to Kove's Reply ISO Its Motion for Sanctions for Spoliation of Evidence and Motion to Exclude)(Reichman, Courtland) (Entered: 03/07/2024) |
| 03/07/2024 | 802 | REPLY by Plaintiff Kove IO, Inc. to motion for sanctions,,,,,, 757 (Attachments: # 1 Declaration of Savannah Carnes, # 2 Exhibit KKKK (PUBLIC), # 3 Exhibit LLLL |

| | | |
|---|---|---|
| | | (PUBLIC), # 4 Exhibit MMMM (PUBLIC), # 5 Exhibit NNNN (PUBLIC))(Reichman, Courtland) (Entered: 03/07/2024) |
| 03/07/2024 | 803 | MOTION by Defendant Amazon Web Services, Inc. to seal *its Motion to Compel Depositions and Agreements*<br><br>(Attachments: # 1 Declaration of G. Cremona ISO Kove's Redactions to Motion to Compel, # 2 Declaration of J. Saltman ISO Motion to File Motion to Compel Under Seal)(Saltman, Jeffrey) (Entered: 03/07/2024) |
| 03/07/2024 | 804 | MOTION by Defendant Amazon Web Services, Inc. to compel *Depositions and Agreements*<br><br>(Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Declaration of R. William Sigler ISO Motion to Compel)(Sigler, R.) (Entered: 03/07/2024) |
| 03/07/2024 | 805 | MOTION by Defendant Amazon Web Services, Inc. to seal *AWS's Motions in Limine*<br><br>(Sigler, R.) (Entered: 03/07/2024) |
| 03/07/2024 | 806 | SEALED MOTION by Defendant Amazon Web Services, Inc. *in Limine* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Declaration of W. Sigler ISO Motions in Limine)(Sigler, R.) (Entered: 03/07/2024) |
| 03/07/2024 | 807 | MOTION by Plaintiff Kove IO, Inc. to seal *Its Omnibus Motions In Limine*<br><br>(Reichman, Courtland) (Entered: 03/07/2024) |
| 03/07/2024 | 808 | SEALED MOTION by Plaintiff Kove IO, Inc. *Omnibus Motions in Limine* (Attachments: # 1 Declaration of Savannah Carnes ISO Kove Omnibus Motions in Limine, # 2 Exhibit K1 (SEALED), # 3 Exhibit K2 (SEALED), # 4 Exhibit K3 (SEALED), # 5 Exhibit K4 (SEALED), # 6 Exhibit K5 (SEALED), # 7 Exhibit K6 (SEALED), # 8 Exhibit K7 (SEALED), # 9 Exhibit K8 (SEALED), # 10 Exhibit K9 (SEALED))(Reichman, Courtland) (Entered: 03/07/2024) |
| 03/08/2024 | 809 | MINUTE entry before the Honorable Matthew F. Kennelly: Motions to file under seal 799 801 803 805 807 are granted. Complete versions, including all exhibits, are to be filed under seal, and redacted versions are to be filed in the public record. (mk) (Entered: 03/08/2024) |
| 03/08/2024 | 810 | MOTION by Plaintiff Kove IO, Inc. to seal *Response to AWS's Motion to Compel Depositions and Other Discovery Based On Kove's Production of New Information*<br><br>(Attachments: # 1 Declaration of Gina H. Cremona ISO Kove's Redactions to Kove's Resp to AWS's MTC Depositions and Other Discovery)(Reichman, Courtland) (Entered: 03/08/2024) |
| 03/08/2024 | 811 | RESPONSE by Plaintiff Kove IO, Inc. *to AWS's Motion to Compel Depositions and Other Discovery Based on Kove's Production of New Information* (Attachments: # 1 Declaration of Jennifer Estremera ISO Kove's Response In Opposition to Motion to Compel Depositions and Other Discovery Based on Kove's Production of New Information, # 2 Exhibit A (PUBLIC), # 3 Exhibit B (PUBLIC), # 4 Exhibit C (PUBLIC), # 5 Exhibit D (PUBLIC), # 6 Exhibit E (REDACTED), # 7 Exhibit F (PUBLIC), # 8 Exhibit G (REDACTED), # 9 Exhibit H (PUBLIC), # 10 Exhibit I (PUBLIC))(Reichman, Courtland) (Entered: 03/08/2024) |

| | | |
|---|---|---|
| 03/09/2024 | 812 | MINUTE entry before the Honorable Matthew F. Kennelly: Plaintiff's motion for leave to file under seal 810 is granted. (mk) (Entered: 03/09/2024) |
| 03/13/2024 | 813 | MOTION by Defendant Amazon Web Services, Inc. to seal *AWS's Motions in Limine*<br><br>(Attachments: # 1 Declaration of J. Saltman ISO Motion for Leave to File AWS's MIL Under Seal, # 2 Declaration of G. Cremona ISO Kove Redactions to AWS MILs)(Sigler, R.) (Entered: 03/13/2024) |
| 03/13/2024 | 814 | MOTION by Defendant Amazon Web Services, Inc.in limine<br><br>(Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Declaration of R. Sigler ISO AWS's Motions in Limine)(Sigler, R.) (Entered: 03/13/2024) |
| 03/13/2024 | 815 | MOTION by Plaintiff Kove IO, Inc. to seal *Kove IO, Inc.'s Omnibus Motions in Limine*<br><br>(Attachments: # 1 Declaration of Jeffrey Saltman ISO AWS'S Redactions to Kove's Motions in Limine, # 2 Declaration of Gina Cremona ISO Kove's Redactions to Kove's Omnibus Motions in Limine)(Reichman, Courtland) (Entered: 03/13/2024) |
| 03/13/2024 | 816 | MOTION by Plaintiff Kove IO, Inc.in limine *Kove IO, Inc.'s Omnibus Motions in Limine*<br><br>(Attachments: # 1 Declaration of Savannah Carnes ISO Kove IO, Inc.'s Omnibus Motions in Limine, # 2 Exhibit K1 (REDACTED), # 3 Exhibit K2 (PUBLIC), # 4 Exhibit K3 (PUBLIC), # 5 Exhibit K4 (PUBLIC), # 6 Exhibit K5 (PUBLIC), # 7 Exhibit K6 (REDACTED), # 8 Exhibit K7 (REDACTED), # 9 Exhibit K8 (PUBLIC), # 10 Exhibit K9 (PUBLIC))(Reichman, Courtland) (Entered: 03/13/2024) |
| 03/14/2024 | 817 | MINUTE entry before the Honorable Matthew F. Kennelly: Motions to file under seal 813 815 are granted. Redacted versions are to be filed in the public record, and complete versions, including all exhibits, are to be filed under seal. In addition, as with the Daubert/spoliation motions, the parties are directed to deliver to chambers (Room 2188), within one day after the filing of responses to the motions in limine, a single USB drive that contains the complete, under seal versions of the motions and responses, formatted as the parties did with the USB drive on the earlier motions that was delivered to chambers on 3/7/2024. (mk) (Entered: 03/14/2024) |
| 03/14/2024 | 818 | MOTION by Defendant Amazon Web Services, Inc. to seal *Response to Kove's Omnibus Motions in Limine*<br><br>(Sigler, R.) (Entered: 03/14/2024) |
| 03/14/2024 | 819 | SEALED RESPONSE by Amazon Web Services, Inc. to SEALED MOTION by Plaintiff Kove IO, Inc. *Omnibus Motions in Limine* 808 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Declaration of R. William Sigler ISO Motions in Limine Response)(Sigler, R.) (Entered: 03/14/2024) |
| 03/14/2024 | 820 | MOTION by Plaintiff Kove IO, Inc. to seal *Its Response to Amazon's Motions in Limine and Exhibits*<br><br>(Reichman, Courtland) (Entered: 03/14/2024) |
| 03/14/2024 | 821 | SEALED RESPONSE by Kove IO, Inc. to SEALED MOTION by Defendant Amazon Web Services, Inc. *in Limine* 806 *Kove IO, Inc.'s Response to Amazon's Motions in Limine* (Attachments: # 1 Declaration of Savannah Carnes ISO Kove's Response to Amazon's Motions in Limine, # 2 Exhibit K10 (SEALED), # 3 Exhibit K11 (SEALED), # 4 Exhibit K12 (SEALED), # 5 Exhibit K13 (SEALED), # 6 Exhibit K14 (SEALED), # 7 |

| | | |
|---|---|---|
| | | Exhibit K15 (SEALED), # 8 Exhibit K16 (SEALED), # 9 Exhibit K17 (SEALED), # 10 Exhibit K18 (SEALED), # 11 Exhibit K19 (SEALED))(Reichman, Courtland) (Entered: 03/14/2024) |
| 03/14/2024 | 822 | STIPULATION *on Narrowing Claims (Joint)* (Reichman, Courtland) (Entered: 03/14/2024) |
| 03/15/2024 | 823 | MINUTE entry before the Honorable Matthew F. Kennelly: Motions for leave to file under seal 818 820 are granted; redacted versions are to be filed in the public record. The USB drive referenced in the Court's order of 3/14/2024 is to be delivered to chambers (Room 2188) by no later than 12:00 noon today. (mk) (Entered: 03/15/2024) |
| 03/18/2024 | 824 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number AILNDC-21756300.<br><br>(Evans, Brandon) (Entered: 03/18/2024) |
| 03/19/2024 | 825 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion by Brandon Evans to appear pro hac vice 824 is granted. (mk) (Entered: 03/19/2024) |
| 03/20/2024 | 826 | MOTION by Defendant Amazon Web Services, Inc. to seal *AWS's Response to Kove's Motions in Limine*<br><br>(Attachments: # 1 Declaration of J. Saltman ISO Motion for Leave to File AWS's Response to Kove's Motions in Limine Under Seal)(Saltman, Jeffrey) (Entered: 03/20/2024) |
| 03/20/2024 | 827 | RESPONSE by Defendant Amazon Web Services, Inc. to motion in limine, 816 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Declaration of W. Sigler ISO of Motions in Limine Response)(Sigler, R.) (Entered: 03/20/2024) |
| 03/20/2024 | 828 | MOTION by Plaintiff Kove IO, Inc. to seal *Kove's Response to Amazon's Motions in Limine*<br><br>(Attachments: # 1 Declaration of Jeffrey Saltman ISO AWS's Redactions to Kove's Response to AWS's Motions in Limine, # 2 Declaration of Gina Cremona ISO Kove's Redactions to Kove's Response to AWS's Motions in Limine)(Reichman, Courtland) (Entered: 03/20/2024) |
| 03/20/2024 | 829 | MINUTE entry before the Honorable Matthew F. Kennelly: The Court advises that at tomorrow's final pretrial conference, it does not intend to hear or invite argument regarding all, or even most, of the motions in limine/"Daubert" motions and other motions that are currently pending before the Court. Rather, the Court will have questions or will invite argument regarding the following points and motions. (1) On defendant's "Daubert" motions: the issue regarding whether Brick Managers (BMs) are still appropriately accused products at trial (Motion at 23; Response at 9-10). (2) On plaintiff's spoliation/"Daubert" motions: the spoliation motion (Motion at 1-11; Response at 1-10); the issue regarding Grama's opinion regarding "naming convention hierarchy" (Motion at 29; Response at 21); the issue regarding Grama's "practicing the prior art" testimony (Motion at 21-22; Response at 21-23); and the issue regarding Grama's "hierarchy" opinions (Motion at 22-23; Response at 23-25). (3) Defendant's motions in limine 5, 6, 7, and 10. (4) Plaintiff's motions in limine 1, 3, 4, 5, 6, and possibly 7. (mk) (Entered: 03/20/2024) |
| 03/20/2024 | 830 | RESPONSE by Plaintiff Kove IO, Inc. to motion in limine, 814 (Attachments: # 1 Declaration of Savannah Carnes ISO Kove Resp to AWS's MILs, # 2 Exhibit K10 [PUBLIC], # 3 Exhibit K11 [PUBLIC], # 4 Exhibit K12 [PUBLIC], # 5 Exhibit K13 |

| | | |
|---|---|---|
| | | [PUBLIC], # 6 Exhibit K14 [PUBLIC], # 7 Exhibit K15 [PUBLIC], # 8 Exhibit K16 [REDACTED], # 9 Exhibit K17 [SEALED], # 10 Exhibit K18 [REDACTED], # 11 Exhibit K19 [REDACTED])(Reichman, Courtland) (Entered: 03/20/2024) |
| 03/20/2024 | 831 | STIPULATION *(Joint)* (Reichman, Courtland) (Entered: 03/20/2024) |
| 03/20/2024 | 832 | STIPULATION *(Joint) Regarding Narrowing of Issues* (Attachments: # 1 Exhibit A)(Sigler, R.) (Entered: 03/20/2024) |
| 03/21/2024 | 833 | MINUTE entry before the Honorable Matthew F. Kennelly: Motions to file responses under seal 826 828 are granted. Redacted versions are to be filed in the public record. (mk) (Entered: 03/21/2024) |
| 03/21/2024 | 834 | MINUTE entry before the Honorable Matthew F. Kennelly: In person pretrial conference held on 3/21/2024. Motions in limine and Daubert/spoliation motions are ruled on as stated in open Court. Mailed notice. (mma, ) (Entered: 03/21/2024) |
| 03/22/2024 | 835 | Notice by Amazon Web Services, Inc. *on Part Five of Kove's MIL No. 7* (Sigler, R.) (Entered: 03/22/2024) |
| 03/22/2024 | 836 | NOTICE by Kove IO, Inc. re other 835 *Kove's Response to AWS's Notice Regarding Kove's MIL No. 7* (Reichman, Courtland) (Entered: 03/22/2024) |
| 03/24/2024 | 837 | ORDER ON PLAINTIFF'S MOTION IN LIMINE 7, signed by the Honorable Matthew F. Kennelly on 3/24/2024. (mk) (Entered: 03/24/2024) |
| 03/25/2024 | 838 | ORDER Regarding Equipment for Court: It is hereby ORDERED that Plaintiff Kove IO, Inc. ("Plaintiff" or "Kove") be permitted to bring in and utilize the following large equipment into Courtroom 2103 of the United States Courthouse for use starting on March 26, 2024 and for the duration of trial beginning on April 1, 2024, and continue through, no later than, April 12, 2024: one (1) printer and requisite cables and power cords, and one (1) small, foldable table. Counsel and support staff for Kove will be required to present a copy of this Order upon entering the security station. Proper identification will also be required. Said equipment shall be subject to inspection by the United States Marshals Service. Signed by the Honorable Matthew F. Kennelly on 3/25/2024:Mailed notice. (mma, ) (Entered: 03/26/2024) |
| 03/26/2024 | 839 | NOTICE by Kove IO, Inc. re sealed document, 765 *Withdrawal of Opposition to AWS's Proposed Jury Instruction on "Person of Ordinary Skill"* (Reichman, Courtland) (Entered: 03/26/2024) |
| 03/27/2024 | 840 | ORDER Regarding Large Equipment: Signed by the Honorable Matthew F. Kennelly on 3/27/2024. Mailed notice. (mma, ) (Entered: 03/27/2024) |
| 03/28/2024 | 841 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number AILNDC-21793787.  (Ramos, Andew) (Entered: 03/28/2024) |
| 03/28/2024 | 842 | MOTION by Defendant Amazon Web Services, Inc. to seal *its Motion for Reconsideration* (Sigler, R.) (Entered: 03/28/2024) |
| 03/28/2024 | 843 | SEALED MOTION by Defendant Amazon Web Services, Inc. *for reconsideration* (Attachments: # 1 Appendix A, # 2 Declaration of W. Sigler ISO Motion)(Sigler, R.) (Entered: 03/28/2024) |
| 03/29/2024 | 844 | MINUTE entry before the Honorable Matthew F. Kennelly: Having considered defendant's withdrawal of certain invalidity defenses and the parties' statements regarding |

| | | |
|---|---|---|
| | | the proposed effect of this on the trial time allocation, and having considered both the time reasonably allocated to present evidence and argument on those issues, the Court reduces the overall length of the trial by 4 hours (2 hours per side). Each side now is allocated 20 hours of trial time, for a total of 40 hours. (mk) (Entered: 03/29/2024) |
| 03/29/2024 | 845 | MOTION by Plaintiff Kove IO, Inc. to seal *Response to AWS's Motion for Clarification or Reconsideration of Previous Ruling Excluding Certain Dr. Grama Opinions* <br><br> (Reichman, Courtland) (Entered: 03/29/2024) |
| 03/29/2024 | 846 | SEALED RESPONSE by Kove IO, Inc. to SEALED MOTION by Defendant Amazon Web Services, Inc. *for reconsideration* 843 (Reichman, Courtland) (Entered: 03/29/2024) |
| 03/30/2024 | 847 | MOTION by Defendant Amazon Web Services, Inc. to seal *Motion for Reconsideration* <br><br> (Attachments: # 1 Declaration of J. Saltman ISO Motion to Seal)(Sigler, R.) (Entered: 03/30/2024) |
| 03/30/2024 | 848 | MOTION by Defendant Amazon Web Services, Inc. for reconsideration *of Previous Ruling Excluding Certain Grama Opinions* <br><br> (Attachments: # 1 Exhibit A, # 2 Declaration of W. Sigler ISO Motion)(Sigler, R.) (Entered: 03/30/2024) |
| 03/31/2024 | 849 | ORDER DENYING DEFENDANT'S "MOTION FOR CLARIFICATION OR RECONSIDERATION" (DKT. 843), signed by the Honorable Matthew F. Kennelly on 3/31/2024. (mk) (Entered: 03/31/2024) |
| 03/31/2024 | 850 | MINUTE entry before the Honorable Matthew F. Kennelly: Both sides' motions for leave to file under seal 842 845 847 are granted; redacted versions are to be filed in the public record. Motion of Andrew Ramos to appear pro hac vice 841 is granted. (mk) (Entered: 03/31/2024) |
| 03/31/2024 | 851 | MINUTE entry before the Honorable Matthew F. Kennelly: The parties have submitted competing proposals for when and under what circumstances the Court should seal the courtroom during the upcoming jury trial (i.e., require non-participants to leave, and seal the transcript). The discussion of this point has largely taken place by e-mail to the Court. Given the important First Amendment interests implicated by a proposal to seal the proceedings, this is no longer appropriate. Any further proposals must be filed on the docket. AWS's current proposal is to seal the courtroom during the presentation of exhibits and testimony regarding: (1) AWS's source code and "sensitive public technical details of the accused products" that could provide information on how to access them and how they operate; (2) "third party confidential information that AWS has contractual obligations to protect from public disclosure," in particular information regarding licenses and other agreements offered with respect to damages; and (3) "highly sensitive financial information" that Amazon and AWS do not publicly disclose, including revenues and profits for the accused products. Kove's proposal is far narrower and includes only part of category (1) just listed: "the public would not be barred from the courtroom," but any monitors showing source code [would] be turned away from the public." At this point, the Court is not persuaded to adopt any sealing measures beyond those proposed by Kove. The Court has the ability to project exhibits only for counsel and jurors, and if told that a particular exhibit containing source code should not be displayed to the courtroom the Court can easily accomplish this. As for testimony regarding source code, it's not particularly likely that witnesses will be quoting code, and if one does and the Court is advised before it happens, the Court believes there will be a sufficient basis to exclude the public and seal the transcript for that particular testimony. Beyond this, however, AWS has not made the case that the other information it cites meets the threshold needed to |

| | | overcome the presumption that trials are open to the public. *See generally Jessup v. Luther*, 277 F.3d 926, 927 (7th Cir. 2002); *Bond v. Utreras*, 585 F.3d 1061, 1075 (7th CIr. 2009); *Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 546 (7th Cir. 2002). The Court will proceed in accordance with this order unless persuaded by a further filed submission by AWS that additional restrictions on public viewing of the trial are appropriate. (mk) (Entered: 03/31/2024) |
|---|---|---|
| 03/31/2024 | 852 | NOTICE by All Plaintiffs *of Final Claim Constructions for Jury Notebook and Final Jury Instructions* (Attachments: # 1 Declaration S. Carnes, # 2 Exhibit A, # 3 Exhibit B)(Reichman, Courtland) (Entered: 03/31/2024) |
| 03/31/2024 | 853 | RESPONSE by Defendant Amazon Web Services, Inc. to notice of filing 852 (Sigler, R.) (Entered: 03/31/2024) |
| 04/01/2024 | 854 | MINUTE entry before the Honorable Matthew F. Kennelly: Jury trial begun on 4/1/2024. Voir dire held. Evidence entered. Jury trial is continued to 4/2/2024 at 9:00 a.m. Mailed notice. (mma, ) (Entered: 04/01/2024) |
| 04/02/2024 | 855 | MINUTE entry before the Honorable Matthew F. Kennelly: The Court rules as follows on the objections to certain testimony designated from the depositions of Andrew Jassy and Alyssa Henry. Jassy deposition. The objections to the following passages are sustained: 47:9-50:22 (Rule 403 given the wording of the questions); 51:16-53:9, 55:6-56:5 (Rule 403); 57:18-58:20 (Rule 403). The objections to the following passages are overruled: 53:10-55:5, 56:6-56:17. Henry deposition. The following objections are sustained: 59:21-60:17 (relevance); 291:12-291:15 (Rule 403; argumentative). For its consideration of the objections, the Court allocates 12 minutes to plaintiff (the designating party) and 3 to defendant (the objecting party). (mk) (Entered: 04/02/2024) |
| 04/02/2024 | 856 | MINUTE entry before the Honorable Matthew F. Kennelly: Jury trial held on 4/2/2024. Evidence entered. Jury trial continued to 4/3/2024 at 9:00 a.m. Mailed notice. (mma, ) (Entered: 04/02/2024) |
| 04/03/2024 | 857 | MOTION by Plaintiff Kove IO, Inc. to seal *Motion to Exclude*<br><br>(Reichman, Courtland) (Entered: 04/03/2024) |
| 04/03/2024 | 858 | SEALED MOTION by Plaintiff Kove IO, Inc. (Attachments: # 1 Declaration of Savannah Carnes ISO of Kove IO, Inc.'s Motion to Exclude, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C.1, # 5 Exhibit C.2, # 6 Exhibit C.3, # 7 Exhibit C.4, # 8 Exhibit C.5, # 9 Exhibit C.6, # 10 Exhibit D)(Reichman, Courtland) (Entered: 04/03/2024) |
| 04/03/2024 | 859 | MOTION by Defendant Amazon Web Services, Inc. for extension of time *to File Public Version*<br><br>(Sigler, R.) (Entered: 04/03/2024) |
| 04/03/2024 | 860 | MINUTE entry before the Honorable Matthew F. Kennelly: Jury trial held on 4/3/2024. Evidence entered. Jury trial continued to 4/4/2024 at 9:00 a.m. Mailed notice. (mma, ) (Entered: 04/03/2024) |
| 04/04/2024 | 861 | MINUTE entry before the Honorable Matthew F. Kennelly: Defendant's unopposed motion for extension of time to file public version 859 is granted. Plaintiff's motion to exclude 858 will be discussed during today's morning session of the trial. (mk) (Entered: 04/04/2024) |

| | | |
|---|---|---|
| 04/04/2024 | 862 | MOTION by Defendant Amazon Web Services, Inc. to seal *Response to Kove's Motion to Exclude*<br><br>(Sigler, R.) (Entered: 04/04/2024) |
| 04/04/2024 | 863 | SEALED RESPONSE by Amazon Web Services, Inc. to SEALED MOTION by Plaintiff Kove IO, Inc. 858 *to Exclude* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Declaration of W. Sigler ISO Response to Motion to Exclude)(Sigler, R.) (Entered: 04/04/2024) |
| 04/04/2024 | 864 | MINUTE entry before the Honorable Matthew F. Kennelly: Jury trial held on 4/4/2024. Evidence entered. Plaintiff's motion to exclude 858 is entered and continued to 4/5/2024. The parties are to confer on a proposed instruction as discussed in open Court. The parties are to send the proposed instruction to Judge Kennelly. Jury trial is continued to 4/5/2024 at 9:00 a.m. Mailed notice. (mma, ) (Entered: 04/04/2024) |
| 04/05/2024 | 865 | MINUTE entry before the Honorable Matthew F. Kennelly: Motions to file under seal 857 862 are granted. Redacted versions of the submissions are to be filed in the public record. (mk) (Entered: 04/05/2024) |
| 04/05/2024 | 866 | MINUTE entry before the Honorable Matthew F. Kennelly: Jury trial held on 4/5/2024. Evidence entered. Jury trial is continued to 4/8/2024 at 9:00 a.m. Mailed notice. (mma, ) (Entered: 04/05/2024) |
| 04/08/2024 | 867 | MINUTE entry before the Honorable Matthew F. Kennelly: Defendant's counterclaims of invalidity, unenforceability, and unpatentability of the '978, '170, and '640 patents--Counterclaims 2, 3, 4, 6, 7, 8, 10, 11, 12, and 13--have been withdrawn and are dismissed with prejudice. The corresponding affirmative defenses--Defenses 2, 4, 7, and 8--have also been withdrawn are likewise stricken with prejudice. (mk) (Entered: 04/08/2024) |
| 04/08/2024 | 868 | MINUTE entry before the Honorable Matthew F. Kennelly: Jury trial held on 4/8/2024. Evidence entered. Jury trial continued to 4/9/2024 at 9:00 a.m. Mailed notice. (mma, ) (Entered: 04/08/2024) |
| 04/09/2024 | 869 | MOTION by Defendant Amazon Web Services, Inc. to seal *Rule 50(a) Motion*<br><br>(Sigler, R.) (Entered: 04/09/2024) |
| 04/09/2024 | 870 | SEALED MOTION by Defendant Amazon Web Services, Inc. *Rule 50(a) Motion* (Sigler, R.) (Entered: 04/09/2024) |
| 04/09/2024 | 871 | MINUTE entry before the Honorable Matthew F. Kennelly: Jury trial held on 4/9/2024. Evidence entered. Jury trial is continued to 4/10/2024 at 9:00 a.m. Mailed notice. (mma, ) (Entered: 04/09/2024) |
| 04/09/2024 | 872 | MOTION by Plaintiff Kove IO, Inc. to seal *Plaintiff Kove IO, Inc.'s Motion to Exclude and Exhibits*<br><br>(Attachments: # 1 Declaration of Jeffrey M. Saltman ISO AWS's Redactions to Kove's Motion to Exclude)(Reichman, Courtland) (Entered: 04/09/2024) |
| 04/09/2024 | 873 | MOTION by Plaintiff Kove IO, Inc. to strike */Exclude*<br><br>(Attachments: # 1 Declaration of Savannah Carnes ISO Kove Io, Inc.'s Motion to Exclude, # 2 Exhibit A [REDACTED], # 3 Exhibit B [REDACTED], # 4 Exhibit C [REDACTED], # 5 Exhibit D [REDACTED])(Reichman, Courtland) (Entered: 04/09/2024) |

| 04/10/2024 | 874 | MINUTE entry before the Honorable Matthew F. Kennelly: AWS's motion 869 for leave to file under seal its Rule 50(a) motion is granted; a redacted version is to be filed promptly in the public record. On Kove's motion 872 to file under seal its motion to strike, the Court is somewhat perplexed; the motion to strike was already filed under seal pursuant to docket entry 865, and the version being filed now appears to be the redacted, public-record version. Kove will need to explain to the Court why another motion to file under seal has been filed. Regardless, the motion to strike 858 873 has been addressed via rulings during the trial and instructions to the jury, and to the extent any claimed inappropriate arguments are made during closing, a contemporaneous objection should be made. The motion to strike is therefore terminated as a pending motion. (mk) (Entered: 04/10/2024) |
|---|---|---|
| 04/10/2024 | 875 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion to file under seal 872 is granted. (mk) (Entered: 04/10/2024) |
| 04/10/2024 | 876 | JURY Instructions (mma, ) (Entered: 04/10/2024) |
| 04/10/2024 | 877 | MOTION by Defendant Amazon Web Services, Inc. to seal<br><br>(Attachments: # 1 Declaration of J. Saltman ISO Motion for Leave to File Under Seal)(Sigler, R.) (Entered: 04/10/2024) |
| 04/10/2024 | 878 | RESPONSE by Defendant Amazon Web Services, Inc. *to Motion to Exclude* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Declaration of W. Sigler ISO Response to Motion to Exclude)(Sigler, R.) (Entered: 04/10/2024) |
| 04/10/2024 | 879 | JURY Note (mma, ) (Entered: 04/10/2024) |
| 04/10/2024 | 880 | MINUTE entry before the Honorable Matthew F. Kennelly: Jury trial held and completed on 4/10/2024. Defendant's Rule 50 motion 870 is taken under advisement. Jury returns a verdict. Judgment is entered in favor of plaintiff Kove IO, Inc. and against defendant Amazon Web Services, Inc., as follows: (a) On Count 1 of plaintiff's complaint, finding infringement by defendant of U.S. Patent No. 7,814,180; (b) On Count 2 of plaintiff's complaint, finding infringement by defendant of U.S. Patent No. 7,233,978; (c) On Count 3 of plaintiff's complaint, finding infringement by defendant of U.S. Patent No. 7,103,640. (d) The infringement was not willful. (e) Defendant's counterclaims 1 through 13, asserting non-infringement; invalidity; unpatentability; and unenforceability of the three patents in suit, as well as double patenting, are all dismissed with prejudice. (f) Damages are awarded in favor of the plaintiff and against the defendant in the amount of $525,000,000. Civil case terminated. Mailed notice. (mma, ) (Entered: 04/10/2024) |
| 04/10/2024 | 881 | JURY Verdict entered in favor of plaintiff and against defendant. (Mailed Notice) (RESTRICTED) (mma, ) (Entered: 04/10/2024) |
| 04/10/2024 | 882 | ENTERED JUDGMENTMailed notice. (mma, ) (Entered: 04/10/2024) |
| 04/11/2024 | 883 | MOTION by Plaintiff Kove IO, Inc. to seal *its Response to AWS's Motion for Clarification or Reconsideration of Previous Ruling Excluding Certain Dr. Grama Opinions*<br><br>(Attachments: # 1 Declaration of J. Saltman ISO AWS's Redactions to Kove's Resp to Motion for Clarification or Reconsideration)(Reichman, Courtland) (Entered: 04/11/2024) |
| 04/11/2024 | 884 | RESPONSE by Plaintiff Kove IO, Inc. *to AWS's Motion for Clarification or Reconsideration of Previous Ruling Excluding Certain Dr. Grama Opinions* (Reichman, Courtland) (Entered: 04/11/2024) |

| | | |
|---|---|---|
| 04/11/2024 | 885 | MAILED Patent report with certified copy of minute order dated 4/10/2024 to Patent Trademark Office, Alexandria, VA. (smb, ) (Entered: 04/11/2024) |
| 04/11/2024 | 886 | MINUTE entry before the Honorable Matthew F. Kennelly: Motions for leave to file under seal 877 883 are granted. (mk) (Entered: 04/11/2024) |
| 04/12/2024 | 887 | MINUTE entry before the Honorable Matthew F. Kennelly: This order corrects docket entry 880 which contained a typographical error. Jury trial held and completed on 4/10/2024. Defendant's Rule 50 motion 870 is taken under advisement. Jury returns a verdict. Judgment is entered in favor of plaintiff Kove IO, Inc. and against defendant Amazon Web Services, Inc., as follows: (a) On Count 1 of plaintiff's complaint, finding infringement by defendant of U.S. Patent No. 7,814,170; (b) On Count 2 of plaintiff's complaint, finding infringement by defendant of U.S. Patent No. 7,233,978; (c) On Count 3 of plaintiff's complaint, finding infringement by defendant of U.S. Patent No. 7,103,640. (d) The infringement was not willful. (e) Defendant's counterclaims 1 through 13, asserting non-infringement; invalidity; unpatentability; and unenforceability of the three patents in suit, as well as double patenting, are all dismissed with prejudice. (f) Damages are awarded in favor of the plaintiff and against the defendant in the amount of $525,000,000. Civil case terminated. Mailed notice. (mma, ) (Entered: 04/12/2024) |
| 04/12/2024 | 888 | ENTERED CORRECTED JUDGMENT. Mailed notice. (mma, ) (Entered: 04/12/2024) |
| 04/15/2024 | 889 | MAILED Patent report with certified copy of corrected minute order dated 4/12/2024 to Patent Trademark Office, Alexandria, VA. (smb, ) (Entered: 04/15/2024) |
| 04/17/2024 | 890 | MOTION by Defendant Amazon Web Services, Inc. to seal *its Motion for Judgment as a Matter of Law Under Rule 50(a)* <br><br> (Attachments: # 1 Declaration of J. Saltman ISO AWS's Motion for Leave to File its Rule 50(a) Motion Under Seal)(Sigler, R.) (Entered: 04/17/2024) |
| 04/17/2024 | 891 | MOTION by Defendant Amazon Web Services, Inc. for judgment *as a Matter of Law Under Rule 50(a)* <br><br> (Sigler, R.) (Entered: 04/17/2024) |
| 04/18/2024 | 892 | MINUTE entry before the Honorable Matthew F. Kennelly: Defendant's motion for leave to file under seal 890 is granted; a redacted version is to be filed in the public record. The Court intends to hold off setting a schedule on defendant's Rule 50(a) motion until all post-trial motions have been filed. A telephonic status hearing is set for 5/10/2024 at 8:55 AM, using call-in number 888-684-8852, access code 746-1053. (mk) (Entered: 04/18/2024) |
| 04/18/2024 | 893 | MOTION for Leave to Appear Pro Hac Vice Filing fee $ 150, receipt number AILNDC-21870897. <br><br> (Baran, Brian) (Entered: 04/18/2024) |
| 04/19/2024 | 894 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion by Brian C. Baran to appear pro hac vice 893 is granted. (mk) (Entered: 04/19/2024) |
| 04/19/2024 | 895 | MOTION by Plaintiff Kove IO, Inc. for extension of time to file *Joint Motion to Amend Deadline and Process to Seek Attorney's Fees* <br><br> (Attachments: # 1 Text of Proposed Order)(Reichman, Courtland) (Entered: 04/19/2024) |
| 04/20/2024 | 896 | MINUTE entry before the Honorable Matthew F. Kennelly: The joint motion to amend the deadline and process to seek attorney's fees 895 is granted to the following extent: the |

| | | process and determination of the amount of any fee award is deferred pending resolution of whether fees should be awarded under 24 USC 285. Any motion for attorney's fees must be filed within the deadline for motions under Fed. R. Civ. P. 59. The Court advises that if it ultimately determines to award fees, it likely will shorten the time intervals under LR 54.3, which in some cases end up with the attorney's fee motion not being fully briefed until as long as 6 months after the LR 54.3 process starts, which in the Court's view is unduly long. But the specifics of this can and should be determined, in this case, only after a determination that fees should be awarded in the first place. (mk) (Entered: 04/20/2024) |
|---|---|---|
| 04/21/2024 | 897 | MINUTE entry before the Honorable Matthew F. Kennelly: The minute entry dated 4/20/2024 (dkt. no. 896) contained a typographical error and is corrected to read as follows. The joint motion to amend the deadline and process to seek attorney's fees 895 is granted to the following extent: the process and determination of the amount of any fee award is deferred pending resolution of whether fees should be awarded under **35** USC 285. Any motion for attorney's fees must be filed within the deadline for motions under Fed. R. Civ. P. 59. The Court advises that if it ultimately determines to award fees, it likely will shorten the time intervals under LR 54.3, which in some cases end up with the attorney's fee motion not being fully briefed until as long as 6 months after the LR 54.3 process starts, which in the Court's view is unduly long. But the specifics of this can and should be determined, in this case, only after a determination that fees should be awarded in the first place. (mk) (Entered: 04/21/2024) |
| 05/01/2024 | 898 | MOTION by Defendant Amazon Web Services, Inc. to withdraw *Andrew Ramos as Counsel* (Sigler, R.) (Entered: 05/01/2024) |
| 05/02/2024 | 899 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion to withdraw appearance of Andrew Ramos 898 is granted. (mk) (Entered: 05/02/2024) |
| 05/07/2024 | 900 | MINUTE entry before the Honorable Matthew F. Kennelly: At the Court's instance, the telephonic status hearing set for 8:55 a.m. on 5/10/2024 is pushed back to 9:00 a.m. on that date. This is a time change only. The following call-in number will be used for the hearing: 888-684-8852, access code 746-1053. Mailed notice. (mma, ) (Entered: 05/07/2024) |
| 05/08/2024 | 901 | MOTION by Defendant Amazon Web Services, Inc. for judgment *as a Matter of Law Under Rule 50(b)* (Sigler, R.) (Entered: 05/08/2024) |
| 05/08/2024 | 902 | MOTION by Defendant Amazon Web Services, Inc. for new trial *under Rule 59* (Attachments: # 1 Exhibit A, # 2 Declaration of R. William Sigler ISO AWS's Motion for a New Trial)(Sigler, R.) (Entered: 05/08/2024) |
| 05/08/2024 | 903 | MOTION by Plaintiff Kove IO, Inc. to seal *Motion to Amend the Judgment and for Attorney Fees, Declaration and Appendix, and Exhibits* (Reichman, Courtland) (Entered: 05/08/2024) |
| 05/08/2024 | 904 | SEALED MOTION by Plaintiff Kove IO, Inc. *to Amend the Judgment and for Attorney Fees* (Attachments: # 1 Declaration of Jim W. Bergman ISO Kove's Motion to Amend the Judgment and for Attorney Fees, # 2 Exhibit 1, # 3 Exhibit 2)(Reichman, Courtland) (Entered: 05/08/2024) |

| | | |
|---|---|---|
| 05/09/2024 | 905 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion to file under seal 903 is granted; a complete version of the motion, including all exhibits, is to be filed under seal, and a redacted version is to be filed in the public record. (mk) (Entered: 05/09/2024) |
| 05/10/2024 | 906 | MINUTE entry before the Honorable Matthew F. Kennelly: Telephonic status hearing held on 5/10/2024. Responses to all post-trial motions are due 6/7/2024; replies are due 6/21/2024. Both sides have leave to file an omnibus response or reply brief. Mailed notice. (mma, ) (Entered: 05/10/2024) |
| 05/10/2024 | 907 | BILL of Costs - *Kove IO, Inc.* (Attachments: # 1 Declaration Jennifer Estremera ISO Kove IO, Inc.'s Bill of Costs, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Estremera, Jennifer) (Entered: 05/10/2024) |
| 05/11/2024 | 908 | MINUTE entry before the Honorable Matthew F. Kennelly: Response to plaintiff's bill of costs 907 is to be filed by 6/7/2024; reply to response is to be filed by 6/21/2024. (mk) (Entered: 05/11/2024) |
| 05/14/2024 | 909 | MOTION by Plaintiff Kove IO, Inc. for attorney fees *and to amend the judgment* (Attachments: # 1 Declaration of Jim W. Bergman ISO Kove's Motion to Amend the Judgment and for Attorney Fees, # 2 Exhibit 1 (PUBLIC), # 3 Exhibit 2 (PUBLIC))(Reichman, Courtland) (Entered: 05/14/2024) |
| 05/29/2024 | 910 | STIPULATION *(Joint)* (Reichman, Courtland) (Entered: 05/29/2024) |
| 05/30/2024 | 911 | MINUTE entry before the Honorable Matthew F. Kennelly: Pursuant to the parties' joint stipulation, costs are taxed in favor of plaintiff Kove IO, Inc. and against defendant Amazon Web Services, Inc. in the amount of $62,925.01. (mk) (Entered: 05/30/2024) |
| 06/07/2024 | 912 | MOTION by Defendant Amazon Web Services, Inc. to seal *its Opposition to Kove's Motion to Amend the Judgment and for Attorney Fees* (Sigler, R.) (Entered: 06/07/2024) |
| 06/07/2024 | 913 | SEALED RESPONSE by Amazon Web Services, Inc. to SEALED MOTION by Plaintiff Kove IO, Inc. *to Amend the Judgment and for Attorney Fees* 904 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Declaration of M. Bennis in Opposition to Motion to Amend the Judgment and for Attorney Fees, # 15 Declaration of R. William Sigler ISO AWS's Opposition to Motion to Amend the Judgment and for Attorney Fees)(Sigler, R.) (Entered: 06/07/2024) |
| 06/07/2024 | 914 | RESPONSE by Kove IO, Inc.in Opposition to MOTION by Defendant Amazon Web Services, Inc. for judgment *as a Matter of Law Under Rule 50(b)* 901 , MOTION by Defendant Amazon Web Services, Inc. for new trial *under Rule 59* 902 *(AWS's Post-Trial Motions)* (Reichman, Courtland) (Entered: 06/07/2024) |
| 06/09/2024 | 915 | MINUTE entry before the Honorable Matthew F. Kennelly: Defendant's motion for leave to file under seal 912 is granted. A redacted version of the submission is to be filed in the public record. (mk) (Entered: 06/09/2024) |
| 06/13/2024 | 916 | MOTION by Defendant Amazon Web Services, Inc. to seal *its Opposition to Kove's Motion to Amend the Judgment and for Attorney Fees and Certain Materials* (Attachments: # 1 Declaration of J. Saltman)(Saltman, Jeffrey) (Entered: 06/13/2024) |

| | | |
|---|---|---|
| 06/13/2024 | 917 | RESPONSE by Amazon Web Services, Inc.in Opposition to MOTION by Plaintiff Kove IO, Inc. for attorney fees *and to amend the judgment* 909 (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Declaration of M. Bennis in Opposition to Motion to Amend the Judgment and for Attorney Fees, # 15 Declaration of R. William Sigler ISO AWS's Opposition to Motion to Amend the Judgment and for Attorney Fees)(Saltman, Jeffrey) (Entered: 06/13/2024) |
| 06/14/2024 | 918 | MINUTE entry before the Honorable Matthew F. Kennelly: Defendant's motion to file response under seal 916 is granted. A complete version, including all exhibits, is to be filed under seal, and a redacted version is to be filed in the public record. (mk) (Entered: 06/14/2024) |
| 06/21/2024 | 919 | REPLY by Defendant Amazon Web Services, Inc. to motion for judgment 901 (Attachments: # 1 Exhibit A, # 2 Declaration of R. William Sigler ISO Reply)(Sigler, R.) (Entered: 06/21/2024) |
| 06/21/2024 | 920 | REPLY by Defendant Amazon Web Services, Inc. to motion for new trial 902 (Sigler, R.) (Entered: 06/21/2024) |
| 06/21/2024 | 921 | REPLY by Plaintiff Kove IO, Inc. *In Support of Its Motion to Amend the Judgment and for Attorney Fees* (Reichman, Courtland) (Entered: 06/21/2024) |
| 06/27/2024 | 922 | ATTORNEY Appearance for Plaintiff Kove IO, Inc. by Steven Gordon Trubac (Trubac, Steven) (Entered: 06/27/2024) |
| 06/28/2024 | 923 | MOTION by Attorney Holly H. Campbell to withdraw as attorney for Kove IO, Inc., Kove IO, Inc.. No party information provided (Campbell, Holly) (Entered: 06/28/2024) |
| 06/28/2024 | 924 | MOTION by Attorney Renato Mariotti to withdraw as attorney for Kove IO, Inc., Kove IO, Inc.. No party information provided (Mariotti, Renato) (Entered: 06/28/2024) |
| 06/29/2024 | 925 | MINUTE entry before the Honorable Matthew F. Kennelly: Motions to withdraw appearances of attorneys Holly Campbell and Renato Mariotti are granted 923 924 . (mk) (Entered: 06/29/2024) |
| 07/02/2024 | 926 | NOTICE by Taylor Mauze of Change of Address (Mauze, Taylor) (Entered: 07/02/2024) |
| 07/29/2024 | 927 | MINUTE entry before the Honorable Matthew F. Kennelly: The parties are directed to deliver to Judge Kennelly's chambers (Room 2188) by 12:00 noon on 7/30/2024 a single USB drive that includes all of the exhibits admitted during the trial of this case. (mk) (Entered: 07/29/2024) |
| 08/20/2024 | 928 | MEMORANDUM OPINION AND ORDER signed by the Honorable Matthew F. Kennelly on 8/20/2024: For the reasons stated in the accompanying Memorandum Opinion and Order, the Court denies AWS's motions for judgment as a matter of law [dkt. nos. 870, 891, 901] and its motion for a new trial [dkt. no. 902]. The Court grants in part Kove's motion to amend the judgment and for attorneys' fees [dkt. no. 909] with respect to the pre- and post-judgment interest, but otherwise denies that motion. The parties' joint statement regarding prejudgment interest as described in this order is to be filed by no later than August 27, 2024. (mk) (Entered: 08/20/2024) |

| | | |
|---|---|---|
| 08/27/2024 | 929 | Joint Statement Relating to Prejudgment Interest STATEMENT by Kove IO, Inc. (Reichman, Courtland) (Entered: 08/27/2024) |
| 08/28/2024 | 930 | MOTION by Attorney Karlanna Lewis to withdraw as attorney for Kove IO, Inc.. No party information provided<br><br>(Reichman, Courtland) (Entered: 08/28/2024) |
| 08/28/2024 | 931 | ENTERED AMENDED JUDGMENT. Mailed notice. (mma, ) (Entered: 08/28/2024) |
| 08/29/2024 | 932 | MINUTE entry before the Honorable Matthew F. Kennelly: Motion to withdraw appearance of attorney Karlanna Lewis is granted 930 . (mk) (Entered: 08/29/2024) |
| 09/18/2024 | 933 | NOTICE of appeal by Amazon Web Services, Inc. regarding orders 928 , 931 Receipt number: AILNDC-22489998. (Sigler, R.) Modified on 9/18/2024 (gcy, ). (Entered: 09/18/2024) |
| 09/18/2024 | 934 | MOTION by Defendant Amazon Web Services, Inc. to stay *execution of judgment without a supersedeas bond pending appeal (Unopposed)*<br><br>(Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Sigler, R.) (Entered: 09/18/2024) |
| 09/19/2024 | 935 | TRANSMITTED to the Federal Circuit the short record on notice of appeal 933 . Notified counsel. (smb, ) (Entered: 09/19/2024) |
| 09/19/2024 | 936 | MINUTE entry before the Honorable Matthew F. Kennelly: Defendant's unopposed motion to stay execution of the judgment pending appeal without a supersedeas bond 934 is granted. (mk) (Entered: 09/19/2024) |
| 09/24/2024 | 937 | NOTICE of docketing from the USCA for the Federal Circuit, Federal Circuit Docket No. 2024-2350. (daj, ) (Entered: 09/25/2024) |

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| Kove IO, Inc., | Civil Action No. |
| Plaintiff, | |
| v. | COMPLAINT |
| Amazon Web Services, Inc., | **DEMAND FOR JURY TRIAL** |
| Defendant. | |

**COMPLAINT**

Plaintiff Kove IO, Inc. ("Kove") files this Complaint against Defendant Amazon Web Services, Inc. ("AWS"), and in support thereof states as follows:

**NATURE OF THE ACTION**

1. Kove's inventors developed breakthrough technology enabling high-performance, hyper-scalable distributed "cloud" storage years before the advent of the cloud. They were awarded patents for their innovations. Five years after this breakthrough, the *MIT Technology Review* recognized that the type of distributed data storage technology described in Kove's patents was one of the top 10 emerging technologies that would change the world.[1]

2. Kove's technology became essential to AWS as the volume of data stored on its cloud grew exponentially and its cloud storage business faced limitations on the ability to store and retrieve massive amounts of data. An AWS engineer explained that "we have a history of 10 years of using distributed hash tables to run systems and that becomes very powerful and that

_____

[1] Balakrishnan, H., Distributed Storage, 10 Emerging Technologies That Will Change Your World, MIT Technology Review February 2004 (Attached as Ex. 1).

1

Appx315

algorithm makes things work at massive scales and pretty much nothing else does."[2]  Once able to remove the barriers to massive data storage and retrieval present in previous systems, AWS became the first large-scale vendor of economical cloud infrastructure and services, allowing businesses and individuals around the world access to the cloud without having to set up their own servers, software, and functionality.  The ability to offer cloud services on this scope and scale was made possible through infringement of Kove's patents, paving the way for AWS to become what is believed to be Amazon's largest profit center.[3]

3.      Kove is a Chicago-based pioneer in high-performance computer storage and data management technologies.  It sells hardware and data management technology, creating solutions that overcome technological limitations in modern server architecture.  It is a small, innovative product company competing in a field of behemoths, like AWS.  It cannot outspend these dominant global players—respect for its intellectual property, as the law requires, is essential to fair competition.  Companies such as AWS have little incentive to do business with small companies that have patented (and therefore disclosed) technology if they are able to take it without meaningful consequences.  The disclosure of innovation in patents is not intended to facilitate unauthorized use, but rather to incentivize public disclosure for the benefit of all, in return for the promise to inventors of exclusive rights for a limited period of time.

4.      Through this case, Kove seeks to stop AWS's unauthorized use of Kove's patented technology, and its noncompliance with the patent laws.  This case is about ensuring a level playing

---

[2] AWS re:Invent 2017: How DynamoDB Powered Amazon Prime Day 2017 (DAT326), YouTube (November 30, 2017), available at https://www.youtube.com/watch?v=83-IWlvJ__8&feature=youtu.be&t=38m38s.

[3] Wingfield, N., Amazon's Profit Swells to $1.6 Billion, Lifted by Its Cloud Business, New York Times, (April 26, 2018), available at https://www.nytimes.com/2018/04/26/technology/amazon-prime-profit.html (Attached as Ex. 2).

2

field so smaller competitors like Kove can compete fairly on the basis of their hard work and protected innovations.

## THE PARTIES

5. Kove was founded in 2004 with an emphasis on high performance storage solutions. Kove has maintained a lean team of no more than 50 employees over the course of its history. The Kove team has included those with strong backgrounds from premier tech companies, including Intel, Sun, Cisco, Seagate, Quantum, NASA, and many others. Kove's headquarters are located in Chicago, Illinois. It owns the patents asserted in this case. Dr. John Overton and Dr. Stephen Bailey are the named inventors, and Dr. Overton serves as Kove's Chief Executive Officer.

6. Kove is a corporation organized and existing under the laws of the State of Delaware and is registered to do business in the State of Illinois. Kove's principal place of business is located at 14 North Peoria Street Suite 2H, Chicago, Illinois 60607.

7. AWS is a corporation organized and existing under the laws of the State of Delaware and is registered to do business in the State of Illinois. Upon information and belief, AWS has its principal place of business at 410 Terry Avenue North Seattle, Washington 98109 and a regular and established place of business in this District at AT&T Center, 227 W. Monroe Street, Chicago, Illinois 60606.

8. AWS develops and provides cloud storage products and services to customers, including customers in this District.

## JURISDICTION AND VENUE

9. This Court has subject matter jurisdiction over this case under 28 U.S.C. §§ 1331 and 1338. Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400(b).

3

10.     This Court has personal jurisdiction over AWS.  AWS has continuous and systematic business contacts with the State of Illinois.  AWS, directly and/or through subsidiaries or intermediaries, conducts its business extensively throughout Illinois, by shipping, distributing, offering for sale, selling, and advertising (including the provision of interactive web pages) its products and services in the State of Illinois and in this District.  AWS, directly and/or through subsidiaries or intermediaries, has purposefully and voluntarily placed its infringing products and services into this District and into the stream of commerce with the intention and expectation that they will be purchased and used by consumers in this District.  AWS has offered and sold and continues to offer and sell these infringing products and services in this District.[4]  On information and belief, AWS, for example, sells and offers to sell the infringing products and services to developers, partners or, customers in this District, such as Amazon.com, Inc., University of Chicago, City of Chicago, and Federal Home Loan Bank of Chicago.  AWS has committed acts of infringement in this District and has a regular and established place of business in this District.

## BACKGROUND

11.     Drs. Overton and Bailey, who met at the University of Chicago while working on their PhDs, are the named inventors of the three patents-in-suit: U.S. Patent Nos. 7,814,170 ("'170 Patent"); 7,103,640 ("'640 Patent"); and 7,233,978 ("'978 Patent") (collectively, "patents-in-suit").

12.     Today, cloud storage is so ubiquitous that it has become part of the common vernacular.  When the inventors were studying together at the University of Chicago in the 1990's, the cloud as we know it was years away.  The inventors foresaw the advent of the cloud—

---

[4]  AWS, Customer Success Stories, available at https://aws.amazon.com/solutions/case-studies/startups/ and https://aws.amazon.com/solutions/case-studies/government-education/all-government-education-nonprofit/ (Attached as Ex. 3).

4

distributed, large-scale storage networks—and they identified a key roadblock that would need to be overcome in order to sustain viability.

13.     In particular, data storage management has become increasingly critical for companies as the amount of data produced every day grows exponentially—for example, today, there are 2.5 quintillion ($2.5 * 10^{18}$) bytes of data created each day.[5]  In the 1990's, the inventors foresaw that data storage requirements would grow beyond the capabilities of conventional computer networks.  Dependency on traditional ways of indexing the information in a distributed storage network was identified as a key issue.  For example, as information was added to a network, previous technology would require that it be indexed in some hierarchical fashion, and those indices would periodically have to be updated.  While these indices worked well to a certain point, the distributed network of data servers and data would become so vast and complex that ordinary hierarchical indices no longer could handle the load without high levels of inefficiency.

14.     Further, to store a piece of information (e.g., a data file), a storage system must store not only the data file itself but also its corresponding location information, which records where the data file is located on the network of servers and computers.  Without the corresponding location information, a storage system would not know where to find the data file (i.e., which server on the network to access and from which to retrieve the data file).

15.     Location information of data files was traditionally stored on a single centralized server, and it was retrieved from that specific centralized server.  Thus, then-existing systems allowed a client seeking location information associated with a data file to send a request to a

---

[5] Bernard Marr, How Much Data Do We Create Every Day? The Mind-Blowing Stats Everyone Should Read (May 21, 2018), available at https://www.forbes.com/sites/bernardmarr/2018/05/21/how-much-data-do-we-create-every-day-the-mind-blowing-stats-everyone-should-read/#2329790360ba.

5

server, and typically, only data statically associated with that server was returned. The search was conducted only where the system knew in advance to look.

16. In the 1990's, such a server may have been sufficient; however, the inventors knew distributed storage systems would someday contain so many unique data files that it would become impractical—if not impossible—to store the corresponding location information in one place.

17. Drs. Overton and Bailey addressed these challenges. They realized, among other things, that storing location information associated with data files across multiple servers would reduce the processing time to find a data file. Likewise, the inventors understood the need to efficiently identify which of the multiple location information servers stored the location information for a particular data file.

18. To achieve this, Drs. Overton and Bailey invented the claimed technology of the patents-in-suit. For example, hash values corresponding to the location information of data files would be stored and distributed on the network. The distributed hash values would reveal which of the location information servers contained the location information of particular data files. Each hash value may point to the location information server storing the location information of a data file. Each location server would have the ability to point to other servers based on the hash values. While the first server may not have the location information for the file the user is looking for, it will reroute—within milliseconds—to another server that does have that location information. This fundamental technology allowed for the efficient organization of location information even as files are constantly added, deleted, modified, and moved. It enabled hyper-scalable cloud storage and improved upon the scalability limitations of conventional storage systems.

19. The claimed inventions were ahead of their time—distributed storage networks had not yet grown large enough. Years after the inventors filed the earliest of the original patent

6

applications, an article published in the *MIT Technology Review* described the use of distributed hash tables (as discussed above) as one of "10 Emerging Technologies That Will Change Your World," explaining that "[h]ash tables provide a quick way to organize data: a simple mathematical operation assigns each file its own row in a table; the row stores the file's location," and that "distributed hash tables [are] the coming future of networked storage" and have a "huge variety of applications. . . . Not very many technologies have such broad potential."[6]

**THE KOVE PATENTS-IN-SUIT**

20.    On September 5, 2006, the U.S. Patent and Trademark Office duly and legally issued the '640 patent, entitled "Network Distributed Tracking Wire Transfer Protocol," with Drs. Overton and Bailey as inventors. The earliest application related to the '640 patent was filed on July 8, 1998. A true and correct copy of the '640 patent is attached as Exhibit 4.

21.    On June 19, 2007, the U.S. Patent and Trademark Office duly and legally issued the '978 patent, entitled "Method and Apparatus for Managing Location Information in a Network Separate From the Data to Which the Location Information Pertains," with Drs. Overton and Bailey as inventors. The earliest application related to the '978 patent was filed on July 8, 1998. A true and correct copy of the '978 patent is attached as Exhibit 5.

22.    On October 12, 2010, the U.S. Patent and Trademark Office duly and legally issued the '170 patent, entitled "Network Distributed Tracking Wire Transfer Protocol," with Drs. Overton and Bailey as inventors. The earliest application related to the '170 patent was filed on July 8, 1998. A true and correct copy of the '170 patent is attached as Exhibit 6.

23.    Kove is the sole and exclusive owner of all rights, title, and interest to the patents-in-suit necessary to bring this action, including the right to recover past and future damages.

---

[6] *See supra* n. 1. (Balakrishnan, Ex. 1).

24. The patents-in-suit are enforceable and valid.

## AWS'S INFRINGING PRODUCTS AND SERVICES

25. Upon information and belief, AWS has infringed and continues to infringe, directly and indirectly, one or more claims of the patents-in-suit.

26. The accused products include without limitation cloud-based products and services provided by AWS, such as Amazon Simple Storage Service ("Amazon S3"), DynamoDB, and other related products and services (collectively, the "AWS Accused Products").

27. As an example, Amazon S3 allows users to store data in the cloud. In fact, it is described as "storage for the internet." Specifically, it launched in 2006 and was designed to provide highly scalable, reliable, and low-latency data storage infrastructure at very low costs, where users are able to "[w]rite, read, and delete objects containing from 1 byte to 5 gigabytes of data each" and where "[e]ach object is stored and retrieved via a unique developer-assigned key."[7] In the first seven years of operation, Amazon S3 experienced a 20,000% increase in the number of data objects stored, reaching 2 trillion ($2*10^{12}$) data objects by 2013.[8] Amazon S3 is considered "one of the wonders" of AWS.[9]

28. As another example, DynamoDB is described as a "fully managed NoSQL database service that provides fast and predictable performance with seamless scalability. DynamoDB lets

---

[7] Amazon Web Services Launches, Press Release (March 14, 2006), at *1, available at http://phx.corporate-ir.net/phoenix.zhtml?c=176060&p=irol-newsArticle&ID=830816 (Attached as Ex. 7); Feloni, R., How A Regular Employee Helped Put Amazon On The Path To Billions Of Dollars, Business Insider (Jul. 22, 2014), available at http://www.businessinsider.com/benjamin-black-and-amazon-web-services-2014-7 (Attached as Ex. 8).

[8] Barr, J., AWS News Blog, Amazon S3 – Two Trillion Objects, 1.1 Million Requests / Second, available at https://aws.amazon.com/blogs/aws/amazon-s3-two-trillion-objects-11-million-requests-second/ (Attached as Ex. 9).

[9] Hern, A., Amazon Web Services: the secret to the online retailer's future success, The Guardian (February 2, 2017), available at https://www.theguardian.com/technology/2017/feb/02/amazon-web-services-the-secret-to-the-online-retailers-future-success (Attached as Ex. 10).

you offload the administrative burdens of operating and scaling a distributed database, so that you don't have to worry about hardware provisioning, setup and configuration, replication, software patching, or cluster scaling.  With DynamoDB, you can create database tables that can store and retrieve any amount of data, and serve any level of request traffic.  You can scale up or scale down your tables' throughput capacity without downtime or performance degradation, and use the AWS Management Console to monitor resource utilization and performance metrics."[10]

29.     "DynamoDB powers the next wave of high-performance, internet-scale applications. . . .  DynamoDB is used by Lyft to store GPS locations for all their rides, Tinder to store millions of user profiles and make billions of matches, Redfin to scale to millions of users and manage data for hundreds of millions of properties, Comcast to power their XFINITY X1 video service running on more than 20 million devices, BMW to run its car-as-a-sensor service that can scale up and down by two orders of magnitude within 24 hours, Nordstrom for their recommendations engine reducing processing time from 20 minutes to a few seconds, Under Armour to support its connected fitness community of 200 million users, Toyota Racing to make real time decisions on pit-stops, tire changes, and race strategy, and another 100,000+ AWS customers for a wide variety of high-scale, high-performance use cases."[11]

30.     On information and belief, AWS uses the AWS Accused Products for its own business purposes.  In addition, AWS regularly conducts testing and troubleshooting of the AWS

---

[10] DynamoDB Developer Guide (API Version 2012-08-10), at *1, available at https://docs.aws.amazon.com/amazondynamodb/latest/developerguide/dynamodb-dg.pdf (While the full document is incorporated by reference herein, an excerpted version of the document is attached as Ex. 11); *see also* Amazon's Web Version of the DynamoDB Developer Guide at https://docs.aws.amazon.com/amazondynamodb/latest/developerguide/Introduction.html.

[11] Vogels, W., A Decade of Dynamo: Powering the net wave of high-performance, internet-scale applications, All Things Distributed, at *2, available at https://www.allthingsdistributed.com/2017/10/a-decade-of-dynamo.html (Attached as Ex. 12).

9

Appx323

Accused Products. Further, Kove is informed and believes companies related to AWS (e.g., Amazon.com, Inc. and its subsidiaries) use the AWS Accused Products.

31. On information and belief, the features discussed herein are not limited to any one of the AWS Accused Products. For example, as an AWS senior practice manager explained: "[T]ables exist on DynamoDB internal to services we have over 12,000 services at AWS many many of those services use DynamoDB . . . ."[12]



---

[12] AWS Youtube Videos, AWS re:Invent 2017: DynamoDB adaptive capacity: smooth performance for chaotic workl (DAT327), available at https://youtu.be/kMY0_m29YzU.



32.     Indeed, on information and belief, the AWS Accused Products are based on a common platform, like the "Dynamo" technology: "Dynamo is internal technology developed at Amazon to address the need for an incrementally scalable, highly-available key-value storage system.  The technology is designed to give its users the ability to trade-off cost, consistency, durability and performance, while maintaining high-availability."[13]  Dynamo is used "to power parts of [AWS products], such as S3."[14]  DynamoDB too is based on Dynamo technology and is built on AWS products such as S3.[15]

33.     On information and belief, AWS offers an easily integrated platform, consisting of the AWS Accused Products, that uses the features discussed herein as shown below:[16]

---

[13]  Vogels, W., Amazon's Dynamo, All Things Distributed, at *1, available at https://www.allthingsdistributed.com/2007/10/amazons_dynamo.html (Attached as Ex. 13).

[14] *Id.*

[15] Vogels, W., Amazon DynamoDB – a Fast and Scalable NoSQL Database Service Designed for Internet Scale Applications, All Things Distributed, at *1, available at https://www.allthingsdistributed.com/2012/01/amazon-dynamodb.html (Attached as Ex. 14).

[16] Agnihotri, P., Amazon Web Services – Backup, Archive and Restore Approaches Using AWS, at *5, *16 available at https://d0.awsstatic.com/whitepapers/Backup_Archive_and_Restore_Approaches_Using_AWS.pdf (Attached as Ex. 15).

11



Figure 1: AWS Native Scenario



Figure 8: A hybrid infrastructure scenario

## COUNT I

## AWS'S INFRINGEMENT OF THE '170 PATENT

12

34. Kove incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

35. On information and belief, AWS has infringed and will continue to infringe the '170 patent. AWS directly infringes the '170 patent under 35 U.S.C. §271(a) by making, using, selling, offering for sale, and/or importing in this District and into the United States products and/or methods covered by one or more claims of the '170 patent, including, but not limited to, the AWS Accused Products. As an example, the AWS Accused Products infringe at least claim 1 of the '170 patent.

36. Claim 1 is directed to a "system for managing data stored in a distributed network." Claim 1, for example, recites a "data repository configured to store a data entity, wherein an identifier string identifies the data entity." Claim 1 further recites a "data location server network" where "data location information for a plurality of data entities is stored." Further still, claim 1 recites a "hash function used to organize the data location information across the . . . data location servers."

37. The AWS Accused Products manage data stored in a distributed network. For example, as shown below in the Amazon S3 Reference Architecture diagram ("Architecture Diagram"), "[u]sers upload files into Amazon Simple Storage Service (Amazon S3), a highly durable storage infrastructure designed for mission-critical and primary data storage. Amazon S3 makes it easy to store and retrieve any amount of data, at any time."[17]

---

[17]Amazon Web Services, Inc., https://media.amazonwebservices.com/architecturecenter/AWS_ac_ra_filesync_08.pdf (modified from original) Attached as Ex. 16).

13



**1** The file synchronization service endpoint consists of an **Elastic Load Balancer** distributing incoming requests to a group of application servers hosted on **Amazon Elastic Compute Cloud** (Amazon EC2) instances. An **Auto Scaling** group automatically adjusts the number of **Amazon EC2** instances depending on the application needs.

**2** To upload a file, a client first needs to request the permission to the service and get a security token.

**3** After checking the user's identity, application servers get a temporary credential from **AWS Security Token Service** (STS). This credential allows users to upload files.

**4** Users upload files into **Amazon Simple Storage Service** (Amazon S3), a highly durable storage infrastructure designed for mission-critical and primary data storage. **Amazon S3** makes it easy to store and retrieve any amount of data, at any time. Large files can be uploaded by the same client using multiple concurrent threads to maximize bandwidth usage.

**5** File metadata, version information, and unique identifiers are stored by the application servers on an **Amazon DynamoDB** table. As the number of files to maintain in the application grows, **Amazon DynamoDB** tables can store and retrieve any amount of data, and serve

any level of traffic.

**6** File change notifications can be sent via email to users following the resource with **Amazon Simple Email Service** (Amazon SES), an easy-to-use, cost-effective email solution.

**7** Other clients sharing the same files will query the service endpoint to check if newer versions are available. This query compares the list of local files checksums with the checksums listed in an **Amazon DynamoDB** table. If the query finds newer files, they can be retrieved from **Amazon S3** and sent to the client application.

14

38.     AWS stores data entities, wherein an identifier string identifies the data entities.  In particular, Amazon S3 stores objects in a "Files Repository," and each Amazon S3 object, is "uniquely identified within a bucket by a key (name) and a version ID. . . .  Amazon S3 can be thought of as a basic data map between 'bucket + key + version' and the object itself.  Every object in Amazon S3 can be uniquely addressed through the combination of the web service endpoint, bucket name, key, and optionally, a version."[18]

39.     On information and belief, AWS includes a data location server network where data location information for a plurality of data entities is stored.  For example, Amazon S3 maintains an index subsystem that manages the metadata and location information of all S3 objects in the data location servers as illustrated below.[19]

We'd like to give you some additional information about the service disruption that occurred in the Northern Virginia (US-EAST-1) Region on the morning of February 28th, 2017. The Amazon Simple Storage Service (S3) team was debugging an issue causing the S3 billing system to progress more slowly than expected. At 9:37AM PST, an authorized S3 team member using an established playbook executed a command which was intended to remove a small number of servers for one of the S3 subsystems that is used by the S3 billing process. Unfortunately, one of the inputs to the command was entered incorrectly and a larger set of servers was removed than intended. The servers that were inadvertently removed supported two other S3 subsystems. One of these subsystems, the index subsystem, manages the metadata and location information of all S3 objects in the region. This subsystem is necessary to serve all GET, LIST, PUT, and DELETE requests. The second subsystem, the placement subsystem, manages allocation of new storage and requires the index subsystem to be functioning properly to correctly operate. The placement subsystem is used during PUT requests to allocate storage for new objects. Removing a significant portion of the capacity caused each of these systems to require a full restart. While these subsystems were being restarted, S3 was unable to service requests. Other AWS services in the US-EAST-1 Region that rely on S3 for storage, including the S3 console, Amazon Elastic Compute Cloud (EC2) new instance launches, Amazon Elastic Block Store (EBS) volumes (when data was needed from a S3 snapshot), and AWS Lambda were also impacted while the S3 APIs were unavailable.

40.     On information and belief, Amazon S3 stores data location information for S3 objects in a DynamoDB table.[20]  It has been stated that "[t]he heart of the S3 object index is a

---

[18] Amazon Simple Storage Service Developer Guide, (API Version 2006-03-01), at *3–4, available at http://docs.aws.amazon.com/AmazonS3/latest/dev/s3-dg.pdf (While the full document is incorporated by reference herein, an excerpted version of the document is attached as Ex. 17); *see also* Amazon's Web Version of the S3 Developer Guide at https://docs.aws.amazon.com/AmazonS3/latest/dev/Welcome.html.

[19] Summary of the Amazon S3 Service Disruption in the Northern Virginia (US-EAST-1) Region, available at https://aws.amazon.com/message/41926/ (emphasis added) (Attached as Ex. 18).

[20] *See supra* n. 10 at *523 (DynamoDB Developer Guide, Ex. 11).

15

DynamoDB table with one item per object, which associates various attributes with the object's S3 key. Each item contains the S3 key, the size of the object, and any additional attributes to use for lookups."[21]

> ## Storing Large Attribute Values in Amazon S3
>
> As mentioned above, you can also take advantage of Amazon Simple Storage Service (Amazon S3) to store large attribute values that cannot fit in a DynamoDB item. You can store them as an object in Amazon S3 and then store the object identifier in your DynamoDB item.
>
> You can also use the object metadata support in Amazon S3 to provide a link back to the parent item in DynamoDB. Store the primary key value of the item as Amazon S3 metadata of the object in Amazon S3. Doing this often helps with maintenance of the Amazon S3 objects.

41.     AWS's "Frequently Asked Questions About Amazon DynamoDB" explains that "file pointers (possibly to Amazon S3 objects) are best saved in Amazon DynamoDB," as opposed to in Amazon S3.[22] AWS allows "the object metadata support in Amazon S3 to store the primary key value of the corresponding item as Amazon S3 object metadata. This use of metadata can help with future maintenance of your Amazon S3 objects."[23]

42.     On information and belief, AWS uses a hash function to organize data location information across the data location servers. For example, DynamoDB tables organize data location information across servers based on a hash function. AWS has described DynamoDB as a system that "uses its hash function to determine where to store a new item . . . . Note that the

---

[21] Deck, M., AWS Big Data Blog, Building and Maintaining an Amazon S3 Metadata Index without Servers, available at https://aws.amazon.com/blogs/big-data/building-and-maintaining-an-amazon-s3-metadata-index-without-servers/ (Attached as Ex. 19).

[22] Amazon DynamoDB FAQs, at *4–5, available at https://aws.amazon.com/dynamodb/faqs/ (Attached as Ex. 20).

[23] *See supra* n. 10 at *523 (DynamoDB Developer Guide, Ex. 11).

items are not stored in sorted order.  Each item's location is determined by the hash value of its partition key."[24]

43.     As AWS illustrates in its DynamoDB Developer Guide, "[t]he following diagram [below] shows a table named PETS, which spans multiple partitions. The table's primary key is ANIMALTYPE (only this key attribute is shown). DynamoDB uses its hash function to determine where to store a new item, in this case based on the hash value of the string DOG. Note that the items are not stored in sorted order. Each item's location is determined by the hash value of its partition key."[25]

---

[24]     AWS     Documentation,     DynamoDB     Core     Components,     available     at https://docs.aws.amazon.com/amazondynamodb/latest/developerguide/HowItWorks.CoreCompo nents.html#HowItWorks.CoreComponents.PrimaryKey; *see also supra* n. 10 at *2–9.
[25] *See supra* n. 10 at *18–20.



44.     "To read that same item from the PETS table, DynamoDB calculates the hash value of DOG, yielding the partition in which these items are stored."[26] On information and belief, these partitions (e.g., nodes) reside on AWS servers.

45.     It has been further described that "DynamoDB automatically spreads the data and traffic for your tables over a sufficient number of servers to handle your throughput and storage requirements, while maintaining consistent and fast performance.  All of your data is stored on solid state disks (SSDs) and automatically replicated across multiple Availability Zones in an AWS region, providing built-in high availability and data durability."[27]

46.     Moreover, on information and belief, AWS receives read and store (i.e., "get" and "put") operations for the keys, e.g., the ANIMALTYPE example discussed above: "Both get and put operations are invoked using Amazon's infrastructure-specific request processing framework over HTTP.  There are two strategies that a client can use to select a node: (1) route its request through a generic load balancer that will select a node based on load information, or (2) use a partition-aware client library that routes requests directly to the appropriate coordinator nodes. . . . A node

---

[26] *Id.* at *20.
[27] *Id*. at *1.

handling a read or write operation is known as the coordinator. Typically, this is the first among the top N nodes in the preference list. If the requests are received through a load balancer, requests to access a key may be routed to any random node in the ring." [28]

47.     Further still, it has been described that "partitioning and placement information also propagates via the gossip-based protocol and each storage node is aware of the token ranges handled by its peers. This allows each node to forward a key's read/write operations to the right set of nodes directly." [29]

48.     Based on the above, the AWS Accused Products directly infringe at least, but not limited to, claim 1 of the '170 patent.

49.     AWS also indirectly infringes the '170 patent by inducing others to infringe and/or contributing to the infringement of others, including third party users of the AWS Accused Products in this District and elsewhere in the United States. Specifically, on information and belief, AWS has had knowledge of the '170 patent since at least the time it was served with this Complaint. AWS nevertheless continues to act in wanton disregard of Kove's patent rights.

50.     Kove is informed and believes, and thereon alleges, that AWS has actively induced the infringement of the '170 patent under 35 U.S.C. § 271(b) by actively inducing the infringing use of the AWS Accused Products by third party users in the United States. Kove is informed and believes, and thereon alleges, that AWS knew or should have known that its conduct would induce others to use the Accused Products in a manner that infringes the '170 patent. Kove is informed and believes, and thereon alleges, that these third parties infringe the '170 patent in violation of 35 U.S.C. § 271(a) by using the AWS Accused Products.

---

[28] DeCandia, G., et al., Dynamo: Amazon's Highly Available Key-value Store, Amazon.com (Oct. 14–17, 2007) at *211 (Attached as Ex. 21); *see supra* n. 13.
[29] *Id*. at *213.

51.     For example, AWS provides several support websites instructing third parties on the use of the AWS Accused Products, including, without limitation: "Getting Started Resource Center"[30]; "Cloud Solutions"[31]; "AWS Documents"[32]; "AWS Support"[33]; and "AWS Customer Success."[34]  These exemplary instructional documentations explain how to use the AWS Accused Products to store and retrieve data.  In addition, AWS provides a "step-by-step tutorial [that] will help you store your files in the cloud using Amazon Simple Storage Solution (Amazon S3). Amazon S3 is a service that enables you to store your data (referred to as objects) in at massive scale.  In this tutorial, you will create an Amazon S3 bucket, upload a file, retrieve the file and delete the file."[35]



---

[30] Getting Started Resource Center, available at https://aws.amazon.com/getting-started/.

[31] Cloud Solutions Find the right solution by application or industry, available at https://aws.amazon.com/solutions/.

[32] AWS Documentation Find user guides, developer guides, API references, tutorials, and more, available at https://aws.amazon.com/documentation/.

[33] AWS Support, available at https://aws.amazon.com/premiumsupport/.

[34] AWS Customer Success, available at https://aws.amazon.com/solutions/case-studies/.

[35] Store and Retrieve a File with Amazon S3, available at https://aws.amazon.com/getting-started/tutorials/backup-files-to-amazon-s3/.

Appx334

52.     AWS also provides answers on its website to popular topics, posts, and questions that developers, users, or operators may have about the AWS Accused Products.[36]  For instance, AWS News Blog provides updates on Amazon S3.[37]  Likewise, AWS educates users about features and developments of the AWS Accused Products: "AWS holds events both online and in-person to bring the cloud computing community together to connect, collaborate, and learn from AWS experts."[38]  Users can also get help by directly asking AWS support developers.[39]  AWS further provides instructional videos to teach users how to use the AWS Accused Products.[40]



53.     In addition, AWS provides S3 and DynamoDB manuals to help the customer understand, setup, and use the features of the AWS Accused Products, along with user manuals for all AWS products and services, which may be accessed through links at https://aws.amazon.com/documentation/.  AWS also provides Tools for using the AWS Accused

---

[36] AWS News Blog, available at https://aws.amazon.com/blogs.
[37] Barr, J., Amazon S3 Update: New Storage Class and General Availability of S3 Select, available at  https://aws.amazon.com/blogs/aws/amazon-s3-update-new-storage-class-general-availability-of-s3-select/ (Attached as Ex. 22).
[38] AWS Events & Webinars available at https://aws.amazon.com/about-aws/events/.
[39] *See* AWS Support, *supra* n. 33.
[40] Getting Started Videos, https://aws.amazon.com/getting-started/videos/; Amazon S3, http://amzn.to/2iNk9IA; Introduction to Amazon S3, https://youtu.be/rKpKHulqYOQ.

21

Products, such as SDKs (software development kits), IDE (integrated development environment) Toolkits, and Command Line Tools.[41]

54.　As yet another example, in this District, AWS promotes collaborating with "partners and customers" and encourages architects to work "with AWS field sales, pre-sales, training and support teams to help partners and customers learn and use AWS services such as Amazon Elastic Compute Cloud (EC2), Amazon Simple Storage Service (S3), Amazon SimpleDB/RDSdatabases, AWS Identity and Access Management (IAM), etc."[42]　Accordingly, AWS actively induces third parties to infringe the '170 patent.

55.　Upon information and belief, AWS contributorily infringes the '170 patent under 35 U.S.C. § 271(c) by importing, selling and/or offering to sell within the United States the AWS Accused Products (or components thereof) that constitute a material part of the claimed invention and are not staple articles of commerce suitable for substantial non-infringing use.　For example, the AWS Accused Products, including Amazon S3 and DynamoDB, are material, have no substantial non-infringing uses, and are known by AWS to be especially made or especially adapted for use in the manner claimed in the '170 patent.　Accordingly, AWS contributorily infringes the '170 patent.

## COUNT II

### AWS'S INFRINGEMENT OF THE '978 PATENT

56.　Kove incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

---

[41] Tools for Amazon Web Services, available at https://aws.amazon.com/tools/.

[42] Amazon Jobs, Cloud Infrastructure Architect - Chicago - Job ID: 583645 (Attached as Ex. 23).

22

Appx336

57. On information and belief, AWS has infringed and will continue to infringe the '978 patent. AWS directly infringes the '978 patent under 35 U.S.C. § 271(a) by making, using, selling, offering for sale, and/or importing in this District and into the United States products and/or methods covered by one or more claims of the '978 patent, including, but not limited to, the AWS Accused Products. As an example, the AWS Accused Products infringe at least claim 17 of the '978 patent.

58. Claim 17 is directed to a "method of scaling at least one of capacity and transaction rate capability in a location server in a system having a plurality of location servers for storing and retrieving location information." Claim 17, for example, recites a method for "providing a transfer protocol configured to transport identifier and location information." The claimed method also recites "storing location information . . . at a first location server." Claim 17's method further requires "receiving an identifier and a location relevant to the identifier at the first location server," "storing the received location in a location store at the first data location server," and "transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit."

59. On information and belief, AWS provides for a method of scaling at least one of capacity and transaction rate capability in a location server in a system having a plurality of location servers for storing and retrieving location information. For example, DynamoDB manages multiple partitions and servers that support a soft throughput performance limit of 3000 read-capacity units and 1000 write-capacity units. By managing those partitions and servers, DynamoDB provides "some flexibility in your per-partition throughput provisioning by providing

23

burst capacity, as follows.  Whenever you are not fully using a partition's throughput, DynamoDB reserves a portion of that unused capacity for later *bursts* of throughput to handle usage spikes."[43]

60.     As explained in previous paragraphs, AWS stores location information at location servers.  For example, DynamoDB stores Amazon S3 object identifiers.[44]  "The heart of the S3 object index is a DynamoDB table with one item per object, which associates various attributes with the object's S3 key. Each item contains the S3 key, the size of the object, and any additional attributes to use for lookups."[45]

61.     DynamoDB tables organize data location information across servers based on a hash function.[46]  For instance, AWS has described DynamoDB as a system that "uses its hash function to determine where to store a new item . . . . Note that the items are not stored in sorted order.  Each item's location is determined by the hash value of its partition key."[47]

62.     As a further example, it has been explained that DynamoDB hashes location information to create hash tables, which is then split up across a set of servers: "[W]e're gonna hash that attribute value and create this . . . hash index and lay these items out on an arbitrary key space . . . as you add capacity or you increase the storage and add more items into the table we're gonna start splitting that thing up across physical boxes ok so this is how DynamoDB scales . . . ."[48]

---

[43] *See supra* n. 10 at *517 (DynamoDB Developer Guide, Ex. 11).
[44] *Id.* at *523.
[45] *See supra* n. 21 (Deck, Ex. 19).
[46] *See supra* n. 10 at *18 (DynamoDB Developer Guide, Ex. 11).
[47] *Id.* at *18.
[48] *See supra* n. 12 (DynamoDB Youtube Video).

24





63.     In addition, the AWS DynamoDB Developer Guide explains that DynamoDB handles the partition management entirely and the partitions are automatically replicated across multiple Availability Zones within an AWS region.[49]   On information and belief, the partition

---

[49] *See supra* n. 10 at *18 (DynamoDB Developer Guide, Ex. 11).

25

management uses a gossip protocol that allows for "full table routing to other nodes in the system."[50]

64.     Likewise, AWS transfers a portion of the identifiers and associated locations to data location servers when a performance criterion of a location server reaches a predetermined performance limit.  DynamoDB's and Amazon S3's best practices for optimizing performance depend on the usage request rates—the throughput performance limit.  For example, if the workload request rate grows steadily, Amazon S3 automatically partitions the buckets as needed to support higher request rates.[51]  As another example, on information and belief, and as an AWS senior practice manager explained, DynamoDB may use dynamic scaling or burst capacity— throughput and storage—to automatically spread the data location information across more partitions if the throughput performance limit is exceeded[52]:



---

[50] *See supra* n. 28 at *218 (DeCandia, Ex. 21); *see also supra* n. 13.
[51] *See supra* n. 18 at *535 (S3 Developer Guide, Ex. 17).
[52] *See supra* n. 12 (DynamoDB Youtube Video).



65.     Further still, the AWS DynamoDB Developer Guide shows that the partition data is distributed across multiple servers:



66.     As depicted, "[t]he large squares represent partitions, and the small squares represent data items in the table. Note that DynamoDB performs partition splits automatically, in the background."[53]

67.     Based on the above, the AWS Accused Products directly infringe at least, but not limited to, claim 17 of the '978 patent.

_____

[53] *See supra* n. 10 at *514 (DynamoDB Developer Guide, Ex. 11).

27

68.     AWS also indirectly infringes the '978 patent by inducing others to infringe and/or contributing to the infringement of others, including third party users of the AWS Accused Products in this District and elsewhere in the United States.  Specifically, on information and belief, AWS has had knowledge of the '978 patent since at least the time it was served with this Complaint.  AWS nevertheless continues to act in wanton disregard of Kove's patent rights.

69.     Kove is informed and believes, and thereon alleges, that AWS has actively induced the infringement of the '978 patent under 35 U.S.C. § 271(b) by actively inducing the infringing use of the AWS Accused Products by third party users in the United States.  Kove is informed and believes, and thereon alleges, that AWS knew or should have known that its conduct would induce others to use the Accused Products in a manner that infringes the '978 patent.  Kove is informed and believes, and thereon alleges, that these third parties infringe the '978 patent in violation of 35 U.S.C. § 271(a) by using the AWS Accused Products.  In particular, Kove incorporates by reference paragraphs 51 to 54 as if fully set forth herein.

70.     Upon information and belief, AWS contributorily infringes the '978 patent under 35 U.S.C. § 271(c) by importing, selling and/or offering to sell within the United States the AWS Accused Products (or components thereof) that constitute a material part of the claimed invention and are not staple articles of commerce suitable for substantial non-infringing use.  For example, the AWS Accused Products, including Amazon S3 and DynamoDB, are material, have no substantial non-infringing uses, and are known by AWS to be especially made or especially adapted for use in manner claimed in the '978 patent.  Accordingly, AWS contributorily infringes the '978 patent.

## COUNT III

## AWS'S INFRINGEMENT OF THE '640 PATENT

28

71.     Kove incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

72.     On information and belief, AWS has infringed and will continue to infringe the '640 patent.  AWS directly infringes the '640 patent under 35 U.S.C. § 271(a) by making, using, selling, offering for sale, and/or importing in and into the United States products and/or methods covered by one or more claims of the '640 patent, including, but not limited to, the AWS Accused Products.  As an example, the AWS Accused Products infringe at least claim 18 of the '640 patent.

73.     Claim 18 is directed to a "system for retrieving data location information for data stored in a distributed network."  Claim 18 recites, for example, a "data repository configured to store data, wherein the data is associated with an identifier string."  The system also includes a "client responsive to a data query to query a data location server for location information associated with the identifier string."  The "data location server network" according to claim 18 contains "location information associated with the identifier string."  If the "data location server" does not contain the "location information," "the location server transmits a redirect message to the client, wherein the redirect message contains redirect information for use by the client to calculate a location of a different data location server" containing the location information.

74.     AWS provides for a system for retrieving data location information for data stored in a distributed network.  For example, as shown above in the Architecture Diagram, "[u]sers upload files into Amazon Simple Storage Service (Amazon S3), a highly durable storage infrastructure designed for mission-critical and primary data storage.  Amazon S3 makes it easy to store and retrieve any amount of data, at any time. . . .  File metadata, version information, and unique identifiers are stored by the application servers on an Amazon DynamoDB table.  As the

29

Appx343

number of files to maintain in the application grows, Amazon DynamoDB tables can store and retrieve any amount of data, and serve any amount of traffic."[54]

75.     AWS also provides for a data repository configured to store data, wherein the data is associated with an identifier string.  For example, as discussed, Amazon S3 stores data in a files repository.  Each data entity stored by Amazon S3, called an Amazon S3 Object, is "uniquely identified within a bucket by a key (name) and a version ID. . . .  Amazon S3 can be thought of as a basic data map between 'bucket + key + version' and the object itself.  Every object in Amazon S3 can be uniquely addressed through the combination of the web service endpoint, bucket name, key, and optionally, a version."[55]

76.     Further, as discussed, Amazon S3 stores location information for S3 objects in a DynamoDB table.  On information and belief, DynamoDB tables are distributed across multiple servers.  AWS has explained, for example, that "DynamoDB stores data in partitions.  A partition is an allocation of storage for a table, backed by solid-state drives (SSDs) and automatically replicated across multiple Availability Zones within an AWS Region.  Partition management is handled entirely by DynamoDB—you never have to manage partitions yourself."[56]

77.     Likewise, location information for Amazon S3 objects is stored in DynamoDB, along with the objects' metadata.  The Amazon S3 "index subsystem manages the metadata and location information of all S3 objects in the region,"[57] and it has been explained that "[t]he heart of the S3 object index is a DynamoDB table with one item per object, which associates various attributes with the object's S3 key.  Each item contains the S3 key, the size of the object, and any

---

[54] *See supra* n. 17 (Architecture Diagram, Ex. 16).
[55] *See supra* n. 18 at *3–4 (S3 Developer Guide, Ex. 17).
[56] *See supra* n. 10 at *18 (DynamoDB Developer Guide, Ex. 11).
[57] *See supra* n. 19 (Summary of the Amazon S3 Service Disruption in the Northern Virginia, Ex. 18).

30

additional attributes to use for lookups."[58] AWS's "Frequently Asked Questions About Amazon DynamoDB" explains that "file pointers (possibly to Amazon S3 objects) are best saved in Amazon DynamoDB," as opposed to in Amazon S3.[59]

78. On information and belief, DynamoDB tables organize data location information across servers based on a hash function.[60] For instance, AWS has described DynamoDB as a system that "uses its hash function to determine where to store a new item . . . . Note that the items are not stored in sorted order. Each item's location is determined by the hash value of its partition key."[61]

79. Further, Amazon S3 includes the AWS Management Console,[62] which responds to requests to download Amazon S3 objects by querying the locations of the requested objects.[63]

80. Further still, AWS provides for a redirect message that contains redirect information for use to calculate a location of a different data location server. For example, Amazon S3 supports request redirection, as illustrated below, such that if "a request arrives at the wrong Amazon S3 location, Amazon S3 responds with a temporary redirect that tells the requester to send the request to a new endpoint."[64]

---

[58] *See supra* n. 21 (Deck, Ex. 19).

[59] *See supra* n. 22 at *4–5 (Amazon DynamoDB FAQs, Ex. 20).

[60] *See supra* n. 10 at *18 (DynamoDB Developer Guide, Ex. 11).

[61] *Id*.

[62] AWS Management Console, Getting Started with the AWS Management Console, at *1, *9, available at https://docs.aws.amazon.com/awsconsolehelpdocs/latest/gsg/console-help-gsg.pdf (Attached as Ex. 24).

[63] Amazon Simple Storage Service Console User Guide, Uploading, Downloading, and Managing Objects, at *31–41, available at https://docs.aws.amazon.com/AmazonS3/latest/user-guide/s3-user-guide.pdf (While the full document is incorporated by reference herein, an excerpted version of the document is attached as Ex. 25); *see also* Amazon's Web Version of the S3 Console User Guide at https://docs.aws.amazon.com/AmazonS3/latest/user-guide/what-is-s3.html.

[64] *See supra* n. 18 at *530–531 (S3 Developer Guide, Ex. 17).

Appx345



| 1 | The client makes a DNS request to get an object stored on Amazon S3. |
| 2 | The client receives one or more IP addresses for facilities that can process the request. |
| 3 | The client makes a request to Amazon S3 Facility B. |
| 4 | Facility B returns a redirect indicating the object is available from Location C. |
| 5 | The client resends the request to Facility C. |
| 6 | Facility C returns a copy of the object. |

81.     Moreover, on information and belief, AWS receives get and put operations as discussed above: "Both get and put operations are invoked using Amazon's infrastructure-specific request processing framework over HTTP.  There are two strategies that a client can use to select a node: (1) route its request through a generic load balancer that will select a node based on load information, or (2) use a partition-aware client library that routes requests directly to the appropriate coordinator nodes. . . . A node handling a read or write operation is known as the coordinator.  Typically, this is the first among the top N nodes in the preference list.  If the requests are received through a load balancer, requests to access a key may be routed to any random node in the ring.  In this scenario, the node that receives the request will not coordinate it if the node is not in the top N of the requested key's preference list. Instead, that node will forward the request to the first among the top N nodes in the preference list. . . .  Read and write operations involve

32

the first N healthy nodes in the preference list, skipping over those that are down or inaccessible. When all nodes are healthy, the top N nodes in a key's preference list are accessed. When there are node failures or network partitions, nodes that are lower ranked in the preference list are accessed."[65]

82.     Based on the above, the AWS Accused Products directly infringe at least, but not limited to, claim 18 of the '640 patent.

83.     AWS also indirectly infringes the '640 patent by inducing others to infringe and/or contributing to the infringement of others, including third party users of the AWS Accused Products in this District and elsewhere in the United States. Specifically, on information and belief, AWS has had knowledge of the '640 patent since at least the time it was served with this Complaint. AWS nevertheless continues to induce others to infringe in wanton disregard of Kove's patent rights.

84.     Kove is informed and believes, and thereon alleges, that AWS has actively induced the infringement of the '640 patent under 35 U.S.C. § 271(b) by actively inducing the infringing use of the AWS Accused Products by third party users in the United States. Kove is informed and believes, and thereon alleges, that AWS knew or should have known that its conduct would induce others to use the Accused Products in a manner that infringes the '640 patent. Kove is informed and believes, and thereon alleges, that these third parties infringe the '640 patent in violation of 35 U.S.C. § 271(a) by using the AWS Accused Products. In particular, Kove incorporates by reference paragraphs 51 to 54 as if fully set forth herein.

85.     Upon information and belief, AWS contributorily infringes the '640 patent under 35 U.S.C. § 271(c) by importing, selling and/or offering to sell within the United States the AWS

---

[65] *See supra* n. 28 at *211 (DeCandia, Ex. 21); *see also supra* n. 13.

33

Accused Products (or components thereof) that constitute a material part of the claimed invention and are not staple articles of commerce suitable for substantial non-infringing use. For example, the AWS Accused Products, including Amazon S3 and DynamoDB, are material, have no substantial non-infringing uses, and are known by AWS to be especially made or especially adapted for use in manner claimed in the '640 patent. Accordingly, AWS contributorily infringes the '640 patent.

## DAMAGES

86.     Kove incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

87.     As a result of AWS's acts of infringement, Kove has suffered actual and consequential damages; however, Kove does not yet know the full extent of the infringement and its extent cannot be ascertained except through discovery and special accounting. To the fullest extent permitted by law, Kove seeks recovery of damages at least for reasonable royalties, unjust enrichment, lost profits, and/or benefits received by AWS as a result of infringing the patents-in-suit. Kove further seeks any other damages to which Kove is entitled under law or in equity.

## IRREPARABLE HARM TO KOVE

88.     Kove incorporates by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

89.     Kove has been irreparably harmed by AWS's acts of infringement and will continue to be irreparably harmed unless and until AWS's acts of infringement are enjoined by this Court. Kove has no adequate remedy at law to redress AWS's continuing acts of infringement, and money damages will not suffice to remedy the harms to Kove. The hardships that would be imposed upon

34

AWS by an injunction are less than those faced by Kove should an injunction not issue. Furthermore, the public interest would be served by issuance of an injunction.

## ATTORNEYS' FEES

90.     Kove is entitled to recover reasonable and necessary attorneys' fees under applicable law.

## DEMAND FOR JURY TRIAL

91.     Kove hereby demands a jury trial on its claims for patent infringement.

## PRAYER FOR RELIEF

**WHEREFORE**, Kove respectfully requests that this Court enter judgment in its favor and grant the following relief:

A.     A judgment that the AWS Accused Products directly and/or indirectly infringe the '170, '978, and '640 patents;

B.     That such infringement is willful;

C.     An order permanently enjoining AWS and its respective officers, directors, agents, partners, servants, employees, attorneys, licensees, successors, and assigns, and those in active concert or participation with any of them, from engaging in infringing activities with respect to the '170, '978, and '640 patents;

D.     A ruling finding that this case is exceptional and awarding Kove its reasonable attorneys' fees under 35 U.S.C. § 285;

E.     A judgment and order requiring AWS to pay Kove's damages in an amount adequate to compensate Kove for AWS's infringement, but in no event less than a reasonable royalty under 35 U.S.C. § 284, including supplemental damages for any continuing post-verdict infringement up until entry of judgment and beyond, with accounting, as needed;

35

F.       An award of enhanced damages pursuant to 35 U.S.C. § 284;

G.      In the alternative, in the event injunctive relief is not granted as requested by Kove, an award of a mandatory future royalty payable on each future product sold by AWS that is found to infringe one or more claims of the '170, '978, and '640 patents, and on all future products which are not colorably different from products found to infringe;

H.      A judgment and order requiring AWS to pay Kove's costs of this action (including all disbursements);

I.      An order for accounting of damages;

J.      A judgment and order requiring AWS to pay pre-judgment and post-judgment interest to the full extent allowed under the law; and,

K.      Such other and further relief as the Court may deem just and proper under the circumstances.

36

Dated: December 12, 2018

Respectfully submitted,

/s/      *Renato Mariotti*
Renato Mariotti

Renato Mariotti (State Bar No. 6323198)
rmariotti@thompsoncoburn.com
Thompson Coburn LLP
55 E. Monroe St., 37th Floor
Chicago, IL 60603
Telephone: (312) 346-7500
Telecopier: (312) 580-2201

Sarah O. Jorgensen
(*pro hac vice* application pending)
sjorgensen@reichmanjorgensen.com
Reichman Jorgensen LLP
1201 West Peachtree, Suite 2300
Atlanta, GA 30309
Telephone: (650) 623-1403
Telecopier: (650) 623-1449

Courtland L. Reichman
(*pro hac vice* application pending)
creichman@reichmanjorgensen.com
Phillip Lee
(*pro hac vice* application pending)
plee@reichmanjorgensen.com
Jennifer P. Estremera
(*pro hac vice* application pending)
jestremera@reichmanjorgensen.com
Joachim B. Steinberg
(*pro hac vice* application pending)
jsteinberg@reichmanjorgensen.com
Michael G. Flanigan (State Bar No. 6309008)
mflanigan@reichmanjorgensen.com
Kate M. Falkenstien
(*pro hac vice* application pending)
kfalkenstien@reichmanjorgensen.com
Reichman Jorgensen LLP
303 Twin Dolphin Drive, Suite 600
Redwood Shores, CA 94065
Telephone: (650) 623-1401
Telecopier: (650) 623-1449

**ATTORNEYS FOR PLAINTIFF
KOVE IO, INC.**

37

Appx351

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KOVE IO, INC., | | ) |
| | Plaintiff, | ) |
| | | ) |
| v. | | ) |
| | | ) Civil Action No. 1:18-cv-08175 |
| AMAZON WEB SERVICES, INC., | | ) |
| | | ) Hon. Judge Rebecca R. Pallmeyer |
| | Defendant. | ) |
| | | ) |
| | | ) |

**MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

Adam G. Unikowsky
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

Terri L. Mascherin
Michael Babbitt
Michael T. Werner
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
(312) 222-9350
tmascherin@jenner.com
mbabbitt@jenner.com
mwerner@jenner.com

*Attorneys for Amazon Web Services, Inc.*

Appx609

Pursuant to Federal Rule of Civil Procedure 12(b)(6), this action should be dismissed. The asserted patent claims are directed to abstract ideas, and hence are invalid under 35 U.S.C. § 101.

## BACKGROUND

Plaintiff Kove IO, Inc. accuses Defendant Amazon Web Services, Inc. of infringing three patent claims: claim 17 of U.S. Patent No. 7,233,978; claim 1 of U.S. Patent No. 7,814,170; and claim 18 of U.S. Patent No. 7,103,640. Compl. ¶¶ 35, 57, 72.[1]

The three patents, all of which are similar and claim relation back to the same application, recite systems and methods for managing information on a computer network. The '170 and '640 patent abstracts disclose a "network distributed tracking wire transfer protocol for storing and retrieving data across a distributed network." The '978 patent abstract, likewise, discloses "storing and retrieving location information across a network," which involves a "transfer protocol configured to transport an identifier/location relationship."

The specifications of each patent describe technical implementations of the proposed protocol: for instance, they include figures disclosing the exact formatting of digital messages. Kove's asserted claims, however, are much broader. As described more fully below, all of the asserted claims recite data-manipulation steps, such as "receiving" or "storing" information. None, however, recites any particular technical implementation of these steps. Rather, the steps are conducted on generic "servers" and generic "networks."

## ARGUMENT

It is a bedrock of our patent system that abstract ideas are not patent-eligible subject matter under 35 U.S.C. § 101. Abstract ideas are not patentable because they are the basic tools of

---

[1] For the Court's convenience, the three asserted claims are in Appendix A. The '170, '978, and '640 patents are in Appendices B, C, and D, respectively.

scientific work. Allowing a patentee to monopolize an idea would "improperly [tie] up the future use of these building blocks of human ingenuity." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2354 (2014) (internal quotation marks omitted).

In *Alice*, the Supreme Court established a two-step test for determining whether a claim is invalid under § 101. First, the court determines whether the claim is directed to an abstract idea. *Id.* at 2355. Second, if it is, the court determines whether the claim contains any elements which transform it into a concrete application of that idea—*i.e.*, a patentable invention. *Id.* In this case, all three claims-in-suit are invalid under *Alice*'s two-step test. [2]

## I.   AT *ALICE* STEP ONE, THE CLAIMS ARE DIRECTED TO ABSTRACT IDEAS.

All three claims-in-suit are directed to abstract ideas. They recite systems and methods of storing, organizing, and retrieving information—activities humans have engaged in since the dawn of time. While the patents recite generic computer components such as "server" and "network," the claimed systems and methods could just as easily be applied to a library's pre-Internet scheme of organizing its library books and card catalogues. The systems and methods are not "necessarily rooted in computer technology," and are therefore not directed to patent-eligible subject matter. *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1286 (Fed. Cir. 2018).

The inquiry under *Alice*'s first step presents a question of law that can be resolved on the pleadings. *See, e.g.*, *Two-Way Media Ltd. v. Comcast Cable Comm's, LLC*, 874 F.3d 1329, 1336

---

[2] The complaint alleges that "at least" the three asserted claims are infringed, but it does not identify any others. Compl. ¶ 35, 57, 72. The complaint does not state a claim with respect to other, unidentified claims. *See Oil-Dri Corp. of America v. Nestle Purina Petcare Co.*, No. 15-cv-1067, 2017 WL 1197096, at *11 (N.D. Ill. Mar. 31, 2017) ("*Twombly* and *Iqbal* require plaintiffs to plead sufficient facts supporting their infringement allegations with respect to each asserted patent claim."). In any event, even if Kove properly pleaded infringement with respect to other claims, the legal analysis would not change. All of the claims are invalid because they are abstract data-manipulation claims implemented on generic "servers" and "networks."

2

(Fed. Cir. 2017); *In re TLI Comm's LLC Patent Litig.*, 823 F.3d 607, 610 (Fed. Cir. 2016); *Content Extraction & Transmission LLC v. Wells Fargo Bank*, 776 F.3d 1343, 1346 (Fed. Cir. 2014).

### A. Claims directed to systems and methods of storing, organizing, and retrieving information are directed to abstract ideas.

This case is a variation on a recurrent theme. In a line of several recent cases, the Federal Circuit has invalidated patents reciting systems and methods of storing, organizing, and retrieving information on generic computer systems. In every case, the specification has asserted that the patent improves the operation of computer systems because it allows for processing of large volumes of information. In every case, the Federal Circuit has invalidated the claim, reasoning that abstract data-manipulation steps cannot be patented—even if the specification recites that those steps make computers work better.

For instance, in *BSG*, the Federal Circuit invalidated claims that were "directed to a 'self-evolving generic index' for organizing information stored in a database." 899 F.3d at 1283. The court held that "the asserted claims are directed to the abstract idea of considering historical usage information while inputting data." *Id.* at 1286. Because this idea was not "necessarily rooted in computer technology," but instead could be implemented "in the human mind," it did not reflect a genuine improvement to *computer* technology. *Id.* (quotation marks omitted). The specification's assertion that the claimed invention "allows users to quickly and efficiently access hundreds of thousands or even millions of records," *id.* at 1288, was not enough to render it non-abstract: the court held that "benefits that flow from performing an abstract idea in conjunction with a well-known database structure" cannot be the basis for conferring a patent. *Id.*

Likewise, in *Two-Way*, the Federal Circuit invalidated claims reciting methods of processing, routing, and monitoring digital information over a network. 874 F.3d at 1340-41. The specification described the invention as "an improved scalable architecture for delivering real-time

3

Appx612

information," and the patentee claimed that it solved "various technical problems, including excessive loads on a source server, network congestion, unwelcome variations in delivery times, scalability of networks, and lack of precise recordkeeping*." Id*. at 1333, 1339. The Federal Circuit found the claims invalid, explaining that they merely "manipulate[] data." *Id.* at 1338; *see id.* at 1340. It stated that "the use of generic computer components to carry out the recited abstract idea" was "not sufficient" to confer patentability. *Id.* at 1338.

Another example is *TLI*, in which the Federal Circuit invalidated claims directed to recording images on a cell phone, and then transmitting and organizing those images on a storage device. 823 F.3d at 609. The specification explained that the patent sought to solve the problem that arose when "a large number of digital images are recorded and are to be archived in a central computer unit," causing "the problems of locating the data of an image data file [to] increase." *Id.* The Federal Circuit found the claims unpatentable because they "pertain[ed] to methods of organizing human activity"—namely, "classifying and storing digital images in an organized manner." *Id.* at 613. And although the claims recited "tangible components such as 'a telephone unit' and a 'server,'" those components "merely provide a generic environment in which to carry out the abstract idea of classifying and storing digital images in an organized manner." *Id.* at 611.

Yet another example is *Cloud Satchel, LLC v. Amazon.com, Inc.*, 76 F. Supp. 3d 553 (D. Del. 2014), *summarily aff'd*, No. 15-1251 (Fed. Cir. Dec. 17, 2015). The patents related to "enabling the transmission and storage of document references or 'tokens,' each of which is associated with an electronic document stored in a database." *Id.* at 556-57. According to the specification, the claimed invention "enables mobile users to access all of their electronic documents without being limited by the memory available on a mobile device." *Id.* at 557. The district court—later summarily affirmed by the Federal Circuit—invalidated the claims, deeming

4

Appx613

them "the implementation of the abstract idea of cataloguing documents to facilitate their retrieval from storage in the field of remote computing." *Id.* at 562-63.

This Court's decision in *Joao Control & Monitoring Systems, LLC v. Telular Corp.*, 173 F. Supp. 3d 717 (N.D. Ill. 2016), took a similar view. The Court invalidated patents "directed to the abstract idea of monitoring and controlling property and communicating this information through generic computer functions." *Id.* at 726. It explained that the claims' recitations of generic "devices" that "merely perform basic computing functions of receiving, processing, and transmitting information" did not make the claims any less abstract. *Id.* at 730.

**B.      The asserted claims are directed to abstract ideas.**

These authorities establish that the asserted claims are directed to abstract ideas. They are pure data-manipulation claims, implemented on generic computers.

Every limitation in all three claims-in-suit involves abstract data manipulation—storing, processing, and retrieving data. *See* Appendix A. Although the claims recite a generic "location server," a generic "processor," and a generic "distributed network," they are not directed to a new type of server, processor, or network. Rather, they are directed to the manipulation of information *on* the generic network—an abstract idea that cannot be patented.

Although the specifications tout that the patents disclose improvements to computer networks, those assertions are insufficient to confer patentability—as the Federal Circuit has held regarding patents claiming very similar improvements. For instance, the '978 patent asserts that the patent discloses a "method and system for managing data location information in a network . . . having an easily scaleable architecture." '978 patent, col. 24:59-63. In *Two-Way*, the patent described the invention as "an improved scalable architecture for delivering real-time information," and the patent was invalidated. 874 F.3d at 1333. Similarly, the '978 patent describes an "aspect of the invention" as a method for "storing and retrieving location information

5

over a network," '978 patent, col. 2:53-57—virtually identical to the subject matter in *Cloud Satchel*, where the patent was invalidated. 76 F. Supp. 3d at 562-63 (patent disclosed "cataloguing documents to facilitate their retrieval from storage in the field of remote computing").

As these cases show, obtaining a patent requires more than merely reciting that the invention will improve computers. The patentee must show not only that the claimed invention can be *implemented* on a computer, but that it is "*necessarily* rooted in computer technology in order to overcome a problem specifically arising in the realm of" computer networks. *BSG*, 899 F.3d at 1286 (emphasis added). These patents are not. As shown below, the claims could be rewritten, in almost identical form, as claims directed to a method of organizing card catalogues specifying locations of library books. The fact that a claim can be rewritten without any reference to technology is a hallmark of an abstract idea. *Joao*, 173 F. Supp. 3d at 726 (functions that "could be carried out by human memory, by hand, or by conventional equipment" were abstract ideas).

### 1.   <u>Claim 17 of the '978 patent is directed to an abstract idea.</u>

Claim 17 of the '978 patent is directed to the abstract idea of receiving and storing location information, and transferring some location information to a different location based on predetermined criteria. This abstract idea is not rooted in computer technology; it could just as easily be applied to a university's pre-Internet method of receiving information about new books, and putting cards into old-fashioned card catalogues corresponding to those books.

Consider a university that operates a system of libraries, spread out over a city. It also operates a series of card catalogues on campus. Each card identifies an author and lists all books in the library system corresponding to that author. The university devises a method of updating the card catalogues when the libraries receive new books, which works as follows. When a library receives a new book, it notifies the university, using a particular protocol—such as filling in the blanks in a standardized form, with information written in a standardized format. When the

6

librarian receives this standardized form, she updates the card catalogue. But when information about too many books is stored in a single card catalogue, students have to wait in line to use it. Thus, when some predetermined condition is met—for instance, when one catalogue contains location information for so many books that only a particular number of students can use it per hour— the librarian transfers some cards into a different card catalogue.

That method is substantively identical to claim 17 of the '978 patent.

| Claim 17 of '978 patent | Element of library method |
|---|---|
| A method of scaling at least one of capacity and transaction rate capability in a **location server** in a system having a plurality of **location servers** for storing and retrieving location information, wherein each of the plurality of **location servers** stores unique set of location information of an aggregate set of location information, the method comprising: | A method of scaling at least one of capacity and transaction rate capability in a **card catalogue** in a system having a plurality of **card catalogues** for storing and retrieving location information, wherein each of the plurality of **card catalogues** stores unique set of location information of an aggregate set of location information, the method comprising: |
| Providing a transfer protocol **configured to transport identifier** and location information, the location information specifying the location of **information related to the identifier**; | Providing a transfer protocol **allowing for the transportation of author** and location information, the location information specifying the location of the **book**; |
| Storing location information formatted according to the transfer protocol at a first **location server**; | Storing location information formatted according to the transfer protocol at a first **card catalogue**; |
| Receiving an **identifier** and a location relevant to the **identifier** at the first **location server**; | Receiving an **author** and a location relevant to the **author** at the first **card catalogue**; |
| Storing the received location in a **location store** at the first data **location server**, | Storing the received location in a **drawer** at the first **card catalogue** (*i.e.*, on a card); |
| The **location store** comprising a plurality of **identifiers**, each **identifier** associated with at least one location, | The **drawer** comprising a plurality of **authors**, each **author** associated with at least one location (*i.e.*, **cards listing authors and locations**) |
| Wherein the received location is associated with the received **identifier** in the **location store**; | Wherein the received location is associated with the received **author** in the **drawer;** |
| Transferring a portion of **the identifiers and associated locations** to a second **data location server** when a performance criterion of the first **location server** reaches a predetermined performance limit. | Transferring a portion of the **cards in the card catalogue** to a second **card catalogue** when a performance criterion of the first **card catalogue** reaches a predetermined performance limit. |

7

As this chart demonstrates, there are no substantive differences between the claim and the university's proposed method of organizing its books. The claim's references to a generic "location server" and "location store" map perfectly to a card catalogue and drawer within that catalogue. Likewise, the claim's references to an "identifier" with an "associated location" map perfectly to the authors and associated locations that appear on the cards. Just as each "identifier" is associated with "at least one location" (and potentially more), each author is associated with at least one location in the library system (and potentially more, if she wrote multiple books). Like the claim-in-suit, the university's storage method is a method of scaling the "capacity and transaction rate capability in a system with a plurality of location servers"—*i.e.*, the number of cards that can be stored in the card catalogues, and the rate of students using them. The university's storage method provides a "transfer protocol"—a protocol by which libraries submit new book information to librarians. When one card catalogue "reaches a predetermined performance limit," some cards are transferred to a different catalogue. In sum, this is a classic data manipulation claim that is not rooted in computer technology—and is therefore abstract under *Alice*'s first step, regardless of whether it is implemented on a generic "server."

### 2. Claim 1 of the '170 patent is directed to an abstract idea.

Claim 1 of the '170 patent is directed to the abstract idea of storing data and location information in different places, and using a "hash function" on an identifier to determine where the location information can be found. The claim is not rooted in computer technology; it, too, could just as easily be applied to a university's pre-Internet library system.

Consider, again, a university with libraries scattered across a city, and card catalogues on campus. The university uses multiple card catalogues to store all the cards. This means that librarians now face the problem of determining which card catalogue stores the card corresponding to the book they are looking for. To address this problem, each of the card catalogues has, stapled

8

Appx617

to it, a chart that allows the librarians to deduce the card catalogue from the author.  For instance,

if there are three card catalogues, the following chart might appear:

| First letter of author's last name | Card catalogue |
|---|---|
| A-I | 1 |
| J-R | 2 |
| S-Z | 3 |

Thus, if a student or librarian goes to any card catalogue, she can immediately deduce

which card catalogue contains the location information she is looking for.

That system is substantively identical to claim 1 of the '170 patent.

| Claim 1 of '170 patent | Element of library system |
|---|---|
| A system for managing **data stored in a distributed network**, the system comprising | A system for managing **books stored in multiple libraries**, the system comprising |
| A **data repository** configured to store a **data entity**, wherein an **identifier string** identifies the **data entity** | A **library** that stores **a book**, wherein an **author** identifies the **book** |
| A **data location server network** comprising a plurality of **data location servers** | A **group of card catalogues** comprising a plurality of **card catalogues** |
| Wherein **data** location information for a plurality of **data entities** is stored in the **data location server network** | Wherein **book** location information for a plurality of **books** is stored in the **group of card catalogues** |
| At least one of the plurality of **data location servers** includes location information associated with the **identifier string** | At least one of the plurality of **card catalogues** includes location information associated with the **author** |
| Each one of the plurality of **data location servers** comprises a processor and a portion of the **data** location information | Each one of the plurality of **card catalogues** comprises a **chart** and a portion of the **book** location information |
| The portion of the **data** location information included in a corresponding one of the **data location servers** is based on a hash function used to organize the **data** location information across the plurality of **data location servers** | The portion of the **book** location information included in a corresponding one of the **card catalogues** is based on a hash function used to organize the **book** location information across the plurality of **card catalogues** |
| Each one of the **data location servers is configured to** determine the at least one of the plurality of **data location servers** based on the hash function applied to the **identifier string.** | Each one of the **card catalogues' charts allows someone to** determine the at least one of the plurality of **card catalogues** based on the hash function applied to the **author**. |

One term in the claim may be unfamiliar.  The claim uses the term "hash function."  A hash

function is not a piece of technology.  It is a type of abstract mathematical function which maps

9

Appx618

an input of arbitrary size to an output of fixed, typically small size. *See Pers. Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 989 (Fed. Cir. 2017) (hash functions are "mathematical algorithms" that "use contents of [a] file to generate a comparatively small-size identifier for the file"); *Symantec Corp. v. Zscaler, Inc.*, No. 17-cv-04426-JST, 2018 WL 1456678, at *7 (N.D. Cal. March 23, 2018) (characterizing "[h]ashes, also called hash functions" as "generic and basic mathematical or algorithmic functions that do not make a patent inventive"). The specification states that the hash function "preferably applied" is a "well-known" function in a computer science treatise. '170 patent, col. 15:12-18. In the above example, the chart on each card catalogue describes a hash function: it maps an author's last name, which may have any length, to a one-digit output.

Every other claim limitation also has an exact analog in the library system. The claim's references to "data," "identifier strings," and "location servers" map perfectly to books, authors, and card catalogues in the university's storage scheme. The claim's "location server network" is simply the group of all of the card catalogues. The "data repository" which stores "data" with "identifier strings" is a library which stores books that have authors. In the claim, each "data location server" has a "processor" and is "configured to determine" the appropriate server "based on the hash function"; likewise, in the library system, each card catalogue has a chart, and a human is capable of using the chart to determine the book's location. Thus, this is not an improvement to a computer; it is a system for organizing human activity implemented on generic computer parts.

### 3. <u>Claim 18 of the '640 patent is directed to an abstract idea</u>

Finally, claim 18 of the '640 patent is directed to the abstract idea of storing location information in multiple places, with information at each place directing the user to the right place.

Claim 18 of the '640 patent is a minor variation on claim 1 of the '170 patent. Consider, again, a university library system. Cards are stored in three card catalogues. Students may ask a librarian to determine a book's location, and the librarian then looks for the card. Each card

10

Appx619

catalogue has a chart allowing the librarian to determine which card catalogue contains the appropriate card. Card Catalogue 1 has the following chart stapled to it:

| Card Catalogue 1 |
|---|
| **If the first letter of the author's last name is A-I, you're in the right place! If not, you are hereby redirected as follows:** |

| First letter of author's last name | Card catalogue |
|---|---|
| J-R | 2 |
| S-Z | 3 |

Card Catalogues 2 and 3 have analogous charts stapled to them.

That system is substantively identical to claim 18 of the '640 patent.

| Claim limitation of claim 18 of '640 patent | Element of library system |
|---|---|
| A system for retrieving **data** location information for **data stored in a distributed network**, the system comprising: | A system for retrieving **book** location information for **books stored in multiple libraries**, the system comprising: |
| a **data repository** configured to store **data**, wherein the **data** is associated with an **identifier string**; | A **library** configured to store **books**, wherein a **book** is associated with an **author**; |
| a **client** responsive to a **data** query to query a data **location server** for location information associated with the **identifier string**; | A **librarian** responsive to a **book** query to query a **card catalogue** for location information associated with the **author**; |
| a **data location server network** comprising a plurality of **data location servers**, at least one of the plurality of **data location servers** containing location information associated with the **identifier string**, | A **group of card catalogues** comprising a plurality of **card catalogues**, at least one of the plurality of **card catalogues** containing location information associated with the **author**, |
| wherein each of the plurality of **data location servers** comprises **computer executable code configured to execute** the following steps in response to receiving a **data** location request from the **client**: | Wherein each of the plurality of **card catalogues** comprises **instructions for the librarian to take** the following steps in response to receiving a **book** location request from the **librarian**: |
| if the **data location server** contains the location string associated with the **identification string** provided in the **data** location request, the **data location server** transmits location information for use by the **client** to calculate a location of the **data** associated with the **identification string**; | If the **card catalogue** contains the location string associated with the **author** provided in the **book** location request, the **card catalogue** transmits location information for use by the **librarian** to determine the location of the **book** associated with the **author**; |
| if the **data location server** does not contain the location string associated with the **identification string**, the **location server** transmits a redirect message to the | If the **card catalogue** does not contain the location string associated with the **author**, the **card catalogue** transmits a redirect message to the **librarian**, wherein the |

11

| Claim limitation of claim 18 of '640 patent | Element of library system |
|---|---|
| **client**, wherein the redirect message contains redirect information for use by the **client** to calculate a location of a different **data location server** in the plurality of **data location servers,** wherein the different **data location server** contains the location string. | redirect message contains redirect information for use by the **librarian** to calculate a location of a different **card catalogue** in the plurality of **card catalogues**, wherein the different **card catalogue** contains the location string. |

Once again, every element of the claim has an analog in the library system. The "data repository" is the library; the "client" is the librarian; the "location servers" are the card catalogues; the "location information" or "location string" is the location information on the card; and the "identification string" is the author. If a card catalogue contains a book's location, the librarian collects it. If not, the chart on the card catalogue redirects the librarian to the right catalogue. This, too, is a system of organizing human activity, and hence an abstract idea.

## II. AT *ALICE* STEP TWO, NONE OF THE CLAIMS HAS AN INVENTIVE CONCEPT THAT TRANSFORMS THEM INTO PATENTABLE INVENTIONS.

*Alice*'s second step turns on whether the claim recites an "inventive concept" that ensures that the patent "amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 134 S. Ct. at 2355 (quotation marks and brackets omitted). *Alice* held, and the Federal Circuit has repeatedly reiterated, that the use of "well-understood, routine, conventional activities"—such as a "generic computer"—is insufficient to establish an inventive concept. *Id.* at 2359 (quotation marks omitted); *accord Two-Way*, 874 F.3d at 1339 ("conventional computer and network components" could not "transform the abstract idea into something more"); *TLI*, 823 F.3d at 614 (generic "telephone unit" and generic "server" did not render the claim non-abstract because those steps fell "squarely within [its] precedent finding generic computer components insufficient to add an inventive concept to an otherwise abstract idea").

12

Appx621

Identical reasoning applies here. Every limitation in the claims is an abstract data-manipulation step with an exact analog in a method of storing books at libraries. The fact that the claims recite generic "servers" on a generic "network" does not render them non-abstract.

Plaintiff cannot avoid this conclusion by alleging that the data manipulation steps *themselves* are "inventive," or that a skilled librarian would not have considered such a way of organizing card catalogues to be "routine." In *BSG*, the Federal Circuit explained that "a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept." *Id.* at 1290. Thus, the court rejected the patentee's argument that the patent's "requirement that users are guided by summary comparison usage information or relative historical usage information" was "unconventional" for purposes of *Alice*'s second step. *Id.* at 1291. It explained that this supposedly inventive concept "simply restates what we have already determined is an abstract idea." *Id.* Therefore, it was "irrelevant" whether this feature was "routine or unconventional as a factual matter." *Id.* at 1291. The relevant question is whether the "the claim limitations other than the invention's use of the ineligible concept to which it was directed" are inventive. *Id.* at 1290.

Here, too, the mere assertion that the data-manipulation steps are inventive cannot render the claims patentable. Plaintiff must point to something beyond those steps—and because there is nothing beyond those steps other than generic computer parts, the patent is invalid.

In *BSG*, *Two-Way*, and *TLC*, the Federal Circuit resolved *Alice*'s second step as a matter of law. This Court should do the same here. While the Federal Circuit has identified a narrow set of circumstances in which fact-finding may be relevant to *Alice*'s second step, those circumstances are not present here. The Federal Circuit has stated that *Alice*'s second step presents a "question of law," but "[u]nderlying factual determinations may inform this legal determination." *BSG*, 899

13

F.3d at 1290. Thus, "in cases where the only issue at step two is whether claim limitations are well-understood, routine, and conventional, a genuine dispute over that issue will preclude summary judgment that a claim is ineligible under § 101." *Id.* There is no such dispute here. Setting aside the unpatentable data-manipulation steps, there is nothing left in the claims other than a generic "server" and "network." As a matter of law, these generic components are not inventive.

### III. THE CLAIMS' USE OF BROAD, RESULTS-ORIENTED LANGUAGE FURTHER CONFIRMS THAT THEY ARE UNPATENTABLE ABSTRACT IDEAS.

Kove's claims have another "frequent feature of claims held ineligible under § 101": they are "so result-focused, so functional, as to effectively cover any solution to an identified problem." *Electric Power Group, LLC v. Alstom SA*, 830 F.3d 1350, 1356 (Fed. Cir. 2016). Although the specifications are studded with technical details, the claims purport to reach far more broadly.

All three specifications recite technical details. The '978 patent specification is illustrative: it explains a particular format for encoding messages, going as far as to offer details such as the "ss_it_t type … is a 32-bit integer on Intel (IA32) platforms, and a 64-bit integer on UltraSPARC platforms." '978 patent, col. 6:20-7:9. It explains the "preferred data structure" for the "fixed-size, 12-octet header" to digital messages. *Id.* at 8:48-9:49. It offers precise "message formats" for encoded messages, accompanied by figures and computer code. *Id.* at 10:24-13:4 & Figs. 8-16. It offers a lengthy explanation on "NDTP redirection" techniques, with computer code. *Id.* at 15:46-18:36. It discusses techniques for "splitting & coalescing data sets." *Id.* at 19:50-21:23.

Yet none of this is recited in the claims, which are written in broad, results-oriented language. For instance, claim 17 of the '978 patent recites a generic "transport protocol configured to transport identifier and location information." All of the figures and descriptions in the specification describing particular message formats and data structures are absent from the claim language. Likewise, it purports to cover *any* technical implementation of the generic steps of

14

Appx623

"storing" and "receiving" information on generic "servers." It recites the step of "transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit," a step that purports to be broad enough to encompass *any* method of determining the "portion" of identifiers to be transferred, *any* method of identifying the other server, *any* "predetermined performance limit," and *any* way of calculating whether that limit is satisfied.

*Two-Way* establishes that such claims are not patentable. In *Two-Way*, the specification "describe[d] a system architecture as a technological innovation," but the claims themselves recited abstract data manipulation steps. 874 F.3d at 1338. The Federal Circuit found the claim invalid, explaining that "the specification may describe a purported innovative 'scalable architecture,'" but "the *claim*—as opposed to something purportedly described in the specification—is missing an inventive concept." *Id.* at 1338-39. Those words could have been written for this case. The specification purports to disclose "a method and system for managing data location information in a network has been disclosed having an easily scaleable architecture." '978 patent, col. 24:59-63. But that supposed "architecture" does not show up in the claims, which merely "manipulate[] data but fail[] to do so in a non-abstract way." *Two-Way*, 874 F.3d at 1338. They are therefore invalid.

## CONCLUSION

For the reasons set forth above, the Court should dismiss this action because the asserted patent claims are ineligible to be patented under 35 U.S.C. § 101.

15

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Kove IO, Inc., | Civil Action No. 1:18-cv-08175 |
| Plaintiff, | Judge Rebecca R. Pallmeyer |
| v. | Jury Trial Demanded |
| Amazon Web Services, Inc., | |
| Defendant. | |

**KOVE'S MEMORANDUM IN OPPOSITION TO AMAZON'S MOTION TO DISMISS**

Appx647

(reviewing the specification and determining that the claims encompassed this improvement in computer capabilities, and were therefore patent-eligible); *SRI Int'l, Inc. v. Cisco Sys.*, 918 F.3d 1368, 1375 (Fed. Cir. 2019) ("The 'focus of the claims is on the specific asserted improvement in computer capabilities'—that is, providing a network defense system that monitors network traffic in real-time to automatically detect large-scale attacks.").

**B.      Under The *Enfish* Framework, The Kove Patents Are Not Abstract Ideas.**

As Amazon acknowledges, the key test is whether the systems and methods disclosed in the Kove Patents are "necessarily rooted in computer technology." Dkt. 38 at 2, 6, 8. Here, they plainly are. The specification of the Kove Patents describes a specific architecture for storing and retrieving location information across a large distributed computer network that improves upon conventional database storage systems. '170 patent, 2:21-25, 3:10-21, 20:28-29.[4] The claims of the Kove Patents are tailored to these improvements in computer technology. *See, e.g.*, '170 patent, claim 1; '640 patent, claim 18; '978 patent, claim 17.[5]

In conventional systems, when a computer (a "client") seeking information sent a request to a server, typically only data associated with that server was returned. '170 patent, 1:37-40. "The search is thus conducted only where the server knows in advance where to look." *Id.* 1:41-42. Prior

---

[4]      The '170 and '640 patents share the same specification, and the '978 patent shares substantially the same specification with the '170 and '640 patents.

[5]      Amazon suggests that Kove is limited to the three claims discussed in the Complaint. To the contrary, Kove is not required to identify every claim that has been infringed, which takes place during the claim identification process under the Patent Local Rules—the Complaint merely needs to allege at least one claim for each patent. *See Cascades AV LLC v. Evertz Microsystems, LTD*, 2019 U.S. Dist. LEXIS 5386, *14-15 (N.D. Ill. Jan. 11. 2019). The other claims not discussed by Amazon are not at issue in its § 101 motion. *A. Zahner Co. v. Hendrick Metal Prods., LLC*, 328 F. Supp. 3d 870, 884 (N.D. Ill. July 20, 2018) (Pallmeyer, J.) (denying motion as to claims not discussed because "[i]t would be inappropriate to grant judgment on the pleadings in these circumstances, as the court is required to draw all reasonable inferences in the non-movant's favor.").

7

systems were limited by traditional hierarchical ways of indexing information. Compl. ¶ 13. These hierarchical indices would need to be periodically updated as information was added. *Id.* The problem was that once the size of the distributed network of data servers became sufficiently complex and constantly changing (i.e., dynamic), it was not possible to constantly update indices. *Id.* ¶¶ 14-17.

The Kove Patents solved this problem by tracking the location information of data files independently of the files themselves by using an intermediate layer of computer servers called "location servers." '170 patent, 3:10-21. These location servers negotiate between the client computers and the data repositories, where the data files are stored. Figure 11 from the '170 patent is instructive. It shows a client computer (112) sending a request for the location information associated with an identifier (used to refer to a data file) to the "server constellation" (110), which is where the location servers reside. Thereafter, the location server returns location information corresponding to the identifier in response to the client request. Once the client has the location information for a data file, the client retrieves the data file directly from the relevant data repository (114). '170 patent, 17:3-9. The Kove Patents aim to separate the *where* from the *what*, allowing for the mappings between identifiers and location information to be distributed across location severs independent of the corresponding data files.

**Claim 1 of the '170 patent.** The '170 patent is directed to a novel computer network architecture, and therefore an improvement in computer functionality. '170 patent, 2:21-25, 20:28-29. Only by ignoring or "rewriting" the plain language of the patent can it be interpreted to apply outside of a computer network environment. Claim 1 begins by stating that it is a system for managing data stored in a distributed network. '170 patent, 20:58-59. The specification makes clear that the claimed distributed network is grounded in computer technology. *Id.* 1:29-32. In this

8

computer environment, a data repository is configured to store a data entity. *Id.* 20:60-61. An identifier string—again, something that only exists in a computer networked environment—identifies the data entity. *Id.* This architecture also features a data location server network—and obviously, a server exists in a connected computer environment, and claim 1 is clear that the server contains a processor, which means it is rooted in computer technology. *Id.* 20:62-21:10. This intermediate data location server, which stores data location for data entities, is an innovative feature of the patented invention, and an improvement to conventional systems. Compl. ¶ 18. The claimed architecture provides for at least one of the data location servers to include location information associated with the identifier string. '170 patent, 20:65-67. Then, claim 1 further makes clear that the portion of the data location information contained on a server is based on a hash function used to organize the location information across the location servers. *Id.* 21:2-10. Thus, the claimed invention contemplates hash function computations across the network of servers, i.e., a "distributed hash table." Each of the data location servers is configured to determine the correct data location server for the incoming request for a data entity based on a hash function applied to the identifier string. *Id.* 21:2-6. This way, when the request from a client lands on a location server that lacks the location information of the desired data entity, it can quickly redirect the request to the location server that can determine the location of the requested information. *Id.* 21:51-54 (claim 6 and more on the "redirect mechanism" below). The use of the "distributed hash table" in this manner by the location servers is one of the key improvements of the claimed architecture discussed in the *MIT Technology Review*. Compl. ¶ 19. The claimed invention not only distributes the data itself across many repositories for the sake of scaling but also distributes the location information independent of the data entities across intermediate servers for the sake of scaling—an extraordinary benefit of this system and rooted in technology to improve the

9

operation of computers.

This invention is inherently and inextricably rooted in computer technology. The claimed invention is expressly directed to a novel computer architecture, and the specification and surrounding facts describe how this invention improves upon conventional technological solutions. '170 patent, 2:21-25, 20:28-29; Compl. ¶ 12-19. The invention in *Enfish* was far more rudimentary—comprising a database table that had at least one row defined by one column—and yet was found to be eligible for patenting.

**Claim 18 of the '640 patent.** Claim 18 recites substantially the same claimed architecture as claim 1 of the '170 patent, and adds a redirection mechanism. '640 patent, 1:37-41, 1:66-2:8, 3:7-25. This redirection mechanism—which the specification makes clear is a concept rooted in computer technology—is an instruction sent to the client (a user's computer) to assist the client in identifying an alternative data location server in the event the client sends a request to the wrong server. '640 patent, 17:9-20. This is even more of an improvement over the conventional hierarchical databases, because it includes redirection—so, as the *MIT Technology Review* put it, "while the first hash table searched may not list the file you want, it will point to other tables that will eventually—but still within milliseconds—reveal the file's location." Compl. Ex. 1.

**Claim 17 of the '978 patent.** Claim 17 recites substantially the same claimed architecture as claim 1 of the '170 patent, and also includes a transfer mechanism between a "first location server" and a "second location server," where a portion of the identifiers and associated locations is transferred to the second data location server when a performance criterion of the first location server reaches a predetermined performance limit. '978 patent, 1:37-43, 2:1-10. In other words, this patent adds to the claimed architecture a type of load balancing, so that identifiers and location information can be moved to a different location server when certain performance criteria have

10

been satisfied. '978 patent, 21:35-41. Accordingly, the Kove Patents plainly are "rooted in computer technology" and tailored to an improvement and therefore directed to patent-eligible subject matter. Only by "rewriting" the patents can Amazon argue otherwise.

### C. Amazon's Cases Are Not Applicable To The Kove Patents.

The Kove Patents are distinct from the types of claims found to be abstract because they are directed to an improvement in the functioning of a computer. By contrast, the types of claims that are found to be abstract ideas are those "simply adding conventional computer components to well-known business practices." *Enfish*, 822 F.3d at 1338 (citing cases). They also are unlike "the patent-ineligible claims at issue in other cases [that] recited use of an abstract mathematical formula on any general purpose computer . . . . or recited generalized steps to be performed on a computer using conventional computer activity." *Id.* "Much of the advancement made in computer technology consists of improvements to software that, by their very nature, may not be defined by particular physical features but rather by logical structures and processes." *Id.* at 1339.

The cases cited by Amazon reflect claims far different than those at issue here. Its cases deal with the mere gathering and manipulation of data, as opposed to the structuring of architecture with physical and software components that improve how a computer system operates. For example, in *BSG*, the claim was directed to "presenting summary comparison information to users" and "did not recite any improvement to the way in which . . . databases store or organize information analogous to the self-referential table in *Enfish* or the adaptable memory caches in *Visual Memory*." *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1288 (Fed. Cir. 2018). In *Two-Way*, the claim was found to merely "manipulate[] data." *Two-Way Media Ltd. v. Comcast Cable Comm'cs, LLC*, 874 F.3d 1329, 1338 (Fed. Cir. 2017). The plaintiff there failed to show how the claims were "directed to a scalable network architecture that itself leads to an

11

of storage. Today's servers are over 200 terabytes in size. A 200 terabyte server could, therefore, store over 133 million books. Amazon can be estimated to have 19.2 million servers—meaning over 2.5 quadrillion books (over 2,500,000,000,000,000 books). And the invention is not just about storing and locating the author and title of these books, as Amazon suggests. It is more akin to storing the entire index of these books and being able to locate them instantaneously, even if hundreds of millions of books are rewritten, added, and subtracted each day. Even if computerized, a simplistic card catalogue system would never be able to hierarchically store such large quantities of dynamically changing information—when, for example, 100 million books were added one day, the hierarchy would need to be rewritten instantaneously to fit the indexes of these books into a static, hierarchical framework. This was the very limitation in the prior art the Kove Patents overcame—they allowed for dynamic data movement because data locations are stored in intermediate servers using hash functions, not in the data repositories themselves in hierarchical fashion. This is why *MIT Technology Review* found this technology to be among the top ten technologies that would change the world. Compl. Ex. 1. It hardly would have given such extraordinary praise to a simplistic library card catalogue on a generic computer. *SRI*, 918F.3d at 1376 ("This is not the type of human activity that § 101 is meant to exclude. . . .").

## II.     *Alice* Step 2 is Unnecessary, But In All Events Is Satisfied.

The Kove Patents are not directed to abstract ideas, and so *Alice* Step 2 is unnecessary. But it nonetheless is satisfied here. The Kove Patents "involve more than performance of well-understood, routine, [and] conventional activit[ies] previously known to the industry.'" *Alice*, 134 S. Ct. at 2359. Amazon argues the "hash function is not a piece of technology" and refers to the '170 patent as "a system for organizing human activity implemented on generic computer parts." Dkt. 38 at 9-10. A hash function here is used as part of a system—it is not what alone is patentable.

14

Appx661

Indeed, the Federal Circuit has cautioned that just because a patent uses known components does not render it abstract. *BASCOM Global Internet Servs. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350 (Fed. Cir. 2016.) ("[A]n inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces."). For example, the "hash function" is an important aspect of the claimed "data location servers" and enables location information to be distributed across the network of the "data location servers." In that sense, the "data location server" is not "generic" and provides for a specific implementation of the claimed architecture—it is specially programmed to store "portions" of the "data location information" and the "hash function" is used to determine which of the location servers the location information is stored. *Thales Visionix, Inc. v. United States*, 850 F.3d 1343, 1348-49 (Fed. Cir. 2017) (finding claims are not directed to "mathematical equations" because "systems and methods . . . use inertial sensors in a non-conventional manner"). In any event, the "data location servers," "data location information" associated with the "identifier string," and the "hash function" work together in an unconventional manner to achieve an improvement in computer database functionality. *Amdocs v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300-01 (finding "generic components . . . operate in an unconventional manner to achieve an improvement in computer functionality."). In addition to the applicable discussion concerning the '170 patent, the redirection mechanism in claim 18 of the '640 patent and the transfer mechanism in claim 17 of the '978 patent demonstrate that the claims are further directed to something more than well-understood, routine, and conventional activities.

## CONCLUSION

Accordingly, Kove respectfully requests that the Court deny Amazon's Motion to Dismiss.

15

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KOVE IO, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 1:18-cv-08175 |
| AMAZON WEB SERVICES, INC., | ) | |
| | ) | Hon. Judge Rebecca R. Pallmeyer |
| Defendant. | ) | |
| | ) | |
| | ) | |

**REPLY BRIEF IN SUPPORT OF MOTION TO DISMISS**

| | |
|---|---|
| Adam G. Unikowsky | Terri L. Mascherin |
| JENNER & BLOCK LLP | Michael Babbitt |
| 1099 New York Ave. NW Suite 900 | Michael T. Werner |
| Washington, DC 20001 | JENNER & BLOCK LLP |
| (202) 639-6000 | 353 N. Clark St. |
| aunikowsky@jenner.com | Chicago, IL 60654 |
| | (312) 222-9350 |
| | tmascherin@jenner.com |
| | mbabbitt@jenner.com |
| | mwerner@jenner.com |

*Attorneys for Amazon Web Services, Inc.*

Appx665

Amazon showed in its motion to dismiss that Kove's asserted claims are ineligible for patenting under 35 U.S.C. § 101. Kove's patent specifications recite detailed technological implementations of its proposed protocol, but those technological details do not show up in the claims. Indeed, the claims could just as easily be applied to a library's pre-Internet scheme of organizing its library books and card catalogues.

In its response brief, Kove does not identify any material difference between the asserted claims and methods for organizing library books. Instead, Kove argues that the claims are patentable because they recite generic computer components like "server" and "network." Kove also seeks to minimize the broad, results-oriented language of the claims by pointing to statements in the specification characterizing its invention as a technological improvement. The Federal Circuit has repeatedly rejected identical arguments, and the Court should do the same here.

## I. AT *ALICE* STEP ONE, THE CLAIMS ARE DIRECTED TO ABSTRACT IDEAS.

Relying heavily on the specification and an article from MIT Technology Review, Kove contends that its invention is rooted in technology. But *Alice* requires an analysis of the *claims*—and here, the claims are substantively identical to schemes for organizing library books, implemented on generic "servers" and "networks." Thus, they are directed to abstract ideas.

### A. Under the Federal Circuit's cases, including *Enfish*, the *Alice* step one analysis requires an analysis of the *claim*.

*Alice*'s first step requires the court to determine whether a claim is directed to an abstract idea. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014). As the Federal Circuit has repeatedly explained, methods of organizing and retrieving information are directed to abstract ideas. Such claims are not patentable because they are not "necessarily rooted in computer technology," but can instead be implemented "in the human mind." *See, e.g.*, *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1286 (Fed. Cir. 2018); *see* Amazon Br. 3-5 (collecting cases).

Appx666

Two other principles are crucial. First, a claim is not patentable merely because the *specification* describes a technological improvement. Rather, the *claim itself* must be directed to patent-eligible subject matter. *See, e.g.*, *Two-Way Media Ltd. v. Comcast Cable Comm's, LLC*, 874 F.3d 1329, 1338-39 (Fed. Cir. 2017) (claim was invalid when "the *claim*—as opposed to something purportedly described in the specification—is missing an inventive concept"). Second, claims are not "saved from abstraction merely because they recite" generic computer components, like "servers." *BSG*, 899 F.3d at 1286. Rather, the claims must be "directed to a specific improvement to the way computers operate." *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1336 (Fed. Cir. 2016).

Kove relies heavily on *Enfish,* Kove Br. 6, but *Enfish* does not support Kove's position. In *Enfish*, the claims were directed to a "self-referential" database, which was an improvement over traditional "relational" databases. *Id.* at 1330. The claim at issue recited:

> A data storage and retrieval system for a computer memory, comprising:
>
> *means for configuring* said memory according to a logical table, said logical table including:
>
> a plurality of logical rows, each said logical row including an object identification number (OID) to identify each said logical row, each said logical row corresponding to a record of information;
>
> a plurality of logical columns intersecting said plurality of logical rows to define a plurality of logical cells, each said logical column including an OID to identify each said logical column; and
>
> means for indexing data stored in said table.

*Id.* at 1336 (emphasis added). Because the claim included the phrase "means for configuring," this was a "means-plus-function" claim. *Id.* at 1336 n.3.

Under the Patent Act, means-plus-function claims are "construed to cover the corresponding structure … described in the specification and equivalents thereof." 35 U.S.C. §

112(f) (formerly codified at 35 U.S.C. § 112, ¶ 6); *see Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333 (Fed. Cir. 2006) ("Literal infringement of a means-plus-function claim limitation requires that the relevant structure in the accused device perform the identical function recited in the claim *and be identical or equivalent to the corresponding structure in the specification*.") (emphasis added).  Thus, in *Enfish*, the specification disclosed the *structure* that performed the "configuring" *function*, and the structure was treated as a claim limitation.  822 F.3d at 1336 n.3, 1345-46.  The District Court "construed the 'means for configuring' language as requiring a four-step algorithm":

> 1. Create, in a computer memory, a logical table that need not be stored contiguously in the computer memory, the logical table being comprised of rows and columns, the rows corresponding to records, the columns corresponding to fields or attributes, the logical table being capable of storing different kinds of records.
>
> 2. Assign each row and column an object identification number (OID) that, when stored as data, can act as a pointer to the associated row or column and that can be of variable length between databases.
>
> 3. For each column, store information about that column in one or more rows, rendering the table self-referential, the appending, to the logical table, of new columns that are available for immediate use being possible through the creation of new column definition records.
>
> 4. In one or more cells defined by the intersection of the rows and columns, store and access data, which can include structured data, unstructured data, or a pointer to another row.

*Id.* at 1336-37.

The *Enfish* defendant contended that the claim was abstract because it was "directed to 'the concepts of organizing data into a logical table with identified columns and rows where one or more rows are used to store an index or information defining columns.'" *Id.* at 1337.  The Federal Circuit held that this description was "untethered from the language of the claims." *Id.*  It pointed out that the claims are "not simply directed to *any* form of storing tabular data, but instead are

3

specifically directed to a *self-referential* table." *Id.* This was "reflected in step three of the 'means for configuring' algorithm," *id.*—a *claim limitation* in this means-plus-function claim.

*Enfish* thus illustrates that determining patentability under § 101 requires an analysis of the *claim*. In *Enfish*, the *claim* contained limitations rooted in database technology that could not be analogized to human activities. Accordingly, the defendant was forced to offer a § 101 argument premised on a description of the claim that was at "a high level of abstraction and untethered from the language of the claims." *Id.* The Court rejected that argument, holding that *particular claim language* disclosed technological improvements that went beyond abstract mental steps. *Id.*

In subsequent cases, the Federal Circuit has not hesitated to invalidate claims in which the claim language was directed to abstract mental steps—even when the specification touted that the invention purportedly improved computer technology. In *Two-Way*, for instance, the patentee characterized the invention in a manner closely similar to Kove's characterization here: as an "improved scalable architecture for delivering real-time information," so as to solve "technical problems" such as "excessive loads on a source server" and "scalability of networks." 874 F.3d at 1333, 1339. But the Court held that the *claims* merely "manipulate[] data" on "generic computer components." *Id.* at 1338. *Accord BSG*, 899 F.3d at 1288 (invalidating claim for "organizing information stored in a database" that purportedly "allows users to quickly and efficiently access … millions of records" when claim language did not disclose technological improvement).

**B.     The claims are directed to abstract ideas because they are substantively indistinguishable from schemes for organizing library books.**

This case is more like *Two-Way* and *BSG* than *Enfish*. Each of the asserted claims is substantively identical to a scheme for organizing library books. Claim 17 of the '978 patent is directed to the abstract idea of receiving and storing location information, and transferring some location information to a different location based on predetermined criteria; a librarian could

4

Appx669

implement the identical idea, as applied to updating card catalogues when new books arrive. Claim 1 of the '170 patent is directed to the abstract idea of storing data and location information in different places, and using a "hash function" to find the location information; a librarian could implement the identical idea, as applied to determining which catalogue stores a card corresponding to a particular book. Finally, claim 18 of the '640 patent is directed to the abstract idea of storing location information in multiple places, with information at each place directing the user to the right place; again, a librarian could implement the identical idea, as applied to determining which catalogue stores a card corresponding to a particular book. Amazon Br. 5-12.[1]

Kove does not seriously dispute any of this. While it characterizes Amazon's argument as a "gimmick" and declares that its patents "self-evidently are rooted in technology," Kove Br. 1, it does not actually identify any differences in functionality between the asserted claims and the corresponding methods for organizing library books. Instead, Kove attempts to show that its claims recite technological improvements, Kove Br. 7-10, and then offers five purported "problems" with Amazon's analysis. *Id.* at 12-14. Kove's arguments lack merit.

According to Kove, "[p]rior systems were limited by hierarchical ways of indexing information." *Id*. at 7-8. "The Kove Patents aim to separate the *where* from the *what*, allowing for the mappings between identifiers and location information to be distributed across location severs independent of the corresponding data files." *Id*. at 8. Even setting aside that this generalized description is not connected to any claim language, Kove's description simply

---

[1] Contrary to Kove's suggestion (Kove Br. 7 n.5), Kove cannot avoid dismissal merely by suggesting it might assert *other* patent claims, when those claims are not identified in the complaint or in its brief. Amazon Br. 2 n.2 (citing *Oil-Dri Corp. of America v. Nestle Purina Petcare Co.*, No. 15-cv-1067, 2017 WL 1197096, at *11 (N.D. Ill. Mar. 31, 2017)). Kove cites *A. Zahner Co. v. Hendrick Metal Prods., LLC*, 328 F. Supp. 3d 870 (N.D. Ill. 2018), but in that case, the complaint asserted the claims at issue. *Id.* at 878, 884.

5

Appx670

underscores that its claims are directed to abstract ideas. They recite ways of organizing and retrieving information that could be implemented just as easily in a library as on a computer network. Indeed, other than the "location server"—which merely is a generic computer that stores information about where data is located—nothing in this description requires a *computer*, much less specialized hardware or software that reflects a genuine technological improvement.

Kove then offers descriptions of the asserted claims, *id.* at 8-10, but they do not assist Kove's case. Kove emphasizes that claim 1 of the '170 patent recites generic computer components: it "features a data allocation server network," which "exists in a connected computer environment," and a "processor," which "means it is rooted in computer technology." *Id.* at 9. But each of these generic components functions exactly as a non-technological object would. For instance, the "network" is simply a series of computers storing information, which serve the same purpose as libraries storing books, and the generic "processor" simply performs the hash function algorithm—just like the human mind. Amazon Br. 8-10.

Kove also points to claim limitations that say *nothing* about computers. For instance, it asserts that an "identifier string" is "something that only exists in a computer networked environment." Kove Br. 9. This is just wrong. A Dewey Decimal code is an "identifier string": it is a number that identifies a book. Likewise, Kove touts the claim's "hash function computations" *id.*, but does not dispute that a hash function is a well-known, abstract mathematical function that could be implemented just as easily on a hand-written chart as on a computer. Moreover, the Federal Circuit has specifically held that a reference to a "hash identifier" or the "use of hashing" does not render a claim non-abstract. *Smart Systems Innovations, LLC v. Chicago Transit Auth.*, 873 F.3d 1364, 1374 & n.9 (Fed. Cir. 2017). Kove declares that the claimed invention "distributes the location information independent of the data entities across intermediate

6

servers for the sake of scaling," *id.,* but aside from the generic term "servers," this language reflects pure data manipulation that works just as well in a library.

Kove's descriptions of the other two asserted claims are equally unavailing. Kove states that claim 18 of the '640 patent "adds a redirection mechanism" which is an "instruction" to "assist the client in identifying an alternative data location server." *Id.* at 10. And it states that claim 17 of the '978 patents adds "load balancing," so that "identifiers and location information can be moved to a different location server." *Id.* But the concepts of an instruction redirecting someone to a different place, or moving things from one place to a different place to balance the load in both places, have existed since time immemorial.

Kove also claims to identify five "problems" with Amazon's card catalogue analogy. Kove Br. 12. None has merit. First, Kove contends that Amazon is "oversimplifying" the claims. *Id.* To the contrary, Amazon's analysis accounts for every claim limitation. Notably, Kove does not identify any specific claim limitation that Amazon has oversimplified.[2]

Second, Kove observes that its claims "plainly are not so broad as to cover physical card catalogues." *Id.* That is true—the claims include generic computer terms like "server" and "network." But it is black-letter law that an otherwise abstract claim is not patentable merely if implemented on generic computer parts. *Alice*, 134 S. Ct. at 2360 (claims that "recite a handful of generic computer components configured to implement" abstract idea are unpatentable).

---

[2] Kove states in a footnote that Amazon should not have substituted "author" for an "identifier," because an "identifier" is a "unique digital fingerprint specific to a given data object." Kove Br. 13 n.6. Kove offers no citation to support this statement, and it directly contradicts the claim language, which states that an "identifier" can be associated with "at least one location." Amazon Br. 7. As Amazon explained, that is why "identifier" is analogous to "author": because an author can have books in multiple locations. *Id.* at 8. But if Kove were correct that an "identifier" referred to a unique object, then it could be analogized to a book "title," which identifies a single book.

7

Moreover, notwithstanding the use of these generic computer terms, Kove's claims have another "frequent feature" of ineligible claims: they are "so result-focused, so functional, as to effectively cover any solution to an identified problem." *Electric Power Group, LLC v. Alstom SA*, 830 F.3d 1350, 1356 (Fed. Cir. 2016). As Amazon's brief explained, the claims are written in broad, results-oriented language. Amazon Br. 14-15. Kove ignores this portion of Amazon's brief. The broad claims in this case reflect the paradigmatic example of the sort of claim language the Federal Circuit has invalidated under § 101. Kove offers no reason to deviate from the abundant case law invalidating such claims.

Third, Kove claims that Amazon "ignores the specification" and Kove's factual allegations. Kove Br. 13. To the contrary, Amazon acknowledges that the "specifications are studded with technical details." Amazon Br. 14. But while a specification can provide context for a claim, it is ultimately the claim itself that must be non-abstract. Here, those technological details do not appear in the claims. As the Federal Circuit has held on similar facts: even if the specification "describe[s] a purported innovative 'scalable architecture,'" "the *claim*—as opposed to something purportedly described in the specification—is missing an inventive concept." *Two-Way*, 874 F.3d at 1338-39. Similarly, the MIT Technology Review article (Complaint, Ex. 1) is irrelevant. The article generally describes distributed-storage technology. But it does not mention the patents or even the inventors, much less establish that the claims are non-abstract.

Indeed, here, the roles are reversed from *Enfish*. In *Enfish*, the *defendant* resorted to a generalized description of the claim as abstract, while the *patentee* pointed to particular claim language disclosing technological improvements. The court rejected the defendant's arguments, finding them "untethered from the language of the claims." 822 F.3d at 1337. Here, by contrast, Amazon demonstrated that every claim limitation is precisely analogous to a step in a method or

8

Appx673

system for organizing library books, while Kove resorts to generalized quotations from the specification and MIT Technology Review. As in *Enfish*, the Court should reject Kove's argument because it is "untethered from the language of the claims." *Id.*

Fourth, Kove claims that Amazon's argument would "invalidate essentially any database patent," including the patent in *Enfish*. Kove Br. 13. Not so: as explained above, the *Enfish* claim was patentable because it recited a technological improvement. These claims do not.

Fifth, and "[m]ost importantly," Kove claims that Amazon "misses the fundamental import of the Kove Patents." *Id.* According to Kove, the patents enable the processing of "extremely large data sets." *Id.* at 13-14. But this purported improvement does not appear in the claims. Thus, in its "most important" argument, Kove cites the specification and MIT Technology Review—not the claims themselves. Moreover, even if the claims recited an "extremely large data sets" limitation, they would be unpatentable. Over and over again, the Federal Circuit has held that abstract data-manipulation steps cannot be patented—even if the patentee insists that those steps make computers work better. *See* Amazon Br. 3-5 (collecting cases); *see, e.g.*, *BSG*, 899 F.3d at 1288 (invalidating claim despite specification's assertion that the invention "allows users to quickly and efficiently access hundreds of thousands or even millions of records"); *Two-Way*, 874 F.3d at 1333, 1339 (invalidating claim despite patentee's assertion that the claim solved "various technical problems," such as "excessive loads on a source server," "network congestion," and "scalability of networks"). Here, too, the claims do not require the "processing of large volumes of information" or contain any other "improvement to computer functionality" that would meaningfully distinguish them from the organization of library books. *Enfish,* 822 F. 3d at 1335.

## II.   AT *ALICE* STEP TWO, THE CLAIMS LACK AN INVENTIVE CONCEPT.

*Alice*'s second step turns on whether the claim recites an "inventive concept" that ensures that the patent "amounts to significantly more than a patent upon the ineligible concept itself."

<div align="center">9</div>

<div align="center">Appx674</div>

*Alice*, 134 S. Ct. at 2355 (quotation marks and brackets omitted).  The use of "well-understood, routine, conventional activities"—such as a "generic computer"—is not enough to establish an inventive concept.  *Id.* at 2359 (quotation marks omitted).  Here, there is no inventive concept because every limitation in the claims is an abstract data-manipulation step.  The fact that the claims recite generic "servers" on a generic "network" does not render them non-abstract.

In its brief discussion of *Alice*'s second step, Kove asserts that the "data location server" is not "generic" because it is programmed to store particular "data location information" and a particular "hash function."  Kove Br. 15.  Similarly, Kove asserts that the "servers," "information," and "hash function" "work together in an unconventional manner."  *Id.*

Kove's argument fails because "a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept."  *BSG*, 899 F.3d at 1290.  Here, the supposedly "inventive concept" is the fact that the generic server stores "data location information" and performs a "hash function."  Yet information storage and math functions are part of the abstract idea—as shown by the fact that the library methods recite these steps as well.  The relevant question is whether the "the claim limitations other than the invention's use of the ineligible concept to which it was directed" are inventive.  *Id.* at 1290.  As applied here: Is there any *difference* between the "library" claims (which Kove does not dispute would be abstract), and the claims as written, that reflects an inventive concept?  Kove does not and cannot identify such a difference.

## CONCLUSION

For the reasons set forth above, the Court should dismiss this action because the asserted patent claims are ineligible to be patented under 35 U.S.C. § 101.

10

Appx675

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION


KOVE IO, INC.,                    )
                                  )
                Plaintiff,        )  Docket No. 18 C 8175
                                  )
           vs.                    )
                                  )
AMAZON WEB SERVICES, INC.,        )  Chicago, Illinois
                                  )  May 30, 2019
                Defendant.        )  10:33 a.m.


TRANSCRIPT OF PROCEEDINGS - Oral Arguments
BEFORE THE HONORABLE REBECCA R. PALLMEYER


APPEARANCES:


For the Plaintiff:        THOMPSON COBURN LLC
                          BY:  MR. RENATO T. MARIOTTI
                               MS. HOLLY H. CAMPBELL
                          55 East Monroe, 37th Floor
                          Chicago, Illinois  60603

                          REICHMAN JORGENSEN LLP
                          BY:  MR. PHILLIP LEE
                               MR. COURTLAND REICHMAN
                          303 Twin Dolphin Drive, Suite 600
                          Redwood Shores, California  94065

                          REICHMAN JORGENSON LLP
                          BY:  MR. JAIME F. CARDENAS-NAVIA
                          100 Park Avenue, Suite 1600
                          New York, New York  10017


For the Defendant:        JENNER & BLOCK LLP
                          BY:  MS. TERRI L. MASCHERIN
                               MR. MICHAEL G. BABBITT
                               MR. MICHAEL T. WERNER
                          353 North Clark Street
                          Chicago, Illinois  60654

APPEARANCES (Continued):

                                    JENNER & BLOCK LLP
                                    BY:   MR. ADAM UNIKOWSKY
                                    1099 New York Avenue, NW
                                    Washington, DC  20001

Court Reporter:             FRANCES WARD, CSR, RPR, RMR, FCRR
                            Official Court Reporter
                            219 S. Dearborn Street, Suite 2144D
                            Chicago, Illinois  60604
                            (312) 435-5561
                            frances_ward@ilnd.uscourts.gov

THE CLERK:  18 C 8175, Kove IO versus Amazon Web Services, for motion hearing.

MR. MARIOTTI:  Good morning, your Honor.

Renato Mariotti, Courtland Reichman, Phil Lee, Jaime Cardenas-Navia, and Holly Campbell on behalf of Kove IO.

And the CEO of Kove, Mr. Overton, one of the inventors, is here as well.

THE COURT:  Okay.  Good morning.

MS. MASCHERIN:  Good morning, your Honor.

Terri Mascherin, Jenner & Block, on behalf of Amazon.

With me today are my partners Adam Unikowsky and Michael Babbitt and our colleague Michael Werner.  And we also have a summer associate observing this morning as well.

Mr. Unikowsky will be making the argument for Amazon today, your Honor.

THE COURT:  All right.  Good morning.

I have read the briefs, but I'm anxious to hear your arguments.  I am not any computer expert, as you probably could guess, but interested in the area of intellectual property.  So I'm happy to dive in.

So we will certainly begin with -- it's Amazon's motion to dismiss.  So we will begin with Amazon.

MS. MASCHERIN:  Thank you, your Honor.

MR. UNIKOWSKY:  Thank you, your Honor.

May I proceed?

THE COURT:  Sure.

MR. UNIKOWSKY:  The Court should dismiss the complaint because the asserted claims are directed to patent-ineligible subject matter under 35 USC, Section 101.

The Federal Circuit has made clear that claims directed to methods of manipulating and organizing data are abstract and are not saved by abstractness merely because they are implemented on generic computer components, like servers or processors or networks.

Rather, to be patentable, they have to be necessarily rooted in computer technology.  And the claim that merely reflects ordinary human activities implemented on generic computer parts isn't necessarily rooted in computer technology.

Now, it may be, in some cases, the line between claims that are and are not necessarily rooted in technology is difficult to draw, but I actually think that it's not hard to draw in this case.  These are really the paradigmatic example of claims directed to abstract methods of data manipulation on generic computers that aren't patentable.

So as we explained in our brief, really the claims functionally work the exact same way as claims directed to organizing books in a library and card catalogues.  And Kove

refers to our argument as a gimmick and an oversimplification, but I actually don't think we are oversimplifying anything.  The claims really do work the exact same way as claims directed to organizing library books.

So I am happy to step through each of the asserted claims, if that's helpful for the Court.

I will start with the first claim we talk about in our brief, which is Claim 17 of the '978.  I can go through them in any order, but I will do it in the order that our brief talks about.

THE COURT:  That's fine.

MR. UNIKOWSKY:  So imagine you have a scheme where you have got a bunch of libraries scattered around a city, for instance, and you have got a librarian with a bunch of card catalogues.  And every time a new book comes in, the librarian prepares a new card and puts it in one of the card catalogues.  And if one of the card catalogues gets too full, then some cards are transferred into a different card catalogue.

So that's exactly what this claim is saying with the sole exception being that there is a reference to a generic server.

So if you look through the entire claim language, the only even generic computer component appearing anywhere

in this claim is the word "location server."

And Kove doesn't claim to have invented a new server. It's a completely generic object that stores the information about the locations of things, just like the card catalogue is a big box that stores cards about locations of things. That's it. That's the only even generic computer component anywhere in this claim.

And every single other term is a purely abstract word referring to data manipulation. So you have got things like "identifier," information related to the identifier, "data locations." All of these things have existed since time immemorial. We have always identified information and stored things in different locations.

And if you go through every single claim step, it really works exactly the same way as what I have just described, the method of organizing cards in card catalogues. So this is just a classic example of data manipulation on a generic server.

I think the analysis is the same with respect to all the claims, which are all pretty similar. So I will turn to Claim 1 of the '170, which is the next one we talk about in our brief.

So suppose again you have a library system, and you have got so many cards, you need several card catalogues. And in every card catalogue, there is a little chart that

says, here is how you find out which card catalogue you are looking at.  So if the first letter of the last name of the author is A through I, go to No. 1.  If it's J through R, go to No. 2, and so forth.

So on every card catalogue, stapled is this chart that allows you to discern the location of the card catalogue that you are looking for to find the book.

So that scheme is, again, exactly what this claim is saying, except it's implemented on a generic computer.

So again, there is a reference to data location servers, which are just like the card catalogues -- they are just boxes that store the locations of things -- and a generic distributed network, which is just like the library. It's just a network of libraries that have books in them.

But the scheme that's disclosed in this claim -- and we are not oversimplifying at all; we really accounted for every single limitation in the claim -- is identical to the scheme I just described.

And the claim includes the word "hash function," but hash function is not like a transistor or a diode.  It's not like some physical component.  It's like an abstract mathematical function that maps a big thing to a small thing.

So the chart we described is a species of hash function.  It maps an author's last name, which could be of any length, to a card catalogue, 1, 2, or 3.  That's a type

of hash function.

And when you realize that, that it's an abstract mathematical object that isn't technology, you realize that really what we have described with the card catalogues is exactly what this is saying.

And the same is true for the last one, Claim 18 of the '640, which is substantively similar. It just involves you going from -- if you go to one card catalogue, it tells you, you are in the wrong place. Go to another card catalogue based on a similar chart. It just redirects you to a different one.

THE COURT: Here was where you lost me on the card catalogue analogy.

MR. UNIKOWSKY: Yes.

THE COURT: This is no doubt a function of my ignorance here.

You posit this university library that has what I understand to be more than one location -- more than one physical location, right?

MR. UNIKOWSKY: Just a bunch of libraries, but like a single campus with a bunch of card catalogues.

THE COURT: Right. Okay.

And what I understand, then, is that some books will be in one physical location and other books will be in other physical locations.

MR. UNIKOWSKY: Yeah. You might have, like, ten buildings.

THE COURT: Right. So you know, the *Rise and Fall of the Roman Civilization* might be at Point B but not at Points C, D, and E.

MR. UNIKOWSKY: Right.

THE COURT: Okay. Now, we go to -- the card catalogue is at Point A.

MR. UNIKOWSKY: So the way to think about it is that --

THE COURT: Are we talking about a card catalogue in every single location?

MR. UNIKOWSKY: No, we are not. No, no, no, we are not talking about that.

So the way to think about it is, suppose you have lots of far-flung libraries all over the city, for instance.

THE COURT: Right.

MR. UNIKOWSKY: And then you have got a single campus, and you have got a bunch of card catalogues just on campus. There is too many cards to fit in one. So you have got several of them.

THE COURT: Are all the card catalogues in one building?

MR. UNIKOWSKY: Yes. That's consistent with what we are saying.

THE COURT: Okay. So the student --

MR. UNIKOWSKY: They don't have to be, but they can be.

THE COURT: The student who wants to read Gibbon goes to the central card -- central location and says, I want to read *Rise and Fall of the Roman Civilization*, whatever it is.

MR. UNIKOWSKY: Right.

THE COURT: And the librarian flips through the card catalogue for G and finds the book, and then says, okay, it's at Library B. You can go get it.

MR. UNIKOWSKY: Right.

THE COURT: All right. Now, if our student walks into B and says, I want to read this book and doesn't know it's there -- no. Say the student walks into Library C and says, I want to read this book. There isn't a card catalogue there, or there could be.

MR. UNIKOWSKY: There could be.

THE COURT: Does the card catalogue get automatically updated at every one of these locations when a new book is acquired by the university?

MR. UNIKOWSKY: No, not necessarily.

So the way to think about it is that you might have a single building with lots of card catalogues, and the librarian is managing all of them. And the thing is, not all

the cards fit in one. So you need to have several, right?

THE COURT: Sure. I get that. I get that. The box is too small.

MR. UNIKOWSKY: The box is too small. Exactly. So -- yes.

So, I mean, I'm not sure which claim you are referring to. I can -- so, for instance, with the first -- Claim 1 of the '170, I can talk about that one.

THE COURT: That's the second one, right?

MR. UNIKOWSKY: Yeah.

So just imagine that, like, stapled to every card catalogue is information that tells you which card catalogue to go to. So you go to some random card catalogue. You don't know which one is the right one, but it has this chart that says, if the first name is A to E, go to this one. If not, go to that one.

And so by going to the card catalogue, it tells you which one to go to, right? So if you go to No. 2 arbitrarily, it will say, okay, I should go to No. 7, because the first letter of the author's last name is B through F or something.

So that's it. That's all that this is saying.

THE COURT: Your analogy, it seems to me, assumes there is -- you are right that there is more than one card catalogue. They won't all fit in one. But there isn't more

than one location for the card catalogues.

MR. UNIKOWSKY: I mean, they are in physically different -- it actually doesn't matter whether they are all in one building or they are in lots of buildings. It's just a bunch of servers. They could be different parts in one building or they could be in lots of buildings. It doesn't really matter. It's just a bunch of card catalogues.

That's what this claim is saying. It's just saying that there is a plurality of data location servers. That's it.

So I am happy to go through every single word of this claim.

It says there is "a data location server network comprising a plurality of data location servers." So that's just a bunch of boxes -- a bunch of card catalogues. Whether they are in the same building or in different buildings doesn't really matter. The relevant point is that there is just lots of card catalogues. And by going to any one of them, you can figure out which one to go to.

THE COURT: Well, okay. I don't want to spend too much time on this. I know you have got other things to say.

Here is why I was focusing on that. To make this analogy meaningful to me, I have got to see how this setup in an actual physical library corresponds to the virtual

categorization that's going on under the patented invention allegedly that you believe is not even patentable.

And the first thing that jumps out of my mind from your analogy is, but if I'm the student, do I have to -- what happens if I go to one of the other locations? Do they have the cards, too?

MR. UNIKOWSKY: No, I don't think so. So conceptually --

THE COURT: They don't have them.

If I want to know whether the book I want is in the university system, there is only one place for me to go, and that is the room that has all these boxes of card catalogues.

MR. UNIKOWSKY: Right. That is equivalent to this.

THE COURT: All right.

MR. UNIKOWSKY: Now, it's not limited to that. You could have card catalogues in lots of places, but, you know, it's a network. It's just lots of card catalogues. It could be in one building. That's fine. It's just a bunch of them that are all -- just a bunch of them.

So what you would do is, you'd go to the central building, like the campus building, and then you have 10, 10 of these.

THE COURT: There's drawers full of cards.

MR. UNIKOWSKY: Right, drawers full of cards.

And you're like, well, I want to figure out the

book that I want, but I have to figure out which card catalogue to look in.  If you go to any one of them, there is a chart that tells you which one to go to.  Okay?

So you go to Card Catalogue No. 3, and it says, well, the first letter of the author's last name is H.  So actually I should go to No. 5.  So you go to No. 5 and you open it, and that's it.  That's what you do.

I mean --

THE COURT:  Although in real life, I mean, I'm old enough to have done exactly this.  In real life, you wouldn't open a box and say, okay, it's in the -- the drawers are all marked.  So you just open the drawer.

MR. UNIKOWSKY:  Yeah, they are marked.  That's -- yeah.  I mean, yes, exactly.  There is markings.

I think that if you go carefully through every single element of this claim, that's what's happening.  So it says -- you know, I'm happy to go through every single claim limitation.

It says, "wherein data location information for a plurality of data entities is stored in the data location server network."

Okay.  That's just saying that the location of information about data is stored in all these boxes.

"At least one of the plurality of data location servers includes location information associated with the

identifier string."

"Identifier string" is not a computer term.  Like the Dewey decimal code is an identifier string.  So at least one of these boxes has location information associated with the string.

"Each one of the plurality of . . . servers comprises a processor" -- it's a completely generic processor -- "and a portion of the data location information."

So that's just cards.

The portion of the -- and it goes on in that vein.

Every single claim -- and I'm happy to go through all of them if there is any one that troubles you.  But it really does work -- it does work the same way, as I think we have described.

And I think the relevant point is that there is nothing here other than just these very generic servers and networks.  There is no claim that a new server, a new network has been invented.  It's a way of just pushing data around.

So I think that -- so Kove makes a series of arguments that its claim is patentable, but really every single one of their arguments is identical to an argument that the Federal Circuit has rejected.

So the core argument made by Kove is that these claims don't actually recite physical card catalogues.  They

do say that there is things like servers and processors. But we know from the Federal Circuit's cases that's not enough. Just the mere recitation of those generic objects can't make a data manipulation claim patentable.

And similarly, there is this discussion of the *MIT Technology Review* article and things like that. But that's -- the Federal Circuit requires this focus analysis on the claim language. I think it's quite telling that they rely on this general article, which is not about the claims. It's not about the patent. It's not even about the inventors. It's just a general discussion of technology. And I think what that shows is that maybe some claims could hypothetically have been written in this area that might be patentable, but you have got to have this focused look at the claims themselves, and I think that they are truly abstract.

I think that really the gravamen of the claims -- of the argument that Kove is making in this case is that, really, this method is particularly useful on a network. So you know, if we have this method of organizing and manipulating data on a network, then it would be helpful to process large amounts of data. And really that argument has been repeatedly made and repeatedly rejected by the Federal Circuit, almost the identical argument.

So, for instance, the *Two-Way* case, which we cite in our brief, in that case -- the words of that case could

have almost been lifted out of this case. The specification, "describe the invention as an improved scalable architecture for delivering real-time information."

The patentee said that it solves "various technical problems, including excessive loads on a source server, network congestion, unwelcome variations in delivery times, scalability of networks, lack of precise recordkeeping."

That's essentially the same set of problems that Kove claims to have solved. And so the patentee made the exact same argument, that this claim of moving data around and organizing it is useful on networks, and so it's rooted in technology.

And the Federal Circuit rejected that argument. They said, you've got to look at the specific claim language. The claim language is directed to manipulation and organization of data. That's not patentable.

And I think the *BSG* case, almost identical. So the argument in that case is this way of structuring databases, "allows users to quickly and efficiently access hundreds of thousands or even millions of records." That's language from the specification. Very similar to the improvement that's claimed here.

And the court said, no, it doesn't matter if the specification touts that. You have got to look at the claim language, and really there is just manipulation of data.

So I would like to say a word about this *Enfish* case, which is the case that is primarily relied upon by Kove.

So I think that *Enfish* underscores what we are saying here, which is that you have to look at the claim language specifically and whether or not that's necessarily rooted in technology.

So the *Enfish* case involved a -- quote/unquote -- means-plus-function claim. And that's a type of claim in which the claim language includes words like "means for configuring." And that's a reference to the fact that there is an algorithm in the specification that provides structure for the configuring function.

And under the rules of claim construction, that portion of the specification, the structure, is actually part of the claim. In other words, you have to do those things to infringe the claim. So really you should treat that structure and the specification as a portion of the claim.

So what's notable in that case is that the arguments of the parties were really inverted from the arguments of the parties this morning.

In that case, there is this very specific algorithm that I honestly don't see how you could possibly implement in a library -- or how it could possibly be practically implemented in a library. It involves this particular way of

structuring computer memory. We had certain rows containing fields corresponding to other columns and memory. And there is two points there.

First of all, I just don't see how you would do that at a library in any meaningful way.

And second of all, Microsoft, the defendant -- the very sophisticated defendant in that case, did not even try to make that argument. They just made this very argument at a high-level of generality. This is just organizing data. Therefore, it's unpatentable.

And what the court held is that it was "untethered from the language of the claims." And the court pointed to a particular claim limitation which was in that algorithm in the specification.

But again, because this was a means-plus-function claim, it was part of the claim. So they pointed to this particular step involving the creation of the self-referential table, and they pointed out that the abstract idea as claimed by Microsoft didn't focus on that step, which was really an improvement to database technology. It couldn't be analogized to anything in the real world.

And here, I think that the shoe is really on the other foot. I think that we have really explained every single step here. We are not ignoring any steps at all. We are saying how every single step is just a method of

organizing data that's equivalent to a library. And then Kove is saying, well, look at these general articles in *MIT Technology Review* and these statements in the specification that aren't reflected in the claim.

So I think that when you have this analysis of the claim language, I do think this claim -- all of the asserted claims are directed to abstract ideas.

So I'm happy to answer any other questions from the Court.

THE COURT: No. I am ready to hear from Kove.

MR. UNIKOWSKY: Okay. Thank you.

MR. REICHMAN: Thank you, your Honor.

May it please the Court?

We have some slides we may use, if we can put them up?

THE COURT: Sure.

THE COURT REPORTER: Could you state your name again.

MR. REICHMAN: Sure. Courtland Reichman.

May it please the Court?

Any claim can be characterized in abstract terms. The Federal Circuit has made that very clear, especially when they are untethered from the claim language. And the Federal Circuit and Supreme Court cases are equally clear that characterizing things at such a high level of abstraction

associated in an NDTP server.

It's inextricably rooted in technology, and anybody skilled in the art would understand, and we have to assume for these purposes, construing inferences in our favor, that they would understand that to be a computer term.

So again, the test is -- without the undercover claim construction, the test is, do these improve the way a computer functions in the way that the cases talk about it?

And they do. I will list some of the ways in which they improve it. This is in the specification, and it's in the complaint.

And I guess I should say, of course, you have to, in a 12(b)(6), assume that the allegations in the complaint are true.

And one of the areas that we heard Amazon, in their brief and sitting here today, takes aim at Kove is to say, well, this MIT article may describe advances, improvements, but that's not this patent. And we should assume, for these purposes, is what they are saying, that this isn't this patent. This isn't these inventors.

But if you look at Paragraphs 1 and 19 of the complaint, they say that the invention described in the MIT article is substantially identical to the invention in Kove's patents. That's what we have to take as true.

And we use that article to show that this is not

some routine improvement over prior systems. There is no way that MIT said this is one of the top ten technologies that are going to change the world, because somebody said, do a card catalogue on a computer.

So what are those improvements?

Well, first it's the idea of using an intermediate server. Using an intermediate server that, of course, itself is rooted in technology, but that stores location information. Before, the information had to be out on the actual server. The way your Honor described it in the analogy, they had to be out at the library. Nobody had thought to put intermediate servers in between the user or the cluster of servers that represents the user, what they call the client, and the actual data entities that could be located anywhere in millions of servers.

It used to be that you had to go to a central index that was associated with that data. This is separating the two and doing an intermediate server on which the location information is associated with an identifier string, not the Dewey decimal system, but a computer identifier string. It's in the patents. It describes what the identifier string is. That term would have to be defined by reference in the specification since it's in quotes and it's defined in the specification.

You then store this location information

independent from the data entities.  That's one of the things that the MIT article talks about and the complaint talks about, is a dramatic break from what existed before.  When you separate what we characterize as the where from the what, there is some magic in that.

But then it goes on, very similar to the MIT article.  It's in the specification and it's in the complaint.  It's using a distributed hash table to store the location information or portions of it across a network of intermediate location servers.

Now, again, as we start talking about the actual language of the claims -- and I'm focused -- you might put up the '170 claim.  I'm walking through that.  I think that's the baseline, and the other ones build off of that.

This is at the heart of the invention, your Honor.  It's -- let's just -- I will deal with the analogy later, but I am not hearing in this analogy that there are distributed hash tables nor could there be.

Distributed hash tables, if you even just look them up on Wikipedia, are computer science terms.  In fact, what it says in there is that this term arises out of computer science.

And what is it?  Well, it is a type of table, type of lookup table, not different at that level, that it's a table that you would have in *Enfish*.  And hash tables have

been a tool that have been used.

To be clear, every single patent, your Honor -- and I defy the defendants to put up a patent that is not built out of things that already existed.  As the courts have recognized, of course they are, because nobody is inventing new matter.  It's all based on stuff that's in the world.  So you can't just pick a word out and say, well, distributed hash tables or hash tables existed before.  That's not the question, no more than it was the question in the Supreme Court case *Diehr*, if I'm pronouncing it correctly, where they used a mathematical equation for purposes of curing rubber.  You are using it as a tool, like you would use any other technology.

But here what's going on is really interesting.  You have got these intermediate location servers, and no one server -- this, I guess, goes to one of your questions, your Honor.  No one server of these intermediate location servers has the entire hash table on it.

One of the innovations -- this was talked about in the MIT article, talked about in the patent, talked about in the complaint -- is breaking that hash table up so that it sits across all of these different intermediate location servers.

And then, when you -- it's not hashing -- this was what was in the prior technology.  And this is all in the

complaint and in the patent.

In the prior technology, you would be hashing; that is, breaking apart and creating locations for the underlying data.

This said, no, we are not going to do that.  There is too much data.  We are talking about, you know, quadrillions -- I learned that word -- quadrillions of data entities, more than that even.  That would be impossible. That's why you couldn't do these sorts of massive data cloud applications with the prior technology.

We are not hashing the data entities.  We are hashing the location information.  That's a much more discrete piece of information.  And we are spreading it across these different servers so that when you go to one server and you say, okay, I would like to know the electrical engineering professors at the University of Chicago, that server may not have that on it.  It may not even know the location, but it runs a hash table, and it says, I think if you go to these other servers, it might have the information, or go to these other servers and it might have the information.

As the MIT article describes, the use of distributed hash tables to organize location information was a major breakthrough in computer science.  It is what enabled cloud technology.

Hash function, these are -- if the Court were to look it up on Wikipedia or if we were to actually have evidence around this -- and this is part of the problem, evidence -- it's a highly sophisticated term rooted in computers.

And the idea -- I'm not a computer scientist by any means. I'm the last person. But I did enough research to figure it out. And what it is, is, you can take information, like, please tell me the electrical engineering professors at the University of Chicago. It could be any sentence that you want to put in. And it runs this hash function on it, and it turns that into this -- it could be 32 or hundreds-of-digit-long code. Think of it -- the example that is given in the literature is like cryptography, that if you were to take your message and convert it into letters and numbers and ones and zeros, you could have a hundred-digit-long unique identifier. So if you say, all identifiers are all going to be 300 lengths long, it will do the hash function and convert it into that. It's inextricably tied to computers.

It then has this redirection mechanism and the transfer mechanism.

What emerges out of all this, your Honor, is that you are organizing the architecture for how the computer works. And when you organize that architecture, what the

cases say is, you are improving the way the computer works.

I am going to come back to *Enfish,* but I want to start on defendant's cases, because I think it highlights what is so different.

This type of patent has never been considered by the Federal Circuit to be a data manipulation patent.

I mean, what are those patents that are data manipulation?  For example, the *BSG* patent.  That was a Federal Circuit case the defendants cited.  And the idea here is that they had what they call the self-evolving database.

And what did that mean?  It meant that you collect information, and then when I want to type in a tag for that information, it gives me a suggestion of what other people typed in as tags.  There was no structural organization of how the servers connect to each other, how they are organized.

Similarly in *Two-Way*, the other case that was cited here today, the claim involved the following:  Sending information, directing the sent information, monitoring the receipt of the sent information, and accumulating records about the receipt of the information.

You see how in these patents all you are doing is moving the information around.  You are not organizing the architecture for a computer.

Now, contrast that with *Enfish*, which I think is

right on point for us.  In *Enfish*, the conclusion was that you are organizing the architecture of a computer.

Now, what was that architecture?  I think this says it all.  The architecture was a table in which some of the rows had the same name as some of the columns.

It could be done.  It's what they call the self-referential table.  And that was distinguished from a relational table, where you might relate a piece of information on this one table to information on another table.  They said, hey, wouldn't it be great?  We will put it all in the same table, and we will have cross-references in the table where some rows have the same name as some columns.

This could be done in the human mind.  It could be done with pen and paper.  In fact, if you look at the *Enfish* decision, you will see it's done with pen and paper.  The Federal Circuit writes it out, gives examples that it makes up of these tables.

So why was it patentable?  It was patentable because it was an architecture for how you build a computer system in a way that improves over other computer systems.

What did it improve over?  Well, one example that was given was relational databases.  Instead of having to create all of those relationships between the different tables, it would -- it could be automatically updated in a self-referential table, because you are just using one table.

You don't have to create a connection.

Well, although it's just one facet of the invention, a distributed hash table is so much more complex than a table with rows and columns that have the same names. It's like saying a Big Wheel is a vehicle but a Ferrari isn't. *A fortiori*, if the table in *Enfish* is a sufficient architecture for a database, then using distributed hash tables on intermediate location servers is sufficiently complex.

We don't think you get past Step 1, but it's, I think, useful to consider the question here of preemption.

I guess before I do, I just want to underscore this point about the picking on these technical words.

As I said before, there is no patent that you couldn't pick out a technical word, as Amazon is doing. They stood up here and in their brief they said, well, it's says "server." Servers are everywhere. Or it says "database." Well, databases are everywhere.

If you pick any individual word -- and I would posit -- maybe I'm overstating -- in any electronics patent, every individual thing listed in there exists somewhere else. That's not the test.

If you look at the analogy -- I want to pull up -- why don't we pull up the *Enfish* patent first.

If you look at the analogy, your Honor, we could

take this library card catalogue point, and I think you could apply it to any database patent to invalidate it. There is no authority for rewriting the patent to substitute claims. I mean, Amazon's point, in its opening brief at least, was, this isn't rooted in technology because it could apply to a library.

And to get there what they do is, they strip all the technical words out of the patent and substitute them with nontechnical words and then construe things like "identifier string" -- contrary to the specification and the way people skilled in the art would understand them -- to have nontechnical meanings.

Well, if we took the very patent in *Enfish* and did the same word substitution exercise, as you could see here, we end up at the same place that the defendants end up. Yet we know that this is patentable.

Or the patent that we cite in the brief, the Amazon patent -- if we could pull that up.

We could take Amazon's patent -- why don't we put up the full claim. Do you happen to have it there? Maybe the next one. There you go.

I will show you the word substitution, your Honor. But if we take -- this is the patent that we cite of Amazon's. And I'll tell you, there are more than 70 Amazon distributed network-type patents that cite the Kove patent,

and we took a look at them.  Not one of them cites a library card catalogue.

If they thought a library card catalogue was prior art -- if it was the same thing as the Kove patent, they had a duty to bring that to the examiner's attention.  That was never done because, of course, nobody in computer science would consider a card catalogue to be this.

If you take one of their patents, the '482, you see it's a lot of the same terms.  And I could pick any of them out and say they existed before -- a structured data record, receiving a request, mapping a request, a hash function of the partition key.

What happens -- if we put up the other slide -- if we try and do the word substitution exercise, we end up right back at a library card catalogue.  I strip out the technical words, and I write non-technical words.

So a computer-implemented method becomes a library card catalogue-implemented method.

We receive a request from a client, so we receive it from a librarian.  To store structured data, we could just call it a book.

And this is the point I started with, your Honor. The test that the Court is to apply is not some free-for-all about whether you can rewrite claims or characterize them abstractly.

The question is whether the architecture here improves the way computers function.

And then where I was going was, undergirding all of these laws, the Supreme Court has made clear, is a concern around preemption.

So one of the questions that's relevant to ask is, is this taking the entire field?  It's not something we hear much about in Amazon's briefs, but it clearly isn't.

In *Enfish* we see that a self-referential table is not preempting because you have a relational table, a relational database.

Similarly, in this case you have self-referential tables.  You have relational databases.  You have hierarchical indexes.  You have databases where you don't have intermediate location servers.  You cannot use a hash table at all.  And you certainly don't have to make it a distributed hash table.

Again, deciding whether this is an improvement over conventional systems is a fact question, as *Berkheimer* and other Federal Circuit cases made clear.  And at this stage we are to assume or construe the facts in the plaintiff's favor.  And the complaint, paragraph after paragraph -- it's through, roughly, Paragraph 20 or 22 -- makes clear that this is an improvement over conventional systems.

And in Paragraph 1 and 19 it makes clear that we

are talking about -- the MIT article is talking about the same thing as the Kove invention, and it's talking about how using distributed hash tables to store location information is one of the top ten innovations.  I'm not talking about computer science innovations.  I'm talking about one of the top ten innovations that are going to change the world.

This is deeply rooted in technology, every word in the patent.  And the actual claims is rooted in technology, and it is an architecture for improving how computers function.

That architecture point is the key one, because it ties you right into *Enfish*.  It's architecture in just the same way that *Enfish* is, your Honor.

THE COURT:  Thank you.

MR. REICHMAN:  Thank you.

THE COURT:  Any rebuttal?

MR. UNIKOWSKY:  Thank you, your Honor.  Yes.

I would just like to make a couple of quick points.

THE COURT:  Sure.

MR. UNIKOWSKY:  First of all, we are certainly not arguing that just you can arbitrarily take some words, change them into different words, and therefore prove that the patent is abstract.

So I'm not saying that in any claim in the entire world you can take a word like "light bulb" and replace it

with a word like "book," and suddenly you have shown that it's an abstract idea.

What I'm saying is, look at the words of this particular claim. And if you replace these technical-sounding words with their nontechnical equivalents, you have something that you could do in the real world that works in the exact same way as what these claims are describing on a computer.

So just to take a concrete example of something that was said during my colleague's prior remarks, "identifier string." So, of course, an identifier string is just a string that identifies something. But we are told that, look at the specification. It says the identifier string is something on a computer.

So you go to the specification at Column 4, and it defines the identifier string as "a unique string with which zero or more location strings are associated in an NDTP server." So it's a string that identifies something on a generic server.

Okay. That's just like "server." It's a completely generic thing on computers that works the exact same way as something in the real world not on the computers. It's something that identifies something on a generic server. And just as the word "server" in a claim doesn't make it nonabstract, the statement in the specification that an

identifier string appears on a server doesn't make it nonabstract when the idea here is just something that identifies something, which you don't need a computer to do.

And it's similar with this idea of these distributed hash tables. So I construed from my colleague's remarks that they think that the inventive concept here, what's really rooted in technology, is this notion of distributed hash tables. That's what they seem to think is technological.

So I think that they are referring to Claim 1 of the '170. That's the only claim that even uses the word "hash." But it doesn't actually say -- the words "distributed hash tables" don't appear.

And again, I think that the Federal Circuit's requirement to look at the language of the claims is instructive. I'm happy to just read the exact same claim language that uses the word "hash" and demonstrate that there is nothing about that, that couldn't be implemented in a library. It's really the exact same thing.

So it's the last two elements of Claim 1 of the '170.

It says, "the portion of the data location information" -- so those are likes the cards -- "included in a corresponding one of the data location servers" -- that's the card catalogue -- "is based on a hash function used to

organize the data location information across the plurality of data location servers."

So it just says, use a hash function to organize the cards -- to organize the information in the boxes. Okay? And there's no dispute that a hash function is just a piece of mathematics. That chart which we describe, that's a hash function.

So my colleague talks about distributed hash tables, but the relevant claim limitation, all it's saying is, you use a hash function to organize the cards in the boxes.

And then the next one says, "each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string."

So each one of the card catalogues -- so you can go to any one of these boxes, and you can determine which server to go to by looking at the chart and applying it to the person's name.

So it says, "each . . . of the data location servers is configured to determine the at least one of the plurality of data location servers" -- so the at least one card catalogue -- "based on the hash function applied to the identifier string." So just by looking in the chart and applying that chart to the person's name. That's all this

says. That's the entire claim.

And although I understand that there may be an article in the *MIT Technology Review* saying distributed hash tables are an important technology, that's just not enough to get a patent. You have to look at the language of these claims.

And just one final point. There is reference to factfinding and claim construction, but I think that they have to show something concrete, like a particular claim term that has to be construed that will actually affect the abstractness analysis or some question of fact that has to be determined.

There is a number of Federal Circuit cases that have affirmed dismissals under Rule 12(b)(6). You can't just arbitrarily try to get facts and claim construction without showing why it matters. And I don't think that there is any factual dispute or claim construction dispute on which this dispute will turn. I just think that the claims are plainly abstract, according to their plain meaning.

If the Court has no further questions --

THE COURT: Let me just ask.

MR. UNIKOWSKY: Yes.

THE COURT: When you refer to the hash function to organize data, is that, in your mind, akin to A through G are in this box?

MR. UNIKOWSKY: Yes. That's what it is, yes.

THE COURT: I wanted to make sure I understood that.

All right. Well, thank you. Great case. Great case. I have been here long enough that I like the hard ones.

MR. UNIKOWSKY: Thank you, your Honor.

THE COURT: And I hope to rule within the next 60 days. I can't make you any promises, but that would be a hope.

Thank you.

MS. MASCHERIN: Your Honor, before we break, may I just ask for clarification on one thing?

The last time we were before you, you entered a minute order staying discovery other than the initial disclosures, which the parties have exchanged.

THE COURT: Was stayed. You know, I am going to lift the stay at this point. I realize you won't get a whole lot done within 60 days anyway, but I think we can go ahead and lift the stay so you can at least initiate other discovery mechanisms.

MS. MASCHERIN: Could I ask your Honor that we continue the stay with respect to the portion of the local patent rules that require the initial infringement, noninfringement, and invalidity disclosures? because those

Trials@uspto.gov                                              Paper 23
571-272-7822                                          Date: June 16, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

—————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

—————————

AMAZON WEB SERVICES, INC.,
Petitioner,

v.

KOVE IO, INC.,
Patent Owner.

—————————

IPR2020-00276
Patent 7,233,978 B2

—————————

Before BRYAN F. MOORE, BARBARA A. PARVIS, and
KAMRAN JIVANI, *Administrative Patent Judges.*

JIVANI, *Administrative Patent Judge*.


DECISION
Denying Institution of *Inter Partes* Review
*35 U.S.C. § 314, 37 C.F.R. § 42.4*


I.   INTRODUCTION

*A.  Background and Summary*

On December 12, 2019, Amazon Web Services, Inc. ("Petitioner")
filed a petition for *inter partes* review of claims 1, 3, 6, 10, 14, 17, 23, 24,
30, and 31 of U.S. Patent No. 7,233,978 ("the '978 patent").  Paper 2 ("Pet."

IPR2020-00276
Patent 7,233,978 B2

experience working with distributed systems (or in a similar field), or equivalent." Pet. 11–12. Patent Owner does not propose a differing view. Prelim. Resp. 16–17.

We regard Petitioner's formulation of the level of skill as consistent with the Specification and the asserted prior art. *See Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001) (prior art itself may reflect an appropriate level of skill). Thus, we adopt Petitioner's proposal for the purposes of this Decision only.

### C. Overview of the Asserted Prior Art

#### 1. RFC1034 (Ex. 1003)

RFC1034 provides an introduction to concepts and facilities, but not implementation and specification, of the Domain Name System (DNS), for Internet mail and host address support. Ex. 1003, 1. The development of DNS was driven by an increase in the number host computers, and the subsequent increase in network traffic to copy a single file that mapped each computer to its network identifier, as well as an increase in sophistication of applications on those computers. *Id.* at 1–2.

RFC1034 describes distributed database problems in the host name scenario, where "a particular name server may be presented with a query that can only be answered by some other server." *Id.* at 4. RFC1034 prefers an approach it labels "'iterative,' in which the server refers the client to another server and lets the client pursue the query," but is open to the approach it labels "'recursive', in which the first server pursues the query for the client at another server." *Id.*

RFC1034 describes "a tree structured name space and data associated with the names." *Id.* at 6. Using this, "queries for address resources return

15

Appx3587

IPR2020-00276
Patent 7,233,978 B2

Internet host addresses." *Id.* RFC1034 describes the use of "name servers," which each have "complete information about a subset of the domain space, and pointers to other name servers that can be used to lead to information from any part of the domain tree." *Id.*

An example of a high-level portion of the tree-structured Internet domain name space is reproduced below in an unlabeled figure in Section 3.4, page 10, of RFC1034.



In the unlabeled figure, above, appearing in the section named "Example name space," is a root domain which "has three immediate subdomains: MIL, EDU, and ARPA. The LCS.MIT.EDU domain has one immediate subdomain named XX.LCS.MIT.EDU." *Id.* at 10. Each node in the tree has a set of resource information, referred to as "resource records," ("RR") which include information such as the domain name where the resource record is found, the type and class of resource, a time-to-live value for the data, the data itself, such as domain name (usually a pointer to other information in the database), or IP address. *Id.* at 11–13.

16

IPR2020-00276
Patent 7,233,978 B2

An example of resource records, with class and time-to-live data omitted, is provided as follows:

```
ISI.EDU.            MX        10 VENERA.ISI.EDU.
                    MX        10 VAXA.ISI.EDU.
VENERA.ISI.EDU.  A            128.9.0.32
                 A            10.1.0.52
VAXA.ISI.EDU.    A            10.2.0.27
                 A            128.9.0.33
```

*Id.* at 14. In this example above, ISI.EDU has two "mail exchange" records, which point to sub-domains, each of which has two IP addresses associated with it. *See id.* at 12–13.

In the DNS system, the "response by the name server either answers the question posed in the query, refers the requester to another set of name servers, or signals some error condition." *Id.* at 16. Further, a "given name server will typically support one or more zones, but this gives it authoritative information about only a small section of the domain tree. It may also have some cached non-authoritative data about other parts of the tree." *Id.* at 19. The "authoritative data for a zone is simply all of the RRs attached to all of the nodes from the top node of the zone down to leaf nodes or nodes above cuts around the bottom edge of the zone." *Id.* at 20. Thus, "a zone can be completely described in terms of a set of RRs. Whole zones can be transferred between name servers by transferring the RRs." *Id.*

## 2. *Neimat (Ex. 1004)*

Neimat concerns "generating a correct memory address from a character or digit string such as a record key." Ex. 1004, 1:6–9. Petitioner asserts that Neimat discloses "the particular method of scaling capacity or transaction rate capability recited." Pet. 44.

17

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KOVE IO, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:18-cv-08175 |
| | ) | |
| | ) | |
| AMAZON WEB SERVICES, INC., | ) | Hon. Rebecca R. Pallmeyer |
| Defendant. | ) | |

**AMAZON WEB SERVICES, INC.'S OPENING CLAIM CONSTRUCTION BRIEF**

Adam G. Unikowsky
JENNER & BLOCK LLP
1099 New York Ave. NW Suite 900
Washington, DC 20001
(202) 639-6000
aunikowsky@jenner.com

Terri L. Mascherin
Timothy J. Barron
Michael T. Werner
JENNER & BLOCK LLP
353 N. Clark St.
Chicago, IL 60654
(312) 222-9350
tmascherin@jenner.com
tbarron@jenner.com
mwerner@jenner.com

*Attorneys for Amazon Web Services, Inc.*

## II.    ARGUMENT

### A.    "Location"

| Claim(s) | Term | AWS Proposed Construction | Kove Proposed Construction |
|---|---|---|---|
| • '170 patent, claims 1, 2, 6, 8, 12, 15;<br>• '640 patent, claims 17, 18, 24; and<br>• '978 patent, claims 1, 3, 6, 10, 14, 17, 23, 30, 31 | "location" | "An encoding that is a member of a set of associations with an identifier in a location server, and that is used to directly contact a server storing data and retrieve the data." | "An encoding that is a member of a set of associations with an identifier in a location server, and that specifies a location of data pertaining to the entity identified by the identifier." |

The asserted claims refer to "locations" of data. The parties dispute what that means. The Court should hold that a "location" of data is an encoding that is used to *directly* contact the server storing data and retrieve the data.

### 1.    Background of dispute

The patents relate to techniques for retrieving data from a network. The basic idea is that the location of data is stored separately from the data itself. Figure 11 of the '640 and '170 patents (below), and the similar Figure 18 of the '978 patent, depict the patented system's architecture:



*Fig. 11*    NDTP Server Constellation Context

2

Although the claims vary, they generally recite that "location servers" store "locations" associated with identifiers. (In the diagram, the "location servers" are referred to as "NDTP Server Constellation"—the patents use "NDTP server" and "location server" interchangeably.) In addition, data repositories (in the diagram, "Repository1") store data associated with those identifiers. A client (in the diagram, "Client1") wants to retrieve data associated with an identifier. To do so, the client needs to determine the data's "location." Thus, the client sends a "location query" to a "location server," asking for the "location" of the data associated with the identifier. If the "location server" contains a "location" associated with that identifier, it returns a "location message" containing the desired "location." (In the diagram, this exchange is shown by the arrows between "Client1" and "NDTP Server Constellation.") The client then requests data from the data repository at that "location," which returns the data (in the diagram, "data item transfer").

All of the asserted claims require "location servers" to store "locations" or "location information." The parties dispute the scope of the term "location"—specifically, whether a "location" must itself be used to retrieve data directly from where the data is stored, or whether information inputted into a different system to *retrieve* a "location" is *also* a "location."

Consider two concrete examples that illustrate the dispute. In the first example, a client sends a message to a server. The server responds with a message containing a network address. The client then uses the network address to contact a data repository storing sought-after data. In that scenario, the network address is undisputedly the "location" of the sought-after data.

In the second example, a client sends a message to Server A. Server A then transmits information back to the client. The client then uses that information to send another message, this time to Server B. Server B returns a network address to the client. The client uses that network address to contact a data repository storing sought-after data. The question is: in this example,

3

what is the "location" of the sought-after data? AWS's answer is the same as before: the network address used to contact the data repository is the "location" of the sought-after data.

Kove, however, contends that the information retrieved from Server A, and sent to Server B, is *also* a "location" of the sought-after data. Kove is incorrect. "Location" does not encompass information inputted into a different system in order to retrieve the actual location.

2. Claim construction analysis

A. *The parties agree that the construction of "location" should recite "an encoding that is a member of a set of associations with an identifier in a location server."*

Each patent includes a paragraph that begins as follows: "The following terms are used to describe the operation of the presently preferred" network distributed tracking protocol or distributed database system. ('170 patent, 4:8-10, JA0016; '640 patent, 4:5-7, JA0041; '978 patent, 4:19-20, JA0073.) The paragraph then describes several claim terms, including "location." Specifically, it recites that a "location" is "a member of a set of associations with an identifier in an NDTP server."[1] ('978 patent, 4:28-30, JA0073.). Both parties agree that this statement is an express narrowing of claim scope, and the Court's construction of "location" should therefore recite "a member of a set of associations with an identifier in a location server." In other words, to satisfy the claim, a "location" must be (a) associated with an identifier, and (b) stored on a location server, even though the plain meaning of "location" would not encompass those narrowing limitations.

---

[1] The description of "location" in the '640 and '170 patents is slightly different from the description in the '978 patent. The '640 and '170 patents refer to a location as a "string," while the '978 patent refers to it as an "encoding, for example a string." ('170 patent, 4:12-14, JA0016; '640 patent, 4:9-11, JA0041; '978 patent, 4:28-30, JA0073.) This distinction reflects the fact that the '978 specification describes embodiments of "location" that do not appear in the '640 and '170 specifications. *See infra* n.2. As explained below, however, both parties propose using a single construction for all three patents. *Id.*

4

Appx4823

B. *The parties agree that the construction of "location" must include additional language clarifying what a "location" actually is.*

Both parties agree that the analysis cannot stop there. The phrase "a member of a set of associations with an identifier in a location server" recites what a "location" must be *associated with* (an "identifier"), and where a "location" must be *stored* (a "location server"). But it does not resolve what a location *is*. To give an analogy, this phrase is like a statement that an "automobile must be associated with an owner, and stored in a garage." Such a statement narrows the scope of "automobile," because the plain and ordinary meaning of "automobile" encompasses automobiles that are abandoned or stored in the street. But this statement does not resolve, for instance, whether a motorcycle or a tow truck is an "automobile."

Moreover, after reciting that a "location" is stored on an "NDTP server," the above-quoted paragraph states that an "NDTP server" is, in relevant part, "a network-attached component that maintains a set of identifier/location mappings." ('170 patent, 4:17-20, JA0016; '640 patent, 4:14-18, JA0041; '978 patent, 4:34-38, JA0073.) Thus, it states that a "location" is stored on a "server," and a "server" stores "locations." This circular statement does not resolve what a "location" is.

Both parties, therefore, propose additional language for their proposed constructions. The sole dispute between the parties concerns what additional language to use.

Kove's proposed additional language is still circular: it defines a "location" in part as an encoding that "specifies the location of data."[2] Such a construction is useless in resolving disputes over the scope of "location." *See, e.g.*, *Triplay, Inc. v. Whatsapp, Inc.*, No. 13-1703-LPS-CJB,

---

[2] Kove's proposed construction also uses the phrase: "location of data *pertaining to the entity identified by the identifier*." AWS agrees with Kove that the "data" in question is the "data pertaining to the entity identified by the identifier." But the claims do not refer to any other type of "data," and AWS is concerned that the phrase "data pertaining to the entity identified by the identifier" may prove unwieldy to the jury. AWS therefore proposes simply using the word "data."

5

2016 WL 3574012, at *15 (D. Del. June 30, 2016) (noting that proposed construction "includes the very term to be construed, … a circular result that is disfavored," and collecting cases); *Wi-Lan Inc. v. LG Elecs., Inc.*, No. 18-cv-01577-H-BGS, 2019 WL 2270434, at *18-19 (S.D. Cal. May 28, 2019) (rejecting "proposed construction" that "is circular because it uses the words 'traffic shaping' and 'rate' within its proposed construction for the term 'traffic shaping rate'"). A construction is needed that resolves what a location *is*, and that does not repeat the word "location."

    C. *AWS's construction conforms to the plain meaning of "location."*

The Court should adopt AWS's proposed construction, which requires that the "location" of data be "used to directly contact a server storing data and retrieve the data." This construction clarifies that information that is merely inputted into a different system component, which returns the *actual* location, is not *also* a location.

AWS's construction is consistent with the plain meaning of "location." A "location" requires knowing where something is. For instance, a courthouse's address is a "location." But a courthouse's telephone number is not a "location," even though one can dial the number and ask for the address. Indeed, if information that can merely be used to *access* a "location" were *itself* a "location," then the scope of "location" would be limitless—anything used to look up anything else that after any number of steps would lead to an actual location would itself be a "location." In the above analogy, not only would the courthouse's address be a location, but also the telephone number; and because *that* is a "location," any information used to access the telephone number, such as telephone directory, would *also* be a "location." That is not what a "location" means.

The same is true in networks. If a client wants to retrieve data, then the location is what is used to directly contact the server storing the data and retrieve the data. An input to a different system used to retrieve the actual location is not also a "location."

<div align="center">6</div>

AWS's construction comes directly from the '170 and '640 specifications: "Once the client 112 has the location string for a particular unit of data, the client 112 **contacts and retrieves information directly** from the data repository 114." ('170 patent, 17:6-9, JA0023; '640 patent, 16:56-59, JA0047 (emphasis added)). The '978 specification includes similar language: "In one embodiment,[3] when a client queries the NDTP server for information pertaining to an entity, the NDTP server preferably returns a list of all locations for the specified entity. **The client then can directly access the various locations**, relieving the NDTP server of any further involvement in the transaction...." ('978 patent, 4:61-67, JA0073 (emphasis added).) Thus, in the specifications, a "location" is *itself* used to *directly* contact the server storing the data and retrieve the data There is no indication in any of the specifications that "location" stretches more broadly to cover information indirectly used to retrieve an actual location.

AWS's proposed construction is also consistent with the specifications' examples of "locations." The specifications state that a "location" or "location specifier" "might be an Internet machine name, and a TCP/IP port number for a relational database server." ('170 patent, 4:53-57, JA0016; '640 patent, 4:53-57, JA0041; '978 patent, 8:10-13, JA0075.) "Port numbers" are used to "open[] a connection with a server." ('170 patent, 11:62-64, JA0020; '640 patent, 11:41-43,

---

[3] The next sentence in the '978 specification describes another embodiment which is not described in the specifications of the other patents: "Alternatively, the location may also be one or more pieces of data identifying the physical location of the entity identified by the identifier." ('978 patent, 5:1-3, JA0074.) However, AWS proposes using a single construction across all three patents for a pragmatic reason: the accused products, as well as the relevant prior art, use "location" in the sense of "location" on a network, not physical location. It would needlessly confuse the jury to propose a broader construction for "location" in the '978 patent than the other patents, when that distinction reflects embodiments not at issue in the case. Kove disagrees with AWS's construction, but similarly proposes a single construction across all three patents. By proposing this construction, AWS does not intend to waive any arguments based on the '978 patent's discussion of physical locations, such as on whether the '978 patent may claim priority to earlier applications.

JA0045; '978 patent, 14:25-26, JA0078.) In other words, the location must consist not only of the machine *name*, but also a *port number*—information that is needed to communicate directly with a server. Likewise, the specifications recite that a "location" can be a Uniform Resource Locator (URL). ('170 patent, 4:53-57, JA0016; '640 patent, 4:53-57, JA0041; '978 patent, 8:10-13, JA0075.) The '978 specification elaborates that "the location may be a URL for the specific application server 156 at which the substantive content may be accessed." ('978 patent, 21:60-64, JA0082.) This again shows that the "location" is directly used to access the server storing the data.

Further, the specifications show that information used to *retrieve* the "location" of data is not *itself* the "location" of that data. Several claims include "redirect" limitations. For instance, claim 18 of the '640 patent recites a "redirect message" that "contains redirect information for use by the client to calculate a location of a different data location server" which "contains the location string." ('640 patent, 22:65-23:2, JA0050-51.) These limitations distinguish between the "location string"—which contains the location of sought-after data—and "redirect information for use by the client to calculate a location of a different data location server"—which is used to obtain the "location string" for the sought-after data. This shows that the "redirect information for use by the client to calculate a location of a different data location server" is not *itself* the "location string" for the sought-after data. The specifications recite a similar distinction between redirection pointers and locations. ('640 patent, 14:36-38, JA0046 (A "message may contain any mixture of real data location strings and NDTP server redirection pointers.").) Thus, a mere redirection pointer that assists in finding the location of data is not itself the location of that data.

### B. "Location Information"

| Claim(s) | Term | AWS Proposed Construction | Kove Proposed Construction |
|---|---|---|---|
| • '170 patent, claims 1, 2, 6, 8, 15; | "location information" | "One or more identifiers and | 170/640: "Information pertaining to one or more locations of |

| *Notice of Allowability* | Application No. 11/354,224 | Applicant(s) OVERTON ET AL. |
|---|---|---|
| | Examiner Brian J. Gillis | Art Unit 2441 |

*-- The MAILING DATE of this communication appears on the cover sheet with the correspondence address--*

All claims being allowable, PROSECUTION ON THE MERITS IS (OR REMAINS) CLOSED in this application. If not included herewith (or previously mailed), a Notice of Allowance (PTOL-85) or other appropriate communication will be mailed in due course. **THIS NOTICE OF ALLOWABILITY IS NOT A GRANT OF PATENT RIGHTS.** This application is subject to withdrawal from issue at the initiative of the Office or upon petition by the applicant. See 37 CFR 1.313 and MPEP 1308.

1. ☒ This communication is responsive to *the Request for Continued Examination filed January 27, 2010*.

2. ☒ The allowed claim(s) is/are *17-20,22-29 and 33-37*.

3. ☐ **Acknowledgment** is made of a claim for foreign priority under 35 U.S.C. § 119(a)-(d) or (f).
    a) ☐ All    b) ☐ Some*    c) ☐ None    of the:
        1. ☐ Certified copies of the priority documents have been received.
        2. ☐ Certified copies of the priority documents have been received in Application No. _____ .
        3. ☐ Copies of the certified copies of the priority documents have been received in this national stage application from the International Bureau (PCT Rule 17.2(a)).
    * Certified copies not received: _____ .

Applicant has THREE MONTHS FROM THE "MAILING DATE" of this communication to file a reply complying with the requirements noted below. Failure to timely comply will result in ABANDONMENT of this application.
**THIS THREE-MONTH PERIOD IS NOT EXTENDABLE**.

4. ☐ A SUBSTITUTE OATH OR DECLARATION must be submitted. Note the attached EXAMINER'S AMENDMENT or NOTICE OF INFORMAL PATENT APPLICATION (PTO-152) which gives reason(s) why the oath or declaration is deficient.

5. ☐ CORRECTED DRAWINGS ( as "replacement sheets") must be submitted.
    (a) ☐ including changes required by the Notice of Draftsperson's Patent Drawing Review ( PTO-948) attached
        1) ☐ hereto or 2) ☐ to Paper No./Mail Date _____ .
    (b) ☐ including changes required by the attached Examiner's Amendment / Comment or in the Office action of
        Paper No./Mail Date _____ .

    **Identifying indicia such as the application number (see 37 CFR 1.84(c)) should be written on the drawings in the front (not the back) of each sheet. Replacement sheet(s) should be labeled as such in the header according to 37 CFR 1.121(d).**

6. ☐ DEPOSIT OF and/or INFORMATION about the deposit of BIOLOGICAL MATERIAL must be submitted. Note the attached Examiner's comment regarding REQUIREMENT FOR THE DEPOSIT OF BIOLOGICAL MATERIAL.

**Attachment(s)**
1. ☐ Notice of References Cited (PTO-892)
2. ☐ Notice of Draftperson's Patent Drawing Review (PTO-948)
3. ☒ Information Disclosure Statements (PTO/SB/08), Paper No./Mail Date 01272010
4. ☐ Examiner's Comment Regarding Requirement for Deposit of Biological Material

5. ☐ Notice of Informal Patent Application
6. ☐ Interview Summary (PTO-413), Paper No./Mail Date _____ .
7. ☐ Examiner's Amendment/Comment
8. ☒ Examiner's Statement of Reasons for Allowance
9. ☐ Other _____ .

/Larry Donaghue/
Primary Examiner, Art Unit 2454

U.S. Patent and Trademark Office
PTOL-37 (Rev. 08-06)          **Notice of Allowability**          Part of Paper No./Mail Date 02222010

JA0331

Application/Control Number: 11/354,224                                    Page 2

Art Unit: 2441

## DETAILED ACTION

This action is responsive to the Request for Continued Examination filed January 27, 2010.  Claims 17-20, 22-29, and 33-37 were pending.  *Claims 17-20, 22-29, and 33-37 are allowed.*

### *Continued Examination Under 37 CFR 1.114*

A request for continued examination under 37 CFR 1.114, including the fee set forth in 37 CFR 1.17(e), was filed in this application after allowance or after an Office action under *Ex Parte Quayle*, 25 USPQ 74, 453 O.G. 213 (Comm'r Pat. 1935). Since this application is eligible for continued examination under 37 CFR 1.114, and the fee set forth in 37 CFR 1.17(e) has been timely paid, prosecution in this application has been reopened pursuant to 37 CFR 1.114.  Applicant's submission filed on January 27, 2010 has been entered.

### REASONS FOR ALLOWANCE

The following is an examiner's statement of reasons for allowance:

The prior art of record fails to teach neither singly nor in combination, the claimed limitations of "a data location server network comprising a plurality of data location servers, wherein data location information for a plurality of data entities is stored in the data location server network, at least one of the plurality of data location servers includes location information associated with the identifier string, each one of the plurality of data location servers comprises a processor and a portion of the data location information, *the portion of the data location information included in a corresponding one of the data location servers is based on a hash function used to*

Appx5152                                                              JA0332

Application/Control Number: 11/354,224                                   Page 3
Art Unit: 2441

*organize the data location information across the plurality of data location servers, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string.*" (emphasis added) as stated in claims 17, and " programming logic stored on the location server, wherein the programming logic is configured to return, in response to a location query related to a desired entity, a location message, the location message in conformance with the transfer protocol and comprising at least one location associated with the desired entity, wherein the programming logic is further configured to return the location message if the location server contains location information for the desired entity, and *wherein the programming logic is further configured to return a redirect message if the location server lacks the location information for the desired entity, the redirect message comprising a list of at least one other location server known to have the location information for the desired entity.*" (emphasis added) as stated in claim 20 and similarly in claim 35. These limitations, in conjunction with other limitations in the independent claim, are not specifically disclosed or remotely suggested in the prior art of record. A review of claims 17-20, 22-29, and 33-37 indicated claims 17-20, 22-29, and 33-37 are allowable over the prior art of record.

Any comments considered necessary by applicant must be submitted no later than the payment of the issue fee and, to avoid processing delays, should preferably accompany the issue fee. Such submissions should be clearly labeled "Comments on Statement of Reasons for Allowance."



"Express Mail" mailing label number <u>EV 655 031 406 US</u>

Date of Deposit: <u>August 9, 2005</u>

<div align="right">Our Case No. 11958/43</div>

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of: )
)
JOHN OVERTON )
) Examiner: Thompson, M.
Serial No. 09/661,222 )
) Group Art Unit: 2144
Filing Date: September 13, 2000 )
)
For   NETWORK DISTRIBUTED )
      TRACKING WIRE TRANSFER )
      PROTOCOL )

## AMENDMENT

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

     In response to the non-final Office Action dated February 9, 2005, please enter the following amendments and consider the remarks provided below.

08/11/2005 JBALINAN 00000053 09661222

02 FC:2201               100.00 OP
03 FC:2202               100.00 OP

JA0904

### III. Rejections Under 35 U.S.C. § 101

Applicant respectfully disagrees that claims 1-4 and 17-18 were directed to non-statutory subject matter. Applicant has cancelled these claims to focus more directly on aspects of the invention recited in new claims 24-49. Accordingly, Applicant submits that this rejection is now moot. Furthermore, none of new claims 24-49 utilize the term "protocol" identified as objectionable by the Examiner.

### IV. Rejections Under 35 U.S.C. § 112, Second Paragraph

Applicant respectfully disagrees that claims 1-9 and 12-23 were indefinite. Applicant has cancelled these claims to focus more directly on aspects of the invention recited in new claims 24-49. Accordingly, Applicant submits that this rejection is now moot. New claims 24-49 do utilize the terms "redirect message" and "hash function" in several instances; however, Applicant submits that these terms are properly understandable in the context of the new claims in which they are now being used.

### V. Rejections Under 35 U.S.C. § 102

Applicant respectfully disagrees with the Examiner's rejections of claims 1-9 and 12-23 as anticipated by the 4 cited references. However, in order to expedite allowance of claims 24-49 directed to certain aspects of the invention, claims 1-9 and 12-23 have been cancelled.

### VI. New Claims 24-29

New claims 24-49 relate to systems and methods that decentralize the processing requirements that can burden traditional databases, such as relational databases. The claimed method and system generally relates to a highly scalable and dynamic way of handling extremely large amounts of data by distributing the way data location information is handled (i.e. the information on where a piece of data is stored in a network), distributing it across a logical pool of participating machines, and distributing data location computation across participating machines, for example by allowing the clients that request the location of data to participate in the computation.

Page 8 of 13

**JA0911**

One aspect of a system configured with a communication protocol to implement this data handling strategy is the redirect message supported by the communication protocol. Examples of one type of redirection include the "well-known" and "passed function" redirection described in the specification, for example at pages 24-26.

In 'well-known function' redirection both servers and clients compute the same function on the same data to generate the same location results. This guarantees that a system configured with the protocol described (NDTP) distributes computation across clients and servers. The disclosure illustrates this using the standard hashpjw function from a reference computer science text book.

> The first appropriate NDTP server is selected from the table in the NDTP_RDR_RSP message by applying a well-known function to the identifier string and using the function result as an index into the NDTP server table. The well-known function preferably applied is the *hashpjw* function presented by Aho, Sethi and Ullman in their text Compilers, Principles, Techniques and Tools (Specification at p. 24, ll. 26–31).

That is, the system distributes hash-function computation, or creates a "distributed hash table". This is fundamentally different than relational database management systems, which are not hash tables. This well-known function can be applied to both clients and servers in their original programming.

> The first variant of the NDTP_RDR_RSP function mechanism specifies a well-known function that all NDTP server and client implementations know when they are programmed, and the NDTP_RDR_RSP message carries a table of NDTP server URLs. (Specification at p.24, ll.20).

As discussed in the specification in one embodiment, when a client requests data from a server for which the server is not responsible, the server returns a NDTP_RDR_RSP message containing a table listing the currently deployed server configuration. This does not indicate where the data is, only which servers currently are operating in a server pool. NDTP_RDR_RSP returns the very same information that the servers use to compute where to put the data in the first place, so the client will compute the location just like the servers originally knew how to store it. Both servers and clients hash the location, using the same information. Receiving NDTP_RDR_RSP, a client runs the same computation, on the same data and therefore computes the same result.

Page 9 of 13

JA0912

> The appropriate NDTP server is selected from the table in the NDTP_RDR_RSP message by applying a well-known function to the identifier string and using the function result as an index into the NDTP server table (Specification at p. 24, ll. 26–28).

In another disclosed redirection approach, the 'communicated function' redirection, servers use NDTP_RDR_RSP message to pass new function definitions to clients, rather than requiring clients and servers to share the same "well-known" function.

> The second variant of the NDTP_RDR_RSP function mechanism specifies that a general function description will be sent to the NDTP client in the NDTP_RDR_RSP message. The client will apply this function to the identifier string and the output of the function will be the NDTP server URL to which to send NDTP requests for the particular identifier string. (Specification at p. 25, ll. 32–p. 26, ll. 2).

Communicated function allows passing entirely new functions to clients, and therefore allows modifying system behavior at the moment of interaction with the NDTP distributed system. Rather than recalling millions of clients to replace the well-known function in both clients and servers, this allows dynamically remapping the identifier string space to the deployed system in the field. An example of this might be if a company installs one or more NDTP (data location) servers and then learns that it would benefit by portioning certain "General Electric" identifier location strings to a new location. Using communicated function redirection via NDTP_RDR_RSP would allow this.

> The advantage of this technique over the well-known function approach is that it allows application-specific partitions of the identifier string space. This can permit useful administrative control. For example, if General Electric manages all identifies beginning with the prefix "GE", a general function can be used to make this selection appropriately. The disadvantage of using a general function is it may be less efficient to compute than a well-known function, (Specification at p. 25, ll. 32–p. 26, ll. 2).

Finally, communicated function redirection may allow changing the processing behavior of clients and servers dynamically that are already deployed in the field.

Each of new claims relates to aspects of the redirection process and system configuration. Claim 24, for example, relates to the process supported by redirection



"Express Mail" mailing label number <u>EV 316 041 955 US</u>

Date of Deposit: <u>November 1, 2006</u>

<u>Our Case No. 11958/49</u>

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Application of:      )
     )
JOHN OVERTON et al.      )
     )
     )    Examiner: Delgado, Michael A.
Serial No. 09/872,736      )
     )
Filing Date: June 6, 2001      )    Group Art Unit: 2144
     )
For    METHOD AND APPARATUS FOR   )
         MANAGING LOCATION         )
         INFORMATION IN A NETWORK    )
                                        )

## AMENDMENT

Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Dear Sir:

In response to the Office Action dated August 24, 2006, please consider the following:

Appx6175

**JA1355**

CLAIM 24

Amended claim 24 relates to a method of scaling at least one of location server capacity and transaction rate capability in a system for storing and retrieving location information by manipulating the location information used to find the data that is being requested.

Claim 24 includes, *inter alia,* the step of:

transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first server reaches a predetermined performance limit

**Thus, amended claim 24 relates to improvements for transaction rate scalability for location information separate and apart from any data to which the location information points.** As recited in claim 24**, transferring a portion of the identifiers and associated locations to a second data location server** involves isolating specifically the location information from the end-point data itself and making changes to how the location information is managed, not the end-point data that is stored at a location identified by the location information. Examples of partitioning portions of the *location information* across servers are found in Applicants' specification (See, for example, FIG. 5 and p. 11, ll. 30 – p. 12, l. 1 illustrating location data server topology using clustering, or a distributed topology using replication, where each of the servers in the cluster may contain a different portion of a pool of associated identifier and location information).

In contrast to Claim 24, Lumelsky only focuses on replication of data objects rather than on management of specifically location information separated from the data objects themselves. Instead of teaching the management of location data itself so that data location servers with data location information are reconfigured to handle queries for the location of data, Lumelsky discloses managing and replicating the end-point data itself (in Lumelsky, the data objects disclosed are multimedia files). The method of claim 24 relates to the management of specifically location information and capacity and transaction rate scaling for accessing the location information needed to access data,

Page 11 of 15

JA1365

while Lumelsky is concerned with the replicating and managing the data itself rather than the location information relating to the whereabouts of the data.

The Examiner asserts that Lumelsky teaches or suggests transferring portions of identifier-location associations to a second server given a performance limit. As pointed out in Applicants' Response filed February 22, 2006, Lumelsky actually teaches replication of the multimedia objects, not simply the location data (See Lumelsky, Col. 6, lines 33-43: "The present invention additionally introduces the notion of a transient replica which replica acts as a migrating object of limited lifetime that responds to demand and capacity conditions. To do so, the controller node monitors demand and capacity and uses, creates, and deletes transient replicas from global servers.")

Lumelsky's "transient replica" refers to a multimedia object, not location information. Therefore, Lumelsky teaches transferring data objects to additional servers but does not teach transferring portions of location information to additional servers separate from data objects. Lumelsky fails to teach or suggest the separate management of location information pertaining to the data, therefore Lumelsky does not teach transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit as claimed in claim 24.

Thus, Lumelsky does not teach either (a) a method of scaling at least one of location server capacity and transaction rate capability in a system for storing and retrieving location information, or (b) transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit. Also, Applicants have amended claim 24 to note that different sets of location information are maintained on each of the location servers to further emphasize the difference between Lumelsky and the invention of claim 24.

For at least these reasons, Applicants submit that independent Claim 24 is patentable over Lumelsky. Claims 25-37 are dependent claims, therefore their allowability directly follows from the allowability of independent claim 24.

Page 12 of 15

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Kove IO, Inc., | Civil Action No. 1:18-cv-08175 |
| Plaintiff, | Hon. Rebecca R. Pallmeyer |
| v. | Jury Trial Demanded |
| Amazon Web Services, Inc., | |
| Defendant. | |

**KOVE IO, INC.'S RESPONSE TO AMAZON WEB SERVICES, INC.'S
<u>OPENING CLAIM CONSTRUCTION BRIEF</u>**

# TABLE OF CONTENTS

I. THE KOVE PATENTS.........................................................................................................1

II. LEGAL PRINCIPLES OF PATENT CLAIM CONSTRUCTION .................................3

III. ARGUMENT......................................................................................................................4

    A.    "location" ...................................................................................................................4

        1.    "Location" Is Expressly Defined In The Patents. ...........................................5

        2.    AWS's Construction Ignores Express Lexicography, Adds Limitations, And Excludes Preferred Embodiments. ...................................................................8

        3.    AWS's Criticisms Of Kove's Proposed Construction Are Inaccurate. ......10

    B.    "location information" ...........................................................................................12

    C.    "location server" .....................................................................................................13

    D.    "client" ....................................................................................................................16

    E.    "based on a hash function…" ..................................................................................17

        1.    Claim 1 Of The '170 Patent Is Not Indefinite............................................17

        2.    AWS Improperly Imports A Limitation From The Specification Into Its Construction Of "Hash Function Used To Organize" ...................................19

    F.    "hash table"............................................................................................................22

    G.    "data pertaining to the entity"................................................................................23

    H.    "redirect message" .................................................................................................25

IV. CONCLUSION ................................................................................................................25

Appx6433

*Techs., Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098, 1106 (Fed. Cir. 1996) ("[A]ttorney argument cannot control in light of the language of the claim.").

> **b.      The Data's "Location" Is Not Contingent On Whether Such Location Is "Directly" Contacted.**

AWS argues that a "location" must be used to "directly" contact a server to retrieve data. The intrinsic evidence does not support this construction.  In fact, AWS's proposal would *exclude* preferred embodiments, something well-settled claim construction law sternly warns against. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (holding that a claim construction that excludes preferred embodiments is "rarely, if ever, correct").

AWS's own example using the courthouse address illustrates the illogic of its construction. *See* Dkt. 219 at 6.  This Court's address is 219 South Dearborn St., Chicago, IL 60604.  If a person begins at Millennium Park and walks *directly* to 219 South Dearborn St., then the address would meet AWS's construction of "location."  But, if instead of walking directly, the person stops at a gas station to ask for directions on how to get to 219 South Dearborn St., then, according to AWS, the address would no longer qualify as a "location" because it was not used to "directly" reach the Court.  But the location of a thing does not cease to be its location if it is reached indirectly (i.e., with intermediate stops along the way); a location is a characteristic of the thing, regardless of how it is used.  Goodrich Decl., ¶22.[8]  AWS's added limitation of "directly" is illogical, and, as explained below, contrary to what the patent teaches.

The Kove Patents provide multiple examples of a "location," including that it may be an "Internet machine name," a "TCP/IP port number," or an "HTTP Universal Resource Locator

---

for a precise construction, not a vague one.  Dkt. 219, n.2. Notably, AWS's initial proposed construction contained the same language it now seeks to omit. Ex. B, at 1 ("An encoding that…specifies…information used to send a request *for data pertaining to the entity identified by the identifier*." (emphasis added).)

[8] "Goodrich Decl." refers to the Declaration of Michael T. Goodrich, Kove's technical expert, which is filed concurrently herewith.

(URL)." '978 patent, 8:10-13, JA0075; '170 patent, 4:53-57, JA0016.[9] AWS acknowledges that each of these examples are intended to be encompassed within the scope of the claim term "location," and that they are generally understood as "locations" (*e.g.,* a URL is colloquially referred to as a "web address"). Dkt. 219 at 7-8. Yet, AWS's proposed construction would *exclude* these embodiments. Retrieving data specified by a URL, for example, requires sending requests that are passed through multiple intermediate servers, such as routers and gateways. (Goodrich Decl., ¶¶ 15-16.) Like the gas station in the example above, these intermediate servers are "stops" along the way, such that the server containing the sought after information is no longer "directly" contacted.[10] *See Novelaire Techs., L.L.C. v. Munters AB*, No. 13-cv-472 CM, 2013 WL 8508578, at *3 (S.D.N.Y. Nov. 21, 2013) (rejecting reading "directly" into the claims because doing so would exclude disclosed embodiments).

AWS cites to uses of the word "directly" in the Kove Patents as support for its construction (Dkt. 219 at p. 7), but it is clear from those examples (as well as others throughout the patents) that "direct" contact is dependent on context and cannot be imported into the construction without excluding clear examples of "non-direct" contact (e.g., the URL example above). *See* Goodrich Decl., ¶¶ 15-16. Inclusion of this limitation into its construction is improper, particularly where doing so would result in exclusion of preferred embodiment(s). *Vitronics*, 90 F.3d at 1583.

### 3. AWS's Criticisms Of Kove's Proposed Construction Are Inaccurate.

AWS attacks Kove's construction by mischaracterizing it. AWS claims that Kove's construction encompasses information that is not itself a location but is merely used to retrieve the location from a different server. This argument is readily disproven.

---

[9] The sections of the '640/'170 patents and '978 patents from which these examples are taken are entitled "Detailed Description of the Presently *Preferred Embodiments* of the Invention." (emphasis added)

[10] In the case of a URL, there is an additional step that must be taken before even beginning the "trip": a network of computers must be queried to translate the URL into an IP address. *Id.*, ¶¶ 15-16. This is analogous to knowing you are going to a specific place (like this Court), but then having to look up its address before starting the trip there.

10

**IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF ILLINOIS EASTERN DIVISION**

| | |
|---|---|
| Kove IO, Inc., | Civil Action No. 1:18-cv-08175 |
| Plaintiff, | Hon. Rebecca R. Pallmeyer |
| v. | Jury Trial Demanded |
| Amazon Web Services, Inc., | |
| Defendant. | |

## JOINT CLAIM CONSTRUCTION CHART (UPDATED)

Pursuant to Local Patent Rule 4.2(f), Plaintiffs Kove IO, Inc. ("Kove") and Amazon

WebServices, Inc. ("AWS"), respectfully submit this updated Joint Claim Construction Chart

reflecting the parties' agreement on the construction of the term "hash table" that was discussed

during the July 23, 2021 Claim Construction Hearing.

Attached as Exhibit A is a revised table identifying the parties' respective proposed

claim constructions for the remaining disputed terms in connection with the asserted claims of

U.S. Patent Nos. 7,103,640 ("the '640 Patent"), 7,233,978 ("the '978 Patent"), and 7,814,170

("the '170 Patent"), which removes the term "hash table." Attached as Exhibit B is a revised

table identifying the parties' agreed upon constructions, which now includes the term "hash

table."

**EXHIBIT B**
**The Parties' Agreed Upon Constructions for U.S. Patent Nos. 7,103,640 ("the '640 Patent"), 7,233,978 ("the '978 patent"),**
**and 7,814,170 ("the '170 patent")**

| Claim Term/Phrase | The Parties' Agreed Upon Construction |
|---|---|
| **location**<br><br>'978 patent: claims 1, 3, 6, 10, 14, 17, 23-24, 30-31<br><br>'170 patent: claims 1-2, 6, 8, 12, 15<br><br>'640 patent: claims 17-18, 24 | an encoding that is a member of a set of associations with an identifier in a location server, and that specifies where data pertaining to the entity identified by the identifier is stored |
| **identifier/identifier string/identification string**<br><br>'978 patent: claims 1, 10, 14, 17, 30, 31<br><br>'170 patent: claims 1, 6, 15<br><br>'640 patent: claims 17-18 | a unique encoding that identifies an individual entity, and with which zero or more location strings are associated in a location server |
| **hash table**<br><br>'978 patent: claim 6<br><br>'170 patent: claims 2, 12<br><br>'640 patent: claim 24 | a data structure that stores values in a table, where values are stored and retrieved by applying a hash function to an input and using the function result as an index into the table |
| **data location sewer network**<br><br>'640 patent: claim 17 | data location server network |
| **Preamble**<br><br>'978 patent: claim 14 | Preamble after "comprising" limits the claim |
| **Preamble**<br><br>'978 patent: claim 17 | Preamble after "having" limits the claim |

Appx7756

1

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

KOVE IO, INC.,                         )
                                       )
                Plaintiff,             )   Docket No. 18 C 8175
                                       )
        vs.                            )
                                       )
AMAZON WEB SERVICES, INC.,             )   Chicago, Illinois
                                       )   July 23, 2021
                Defendant.             )   9:37 a.m.


TRANSCRIPT OF PROCEEDINGS - Hearing
BEFORE THE HONORABLE CHIEF JUDGE REBECCA R. PALLMEYER

APPEARANCES:

For the Plaintiff:          REICHMAN JORGENSON LEHMAN
                              & FELDBERG LLP
                            BY:  MR. JAIME F. CARDENAS-NAVIA
                                 MS. KHUE HOANG
                            750 3rd Avenue, Suite 2400
                            New York, New York  10017

                            REICHMAN JORGENSEN LEHMAN
                              & FELDBERG LLP
                            BY:  MR. ADAM ADLER
                            1710 Rhode Island Ave. NW, 12th Floor
                            Washington, DC  20036

                            REICHMAN JORGENSEN LEHMAN
                              & FELDBERG LLP
                            BY:  MS. TAYLOR MAUZE
                            100 Marine Parkway, Suite 300
                            Redwood Shores, California  94065

For the Defendant:          FISCH SIGLER LLP
                            BY:  MR. ALAN M. FISCH
                                 MR. R. WILLIAM SIGLER
                                 MR. ADAM ALLGOOD
                                 MS. ELIZABETH BERNARD
                            5301 Wisconsin Avenue NW, Fourth Floor
                            Washington, DC  20015

I also moved the case start time, but I am glad that you are ready to proceed.

I have seen the demonstrative exhibits that were submitted in a Dropbox submission earlier this week and, despite my poor tech skills, had absolutely no trouble opening those and looking at them.  So I appreciate it.

So we are ready to get started whenever you are.

MS. HOANG:  If I may, your Honor?

Kove has prepared a short tutorial.  And if it's okay with your Honor, I would like to share my screen.  There are some animations there that the Court might find illuminating.

THE COURT:  Great.

MS. HOANG:  You should have a hard copy in PDF that leads to this slide.  So if I can get this to work, I will pull up our tutorial.

Is everyone able to see my screen?

THE COURT:  I see it now.

MS. HOANG:  Okay.  Terrific.  All right.  I will keep going.

Good morning, your Honor.

Again, this is Khue Hoang on behalf of Kove IO.

And may it please the Court, this is a technology tutorial that will give a brief overview of the technology of the patents-in-suit in this case.

We wanted to begin with sort of a contextual background of the state of play when the inventors first applied for their patent.

This is the late '90s.  The Internet was barely a decade old.  Digital data, at least relatively speaking, was pretty manageable.  You would store data on CDs, disks, drives.  And single servers or small numbers of servers were generally good enough to get the job done.

You did have to know where to look for your data, and you had to go there to get it.  And it was into this environment that Kove introduced ideas that would revolutionize the way data was stored and retrieved.

Now, even 20 years ago data was growing very quickly.  People still didn't have a solid grasp of just how much and how quickly it would scale.  The cloud was still years away.

But by 1998, the inventors predicted that data would proliferate and grow so fast that storing and retrieving it reliably and efficiently would require a new way of doing things, and they were right.

I found this statistic to be sort of mind-boggling, and it's 11 years old.  But in 2017, the estimate is that there were two zettabytes of data.  That's 21 zeros.  That's about six quadrillion books.  Again, that was a decade ago.  We are up to about 50 zettabytes today, and it's continuing

to compound.

So the three patents that are part of this litigation are all related to one another but in slightly different ways.

The '640 patent, which was the first to debut, is what we call the parent patent.

And the '170 is the child of that parent. It shares an identical set of disclosures, specifications, and figures.

The '978, the third patent, is related as well, and it shares some of the same disclosures, but it also adds additional material.

We have made this little chart to sort of contextualize the relationships among the three patents that are in suit here.

Now, the primary concept of the patent has to do with storing and retrieving data where the location of that data is managed separately from the data itself.

You may recall that it's been a couple years now when the parties argued before the Court at the 101 hearing. Counsel for Kove talked about this idea, using the phrase "separating the what from the where."

And this figure in the patent, which is common to all three patents, uses a high-level idea of what that looks like.

It talks about an architecture where the data associated with particular applications can be managed and obtained independently of the data itself.

You can see that in this figure where the data is represented by the orange canister in the lower right, the repository; and the location server, which manages the location of that data, is depicted as that blue cloud.

We are going to get into more detail on those relationships and what's inside that cloud in the next few slides.

And just as a high-level starting point, I wanted to put up here a representative claim. This is Claim 1 from the '170 patent.

And again, for a high-level context, you can see that the claim claims, "A system for managing data stored in a distributed network."

There are two primary elements with subelements.

The primary elements talk about a data repository, which is that yellow canister -- or orange canister; and, separately, a data location server network. That's the blue cloud.

Now we are going to dive a little bit deeper into what each of those means.

We thought it would be helpful to just use an example, and we are going to use a fellow by the name of

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **KOVE IO, INC.,** )<br><br>        **Plaintiff,** )<br>  )<br>    **v.** )<br>  )<br>**AMAZON WEB SERVICES, INC.** )<br>  )<br>        **Defendant.** ) | **No. 18 C 8175**<br><br>**Judge Rebecca R. Pallmeyer** |

**MEMORANDUM OPINION AND ORDER**

In an era when data collections grow rapidly, an effective data storage system must store not only data itself but also information about where to find that data. Historically, a storage-system user seeking particular data would send a request to a single, centralized server, and the server would return only data that was stored on that server. As the quantity of data produced each day increased, the number of servers necessary to store the data increased as well. Distributed-data-storage systems increased the amount of available data storage by connecting multiple servers, but storing the corresponding information about where all the data was located proved challenging. Early systems were inefficient in that they required a user seeking particular data to query every server in the network to find that data. The three patents in suit aim to solve this problem by separating the "what" (the data itself) from the "where" (information about the location of the data). To retrieve data, a client first requests the location of data from a location server and then retrieves that data from the appropriate data server. Multiple data servers and multiple location servers can be connected in a network.

Plaintiff Kove IO, Inc. ("Kove") is a Delaware corporation with its principal place of business in Chicago, Illinois. (Compl. [1] ¶ 6.) Kove is the owner of the three patents in suit: U.S. Patent Nos. 7,103,640 ("the '640 Patent"), 7,814,170 ("the '170 Patent"), and 7,233,978 ("the '978 Patent"). (*Id*. ¶ 5.) John Overton, Kove's Chief Executive Officer, and Stephen Bailey are the named inventors. (*Id.*) Kove has sued Defendant Amazon Web Services, Inc. ("AWS") for

infringement of all three patents. AWS is a Delaware corporation registered to do business in Illinois. (*Id*. ¶ 7.) The patents in suit disclose a distributed-data-storage technology that can be used for large-scale cloud storage. Kove has specifically identified two accused products: the Amazon S3 and the DynamoDB, which allow users to store data in the cloud. (*Id*. ¶¶ 27–28.) AWS has asserted numerous affirmative defenses and counterclaims, including counterclaims for declaratory judgment that each patent is invalid and not infringed. (*See* Answer and Counterclaims [129] at 37–54.)

The merits of these claims and defenses may turn on the interpretations of the disputed claim terms. The court held a claim construction hearing by videoconference on July 23, 2021, and now addresses construction of the following disputed terms: "location information," "location server," "client," "based on a hash function used to organize the data location information across the plurality of data location servers . . . based on the hash function applied to the identifier string," and "data pertaining to the entity." (*See* Proposed Constructions, Ex. A to Updated Joint Claim Construction Chart [382] (hereinafter "Cl. Constr. Chart").)[1]

## **BACKGROUND**

The inventions disclosed in the '640 and '170 Patents "relate[ ] generally to the storage and retrieval of information, and in particular, to a protocol for dynamic and spontaneous global search and retrieval of information across a distributed network regardless of the data format." ('170 Patent, 1:30–33, Joint Appendix [221] at JA0015; '640 Patent, 1:26–30, JA0040.) The '170 Patent is a continuation of the '640 Patent, meaning that the '640 Patent is the "parent" patent and the '170 Patent is the "child" patent. (*See* '170 Patent, 1:6–9, JA0015.) The two patents share the same specification and drawings. The '640 and '170 Patents claim systems for managing or retrieving data stored in a distributed network and/or methods of operating such

---

[1] The parties report that they resolved their disputes about the following terms: "location," "identifier/identifier string/identification string," "hash table," "data location sewer [sic] network," and the preambles to claims 14 and 17 of the '978 patent. (*See* Agreed Upon Constructions, Ex. B to Cl. Constr. Chart.)

systems. The specification explains that the inventions disclose "an architecture in which information about where data associated with particular application entities can be managed and obtained independently of the data itself." ('170 Patent, 3:15–18, JA0016; '640 Patent, 3:15–18, JA0041.)

The preferred embodiment of the inventions is referred to as a "network distributed tracking protocol" or "NDTP." ('170 Patent, 4:9–10, JA0016.) Figure 11 of the '640 and '170 Patents illustrates at a high level how the protocol works. (*See* '170 Patent, Fig. 11, JA0013; '640 Patent, Fig. 11, JA0038.)[2] A "client" (112) queries one or more location servers in the "NDTP server constellation" (110), seeking information about the location of data. An NDTP server responds to the query by providing location information, and the client uses that location information to retrieve the desired data from a "repository" (114). (*See, e.g.*, '170 Patent, 16:58–65, 17:3–9, JA0022–23.)



Fig. 11    NDTP Server Constellation Context

More specifically, an entity's "identifier" is mapped to "locations" of repositories containing data pertaining to that entity. (*See, e.g.*, '170 Patent, 2:42–43, 4:8–26, JA0015, JA0016.) Particular "identifier/location mappings" are stored in "location servers" separately from the data itself. (*Id.*)

---

[2]    The '978 Patent, discussed below, contains a similar figure. (*See* '978 Patent, Fig. 18, JA0067.)

3

The '640 and '170 Patents define "client" as "a network-attached component that initiates update or lookup of identifier/location mappings from an NDTP server with NDTP request messages." ('170 Patent, 4:14–17, JA0016; '640 Patent, 4:11–14, JA0041.)  In turn, an "NDTP server" is defined as "a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to NDTP request messages from NDTP clients."  ('170 Patent, 4:17–20, JA0016; '640 Patent, 4:14–18, JA0041.)

For example, suppose a doctor wants to request all medical records pertaining to a particular patient.  That patient is an "entity" who is identified by an "identifier," such as a Social Security number.  The patient's records are "data," and the whereabouts of that data are "locations."  A patient's data are associated with the patient's identifier, and the identifier is mapped to data locations.  These identifier/location mappings are stored on one or more "location servers."  A doctor can use a "client" to access patient data by querying one or more location servers with a patient's identifier.  The location server will return location information for data pertaining to the patient, and the doctor can then use that location information to retrieve the patient data from wherever it is stored.  (*See, e.g.*, '170 Patent, 2:14–26, 4:8–26.)  From the doctor's perspective, the process of requesting data and receiving that data is seamless, and the doctor may not perceive the intermediate step involving a location server.

Sometimes, a particular location server will not contain the necessary location information for the desired data.  Querying every location server in the network would be inefficient, if not impossible, as the network grows to include many location servers.  The inventions anticipate this problem and offer a solution, illustrated in Figure 12 of the '640 and '170 Patents.  (*See* '170 Patent, Fig. 12, JA0013; '640 Patent, Fig. 12, JA0038.)

4



*Fig. 12*                     NDTP Client-Centric Constellation

A client sends a request (arrow 1) to a location server (120a). If the first location server does not contain location information mapped to an entity's identifier, it will respond with a redirect message (arrow 2). The redirect message informs the client that the first location server did not contain the relevant location information, and it specifies a second location server that does contain such relevant location information. The client then queries (arrow 3) the second location server (120b), which returns the location information to the client.

The '978 Patent is a continuation-in-part of the '640 Patent. (*See* '978 Patent, 1:9–16, JA0072.) The '978 Patent "relates generally to the storage and retrieval of information, and in particular, to a system and method for managing global search and retrieval of information across a network." (*Id*.) It builds off the '640 Patent by addressing the challenge of "scaling system capabilities in a manner sufficient to handle variable demand for resources" in a networked environment. (*Id*. at 2:11–13.) The specification explains that a redirect mechanism "permit[s] the distribution of identifiers to location mappings across members of an NDTP server cluster," which consists of multiple location servers. (*Id*. at 15:53–55, JA0079.) "An advantage of distributing an NDTP server data set across independent mechanisms is that both capacity and transaction rate scale can be increased." (*Id*. at 15:55–57.) The specification further explains that sets of identifier/location mappings can be transferred from one location server to another, as shown in Figure 22. (*See id.* at Fig. 22, JA0069.)

5



In this illustration, Set B of identifier/location mappings (144) is originally stored on Server 1. If needed (for example, based on a performance criterion, such as Server 1's capacity), Set B could be transferred to a new location (148) on Server 2. The '978 Patent claims a system of multiple location servers for managing location information and providing location information in response to location queries, as well as methods of operating such systems.

Below, the court reproduces representative claims of the patents in suit.

## A. The '640 Patent

The '640 Patent is titled "Network Distributed Tracking Wire Transfer Protocol." Claim 18 of the '640 Patent, an independent claim, recites:

> A system for retrieving data location information for data stored in a distributed network, the system comprising:
>
> > a data repository configured to store data, wherein the data is associated with an identifier string;
> >
> > a client responsive to a data query to query a data location server for location information associated with the identifier string;
> >
> > a data location server network comprising a plurality of data location servers, at least one of the plurality of data location servers containing location information associated with the identifier string, wherein each of the plurality of data location servers comprises computer executable code configured to execute the following steps in response to receiving a data location request from the client:
> >
> > if the data location server contains the location string associated with the identification string provided in the data location request, the data location

6

> server transmits location information for use by the client to calculate a location of the data associated with the identification string;
>
> if the data location server does not contain the location string associated with the identifier string, the location server transmits a redirect message to the client, wherein the redirect message contains redirect information for use by the client to calculate a location of a different data location server in the plurality of data location servers, wherein the different data location server contains the location string.

('640 Patent, 22:41–23:2, JA0050–51.)  Dependent Claim 24 of the '640 Patent recites:

> The system of claim 18, wherein the location information comprises a portion of a hash table distributed over the plurality of data location servers.

(*Id.* at 24:5–7, JA0051.)[3]

## B.  The '170 Patent

The '170 Patent, like the '640 Patent, is titled "Network Distributed Tracking Wire Transfer Protocol."  Claim 1 of the '170 Patent, an independent claim, recites:

> A system for managing data stored in a distributed network, the system comprising:
>
> a data repository configured to store a data entity, wherein an identifier string identifies the data entity; and
>
> a data location server network comprising a plurality of data location servers, wherein data location information for a plurality of data entities is stored in the data location server network,
>
> > at least one of the plurality of data location servers includes location information associated with the identifier string,
> >
> > each one of the plurality of data location servers comprises a processor and a portion of the data location information,
> >
> > the portion of the data location information included in a corresponding one of the data location servers is based on a hash function used to organize the data location information across the plurality of data location servers,

---

[3]    The parties agree to the following construction of the term "hash table": "a data structure that stores values in a table, where values are stored and retrieved by applying a hash function to an input and using the function result as an index into the table."  (Agreed Upon Constructions, Ex. B to Cl. Constr. Chart.)   *See infra* Part E.  The court discusses hash functions below.  *See infra* Part D.

> and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string.

('170 Patent, 20:58–21:10, JA0024–25.)  Dependent Claim 5 of the '170 Patent recites:

> The system of claim 1, wherein the location information includes a hash table and the hash table includes an association between a hash of the string identifier and at least one identifier of the at least one of the plurality of data location servers.

(*Id*. at 21:39–43, JA0025.)  Claim 15 of the '170 Patent, another independent claim, recites:

> A method of handling location queries in a network, the network comprising a plurality of location servers including data location information, the method comprising:
>
>> correlating each one of a plurality of identifiers with at least one of a plurality of locations in the network, each one of the plurality of identifiers identifying a respective one of a plurality of data entities, wherein the data entities are stored in corresponding locations in the network;
>>
>> receiving a location query from a client at one of the plurality of location servers, the location query requesting location information identifying a location of a data entity included in the data entities;
>>
>> determining which of the plurality of location servers includes the location information;
>>
>> sending a location response message to the client in response to determining the one of the plurality of location servers includes the location information, the location response message comprising the location information; and
>>
>> sending a redirect message to the client in response to determining the one of the plurality of location servers fails to include the location information, the redirect message identifying which of the plurality of location servers includes the location information.

(*Id.* at 22:25–48, JA0025.)

## C.  The '978 Patent

The '978 Patent is titled "Method and Apparatus for Managing Location Information in a Network Separate from the Data to Which the Location Information Pertains."  Claim 1 of the '978 Patent, an independent claim, recites:

> A system having a plurality of location servers for managing location information and providing location information to location queries, the system comprising:

8

Appx10950

a first location server containing a first set of location information corresponding to at least one entity, the location information comprising an identifier and at least one location string associated with the identifier, wherein the identifier identifies an entity and the location string specifies a location of data pertaining to the entity[;]

a second location server comprising a second set of location information, wherein at least a portion of the second set of location information differs from the first set of location information; and

programming logic stored on each of the location servers responsive to a location query identifying a desired entity to return a location message, the location message comprising at least one location of data pertaining to the desired entity, if the location server receiving the location query contains location information for the desired entity.

('978 Patent, 25:24–44, JA0084.) Claim 17 of the '978 Patent, another independent claim, recites:

A method of scaling at least one of capacity and transaction rate capability in a location server in a system having a plurality of location servers for storing and retrieving location information, wherein each of the plurality of location servers stores unique set of location information of an aggregate set of location information, the method comprising:

providing a transfer protocol configured to transport identifier and location information, the location information specifying the location of information related to the identifier;

storing location information formatted according to the transfer protocol at a first location server;

receiving an identifier and a location relevant to the identifier at the first location server;

storing the received location in a location store at the first data location server, the location store comprising a plurality of identifiers, each identifier associated with at least one location, wherein the received location is associated with the received identifier in the location store; and

transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit.

(*Id.* at 27:19–43, JA0085.)

## LEGAL STANDARD

A patent's claims define the scope of the invention and the patentee's right to exclude.

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc). Where the meaning of a

9

claim is disputed, the court must determine its proper construction as a matter of law. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996). In construing a claim term, the court "look[s] to the words of the claim itself." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1361 (Fed. Cir. 2013). As a rule, courts should give claim terms their "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312–13 (internal quotation marks omitted). "[T]he person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313.

Sometimes, a term's ordinary meaning is equally apparent to a lay person as to a person of ordinary skill in the art ("POSITA"). *See id.* at 1314. In that circumstance, claim construction entails "little more than the application of the widely accepted meaning of commonly understood words." *Id.* "[G]eneral purpose dictionaries may be helpful" for that exercise. *Id.* If a claim term "does not have an ordinary meaning, and its meaning is not clear from a plain reading of the claim," the court should look to other sources of intrinsic evidence for guidance. *Power Integrations*, 711 F.3d at 1361; *see also Phillips*, 415 F.3d at 1314–19. The patent's specification "is the single best guide to the meaning of a disputed term." *Power Integrations*, 711 F.3d at 1361 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *see also Phillips*, 415 F.3d at 1315. The specification must include a "full, clear, concise, and exact" description of the claimed invention. *Phillips*, 415 F.3d at 1316 (quoting 35 U.S.C. § 112). If the specification reveals that the inventor has given a claim term a "special definition" that "differs from the meaning it would otherwise possess," the "inventor's lexicography governs." *Id.* at 1316. The same is true if the specification shows that the inventor has limited the scope of the term. *See id.* Often, the specification "describes very specific embodiments of the invention." *Id.* at 1323. But the Federal Circuit has "repeatedly warned against confining the claims to those embodiments." *Id.*

The prosecution history is another helpful source of intrinsic evidence. *See id.* at 1317. The prosecution history "consists of the complete record of the proceedings before the [Patent and Trademark Office] and includes the prior art cited during the examination of the patent." *Id.* Because the prosecution history "represents an ongoing negotiation between the PTO and the applicant," however, "it often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* Finally, in some circumstances the court is permitted to consider extrinsic evidence, so long as it is not used to contradict claim language that is "unambiguous in light of the intrinsic evidence." *Id.* at 1318–19, 1324; *see also Vitronics Corp.*, 90 F.3d at 1583. Extrinsic evidence, which can include expert and inventor testimony, technical dictionaries, and treatises, is generally thought "less reliable than the patent and its prosecution history in determining how to read claim terms." *Phillips*, 415 F.3d at 1317, 1318.

## **DISCUSSION**

The parties' disputes have narrowed over time. First, the parties have agreed upon the proper construction of the term "location": "an encoding that is a member of a set of associations with an identifier in a location server, and that specifies where data pertaining to the entity identified by the identifier is stored." (Agreed Upon Constructions, Ex. B to Cl. Constr. Chart.) They also agree that the terms "identifier," "identifier string," and "identification string" all mean "a unique encoding that identifies an individual entity, and with which zero or more location strings are associated in a location server." (*Id.*) Kove has withdrawn its proposed construction of the term "redirect message" and agrees with AWS that it does not require construction. (*See* Kove Cl. Constr. Resp. [247] at 25.) There are no remaining disputes about definiteness. (*See* Cl. Constr. Hr'g [477] 17:7–11.) After the claim construction hearing, the parties informed the court that they have agreed upon the following construction of "hash table": "a data structure that stores values in a table, where values are stored and retrieved by applying a hash function to an input and using the function result as an index into the table." (Agreed Upon Constructions, Ex. B to Cl. Constr. Chart.) The court will now address the remaining disputed terms.

11

A.  "Location information"

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "location information"<br><br>'978 Patent: Claims 1, 3, 6, 10, 14, 17, 31<br><br>'170 Patent: Claims 1–2, 6, 8, 15<br><br>'640 Patent: Claims 17–18, 24 | '978: "one or more identifiers and their associated locations"<br><br>'170/'640: "information pertaining to one or more locations of data and/or the identities of one or more location servers" | '978/'170/'640: "one or more identifiers and their associated locations" |

AWS argues that the term "location information" should have the same meaning in all three patents in suit: "one or more identifiers and their associated locations." For support, AWS points to two canons of claim construction: first, that courts should give claim terms their ordinary and customary meaning, *see Phillips*, 415 F.3d at 1312–13; and second, that the same terms in related patents should be construed in the same way, *see Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1334 (Fed. Cir. 2003). Claim 1 of the '978 Patent recites that "the location information compris[es] an identifier and at least one location string associated with the identifier." ('978 Patent, 25:28–30, JA0084.) Based on this definitional language and similar usage of the term "location information" throughout the '978 Patent, the parties agree that "location information" means (at least in the '978 Patent) "one or more identifiers and their associated locations." (*Id.*; *see also id.* at 2:21–28, 2:38–42, 4:55–57, 8:17–22, JA0072, JA0075.)[4] The '640 and '170 Patents lack this definitional language contained in Claim 1 of the '978 Patent—in fact, their specification does not use the term "location information" at all—but AWS argues that "location

---

[4]     As discussed above, if a patent's specification reveals that the inventor has given a claim term a "special definition" that "differs from the meaning it would otherwise possess," the "inventor's lexicography governs." *Phillips*, 415 F.3d at 1316. It is not clear to the court whether a claim, as opposed to an earlier part of a specification, can supply a definition for the purpose of the lexicography rule. The parties nevertheless apply this rule to the quasi-definitional language recited in Claim 1. (*See* Kove Cl. Constr. Resp. at 12; AWS Cl. Constr. Br. [219] at 9.).

information" should be construed the same way in all three patents because they are all related. (*See* AWS Cl. Constr. Br. [219] at 10.)

Kove agrees with AWS's proposed construction of "location information" in the '978 Patent, but Kove contends that the term should be construed differently in the '640 and '170 Patents. To reiterate, the '640 Patent is the "parent" patent, the '170 Patent is the "child" patent, and the '978 Patent is a continuation-in-part of the '640 Patent. The '640 Patent and the '170 Patent share the same specification, while the '978 Patent has a different specification. Kove's proposed construction of "location information" for the '640 and '170 Patents is broader: "information pertaining to one or more locations of data and/or the identities of one or more location servers." According to Kove, the '640 and '170 Patents contemplate two types of "location information": (1) the location of data stored in a distributed system, and (2) the identity of the location server that stores a particular data location, or "the location of the location." (Kove Cl. Constr. Resp. at 12.) AWS's proposed construction would cover only the first type of location information, not the second.

Kove points to intrinsic evidence in support of its broader construction. Claim 1 of the '170 Patent, an independent claim, uses the phrase "*data* location information," which Kove suggests refers specifically to the first type of location information. (*Id*. (emphasis in original).) Elsewhere in the same claim, the '170 Patent refers to "location information," which arguably has a broader meaning encompassing both types of location information. (*See* '170 Patent, 20:66, JA0024.) By way of illustration, dependent Claim 5 of the '170 Patent states:

> The system of claim 1, wherein the *location information includes* a hash table and the hash table includes an association between a hash of the string identifier and *at least one identifier of the at least one of the plurality of data location servers*.

('170 Patent, 21:26–30, JA0025 (emphases added).) Kove argues that the use of "location information" in Claim 5 refers to the second type, or the "location of the location." And because Claim 5 depends on Claim 1, the reference to "location information" in Claim 1 must encompass both types of location information.

13

At the claim construction hearing, Kove clarified that the second type of location information includes "redirect information." (*See* Kove Cl. Constr. Presentation at 7.) In other words, the second type of location information includes information about where to look for the desired data when the first location server does not contain that data. Kove points out that the specification of the '640 and '170 Patents describes the embodiment that is encompassed by Claim 5 of the '170 Patent, whereas the '978 Patent does not contain intrinsic evidence supporting this broader construction. (*See* '170 Patent, 14:42–16:30, JA0021–22.) Accordingly, Kove contends, the court may construe the term "location information" differently in the '640 and '170 Patents than in the '978 Patent.

AWS responds that Kove's proposed construction for the '640 and '170 Patents "would allow Kove to expand its monopoly beyond what's claimed, as 'location information' wouldn't need to include a 'location' at all." (AWS Cl. Constr. Reply [262] at 1.) From AWS's perspective, redirect messages are a separate issue not relevant to the construction of "location information." AWS points to the doctrine of claim differentiation. (*Id.* at 6 & n.20.) As relevant here, that doctrine provides that "the presence of a dependent claim that adds a particular limitation raises a presumption that the limitation in question is not found in the independent claim." *See Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) (alteration omitted). "That presumption is especially strong when the limitation in dispute is the only meaningful difference between an independent and dependent claim, and one party is urging that the limitation in the dependent claim should be read into the independent claim." *SunRace Roots Enter. Co., Ltd. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003). According to AWS, claim differentiation dictates that a limitation in dependent Claim 5 of the '170 Patent does not apply to independent Claim 1. AWS also notes that Kove's construction is broader than Claim 5 itself, which contemplates a "hash table" with "an association between a hash of the string identifier" and "data location servers." (AWS Cl. Constr. Reply at 6 (quoting '170 Patent, 21:26–30, JA0025).) Claim 5 is also not one of the claims asserted in this litigation. Furthermore, AWS argues, Kove has not identified similar

14

claim language in the '640 Patent, so it is unclear why language from a dependent claim in the '170 Patent should inform the construction of a term in the '640 Patent.

Kove argues that to the extent there is a presumption that the same terms in related patents should be construed in the same way, that presumption is overcome here. *See IP Innovation v. Sony Elecs.*, No. 04 C 6388, 2005 WL 2035578, at *1, 5–7 (N.D. Ill. Aug. 18, 2005) (concluding that a claim term had a different meaning in a continuation-in-part patent than in the parent patent). Kove further argues that *Omega Engineering* is distinguishable because, in that case, the "patentee made a clear and unmistakable disclaimer of claim scope in its prosecution of the parent [ ] patent." *Omega Eng'g*, 334 F.3d at 1334. AWS has cited no such prosecution disclaimer here. *NTP, Inc. v. Research in Motion, Ltd.* is similarly distinguishable, Kove argues, because the related patents in that case all "contain[ed] the same written descriptions." *See NTP, Inc. v. Rsch. in Motion, Ltd.*, 418 F.3d 1282, 1289, 1293 (Fed. Cir. 2005). The '978 Patent, once again, has a different specification than the '640 and '170 Patents. And Kove's construction conforms to the principles of claim differentiation, it contends, because usages of "location information" in independent claims encompass the narrower usages of "location information" in dependent claims. (Kove Cl. Constr. Presentation at 22.)

The court agrees with Kove's proposed construction of "location information." As a preliminary matter, the court is not convinced by AWS's "plain meaning" argument for reading the term narrowly. (*See* AWS Cl. Constr. Br. at 9–10; AWS Cl. Constr. Reply at 5 & n.15.) AWS offers the analogy of a lawyer who calls chambers to ask where an upcoming hearing will occur. According to AWS, that lawyer is seeking the location of the hearing (presumably a courtroom number), not merely information "pertaining" to that location. But AWS does not explain why the precise piece of information that the lawyer *ultimately* seeks should narrow the scope of the category "location information." Even if the best the clerk can do is to tell the lawyer to visit a specific whiteboard in the building's lobby, which in turn will inform the lawyer of the courtroom number, the lawyer has still obtained location information from the clerk. The location information

15

has simply taken the form of an intermediate step—"the location of the location"—as Kove's construction contemplates.

As the court understands AWS's position, AWS believes that a narrower definition of a claim term should be imported from a continuation-in-part patent (here, the '978 Patent) to the parent patent (the '640 Patent). The court disagrees. *Omega Engineering* involved the reverse: in that case, the Federal Circuit applied a prosecution disclaimer from a parent patent to a continuation-in-part patent. *See Omega Eng'g*, 334 F.3d at 1333–34 ("[T]hat the '678 patent is a continuation-in-part of the '880 patent does not shield it from narrowing disclaimers made during the prosecution of a parent application.").[5] The opinion says nothing about applying a claim limitation from a continuation-in-part patent back to the parent patent. Moreover, AWS has not identified a prosecution disclaimer for the scope of the term "location information" in any of the patents in suit. By contrast, the patentee in *Omega Engineering* "made a clear and unmistakable disclaimer of claim scope in its prosecution of the parent '880 patent," leading the court to "presume, unless otherwise compelled, that the same claim term in the same patent or related patents carries the same construed meaning." *Id*. at 1334.

The district court in *IP Innovation* derived the same principle from *Omega Engineering*. *See IP Innovation*, 2005 WL 2035578, at *2 ("[I]f the inventor unequivocally disavowed a particular meaning to obtain the patent or otherwise limited the scope of the invention during the course of the prosecution, 'the doctrine of prosecution disclaimer attaches and narrows the ordinary

---

[5] In its reply brief, AWS similarly relies on *NTP, Inc.*, 418 F.3d at 1293 (observing that when patents "derive from the same parent application and share many common terms, we must interpret the claims consistently across all asserted patents"). (*See* AWS Cl. Constr. Reply at 4 n.14.) But as in *Omega Engineering*, the context of the cited passage in *NTP* makes clear that the court was referring to prosecution disclaimers that limit the scope of related patents. *See NTP, Inc.*, 418 F.3d at 1293 (citing *Microsoft Corp. v. Multi–Tech Sys., Inc.*, 357 F.3d 1340, 1350 (Fed. Cir. 2004) (holding that statements made in prosecution of one patent are relevant to the scope of all sibling patents); *Laitram Corp. v. Morehouse Indus., Inc.*,143 F.3d 1456, 1460 & n.2 (Fed. Cir. 1998) (noting that it was proper to consider the prosecution histories of two related re-examination patents originating from the same parent to determine the meaning of a term used in both patents)).

meaning of the claim congruent with the scope of the surrender.'" (quoting *Omega Eng'g*, 334 F.3d at 1324)).  In *IP Innovation*, the district court gave different constructions to the same term in two related patents where the parent patent incorporated a prosecution disclaimer but the continuation-in-part patent contained significant differences in its specification.  *Id.* at \*6–7.  The court acknowledged that there was a presumption "that a claim term carries the same meaning throughout a particular patent and related patents, including a continuation-in-part."  *Id.* at \*7 (citing *Omega Eng'g*, 334 F.3d at 1334).  "But this presumption may be overcome by evidence that the patentee clearly assigned different meanings to a term that appears in two related patents," such as a different specification for the continuation-in-part patent.  *Id.*  Here, Kove has identified enough intrinsic evidence in the '170 Patent to suggest that the claims contemplate two different types of location information.  And because the '170 Patent and '640 Patent share the same specification, it is appropriate to apply this broader construction to both patents.

At the claim construction hearing, AWS argued that the court should instead consider how "location information" is used in independent Claim 15 of the '170 Patent.  (*See* AWS Cl. Constr. Presentation at 23.)  Unlike Claim 5, Claim 15 is asserted in this litigation.  Kove responded that whether a particular claim is being asserted in an infringement action is irrelevant for claim construction purposes.  (Cl. Constr. Hr'g 34:8–12.)  Neither party has directed the court to case law resolving this issue.  Regardless, Claim 15 recites in relevant part:

> A method of handling location queries in a network . . . the method comprising: . . . sending a location response message to the client in response to determining the one of the plurality of location servers includes the location information, *the location response messages comprising the location information*; and sending a redirect message to the client in response to determining the one of the plurality of location servers fails to include the location information, *the redirect message identifying which of the plurality of location servers includes the location information*.

('170 Patent, 22:25–43, JA0025 (emphasis added).)  Claim 15 uses the term "location information" when describing the contents of location response messages (which contain the exact location of data).  But it does not use the term "location information" when describing the contents of redirect messages (which identify the server that contains the exact location of data).  AWS therefore

17

contends that Claim 15 favors its construction of "location information," which is limited to the exact location of data. But Kove's proposed construction is not inconsistent with Claim 15. Through the inclusive "and/or" term, Kove's construction allows for "location information" to mean the exact location of data, the identity of the server(s) containing the exact location, or both the exact location and the identity of the server(s) containing it. It is true that Claim 15 tracks most closely with the first of these options, but that does not nullify the other usages of "location information" in the '640 and '170 Patents.

In their claim construction briefing, neither party has identified claims in the '640 Patent that might support their proposed constructions. The court itself observes that one of the asserted claims, independent Claim 18, claims "[a] system for retrieving data location information." ('640 Patent, 22:41–23:2, JA0050–51.) In turn, dependent Claim 24 recites: "The system of claim 18, wherein the *location information comprises a portion of a hash table* distributed over the plurality of data location servers." ('640 Patent, 24:5–7, JA0051 (emphasis added).) As the court reads that language, it lends support to Kove's construction of "location information": Claim 24 seems to contemplate that "location information" will include not only the exact location of data, but also "information pertaining to the one or more locations of data," such as a hash table.

The court shares AWS's concern that the use of two different constructions for the same term could be confusing for the jury. But AWS's construction would also be problematic in that it ignores differences between the specification of the '640 and '170 Patents and the specification of the '978 Patent. The court also rejects AWS's argument that Kove's construction violates the doctrine of claim differentiation with respect to Claims 1 and 5 of the '170 Patent. Kove's construction does not, as AWS seems to contend, import a limitation from a dependent claim to an independent claim. "[I]independent claims are presumed to have broader scope than their dependents." *Acumed*, 483 F.3d at 806. It follows that the category of "location information" recited in Claim 1 encompasses the more specific type of "location information" referenced in Claim 5. In other words, "location information" includes not only the location of data stored in a

18

distributed system, but also "information pertaining to . . . the identities of one or more location servers." (Cl. Constr. Chart at 1.)

The court adopts Kove's proposed construction of "location information."

## B. "Location server"

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "location server"<br><br>'978 Patent: Claims 1, 3, 6, 10, 14, 17, 23, 30, 31<br><br>'170 Patent: Claims 1, 6, 8, 12, 15<br><br>'640 Patent: Claims 17, 18, 24 | "a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to *location* request messages from clients" | "a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to *NDTP* request messages from clients" |

The parties generally agree as to the proper construction of "location server": "a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to [ ] request messages from clients." The only difference in their proposed constructions is that Kove prefers "*location* request messages," while AWS would use "*NDTP* request messages."[6] As a reminder, NDTP is short for "network distributed tracking protocol," the preferred embodiment of the patents in suit. (*See, e.g.*, '170 Patent, 4:9–10, JA0016.)

AWS argues that its construction matches the precise wording of the '978 Patent's specification: "An 'NDTP server' or a 'server' is a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to NDTP request messages from clients." ('978 Patent, 4:34–38, JA0073; *see also* '170 Patent, 4:17–20, JA0016; '640 Patent, 4:14–18, JA0041.) According to AWS, Kove's construction unnecessarily replaces "NDTP" with "location," which "would invite further disputes as the case moves forward." (AWS

---

[6] AWS has withdrawn its request for a construction specifying that a "location server" "does not store data to which locations pertain." (AWS Cl. Constr. Reply at 7 n.21.)

19

Cl. Constr. Reply at 7.) At the hearing, AWS pointed to *Martek Biosciences Corp. v. Nutrinova* for the proposition that "[w]hen a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls." 579 F.3d 1363, 1381 (Fed. Cir. 2009) (citing *Phillips*, 415 F.3d at 1321). AWS also notes that Dr. Michael T. Goodrich, Kove's expert witness, testified at his deposition that he could explain "NDTP" to a jury. (*See* Goodrich Dep. 82:22–83:4, Ex. 3 to AWS's Cl. Constr. Reply [262-1].)[7]

Kove responds that the terms "NDTP server" and "location server" are used interchangeably in the specifications, but only "location server" appears in the claims themselves. (Kove Cl. Constr. Resp. at 6 n.6). Kove acknowledges that an NDTP server is functionally the same as a location server, and that "NDTP request messages" are therefore synonymous with "location request messages." Still, Kove contends, the claims refer to a "location query" rather than an "NDTP query." (Kove Cl. Constr. Sur-Reply [265] at 5 & n.3.) And Kove contends that using "NDTP" could confuse the jury. (*See id.* at 5.) Because NDTP is "not a term of art and has no plain meaning," use of that term would counterproductively require further construction in order for a POSITA or a juror to make sense of it. (*Id*. at 5 (citing *Ignite USA, LLC v. Pac. Mkt. Int'l, LLC*, No. 09 C 03339, 2018 WL 2412375, at *6 (N.D. Ill. May 5, 2018) ("The purpose of claim construction is to help clarify the scope of the claims, not to add further confusion.")).)

The court agrees with Kove's proposed construction for three reasons. First, now that the parties have agreed upon the construction of "location," AWS's concerns about further disputes over the term "location request messages" seem unwarranted. (*See* Agreed Upon Constructions, Ex. B to Cl. Constr. Chart.) Second, the court agrees with Kove that the jury could be unnecessarily confused by the use of "NDTP" in AWS's proposed construction of "location server."

---

[7] Dr. Goodrich went on to say, however, that NDTP "is synonymous with location as an adjective, because NDTP server is synonymous with location server." (Goodrich Dep. 83:22–84:2.) Similarly, he believes that "a [POSITA] would understand that NDTP server in this express definition is synonymous with location server. And so the appropriate thing, since location server is the claim term, is to continue using that adjective throughout the definition rather than introducing NDTP from a preferred embodiment into the claim." (*Id*. at 84:20–85:5.)

20

Viewing the patents in light of their specifications, a POSITA would understand the term "NDTP request messages" as synonymous with "location request messages," so a more straightforward construction is preferable. Finally, the specifications describe NDTP as a preferred embodiment, not the only embodiment, so despite the fact that the terms appear to be largely synonymous, it would be improper to limit the construction of "location server" with the use of "NDTP." *See, e.g., Martek*, 579 F.3d at 1381 ("[P]articular embodiments appearing in the written description will not be used to limit claim language that has broader effect." (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed. Cir. 2004))).

The court adopts Kove's proposed construction of "location server."

## C. "Client"

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "client"<br><br>'978 Patent: Claim 14<br><br>'170 Patent: Claim 15<br><br>'640 Patent: Claims 17–18, 24 | "a network-attached component that initiates update or lookup of identifier/location mappings from a ***location*** server with ***location*** request messages" | Plain and ordinary meaning or, in the alternative:<br><br>"a network-attached component that initiates update or lookup of identifier/location mappings from a ***NDTP*** server with ***NDTP*** request messages" |

AWS contends that the claim term "client" needs no construction, such that the jury may refer to its plain and ordinary meaning. If the court determines that the term requires construction, AWS argues in the alternative that "client" be construed as "a network-attached component that initiates update or lookup of identifier/location mappings from a NDTP server with NDTP request messages." This construction comes from the express definition of "NDTP client" or "client" in the specifications. (*See* '170 Patent, 4:14–17, JA0016; '640 Patent, 4:11–14, JA0041; '978 Patent, 4:30–34, JA0073.)[8] As with the term "location server," the parties generally agree on the proper

---

[8] The '978 Patent's definition of "NDTP client" or "client" differs slightly: "a network-attached component that initiates *add, delete, lookup and update* of identifier/location mappings . . . ." ('978 Patent, 4:30–34, JA0073 (emphasis added).) Dr. Goodrich, Kove's expert,

construction of "client" with one exception: AWS prefers to use the modifier "NDTP" before "server" and "request messages," while Kove would use "location."

The court agrees with Kove that the term "client" requires construction. In ordinary speech, the word "client" could refer to "a person who engages the professional advice or services of another," such as an attorney's client; "one that is under the protection of another," such as a nation state; or "a computer in a network that uses the services provided by a server."[9] One of the inventors similarly testified that "client" "only [has] meaning in context . . . of something. It doesn't really mean anything in isolation." (Bailey Dep. [220] 93:8–11; *see also* Goodrich Dep. 101:13–15 (similar).) Even more importantly, because the inventors acted as their own lexicographers by defining "NDTP client" or "client" in the specifications, their lexicography governs. *See Phillips*, 415 F.3d at 1316.

Next, the court turns to whether the construction of "client" should use "NDTP" or "location" as a modifier of "server" and "request messages." As it did with respect to the term "location server," the court adopts Kove's construction of "client": "a network-attached component that initiates update or lookup of identifier/location mappings from a location server with location request messages." Kove's construction matches the express definition from the specifications, with the minor clarification that "NDTP" is synonymous with "location" when used as an adjective modifying "server" and "request messages." (*See* '170 Patent, 4:14–17, JA0016; '640 Patent, 4:11–14, JA0041; '978 Patent, 4:30–34, JA0073.) By contrast, AWS's proposed construction would improperly narrow the scope of the claims by importing the preferred embodiment ("NDTP") from the specifications. Kove's construction not only mirrors how a POSITA would understand the claims, but also should reduce the potential for juror confusion.

---

believes that a POSITA would understand "update" in the '640 and '170 Patents to include "add" and "delete," so the addition of those two words in the '978 Patent is not a substantive change. (*See* Goodrich Decl. [247-1] ¶ 31.)

[9] *Client*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/client (last visited Dec. 14, 2021).

22

Relatedly, Kove contends that by using the term "network-attached component," rather than "network-attached computer" or "machine," the inventors intended for "client" to include both hardware and software. (*See* Goodrich Decl. ¶ 32; '170 Patent, 2:30–45, JA0015; '640 Patent, 2:28–36, JA0040.) For example, the specification of the '978 Patent explains that "the client . . . may be any mechanism capable of communicating with the NDTP server." ('978 Patent, 5:32–36, JA0074.) Kove points to several contemporaneous technical dictionaries in support of its interpretation. (*See* Kove Cl. Constr. Sur-Reply at 7.)[10] Kove raised a similar argument in support of its proposed construction of "location server." (*See* Kove Cl. Constr. Resp. at 14.) AWS disagrees and insists that the parties' dispute over whether a "component" may be software is best resolved at summary judgment or at trial. (*See* AWS Cl. Constr. Br. at 14; AWS Cl. Constr. Reply at 8–9.)

The court concludes that it can resolve this dispute now, and concludes, further, that Kove is correct: a "client" or "component" may include software. Even *Merriam-Webster*, a non-technical dictionary, offers the following definition of "client": "software that allows a computer to function as a client in a network."[11] In order to reflect this understanding, the court construes the term "client" as "a network-attached component *(which may be software or hardware)* that initiates update or lookup of identifier/location mappings from a location server with location request messages." With that addition, the court adopts Kove's proposed construction of "client."

---

[10] The *IBM Dictionary of Computing* (1994) defines "component" as "[h]ardware or software that is part of functional unit." (Ex. A to Kove Cl. Constr. Sur-Reply [265-1] at 127.) The *Microsoft Press Computer Dictionary* (1997) defines "component" as "[a]n individual modular software routine that has been compiled and dynamically linked, and is ready to use with other components or programs." (Ex. B to Kove Cl. Constr. Sur-Reply [265-2] at 106.)

[11] *Client*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/client (last visited Dec. 14, 2021).

**D. "Based on a hash function . . ."**

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "the portion of the data location information included in a corresponding one of the data location servers is **based on a hash function used to organize the data location information across the plurality of data location servers**, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers **based on the hash function applied to the identifier string**"<br><br>'170 Patent: Claim 1 | "the portion of the data location information included in a corresponding one of the data location servers is ***based on a hash function that maps identifier strings to one or more of the data location servers***, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers ***based on the hash function applied to the identifier string***" | "the portion of the data location information included in a corresponding one of the data location servers is ***based on a hash function applied to an identifier string in which the function result organizes the data location information by giving an index into a data structure that provides the location of an indicated location server***, and each one of the data location servers is configured to determine at least one of the plurality of data location servers ***by applying the hash function to the identifier string in which the function result is an index into a data structure on the location server containing the location of an indicated location server for the identifier string***" |

As noted earlier, the parties agree on the meaning of the term "hash table." They disagree, however, about the meaning of the term "based on a hash function . . ." in Claim 1 of the '170 Patent. (*See* '170 Patent, 20:58–21:10, JA0024–25.) By way of background, a hash function is a function that converts inputs of varying lengths (such as a person's name) to fixed-size outputs (such as an integer). (*See* Mitzenmacher Decl. [219-2] ¶ 10.) As Dr. Goodrich explains in one of his textbooks: "The use of such a function allows us to treat objects, such as strings [i.e., sequences of characters], as numbers. . . . Equipped with such a function, . . . we can apply the lookup table approach" to strings of varying size. (*Id*. ¶ 17 (quoting Michael T. Goodrich and Roberto Tamassia, *Algorithm Design and Applications* 192 (John Wiley & Sons 2015).) According

24

to a technical reference that was available when the patent application was filed, "hashing" is "[a] technique that is used for organizing tables to permit rapid searching or table lookup, and is particularly useful for tables in which items are added in an unpredictable manner." (*Id*. ¶ 18 (quoting *Oxford Dictionary of Computing* 221 (4th ed. 1997)).) A POSITA would be aware of many possible ways to organize information that involve the application of hash functions. (*Id*. ¶ 24; *see also* Goodrich Decl. ¶ 36.)

The specification of the '170 Patent explains that "[t]he goal of NDTP is to support a network service that efficiently manages mappings from each individual key string, an identifier, to an arbitrary set of strings, locations." ('170 Patent, 20:10–13, JA0024.) In short, hashing is a way to map identifiers to location servers more efficiently. The '170 Patent teaches that a client applies a function to an identifier, the result of which is the location information for data pertaining to an entity. (*See id.* at 15:4–15, 15:50–56, JA0022.) The specification discloses two variants for this process.[12]

In the first variant, a client applies "*a well-known function* that all NDTP server and client implementations know when they are programmed, and the [redirect] message carries a table of NDTP server URLs." (*Id*. at 15:4–9 (emphasis added).) "The well-known function preferably applied is the hashpjw function," which is a specific algorithm (or sequence of steps) for a hash function. (*Id*. at 15:15–16.) The specification provides source code for this algorithm. (*See id*. at 15:21–36.) After applying the hash function to an identifier, the function result is used as an index into a location server table. (*Id*. at 15:12–15.) AWS's expert, Dr. Michael Mitzenmacher, created the following illustration to demonstrate how this variant works.

---

[12] A third redirection mechanism, "embedded redirection links," is not relevant to the parties' proposed constructions of the term "based on a hash function . . ." because it does not describe the use of a hash function. (*See* '170 Patent, 14:46–62, JA0021.)

25

**Figure 2.** Example Illustrating Patent Specification

(Mitzenmacher Decl. ¶ 15.)  Kove does not dispute this characterization of the first variant, which Kove refers to as "indirect mapping."  (Kove Cl. Constr. Presentation at 51.)

Alternatively, the second variant "specifies that a *general function* description will be sent to the NDTP client in the [redirect] message.  The NDTP client will apply this function to the identifier string and *the output of the function will be the NDTP server URL* to which to send NDTP requests for the particular string."  ('170 Patent, 15:4–9, 15:50–56, JA0022 (emphasis added).)  In other words, the function result is not an index into a table but a URL to the location server itself.  Kove refers to the second variant as "direct mapping."  (Kove Cl. Constr. Presentation at 49–50.)

The parties generally agree that in Claim 1 of the '170 Patent, a location server applies a hash function to an identifier string, and the function result identifies the location server in a network that contains data pertaining to that identifier string.  AWS's construction would narrow the claim by requiring that the output of the hash function be an index into a data structure containing the identity of a location server.  Put differently, AWS's construction would cover only indirect mapping.  Kove's construction would not require that a hash function produce an index; rather, Kove argues, the claim is directed to "*any* way of 'organiz[ing]' data location information using a hash function that would have been known to a skilled artisan."  (Kove Cl. Constr. Resp. at 19 (emphasis in original) (quoting '170 Patent, 21:5, JA0025).)  Kove's construction would therefore include both direct and indirect mapping.

26

Kove argues that its construction clarifies how data location information is organized while preserving the breadth of the claim. According to Kove, the hash function described in Claim 1 "maps identifier strings to . . . location servers," but the claim does not require use of any specific algorithm (such as the hashpjw function) or any particular type of mapping (direct or indirect). In the absence of a "clear indication in the intrinsic record" that the patentees intended to limit Claim 1 to the specific algorithm disclosed in the specification, Kove says, the court should look to the ordinary and customary meaning of the term. *See GE Lighting Solutions, LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (citation omitted). The district court in *Symantec Corp. v. Acronis, Inc.*, which involved patents related to a system for "fast incremental backup of a data storage device," applied similar logic. *See Symantec Corp. v. Acronis, Inc.*, No. 12-cv-05331-JST, 2014 WL 230023, *3 (N.D. Cal. Dec. 13, 2013). By construing the term "hash function values" to mean "value generated by a hash function," the court declined to import a limitation from the specification, which in the defendant's view required that a value generated by a hash function be shorter than the input. *Id.* at *5–6. As the court noted, the specification merely stated that "a hash function is a '*usually* shorter value of a fixed length.'" *Id.* at *6. Adopting the defendant's proposed construction "would therefore impose a limitation that the specification does not clearly encompass." According to Dr. Goodrich, a POSITA would have understood that multiple hashing algorithms could satisfy the limitations of Claim 1. (*See* Goodrich Decl. ¶¶ 38–43.) Kove also points out that AWS's construction would exclude a preferred embodiment—direct mapping—that is discussed in the specification. *See CSS Tech., Inc. v. Panduit Corp.*, 778 F. App'x 947, 950 (Fed. Cir. 2019) ("[A]n interpretation which excludes a disclosed embodiment from the scope of the claim is rarely, if ever, correct." (citations and internal quotation marks omitted)). Finally, Kove notes that AWS's construction is very long and would be hard for the jury to comprehend.

AWS responds that the claim language is ambiguous and that the construction AWS has proposed describes "the standard way of using hash functions to organize information at the time

27

of the patents." (AWS Cl. Constr. Br. at 19.) AWS emphasizes that the words "*based on* a hash function" suggest the use of a hash table to organize the location information. In other words, a POSITA would understand "based on a hash function . . ." to mean indirect mapping with an index, not direct mapping without an index. AWS points to several technical dictionaries defining "hash function" or "hashing" in a way that requires the use of an index. (*See* Mitzenmacher Decl. ¶¶ 16, 18.)[13] AWS also suggests that Kove's construction would invalidate the claim for "lack of written description and enablement," because the specification does not describe another way to use a *hash* function to organize location information. (AWS Cl. Constr. Br. at 20.) When discussing the first variant, the specification explains that the "well-known function preferably applied is the hashpjw function." ('170 Patent, 15:15–16, JA0022.) But when discussing the second variant, the specification simply refers to "a general function." (*Id*. at 15:51.)

These arguments do not persuade the court that the expression "based on a hash function . . ." must be limited to indirect mapping. (*See* Goodrich Decl. ¶ 45.) Claim 1 is not limited to any particular manner of organizing data based on a hash function. It merely requires a hash function "used to organize the data location information across the plurality of data location servers." ('170 Patent, 21:4–6, JA0022.) As Dr. Goodrich has explained, a POSITA would understand this requirement to be satisfied by a hash function that "takes an identifier string as input and outputs the URL of one or more location servers rather than an index into a data structure that would contain such URL information"—in other words, it would be satisfied by direct mapping. (Goodrich Decl. ¶¶ 42–43.) Nowhere does Claim 1 require that a hash function's output be an index into a table, as in indirect mapping. A hash function's output may, alternatively, identify a server directly, as in direct mapping. Kove's construction preserves that breadth by allowing for both direct and indirect mapping.

---

[13] In fact, of the dictionaries cited, only one appears to use the word "index." (*See* Mitzenmacher Decl. ¶ 18(c) ("A hash function is applied to the item's key and the resulting hash value is used as an index to select one of a number of 'hash buckets' in a hash table." (quoting *Blackie's Dictionary of Computer Science* 106–107 (2013))).)

28

The specification supports this construction. As discussed above, the specification discloses two variants of a redirect message. In the first variant, the appropriate location server is selected by "applying a well-known function to the identifier string and using the function result as an index into the NDTP server table." ('170 Patent, 15:13–15, JA0022.) The parties agree that this variant represents what Kove calls indirect mapping. In the second variant, a client applies a "general function" to the identifier, and "the output of the function will be the NDTP server URL." (*Id.* at 15:51–56.) That description does not use the word "hash," but a POSITA would understand it to encompass direct mapping with a hash function. (Goodrich Decl. ¶ 43.)

The court declines AWS's invitation to read the entire second variant out of the claim. As noted, it is "rarely, if ever," appropriate to interpret a claim in such a way as to "exclude[] a preferred embodiment" from that claim. *MBO Lab'ys, Inc. v. Becton, Dickinson & Co.*, 474 F.3d 1323, 1333 (Fed. Cir. 2007). True, as AWS notes, unlike the first variant, the second variant does not use the word "hash function" or provide the source code for a hash function (AWS Reply at 11–12), but this does not defeat the conclusion that the second variant also encompasses a method of organizing information that is "based on a hash function . . . ." As the Federal Circuit has explained, "it is improper to read limitations from a preferred embodiment described in the specification . . . into the claims absent a clear indication in the intrinsic record that the patentee intended the claims to be so limited." *Liebel–Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 913 (Fed. Cir. 2004). AWS points to a preferred embodiment that constitutes indirect mapping, but it has not established any clear indication that direct mapping is excluded from Claim 1.

Finally, the court rejects AWS's argument that the claim would be invalid for lack of written description and enablement if the term "based on a hash function . . ." were given Kove's construction. Because a patent is presumed to be enabled and adequately described, a challenger bears the burden of proving invalidity by clear and convincing evidence. *See Cephalon, Inc. v. Watson Pharms., Inc.*, 707 F.3d 1330, 1337 (Fed. Cir. 2013); *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1338 (Fed. Cir. 2016). AWS has not made this showing. "[A] patent

29

need not teach, and preferably omits, what is well known in the art." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986). The enablement requirement thus focuses primarily on the novel aspects of an invention. *See Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1366 (Fed. Cir. 1997). AWS emphasizes that there are many possible ways to organize information based on a hash function, but the use of a hash function is not the novel aspect of the invention, so that is not a basis for concern. After all, as Dr. Goodrich explained, a POSITA would be aware of various methods of organizing information "based on a hash function." (Goodrich Decl. ¶¶ 36–37.) The patentees thus "rel[ied] on information that is 'well-known in the art' for purposes of meeting the written description requirement." *Bos. Sci. Corp. v. Johnson & Johnson*, 647 F.3d 1353, 1366 (Fed. Cir. 2011). They were "not required to describe in the specification every conceivable and possible future embodiment of [their] invention." *Innogenetics, N.V. v. Abbott Lab'ys*, 512 F.3d 1363, 1370 (Fed. Cir. 2008); *cf. Pfizer Inc. v. Teva Pharms. USA, Inc.*, 555 F. App'x 961, 967 (Fed. Cir. 2014) ("In view of the finding that enantiomer separation methods are well-known and routine to a person of ordinary skill, we agree with the district court that the inventors were not required to provide a detailed recipe for preparing every conceivable permutation of the compound they invented to be entitled to a claim covering that compound.").

E. **"Hash table"**

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "hash table"<br><br>'978 Patent: Claim 6<br><br>'170 Patent: Claims 2, 12<br><br>'640 Patent: Claim 24 | "a data structure *that stores values in a table, where values are stored and retrieved based on the output of a hash function*" | "a data structure *in which a hash function is applied to an input and the function result is used as an index to a table in which the desired output can be found*" |

After the claim construction hearing, the parties informed the court that they have agreed upon the following construction of "hash table": "a data structure that stores values in a table,

30

where values are stored and retrieved by applying a hash function to an input and using the function result as an index into the table." (Agreed Upon Constructions, Ex. B to Cl. Constr. Chart.) The court therefore adopts the agreed upon construction.

## F. "Data pertaining to the entity"

| Claim Term | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| "data pertaining to the entity" <br><br> '978 Patent: Claims 1, 31 <br><br> '170 Patent: Claim 6 | "data pertaining to a person or thing *(real, digital, or abstract)*" | "data pertaining to a person or thing *distinct from that data*" |

The three asserted claims containing this term all recite an "identifier" that identifies an "entity" and a location of data "pertaining to the entity." (*See* '978 Patent, 25:27–33, 29:48–54, JA0084-85 (Claims 1 and 31); '170 Patent, 21:34–41, JA0025 (Claim 6).) The parties generally agree that the term "data pertaining to the entity" means "data pertaining to a person or thing," but they differ as to qualifiers. Kove would clarify that the person or thing to which data pertains (i.e., the entity) may be "real, digital, or abstract," while AWS would stipulate that the person or thing (i.e., the entity) is "distinct from" the data that pertains to it. Recall that the parties have agreed upon the following construction of "location": "an encoding that is a member of a set of associations with an identifier in a location server, and that specifies where *data pertaining to the entity* identified by the identifier is stored." (Agreed Upon Constructions, Ex. B to Cl. Constr. Chart (emphasis added).) The construction of "data pertaining to the entity" therefore implicates all of the asserted claims containing the word "location."

Kove points to several pieces of evidence, both intrinsic and extrinsic, to prove that the person or thing to which data pertains (i.e., the entity) may be "real, digital, or abstract." Not all this evidence is compelling; for example, Kove points out that the specifications of the '170 and '978 Patents explain that the inventions improve upon prior technology by retrieving data files in multiple forms, such as text, image, sound, or video files. (*See* '170 Patent, 1:47–57, JA0001;

31

'978 Patent, 1:48–58, JA0072.)  This sheds little light on the appropriate construction, as it simply recognizes that *data* may comprise text, image, sound, or video files.  That much is not contested. Kove is on firmer ground in citing to the provisional applications for the patents in suit, which list examples of entities including "Song," "Customer," "Software object," or "Messaging group."  (*See* Provisional Application No. 60/277,408, Ex. F to Kove Cl. Constr. Resp. [247-7] at 6; Provisional Application No. 60/209,070, Ex. G to Kove Cl. Constr. Resp. [247-8] at 12.)[14]  One of the inventors even described "Content Delivery" as an application of the technology, in which the protocol assigns an identifier to the song "Hotel California" and copies of the song are stored in multiple locations.  (Ex. F to Kove Cl. Constr. Resp. at 7.)  Kove also points to a contemporaneous technical dictionary that defines "entity" as "a distinguishable object, either real or abstract, about which data are recorded."  (Dictionary of IEEE Standards Terms, Ex. E to Kove Cl. Constr. Resp. [247-6] at 3.)[15]

AWS does not challenge Kove's understanding that an entity may be "real, digital, or abstract" other than contending that Kove's clarification is "unnecessary" and "wouldn't be helpful to a jury."  (Cl. Constr. Hr'g 103:20–24.)  AWS focuses instead on its own proposed requirement that an entity be "distinct from" the data that pertains to it.  According to AWS, the plain meaning of "data pertaining to the entity" implies a distinction between "data" and an "entity."  (*See* AWS Cl. Constr. Br. at 23–24.)  AWS contends that its construction is consistent with all three patents' specifications, which provide: "In networked environments where there are a large number of data repositories and any particular entity does not store data in all the repositories, a mechanism is needed that would permit queries to be directed only at data repositories with relevant

---

[14]     Kove has not presented evidence that these documents are, in fact, the provisional applications for the patents in suit, but AWS has not contested this assertion.

[15]     As AWS notes, the definition continues: "for example, a person such as a CUSTOMER, or a concept, such as SALES REVENUE, about which data is stored in a data structure."  (Ex. E to Kove Cl. Constr. Resp. at 3; *see* AWS Cl. Constr. Reply at 13–14.)

information."  ('170 Patent, 2:1–5, JA0015; '640 Patent, 1:66–2:3, JA0040; *see also* '978 Patent, 2:1–5, JA0072 (similar).)  In the view of AWS, this passage implies that an "entity" *stores* "data," not that an "entity" could also *be* "data."

Kove responds that AWS's construction "artificially narrows" the term "entity."  (Kove Cl. Constr. at 24.)  In fact, Kove says, "an entity and data may, in practical terms, be the same." (*Id.*)  For example, if the entity in question is a film that is available on a video streaming platform, the "location of the data *is* the location of the entity, making entity and data effectively the same." (*Id.*)  Kove also cites stray uses of the terms "data entity" and "data object" in the '170 Patent and a Patent Examiner's statement, respectively.  (Kove Cl. Constr. Resp. at 25.)  It contends that these usages "recite 'entity' and 'data' as the same thing."  (*Id.*)

AWS replies that, by allowing "data" and an "entity" to be the same thing, Kove's construction would render the phrase "pertaining to the entity" superfluous.  (AWS Reply at 13.) *See also Wasica Fin. GmbH v. Continental Auto. Sys., Inc.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous.").  Relatedly, AWS urges that Kove's construction would rewrite the claims such that an "identifier" would identify data rather than identifying an entity.[16]

The court adopts and combines both parties' proposed clarifications of the term.  As mentioned above, AWS has provided no substantive reason to reject Kove's proposed clarification that an entity may be "real, digital, or abstract."  The court disagrees with AWS that this language would not be useful; specifying that an entity may be "real, digital, or abstract" helps clarify the breadth of the term.  The court agrees, however, with AWS's assertion that data is

---

[16]    In support of this point, AWS cites *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1301 (Fed. Cir. 2014).  Although AWS does not provide an explanatory parenthetical, the court presumes that AWS is referring to the following passage: "[A] court may not rewrite a claim even if giving a disputed claim its plain meaning would lead to a 'nonsensical result.'"  *Id.* (citation omitted).  But Kove does not appear to be advocating for rewriting the claim term to avoid absurd results or to preserve the validity of the claims.  *See id.* (collecting cases).

33

distinct from the entity to which it pertains, and it therefore rejects Kove's conflation of these two concepts.

By way of illustration, imagine that a video streaming platform manages its data as taught by the patents in suit. Suppose further that the "entity" in question is an award-winning film that was first released on this platform ("*Award-Winning Film*"). The "data," in this example, would mainly be the millions of bytes of audiovisual information that a subscriber would temporarily download to view *Award-Winning Film*. The data might also include closed captions, subtitles, or alternative audio tracks (e.g., from other languages). The "identifier" could simply be the words of the film's title, perhaps with spaces and punctuation removed: "awardwinningfilm." A subscriber seeking to view *Award-Winning Film* would use a client to query a location server for the location of data associated with the identifier "awardwinningfilm." Whether the subscriber immediately received a location response message or instead first received a redirect message, the subscriber would eventually be directed to a repository (or repositories) containing data associated with the identifier "awardwinningfilm." That data, in turn, would allow the subscriber to view *Award-Winning Film*.

In this example, there is a sense in which, as Kove suggests, the "location of the data *is* the location of the entity." (Kove Cl. Constr. Resp. at 24.) Unlike a "real" entity such as a medical patient, a digital entity like *Award-Winning Film* cannot meaningfully be said to have any "location" other than the location of the data that constitutes it. But that does not mean that the entity (*Award-Winning Film*) and the data (the bytes of information) are "effectively the same." (*Id.*) The millions of bytes of information—the audio, video, text, and so on—are indeed just data. Although these pieces of data pertain to, and in the aggregate constitute, the entity *Award-Winning Film*, none of the pieces of data are themselves the "entity" that is identified by the identifier "awardwinningfilm." To help illustrate this point further, we can imagine two different ways in which the relevant data might be organized in the video streaming platform's distributed-data-storage system. First, the data that constitutes *Award-Winning Film* could be stored in unique

34

pieces across several data repositories. Even with the data scattered in this way, there would still be just one entity to which the data pertains. Conversely, the distributed-data-storage system could contain several duplicate sets of the data—each set independently constituting the entirety of *Award-Winning Film*. And here, too, there would be only one entity to which the data pertains. Thus, even in the case of a digital entity, the data and the entity are not "the same thing," as Kove suggests.

To reflect this understanding, the court construes the term "data pertaining to the entity" as "data pertaining to a person or thing (real, digital, or abstract) distinct from that data."

## CONCLUSION

The claim terms in the '640 Patent, '170 Patent, and '978 Patent are construed as follows:

| Claim Term | Construction |
|---|---|
| "location information" | '978: "one or more identifiers and their associated locations"<br><br>'170/'640: "information pertaining to one or more locations of data and/or the identities of one or more location servers" |
| "location server" | "a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients" |
| "client" | "a network-attached component (which may be software or hardware) that initiates update or lookup of identifier/location mappings from a location server with location request messages" |
| "based on a hash function used to organize the data location information across the plurality of data location servers . . . based on the hash function applied to the identifier string" | "the portion of the data location information included in a corresponding one of the data location servers is based on a hash function that maps identifier strings to one or more of the data location servers, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string" |
| "data pertaining to the entity" | "data pertaining to a person or thing (real, digital, or abstract) distinct from that data" |

35

ENTER:

Dated: December 17, 2021

REBECCA R. PALLMEYER
United States District Judge

36

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

KOVE IO, INC.,

    *Plaintiff,*

    v.

AMAZON WEB SERVICES, INC.,

    *Defendant.*

Case No. 1:18-cv-8175

Judge Rebecca R. Pallmeyer

Jury Trial Demanded

## AMAZON WEB SERVICES, INC.'S ~~THIRD~~ FOURTH AMENDED FINAL UNENFORCEABILITY AND INVALIDITY CONTENTIONS

Alan M. Fisch
*alan.fisch@fischllp.com*
R. William Sigler
*bill.sigler@fischllp.com*
Jeffrey M. Saltman (*pro hac vice*)
*jeffrey.saltman@fischllp.com*
Lisa Phillips (*pro hac vice*)
*lisa.phillips@fischllp.com*
FISCH SIGLER LLP
5301 Wisconsin Avenue NW
Fourth Floor
Washington, DC 20015
202.362.3500

*Attorneys for Amazon Web Services, Inc.*

Appx11829

**TABLE OF CONTENTS**

I.     AWS RESERVATIONS OF RIGHTS ............................................................................... 3

II.    CURRENT IDENTIFICATION OF PRIOR ART FOR PATENTS-IN-SUIT .................... 4

    A.  PRIOR ART PATENTS AND PUBLICATIONS ........................................................ 4
    B.  PRIOR ART SYSTEMS ............................................................................................. 5

III.   SELECTION OF CURRENT GROUNDS OF INVALIDITY .............................................. 8

    '170 PATENT CLAIMS 1, 2, AND 12 ............................................................................. 8
    '170 PATENT CLAIMS 6, 8, AND 15 ............................................................................. 9
    '640 PATENT CLAIMS 17 AND 18 ............................................................................... 9
    '640 PATENT CLAIM 24 .............................................................................................. 10
    '978 PATENT CLAIMS 1, 3, 6, 10, 14, AND 31 ......................................................... 11
    '978 PATENT CLAIMS 17, 23, AND 30 ...................................................................... 12
    '978 PATENT CLAIM 24 .............................................................................................. 12

IV.    EXEMPLARY OBVIOUSNESS ARGUMENTS AND REASONS TO COMBINE THE
    IDENTIFIED PRIOR ART ............................................................................................ 13

V.     INVALIDITY CLAIM CHARTS FOR PATENTS-IN-SUIT ............................................ 31

VI.    INVALIDITY OF PATENTS-IN-SUIT BASED ON 35 U.S.C. § 112 ............................... 32

VII.   INVALIDITY OF PATENTS-IN-SUIT BASED ON 35 U.S.C. § 101 ............................... 36

VIII.  UNENFORCEABILITY CONTENTIONS AGAINST PATENTS-IN-SUIT .................... 38

IX.    DOCUMENT PRODUCTION ....................................................................................... 39

DEFENDANT AMAZON WEB SERVICES, INC.      2             CIVIL ACTION NO. 1:18-CV-8175
~~THIRD~~ FOURTH AMENDED FINAL UNENFORCEABILITY
AND INVALIDITY CONTENTIONS

Appx11830

system.

## III.    SELECTION OF CURRENT GROUNDS OF INVALIDITY

Pursuant to LPR 3.1(b), AWS specifically identifies below the four (4) prior art grounds per asserted claim and four (4) non-prior art grounds asserted against Kove's patents at this time. The prior art grounds are further supported by the attached claim charts Exhibits 1-3.

### '170 Patent Claims 1, 2, and 12

AWS contends that '170 patent claims 1, 2, and 12 are invalid for failure to meet the conditions for patentability set forth in Title 35 of the United States Code, including, but not limited to, 35 U.S.C. § 101 et seq., 35 U.S.C. §§ 101, 102, 103, and/or 112, the requirements of the Code of Federal Regulations, as well as general principles of patent law.

AWS asserts the following four prior art grounds for these claims at this time.  These prior art grounds are further supported by the accompanying claim chart exhibits as well as Sections IV-V herein.

1. Obviousness based on the combination of Domain Name System (DNS) and Karger '618/420 (*see* Exhibit 1A);
2. Anticipation based on the Cache Resolver system (*see* Exhibit 1B);
3. Obviousness based on the combination of U.S. Patent No. 5,542,087 to Neimat, DNS, and Karger '618/420 (*see* Exhibit 1C);
4. Obviousness based on the combination of U.S. Patent No. 6,212,521 to Minami, DNS, and Karger '618/420 (*see* Exhibit 1D).

AWS asserts the following four non-prior art grounds for these claims at this time. These non-prior art grounds are further supported by Sections IV-VII.

1. Unpatentable under 35 U.S.C. § 101 (as described in AWS motion to dismiss[3], *see* Dkts. 38, 45 etc. and Section VII below);
2. Lack of proper written description support under 35 U.S.C. § 112, ¶ 1 (*see* Section VI);
3. Lack of enablement under 35 U.S.C. § 112, ¶ 1 (*see* Section VI);

---

[3] To the extent that the district court has determined that the Asserted Patents are not unpatentable under 35 U.S.C. § 101 (*see* Dkt. 110), AWS maintains its position for the purposes of appeal.

DEFENDANT AMAZON WEB SERVICES, INC.                                    CIVIL ACTION NO. 1:18-CV-8175
FOURTH AMENDED FINAL UNENFORCEABILITY        8
AND INVALIDITY CONTENTIONS

Appx11836

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KOVE IO, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> AMAZON WEB SERVICES, INC., <br><br> *Defendant*. | Case No. 1:18-cv-8175 <br><br> ███████████ |

**AMAZON'S MOTION FOR SUMMARY JUDGMENT AND
MEMORANDUM IN SUPPORT**

Alan M. Fisch
*alan.fisch@fischllp.com*
R. William Sigler
*bill.sigler@fischllp.com*
Jeffrey M. Saltman *(pro hac vice)*
*jeffrey.saltman@fischllp.com*
Lisa N. Phillips *(pro hac vice)*
*lisa.phillips@fischllp.com*
FISCH SIGLER LLP
5301 Wisconsin Avenue NW, Suite 400
Washington, D.C. 20015
202.362.3500

*Attorneys for Amazon Web Services, Inc.*

Appx18682

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................... 1

BACKGROUND ....................................................................................................................... 4

    I.   Patents-in-Suit and Asserted Claims ................................................................... 4

    II.  Ex Parte Reexaminations ..................................................................................... 4

    III. This Court's January 13, 2023 Order .................................................................. 6

LEGAL STANDARDS .............................................................................................................. 7

ARGUMENT ............................................................................................................................. 7

    I.   Summary Judgment of Non-Infringement of All 17 Asserted Claims Based on Kove's Disclaimers is Appropriate. ............................................................................................ 7

        A.  It's Undisputed That at Least 12 of 17 Asserted Claims Require a Non-Hierarchical Cluster Configuration. ................................................................. 8

        B.  All 17 Asserted Claims Should Be Construed to Require a Non-Hierarchical Configuration. ......................................................................... 9

        C.  During the Reexaminations, Kove Disclaimed "Non-Hierarchical" Structures. ......... 11

        D.  S3 and DDB Don't Employ the Asserted Claims' "Non-Hierarchical" Configuration. ..................................................................................... 16

    II.  Summary Judgment of Non-Infringement of All 17 Asserted Claims Under the Court's Previous Constructions Is Warranted. ................................................................... 22

        A.  S3 Doesn't Infringe Under the Current Constructions. ........................... 23

        B.  DDB Doesn't Infringe Under the Current Constructions. ........................ 26

    III. Summary Judgment on Willfulness and Enhanced Damages is Warranted. ..................... 29

        A.  Kove Can't Show Pre-Suit Willfulness. ................................................... 30

        B.  Post-Suit: Kove Can't Show Willfulness Between December 12, 2018, and the Expiration of Its Patents. ....................................................................... 35

CONCLUSION ........................................................................................................................ 38

ii

### C. DURING THE REEXAMINATIONS, KOVE DISCLAIMED "NON-HIERARCHICAL" STRUCTURES.

Under *Phillips v. AWH Corp.*, courts usually construe claims using the ordinary and customary meaning to an ordinarily skilled artisan at the time of invention.[36] One well-established exception is where a patentee clearly and unambiguously disavows claim scope during prosecution, including *ex parte* reexamination.[37] For example, when a patentee told the Patent Office that "the device used is a sheet," the Federal Circuit found the claimed invention to be limited to a sheet.[38] Holding patentees to such statements made during prosecution about what their claims require serves fundamental notions of fairness, and is necessary for the public to have notice of a patentee's claimed monopoly.[39]

Here, Kove limited the scope of the asserted claims to: (1) location servers in non-hierarchical, cluster structures, where each location server (2) contains the relevant location information, or information to locate the relevant location information, and (3) can resolve the request in two or fewer steps.[40] But Kove's infringement and validity contentions served before the reexaminations didn't notify Amazon of these requirements of the claim language or identify how the accused products and prior art compared to them—thus undermining Kove's and Goodrich's later assertions that the claim language itself should've made these requirements apparent.[41] And the specification of each patent-in-suit, on its face, describes examples using the invention in hierarchical structures, thus further undermining these assertions. For example, the specifications of the '640

---

[36] *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).

[37] *E.g.*, *Saffran v. Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013).

[38] *Id.*

[39] *Aylus*, 856 F.3d at 1359–60 (noting that this doctrine extends to "statements made in reexamination proceedings").

[40] *See generally* Dkt. 539 at 9.

[41] SMF at ¶ 55.

11

and '170 patents (both entitled "Network Distributed Wire Transfer Protocol") both state that:

> NDTP provides two mechanisms for server redirection. The redirection mechanisms allow cluster and hierarchical topologies, and mixtures of such topologies.[42]

The '978 specification uses different but equally clear language:

> An NDTP server hierarchy 100, such as illustrated in FIG. 21, permits identifier/location association data to be owned and physically controlled by many different entities.[43]

And additional examples appear in all three patents.[44]

Yet, in the reexaminations of all three patents-in-suit, in response to the Patent Office's non-final rejections of all 17 asserted claims over the prior art, Kove repeatedly disclaimed networks lacking a "non-hierarchical" structure where every location server can provide requested information in no more than two steps. This includes Kove's July 3, 2023 argument in response to the non-final rejections of asserted '978 claims 17, 23, 24, and 30, which stated:

> Their invention, as embodied in the claims of the '978 patent, enables a client to retrieve data through any server in the network and receive in response the location information associated with a desired entity. The structured relationships of the invention allow clients to access data in distributed environments through a non-hierarchical, limitlessly scalable, server structure that enables retrieval of requested information in not more than two iterations.[45]

Kove said substantially the same when responding to the earlier non-final rejections of the other four asserted '978 claims,[46] and all '170 asserted claims,[47] and all '640 asserted claims.[48]

---

[42] SMF at ¶ 47 (quoting '640 patent, 14:28–31; '170 patent, 14:43–46).

[43] SMF at ¶ 46 (quoting '978 patent, 19:46–48).

[44] *E.g.*, in the '978 patent: "In another alternative embodiment, a hierarchical NDTP server topology, such as the NDTP server tree 52 shown in FIG. 6, may be utilized." SMF at ¶ 46; *see also id.* (additionally citing '978 patent, 7:37–53, 19:38–39; '640 patent, 16:14–38, 14:28–31, 16:14–38, 17:22–24, 17:61–18:16, 18:36–58; '170 patent, 14:43–46, 16:33–56, 17:38–42, 18:9–30, 18:49–19:4).

[45] SMF at ¶ 32.

[46] SMF at ¶¶ 31–38; Dkt. 539-4 at 12.

[47] SMF at ¶¶ 31–38; Dkt. 539-3 at 11 ("Their invention, as embodied in the claims of the '710 patent ….").

[48] SMF at ¶¶ 31–38; Dkt. 539-2 at 10 ("Their invention, as embodied in the claims of the '640 patent ….").

12

And Kove repeatedly distinguished all asserted claims from "hierarchical" prior art, such as Oracle Names Administrator's Guide (ONAG), based on the above requirements. For example, in the more recent '978 reexamination, Kove stated:

> In contrast to the hierarchical "tree" structure of prior systems like ONAG, the configuration taught by the '978 patent allows for linear scaling of the location servers. Particularly, the patent teaches seamlessly adding location servers based on the growth of a network.[49]

Indeed, Kove specifically argued that the limitations of the asserted claims "cannot be met in hierarchical configurations such as [Oracle's] Names Server."[50] For example, in the earlier '978 patent reexamination, Kove argued that:

> The Examiner points to ONAG Figure C-4 as allegedly disclosing the claimed "cluster topology" recited in claim 10. But ONAG only describes the hierarchical topology of [Oracle's] Names Servers.[51]

Kove then met with the Patent Examiner and presented a slide show that included the following slide summarizing the purported differences between the Kove Patents and the Oracle prior art, and distinguishing Kove's purported invention from a hierarchical architecture:[52]

---

[49] SMF at ¶ 35.

[50] SMF at ¶ 34; Dkt. 539-4 at 36; Dkt. 539-3 at 26.

[51] SMF at ¶ 35; Dkt. 539-4 at 51; *see also id*. at 35 ("ONAG lacks the non-hierarchical cluster structure required to satisfy the requirements of independent claims 10 and 14 and dependent claim 3."); *id*. ("In contrast, independent claims 10 and 14 and dependent claim 3 of the '978 patent require networks with *non-hierarchical* (or 'cluster') configurations ….") (emphasis in original).

[52] SMF at ¶ 36.

13



Kove also made similar arguments in the other reexaminations.[53]

Further, Kove repeatedly emphasized in the reexaminations of all three patents that each and every location server must be capable of providing the desired location information, as set forth in Amazon's proposed constructions. For example, Kove stated:

> The '640 patent **requires** that ***each and every*** **server in the data location server network have the capability of transmitting information to the client that the client then processes to determine the server that contains its requested information**. This configuration **"collapses" the hierarchical composition** of Oracle Names, making it entirely different in practice and principle from what Oracle Admin discloses. Oracle Admin in no way teaches that Oracle Names network servers have this capability.[54]

---

[53] SMF at ¶¶ 37–38 (citing, *inter alia*, Dkt. 539-2 at 23; Dkt. 539-3 at 26).

[54] SMF at ¶ 35 (quoting Kove response in '640 reexamination at 23–24) (emphasis in original)); *see also*

And, as noted, Kove repeatedly confirmed that each and every location server must be capable of doing so in no more than two steps (or "iterations," in Kove's words):

> The structured relationships of the invention allow clients to access data in distributed environments through a non-hierarchical, limitlessly scalable, server structure *that enables retrieval of requested information in not more than two iterations*.[55]

Consistent with that, Kove further stated, for example, that "the location servers in the network do not have to execute any extraneous steps for determining or identifying a given entity when resolving a location query."[56]

In the '170 reexamination, Kove argued that a non-hierarchical cluster structure is "expressly" claimed, despite the absence of the words "non-hierarchical," "cluster," or any description of how the location servers are arranged:

> **This non-hierarchical cluster composition is expressly claimed in claim 1**, through the requirement that the data location information is portioned and organized across the data location servers based on a hash function and each and every data location server being configured to determine the data location server that contains the location information based on applying the hash function to the identifier string associated to the location information.[57]

Kove made similar assertions in the '640 and '978 reexaminations, based on the different language of the asserted claims of those patents.[58] Yet, "non-hierarchical" doesn't appear in any asserted claim of any patent-in-suit.

And Kove admitted that the specifications of the patents-in-suit describe hierarchical, non-hierarchical, and hybrid embodiments. But, when doing so, Kove limited the asserted claims to

---

*id*. (listing a dozen similar Kove statements across all three reexaminations).

[55] SMF at ¶ 8.

[56] SMF at ¶ 9.

[57] SMF at ¶ 33 (quoting Dkt. 539-3 at 36 (emphasis added); *see also id*. ("This non-hierarchical cluster composition is expressly claimed in claims 6 and 15….") (quoting Dkt. 539-3 at 53).

[58] *Id*. (citing, *inter alia*, Dkt. 539-2 at 39, Dkt. 539-4 at 35, 66).

15

non-hierarchical:

> Although the '640 specification discloses hierarchical applications for NDTP as possible embodiments, [asserted] claims 17 and 18 require *non-hierarchical* structure, as explained here and throughout this Reply [to the non-final rejection].[59]

All the above-quoted statements, which Kove made to the Patent Office in support of validity, are clear and unmistakable disclaimers that limit the asserted claims beyond what may otherwise be the plain and ordinary meaning.[60] Thus, this Court should construe the asserted claims to require: 1) location servers in non-hierarchical, cluster structures, where each location server (2) contains the relevant location information, or information to locate the relevant location information, and (3) can resolve the request in two or fewer steps.[61] And entering these constructions would help the trier of fact understand requirements of the claims that aren't expressly stated therein and that an artisan of ordinary skill wouldn't have understood to be part of the plain and ordinary meaning. It would also prevent Kove from reducing the bounds of its monopoly at the Patent Office to preserve its claims, and then unfairly expanding those bounds in this Court to recapture what it disclaimed. This is precisely what the prosecution disclaimer doctrine disallows.

## D. S3 AND DDB DON'T EMPLOY THE ASSERTED CLAIMS' "NON-HIERARCHICAL" CONFIGURATION.

The plaintiff has the burden of proving that every element of an asserted claim is present in an accused product, either literally or under the doctrine of equivalents.[62] All 17 asserted claims,

---

[59] *Id.* (quoting Dkt. 539-2 at 23, n. 2); *see also* Dkt. 484 at 13 (noting '640 and '170 patents "share the same specification").

[60] *See, e.g.*, *X One, Inc. v. Uber Techs., Inc.*, 440 F. Supp. 3d 1019, 1045 (N.D. Cal. 2020) ("That X One repeatedly made this argument to the [Patent Office during *inter partes* review] leads the Court to find that these statements, taken together, amount to a 'clear and unmistakable disclaimer' of [patent] scope.").

[61] SMF at ¶ 42 (citing chart of proposed constructions).

[62] *See, e.g.*, *Wolverine World Wide, Inc. v. Nike, Inc.*, 38 F.3d 1192, 1199 (Fed. Cir. 1994) (affirming summary judgment of non-infringement); *PSC Computer Prod., Inc. v. Foxconn Int'l, Inc.*, 355 F.3d 1353, 1357 (Fed. Cir. 2004) (same).

16

Thus, under these constructions, all asserted claims require that:

- The "location server" must maintain "identifier/location mappings";

- The "location" must specify "where data pertaining to the entity identified by the identifier is stored"; and

- The "identifier" must be "unique" and identify "an individual" entity.[99]

And there's no genuine dispute of material fact that both DDB and S3 lack one or more of these requirements. Hence, even without Kove's disclaimers in the reexaminations and Amazon's proposed additional claim constructions, summary judgment of non-infringement is warranted.[100]

### A.   S3 DOESN'T INFRINGE UNDER THE CURRENT CONSTRUCTIONS.

In S3, the end user (e.g., a person) sends a request for an object (e.g., a video) to

.[101] It's undisputed that

there's no single place where

that are stored on different components. Indeed, Kove's expert

Dr. Goodrich states that "

," of which any                                      to re-

construct the object.[102] This means that even if some of the pieces are lost or corrupted, the object

.

---

[99] It's undisputed that all asserted claims require these elements. *See*, *e.g.*, SMF at ¶ 35 (Dr. Goodrich's statement that prior art does not teach or suggest: 'identifier,' 'location,' 'location information,' and 'location server,' as required by [asserted '978] claims 3, 6, 10, 14, 17, 23, and 30).

[100] *See*, *e.g.*, *Wolverine*, 38 F.3d at 1199.

[101] SMF at ¶ 16. These include                                              . *See id.* (providing background and an overview of each component); SMF at ¶ 16 (describing use of local cache).

[102] SMF at ¶ 81 (citing Goodrich July 7, 2023 Rep., Ex. D at ¶ 33).                          depending on the build of S3. *See id.* [Grama Aug. 18, 2023 Rep. at ¶ 262 ("                                        which are stored in                    " and "can be assembled by                                )].

23

Dr. Goodrich attempts to show that ▮▮▮▮▮▮▮ can be the required "location" in a location server's "identifier/location mappings."[103] According to his infringement report, S3 "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."[104] Dr. Goodrich asserts that "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ satisfies the parties' agreed construction of 'location.'"[105] But calling ▮▮▮▮▮▮ a "locator" doesn't make it a "location," or "location information." As detailed below, Dr. Goodrich's opinion ignores the source code (i.e., the instructions showing how the S3 software works) and the testimony of Amazon's engineers who designed and maintain S3 showing the information ▮▮▮▮▮ contains. Thus, it fails to raise a genuine dispute of material fact.[106]

Dr. Goodrich doesn't address the S3 source code that shows ▮▮▮▮▮▮▮▮▮▮▮ ▮ As Dr. Grama explained, with reference to that specific source code, ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[107] This is consistent with the testimony of Seth Markle, the Principal Senior Software Engineer for S3 who provided 30(b)(6) testimony on S3's operation, when Kove repeatedly asked him about ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[108] Indeed, Dr. Goodrich doesn't

---

[103] SMF at ¶ 76.

[104] *Id.*

[105] SMF ¶ 76 ("▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ satisfies the parties agreed construction of 'location…'") (quoting Goodrich Op. Rep, Ex. D at ¶ 87). Dr. Goodrich also states that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (i.e., a 'location server')." *Id.*

[106] *See, e.g., Invitrogen Corp. v. Clontech Lab'ys, Inc.*, 429 F.3d 1052, 1080 (Fed. Cir. 2005) ("A party does not manufacture more than a merely colorable dispute simply by submitting an expert declaration asserting that something is black when the moving party's expert says it is white; there must be some foundation or basis for the opinion.").

[107] SMF at ¶ 82.

[108] SMF at ¶ 78; *see also id.* ("The location of the object is ▮▮▮▮▮▮▮▮"), 176:12 ("▮▮▮▮▮▮ is not a location.").

24

Appx18709

address the undisputed fact that ████████████████████████████████████, even when the location of corresponding data changes.[109] Thus, ████████████████████████, in the same way that any name could be said to. But knowing what the Magna Carta is, and knowing where in England the four existing copies are located, aren't the same thing. And ████████ doesn't "specif[y] where data pertaining to the entity identified by the identifier is stored," as the construction of location requires for all asserted claims. Nor does it help satisfy the "location server" or "location information" constructions.[110]

Consistent with those previous constructions and the Kove patents' specifications, in the reexamination proceedings Kove specifically distinguished its claimed inventions from such a "static" association between an identifier and alleged location. In doing so, Kove explained the need to support "dynamic" associations between location and identifier, because the data in a distributed storage network would be moving—something that ████████████████████████████ ████████. As Kove stated:

> The Inventors understood that maintaining a static relationship of data and its location in traditional distributed data collection environments (i.e., tree structures) would become untenable, … particularly where the data in the components of the network could change location, unbeknownst to one another. The Inventors invented a protocol that dynamically creates relationships between data and its locations using an algorithm or function.[111]

████████████████████████████████[112] Because an ████████████████ is not a "location," the "location" requirements of every asserted claim are not

---

[109] SMF at ¶ 78.

[110] As noted, the "location server," as required in all asserted claims, must maintain identifier/location mappings. The Court adopted two constructions for "location information," depending on the patent. They require "one or more identifiers and their associated locations" ('978 claims), or "information pertaining to one or more locations of data and/or the identities of one or more location servers" ('640 and '170 claims).

[111] SMF at ¶ 79.

[112] SMF at ¶ 78.

25

satisfied by S3, and S3 doesn't infringe Kove's claims.

### B. DDB DOESN'T INFRINGE UNDER THE CURRENT CONSTRUCTIONS.

DDB uses ▇▇▇▇▇▇ to help complete an end user's request for data.[113] According to Kove's infringement theory, DDB's ▇▇▇▇▇▇ are the "location servers" that maintain "identifier/location mappings," as required for all asserted claims under Judge Pallmeyer's construction.[114] To support that, Dr. Goodrich's report asserts that the ▇▇▇▇▇▇ store a "▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ that's the "identifier" in the location servers' "identifier/location mappings."[115] This argument fails to create a genuine dispute of material fact, particularly in view of his deposition testimony. This is shown below, though it's necessary to first provide some context.

In DDB, the parties' experts and the relevant documents agree that:

- ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇[116]

- ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇[117]

- ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

- ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇[118]

- ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

---

[113] SMF at ¶¶ 84–85.

[114] *Id.*

[115] SMF at ¶ 85. Dr. Grama also explained the relevant source code and what information would be contained ▇▇▇▇▇▇▇▇▇. *See id.*

[116] SMF at ¶ 84. As Dr. Goodrich stated: "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" *Id.*

[117] *Id.*

[118] SMF at ¶ 86.

████████████████████████████ [119]

- ████████████████████████████████████████████████████

████████████████████████████████████ [120]

Given the above, Kove's theory fails as a matter of law for two independent reasons. First, it's undisputed that ████████ doesn't necessarily ███████████████████████ ███████████████████. As such, ████████████ can't satisfy the construction of the required identifier ("a unique encoding that identifies an individual entity, and with which zero or more location strings are associated in a location server"). And Dr. Goodrich didn't explain how ██████ ████████████████████████████████ ████████████████████ satisfies the identifier construction's requirement that it *must* identify an individual item.

Second, there's no evidence that ████████████████████████████████████ ██████████. So, ████████████ don't qualify as the required "location servers," as they don't contain the requisite "identifier/location mappings." And, to the extent Dr. Goodrich's opinion can be read as suggesting that they do, it lacks any foundation in the record. Indeed, the DDB source code shows that ████████████████████████████, though they store metadata associated with the partition key that the primary key comprises (along with, in the much more common composite type, a sort key).[121] Dr. Goodrich didn't dispute that. Rather, he acknowledged at deposition that his opinions that the ████████████ are location servers depend on the ██████████ ██[122] Further, he admitted that he put ████████████████████████████████ *precisely*

---

[119] SMF at ¶ 86.

[120] *Id.*

[121] SMF at ¶ 85. ██████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████

[122] *Id.*

27

Appx18712

*because* ███████████████████████████████████ :

    Amazon Atty: ████████████████████████████████

    Goodrich: That's why I had this additional parenthetical that ████████████ ██████████████████████████████[123]

And when Amazon asked Dr. Goodrich if the ████████████████████████████████████

████████████████████████████████████████████████████████████████ , he

testified that they didn't.[124]

Accordingly, there's no dispute that the ████████████ don't store the required "identi-fier"—which, as construed, must be "unique" and identify "an individual entity." And there should be no dispute about the meaning of this already construed term. Kove itself has repeatedly applied the same understanding of what "identifier" requires, particularly when it comes to issues of va-lidity. For example. Kove recently argued in Reexamination 90/019,109 for distinguishing certain prior art (Ault) on the basis that Ault's "file set location server" maintained information identifying "file sets" that may hold multiple objects, rather than being specifically limited to holding a single object.[125] Based on those arguments, and after adopting this Court's identifier construction, the Patent Office withdrew the non-final rejection based on Ault, finding:

> [Kove's] arguments with respect to the [Ault combination] overall persuasive, in particular the argument with respect to the combination failing to disclose the claimed identifiers uniquely identifying an entity as required when interpreting the term under *Phillips* [*v. AWH Corp.*]."[126]

Here, just as with Ault's "file sets," ██████████████████████████████████ . And ████████

---

[123] SMF at ¶ 89.

[124] SMF at ¶ 85 ("Q. ████████████████████████████████████████ A. It associates ████████████████████████████████████████████████████████████████ ]. Q. Okay. So it associates ████████████████████████████ ? A. That's right.").

[125] SMF at ¶ 9.

[126] SMF at ¶ 10. Although the Patent Office issued a final rejection of three out of four asserted claims at issue, it withdrew the non-final rejection based on Ault. *Id.*

28

██ (which Kove only looked to because ███████████, as Dr. Goodrich admitted) doesn't qualify as an identifier because it identifies ██████████████████████████. This follows not only from the construction of identifier ("a unique encoding that identifies an individual entity") but the arguments consistent with this construction that Kove recently made to the Patent Office to overcome Ault. And because Kove can't show that ████████ maintain an identifier (or identifier/location mappings), Kove can't satisfy the identifier and location-server requirements of all asserted claims. Thus, there's no genuine dispute of material fact that DDB doesn't infringe those 17 asserted claims.

### III.  SUMMARY JUDGMENT ON WILLFULNESS AND ENHANCED DAMAGES IS WARRANTED.

Under 35 U.S.C. § 284, a court may enhance damages in a patent-infringement case by "up to three times the amount found or assessed." In *Halo Electronics, Inc. v. Pulse Electronics, Inc.*, the Supreme Court clarified that § 284 enhanced damages were "designed as a 'punitive' or 'vindictive' sanction for egregious infringement behavior."[127] And the Court further explained that:

> The sort of conduct warranting enhanced damages has been variously described in our cases as willful, wanton, malicious, bad-faith, deliberate, consciously wrongful, flagrant, or—indeed—characteristic of a pirate.[128]

Since *Halo*, the Federal Circuit has divided the enhanced-damages determination into two stages.[129] First, as a threshold matter, the factfinder must find that the infringement was willful.[130] This requires the patent owner to show the accused infringer had knowledge of the patent and "a

---

[127] 579 U.S. 93, 103 (2016).

[128] *Id*. at 103–04; *accord id*. at 106 (Enhanced damages "should generally be reserved for egregious cases typified by willful misconduct.").

[129] *Extang Corp. v. Truck Accessories Grp., LLC*, No. 19-cv-923, 2022 WL 607868, at *1 (D. Del. Feb. 18, 2022) (citing *Eko Brands, LLC v. Adrian Rivera Maynez Enters., Inc.*, 946 F.3d 1367, 1378 (Fed. Cir. 2020)).

[130] *Extang*, 2022 WL 607868, at *1; *accord Bayer*, 989 F.3d at 988; *SRI Int'l, Inc. v. Cisco Sys., Inc.*, 14 F.4th 1323, 1330 (Fed. Cir. 2021) (willfulness requires "deliberate or intentional infringement.").

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KOVE IO, INC., | Civil Action No. 1:18-cv-08175 |
| Plaintiff, | Judge Matthew F. Kennelly |
| v. | Jury Trial Demanded |
| AMAZON WEB SERVICES, INC., | █████████████ |
| Defendant. | |

**AMAZON WEB SERVICES, INC.'S STATEMENT OF MATERIAL FACTS**

Under Federal Rule of Civil Procedure 56 and Local Rule 56.1(d), Defendant Amazon Web Services, Inc. ("Amazon") submits this Statement of Material Facts in support of its motion for summary judgment.

**THE KOVE PATENTS**

1. Plaintiff Kove, Inc. ("Kove") alleges that Amazon's Simple Storage Service ("S3") and DynamoDB ("DDB") (together, the "Accused Products") infringe Kove's '640, '170, and '978 patents (collectively, the "Kove Patents").[1]

2. The Kove Patents describe a location service called "network distributed tracking wire transfer protocol" ("NDTP") for "storing and retrieving data across a distributed data collection."[2] The Kove Patents each describe how to locate particular units of data within a distributed database, *i.e.*, specific ways to answer the question "Where is my data?":

> A distributed database is one where data is stored and retrieved among multiple machines connected by a network. Typically, each machine in which some portion

---

[1] Ex. 1 ('640 patent), Ex. 2 ('170 patent), Ex. 3 ('978 patent), Ex. 4, Kove's March 2, 2023 Fourth Amended Final Infringement Contentions. Exhibits are attached to the accompanying declaration of R. William Sigler.

[2] Ex. 1 ('640 patent) at abstract, Ex. 2 ('170 patent) at abstract, Ex. 3 ('978 patent) at abstract and 4:20-25.

distributed databases and networks.[30] He has dedicated more than three decades to implementing, managing, and analyzing distributed and relational databases.[31] In 1994, he supported one of the ten largest Oracle data warehouses in the United States.[32] Mr. Greene has authored numerous books on distributed databases and architectures—including six on Oracle, a prior art database product that Amazon relies on here and in the reexaminations—explaining how they work and how to optimize their performance for database administrators ("DBAs").[33] The following table lists the most relevant texts he has written in this technology field.[34]

| Title | Publication Year | Pages |
|---|---|---|
| Oracle DBA Survival Guide | 1995 | 769 |
| Oracle 7.3 Developer's Guide | 1996 | 1,008 |
| Windows NT Server 4.0 Unleashed | 1996 | 1,152 |
| Microsoft BackOffice Unleashed | 1996 | 1,222 |
| Oracle Unleashed | 1996 | 1,404 |
| Oracle Unleashed, 2nd Edition | 1997 | 1,431 |
| Microsoft BackOffice Unleashed, 2nd Ed. | 1997 | 1,503 |
| Oracle Development Unleashed | 1998 | 1,538 |
| Oracle and Java Development | 2001 | 438 |

**THE ACCUSED S3 PRODUCT**

14.     Amazon engineers developed S3 from the ground up starting in ████, and Amazon introduced it in March 2006,[35] over 12 years before Kove filed this lawsuit.[36]

---

[30] Ex. 12, 07/03/2023 Greene Report, ¶¶ 5-12.

[31] Ex. 12, 07/03/2023 Greene Report, ¶¶ 5-12.

[32] Ex. 12, 07/03/2023 Greene Report, ¶¶ 5-12.

[33] Ex. 12, 07/03/2023 Greene Report, ¶¶ 5-12.

[34] Ex. 12, 07/03/2023 Greene Report, ¶¶ 5-12.

[35] Ex. 13, 06/04/2021 A. Vermeulen Dep. Tr., 43:12-44:24 ("The [S3] project did not commence until ████████ ."); 99:12-21 ("So the S3 project was really initiated, and we started design work during a two-day off-site at the Seattle Convention Center in ████████ ."); Ex. 8, 08/18/2023 Grama Report, ¶ 110.

[36] Ex. 14, 09/09/2023 M. Goodrich Dep. Tr., 207:3-10 (Amazon Atty: "In Paragraph 70, in the first sentence, your report says 'Kove filed its Complaint for patent infringement on December 12, 2018,' correct?"

15.    S3 provides a system that can be used to store and retrieve data at any time, from anywhere on the internet. As Amazon has stated:

> Amazon S3 is storage for the Internet. IT's designed to make web-scale computing easier for developers. Amazon S3 provides a simple web services interface that can be used to store and retrieve any amount of data, at any time, from anywhere on the web. It gives developer access to the same highly, scalable, reliable, fast, inexpensive data storage infrastructure that Amazon uses to run its own global network of websites. The service aims to maximize benefits of scale and pass those benefits on to developers.[37]

16.    In S3, data storage and retrieval relies on numerous different components working together, including: the end user device, ███████████████████████ ███████████████████████████████████████████████.[38] Users access S3 objects with the following steps called a "Get Request," which Dr. Grama also summarized into the diagram below:[39]

   A. The end user sends the Get object request to the ████████████.[40]
   B. ██████████████████████████████████████████[41]
      ██████████████████████████████████████████[42]

---

Goodrich "Yes, that is correct." Amazon Atty: All right. And December 12, 2018 is over 12 years after Amazon launched S3, right?" Goodrich "Yes, that is correct.")

[37] Ex. 15, AMZ_KOVE_000061904.

[38] Ex. 16, AMZ_KOVE_000012900 at AMZ_KOVE_000012902; Ex. 17, 07/06/2023 Goodrich Corrected Report, Ex. D ¶ 16; Ex. 14, 09/09/2023 M. Goodrich Dep. Tr., 212:10-14, 297:9-298-2, 300:15-301:12 (acknowledging accused products are "highly complex," and capable of storing "any amount of data" and serving "any level of request traffic.").

[39] Ex. 8, 08/18/2023 Grama Report, ¶ 119.

[40] Ex. 16, AMZ_KOVE_000012900 at AMZ_KOVE_000012900, AMZ_KOVE_000012902; 07/06/2023 Goodrich Corrected Report, Ex. D ¶ 38; Ex. 16, AMZ_KOVE_000012900 (describing GET process); Ex. 8, 08/18/2023 Grama Report, ¶ 120.

[41] Ex. 16, AMZ_KOVE_000012900 at AMZ_KOVE_000012902; Ex. 18, AMZ_KOVE_000062719 at AMZ_KOVE_000062734; Ex. 17, 07/06/2023 Goodrich Corrected Report, Ex. D ¶ 27; Ex. 8, 08/18/2023 Grama Report, ¶ 120.

[42] Ex. 16, AMZ_KOVE_000012900 at AMZ_KOVE_000012902; Ex. 17, 07/06/2023 Goodrich Corrected Report, Ex. D ¶ 27 ("Each ████████████████████████████████…"); Ex. 8, 08/18/2023 Grama Report, ¶ 120.



---

[43] Ex. 16, AMZ_KOVE_000012900 at AMZ_KOVE_000012902; Ex. 17, 07/06/2023 Goodrich Corrected Report, Ex. D ¶ 27; Ex. 8, 08/18/2023 Grama Report, ¶ 120.

[44] Ex. 17, 07/06/2023 Goodrich Corrected Report, Ex. D ¶¶ 38-39; Ex. , 08/18/2023 Grama Report, ¶ 120; *see also* Ex. 16, AMZ_KOVE_000012900 (describing GET process).

[45] Ex. 16, AMZ_KOVE_000012900 at AMZ_KOVE_000012902; Ex. 17, 07/06/2023 Goodrich Corrected Report, Ex. D ¶ 33; Ex. 8, 08/18/2023 Grama Report, ¶ 120.

[46] Ex. 16, AMZ_KOVE_000012900 at AMZ_KOVE_000012902; Ex. 17, 07/06/2023 Goodrich Corrected Report, Ex. D ¶ 33; Ex. 16, 08/18/2023 Grama Report, ¶ 120.

[47] Ex. 16, AMZ_KOVE_000012900 at AMZ_KOVE_000012902; Ex. 17, 07/06/2023 Goodrich Corrected Report, Ex. D ¶ 33; Ex. 8, 08/18/2023 Grama Report, ¶ 120.

[48] Ex. 16, AMZ_KOVE_000012900 at AMZ_KOVE_000012902; Ex. 17, 07/06/2023 Goodrich Corrected Report, Ex. D ¶ 33; Ex. , 08/18/2023 Grama Report, ¶ 120.

[49] Ex. 16, AMZ_KOVE_000012900 at AMZ_KOVE_000012902; Ex. 17, 07/06/2023 Goodrich Corrected Report, Ex. D ¶¶ 38-39; Ex. , 08/18/2023 Grama Report, ¶ 120.



**THE ACCUSED DDB PRODUCT**

17.     Amazon engineers began developing DDB from scratch in ▮▮▮▮, and it became available to the public in January 2012,[50] over six years before Kove filed this lawsuit.[51]

18.     With DDB, a customer can create database tables to organize and access stored

---

[50] Ex. 19, 05/24/2023 R. Blackman Dep. Tr., 45:6-11 (describing when Amazon first thought about DDB); 51:5-19 (describing the initial DDB team); 68:17-69:6 (describing scaling benefits of DDB); 70:2-5 (describing designing DDB APIs to be predictable); 93:3-14 (describing other design goals of DDB); 103:20-21 ("I think there are different use cases between SimpleDB and DynamoDB.").

[51] Ex. 14, 09/09/2023 M. Goodrich Dep. Tr., 213:14-20 (Amazon Atty: "And we talked about previously that Kove filed its complaint in this case on December 12, 2018, right?" Goodrich: "That's right." Amazon Atty: "And that's over six years after Amazon launched DynamoDB, right?" Goodrich "Yes, that's correct.").

items.[52] A "table" is a collection of data called "items" and each item is a collection of "attributes."[53] "Items" are similar to rows or records in other database systems.[54]

19.     In DDB, the user defines a ██████████ to ██████████████████████ ███████. The Amazon DDB documentation states:

███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████[55]

███████████████████████████████████████████████████
██████████████████████████████████████████[56]

███████████████████████████████████████████████████
███████████████████████████████████████████████[57]

Dr. Goodrich states:

> Items are distinguished among the other items in the table by ████████████ ████████████[58]

> As explained above, ██████████████████████████████████ ███████████████ (corresponding to an "entity") in the table, so that no two items can have ███████████.[59]

20.     DDB stores data from tables in ████████ managed by DDB.[60] Amazon DDB

---

[52] Ex. 20, 07/06/2023 Goodrich Corrected Report, Ex. E, ¶¶ 5, 11. *See also*, Ex. 21, 01/29/2020 J. Sorenson Dep. Tr. 53:11–54:9.

[53] Ex. 20, 07/06/2023 Goodrich Corrected Report, Ex. E, ¶ 7; Ex. 22, AMZ_KOVE_000007001 at AMZ_KOVE_000007013–AMZ_KOVE_000007014.

[54] Ex. 20, 07/06/2023 Goodrich Corrected Report, Ex. E, ¶ 7; Ex. 22, AMZ_KOVE_000007001 at AMZ_KOVE_000007014.

[55] Ex. 23, AMZ_KOVE_000009918 at AMZ_KOVE_000009919.

[56] Ex. 24, AMZ_KOVE_000009865 at AMZ_KOVE_000009881.

[57] Ex. 24, AMZ_KOVE_000009865 at AMZ_KOVE_000009872.

[58] Ex. 20, 07/06/2023 Goodrich Corrected Report, Ex. E, ¶ 9.

[59] Ex. 20, 07/06/2023 Goodrich Corrected Report, Ex. E, ¶ 83.

[60] Ex. 25, AMZ_KOVE_000446229 at AMZ_KOVE_000446248.


documentation states:

> DynamoDB stores data ███████. ██████████ is an allocation of storage for a table, backed by ████████████████████████████████ Availability Zones within an AWS Region. ████████████████████████████████████████████████████[61]

Dr. Goodrich states:

> When AWS stores the data in a table, it stores the data ██████████ A table can be ████████████████████████████████████.[62]

### THE '034, '035, AND '036 REEXAMINATIONS

21.     On November 19, 2021, Amazon requested *ex parte* reexamination ("Reexam") of all Asserted Claims as obvious over combinations of Oracle Names Administrator's Guide, Release 2.0 ("ONAG"), Oracle DBA Survivial Guide, 1st Edition. ("OSG"), U.S. Pat. No. 5,777,989 ("McGarvey"), and U.S. Pat. No. 5,301,286 ("Rajani") (collectively the "Oracle prior art").[63] The Patent Office granted the requests and initiated review of all asserted claims.[64]

22.     On May 4, 2022, as part of the '036 Reexam, the Patent Office rejected '640 Patent claims 17, 18, and 24 in view of ONAG, OSG, and McGarvey.[65]

23.     On May 11, 2022, as part of the '035 Reexam, the Patent Office rejected '170 Patent claims 1 and 2 in view of ONAG, OSG, and Rajani, claims 6, 8, and 15 in view of ONAG, OSG, and McGarvey, and claim 9 and 12 in view of ONAG, OSG, McGarvey, and Rajani.[66]

24.     On June 28, 2022, as part of the '034 Reexam, the Patent Office rejected '978 Patent

---

[61] Ex. 25, AMZ_KOVE_000446229 at AMZ_KOVE_000446248.

[62] Ex. 20, 07/06/2023 Goodrich Corrected Report, Ex. E, ¶ 11.

[63] Amazon also requested review of unasserted claim 9 of the '170, from which asserted claim 12 depends.

[64] *E.g.,* Ex. 26, '036 Reexam. Grant Order at 1-19, *E.g.,* Ex. 27 '034 Reexam. Grant Order at 1-15, *E.g.,* Ex. 28, '035 Reexam. Grant Order at 1-12.

[65] Ex. 29, '036 Reexam. NFOA at 4.

[66] Ex. 30, '035 Reexam. NFOA at 8-9.

claims 1 and 31 in view of ONAG and OSG, claims 3, 10, and 14 in view of ONAG, OSG, and McGarvey, and claim 6 in view of ONAG, OSG, and Rajani.[67]

25. The '640 and '170 patents expired on April 8, 2020, and the '978 patent expired on September 25, 2020.[68] Because the Kove Patents were expired, Kove didn't have the option of amending their claims during the '034, '035, and '036 reexaminations.[69]

26. In each of the '034, '035, and '036 Reexams, Kove conducted an *ex parte* examiner interview, filed an Office Action Response, and included a supporting declaration by Dr. Goodrich.[70]

**THE ORACLE PRIOR ART**

27. In the '034, '035, and '036 Reexaminations, the Patent Office considered the Asserted Claims against the Oracle prior art for the first time. Specifically, each reexamination included ONAG, a manual published by Oracle, LLC, and OracleSG, a book authored by Mr. Greene to guide database administrators' use of Oracle.[71]

28. ONAG describes a real product, the Oracle Names Servers, that comprise a part of the larger Oracle7 database system.[72] The Names Servers sole role is assisting clients to locate their data. The Patent Office stated:

> With respect to claim 1, OracleNamesAdminGuide discloses an Oracle 7 distributed database management system (DBMS)for managing data stored in a

---

[67] Ex. 31, '034 Reexam. NFOA, at 2.

[68] Dkt. 145 at 3.

[69] *See, e.g.*, Ex. 29, '036 Reexam. NFOA at 3-4.

[70] Ex. 27, '034 Reexam. Interview Summary, Ex. 32, '034 Reexam. Response, Ex. 33, '034 Reexam. Goodrich Dec., Ex. 34, '035 Reexam. Interview Summary, Ex. 35, '035 Reexam. Response, Ex. 36, '035 Reexam. Goodrich Dec., Ex. 37, '036 Reexam. Interview Summary, Ex. 38, '036 Reexam. Response, Ex. 39, '036 Reexam. Goodrich Dec.

[71] Ex. 29, '036 Reexam. NFOA at 3-4, Ex. 30, '035 Reexam. NFOA at 8-9, Ex. 31, '034 Reexam. NFOA at 2.

[72] *E.g.*, Ex. 39, '165 Reexam. Greene Dec., ¶ 114.

distributed network. The DBMS allows users to request and manage data that is located in the distributed system using Oracle Names Servers.

The Oracle Names Servers store names and addresses for network services such as databases, as well as the names and addresses of other Oracle Names Servers. After services (e.g., databases) have been defined in Oracle Names, users only need to refer to them by name to connect to a database or network service (see page 23).

The Names Server has a single purpose: to resolve or assist in resolving a client-initiated name request. It interprets the request, then looks up the name in its cache, then sends the response back to the client (pages 52-53).[73]

29.     ONAG explains that the examples and figures presented in it are non-limiting:

This manual contains examples and figures that refer to specific machine types, network protocols, and operating systems. These references are examples of possible configurations and are not representative of all configurations.[74]

30.     ONAG includes examples of both hierarchical and non-hierarchical, or "flat,"

configurations. For example, ONAG Figure 3-8 shows the following:[75]

---

[73] *E.g.*, Ex. 28, '035 Reexam. Grant Order at 12.

[74] Ex. 40, AMZ_KOVE_000528884 at AMZ_KOVE_000528888.

[75] *E.g.*, Ex. 41, '165 Reexam. Greene Dec., ¶¶ 63-66.



Figure 3 – 8 Two Centralized Administration Alternatives

**KOVE'S DISCLAIMING STATEMENTS TO THE PATENT OFFICE**

31.     After the Patent Office ordered reexamination of all Asserted Claims based on the

Oracle Prior Art, Kove argued that the use of hashing and redirect messages meant that the claims

require a non-hierarchical arrangement of location servers. For example, Kove stated:

> Furthermore, claim 10 requires each location server be configured to transmit a redirect message comprising information to for finding a location server having location information. Therefore, these limitations require a non-hierarchical cluster configuration.[76]
>
> As such, claim 1 requires data location information to be portioned and organized across the data location servers in the network *based on a hash function*. A hash function necessarily organizes data in a non-hierarchical manner, meaning claim 1 can only be accomplished through the duster configuration taught by the specification.[77]

---

[76] Ex. 32, '034 Reexam. Response at 36.

[77] Ex. 35, '035 Reexam. Response at 26.

32.     In each of the '034, '035, '036, and '109 Reexaminations, Kove described the Kove

Patents' invention as follows:

> The structured relationships of the invention allow clients to access data in distributed environments through a non-hierarchical, limitlessly scalable, server structure that enables retrieval of requested information in not more than two iterations.[78]

> Their invention, as embodied in the claims of the '978 patent, enables a client to retrieve data through any server in the network and receive in response the location information associated with a desired entity. The structured relationships of the invention allow clients to access data in distributed environments through a non-hierarchical, limitlessly scalable, server structure that enables retrieval of requested information in not more than two iterations.[79]

33.     In these reexaminations, Kove stated that '640 Patent claims 17, 18, and 24, '170

claims 1, 2, 6, 8, 12, and 15, and '978 claims 3, 10, 14 require non-hierarchical clusters. For

example, in the '036 Reexamination, Kove stated that '640 claims 17 and 18, from which claim

24 depends, expressly require non-hierarchical clusters:

> In contrast, claims 17 and 18 recites a *non-hierarchical* cluster configuration.[80]

> This non-hierarchical duster composition is expressly claimed in claims 17 and 18, through the requirement that "each" (i.e., all) of the data location servers be similarly configured to respond to a client request with the aforementioned information.[81]

> Although the '640 specification discloses hierarchical applications for NDTP as possible embodiments, [asserted] claims 17 and 18 require *non-hierarchical* structure, as explained here and throughout this Reply [to the non-final rejection].[82]

And, in the '035 Reexamination, Kove stated that '170 claims 1, 2, 6, 8, 12, and 15 require non-

---

[78] Ex. 37, '036 Reexam. Response at 10, Ex. 38, '036 Reexam. Goodrich Declaration at 10, Ex. 35, '035 Reexam. Response at 10, Ex. 32, '034 Reexam. Response at 12, Ex. 10, '109 Reexam. Response at 9.

[79] Ex. 10, '109 Reexam. Response at 9.

[80] Ex. 37, '036 Reexam. Response at 23.

[81] Ex. 37, '036 Reexam. Response at 39.

[82] Dkt. 539-2 at 23.

hierarchical clusters:

> Each of the claims at issue require, expressly or impliedly, a non-hierarchical cluster configuration of location servers in a network.[83]

> In contrast, claims 1, 6, and l5 of the '170 patent require networks with non-hierarchical (or "cluster") configurations of location servers that enable each server in the server network to know which location server contains the location(s)of the desired data.[84]

> These features exemplify the non-hierarchical cluster configuration required in claim l.[85]

> Accordingly, the redirect message limitations, as recited by claims 6 and l5 demonstrate that claims 6 and 15 recite a non-hierarchical cluster configuration.[86]

> As stated above, the limitations of claims 6 and 15 require a non-hierarchical cluster configuration that allows location servers to return a redirect message that identifies which data location server is "known to have" (claim 6) or definitively "includes" (claim 15) the location information.[87]

> It is my opinion that a POSITA at the time of this invention would understand claims 1, 6, and 15, through various limitations in each of the claims, to require a non-hierarchical cluster configuration as taught by the '170 patent.[88]

> This non-hierarchical cluster composition is expressly claimed in claim 1, through the requirement that the data location information is portioned and organized across the data location servers based on a hash function and each and every data location server being configured to determine the data location server that contains the location information based on applying the hash function to the identifier string associated to the location information.[89]

And, in the '034 Reexamination, Kove stated that '978 claims 3, 10, 14 require non-hierarchical

clusters:

---

[83] Ex. 35, '035 Reexam. Response at 25.

[84] Ex. 35, '035 Reexam. Response at 25.

[85] Ex. 35, '035 Reexam. Response at 26.

[86] Ex. 35, '035 Reexam. Response at 26.

[87] Ex. 35, '035 Reexam. Response at 51.

[88] Ex. 35, '035 Reexam. Goodrich Declaration at 9.

[89] Dkt. 539-3 at 36 (emphasis added); *see also id.* ("This non-hierarchical cluster composition is expressly claimed in claims 6 and 15….") (quoting Dkt. 539-3 at 53).

In contrast, independent claims 10 and 14 and dependent claim 3 of the '978 patent require networks with non-hierarchical (or "cluster") configurations of location servers that enable each server in the server network to know which location server contains the location(s) of the desired data.[90]

Independent claims 10 and 14 and dependent claim 3 require, expressly or impliedly, a non-hierarchical cluster configuration of locations servers in a network.[91]

34. In these reexaminations, Kove described the claims as imposing certain requirements of every network server. For example, in the '036 Reexamination, Kove also described rejected '640 claims 17 and 18, from which claim 24 depends, as imposing certain requirements of "every server in the network":

Claims 17 and 18 therefore require ***every*** server in the network be able to return information for calculating the location of the server that contains the requested information. In other words, any first queried server will either have the requested information or will provide the client with the information to find the requested information in the client's next query.[92]

In the '035 Reexamination, Kove also described the '170 claims as imposing certain requirements of "every server in the network":

In other words, claim 1 requires every location server m the network must be configured to identify the location server in that network that contains the location information for the data entity identified by the identifier.[93]

Further, a POSA at the time of the invention would have no reason to modify or combine Oracle Admin with OracleSG to achieve this limitation both references are silent with respect to configuring every server in the network to determine the data location server that contains the location information.[94]

Another reason is that requiring every location server in the server network be configured to determine which server contains the sought after location information connotes a flat, non-hierarchal structure, where every server is similarly capable of

---

[90] Ex. 32, '034 Reexam. Response at 35.

[91] Ex. 32, '034 Reexam. Response at 35.

[92] Ex. 37, '036 Reexam. Response at 10.

[93] Ex. 35, '035 Reexam. Response at 32.

[94] Ex. 35, '035 Reexam. Response at 33.

identifying the server with the requested information, thus obviating the need for any hierarchy.[95]

In the '034 Reexamination, Kove also described the rejected '978 claims as imposing certain requirements of "any given server" that are incompatible with hierarchical structures:

> In order to satisfy the requirements of independent claims 10 and 14 and dependent claim 3, Names Service would have to abandon its "tree" composition that is the center of its organizational structure in favor of a non-hierarchical one where any given server is able to return either the requested information or information useable by the client to locate the server with the requested information.[96]

> For example, if a queried server receives a request for the data locations associated with a particular identifier but does not have it, that server will return a message to indicating which other server in the network contains the requested information. This configuration "collapses" the hierarchical composition of Oracle Names, making it entirely different in practice and principle from what ONAG discloses. ONAG in no way teaches or suggests something so fundamentally different from the architecture of the Oracle Names system.[97]

> Oracle Names depends on a hierarchical structure where a client can only query to the node immediately "above" or "below" it in the "tree." If the queried server does not have the requested information, that server forwards the query to the next higher node and so on until it reaches the root server.[98]

> Therefore, these limitations require a non-hierarchical cluster configuration. [Goodrich Decl., ¶¶ 35-43, 52-57]. These limitations cannot be met in hierarchical configurations such as Names Server because each location server in tree-structures do not necessarily store information for finding the location server having the desired location information. [*Id*]. Turning off request forwarding, as taught by ONAG, does not enable servers in the Names network to meet this limitation [*see infra*, pp. 28-29 and 44-45].[99]

35.   In each reexamination, Kove and Dr. Goodrich distinguished the rejected claims

from the Oracle prior art by arguing that Oracle is limited to using hierarchical tree paths. In the

---

[95] Ex. 36, '035 Reexam. Goodrich Declaration at 10.

[96] Ex. 32, '034 Reexam. Response at 40.

[97] Ex. 32, '034 Reexam. Response at 35.

[98] Ex. 32, '034 Reexam. Response at 34.

[99] Ex. 32, '034 Reexam. Response at 36.

'036 Reexamination, Kove filed the following statements:

> In contrast, naming systems like Oracle Names imposes a hierarchical tree structure that limits queries to be received by a client's local or preferred server, and servers are not configured to provide the aforementioned information.[100]

> Unlike DNS or Names Service, Oracle Admin relies on traversing network paths and relationships organized in a hierarchical tree structure.[101]

> Oracle Admin's hierarchical configuration is foundationally different from the non-hierarchical cluster configuration required by claims 17 and 18. An important distinction that, unlike the non-hierarchical cluster configuration required by claims 17 and 18, the Names Servers in Oracle Admin's hierarchical structure do not have information that can be used to calculate the location of location servers containing data location strings.[102]

> As I described above, Oracle Admin is a system similar to DNS, and as described in Oracle Admin, borrows the DNS system to allow clients to search for network addresses of network services. (*See* e.g., Oracle Admin, 56-57 and 190-192). Oracle Admin does not contemplate a non-hierarchical cluster configurations [*sic*], and OracleSG and McGarvey do not either.[103]

> In contrast to the hierarchical "tree" structure of prior systems like ONAG, the configuration taught by the '978 patent allows for linear scaling of the location servers. Particularly, the patent teaches seamlessly adding location servers based on the growth of a network.[104]

> The '640 patent requires that **each and every server in the data location server network have the capability of transmitting information to the client that the client then processes to determine the server that contains its requested information**. This configuration **"collapses" the hierarchical composition** of Oracle Names, making it entirely different in practice and principle from what Oracle Admin discloses. Oracle Admin in no way teaches that Oracle Names network servers have this capability.[105]

In the '035 Reexamination, Kove and Dr. Goodrich stated:

> In contrast, naming systems like Oracle Names imposes a hierarchical tree structure

---

[100] Ex. 37, '036 Reexam. Response at 39.

[101] Ex. 39, '036 Reexam. Goodrich Dec. at 12.

[102] Ex. 39, '036 Reexam. Goodrich Dec. at 12.

[103] Ex. 39, '036 Reexam. Goodrich Dec. at 13.

[104] Ex. 9, '109 NFOA Response at 16.

[105] Ex. 38, '036 Reexam. Response at 23–24) (emphasis in original).

that limits queries to be received by a client's local or preferred server, and servers are not configured to provide the aforementioned information.[106]

Oracle Admin's Name Servers has no such capability; the hierarchical tree structure of the network limits each server to knowing only about its direct children and therefore has no knowledge of information stored in other Names Servers. (Oracle Admin, p. 191). Accordingly, Oracle Admin's Names Servers are not configured to determine with any specificity or certainty which location server is known to include the sought-after data location information.[107]

Like OracleSG and Rajani, Oracle Admin does not contemplate portioning and organizing data location information across data location servers and enabling each and every Names Server to be configured to determine, which one of the Names Servers stores the requested location information. In fact, Oracle Admin cannot satisfy these features.[108]

As the example in Fig. C-4, and as explained on pages l90-192 of Oracle Admin, even a modestly sized environment with a handful of servers may take numerous iterations to return a query.[109]

ln other words, *whatever location server is queried, if that location server does not have the information, it will either identify the location server that does, identify a list of location servers containing at least the location server that does, and/or send the algorithm or function that will allow the client to make that identification for itself*; rather than traverse a network path across a tree structure like DNS or Oracle Name Service that maintained a static relationship of data and that data's location.[110]

And in the '034 Reexamination, Dr. Goodrich similarly distinguished the claims and the purportedly hierarchical Names Servers in Oracle. He stated:

It is my opinion that a POSITA at the time of this invention would understand claims 3, 10, and 14, through various limitations in each of the claims, to require a non-hierarchical cluster configuration as taught by the '978 patent.[111]

Furthermore, ONAG describes a hierarchical tree structure and claims 3, 10, and 14 requires a non-hierarchical cluster configuration. Therefore, attempting to

---

[106] Ex. 35, '035 Reexam. Response at 36.

[107] Ex. 35, '035 Reexam. Response at 52.

[108] Ex. 35, '035 Reexam. Response at 35.

[109] Ex. 35, '035 Reexam. Response at 25.

[110] Ex. 35, '035 Reexam. Response at 15.

[111] Ex. 33, '034 Reexam. Goodrich Dec. at 11.

modify ONAG with OracleSG and McGarvey to achieve the requirements of claims 3, 10, and 14 would require abandoning Oracle Admin's hierarchical structure and reconfiguring ONAG such that Names Servers are configured to transmit a redirect message indicating information to find the Names Server that includes the requested location information.[112]

ONAG's principle operation involves traversing a hierarchical tree configuration of Names Severs to retrieve a network address. Attempting to modifying ONAG to satisfy claims 3, 10, and 14 requirements would involve abandoning ONAG's hierarchical structure, requiring substantial reconstruction and redesign of ONAG's elements (e.g., Names Servers).[113]

The Examiner points to ONAG Figure C-4 as allegedly disclosing the claimed "cluster topology" recited in claim 10. But ONAG only describes the hierarchical topology of [Oracle's] Names Servers.[114]

36.     On September 12, 2022, Dr. Goodrich and Kove's attorneys met with the Patent Examiner in the '034 Reexamination for an *ex parte* interview.[115] Kove presented a slide show that included the below slide summarizing the purported differences between the Kove Patents and the Oracle prior art:[116]

---

[112] Ex. 33, '034 Reexam. Goodrich Dec. at 26.

[113] Ex. 33, '034 Reexam. Goodrich Dec. at 27.

[114] Dkt. 539-4 at 51]; *see also id*. at 35 ("ONAG lacks the non-hierarchical cluster structure required to satisfy the requirements of independent claims 10 and 14 and dependent claim 3."); *id*. ("In contrast, independent claims 10 and 14 and dependent claim 3 of the '978 patent require networks with *non-hierarchical* (or 'cluster') configurations ….") (emphasis in original).

[115] Ex. 42, '034 Reexam. Interview Summary.

[116] Ex. 43, '034 Reexam. NFOA Response Appendix L.



37.     And in the '035 Reexamination, Kove also argued that each server must know what each location server contains:

> However, OracleSG is completely silent with respect to the aspect of the limitation that requires, well data location server in a data location network being configured to determine the data location server that contains the location information.[117]

> This allows each data location server to (1) itself determine, using the function, which other data location server stores the location information for a particular unit of data (*id.*, 14;46-15.15); (2) transmit a list of location servers which contains the location serverknow11to have the location information (*id.*, 17:65-18:8); and (3) transmit the algorithm or function to the client to enable the client lo determine which one of the data location servers stores the location information for the particular unit of data (*id.*, 14:46-15:15; 18:3-8).[118]

---

[117] Ex. 35, '035 Reexam. Response at 33.

[118] Ex. 35, '035 Reexam. Response at 15.

38. Kove also stated that using rejected claim 6's hash table to index the ONAG servers would have required "reengineering and reconfiguration":

> Attempting to modify ONAG to enable maintaining location information in an indexed location store indexed by a hash table in the Name Servers requires significant reengineering and reconfiguration of ONAG. Therefore, a POSA would not have had a reasonable expectation of success to configure ONAG to satisfy claim 6's requirement.[119]

**THE PATENT OFFICE'S RELIANCE ON KOVE'S DISCLAIMING STATEMENTS**

39. In both the '034 and '035 Reexaminations, the Patent Office withdrew its rejections based on Kove's argument that Oracle's Names Servers were incapable of knowing the contents of other names servers due to their purported limiting hierarchical organization. The Patent Office stated:

> If Oracle's Names Server had this ability, there would be no need to pass requests up and down a hierarchy of Names Servers; it could determine on its own the Names Server having the desired information and send the request directly to that Names Server.[120]

40. In the '036 Reexamination, the Patent Office didn't explain why it withdrew the rejections, instead adopting Kove's descriptions as its own. The Patent Office stated:

> Based on applicant's remarks (p29-37, p41-42) presented on 8/04/2022, The cited prior art fail to teach individually or in combination: "…**transmitting a redirect message to the client if the identification string is not associated with a location string at the data location server**…" and "…wherein the redirect message contains information for use by the client to calculate a location of a different data location server…" of claim 17; and
>
> "if the data location server does not contain the location string associated with the identification string, the location server transmits a redirect message to the client…" and "where in the redirect message contains redirect information for use by the client to calculate a location of a different data location server in the plurality of the data location server…" of claim 18.[121]

---

[119] Ex. 32, '034 Reexam. Response at 70.

[120] Ex. 44, '035 Reexam. NOIRC at 10, Ex. 45, '034 Reexam. FOA at 25.

[121] Ex.46, '036 Reexam. NOIRC at 4.

41.     In the '034 Reexamination, the Patent Office's reasons for allowing claims 3, 6, 10, and 14 specifically point to the purportedly hierarchical configuration of Names Servers as the reason it does not have the requisite knowledge of other location servers' contents. The Patent Office stated:

> In regards to independent claims 10 and 14 and dependent claim 3, the claims all require the use of a "redirect message comprising information for finding a location server known to have location information relevant to the location query" (as found in claim 3, similar language in claims 10 and 14). Oracle's Names Servers forward name requests up and down a hierarchy of Names Servers until the Names Server containing the desired information is reached, and the desired information is returned in the same way, traversing the network of Names Servers. This fact gives evidence to the fact that any given Names Server has no information regarding which specific Names Server stores a desired information item. Were any given Names Server to have such information, then the Names Server would simply pass the request directly to that Names Server, instead of forwarding the request up and down a hierarchy of Names Servers. Since any given Names Server has no information regarding which specific Names Server stores a requested item, there would be no way for the Names Server to include such information in a redirect message returned to the requesting device.[122]
>
> In regards to dependent claim 6, the claim requires that "the location information in the location server is maintained in an indexed location store indexed by a hash table." If Oracle's Names Server had this ability, there would be no need to pass requests up and down a hierarchy of Names Servers; it could determine on its own the Names Server having the desired information and send the request directly to that Names Server.[123]

42.     Amazon moved for the following additional claim constructions to address Kove's disclaimers:[124]

---

[122] Ex. 45, '034 Reexam. FOA at 24-25.

[123] Ex. 45, '034 Reexam. FOA at 25.

[124] Dkt. 539 at 9.

**APPENDIX A**

| Claims | Terms | Proposed Constructions |
|---|---|---|
| '640: 17, 18, 24<br>'170: 1, 2, 6, 8, 9, 12, 15<br>'978: 1, 3, 6, 10, 14, 17, 23, 24, 30, 31 | "network" / "system" | [network/system] **arranged in a non-hierarchical, cluster topology** |
| '640: 17, 18, 24<br>'170: 1, 2, 6, 8, 9, 12, 15<br>'978: 1, 3, 6, 10, 14, 17, 23, 24, 30, 31 | "location server" | a network-attached component that maintains, **for satisfying every request for the location of data on the network**, a set of **at least one of (1)** identifier/location mappings **or (2) information about the location of such mappings** that are modified or returned in response to **all** location request messages from clients |
| '640: 17, 18<br>'170: 1, 2, 5, 6, 8, 9, 12<br>'978: 1, 3, 6, 10, 17, 23, 24, 30, 31 | "providing" / "determin[e/ing]" / "retrieving" location information or servers | providing, **without performing any request iterations**, … location information / determin[e/ing], **without performing any request iterations**, … location servers / retrieving **in two or fewer request iterations** location information |
| '640: 17, 18<br>'170: 6, 15<br>'978: 3, 10, 14 | "return" / "sending" / "transmit[s/ting]" a redirect message | return / sending / transmit[s/ting] a redirect message **without performing any request iterations** |

On January 13, this Court denied that motion "without prejudice to the presentation of the claim construction arguments during briefing on summary judgment."[125]

## DR. GOODRICH WILL TESTIFY ABOUT THE CLAIMS' NON-HIERARCHICAL ARCHITECTURE AT TRIAL

43. For his invalidity analysis, Dr. Goodrich interpreted the claims in the same way as he and Kove did before the Patent Office. For example, in his deposition on his invalidity report in this case, Dr. Goodrich testified:

> Amazon Atty: So it's your opinion that each location server must be structured in a nonhierarchical configuration, right?
>
> Goodrich: That it is my opinion that, again, just based on the language of the claim itself, it requires -- in order to have this ability, based on the specification of the '640 patent, requires that the logical

---

[125] Dkt. 579/580.

organization among the location servers must be a nonhierarchical clustered topology. [126]

44.     Dr. Goodrich further testified that Amazon's proposed constructions incorporating such a non-hierarchical configuration would be redundant:

> Amazon Atty: In your view, what would be the harm of the Court further construing those claims to include those requirements?
>
> …
>
> Goodrich: I'm not an attorney. But as we've discussed this morning, I've been told by attorneys that it's helpful if claim construction does not confuse a jury, and to be adding on what are, in my opinion, additional limitations that are already there in the claims and are clear, in my opinion, that this is required, I believe it would be redundant, which is potentially confusing to a jury to add on that additional language that's already there. [127]

45.     Dr. Goodrich also testified that the jury at trial would understand the claims' non-hierarchical requirements based on the "sound principles" he explains to them.[128]

> Amazon Atty: Do you believe a juror reading Claim 17 of the '640 patent would understand that it requires a nonhierarchical topology for the data location servers?
>
> …
>
> Goodrich: I mean, we're not in trial right now, but I would anticipate that after I explain these terms -- this is very speculative, of course -- but after I explain these terms to the jury, the way that the Court has already construed them, what is implied by those constructions, I believe that the jury will be able to understand what is required. That's my hope. That then they will render their decision based on sound principles that I've explained to them.
>
> Amazon Atty: Do you think a single juror will know what a nonhierarchical topology is?
>
> …
>
> Goodrich: I would answer that similarly, that I will do my best – that's my

---

[126] Ex. 47, 09/11/2023 M. Goodrich Dep. Tr. 470:4-10.

[127] Ex. 47, 09/11/2023 M. Goodrich Dep. Tr. 481:7-22.

[128] Dr. Goodrich excludes claims 6, 17, 23-24, and 30, which he states were not limited either way by Kove during reexamination. *See, e.g.*, Ex. 48, 08/18/2023 Goodrich Report ¶ 64.

intent certainly. I know it's still a long ways in the future. I'll do my best to explain to the jury all the concepts at play in this case, some of them are admittedly complicated. But I believe I will be able to explain that to a jury, even to a single juror on the panel, in a way that then they would understand and be able to render a verdict that is based on sound principles.[129]

## THE KOVE PATENTS DON'T TEACH ANY CONNECTION BETWEEN REDIRECTION, HASHING, AND ARCHITECTURE

46. The Kove Patents describe the NDTP invention as applying to all topologies. For example, the '978 Patent states:

> Additionally, as illustrated in FIGS 5 and 6, the NDTP server may be a network of NDTP servers configured in any number of ways. For example, FIG. 5 illustrates a flat NDTP server topology using clustering, or a distributed topology using replication, where each of the NDTP servers 12 in the cluster may contain a different portion of a pool of associated identifier and location information. In another alternative embodiment, a hierarchical NDTP server topology, such as the NDTP server tree 52 shown in FIG. 6, may be utilized. In the NDTP server tree 52 topology, each node 54 may be an individual NDTP server 12, a cluster 50 of NDTP servers, an NDTP server tree or any combination of these arrangements.[130]

> An NDTP server hierarchy 100, such as illustrated in FIG. 21, permits identifier/location association data to be owned and physically controlled by many different entities.[131]

47. The '640 and '170 Patents specifically pronounce that there are two NDTP redirect mechanisms that allow for its use with all topologies. They state: "NDTP provides two mechanisms for server redirection. The redirection mechanisms allow cluster and hierarchical topologies, and mixtures of such topologies…"[132]

48. To support the connection between redirect messages and non-hierarchical clusters, at deposition Dr. Goodrich pointed to the description of the "client-centric approach" as the claimed redirection mechanism, alleging that the "server centric approach" would be the one

---

[129] Ex. 47, 09/11/2023 M. Goodrich Dep. Tr. 482:2-483:12.

[130] Ex. 3, 7:41-52.

[131] Ex. 3, '978 patent, 19:46–48.

[132] Ex. 1, 14:28-31, Ex. 2, 14:43-45.



US007103640B1

(12) **United States Patent**
Overton et al.

(10) **Patent No.:** US 7,103,640 B1
(45) **Date of Patent:** Sep. 5, 2006

(54) **NETWORK DISTRIBUTED TRACKING WIRE TRANSFER PROTOCOL**

(75) Inventors: **John K. Overton**, Chicago, IL (US); **Stephen W. Bailey**, Chicago, IL (US)

(73) Assignee: **Econnectix, LLC**, Chicago, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 640 days.

(21) Appl. No.: **09/661,222**

(22) Filed: **Sep. 13, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/153,709, filed on Sep. 14, 1999.

(51) **Int. Cl.**
*G06F 15/16* (2006.01)

(52) **U.S. Cl.** .......................... **709/217**; 709/219; 707/10

(58) **Field of Classification Search** ............ 709/201–3, 709/217–19, 230, 227, 228; 707/3, 4, 5, 707/6, 10
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,553,261 A | 11/1985 | Froessl | |
| 4,636,858 A | 1/1987 | Hague et al. | |
| 4,728,978 A | 3/1988 | Inoue et al. | |
| 4,800,488 A | 1/1989 | Agrawal et al. | |
| 4,825,406 A | 4/1989 | Bean et al. | |
| 4,835,372 A | 5/1989 | Gombrich et al. | |
| 4,914,571 A | 4/1990 | Baratz et al. | |
| 5,008,700 A | 4/1991 | Okamoto | |
| 5,124,814 A | 6/1992 | Takahashi et al. | |
| 5,193,185 A | 3/1993 | Lanter | |
| 5,208,623 A | 5/1993 | Takahashi | |
| 5,291,399 A | 3/1994 | Chaco | |
| 5,319,401 A | 6/1994 | Hicks | |
| 5,347,600 A | 9/1994 | Barnsley et al. | |
| 5,384,643 A | 1/1995 | Inga et al. | |
| 5,414,841 A | 5/1995 | Bingham et al. | |
| 5,455,648 A | 10/1995 | Kazami | |

| | | | | |
|---|---|---|---|---|
| 5,475,817 A | * | 12/1995 | Waldo et al. | ............... 719/316 |
| 5,479,654 A | | 12/1995 | Squibb | |
| 5,499,113 A | | 3/1996 | Tsuboi et al. | |
| 5,522,077 A | | 5/1996 | Cuthbert et al. | |

(Continued)

FOREIGN PATENT DOCUMENTS

EP 568 161 A1 3/1993

(Continued)

OTHER PUBLICATIONS

"Service Location in an Open Distributed Environment," Beitz et al, Second International Workshop on Services in Distributed and Networked Environments, IEEE Comput. Soc., pp. 28-34 (Jun. 1995).

(Continued)

*Primary Examiner*—Marc D. Thompson
(74) *Attorney, Agent, or Firm*—Brinks Hofer Gilson & Lione

(57) **ABSTRACT**

A network distributed tracking wire transfer protocol for storing and retrieving data across a distributed data collection. The protocol includes a location string for specifying the network location of data associated with an entity in the distributed data collection, and an identification string for specifying the identity of an entity in the distributed data collection. According to the protocol, the length of the location string and the length of the identification string are variable, and an association between an identification string and a location string can be spontaneously and dynamically changed. The network distributed tracking wire transfer protocol is application independent, organizationally independent, and geographically independent. A method for using the protocol in a distributed data collection environment and a system for implementing the protocol are also provided.

**25 Claims, 12 Drawing Sheets**



NETWORK DISTRIBUTED TRACKING
DISTRIBUTED RECORD RETRIEVAL

Appx18792

US 7,103,640 B1

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,537,547 | A | 7/1996 | Chan et al. |
| 5,550,981 | A | 8/1996 | Bauer et al. |
| 5,551,027 | A | 8/1996 | Choy et al. |
| 5,557,790 | A | 9/1996 | Bingham et al. |
| 5,560,005 | A | 9/1996 | Hoover et al. |
| 5,576,952 | A | 11/1996 | Stutman et al. |
| 5,579,067 | A | 11/1996 | Wakabayashi |
| 5,610,653 | A | 3/1997 | Abecassis |
| 5,617,570 | A | 4/1997 | Russell et al. |
| 5,625,841 | A | 4/1997 | Dawkins et al. |
| 5,649,247 | A | 7/1997 | Itoh et al. |
| 5,664,170 | A | 9/1997 | Taylor |
| 5,669,029 | A | 9/1997 | Fyson et al. |
| 5,740,428 | A | 4/1998 | Mortimore et al. |
| 5,764,889 | A | 6/1998 | Ault et al. |
| 5,764,906 | A * | 6/1998 | Edelstein et al. ........... 709/219 |
| 5,774,670 | A | 6/1998 | Montulli |
| 5,781,725 | A | 7/1998 | Saito |
| 5,784,565 | A | 7/1998 | Lewine |
| 5,802,518 | A | 9/1998 | Karaev et al. |
| 5,809,161 | A | 9/1998 | Auty et al. |
| 5,809,331 | A | 9/1998 | Staats et al. |
| 5,809,495 | A | 9/1998 | Loaiza |
| 5,813,006 | A | 9/1998 | Polnerow et al. |
| 5,848,246 | A | 12/1998 | Gish |
| 5,864,482 | A | 1/1999 | Hazama et al. |
| 5,872,973 | A | 2/1999 | Mitchell et al. |
| 5,875,302 | A | 2/1999 | Obhan |
| 5,903,889 | A | 5/1999 | de la Huerga et al. |
| 5,907,837 | A | 5/1999 | Ferrel et al. |
| 5,913,210 | A | 6/1999 | Call |
| 5,915,240 | A | 6/1999 | Karpf |
| 5,918,214 | A | 6/1999 | Perkowski |
| 5,920,702 | A | 7/1999 | Bleidt et al. |
| 5,940,844 | A | 8/1999 | Cahill et al. |
| 5,950,173 | A | 9/1999 | Perkowski |
| 5,961,610 | A | 10/1999 | Kelly et al. |
| 5,966,705 | A | 10/1999 | Koneru et al. |
| 5,974,124 | A | 10/1999 | Schlueter, Jr. et al. |
| 5,978,773 | A | 11/1999 | Hudetz et al. |
| 5,987,519 | A | 11/1999 | Peifer et al. |
| 5,995,965 | A | 11/1999 | Experton |
| 6,032,175 | A | 2/2000 | Fletcher et al. |
| 6,047,332 | A | 4/2000 | Viswanathan et al. |
| 6,055,544 | A | 4/2000 | DeRose et al. |
| 6,058,193 | A | 5/2000 | Cordery et al. |
| 6,092,189 | A | 7/2000 | Fisher et al. |
| 6,108,787 | A | 8/2000 | Anderson et al. |
| 6,131,095 | A * | 10/2000 | Low et al. .................... 707/10 |

| | | | |
|---|---|---|---|
| 6,154,738 | A | 11/2000 | Call |
| 6,188,766 | B1 | 2/2001 | Kocher |
| 6,201,931 | B1 | 3/2001 | Cipolla et al. |
| 6,202,070 | B1 | 3/2001 | Nguyen et al. |
| 6,209,095 | B1 | 3/2001 | Anderson et al. |
| 6,212,280 | B1 | 4/2001 | Howard, Jr. et al. |
| 6,377,986 | B1 * | 4/2002 | Philyaw et al. ............. 709/219 |
| 6,418,441 | B1 * | 7/2002 | Call ............................. 707/10 |
| 6,438,652 | B1 | 8/2002 | Jordan et al. |
| 6,463,454 | B1 | 10/2002 | Lumelsky et al. |
| 6,466,980 | B1 | 10/2002 | Lumelsky et al. |
| 6,578,068 | B1 | 6/2003 | Bowman-Amuah |
| 6,711,408 | B1 | 3/2004 | Raith |
| 2002/0112048 | A1 | 8/2002 | Gruyer et al. |

## FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 889 422 A2 | 1/1999 |
| WO | WO 86/05610 | 9/1986 |
| WO | WO 98/15910 | 4/1998 |
| WO | WO 98/31138 | 7/1998 |
| WO | WO 00/03526 | 1/2000 |

## OTHER PUBLICATIONS

Callaghan V L et al: "Structures and Metrics for Image Storage and Interchange" Journal of Electronic Imaging, vol. 2 No. 2, Apr. 1, 1993, pp. 126-137.

Bourke D G et al: "Programmable Module and Circuit for Machine-Readable Unique Serial Number" IBM Technical Dislosure Bulletin, vol. 27, No. 4A, Sep. 1, 1984 pp. 1942-1944.

Kleinholz L et al: "Supporting Cooperative Medicine: The Bermed Project" IEEE Multimedia, vol. 1, No. 4, Dec. 21, 1994, pp. 44-53.

"Method for Network Naming and Routing" IBM Technical Disclosure Bulletin, vol. 37, No. 9, Sep. 1, 1994, p. 255.

"Minimizing Locking To Access Global Shared Data", IBM Technical Disclosure Bulletin, pp 619-622, Feb. 1995.

"Service Location in an Open Distributed Environment," Beitz et al, Second International Workshop on Services in Distributed and Networked Environments, IEEE Comput. Soc., pp. 28-34 (Jun. 1995).

Muniz, R., et al., "A robust software barcode reader using the Hough transform", Abstract from IEEE/IEE Electronic Library online, printed Apr. 30, 2001, 2 pages.

Fresonke, D., "In-fab identification of silicon wafers with clean, laser marked barcodes", Abstract from IEEE/IEE Electronic Library online, printed Apr. 30, 2001, 2 pages.

Sriram, T., et al., "Applications of barcode technology in automated storage and retrieval systems", Abstract from IEEE/IEE Electronic Library online, printed Apr. 30, 2001, 2 pages.

* cited by examiner



**Use Of Request Identifiers**



Fig. 1



Fig. 2

Fig. 3



Fig. 4

Appx18797

NDTP_PUT Format

*Fig. 5*



Fig. 6

NDTP_DEL Format

Fig. 7

Appx18799



Fig. 8

Case: 1:18-cv-08175 Document #: 690-1 Filed: 10/05/23 Page 11 of 30 PageID #:30376



**Fig. 9(a)**



Fig. 9(b)

NDTP_RDR_RSP With Redirection Function

Case: 1:18-cv-08175 Document #: 690-1 Filed: 10/05/23 Page 13 of 30 PageID #:30378



Fig. 10

Appx18803



Fig. 11

**NDTP Server Constellation Context**



Fig. 12

**NDTP Client-Centric Constellation**

Case: 1:18-cv-08175 Document #: 690-1 Filed: 10/05/23 Page 15 of 30 PageID #:30380



**NDTP Server-Centric Constellation**



Fig. 13

Appx18805

US 7,103,640 B1

# 1

## NETWORK DISTRIBUTED TRACKING WIRE TRANSFER PROTOCOL

### RELATED APPLICATIONS

This application claims priority to provisional patent application Ser. No. 60/153,709, entitled SIMPLE DATA TRANSPORT PROTOCOL METHOD AND APPARATUS, filed on Sep. 14, 1999, and to regular patent application Ser. No. 09/111,896, entitled SYSTEM AND METHOD FOR ESTABLISHING AND RETREIVING DATA BASED ON GLOBAL INDICES, filed on Jul. 8, 1998.

### MICROFICHE/COPYRIGHT REFERENCE

A Microfiche Appendix (143 frames, 2 sheets) is included in this application that contains material which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the Microfiche Appendix, as it appears in the Patent and Trademark Office patent files or records, but otherwise reserves all copyright rights whatsoever.

### FIELD OF THE INVENTION

This invention relates generally to the storage and retrieval of information, and in particular, to a protocol for dynamic and spontaneous global search and retrieval of information across a distributed network regardless of the data format.

### BACKGROUND OF THE INVENTION

Data can reside in many different places. In existing retrieval systems and methods, a client seeking information sends a request to a server.

Typically, only data that are statically associated with that server are returned. Disadvantageously, the search is also usually restricted to previously known systems. The search is thus conducted only where the server knows in advance to look.

Another disadvantage of known retrieval systems is the difficulty in accessing data in different forms. Known retrieval systems are typically designed to search for data in limited forms. One example is where a client requests files based on a subject, like a person's name. In the search results, therefore, only text files of peoples' names may be retrieved. Another problem in current retrieval systems is that the client may receive text and image files in the search results, but could not seamlessly access the image files. Yet another problem in current retrieval systems is that video and sound files related to the request may not even be found in the search results. For example, a doctor might be able to retrieve medical records on a specific patient, but cannot view an MRI or X-Ray results associated with that record.

A distributed data collection is a system where data is stored and retrieved among multiple machines connected by a network. Typically, each machine in which some portion of the data in a distributed data collection may reside is called a "data repository machine", or simply a "data repository". One commonly asked question in a data repository environment is: Where is data associated with a particular entity in a distributed data collection? The data location is a key question when a distributed data collection has highly dynamic data distribution properties.

In networked environments where there are a large number of data repositories and any particular entity does not store data in all the repositories, a mechanism is needed that would permit queries to be directed only at data repositories with relevant information. It would also be beneficial to permit membership in the set of data repositories itself to be highly dynamic. Such a system would support on-the-fly addition and removal of data repositories from a distributed data collection seamlessly and without the need to reprogram the client and server participants.

### BRIEF SUMMARY OF THE INVENTION

In view of the above, the invention provides a network distributed tracking wire transfer protocol, and a system and method for using the protocol in a networked environment. The network distributed tracking wire transfer protocol includes two basic components: identification strings for specifying the identity of an entity in the distributed data collection, and location strings for specifying network locations of data associated with an entity. The protocol accommodates variable length identifier and location strings. Relationships between identification strings and location strings can be dynamically and spontaneously manipulated thus allowing the corresponding data relationships also to change dynamically, spontaneously, and efficiently. In addition, the network distributed tracking wire transfer protocol is application independent, organizationally independent, and geographically independent.

In another aspect of the invention, a system of components using the network distributed tracking protocol are provided for storing and identifying data with a distributed data collection. The components include (1) a data repository for storing data in the distributed data collection, (2) a client entity for manipulating data in the distributed data collection, and (3) a first server entity operative to locate data in the distributed data collection, which may be coupled to a client entity and/or data repository. In a network with these components, a client entity transmits an identifier string to the first server entity along with the client request, and the first server entity provides a set of location strings to the client entity in response thereto. The first server entity maps the identifier string received from the client entity to a set of location strings. The network may also include any number of additional server entities coupled to the first server entity.

According to yet another aspect of the invention, a method is provided for storing and retrieving tracking information over a network using a wire transfer protocol. A location string specifies the location of data associated with an entity in the distributed data collection and the identification string specifies the identification of an entity in a distributed data collection. A first data repository entity stores data by associating an identification string with each particular stored unit of data, and by mapping the identification string to a location string associated with the first data repository. The identification string and location string for the particular unit of data are at a first server entity coupled to the first data repository entity. A request is transmitted from a client entity to the first server entity to retrieve at least one location string associated with the stored unit of data in the distributed data collection. The request includes the identification string associated with the particular stored unit of data. The request is received at the first server entity, which responds to the client entity by providing at least one location string associated with the particular stored unit of data to the client entity.

The request may also be transmitted to a second server entity prior to responding to the client entity, where the

US 7,103,640 B1

3

second server entity is coupled to the first server entity and includes the mapping of the identification string and location strings for the particular units of data. In such case, the second server entity responds to the client entity by providing the at least one location string associated with the particular stored unit of data to the client entity.

The network distributed tracking protocol of the invention is a networking protocol that efficiently manages mappings from one or more identifier strings to zero or more location strings. The protocol permits client entities to add and remove identifier/location associations, and request the current set of locations for an identifier or identifiers from server entities that comply with the protocol.

The protocol is designed for use in the larger context of a distributed data collection. As such, it supports an architecture in which information about where data associated with particular application entities can be managed and obtained independently of the data itself. The protocol and its associated servers thus maintain a mapping between entity identifiers and data locations. The identifier/location mapping maintained by the servers is very dynamic. Regardless of the expected system context in a distributed data collection, the protocol can be used for any application in which one-to-one or one-to-many associations among strings are to be maintained and accessed on a network.

In any context, the protocol supports identifier and location strings of up to $2^{32}-4$ bytes in length, but in most applications it is expected that the strings are typically short. String length is not fixed by the protocol, except by the upperbound. Accordingly, string formats are controlled at a local level and not dictated by the protocol.

These and other features and advantages of the invention will become apparent upon a review of the following detailed description of the presently preferred embodiments of the invention, when viewed in conjunction with the appended drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an example of multiple outstanding protocol requests.

FIG. 2 is a layout of one presently preferred string format.

FIG. 3 is a layout of one presently preferred NDTP_GET message.

FIG. 4 is a layout of one presently preferred NDTP_GET_RSP message.

FIG. 5 is a layout of one presently preferred NDTP_PUT message.

FIG. 6 is a layout of one presently preferred NDTP_PUT_RSP message.

FIG. 7 is a layout of one presently preferred NDTP_DEL message.

FIG. 8 is a layout of one presently preferred NDTP_DEL_RSP message.

FIG. 9 is a layout of one presently preferred NDTP_RDR_RSP message, where FIG. 9(a) shows a server table layout, and FIG. 9(b) shows a redirection function layout.

FIG. 10 is a system block diagram showing a multi-server implementation environment of the network distributed tracking wire transfer protocol of the invention.

FIG. 11 is a system diagram showing an NDTP server constellation configuration.

FIG. 12 is a system diagram showing a client-centric constellation approach.

FIG. 13 is a system diagram showing a server-centric constellation approach.

4

## DETAILED DESCRIPTION OF THE PRESENTLY PREFERRED EMBODIMENTS OF THE INVENTION

The following terms are used to describe the operation of the presently preferred network distributed tracking protocol (NDTP). An "identifier string" or an "identifier" is a unique string with which zero or more location strings are associated in an NDTP server. A "data location" or a "location" is a string that is a member of a set of strings associated with an identifier string in an NDTP server. An "NDTP client" or a "client" is a network-attached component that initiates update or lookup of identifier/location mappings from an NDTP server with NDTP request messages. An "NDTP server" or a "server" is a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to NDTP request messages from NDTP clients. The term "Network Byte Order" is the ordering of bytes that compose an integer of larger than a single byte as defined in the Internet Protocol (I P) suite. Preferably, Network Byte Order specifies a big-endian, or most significant byte first, representation of multibyte integers. In this specification a byte is preferably composed of eight bits.

Network Distributed Tracking Protocol (NDTP)

The Network Distributed Tracking Protocol (NDTP) efficiently tracks the location of data associated with an individual entity in a distributed data collection. NDTP is a transactional protocol, which means that each operation within NDTP consists of a request message from an NDTP client to an NDTP server, followed by an appropriate response message from the NDTP server to the NDTP client. NDTP defines an entity key (or "identifier") as a unique string used to refer to an entity about which a distributed query is performed.

The NDTP server treats the entity key as an unstructured stream of octets, which is assumed to be unique to a particular entity. The precise structure of the NDTP entity key and the mechanism for ensuring its uniqueness are a function of the application in which the NDTP server is used. In a customer oriented application, the NDTP entity key might be a unique customer identifier, for example, a Social Security Number, in either printable or binary integer form, as is appropriate to the application. NDTP also defines a data location specifier as a string used to specify a data respository in which data associated with a particular entity may be found.

As with NDTP entity keys, the NDTP server treats NDTP data location specifiers as unstructured streams of octets. The structure of an NDTP data location specifier is a function of the application in which the NDTP server is used. For example, an NDTP data location specifier might be an Internet machine name, and a TCP/IP port number for a relational database server, or an HTTP Universal Resource Locator(URL), or some concatenation of multiple components.

The NDTP server efficiently maintains and dispenses one to zero or one to many relationships between entity keys and data location specifiers. In other words, an entity key may be associated with any number of data location specifiers. When data for a particular entity is added to a data repository, the NDTP server is updated to indicate an association between the entity key and the data repository's data location specifier. When a query is performed for an entity key, the NDTP server supplies the set of data repositories in which data may be found for that entity key.

US 7,103,640 B1

## General NDTP Mechanics

The protocol of the invention is designed to provide maximum transaction throughput from the NDTP server, associated clients, and associated data repositories when appropriate. The design goal is realized through two design principles:

1. NDTP messages should preferably be as short as possible to maximize the rate of NDTP transactions for a given network communication bandwidth.
2. NDTP messages should preferably be structured for efficient processing on existing machine architectures.

Design Optimizations.

Numerical fields of an NDTP message are preferably represented in binary integer format rather than ASCII or other printable format to minimize host processing overhead and network utilization. Numerical fields of NDTP messages are also aligned on 32-bit boundaries to minimize the cost of manipulation on current machine architectures. Manipulating unaligned multibyte integer quantities on modern machine architectures usually incurs an extra cost ranging from mild to severe compared to manipulating the same quantities in aligned form.

In keeping with other network protocol standards including TCP/IP, multioctet integer quantities in NDTP are preferably encoded using the big end ian integer interpretation convention, as set forth above.

To overcome network latency, NDTP is designed to support asynchronous operation, where many requests may be sent to an NDTP server before a response from any of them is received.

Each NDTP message is preceded by a fixed size, 12-octet header, using the preferred data structure:

```
typedef struct ndtp-hdr {
    uint8_T op;         /* opcode */
    uint8_t pad[3];
    uint32_t id;        /* transaction identifier */
    uint32_t size;      /* total request size
                           following the header */
}ndtp_hdr_t;
where:
op:
    NDTP message numerical operation code.
    NDTP_GET:        get request
    NDTP_GET_RSP:    get response
    NDTP_PUT:        put request
    NDTP_PUT_RSP:    put response
    NDTP_DEL:        delete request
    NDTP_DEL_RSP:    delete response
    NDTP_RDR_RSP:    provide redirection
id:
```

Client supplied operation request used to distinguish responses from multiple outstanding NDTP asynchronous requests. Each "_RSP" message echoes the id field of the associated request.

Size:

Size, in octets of the remainder of the NDTP message. The size field should always be a multiple of 4 octets.

Variably sized portions of NDTP messages are preferably defined with a size field rather than some other delimiter mechanism to facilitate efficient reading of NDTP messages. Requests may be made to the network layer to read the entire variably sized portion of an NDTP message, rather than reading small chunks while scanning for a delimiter. Furthermore, client and server resource management can be more efficient since the size of NDTP messages is known before reading.

The variably sized portions of NDTP messages are composed of zero or more NDTP stings:

```
typedef struct ndtp_str {
    uint32_t len;
    uint8_t data [ ];
{ndtp_str_t;
```

Note that the C struct definitions in this document are schematic, and not necessarily fully compliant structures in the C programming language. Specifically, arrays denoted in this document with "[ ]" imply a dimension which is only known dynamically and this indefinite array size specifier is not allowed in C struct definitions. Note also the following:

Len:

the number of significant octets of data following the len field in the data area.

Data:

len octets of data, followed by up to 3 octets of padding, to ensure that the total length of the NDTP string structure is a multiple of 4 octets. The padding octets are not included in the len field.

Because variable sized portion NDTP messages are composed of zero or more NDTP stings and NDTP strings preferably occupy an even multiple of 4 octets, this ensures that the "size" field of NDTP message headers will preferably be a multiple of 4 octets.

## Protocol Structure

An example of multiple outstanding NDTP requests and the use of request identifiers is shown in FIG. 1. NDTP preferably has a simple, stateless request/response structure. Each request message 10 sent by a client 12 has a corresponding response message 14 returned by the server 16. To maximize server 16 throughput and use of available network bandwidth, NDTP is asynchronous in nature. Many requests 10 from a single client 12 may be outstanding simultaneously, and responses 14 may or may not be returned from the server 16 in the order in which the requests 10 were issued. Each NDTP request 10 contains an NDTP request identifier 18 that is returned in the NDTP response 14 for the associated request 10. An NDTP client 12 uses a unique NDTP request identifier 18 for each NDTP request 10 that is outstanding at the same time to an NDTP server 16 if it wishes to correlate responses with requests.

There are four operations preferably supported by the protocol:

Add a location association to an identifier.

Delete a location association from an identifier.

Get all locations associated with an identifier.

Provide a redirect instruction to identify an alternative server.

The response to adding a location association to an identifier 18 is a simple acknowledgement. If the location is already associated with the identifier 18, adding the association has no effect, but the request 10 is still acknowledged appropriately. In other words, the NDTP add operation is idempotent. The response to deleting a location association from an identifier 18 is a simple acknowledgement. If the location is not currently associated with the identifier 18, deleting the association has no effect, but the request 10 is still acknowledged appropriately. In other words, the NDTP delete operation is idempotent. The response 14 to getting all locations associated with an identifier 18 is a list of the locations presently associated with an identifier 18. If no locations are currently associated with an identifier 18, a list of length zero is returned.

US 7,103,640 B1

## Message Formats

NDTP messages **10**, **14** preferably have a regular structure that consists of a message operation code, followed by a request identifier **18**, followed by a string area length (in bytes) **20**, followed by zero or more strings **22**, as shown in FIG. **2**. As those skilled in the art will appreciate, NDTP message formats are preferably independent of the network transport layer used to carry them. NDTP preferably defines mappings of these messages **10**, **14** onto TCP and UDP transport layers (described in detail below), but other mappings could also be defined and it is likely that these NDTP message formats would not require change. For example, the notation ROUND4(x) means x, rounded up to the next multiple of 4.

## Integer Format

Multibyte integers in NDTP messages are represented in network byte order; using the big-endian convention. In other words, the most significant byte of a multibyte integer is sent first, followed by the remainder of the bytes, in decreasing significance order.

## String Format

Strings in NDTP are represented as counted strings, with a 32-bit length field **20**, followed by the string data **22**, followed by up to 3 bytes of padding **24** to make the total length of the string representation equal to ROUND4 (length). This layout is shown diagrammatically in FIG. **2**.

### NDTP GET Format

The NDTP_GET message has a message operation code **30** of 0, and a single NDTP string **32** which is the identifier string for which to get associated location strings. This layout is shown diagrammatically in FIG. **3**.

### NDTP GET RSP Format

The NDTP_GET_RSP message has a message operation code **40** of 1, and zero or more strings **42** that are the locations currently associated with the requested identifier. This layout is shown diagrammatically in FIG. **4**.

### NDTP PUT Format

The NDTP_PUT message has a message operation code **50** of 2, and two NDTP strings **52**, **54**. The first string **52** is the identifier for which to add a location association, and the second string **54** is the location to add. This layout is shown diagrammatically in FIG. **5**.

### NDTP PUT RSP Format

The NDTP_PUT_RSP message has a message operation code **60** of 3, and zero NDTP strings. This layout is shown diagrammatically in FIG. **6**.

### NDTP DEL Format

The NDTP_DEL message has a message operation code **70** of 4, and two NDTP strings **72**, **74**. The first string **72** is the identifier from which to delete a location association, and the second string **74** is the location to delete. This layout is shown diagrammatically in FIG. **7**.

### NDTP DEL RSP Format

The NDTP_DEL_RSP message has a message operation code **80** of 5, and zero NDTP strings. This layout is shown diagrammatically in FIG. **8**.

### NDTP RDR RSP Format

The NDTP_RDR_RSP message has a message operation code **90** of 6, and one or more NDTP strings **92**, **94**. Two layouts apply, which are shown diagrammatically in FIGS. **9**(*a*) and **9**(*b*).

A general description of the usage and operation of these protocol messages is provided below.

### NDTP GET Transaction

The NDTP_GET message contains a single NDTP string which is the entity key for which associated data locations are requested.

```
typedef struct ndtp_get {
    ndtp_hdr_t hdr;
    ndtp_str_t key;
} ndtp_get_t;
```

The NDTP_GET_RSP message contains zero or more NDTP strings which are the data location specifiers associated with the NDTP entity key:

```
typedef struct ndtp_get_rsp {
    ndtp_hdr_t hdr;
    uint32_t rsps;
    ndtp_str_t values[ ];
} ndtp_get_rsp_t;
```

### NDTP PUT Transaction

The NDTP_PUT messages contains two NDTP strings which are (1) the NDTP entity key and (2) the NDTP data location specifier which is to be associated with the NDTP entity key.

```
typedef struct ndtp_put {
    ndtp_hdr_t hdr;
    ndtp_str_t key;
    ndtp_str_t data;
}ndtp_put_t;
```

The NDTP_PUT_RSP message has no NDTP strings, and simply indicates that the requested entity key/data location specifier association was added:

```
typedef struct ndtp_put_rsp {
    ndtp_hdr_t hdr;
} ndtp_put_rsp_t;
```

The requested entity key/data location specifier association is added in addition to any other associations already maintained by the NDTP server. If the requested entity key/data location specifier association is already in effect, the NDTP_PUT still succeeds and results in an NDTP_PUT_RSP message.

### NDTP DELETE Transaction

The NDTP_DEL message contains two NDTP strings which are (1) the NDTP entity key and (2) the NDTP data location specifier which is to be unassociated with the NDTP entity key:

```
typedef struct ndtp_del {
    ndtp_hdr_t hdr;
    ndtp_str_t key;
    ndtp_str_t data;
} ndtp_del_t;
```

The NDTP_DEL_RSP message has no NDTP strings, and simply indicates that the requested entity key/data location specifier association was deleted.

```
typedef struct ndtp_del_rsp {
    ndtp_hdr_t hdr;
} ndtp_del_rsp_t;
```

If the requested entity key/data location specifier association is not in effect, the NDTP_DEL still succeeds and results in an NDTP_DEL_RSP message.

### NDTP RDR RSP Message

NDTP supports a distributed server implementation for which two principle redirection methods apply: (1) embedded redirection links, and (2) passed functions. The passed functions method in turn has two variants: (a) a well-known

US 7,103,640 B1

9

function, and (b) a communicated function. (These methods and variants are described in further detail below.)

Network Front End

The NDTP server network front end preferably maximizes NDTP transaction throughput including concurrent NDTP requests from a single client as well NDTP requests from multiple concurrent clients.

Network Communication Mechanism

NDTP defines a transaction oriented protocol, which can be carried over any of a variety of lower level network transport protocols. For example:

TCP/IP: TCP/IP provides a ubiquitously implemented transport which works effectively on both local area and wide area networks. An NDTP client using TCP/IP preferably connects with the NDTP server at an established TCP port number, and then simply writes NDTP request messages through the TCP/IP connection to the server, which then writes NDTP response messages back to the client through the same TCP/IP connection in the reverse direction. TCP/IP implementations perform buffering and aggregation of many small messages into larger datagrams, which are carried more efficiently through the network infrastructure. Running NDTP on top of TCP/IP will take advantage of this behavior when the NDTP client is performing many NDTP requests. For example, a data repository which is undergoing rapid addition of data records associated with various entities will perform many rapid NDTP_PUT operations to the NDTP server that can all be carried on the same NDTP TCP/IP connection.

UDP/IP: If an NDTP client only performs occasional, isolated NDTP operations, or there are a vast number of clients communicating with an NDTP server, TCP/IP will not offer the best possible performance because many traversals of the network are required to establish a TCP/IP connection, and yet more network traversals are required to transfer actual NDTP messages themselves. For such isolated NDTP transactions, depending upon the application and network infrastructure in use, it is beneficial to have the NDTP server employ UDP/IP, which is a widely available connectionless datagram protocol.

However, UDP/IP does not support reliable data transfer, or any congestion control mechanism. This means that NDTP clients using UDP/IP must implement reliability and congestion control maintaining transaction timeouts and performing exponential retry backoff timers, precisely analogous to the congestion control mechanism implemented by Ethernet, and other well known UDP protocols. Those skilled in the art will note that the NDTP protocol is stateless from the standpoint of the NDTP server, which means that there is no congestion control or reliability burden on the server; it is all implemented in a distributed manner by the NDTP UDP/IP clients.

Still Higher Performance (ST): Both TCP/IP and to a lesser degree UDP/IP suffer from high host CPU overhead. Like the relatively long latency of TCP/IP, this host CPU consumption is considered just the "cost of doing business" where TCP/IP provides ubiquitous connectivity. If an NDTP server were running in a more constrained environment, where ubiquitous connectivity was not required, its absolute performance could be improved substantially by using a different protocol that is optimized to reduce CPU overhead and latency, such as the Scheduled Transfer (St) protocol.

10

None of these network implementation issues are particularly unique to NDTP, however. All similar protocols face similar tradeoffs, and what art exists to improve the performance of such protocols applies fully to NDTP as well.

NDTP Query Processing

Servicing NDTP query requests does not require high latency operations, such as disk I/O. Therefore, the NDTP server network front end preferably services NDTP query requests in a FIFO style by reading the NDTP_GET message, performing the lookup for the entity key in the NDTP server string store, and writing the NDTP_GET_RSP message. Each NDTP query is independent of any other NDTP transactions (other queries or updates), so it is possible to process multiple NDTP queries simultaneously on multiprocessor machines. The NDTP server permits this by not performing multiprocessor locking in the NDTP query processing path.

The current prototype NDTP server preferably does not create multiple read service threads per NDTP connection, so multiprocessing will only occur while processing queries from different NDTP connections. Nonetheless, the NDTP server could be extended to support multiprocessing of NDTP queries from a single NDTP connection if this turned out to be advantageous.

NDTP Update Processing

Unlike NDTP queries, processing NDTP updates requires the high latency operation of committing the change to nonvolatile storage. To maintain high performance on NDTP updates, the NDTP server network front end preferably supports multiple concurrent asynchronous update transactions. Also, each update is preferably performed atomically to avoid creating an inconsistent state in the string store. Currently, the string store supports only a single mutator thread, which means that all NDTP updates are serialized through the string store mutator critical code sections. As is traditional in transactional systems, the string store mutation mechanism is implemented as a split transaction.

When an NDTP update is processed, a call is made to the string store mutation function, which returns immediately indicating either that the mutation is complete, or that the completion will be signaled asynchronously through a callback mechanism. The mutator function might indicate an immediate completion on an NDTP_PUT operation if the entity key/data location specifier mapping was already present in the database. In this case, the network front end will immediately write the update response message back to the client.

For updates which are not immediately completed, the network front end maintains a queue of NDTP updates for which it is awaiting completion. When the completion callback is called by the string store log file update mechanism, the network front end writes the NDTP update response messages for all completed updates back to the clients. If no new NDTP update requests are arriving from NDTP clients, and there are some incomplete updates in the update queue, the network front end preferably calls the string store log buffer flush function to precipitate the completion of the incomplete updates in update queue.

Multiple Connection Handling

Handling multiple clients in a single server process requires that the server process not block waiting for events from a single client, such as newly received data forming an NDTP request message, or clearing a network output buffer so an NDTP response message can be written. The NDTP server network front end may be conditionally compiled to

US 7,103,640 B1

11

use either of two standard synchronous I/O multiplexing mechanisms, select or poll, or to use threads to prevent blocking the server waiting for events on individual connections. The select and poll interfaces are basically similar in their nature, but different in the details. When compiled for synchronous I/O multiplexing, the NDTP server network front end maintains an input buffer for each connection. The multiplexing function is called to determine if any of the connections have input available, and if so, it is read into the connection's input buffer. Once a complete NDTP request is in the buffer, it is acted upon. Similarly, the network front end maintains an output buffer for each connection, and if there is still a portion of an NDTP response message to send, and the connection has some output buffer available, more of the NDTP response message is sent.

The threaded version of the NDTP server network front end preferably creates two threads for each NDTP connection, one for reading and one for writing. While individual threads may block as input data or output buffer is no longer available on a connection, the thread scheduling mechanism ensures that if any of the threads can run, they will. The threaded version of the NDTP server is most likely to offer best performance on modern operating systems, since it will permit multiple processors of a system to be used, and the thread scheduling algorithms tend to be more efficient than the synchronous I/O multiplexing interfaces. Nonetheless, the synchronous I/O multiplexing versions of NDTP server will permit it to run on operating systems with poor or nonexistent thread support.

A more detailed description of the mapping operation in both a TCP and UDP environment appears below.

TCP Mapping

As those skilled in the art will appreciate, the Transmission Control Protocol (TCP) is a connection-oriented protocol that is part of a universally implemented subset of the Internet Protocol (IP) suite. TCP provides reliable, bi-directional stream data transfer. TCP also implements adaptive congestion avoidance to ensure data transfer across a heterogeneous network with various link speeds and traffic levels.

NDTP is preferably carried on TCP in the natural way. An NDTP/TCP client opens a connection with a server on a well-known port. (The well-known TCP (and UDP) port numbers can be selected arbitrarily by the initial NDTP implementer. Port numbers that do not conflict with existing protocols should preferably be chosen.) The client sends NDTP requests 10 to the server 16 on the TCP connection, and receives responses 14 back on the same connection. While it is permissible for a single client 12 to open multiple NDTP/TCP connections to the same server 16, this practice is discouraged to preserve relatively limited connection resources on the NDTP server 16. The asynchronous nature of NDTP should make it unnecessary for a client 12 to open multiple NDTP/TCP connections to a single server 16.

If protocol errors are detected on an NDTP/TCP connection, the NDTP/TCP connection should be closed immediately. If further NDTP/TCP communication is required after an error has occurred, a new NDTP/TCP connection should be opened. Some examples of detectable protocol errors include:

Illegal NDTP message operation code;

Nonzero String Area Length in NDTP_PUT_RSP or NDTP_GET_RSP;

Inconsistent String Area Length and String Length(s) in NDTP_GET, NDTP_GET_RSP, NDTP_PUT or NDTP_DEL;

Unexpected NDTP request identifier by client.

12

Due to the reliable nature of TCP, NDTP/TCP servers 16 and clients 12 need not maintain any additional form of operation timeout. The only transport errors that can occur will result in gross connection level errors. A client 12 should assume that any NDTP requests 10 for which it has not received responses 14 have not been completed. Incomplete operations may be retried. However, whether unacknowledged NDTP requests 10 have actually been completed is implementation dependent. Any partially received NDTP messages should also be ignored.

UDP Mapping

As those skilled in the art will appreciate, the Unreliable Datagram Protocol (UDP) is a best-effort datagram protocol that, like TCP, is also part of the universally implemented subset of the IP suite. UDP provides connectionless, unacknowledged datagram transmission. The minimal protocol overhead associated with UDP can deliver extremely high performance if used properly.

NDTP/UDP clients 12 send UDP datagrams with NDTP request messages 10 to a well-known UDP port (see above). NDTP/UDP servers 16 return NDTP response messages 14 to the client 12 selected local UDP port indicated in the NDTP/UDP datagram containing the requests 10. NDTP/UDP does not require any form of connection or other association to be established in advance. An NDTP interchange begins simply with the client request message 10.

For efficiency, the mapping of NDTP on to UDP permits multiple NDTP messages to be sent in a single UDP datagram. UDP datagrams encode the length of their payload, so when a UDP datagram is received, the exact payload length is available. The recipient of an NDTP/UDP datagram will read NDTP messages from the beginning of the UDP datagram payload until the payload is exhausted. Thus, a sender of an NDTP/UDP datagram is free to pack as many NDTP messages as will fit in a UDP datagram.

The largest possible UDP datagram payload is presently slightly smaller than 64 K bytes. In addition, there may be a performance penalty sending UDP datagrams that are larger than the maximum datagram size allowed by the physical network links between the sender and intended recipient. IP provides mechanisms for discovering this maximum transfer size, called the Path Maximum Transfer Unit (Path MTU), but a discussion of these mechanisms is beyond the scope of this specification. An implementation of NDTP/UDP should preferably respect these datagram size limitations.

Unlike TCP, UDP does not provide reliable data delivery. Therefore, an NDTP/UDP client 12 implementation should implement a timeout mechanism to await the response for each outstanding NDTP request 10. The exact duration of this response timer is implementation dependent, and may be set adaptively as a client 12 receives responses from a server 16, but a reasonable default maximum value is preferably 60 seconds. If a response 14 is not received within the response timeout, the client 12 may retransmit the request 10. NDTP/UDP servers 16 need not maintain any timeout mechanisms.

Depending upon the exact timeout values selected, the client 12 retry mechanism may place some requirements on a client's 12 use of the NDTP request identifier 18 field. If the response timer is shorter than the maximum lifetime of a datagram in the network, it is possible that a delayed response will arrive after the response timer for the associated request has expired. An NDTP/UDP client 12 implementation should ensure that this delayed response is not mistaken for a response to a different active NDTP request 10. Distinguishing current responses from delayed ones is

US 7,103,640 B1

13

called antialiasing. One presently preferred way to perform antialiasing in NDTP/UDP is to ensure that NDTP request identifier 18 values are not reused more frequently than the maximum datagram lifetime.

NDTP/UDP client 12 implementations that use the NDTP request identifier 18 for antialiasing should ignore (i.e., skip) NDTP messages within a NDTP/UDP datagram with invalid NDTP request identifier 18 values. Client 12 or server 16 NDTP/UDP implementations detecting any other protocol error should also preferably discard the remainder of the current NDTP/UDP datagram without processing any further NDTP requests from that datagram. Some examples of such detectable errors include:

Illegal NDTP message operation code;

Nonzero String Area Length in NDTP_PUT_RSP or NDTP_GET_RSP;

Inconsistent String Area Length and String Length(s) in NDTP_GET, NDTP_GET_RSP, NDTP_PUT or NDTP_DEL;

Inconsistent NDTP message length and UDP datagram length.

Because NDTP/UDP messages are limited to the length of a single UDP datagram payload, NDTP/UDP cannot be used to transfer long NDTP messages. For example, it would be very difficult to send an NDTP_GET message with NDTP/UDP for a 64 K byte identifier string. This case is avoidable by a client 12 realizing that an NDTP message is too long to send as a UDP datagram and using NDTP/TCP instead. However, a greater limitation is that NDTP currently provides no mechanism for an NDTP server 16 to indicate that a response is too large to fit in a UDP datagram. In this case, the NDTP server 16 should not send a response 14, and it may or may not chose to complete the request 10. The recovery mechanism in this case preferably is, after several unsuccessful attempts to use NDTP/UDP, a client 12 may try again with NDTP/TCP.

Because UDP does not provide any form of congestion avoidance it is possible that the simple retry strategy specified for NDTP/UDP can create network congestion. Network congestion can cause a severe degradation in the successful delivery of all network traffic (not just NDTP traffic, nor just the traffic from the particular client/server 12, 16 pair) through a congested network link. Congestion will occur when an NDTP/UDP implementation is sending datagrams faster than can be accommodated through a network link. Sending a large number of NDTP/UDP datagrams all at once is the most likely way to trigger such congestion. Sending a single NDTP/UDP datagram, assuming it is smaller than the Path MTU, and then waiting for a response 14 is unlikely to create congestion. Therefore, the use of NDTP/UDP should be confined to contexts where clients 12 send few outstanding requests at a time, or where network congestion is avoided through network engineering techniques.

Those skilled in the art will appreciate that network congestion is a highly dynamic property that is a function of network traffic from all sources through a network link and will vary over time over any given network path. An NDTP/UDP client 12 implementation can recover from network congestion by switching to NDTP/TCP after several failed retries using NDTP/UPD. Failure due to network congestion may be indistinguishable from failure due to UDP packet size limitations, but since the recovery strategy is the same in both cases, there is no need to distinguish these cases.

14

NDTP/UDP Congestion Avoidance

Given the stateless, transactional nature of NDTP, NDTP/UDP generally performs much better than NDTP/TCP. This performance improvement is measurable both in terms of the maximum sustainable transaction rate of an NDTP server 16, and the latency of a single response to an NDTP client 12. In the same way as the Domain Name Service (DNS), NDTP fits naturally in the UDP model. It is a working assumption of NDTP (and DNS) that for every NDTP transfer, there will be an associated transfer of real data that is an order of magnitude or more greater in size than the NDTP protocol traffic. This property will naturally limit the amount of NDTP traffic on a network. However, in applications where NDTP traffic reaches high levels, particularly at network 'choke points' which are not within the control of network engineers, it may be desirable to support a congestion avoidance mechanism for NDTP/UDP.

However, those skilled in the art will appreciate that the other main future requirement of NDTP, security (described below), implies an existing, durable association between NDTP clients 12 and NDTP servers 16. This association is much like (and in the case of SSL, it is) a network connection. Therefore, depending upon what security technology is applied, developing a congestion avoidance mechanism for NDTP/UDP may be an irrelevant exercise.

Server Redirection Mechanism

NDTP provides two mechanisms for server redirection. The redirection mechanisms allow cluster and hierarchical topologies, and mixtures of such topologies (described in detail below). The first redirection mechanism supported by NDTP, embedded redirection links, uses an application specific convention to return redirection pointers as NDTP data location strings. For example, if location strings are W3C URLs, a URL with the schema ndtp: could be a server indirection pointer. An NDTP_GET_RSP message may contain any mixture of real data location strings and NDTP server redirection pointers. In this case, the client must issue the same NDPT_GET query message to other NDTP servers indicated by the redirection pointers. The total set of data location strings associated with the supplied identifier string is the collection of all the data location strings returned from all the NDTP servers queried. The embedded redirection link technique does not require any specific NDTP protocol support. Therefore, it could be used within the NDTP protocol as is, and does not require further description in this specification.

The second redirection mechanism, which is specified as a future extension of NDTP, is having the server return an NDTP_RDR_RSP message in response to an NDTP request for which the NDTP server has no ownership of the supplied identifier string. Those skilled in the art will note that unlike the embedded redirection links mechanism, the NDTP_RDR_RSP mechanism applies to all NDTP requests, not just NDTP_GET.

As mentioned above, the second redirection mechanism has two variants. The first variant of the NDTP_RDR_RSP function mechanism specifies a well-known function that all NDTP server and client implementations know when they are programmed, and the NDTP_RDR_RSP message carries a table of NDTP server URLs. The format of the NDTP_RDR_RSP message with an NDTP server URL table is shown in FIG. 9(a).

The appropriate NDTP server is selected from the table in the NDTP_RDR_RSP message by applying a well-known function to the identifier string and using the function result as an index into the NDTP server table.

US 7,103,640 B1

15 | 16

The well-known function preferably applied is the hash-pjw function presented by Aho, Sethi and Ullman in their text *Compilers, Principles, Techniques and Tools*:

```
uint32_t
hash (uint8_t *s, uint32_t slen, uint32_t size)
{
    uint32_t g;
    uint32_t i;
            unit32_t h = 0;
    uint8_t c;
    for (i = 0; i < slen; i++) {
        c = s[i];
        h = (h << 4) + c;
        g = (h & 0xf0000000);
        if (g) {
            h ^= g >> 24;
            h ^= g;
        }
    }
    return h % size;
}
```

In this case, the size parameter is the number of elements in the NDTP server URL table returned in the NDTP_RDR_RSP message. For the hashpjw function to behave correctly, the size parameter must be a prime number, therefore the NDTP server URL table must also have a prime number of elements. Those skilled in the art will appreciate that the same NDTP server may appear multiple times in the NDTP server URL table. For example, if the server URL table has 2039 elements, by putting one NDTP server URL in the first 1019 table elements, and a second NDTP server URL in the second 1020 table elements, the responsibility for the index string space will be split roughly in half.

The second variant of the NDTP_RDR_RSP function mechanism specifies that a general function description will be sent to the NDTP client in the NDTP_RDR_RSP message. The NDTP client will apply this function to the identifier string and the output of the function will be the NDTP server URL to which to send NDTP requests for the particular identifier string. The advantage of this technique over the well-know function approach is that it allows application-specific partitions of the identifier string space. This can permit useful administrative control. For example, if General Electric manages all identifiers beginning with the prefix "GE", a general function can be used to make this selection appropriately. The disadvantage of using a general function is it may be less efficient to compute than a well-known function.

There are a variety of possible mechanisms for sending function descriptions. NDTP is expected to be applied in environments that make extensive use of the Java programming platform. Therefore the NDTP_RDR_RSP Mechanism preferably uses a feature of the Java programming language called "serialized representation" to communicate generalized functions in the NDTP_RDR_RSP message. A serialized form of a Java object is a stream of bytes that represents the precise state of the object, including its executable methods. For example, the Java Remote Method Invocation (RMI) mechanism uses serialized objects to send executable code to a remote platform for execution. The NDTP_RDR_RSP message contains the serialized form of an object implementing this Java interface:

interface NDTPRedirectFunction {
    String selectServer(byte[ ] identifier);
}

The format of the NDTP_RDR_RSP message with a Java Serialized form of the NDTP redirection function is specifically identified in FIG. 9(*b*).

The NDTP server redirection mechanism also permits construction of NDTP server clusters (described below). It is expected that the identifier string hash function will be defined at the time NDTP is implemented, but the actual list of NDTP servers **90** will change from application to application and within a single application throughout the lifetime of the system. Therefore, it is necessary for clients to be able to discover updated NDTP server lists, and any other relevant dynamic parameters of the server selection function as these inputs change.

Hierarchical Server Topology

While the NDTP server topology supported by the server redirection mechanism described above and shown in FIGS. **9**(*a*) and **9**(*b*) is an extremely powerful and general scaling technique, suitable for diverse topology deployments, some applications might still benefit from a specifically hierarchical server topology. An NDTP server hierarchy **100**, such as that shown in FIG. **10**, permits identifier/location association data to be owned and physically controlled by many different entities. An NDTP server cluster should be managed by a single administrative entity **102**, and the distribution of data can be for performance and scaling purposes. Furthermore, a server hierarchy would provide some fault isolation so portions of the identifier/location association data can be accessed and updated in the presence of failures of some NDTP servers **104**. Finally, an NDTP server hierarchy can localize NDTP update operations (NDTP_PUT and NDTP_DEL), which can improve performance and reduce network load.

A hierarchical NDTP server topology also allows organizations to maintain their own local NDTP server **104** or NDTP server cluster **102** that manages associations to data locations that are within the organizations' control. Upper tier NDTP servers **108** would be used to link the various leaf NDTP servers **104**.

Server Constellations

The NDTP server organization also allows NDTP servers to be combined in various ways to build server constellations that offer arbitrary server performance scalability and administrative control of the location of portions of the identifier/data location relationship mappings. FIG. **11** illustrates an NDTP server constellation **110** as it relates to a client **112** and a data repository **114**. In FIG. **10**, the client **112** and data repository **114** of FIG. **11** were merged into the single client entity **106** for ease of discussion. Their distinction can now be separated and identified in order to illustrate the storage and retrieval of data in a distributed data collection.

As shown in FIG. **11**, a client **112** consults the server constellation **110**, which may be construed in either of two forms (see FIGS. **12** and **13**), and which returns location strings in response to a client **112** request. Once the client **112** has the location string for a particular unit of data, the client **112** contacts and retrieves information directly from the data repository **114**. In one embodiment, if the client **112** contains a data repository **114**, internal application logic would facilitate this interaction. Those skilled in the art will appreciate that the term "data collection" is being employed rather than the term "database" because database frequently invokes images of Relational Database Systems (which is only one application of the protocol); an NDTP data collection could just as easily be routing tables as it could be files or records in a RDBS database.

US 7,103,640 B1

17

NDTP server constellations 110 preferably have two basic organizational paradigms: Client-Centric and Server-Centric. NDTP supports both by design, and both approaches apply to all aspects of managing the relationships between identifiers and locations, such as data retrieval, index manipulation, and server redirection. Each will be discussed separately below.

Client-Centric Approach

The first basic pattern that NDTP supports is driven by the client 112, and can be called "client-centric". Referring to FIG. 12, a single client (not shown) asks a server 120a in the server constellation 110 for operations that the client desires executed (represented by arrow 1 in FIG. 12). If the client doesn't receive the data requested, it will receive a redirection response message (NDTP_RDR_RSP) from the contacted server 120a (arrow 2). The client then uses the information it receives to ask another server 120b for the operations the client wants to initiate (arrow 3). A successful response from the second server 120b is then sent to the client (arrow 4).

This design constructs operating patterns for (1) redirection, (2) index operations, and (3) hierarchical or cluster topologies. The important point is that the Network Distributed Tracking Protocol is designed to support highly configurable methods for processing index-related operations.

NDTP supports two specific redirection mechanisms, which are not mutually exclusive and may be combined in any way within a single NDTP server constellation 110. This formation may increase performance when many clients (not shown) participate, since client processing is emphasized rather than server processing. The first NDTP redirection mechanism uses a distinctively encoded location string for each NDTP server 120a,b that contains additional location strings associated with the identifier string supplied in the NDTP request 122a,b. This is an embedded redirection link. For example, if location strings are some form of HTTP URL, a URL with the schema specifier ndtp: would indicate a redirection. Using this scheme, the location strings associated with an identifier string may be spread among multiple NDTP servers 120a,b. In addition to redirection, in FIG. 12, all index manipulation operations continue to apply, but they are directed at the correct NDTP server 110b for which they apply: NDTP_GET, NDTP_PUT, NDTP_DEL.

The second NDTP redirection mechanism uses a NDTP_RDR_RSP message to indicate that the server 120a to which the NDTP request 122a was directed does not contain any of the location strings associated with the identifier string supplied in the NDTP request 122a. The NDTP_RDR_RSP message contains all the information required for the originator of the NDTP request 122a to reissue the original NDTP request 122b to a different NDTP server 120b that does have location strings associated with the identifier string supplied in the NDTP request 122b. This information may be an array of NDTP server hosts from which one is selected by applying a well-known function to the identifier string supplied in the NDTP request 122b, or the communicated function to apply as well as a list or other description of the NDTP server hosts from which to choose, as described above.

FIG. 12 illustrates a cluster topology for client interaction with NDTP servers 120. A single client queries a first server 120a (Server0), learns of a new index location (Server1), and then contacts that server 120b (Server1) for the operations it wishes to execute on the index that the client identifies. The basic idea is that a client asks a server 120a to process an index operation. If the contacted server 120a

18

does not have all the information, as for example in a redirect, then it passes the request to another server 120b. If the second server 120b is appropriate it responds appropriately, or it passes the request on to another server (not shown), and so on. FIG. 12 could also illustrate a hierarchical topology if a client (not shown) contacted another client in a handoff as shown in FIG. 10, where a client 106 "asks up" to another client 106, and so on.

Behind the scenes, the server constellation 110 could also be using a hierarchical organization or a cluster organization for managing indices. The important point of this topology is pushing processing emphasis toward clients (not shown) rather than toward servers 120a,b. Such protocol design has scale implications as the number of participating machines/mechanisms increases, since it distributes aggregate processing.

Server-Centric Approach

The second basic pattern that the Network Distributed Tracking Protocol provides is a "Server-Centric Approach". FIG. 13 shows the server constellation 110 characterizing "server-centric" functionality. In this figure, an NDTP server 130a (Server0) receives a request 132a from a client (not shown). The server 130a (Server0) passes the request to a second server 130b (Server1), which is an appropriate server for the process, and the second server 130b returns a response 134a to the first server 130a (Server0). If the second server 130a (Server1) was not appropriate, it could pass the request to another server (not shown), and so on. Each NDTP server 130a,b will combine the results of NDTP requests 132a,b it has performed of other NDTP servers 130a,b with whatever responses 134a,b it gene rates locally for the original NDTP request 132a, and the combined response 134b will be the appropriate response for the original NDTP request 132a.

This design constructs operating patterns for (1) index operations and (2) hierarchical or cluster topologies. The important point is that the Network Distributed Tracking Protocol is designed to support highly configurable methods for processing index-related operations, but this method emphasizes server-processing rather than client-processing. In FIG. 13, all index manipulation operations continue to apply, but they are directed at the correct NDTP server 130a,b for which they apply: NDTP_GET, NDTP_PUT, NDTP_DEL.

FIG. 13 illustrates an hierarchical topology for client interaction with NDTP servers 130. A single client queries a first server 130a (Server0), which is not appropriate, and so the first server 130a (not the client) itself contacts an appropriate server 130b (Server1) for operations it "passes through" to execute on the index that the client has identified. Alternatively, FIG. 13 could illustrate a cluster topology if a server 130a contacted another server 130b in a what is known as a "peer" handoff. The important point of this topology is that it pushes processing emphasis toward servers 130a,b rather than toward clients. Since index processing services can be centralized, administration of the indices can be administered more conveniently in certain cases.

The simplest NDTP server constellation 110 is a single server 130, and the protocol is designed to permit massive scale with a single or simple server constellation. Highly configurable installations are possible using "client-centric" or "server-centric" techniques. NDTP server constellations 110 composed of more than one NDTP server may use any combination of the two approaches for performance optimization and data ownership properties. Client-centric and server-centric approaches can be used to build NDTP server

US 7,103,640 B1

19

clusters, NDTP server trees, NDTP server trees of NDTP server clusters, or any other useful configuration.

NDTP design thus explicitly addresses the emerging "peer-to-peer" topologies called "pure" and "hybrid". The "pure" peer-to-peer approach emphasizes symmetric communication among peers, and is achievable through the "server-centric" approach. The "hybrid" peer-to-peer approach emphasizes asymmetric communication among non-peer participants, and is achievable through the "client-centric" approach. Beyond the pure and hybrid approaches that NDTP allows, as described above, NDTP permits any additional mixtures between client-centric and server-centric approaches to provide superior configurability and performance tuning.

Security

NDTP preferably has no provisions for security. Three key features of security should therefore be provided:

    Data privacy (encryption)
    Client **12** authentication
    Client **12** authorization

NDTP/TCP will be extended using SSL/X.509 to support these security features in a straightforward, 'industry standard' way.

Adding security to NDTP/UDP also requires technology other than SSL. For example, IPSec supports securing all IP traffic, not just TCP between two endpoints. IPSec is a somewhat more heavyweight technology than SSL, and the rate of adoption in industry is somewhat slow. Nonetheless, it can provide the relevant capabilities to NDTP/UDP.

Additional Transport Layers

The early-adopter portion of the industry is in a state of turmoil regarding network transport protocols. On one hand, TCP has provided decades of solid service, and is so widely implemented that the mainstream computer industry could not imagine using another protocol to replace it. On the other hand, TCP lacks several features that may be necessary to enable the next step in network applications. In particular, the TCP design assumed pure software implementations by relatively powerful host computer computers. However, developments in network technology have increased the packet rate that a TCP implementation must handle to deliver full network speed beyond the capabilities of even increasingly powerful host computers. To take the next step, much of the packet processing work must be off-loaded to hardware, and TCP's design makes this very difficult.

It is unclear whether it will become possible to implement the relevant portions of TCP in hardware in a timely fashion. If this does not happen, one of the many new transport layers currently under development (ST, SCTP, VI, etc.) may emerge as a market leader in high performance networking. In this case, a layering of NDTP on top of a new hardware accelerated transport would permit NDTP servers to deliver greatly increased transaction rates. Even with the use of a hardware accelerated transport layer, however, the only benefit to a typical NDTP client would be lower cost of service due to cheaper NDTP server platform requirements. On the flip side, NDTP clients could likely still use a cheaper software implementation of the new transport because of individual clients' modest performance demands.

As can be seen, the Network Distributed Tracking Protocol is a networking protocol that runs on top of any stream (e.g. TCP) or datagram (e.g. UDP) network transport layer. The goal of NDTP is to support a network service that efficiently manages mappings from each individual key string, an identifier, to an arbitrary set of strings, locations.

20

NDTP permits protocol participating clients to add and remove identifier/location associations, and request the current set of locations for an identifier from protocol servers.

NDTP is designed for use in the larger context of a distributed data collection. As such, it supports an architecture, in which information about where data associated with particular application entities, can be managed and obtained independently of the data itself. One way to understand this is as a highly dynamic DNS for data. DNS maintains a mapping between names and machines. NDTP and its associated servers maintain a mapping between entity identifiers and data locations. The identifier/location mapping maintained by NDTP servers is much more dynamic (more frequent updates), than the domain name/IP address mapping maintained by DNS. NDTP is designed to support very fast, very diverse, and very large scale mapping manipulations.

Regardless of the expected system context of NDTP in a distributed data collection, those skilled in the art will appreciate that NDTP can be used for any application in which one-to-zero or one-to-many associations among strings are to be maintained and accessed on a network. In applications of NDTP other than distributed databases, the term identifier is likely to make sense in most cases, but the term location may not. In any context, however, although NDTP supports identifier and location strings of up to $2^{32}-4$ bytes in length, it is a general assumption that the strings are typically short.

Those skilled in the art will note that the invention provides for the management and manipulation of indices and their associated relationships.

Even more importantly, it is the manipulation of dynamic and spontaneous relationships between indices and locations, not the indices and locations, that is the core significance. The Network Distributed Tracking Protocol was written to manipulate these relationships, of which indices (identifiers) and locations are components of the aggregate solution.

It is to be understood that a wide range of changes and modifications to the embodiments described above will be apparent to those skilled in the art, and are contemplated. It is therefore intended that the foregoing detailed description be regarded as illustrative, rather than limiting, and that it be understood that it is the following claims, including all equivalents, that are intended to define the spirit and scope of the invention.

We claim:

1. A method for retrieving data location information for data stored in a distributed network, comprising the steps of:

    a) receiving at a first client a data query for retrieving data associated with an identification string, wherein the data is stored at a data repository and wherein a location string associated with the identification string of the data is stored in at least one of a plurality of data location servers;

    b) transmitting a data location request from the first client to a server to retrieve the location string associated with the identification string in the data query, the data location request including the identification string;

    c) if the server is not a data location server, then operating the server as a next client and transmitting the data location request from the next client to a server logically associated with the next client;

    d) repeating c) until the data location request is transmitted to a data location server, wherein a communication path is defined between the first client and the data location server; and

US 7,103,640 B1

**21**

e) if the data location server does not possess the location string, transmitting a redirect message to the first client over the communication path, the redirect message containing information with which the first client is configured to determine a location of a second data location server, wherein the second data location server contains the location string.

**2**. The method of claim **1**, wherein transmitting the redirect message comprises transmitting a data location server table to the first client.

**3**. The method of claim **2**, further comprising:

f) calculating at the first client the location of the second data location server with a function commonly known to the data location server and the first client and based on the identification string and the data location server table.

**4**. The method of claim **3**, wherein the function comprises a hash function and wherein the first client applies the hash function to the identification string and the data location server table to obtain the location of the second data location server.

**5**. The method of claim **1**, wherein transmitting the redirect message comprises transmitting a function to the first client.

**6**. The method of claim **5**, further comprising:

f) calculating at the first client the location of the second data location server with the transmitted function.

**7**. The method of claim **6**, wherein calculating at the first client the location of the second data location server comprises applying the transmitted function to the identifier string.

**8**. The method of claim **7**, wherein applying the transmitted function generates a URL of the second data location server.

**9**. The method of claim **1**, wherein a length of the identification string and the location string each is variable.

**10**. A method for retrieving data location information for data stored in a distributed network, comprising the steps of:

a) receiving at a first client a data query for retrieving data associated with an identification string, wherein the data is stored at a data repository in the distributed network and wherein a location string associated with the identification string of the data is stored in at least one of a plurality of data location servers;

b) transmitting a data location request from the first client to a first data location server to retrieve the location string associated with the identification string in the data query, the data location request including the identification string;

c) if the first data location server does not possess the location string, transmitting a redirect message to the first client, the redirect message containing information for use by the first client to calculate a location of a second data location server, wherein the second data location server contains the location string;

d) calculating the location of the second data location server at the first client; and

e) transmitting the data query from the first client to the second data location server.

**11**. The method of claim **10**, wherein transmitting the redirect message comprises transmitting a data location server table to the first client.

**12**. The method of claim **11**, wherein calculating the location of the second data location server comprises calculating the location of the second data location server with

**22**

a function commonly known to the first data location server and the first client and based on the data location server table and the identification string.

**13**. The method of claim **12**, wherein the function comprises a hash function and wherein the first client applies the hash function to the identification string and the data location server table to obtain the location of the second data location server.

**14**. The method of claim **10**, wherein transmitting the redirect message comprises transmitting a function to the first client.

**15**. The method of claim **14**, wherein calculating at the first client the location of the second data location server comprises applying the transmitted function to the identifier string.

**16**. The method of claim **15**, wherein applying the transmitted function generates a URL of the second data location server.

**17**. A system for retrieving data location information for data stored in a distributed network, the system comprising:

a plurality of data repositories configured to store data, wherein the data is associated with a respective identifier string in each data repository;

a data location sewer network having a plurality of data location servers, each of the plurality of data location servers containing location strings associated with respective identifier strings and each of the plurality of data location servers having computer executable code configured to execute the following steps:

in response to receiving a data location request from a client to retrieve a location string associated with an identification string provided in the data location request, transmitting a redirect message to the client if the identification string is not associated with a location string at the data location server, wherein the redirect message contains information for use by the client to calculate a location of a different data location server in the plurality of data location servers, wherein the different data location server contains the location string.

**18**. A system for retrieving data location information for data stored in a distributed network, the system comprising:

a data repository configured to store data, wherein the data is associated with an identifier string;

a client responsive to a data query to query a data location server for location information associated with the identifier string;

a data location server network comprising a plurality of data location servers, at least one of the plurality of data location servers containing location information associated with the identifier string, wherein each of the plurality of data location servers comprises computer executable code configured to execute the following steps in response to receiving a data location request from the client:

if the data location server contains the location string associated with the identification string provided in the data location request, the data location server transmits location information for use by the client to calculate a location of the data associated with the identification string;

if the data location server does not contain the location string associated with the identification string, the location server transmits a redirect message to the client, wherein the redirect message contains redirect information for use by the client to calculate a location of a different data location server in the plurality of data

Appx18816

US 7,103,640 B1

23

24

location servers, wherein the different data location server contains the location string.

19. The system of claim 18, wherein the client and the plurality of data location servers each comprise a function commonly known to the client and the plurality of data location servers and wherein the client is configured to apply the commonly known function to the location information or redirect information.

20. The system of claim 19, wherein the redirect message comprises a data location server table.

21. The system of claim 20, wherein the commonly known function comprises a hash function and wherein the client is configured to apply the hash function to the identification string and the data location server table to obtain the location of the different data location server.

22. The system of claim 19, wherein the redirect message comprises a transmitted function for use by the client.

23. The system of claim 22, wherein the client is configured to calculate the location of the different data location server by applying the transmitted function to the identifier string.

24. The system of claim 18, wherein the location information comprises a portion of a hash table distributed over the plurality of data location servers.

25. The system of claim 18, further comprising a plurality of servers related in a logical hierarchy between the client and the data location servers, wherein each of the plurality of servers is configured to function as a next client and retransmit the data location request to a next logically associated server until a data location server receives the data location request.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.      : 7,103,640 B1                             Page 1 of 1
APPLICATION NO. : 09/661222
DATED          : September 5, 2006
INVENTOR(S)     : John K. Overton and Stephen W. Bailey

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

On Title Page, Item (60) Pat No. 7,103,640 B1, Related to U.S. Application Data should be changed from:

"Provisional application No. 60/153,709, filed on Sep. 14, 1999."; to

--U.S. Provisional App. No. 60/153,709, filed Sep. 14, 1999, and U.S. Pat. App. No. 09/111,896, filed Jul 8, 1998.--

Signed and Sealed this

Third Day of April, 2007



JON W. DUDAS
*Director of the United States Patent and Trademark Office*

Appx18818

US007103640C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (12178th)

# United States Patent
Overton et al.

(10) **Number:** US 7,103,640 C1

(45) **Certificate Issued:** Dec. 1, 2022

(54) **NETWORK DISTRIBUTED TRACKING WIRE TRANSFER PROTOCOL**

(75) Inventors: **John K. Overton**, Chicago, IL (US); **Stephen W. Bailey**, Chicago, IL (US)

(73) Assignee: **KOVE IO, INC.**, Chicago, IL (US)

**Reexamination Request:**
No. 90/019,036, Nov. 19, 2021

**Reexamination Certificate for:**
| | |
|---|---|
| Patent No.: | **7,103,640** |
| Issued: | **Sep. 5, 2006** |
| Appl. No.: | **09/661,222** |
| Filed: | **Sep. 13, 2000** |

Certificate of Correction issued Apr. 3, 2007

### Related U.S. Application Data

(60) Provisional application No. 60/153,709, filed on Sep. 14, 1999.

(51) **Int. Cl.**
| | |
|---|---|
| *G06F 16/182* | (2019.01) |
| *G06F 16/14* | (2019.01) |
| *H04L 61/4552* | (2022.01) |

(52) **U.S. Cl.**
CPC ........ ***H04L 61/4552*** (2022.05); ***G06F 16/148*** (2019.01); ***G06F 16/182*** (2019.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/019,036, please refer to the USPTO's Patent Electronic System.

*Primary Examiner* — Peng Ke

(57) **ABSTRACT**

A network distributed tracking wire transfer protocol for storing and retrieving data across a distributed data collection. The protocol includes a location string for specifying the network location of data associated with an entity in the distributed data collection, and an identification string for specifying the identity of an entity in the distributed data collection. According to the protocol, the length of the location string and the length of the identification string are variable, and an association between an identification string and a location string can be spontaneously and dynamically changed. The network distributed tracking wire transfer protocol is application independent, organizationally independent, and geographically independent. A method for using the protocol in a distributed data collection environment and a system for implementing the protocol are also provided.



**Use Of Request Identifiers**

Appx18819

US 7,103,640 C1

**1**

# EX PARTE
# REEXAMINATION CERTIFICATE

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **17**, **18** and **24** is confirmed.
Claims **1-16**, **19-23** and **25** were not reexamined.

\* \* \* \* \*

**2**



US007814170B2

(12) **United States Patent**
Overton et al.

(10) **Patent No.:** US 7,814,170 B2
(45) **Date of Patent:** *Oct. 12, 2010

(54) **NETWORK DISTRIBUTED TRACKING WIRE TRANSFER PROTOCOL**

(75) Inventors: **John K. Overton**, Chicago, IL (US); **Stephen W. Bailey**, Chicago, IL (US)

(73) Assignee: **Econnectix Corporation**, Chicago, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 749 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **11/354,224**

(22) Filed: **Feb. 13, 2006**

(65) **Prior Publication Data**

US 2007/0011267 A1 Jan. 11, 2007

**Related U.S. Application Data**

(63) Continuation of application No. 09/661,222, filed on Sep. 13, 2000, now Pat. No. 7,103,640, and a continuation-in-part of application No. 09/111,896, filed on Jul. 8, 1998, now abandoned.

(60) Provisional application No. 60/153,709, filed on Sep. 14, 1999.

(51) **Int. Cl.**
*G06F 15/16* (2006.01)
*G06F 17/30* (2006.01)
(52) **U.S. Cl.** .......................... **709/217**; 709/219; 707/10
(58) **Field of Classification Search** ................ 709/217, 709/223, 238, 219; 707/10
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,553,261 A | 11/1985 | Froessl | |
| 4,636,858 A | 1/1987 | Hague | |

(Continued)

FOREIGN PATENT DOCUMENTS

EP 0 568 161 A1 1/1992

(Continued)

OTHER PUBLICATIONS

D.G. Bourke et al., Programmable Module and Circuit for Machine-Readable Unique Serial Number, IBM Technical Disclosure Bulletin, vol. 27, No. 4A, Sep. 1, 1984, pp. 1942-1944.

(Continued)

*Primary Examiner*—Larry Donaghue
*Assistant Examiner*—Brian J Gillis
(74) *Attorney, Agent, or Firm*—Brinks Hofer Gilson & Lione

(57) **ABSTRACT**

A network distributed tracking wire transfer protocol for storing and retrieving data across a distributed data collection. The protocol includes a location string for specifying the network location of data associated with an entity in the distributed data collection, and an identification string for specifying the identity of an entity in the distributed data collection. According to the protocol, the length of the location string and the length of the identification string are variable, and an association between an identification string and a location string can be spontaneously and dynamically changed. The network distributed tracking wire transfer protocol is application independent, organizationally independent, and geographically independent. A method for using the protocol in a distributed data collection environment and a system for implementing the protocol are also provided.

**17 Claims, 12 Drawing Sheets**



NETWORK DISTRIBUTED TRACKING
DISTRIBUTED RECORD RETRIEVAL

**US 7,814,170 B2**

Page 2

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,728,978 | A | 3/1988 | Inoue et al. |
| 4,800,488 | A | 1/1989 | Agrawal et al. |
| 4,825,406 | A | 4/1989 | Bean et al. |
| 4,835,372 | A | 5/1989 | Gombrich et al. |
| 4,914,571 | A | 4/1990 | Baratz et al. |
| 5,008,700 | A | 4/1991 | Okamoto |
| 5,124,814 | A | 6/1992 | Takahashi et al. |
| 5,193,185 | A | 3/1993 | Lanter |
| 5,208,623 | A | 5/1993 | Takahashi |
| 5,276,735 | A | 1/1994 | Boebert et al. ................ 380/21 |
| 5,291,399 | A | 3/1994 | Chaco |
| 5,319,401 | A | 6/1994 | Hicks |
| 5,345,586 | A | 9/1994 | Hamala et al. .............. 395/650 |
| 5,347,600 | A | 9/1994 | Barnsley |
| 5,384,643 | A | 1/1995 | Inga et al. |
| 5,414,841 | A | 5/1995 | Bingham et al. |
| 5,454,101 | A | 9/1995 | Mackay et al. |
| 5,455,648 | A | 10/1995 | Kazami |
| 5,475,817 | A | 12/1995 | Waldo et al. |
| 5,479,654 | A | 12/1995 | Squibb |
| 5,491,511 | A | 2/1996 | Olde |
| 5,499,113 | A | 3/1996 | Tsuboi |
| 5,522,077 | A | 5/1996 | Cuthbert et al. |
| 5,537,547 | A | 7/1996 | Chan et al. |
| 5,550,981 | A | 8/1996 | Bauer et al. |
| 5,551,027 | A | 8/1996 | Choy et al. |
| 5,557,790 | A | 9/1996 | Bingham et al. |
| 5,560,005 | A | 9/1996 | Hoover et al. |
| 5,576,952 | A | 11/1996 | Stutman et al. |
| 5,579,067 | A | 11/1996 | Wakabayashi |
| 5,610,653 | A | 3/1997 | Abecassis |
| 5,617,570 | A | 4/1997 | Russell et al. |
| 5,625,841 | A | 4/1997 | Dawkins et al. |
| 5,649,247 | A | 7/1997 | Itoh et al. |
| 5,664,170 | A | 9/1997 | Taylor |
| 5,669,029 | A | 9/1997 | Fyson et al. |
| 5,724,575 | A | 3/1998 | Hoover et al. |
| 5,740,428 | A | 4/1998 | Mortimore et al. |
| 5,764,889 | A | 6/1998 | Ault et al. |
| 5,764,906 | A | 6/1998 | Edelstein et al. |
| 5,774,670 | A | 6/1998 | Montulli |
| 5,781,725 | A | 7/1998 | Saito |
| 5,784,565 | A | 7/1998 | Lewine |
| 5,802,518 | A | 9/1998 | Karaev et al. |
| 5,809,161 | A | 9/1998 | Auty |
| 5,809,331 | A | 9/1998 | Staats et al. |
| 5,809,495 | A | 9/1998 | Loaiza |
| 5,813,006 | A | 9/1998 | Polnerow et al. |
| 5,832,487 | A | 11/1998 | Olds et al. |
| 5,848,246 | A | 12/1998 | Gish |
| 5,864,482 | A | 1/1999 | Hazama |
| 5,872,973 | A | 2/1999 | Mitchell et al. |
| 5,875,302 | A | 2/1999 | Obhan |
| 5,903,889 | A | 5/1999 | De la Huerga et al. |
| 5,907,837 | A | 5/1999 | Ferrel et al. |
| 5,913,210 | A | 6/1999 | Call |
| 5,915,240 | A | 6/1999 | Karpf |
| 5,918,214 | A | 6/1999 | Perkowski |
| 5,920,702 | A | 7/1999 | Bleidt et al. |
| 5,940,844 | A | 8/1999 | Cahill et al. |
| 5,950,173 | A | 9/1999 | Perkowski |
| 5,961,610 | A | 10/1999 | Kelly et al. |
| 5,966,705 | A | 10/1999 | Koneru et al. |
| 5,974,124 | A | 10/1999 | Schlueter, Jr. et al. |
| 5,974,409 | A | 10/1999 | Sanu et al. |
| 5,978,773 | A | 11/1999 | Hudetz et al. |
| 5,987,519 | A | 11/1999 | Peifer et al. |
| 5,995,965 | A | 11/1999 | Experton |
| 6,032,175 | A | 2/2000 | Fletcher et al. |
| 6,047,332 | A | 4/2000 | Viswanathan et al. |
| 6,055,544 | A | 4/2000 | DeRose et al. |
| 6,058,193 | A | 5/2000 | Cordery et al. |
| 6,070,191 | A | 5/2000 | Narendran et al. .......... 709/226 |
| 6,092,189 | A | 7/2000 | Fisher et al. |
| 6,108,787 | A | 8/2000 | Anderson et al. |
| 6,131,095 | A | * 10/2000 | Low et al. ..................... 707/10 |
| 6,154,738 | A | 11/2000 | Call |
| 6,167,438 | A | 12/2000 | Yates et al. ................. 709/216 |
| 6,188,766 | B1 | 2/2001 | Kocher |
| 6,201,931 | B1 | 3/2001 | Cipolla et al. |
| 6,202,070 | B1 | 3/2001 | Nguyen et al. |
| 6,209,095 | B1 | 3/2001 | Anderson et al. |
| 6,212,280 | B1 | 4/2001 | Howard, Jr. et al. |
| 6,370,584 | B1 * | 4/2002 | Bestavros et al. ........... 709/238 |
| 6,374,253 | B1 | 4/2002 | Weider et al. ............... 707/102 |
| 6,377,986 | B1 | 4/2002 | Philyaw et al. |
| 6,418,441 | B1 | 7/2002 | Call |
| 6,438,652 | B1 | 8/2002 | Jordan et al. |
| 6,453,404 | B1 | 9/2002 | Bereznyi et al. ............ 711/171 |
| 6,463,454 | B1 | 10/2002 | Lumelsky et al. |
| 6,466,980 | B1 | 10/2002 | Lumelsky et al. |
| 6,470,389 | B1 * | 10/2002 | Chung et al. ................ 709/227 |
| 6,578,068 | B1 | 6/2003 | Bowman-Amuah |
| 6,594,253 | B1 | 7/2003 | Sallberg et al. ............. 370/349 |
| 6,711,408 | B1 | 3/2004 | Raith |
| 7,103,640 | B1 | 9/2006 | Overton et al. |
| 7,233,978 | B2 | 6/2007 | Overton et al. |
| 7,272,625 | B1 | 9/2007 | Hannel et al. ............... 709/200 |
| 7,349,902 | B1 | 3/2008 | Arlitt et al. .................... 707/8 |
| 7,634,453 | B1 | 12/2009 | Bakke et al. ................... 707/1 |
| 2001/0013059 | A1 | 8/2001 | Dawson et al. .............. 709/217 |
| 2002/0112048 | A1 | 8/2002 | Gruyer et al. |
| 2003/0065653 | A1 | 4/2003 | Overton et al. |
| 2004/0205055 | A1 | 10/2004 | Overton et al. |
| 2008/0005275 | A1 | 1/2008 | Overton et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 889 422 A2 | 1/1999 |
| WO | WO 86/05610 | 9/1986 |
| WO | WO 98/15910 | 4/1998 |
| WO | WO 98/31138 | 7/1998 |
| WO | WO 00/32526 | 1/2000 |

OTHER PUBLICATIONS

Kleinholz, L. et al., Supporting Cooperative Medicine: The Bermed Project, IEEE Multimedia, vol. 1, No. 4, Dec. 21, 1994, pp. 44-53.

Method for Network Naming and Routing, IBM Technical Disclosure Bulletin, vol. 37, No. 9, Sep. 1, 1994, pp. 255-256.

Minimizing Locking to Access Global Shared Data, IBM Technical Disclosure Bulletin, Feb. 1995, pp. 619-622.

R. Muniz et al., A Robust Software Barcode Reader Using the Hough Transform, Abstract, 1999, International Conference on Information Intelligence and Systems (Oct. 31 to Nov. 3, 1999).

D. Fresonke, In-fab Identification of Silicon Wafers With Clean, Laser Marked Barcodes, Abstract, 1994, IEEE/Semi Advanced Semiconductor Manufacturing Conference and Workshop (Nov. 14 to Nov. 16, 1994).

T. Sriram et al., Applications of Barcode Technology in Automated Storage and Retrieval Systems, Abstract, Proceedings of the 1996 IEEE IECON 22nd International Conference on Industrial Electrodes (Aug. 5 to Aug. 10, 1996).

V.L. Callaghan et al., Structures and Metrics for Image Storage and Interchange, Journal of Electronic Imaging, vol. 2, No. 2, Apr. 1, 1993, pp. 126-137.

Beitz et al., Service Location in an Open Distributed Environment, Second International Workshop on Services in Distributed and Networked Environments, IEEE Computer Society Press, Jun. 1995, pp. 28-34.

Office Action, dated Mar. 30, 2010, pp. 1-12, U.S. Appl. No. 11/803,332, U.S. Patent and Trademark Office, Virginia.

Notice of Allowance, dated May 19, 2010, pp. 1-8, U.S. Appl. No. 10/646,350, U.S. Patent and Trademark Office, Virginia.

* cited by examiner

U.S. Patent     Oct. 12, 2010     Sheet 1 of 12     US 7,814,170 B2



**Use Of Request Identifiers**

*Fig. 1*

Appx18825

Fig. 2

NDTP String Format

Fig. 3

NDTP_GET Format

**U.S. Patent**  Oct. 12, 2010  Sheet 3 of 12  US 7,814,170 B2



NDTP_GET_RSP Format

Fig. 4



Fig. 5



Fig. 6

NDTP_DEL Format

Fig. 7

Appx18829

Case: 1:18-cv-08175 Document #: 690-2 Filed: 10/05/23 Page 10 of 28 PageID #:30405



Fig. 8

Appx18830

Appx18831

| | | | | |
|---|---|---|---|---|
| **0** | **1** | **2** | | **3** |
| 0 1 2 3 4 5 6 7 | 8 9 0 1 2 3 4 5 6 7 | 8 9 0 1 2 3 4 5 | 6 7 | 8 9 0 1 |

| | |
|---|---|
| NDTP_RDR_RSP (6) | Reserved |
| NDTP request identifier | |
| String area length (ROUND4(n0) + 4 + … + ROUND4(nm) + 4) | |
| NDTP Server URL0 length (n0) | |
| NDTP Server URL0 data | |
| URL0 byte n0-1 | Padding0 |
| NDTP Server URL1 | |
| … | |
| URLm byte nm-1 | URLm |

**NDTP_RDR_RSP With Server Table**

*Fig. 9(a)*



NDTP_RDR_RSP (6)

Reserved

NDTP request identifier

String area length (ROUND4(n) + 4)

Serialized NDTPRedirectFunction length (n)

Serialized NDTPRedirectFunction data

Function byte n-1

Padding

NDTP_RDR_RSP With Redirection Function

*Fig. 9(b)*





*Fig. 11*     NDTP Server Constellation Context



*Fig. 12*     NDTP Client-Centric Constellation

Appx18834



**NDTP Server-Centric Constellation**



US 7,814,170 B2

# NETWORK DISTRIBUTED TRACKING WIRE TRANSFER PROTOCOL

### RELATED APPLICATIONS

This application is a continuation of U.S. application Ser. No. 09/661,222 filed Sep. 13, 2000, now U.S. Pat. No. 7,103, 640, the entirety of which is hereby incorporated by reference, which claims the benefit of U.S. patent application Ser. No. 60/153,709, entitled SIMPLE DATA TRANSPORT PROTOCOL METHOD AND APPARATUS, filed on Sep. 14, 1999, and is a continuation-in-part of U.S. application Ser. No. 09/111,896, entitled SYSTEM AND METHOD FOR ESTABLISHING AND RETRIEVING DATA BASED ON GLOBAL INDICES, filed on Jul. 8, 1998, abandoned.

### MICROFICHE/COPYRIGHT REFERENCE

A Microfiche Appendix (143 frames, 2 sheets) is included in this application that contains material which is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the Microfiche Appendix, as it appears in the Patent and Trademark Office patent files or records, but otherwise reserves all copyright rights whatsoever.

### FIELD OF THE INVENTION

This invention relates generally to the storage and retrieval of information, and in particular, to a protocol for dynamic and spontaneous global search and retrieval of information across a distributed network regardless of the data format.

### BACKGROUND OF THE INVENTION

Data can reside in many different places. In existing retrieval systems and methods, a client seeking information sends a request to a server. Typically, only data that are statically associated with that server are returned. Disadvantageously, the search is also usually restricted to previously known systems. The search is thus conducted only where the server knows in advance to look.

Another disadvantage of known retrieval systems is the difficulty in accessing data in different forms. Known retrieval systems are typically designed to search for data in limited forms. One example is where a client requests files based on a subject, like a person's name. In the search results, therefore, only text files of peoples' names may be retrieved. Another problem in current retrieval systems is that the client may receive text and image files in the search results, but could not seamlessly access the image files. Yet another problem in current retrieval systems is that video and sound files related to the request may not even be found in the search results. For example, a doctor might be able to retrieve medical records on a specific patient, but cannot view an MRI or X-Ray results associated with that record.

A distributed data collection is a system where data is stored and retrieved among multiple machines connected by a network. Typically, each machine in which some portion of the data in a distributed data collection may reside is called a "data repository machine", or simply a "data repository". One commonly asked question in a data repository environment is: Where is data associated with a particular entity in a distributed data collection? The data location is a key question when a distributed data collection has highly dynamic data distribution properties.

In networked environments where there are a large number of data repositories and any particular entity does not store data in all the repositories, a mechanism is needed that would permit queries to be directed only at data repositories with relevant information. It would also be beneficial to permit membership in the set of data repositories itself to be highly dynamic. Such a system would support on-the-fly addition and removal of data repositories from a distributed data collection seamlessly and without the need to reprogram the client and server participants.

### BRIEF SUMMARY OF THE INVENTION

In view of the above, the invention provides a network distributed tracking wire transfer protocol, and a system and method for using the protocol in a networked environment. The network distributed tracking wire transfer protocol includes two basic components: identification strings for specifying the identity of an entity in the distributed data collection, and location strings for specifying network locations of data associated with an entity. The protocol accommodates variable length identifier and location strings. Relationships between identification strings and location strings can be dynamically and spontaneously manipulated thus allowing the corresponding data relationships also to change dynamically, spontaneously, and efficiently. In addition, the network distributed tracking wire transfer protocol is application independent, organizationally independent, and geographically independent.

In another aspect of the invention, a system of components using the network distributed tracking protocol are provided for storing and identifying data with a distributed data collection. The components include (1) a data repository for storing data in the distributed data collection, (2) a client entity for manipulating data in the distributed data collection, and (3) a first server entity operative to locate data in the distributed data collection, which may be coupled to a client entity and/or data repository. In a network with these components, a client entity transmits an identifier string to the first server entity along with the client request, and the first server entity provides a set of location strings to the client entity in response thereto. The first server entity maps the identifier string received from the client entity to a set of location strings. The network may also include any number of additional server entities coupled to the first server entity.

According to yet another aspect of the invention, a method is provided for storing and retrieving tracking information over a network using a wire transfer protocol. A location string specifies the location of data associated with an entity in the distributed data collection and the identification string specifies the identification of an entity in a distributed data collection. A first data repository entity stores data by associating an identification string with each particular stored unit of data, and by mapping the identification string to a location string associated with the first data repository. The identification string and location string for the particular unit of data are at a first server entity coupled to the first data repository entity. A request is transmitted from a client entity to the first server entity to retrieve at least one location string associated with the stored unit of data in the distributed data collection. The request includes the identification string associated with the particular stored unit of data. The request is received at the first server entity, which responds to the client entity by providing at least one location string associated with the particular stored unit of data to the client entity.

The request may also be transmitted to a second server entity prior to responding to the client entity, where the sec-

US 7,814,170 B2

**3**

ond server entity is coupled to the first server entity and includes the mapping of the identification string and location strings for the particular units of data. In such case, the second server entity responds to the client entity by providing the at least one location string associated with the particular stored unit of data to the client entity.

The network distributed tracking protocol of the invention is a networking protocol that efficiently manages mappings from one or more identifier strings to zero or more location strings. The protocol permits client entities to add and remove identifier/location associations, and request the current set of locations for an identifier or identifiers from server entities that comply with the protocol.

The protocol is designed for use in the larger context of a distributed data collection. As such, it supports an architecture in which information about where data associated with particular application entities can be managed and obtained independently of the data itself. The protocol and its associated servers thus maintain a mapping between entity identifiers and data locations. The identifier/location mapping maintained by the servers is very dynamic. Regardless of the expected system context in a distributed data collection, the protocol can be used for any application in which one-to-one or one-to-many associations among strings are to be maintained and accessed on a network.

In any context, the protocol supports identifier and location strings of up to $2^{32}$-4 bytes in length, but in most applications it is expected that the strings are typically short. String length is not fixed by the protocol, except by the upperbound. Accordingly, string formats are controlled at a local level and not dictated by the protocol.

These and other features and advantages of the invention will become apparent upon a review of the following detailed description of the presently preferred embodiments of the invention, when viewed in conjunction with the appended drawings.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is an example of multiple outstanding protocol requests.

FIG. **2** is a layout of one presently preferred string format.

FIG. **3** is a layout of one presently preferred NDTP_GET message.

FIG. **4** is a layout of one presently preferred NDTP_GET_RSP message.

FIG. **5** is a layout of one presently preferred NDTP_PUT message.

FIG. **6** is a layout of one presently preferred NDTP_PUT_RSP message.

FIG. **7** is a layout of one presently preferred NDTP_DEL message.

FIG. **8** is a layout of one presently preferred NDTP_DEL_RSP message.

FIG. **9** is a layout of one presently preferred NDTP_RDR_RSP message, where FIG. **9**(*a*) shows a server table layout, and FIG. **9**(*b*) shows a redirection function layout.

FIG. **10** is a system block diagram showing a multi-server implementation environment of the network distributed tracking wire transfer protocol of the invention.

FIG. **11** is a system diagram showing an NDTP server constellation configuration.

FIG. **12** is a system diagram showing a client-centric constellation approach.

**4**

FIG. **13** is a system diagram showing a server-centric constellation approach.

## DETAILED DESCRIPTION OF THE PRESENTLY PREFERRED EMBODIMENTS OF THE INVENTION

The following terms are used to describe the operation of the presently preferred network distributed tracking protocol (NDTP). An "identifier string" or an "identifier" is a unique string with which zero or more location strings are associated in an NDTP server. A "data location" or a "location" is a string that is a member of a set of strings associated with an identifier string in an NDTP server. An "NDTP client" or a "client" is a network-attached component that initiates update or lookup of identifier/location mappings from an NDTP server with NDTP request messages. An "NDTP server" or a "server" is a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to NDTP request messages from NDTP clients. The term "Network Byte Order" is the ordering of bytes that compose an integer of larger than a single byte as defined in the Internet Protocol (IP) suite. Preferably, Network Byte Order specifies a big-endian, or most significant byte first, representation of multibyte integers. In this specification a byte is preferably composed of eight bits.

Network Distributed Tracking Protocol (NDTP)

The Network Distributed Tracking Protocol (NDTP) efficiently tracks the location of data associated with an individual entity in a distributed data collection. NDTP is a transactional protocol, which means that each operation within NDTP consists of a request message from an NDTP client to an NDTP server, followed by an appropriate response message from the NDTP server to the NDTP client. NDTP defines an entity key (or "identifier") as a unique string used to refer to an entity about which a distributed query is performed.

The NDTP server treats the entity key as an unstructured stream of octets, which is assumed to be unique to a particular entity. The precise structure of the NDTP entity key and the mechanism for ensuring its uniqueness are a function of the application in which the NDTP server is used. In a customer oriented application, the NDTP entity key might be a unique customer identifier, for example, a Social Security Number, in either printable or binary integer form, as is appropriate to the application. NDTP also defines a data location specifier as a string used to specify a data respository in which data associated with a particular entity may be found.

As with NDTP entity keys, the NDTP server treats NDTP data location specifiers as unstructured streams of octets. The structure of an NDTP data location specifier is a function of the application in which the NDTP server is used. For example, an NDTP data location specifier might be an Internet machine name, and a TCP/IP port number for a relational database server, or an HTTP Universal Resource Locator (URL), or some concatenation of multiple components.

The NDTP server efficiently maintains and dispenses one to zero or one to many relationships between entity keys and data location specifiers. In other words, an entity key may be associated with any number of data location specifiers. When data for a particular entity is added to a data repository, the NDTP server is updated to indicate an association between the entity key and the data repository's data location specifier. When a query is performed for an entity key, the NDTP server supplies the set of data repositories in which data may be found for that entity key.

US 7,814,170 B2

General NDTP Mechanics

The protocol of the invention is designed to provide maximum transaction throughput from the NDTP server, associated clients, and associated data repositories when appropriate. The design goal is realized through two design principles:

1. NDTP messages should preferably be as short as possible to maximize the rate of NDTP transactions for a given network communication bandwidth.
2. NDTP messages should preferably be structured for efficient processing on existing machine architectures.

Design Optimizations.

Numerical fields of an NDTP message are preferably represented in binary integer format rather than ASCII or other printable format to minimize host processing overhead and network utilization. Numerical fields of NDTP messages are also aligned on 32-bit boundaries to minimize the cost of manipulation on current machine architectures. Manipulating unaligned multibyte integer quantities on modern machine architectures usually incurs an extra cost ranging from mild to severe compared to manipulating the same quantities in aligned form.

In keeping with other network protocol standards including TCP/IP, multioctet integer quantities in NDTP are preferably encoded using the big endian integer interpretation convention, as set forth above.

To overcome network latency, NDTP is designed to support asynchronous operation, where many requests may be sent to an NDTP server before a response from any of them is received.

Each NDTP message is preceded by a fixed size, 12-octet header, using the preferred data structure:

```
typedef struct ndtp-hdr {
    uint8__T op;              /* opcode */
    uint8_t pad[3];
    uint32__t id;             /* transaction identifier */
    uint32__t size;           /* total request size
                                 following the header */
}ndtp__hdr__t;
```

where:

op:
    NDTP message numerical operation code.
    NDTP_GET: get request
    NDTP_GET_RSP: get response
    NDTP_PUT: put request
    NDTP_PUT_RSP: put response
    NDTP_DEL: delete request
    NDTP_DEL_RSP: delete response
    NDTP_RDR_RSP: provide redirection

id:
    Client supplied operation request used to distinguish responses from multiple outstanding NDTP asynchronous requests. Each "_RSP" message echoes the id field of the associated request.

size:
    Size, in octets of the remainder of the NDTP message. The size field should always be a multiple of 4 octets.

Variably sized portions of NDTP messages are preferably defined with a size field rather than some other delimiter mechanism to facilitate efficient reading of NDTP messages. Requests may be made to the network layer to read the entire variably sized portion of an NDTP message, rather than reading small chunks while scanning for a delimiter. Furthermore,

client and server resource management can be more efficient since the size of NDTP messages is known before reading.

The variably sized portions of NDTP messages are composed of zero or more NDTP stings:

```
typedef struct ndtp__str {
    uint32__t len;
    uint8__t data [ ];
{ ndtp__str__t;
```

Note that the C struct definitions in this document are schematic, and not necessarily fully compliant structures in the C programming language. Specifically, arrays denoted in this document with "[ ]" imply a dimension which is only known dynamically and this indefinite array size specifier is not allowed in C struct definitions. Note also the following:

len:
    the number of significant octets of data following the len field in the data area.

data:
    len octets of data, followed by up to 3 octets of padding, to ensure that the total length of the NDTP string structure is a multiple of 4 octets.

The padding octets are not included in the len field.

Because variable sized portion NDTP messages are composed of zero or more NDTP stings and NDTP strings preferably occupy an even multiple of 4 octets, this ensures that the "size" field of NDTP message headers will preferably be a multiple of 4 octets.

Protocol Structure

An example of multiple outstanding NDTP requests and the use of request identifiers is shown in FIG. 1. NDTP preferably has a simple, stateless request/response structure. Each request message 10 sent by a client 12 has a corresponding response message 14 returned by the server 16. To maximize server 16 throughput and use of available network bandwidth, NDTP is asynchronous in nature. Many requests 10 from a single client 12 may be outstanding simultaneously, and responses 14 may or may not be returned from the server 16 in the order in which the requests 10 were issued. Each NDTP request 10 contains an NDTP request identifier 18 that is returned in the NDTP response 14 for the associated request 10. An NDTP client 12 uses a unique NDTP request identifier 18 for each NDTP request 10 that is outstanding at the same time to an NDTP server 16 if it wishes to correlate responses with requests.

There are four operations preferably supported by the protocol:
    Add a location association to an identifier.
    Delete a location association from an identifier.
    Get all locations associated with an identifier.
    Provide a redirect instruction to identify an alternative server.

The response to adding a location association to an identifier 18 is a simple acknowledgement. If the location is already associated with the identifier 18, adding the association has no effect, but the request 10 is still acknowledged appropriately. In other words, the NDTP add operation is idempotent. The response to deleting a location association from an identifier 18 is a simple acknowledgement. If the location is not currently associated with the identifier 18, deleting the association has no effect, but the request 10 is still acknowledged appropriately. In other words, the NDTP delete operation is idempotent. The response 14 to getting all locations associ-

US 7,814,170 B2

7 8

ated with an identifier **18** is a list of the locations presently associated with an identifier **18**. If no locations are currently associated with an identifier **18**, a list of length zero is returned.

Message Formats

NDTP messages **10**, **14** preferably have a regular structure that consists of a message operation code, followed by a request identifier **18**, followed by a string area length (in bytes) **20**, followed by zero or more strings **22**, as shown in FIG. **2**. As those skilled in the art will appreciate, NDTP message formats are preferably independent of the network transport layer used to carry them. NDTP preferably defines mappings of these messages **10**, **14** onto TCP and UDP transport layers (described in detail below), but other mappings could also be defined and it is likely that these NDTP message formats would not require change. For example, the notation ROUND4(x) means x, rounded up to the next multiple of 4.

Integer Format

Multibyte integers in NDTP messages are represented in network byte order; using the big-endian convention. In other words, the most significant byte of a multibyte integer is sent first, followed by the remainder of the bytes, in decreasing significance order.

String Format

Strings in NDTP are represented as counted strings, with a 32-bit length field **20**, followed by the string data **22**, followed by up to 3 bytes of padding **24** to make the total length of the string representation equal to ROUND4(length). This layout is shown diagrammatically in FIG. **2**.

NDTP_GET Format

The NDTP_GET message has a message operation code **30** of 0, and a single NDTP string **32** which is the identifier string for which to get associated location strings. This layout is shown diagrammatically in FIG. **3**.

NDTP_GET_RSP Format

The NDTP_GET_RSP message has a message operation code **40** of 1, and zero or more strings **42** that are the locations currently associated with the requested identifier. This layout is shown diagrammatically in FIG. **4**.

NDTP_PUT Format

The NDTP_PUT message has a message operation code **50** of 2, and two NDTP strings **52**, **54**. The first string **52** is the identifier for which to add a location association, and the second string **54** is the location to add. This layout is shown diagrammatically in FIG. **5**.

NDTP_PUT_RSP Format

The NDTP_PUT_RSP message has a message operation code **60** of 3, and zero NDTP strings. This layout is shown diagrammatically in FIG. **6**.

NDTP_DEL Format

The NDTP_DEL message has a message operation code **70** of 4, and two NDTP strings **72**, **74**. The first string **72** is the identifier from which to delete a location association, and the second string **74** is the location to delete. This layout is shown diagrammatically in FIG. **7**.

NDTP_DEL_RSP Format

The NDTP_DEL_RSP message has a message operation code **80** of 5, and zero NDTP strings. This layout is shown diagrammatically in FIG. **8**.

NDTP_RDR_RSP Format

The NDTP_RDR_RSP message has a message operation code **90** of 6, and one or more NDTP strings **92**, **94**. Two layouts apply, which are shown diagrammatically in FIGS. **9**(*a*) and **9**(*b*).

A general description of the usage and operation of these protocol messages is provided below.

NDTP_GET Transaction

The NDTP_GET message contains a single NDTP string which is the entity key for which associated data locations are requested.

```
typedef struct ndtp_get {
    ndtp_hdr_t hdr;
    ndtp_str_t key;
} ndtp_get_t;
```

The NDTP_GET_RSP message contains zero or more NDTP strings which are the data location specifiers associated with the NDTP entity key:

```
typedef struct ndtp_get_rsp {
    ndtp_hdr_t hdr;
    uint32_t rsps;
    ndtp_str_t values[ ];
} ndtp_get_rsp_t;
```

NDTP_PUT Transaction

The NDTP_PUT messages contains two NDTP strings which are (1) the NDTP entity key and (2) the NDTP data location specifier which is to be associated with the NDTP entity key.

```
typedef struct ndtp_put {
    ndtp_hdr_t hdr;
    ndtp_str_t key;
    ndtp_str_t data;
} ndtp_put_t;
```

The NDTP_PUT_RSP message has no NDTP strings, and simply indicates that the requested entity key/data location specifier association was added:

```
typedef struct ndtp_put_rsp {
    ndtp_hdr_t hdr;
} ndtp_put_rsp_t;
```

The requested entity key/data location specifier association is added in addition to any other associations already maintained by the NDTP server. If the requested entity key/data location specifier association is already in effect, the NDTP_PUT still succeeds and results in an NDTP_PUT_RSP message.

NDTP_DELETE Transaction

The NDTP_DEL message contains two NDTP strings which are (1) the NDTP entity key and (2) the NDTP data location specifier which is to be unassociated with the NDTP entity key:

US 7,814,170 B2

9

```
typedef struct ndtp_del {
    ndtp_hdr_t hdr;
    ndtp_str_t key;
    ndtp_str_t data;
} ndtp_del_t;
```

The NDTP_DEL_RSP message has no NDTP strings, and simply indicates that the requested entity key/data location specifier association was deleted.

```
typedef struct ndtp_del_rsp {
    ndtp_hdr_t hdr;
} ndtp_del_rsp_t;
```

If the requested entity key/data location specifier association is not in effect, the NDTP_DEL still succeeds and results in an NDTP_DEL_RSP message.

NDTP_RDR_RSP Message

NDTP supports a distributed server implementation for which two principle redirection methods apply: (1) embedded redirection links, and (2) passed functions. The passed functions method in turn has two variants: (a) a well-known function, and (b) a communicated function. (These methods and variants are described in further detail below.)

Network Front End

The NDTP server network front end preferably maximizes NDTP transaction throughput including concurrent NDTP requests from a single client as well NDTP requests from multiple concurrent clients.

Network Communication Mechanism

NDTP defines a transaction oriented protocol, which can be carried over any of a variety of lower level network transport protocols. For example:

TCP/IP: TCP/IP provides a ubiquitously implemented transport which works effectively on both local area and wide area networks. An NDTP client using TCP/IP preferably connects with the NDTP server at an established TCP port number, and then simply writes NDTP request messages through the TCP/IP connection to the server, which then writes NDTP response messages back to the client through the same TCP/IP connection in the reverse direction. TCP/IP implementations perform buffering and aggregation of many small messages into larger datagrams, which are carried more efficiently through the network infrastructure. Running NDTP on top of TCP/IP will take advantage of this behavior when the NDTP client is performing many NDTP requests. For example, a data repository which is undergoing rapid addition of data records associated with various entities will perform many rapid NDTP_PUT operations to the NDTP server that can all be carried on the same NDTP TCP/IP connection.

UDP/IP: If an NDTP client only performs occasional, isolated NDTP operations, or there are a vast number of clients communicating with an NDTP server, TCP/IP will not offer the best possible performance because many traversals of the network are required to establish a TCP/IP connection, and yet more network traversals are required to transfer actual NDTP messages themselves. For such isolated NDTP transactions, depending upon the application and network infrastructure in use, it is beneficial to have the NDTP server employ UDP/IP, which is a widely available connectionless datagram protocol.

10

However, UDP/IP does not support reliable data transfer, or any congestion control mechanism. This means that NDTP clients using UDP/IP must implement reliability and congestion control maintaining transaction timeouts and performing exponential retry backoff timers, precisely analogous to the congestion control mechanism implemented by Ethernet, and other well known UDP protocols. Those skilled in the art will note that the NDTP protocol is stateless from the standpoint of the NDTP server, which means that there is no congestion control or reliability burden on the server; it is all implemented in a distributed manner by the NDTP UDP/IP clients.

Still Higher Performance (ST): Both TCP/IP and to a lesser degree UDP/IP suffer from high host CPU overhead. Like the relatively long latency of TCP/IP, this host CPU consumption is considered just the "cost of doing business" where TCP/IP provides ubiquitous connectivity. If an NDTP server were running in a more constrained environment, where ubiquitous connectivity was not required, its absolute performance could be improved substantially by using a different protocol that is optimized to reduce CPU overhead and latency, such as the Scheduled Transfer (St) protocol.

None of these network implementation issues are particularly unique to NDTP, however. All similar protocols face similar tradeoffs, and what art exists to improve the performance of such protocols applies fully to NDTP as well.

NDTP Query Processing

Servicing NDTP query requests does not require high latency operations, such as disk I/O. Therefore, the NDTP server network front end preferably services NDTP query requests in a FIFO style by reading the NDTP_GET message, performing the lookup for the entity key in the NDTP server string store, and writing the NDTP_GET_RSP message. Each NDTP query is independent of any other NDTP transactions (other queries or updates), so it is possible to process multiple NDTP queries simultaneously on multiprocessor machines. The NDTP server permits this by not performing multiprocessor locking in the NDTP query processing path.

The current prototype NDTP server preferably does not create multiple read service threads per NDTP connection, so multiprocessing will only occur while processing queries from different NDTP connections. Nonetheless, the NDTP server could be extended to support multiprocessing of NDTP queries from a single NDTP connection if this turned out to be advantageous.

NDTP Update Processing

Unlike NDTP queries, processing NDTP updates requires the high latency operation of committing the change to non-volatile storage. To maintain high performance on NDTP updates, the NDTP server network front end preferably supports multiple concurrent asynchronous update transactions. Also, each update is preferably performed atomically to avoid creating an inconsistent state in the string store. Currently, the string store supports only a single mutator thread, which means that all NDTP updates are serialized through the string store mutator critical code sections. As is traditional in transactional systems, the string store mutation mechanism is implemented as a split transaction.

When an NDTP update is processed, a call is made to the string store mutation function, which returns immediately indicating either that the mutation is complete, or that the completion will be signaled asynchronously through a callback mechanism. The mutator function might indicate an immediate completion on an NDTP_PUT operation if the entity key/data location specifier mapping was already

US 7,814,170 B2

11 12

present in the database. In this case, the network front end will immediately write the update response message back to the client.

For updates which are not immediately completed, the network front end maintains a queue of NDTP updates for which it is awaiting completion. When the completion callback is called by the string store log file update mechanism, the network front end writes the NDTP update response messages for all completed updates back to the clients. If no new NDTP update requests are arriving from NDTP clients, and there are some incomplete updates in the update queue, the network front end preferably calls the string store log buffer flush function to precipitate the completion of the incomplete updates in update queue.

Multiple Connection Handling

Handling multiple clients in a single server process requires that the server process not block waiting for events from a single client, such as newly received data forming an NDTP request message, or clearing a network output buffer so an NDTP response message can be written. The NDTP server network front end may be conditionally compiled to use either of two standard synchronous I/O multiplexing mechanisms, select or poll, or to use threads to prevent blocking the server waiting for events on individual connections. The select and poll interfaces are basically similar in their nature, but different in the details. When compiled for synchronous I/O multiplexing, the NDTP server network front end maintains an input buffer for each connection. The multiplexing function is called to determine if any of the connections have input available, and if so, it is read into the connection's input buffer. Once a complete NDTP request is in the buffer, it is acted upon. Similarly, the network front end maintains an output buffer for each connection, and if there is still a portion of an NDTP response message to send, and the connection has some output buffer available, more of the NDTP response message is sent.

The threaded version of the NDTP server network front end preferably creates two threads for each NDTP connection, one for reading and one for writing. While individual threads may block as input data or output buffer is no longer available on a connection, the thread scheduling mechanism ensures that if any of the threads can run, they will. The threaded version of the NDTP server is most likely to offer best performance on modern operating systems, since it will permit multiple processors of a system to be used, and the thread scheduling algorithms tend to be more efficient than the synchronous I/O multiplexing interfaces. Nonetheless, the synchronous I/O multiplexing versions of NDTP server will permit it to run on operating systems with poor or non-existent thread support.

A more detailed description of the mapping operation in both a TCP and UDP environment appears below.

TCP Mapping

As those skilled in the art will appreciate, the Transmission Control Protocol (TCP) is a connection-oriented protocol that is part of a universally implemented subset of the Internet Protocol (IP) suite. TCP provides reliable, bi-directional stream data transfer. TCP also implements adaptive congestion avoidance to ensure data transfer across a heterogeneous network with various link speeds and traffic levels.

NDTP is preferably carried on TCP in the natural way. An NDTP/TCP client opens a connection with a server on a well-known port. (The well-known TCP (and UDP) port numbers can be selected arbitrarily by the initial NDTP implementer. Port numbers that do not conflict with existing protocols should preferably be chosen.) The client sends NDTP requests 10 to the server 16 on the TCP connection, and receives responses 14 back on the same connection. While it is permissible for a single client 12 to open multiple NDTP/TCP connections to the same server 16, this practice is discouraged to preserve relatively limited connection resources on the NDTP server 16. The asynchronous nature of NDTP should make it unnecessary for a client 12 to open multiple NDTP/TCP connections to a single server 16.

If protocol errors are detected on an NDTP/TCP connection, the NDTP/TCP connection should be closed immediately. If further NDTP/TCP communication is required after an error has occurred, a new NDTP/TCP connection should be opened. Some examples of detectable protocol errors include:

Illegal NDTP message operation code;

Nonzero String Area Length in NDTP_PUT_RSP or NDTP_GET_RSP;

Inconsistent String Area Length and String Length(s) in NDTP_GET, NDTP_GET_RSP, NDTP_PUT or NDTP_DEL;

Unexpected NDTP request identifier by client.

Due to the reliable nature of TCP, NDTP/TCP servers 16 and clients 12 need not maintain any additional form of operation timeout. The only transport errors that can occur will result in gross connection level errors. A client 12 should assume that any NDTP requests 10 for which it has not received responses 14 have not been completed. Incomplete operations may be retried. However, whether unacknowledged NDTP requests 10 have actually been completed is implementation dependent. Any partially received NDTP messages should also be ignored.

UDP Mapping

As those skilled in the art will appreciate, the Unreliable Datagram Protocol (UDP) is a best-effort datagram protocol that, like TCP, is also part of the universally implemented subset of the IP suite. UDP provides connectionless, unacknowledged datagram transmission. The minimal protocol overhead associated with UDP can deliver extremely high performance if used properly.

NDTP/UDP clients 12 send UDP datagrams with NDTP request messages 10 to a well-known UDP port (see above). NDTP/UDP servers 16 return NDTP response messages 14 to the client 12 selected local UDP port indicated in the NDTP/UDP datagram containing the requests 10. NDTP/UDP does not require any form of connection or other association to be established in advance. An NDTP interchange begins simply with the client request message 10.

For efficiency, the mapping of NDTP on to UDP permits multiple NDTP messages to be sent in a single UDP datagram. UDP datagrams encode the length of their payload, so when a UDP datagram is received, the exact payload length is available. The recipient of an NDTP/UDP datagram will read NDTP messages from the beginning of the UDP datagram payload until the payload is exhausted. Thus, a sender of an NDTP/UDP datagram is free to pack as many NDTP messages as will fit in a UDP datagram.

The largest possible UDP datagram payload is presently slightly smaller than 64K bytes. In addition, there may be a performance penalty sending UDP datagrams that are larger than the maximum datagram size allowed by the physical network links between the sender and intended recipient. IP provides mechanisms for discovering this maximum transfer size, called the Path Maximum Transfer Unit (Path MTU), but a discussion of these mechanisms is beyond the scope of this specification. An implementation of NDTP/UDP should preferably respect these datagram size limitations.

US 7,814,170 B2

13

Unlike TCP, UDP does not provide reliable data delivery. Therefore, an NDTP/UDP client 12 implementation should implement a timeout mechanism to await the response for each outstanding NDTP request 10. The exact duration of this response timer is implementation dependent, and may be set adaptively as a client 12 receives responses from a server 16, but a reasonable default maximum value is preferably 60 seconds. If a response 14 is not received within the response timeout, the client 12 may retransmit the request 10. NDTP/ UDP servers 16 need not maintain any timeout mechanisms.

Depending upon the exact timeout values selected, the client 12 retry mechanism may place some requirements on a client's 12 use of the NDTP request identifier 18 field. If the response timer is shorter than the maximum lifetime of a datagram in the network, it is possible that a delayed response will arrive after the response timer for the associated request has expired. An NDTP/UDP client 12 implementation should ensure that this delayed response is not mistaken for a response to a different active NDTP request 10. Distinguishing current responses from delayed ones is called antialiasing. One presently preferred way to perform antialiasing in NDTP/UDP is to ensure that NDTP request identifier 18 values are not reused more frequently than the maximum datagram lifetime.

NDTP/UDP client 12 implementations that use the NDTP request identifier 18 for antialiasing should ignore (i.e., skip) NDTP messages within a NDTP/UDP datagram with invalid NDTP request identifier 18 values. Client 12 or server 16 NDTP/UDP implementations detecting any other protocol error should also preferably discard the remainder of the current NDTP/UDP datagram without processing any further NDTP requests from that datagram. Some examples of such detectable errors include:

Illegal NDTP message operation code;

Nonzero String Area Length in NDTP_PUT_RSP or NDTP_GET_RSP;

Inconsistent String Area Length and String Length(s) in NDTP_GET, NDTP_GET_RSP, NDTP_PUT or NDTP_DEL;

Inconsistent NDTP message length and UDP datagram length.

Because NDTP/UDP messages are limited to the length of a single UDP datagram payload, NDTP/UDP cannot be used to transfer long NDTP messages. For example, it would be very difficult to send an NDTP_GET message with NDTP/UDP for a 64K byte identifier string. This case is avoidable by a client 12 realizing that an NDTP message is too long to send as a UDP datagram and using NDTP/TCP instead. However, a greater limitation is that NDTP currently provides no mechanism for an NDTP server 16 to indicate that a response is too large to fit in a UDP datagram. In this case, the NDTP server 16 should not send a response 14, and it may or may not chose to complete the request 10. The recovery mechanism in this case preferably is, after several unsuccessful attempts to use NDTP/UDP, a client 12 may try again with NDTP/TCP.

Because UDP does not provide any form of congestion avoidance it is possible that the simple retry strategy specified for NDTP/UDP can create network congestion. Network congestion can cause a severe degradation in the successful delivery of all network traffic (not just NDTP traffic, nor just the traffic from the particular client/server 12, 16 pair) through a congested network link. Congestion will occur when an NDTP/UDP implementation is sending datagrams faster than can be accommodated through a network link. Sending a large number of NDTP/UDP datagrams all at once is the most likely way to trigger such congestion. Sending a single NDTP/UDP datagram, assuming it is smaller than the Path

14

MTU, and then waiting for a response 14 is unlikely to create congestion. Therefore, the use of NDTP/UDP should be confined to contexts where clients 12 send few outstanding requests at a time, or where network congestion is avoided through network engineering techniques.

Those skilled in the art will appreciate that network congestion is a highly dynamic property that is a function of network traffic from all sources through a network link and will vary over time over any given network path. An NDTP/ UDP client 12 implementation can recover from network congestion by switching to NDTP/TCP after several failed retries using NDTP/UPD. Failure due to network congestion may be indistinguishable from failure due to UDP packet size limitations, but since the recovery strategy is the same in both cases, there is no need to distinguish these cases.

NDTP/UDP Congestion Avoidance

Given the stateless, transactional nature of NDTP, NDTP/ UDP generally performs much better than NDTP/TCP. This performance improvement is measurable both in terms of the maximum sustainable transaction rate of an NDTP server 16, and the latency of a single response to an NDTP client 12. In the same way as the Domain Name Service (DNS), NDTP fits naturally in the UDP model. It is a working assumption of NDTP (and DNS) that for every NDTP transfer, there will be an associated transfer of real data that is an order of magnitude or more greater in size than the NDTP protocol traffic. This property will naturally limit the amount of NDTP traffic on a network. However, in applications where NDTP traffic reaches high levels, particularly at network 'choke points' which are not within the control of network engineers, it may be desirable to support a congestion avoidance mechanism for NDTP/UDP.

However, those skilled in the art will appreciate that the other main future requirement of NDTP, security (described below), implies an existing, durable association between NDTP clients 12 and NDTP servers 16. This association is much like (and in the case of SSL, it is) a network connection. Therefore, depending upon what security technology is applied, developing a congestion avoidance mechanism for NDTP/UDP may be an irrelevant exercise.

Server Redirection Mechanism

NDTP provides two mechanisms for server redirection. The redirection mechanisms allow cluster and hierarchical topologies, and mixtures of such topologies (described in detail below). The first redirection mechanism supported by NDTP, embedded redirection links, uses an application specific convention to return redirection pointers as NDTP data location strings. For example, if location strings are W3C URLs, a URL with the schema ndtp: could be a server indirection pointer. An NDTP_GET_RSP message may contain any mixture of real data location strings and NDTP server redirection pointers. In this case, the client must issue the same NDPT_GET query message to other NDTP servers indicated by the redirection pointers. The total set of data location strings associated with the supplied identifier string is the collection of all the data location strings returned from all the NDTP servers queried. The embedded redirection link technique does not require any specific NDTP protocol support. Therefore, it could be used within the NDTP protocol as is, and does not require further description in this specification.

The second redirection mechanism, which is specified as a future extension of NDTP, is having the server return an NDTP_RDR_RSP message in response to an NDTP request for which the NDTP server has no ownership of the supplied identifier string. Those skilled in the art will note that unlike

US 7,814,170 B2

15

the embedded redirection links mechanism, the NDTP_RDR_RSP mechanism applies to all NDTP requests, not just NDTP_GET.

As mentioned above, the second redirection mechanism has two variants. The first variant of the NDTP_RDR_RSP function mechanism specifies a well-known function that all NDTP server and client implementations know when they are programmed, and the NDTP_RDR_RSP message carries a table of NDTP server URLs. The format of the NDTP_RDR_RSP message with an NDTP server URL table is shown in FIG. 9(a).

The appropriate NDTP server is selected from the table in the NDTP_RDR_RSP message by applying a well-known function to the identifier string and using the function result as an index into the NDTP server table. The well-known function preferably applied is the hashpjw function presented by Aho, Sethi and Ullman in their text *Compilers, Principles, Techniques and Tools*:

```
uint32_t
hash (uint8_t *s, uint32_t slen, uint32_t size)
{
    uint32_t g;
    uint32_t i;
    uint32_t h = 0;
    uint8_t c;
    for (i = 0; i < slen; i++) {
        c = s[i];
        h = (h << 4) + c;
        g = (h & 0xf0000000);
        if (g) {
            h ^= g >> 24;
            h ^= g;
        }
    }
    return h % size;
}
```

In this case, the size parameter is the number of elements in the NDTP server URL table returned in the NDTP_RDR_RSP message. For the hashpjw function to behave correctly, the size parameter must be a prime number, therefore the NDTP server URL table must also have a prime number of elements. Those skilled in the art will appreciate that the same NDTP server may appear multiple times in the NDTP server URL table. For example, if the server URL table has 2039 elements, by putting one NDTP server URL in the first 1019 table elements, and a second NDTP server URL in the second 1020 table elements, the responsibility for the index string space will be split roughly in half.

The second variant of the NDTP_RDR_RSP function mechanism specifies that a general function description will be sent to the NDTP client in the NDTP_RDR_RSP message. The NDTP client will apply this function to the identifier string and the output of the function will be the NDTP server URL to which to send NDTP requests for the particular identifier string. The advantage of this technique over the well-know function approach is that it allows application-specific partitions of the identifier string space. This can permit useful administrative control. For example, if General Electric manages all identifiers beginning with the prefix "GE", a general function can be used to make this selection appropriately. The disadvantage of using a general function is it may be less efficient to compute than a well-known function.

There are a variety of possible mechanisms for sending function descriptions. NDTP is expected to be applied in environments that make extensive use of the Java programming platform. Therefore the NDTP_RDR_RSP mechanism

16

preferably uses a feature of the Java programming language called "serialized representation" to communicate generalized functions in the NDTP_RDR_RSP message. A serialized form of a Java object is a stream of bytes that represents the precise state of the object, including its executable methods. For example, the Java Remote Method Invocation (RMI) mechanism uses serialized objects to send executable code to a remote platform for execution. The NDTP_RDR_RSP message contains the serialized form of an object implementing this Java interface:

```
interface NDTPRedirectFunction {
    String selectServer(byte[ ] identifier);
}
```

The format of the NDTP_RDR_RSP message with a Java Serialized form of the NDTP redirection function is specifically identified in FIG. 9(b).

The NDTP server redirection mechanism also permits construction of NDTP server clusters (described below). It is expected that the identifier string hash function will be defined at the time NDTP is implemented, but the actual list of NDTP servers 90 will change from application to application and within a single application throughout the lifetime of the system. Therefore, it is necessary for clients to be able to discover updated NDTP server lists, and any other relevant dynamic parameters of the server selection function as these inputs change.

Hierarchical Server Topology

While the NDTP server topology supported by the server redirection mechanism described above and shown in FIGS. 9(a) and 9(b) is an extremely powerful and general scaling technique, suitable for diverse topology deployments, some applications might still benefit from a specifically hierarchical server topology. An NDTP server hierarchy 100, such as that shown in FIG. 10, permits identifier/location association data to be owned and physically controlled by many different entities. An NDTP server cluster should be managed by a single administrative entity 102, and the distribution of data can be for performance and scaling purposes. Furthermore, a server hierarchy would provide some fault isolation so portions of the identifier/location association data can be accessed and updated in the presence of failures of some NDTP servers 104. Finally, an NDTP server hierarchy can localize NDTP update operations (NDTP_PUT and NDTP_DEL), which can improve performance and reduce network load.

A hierarchical NDTP server topology also allows organizations to maintain their own local NDTP server 104 or NDTP server cluster 102 that manages associations to data locations that are within the organizations' control. Upper tier NDTP servers 108 would be used to link the various leaf NDTP servers 104.

Server Constellations

The NDTP server organization also allows NDTP servers to be combined in various ways to build server constellations that offer arbitrary server performance scalability and administrative control of the location of portions of the identifier/data location relationship mappings. FIG. 11 illustrates an NDTP server constellation 110 as it relates to a client 112 and a data repository 114. In FIG. 10, the client 112 and data repository 114 of FIG. 11 were merged into the single client entity 106 for ease of discussion. Their distinction can now be

US 7,814,170 B2

17                                                                18

separated and identified in order to illustrate the storage and retrieval of data in a distributed data collection.

As shown in FIG. 11, a client 112 consults the server constellation 110, which may be construed in either of two forms (see FIGS. 12 and 13), and which returns location strings in response to a client 112 request. Once the client 112 has the location string for a particular unit of data, the client 112 contacts and retrieves information directly from the data repository 114. In one embodiment, if the client 112 contains a data repository 114, internal application logic would facilitate this interaction. Those skilled in the art will appreciate that the term "data collection" is being employed rather than the term "database" because database frequently invokes images of Relational Database Systems (which is only one application of the protocol); an NDTP data collection could just as easily be routing tables as it could be files or records in a RDBS database.

NDTP server constellations 110 preferably have two basic organizational paradigms: Client-Centric and Server-Centric. NDTP supports both by design, and both approaches apply to all aspects of managing the relationships between identifiers and locations, such as data retrieval, index manipulation, and server redirection. Each will be discussed separately below.

Client-Centric Approach

The first basic pattern that NDTP supports is driven by the client 112, and can be called "client-centric". Referring to FIG. 12, a single client (not shown) asks a server 120a in the server constellation 110 for operations that the client desires executed (represented by arrow 1 in FIG. 12). If the client doesn't receive the data requested, it will receive a redirection response message (NDTP_RDR_RSP) from the contacted server 120a (arrow 2). The client then uses the information it receives to ask another server 120b for the operations the client wants to initiate (arrow 3). A successful response from the second server 120b is then sent to the client (arrow 4).

This design constructs operating patterns for (1) redirection, (2) index operations, and (3) hierarchical or cluster topologies. The important point is that the Network Distributed Tracking Protocol is designed to support highly configurable methods for processing index-related operations.

NDTP supports two specific redirection mechanisms, which are not mutually exclusive and may be combined in any way within a single NDTP server constellation 110. This formation may increase performance when many clients (not shown) participate, since client processing is emphasized rather than server processing. The first NDTP redirection mechanism uses a distinctively encoded location string for each NDTP server 120a,b that contains additional location strings associated with the identifier string supplied in the NDTP request 122a,b. This is an embedded redirection link. For example, if location strings are some form of HTTP URL, a URL with the schema specifier ndtp: would indicate a redirection. Using this scheme, the location strings associated with an identifier string may be spread among multiple NDTP servers 120a,b. In addition to redirection, in FIG. 12, all index manipulation operations continue to apply, but they are directed at the correct NDTP server 110b for which they apply: NDTP_GET, NDTP_PUT, NDTP_DEL.

The second NDTP redirection mechanism uses a NDTP_RDR_RSP message to indicate that the server 120a to which the NDTP request 122a was directed does not contain any of the location strings associated with the identifier string supplied in the NDTP request 122a. The NDTP_RDR_RSP message contains all the information required for the originator of the NDTP request 122a to reissue the original NDTP request 122b to a different NDTP server 120b that does have location strings associated with the identifier string supplied in the NDTP request 122b. This information may be an array of NDTP server hosts from which one is selected by applying a well-known function to the identifier string supplied in the NDTP request 122b, or the communicated function to apply as well as a list or other description of the NDTP server hosts from which to choose, as described above.

FIG. 12 illustrates a cluster topology for client interaction with NDTP servers 120. A single client queries a first server 120a (Server0), learns of a new index location (Server1), and then contacts that server 120b (Server1) for the operations it wishes to execute on the index that the client identifies. The basic idea is that a client asks a server 120a to process an index operation. If the contacted server 120a does not have all the information, as for example in a redirect, then it passes the request to another server 120b. If the second server 120b is appropriate it responds appropriately, or it passes the request on to another server (not shown), and so on. FIG. 12 could also illustrate a hierarchical topology if a client (not shown) contacted another client in a handoff as shown in FIG. 10, where a client 106 "asks up" to another client 106, and so on.

Behind the scenes, the server constellation 110 could also be using a hierarchical organization or a cluster organization for managing indices. The important point of this topology is pushing processing emphasis toward clients (not shown) rather than toward servers 120a,b. Such protocol design has scale implications as the number of participating machines/mechanisms increases, since it distributes aggregate processing.

Server-Centric Approach

The second basic pattern that the Network Distributed Tracking Protocol provides is a "Server-Centric Approach". FIG. 13 shows the server constellation 110 characterizing "server-centric" functionality. In this figure, an NDTP server 130a (Server0) receives a request 132a from a client (not shown). The server 130a (Server0) passes the request to a second server 130b (Server1), which is an appropriate server for the process, and the second server 130b returns a response 134a to the first server 130a (Server0). If the second server 130a (Server1) was not appropriate, it could pass the request to another server (not shown), and so on. Each NDTP server 130a,b will combine the results of NDTP requests 132a,b it has performed of other NDTP servers 130a,b with whatever responses 134a,b it generates locally for the original NDTP request 132a, and the combined response 134b will be the appropriate response for the original NDTP request 132a.

This design constructs operating patterns for (1) index operations and (2) hierarchical or cluster topologies. The important point is that the Network Distributed Tracking Protocol is designed to support highly configurable methods for processing index-related operations, but this method emphasizes server-processing rather than client-processing. In FIG. 13, all index manipulation operations continue to apply, but they are directed at the correct NDTP server 130a,b for which they apply: NDTP_GET, NDTP_PUT, NDTP_DEL.

FIG. 13 illustrates an hierarchical topology for client interaction with NDTP servers 130. A single client queries a first server 130a (Server0), which is not appropriate, and so the first server 130a (not the client) itself contacts an appropriate server 130b (Server1) for operations it "passes through" to execute on the index that the client has identified. Alternatively, FIG. 13 could illustrate a cluster topology if a server 130a contacted another server 130b in a what is known as a "peer" handoff. The important point of this topology is that it

US 7,814,170 B2

19 20

pushes processing emphasis toward servers **130***a,b* rather than toward clients. Since index processing services can be centralized, administration of the indices can be administered more conveniently in certain cases.

The simplest NDTP server constellation **110** is a single server **130**, and the protocol is designed to permit massive scale with a single or simple server constellation. Highly configurable installations are possible using "client-centric" or "server-centric" techniques. NDTP server constellations **110** composed of more than one NDTP server may use any combination of the two approaches for performance optimization and data ownership properties. Client-centric and server-centric approaches can be used to build NDTP server clusters, NDTP server trees, NDTP server trees of NDTP server clusters, or any other useful configuration.

NDTP design thus explicitly addresses the emerging "peer-to-peer" topologies called "pure" and "hybrid". The "pure" peer-to-peer approach emphasizes symmetric communication among peers, and is achievable through the "server-centric" approach. The "hybrid" peer-to-peer approach emphasizes asymmetric communication among non-peer participants, and is achievable through the "client-centric" approach. Beyond the pure and hybrid approaches that NDTP allows, as described above, NDTP permits any additional mixtures between client-centric and server-centric approaches to provide superior configurability and performance tuning.

Security

NDTP preferably has no provisions for security. Three key features of security should therefore be provided:

Data privacy (encryption)
Client **12** authentication
Client **12** authorization

NDTP/TCP will be extended using SSL/X.509 to support these security features in a straightforward, 'industry standard' way.

Adding security to NDTP/UDP also requires technology other than SSL. For example, IPSec supports securing all IP traffic, not just TCP between two endpoints. IPSec is a somewhat more heavyweight technology than SSL, and the rate of adoption in industry is somewhat slow. Nonetheless, it can provide the relevant capabilities to NDTP/UDP.

Additional Transport Layers

The early-adopter portion of the industry is in a state of turmoil regarding network transport protocols. On one hand, TCP has provided decades of solid service, and is so widely implemented that the mainstream computer industry could not imagine using another protocol to replace it. On the other hand, TCP lacks several features that may be necessary to enable the next step in network applications. In particular, the TCP design assumed pure software implementations by relatively powerful host computer computers. However, developments in network technology have increased the packet rate that a TCP implementation must handle to deliver full network speed beyond the capabilities of even increasingly powerful host computers. To take the next step, much of the packet processing work must be off-loaded to hardware, and TCP's design makes this very difficult.

It is unclear whether it will become possible to implement the relevant portions of TCP in hardware in a timely fashion. If this does not happen, one of the many new transport layers currently under development (ST, SCTP, VI, etc.) may emerge as a market leader in high performance networking. In this case, a layering of NDTP on top of a new hardware accelerated transport would permit NDTP servers to deliver

greatly increased transaction rates. Even with the use of a hardware accelerated transport layer, however, the only benefit to a typical NDTP client would be lower cost of service due to cheaper NDTP server platform requirements. On the flip side, NDTP clients could likely still use a cheaper software implementation of the new transport because of individual clients' modest performance demands.

As can be seen, the Network Distributed Tracking Protocol is a networking protocol that runs on top of any stream (e.g. TCP) or datagram (e.g. UDP) network transport layer. The goal of NDTP is to support a network service that efficiently manages mappings from each individual key string, an identifier, to an arbitrary set of strings, locations. NDTP permits protocol participating clients to add and remove identifier/location associations, and request the current set of locations for an identifier from protocol servers.

NDTP is designed for use in the larger context of a distributed data collection. As such, it supports an architecture, in which information about where data associated with particular application entities, can be managed and obtained independently of the data itself. One way to understand this is as a highly dynamic DNS for data. DNS maintains a mapping between names and machines. NDTP and its associated servers maintain a mapping between entity identifiers and data locations. The identifier/location mapping maintained by NDTP servers is much more dynamic (more frequent updates), than the domain name/IP address mapping maintained by DNS. NDTP is designed to support very fast, very diverse, and very large scale mapping manipulations.

Regardless of the expected system context of NDTP in a distributed data collection, those skilled in the art will appreciate that NDTP can be used for any application in which one-to-zero or one-to-many associations among strings are to be maintained and accessed on a network. In applications of NDTP other than distributed databases, the term identifier is likely to make sense in most cases, but the term location may not. In any context, however, although NDTP supports identifier and location strings of up to $2^{32}$-4 bytes in length, it is a general assumption that the strings are typically short.

Those skilled in the art will note that the invention provides for the management and manipulation of indices and their associated relationships. Even more importantly, it is the manipulation of dynamic and spontaneous relationships between indices and locations, not the indices and locations, that is the core significance. The Network Distributed Tracking Protocol was written to manipulate these relationships, of which indices (identifiers) and locations are components of the aggregate solution.

It is to be understood that a wide range of changes and modifications to the embodiments described above will be apparent to those skilled in the art, and are contemplated. It is therefore intended that the foregoing detailed description be regarded as illustrative, rather than limiting, and that it be understood that it is the following claims, including all equivalents, that are intended to define the spirit and scope of the invention.

We claim:

1. A system for managing data stored in a distributed network, the system comprising:

a data repository configured to store a data entity, wherein an identifier string identifies the data entity; and

a data location server network comprising a plurality of data location servers, wherein data location information for a plurality of data entities is stored in the data location server network, at least one of the plurality of data location servers includes location information associated with the identifier string, each one of the plurality of

US 7,814,170 B2

21

data location servers comprises a processor and a portion of the data location information, the portion of the data location information included in a corresponding one of the data location servers is based on a hash function used to organize the data location information across the plurality of data location servers, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string.

2. The system of claim 1, wherein the location information comprises any portion of a hash table generated with the hash function.

3. The system of claim 1, wherein the data repository comprises a plurality of data repository servers and wherein each of the plurality of data location servers is configured, in response to a request to store data in the data repository, to execute the hash function and store the data on one of the plurality of data repository servers based on a result of the hash function.

4. The system of claim 1, wherein each one of the data location servers is configured to return all location information associated with a respective one of the data entities in response to a request for any location information associated with the respective one of the data entities.

5. The system of claim 1, wherein the location information includes a hash table and the hash table includes an association between a hash of the string identifier and at least one identifier of the at least one of the plurality of data location servers.

6. A system for managing data location information and providing the data location information in response to location queries, the system comprising:

a location server configured to receive a location addition request, the location addition request formatted in conformance with a transfer protocol, the location addition request comprising an identifier and at least one location to associate with the identifier, wherein the identifier identifies an entity and wherein each of the at least one location specifies a location of data in a network pertaining to the entity;

wherein the location server includes a processor; and

programming logic stored on the location server, wherein the programming logic is configured to return, in response to a location query related to a desired entity, a location message, the location message in conformance with the transfer protocol and comprising at least one location associated with the desired entity, wherein the programming logic is further configured to return the location message if the location server contains location information for the desired entity, and wherein the programming logic is further configured to return a redirect message if the location server lacks the location information for the desired entity, the redirect message comprising a list of at least one other location server known to have the location information for the desired entity.

7. The system of claim 6, wherein the list of at least one other location server comprises a list of a plurality of location servers in the network and a corresponding list of a plurality of entities having location information on the respective one of the plurality of location servers.

22

8. The system of claim 6, wherein each of a plurality of location servers in the network stores only a portion of the data location information.

9. The system of claim 6, wherein the location information in the location server is maintained in an indexed location store.

10. The system of claim 9, wherein the indexed location store comprises a string store indexed by a hash table.

11. The system of claim 9, wherein the indexed location store comprises a string store indexed by a hash table distributed across a plurality of clients.

12. The system of claim 9, wherein the indexed location store comprises a string store indexed by a hash table distributed across a plurality of servers.

13. The system of claim 9, wherein the location query identifying the desired entity comprises a unique identifier for the desired entity, and wherein the programming logic stored on the location server further comprises programming logic configured to apply an index function to the unique identifier to retrieve at least a portion of the locations associated with the unique identifier in the indexed location store.

14. The system of claim 13, wherein the indexed location store comprises a string store and the index function comprises a hash function.

15. A method of handling location queries in a network, the network comprising a plurality of location servers including data location information, the method comprising:

correlating each one of a plurality of identifiers with at least one of a plurality of locations in the network, each one of the plurality of identifiers identifying a respective one of a plurality of data entities, wherein the data entities are stored in corresponding locations in the network;

receiving a location query from a client at one of the plurality of location servers, the location query requesting location information identifying a location of a data entity included in the data entities;

determining which of the plurality of location servers includes the location information;

sending a location response message to the client in response to determining the one of the plurality of location servers includes the location information, the location response message comprising the location information; and

sending a redirect message to the client in response to determining the one of the plurality of location servers fails to include the location information, the redirect message identifying which of the plurality of location servers includes the location information.

16. The method of claim 15, further comprising applying an identifier of the data entity to an indexing function to determine which of the location servers includes the location information.

17. The method of claim 16, wherein each one of the plurality of location servers comprises a portion of an indexed table of the identifiers and corresponding associated locations, and wherein determining which of the plurality of location servers includes the location information comprises applying one of the identifiers to a hash function to look up corresponding associated locations in the indexed table, the one of the identifiers identifying the data entity.

* * * * *



US007814170C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (12166th)

# United States Patent
## Overton et al.

(10) **Number:** **US 7,814,170 C1**

(45) **Certificate Issued:** *Nov. 10, 2022

(54) **NETWORK DISTRIBUTED TRACKING WIRE TRANSFER PROTOCOL**

(75) Inventors: **John K. Overton**, Chicago, IL (US); **Stephen W. Bailey**, Chicago, IL (US)

(73) Assignee: **Kove IO, Inc.**

**Reexamination Request:**
No. 90/019,035, Nov. 19, 2021

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **7,814,170** |
| Issued: | **Oct. 12, 2010** |
| Appl. No.: | **11/354,224** |
| Filed: | **Feb. 13, 2006** |

( * ) Notice: This patent is subject to a terminal disclaimer.

### Related U.S. Application Data

(63) Continuation of application No. 09/661,222, filed on Sep. 13, 2000, now Pat. No. 7,103,640, and a continuation-in-part of application No. 09/111,896, filed on Jul. 8, 1998, now abandoned.

(60) Provisional application No. 60/153,709, filed on Sep. 14, 1999.

(51) **Int. Cl.**

| | |
|---|---|
| *G06F 15/16* | (2006.01) |
| *G06F 16/182* | (2019.01) |
| *G06F 16/14* | (2019.01) |
| *H04L 61/4552* | (2022.01) |

(52) **U.S. Cl.**
CPC .......... *G06F 16/182* (2019.01); *G06F 16/148* (2019.01); *H04L 61/4552* (2022.05)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/019,035, please refer to the USPTO's Patent Electronic System.

*Primary Examiner* — Luke S Wassum

(57) **ABSTRACT**

A network distributed tracking wire transfer protocol for storing and retrieving data across a distributed data collection. The protocol includes a location string for specifying the network location of data associated with an entity in the distributed data collection, and an identification string for specifying the identity of an entity in the distributed data collection. According to the protocol, the length of the location string and the length of the identification string are variable, and an association between an identification string and a location string can be spontaneously and dynamically changed. The network distributed tracking wire transfer protocol is application independent, organizationally independent, and geographically independent. A method for using the protocol in a distributed data collection environment and a system for implementing the protocol are also provided.



US 7,814,170 C1

# EX PARTE
# REEXAMINATION CERTIFICATE

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1-2**, **6-9**, **12** and **15** is confirmed.

Claims **3-5**, **10-11**, **13-14** and **16-17** were not reexamined.

* * * * *



US007233978B2

(12) **United States Patent** (10) **Patent No.: US 7,233,978 B2**

Overton et al. (45) **Date of Patent: Jun. 19, 2007**

(54) **METHOD AND APPARATUS FOR MANAGING LOCATION INFORMATION IN A NETWORK SEPARATE FROM THE DATA TO WHICH THE LOCATION INFORMATION PERTAINS**

(75) Inventors: **John K. Overton**, Chicago, IL (US); **Stephen W. Bailey**, Andover, MA (US)

(73) Assignee: **Econnectix, LLC**, Chicago, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 810 days.

(21) Appl. No.: **09/872,736**

(22) Filed: **Jun. 1, 2001**

(65) **Prior Publication Data**

US 2002/0032787 A1 Mar. 14, 2002

**Related U.S. Application Data**

(63) Continuation-in-part of application No. 09/661,222, filed on Sep. 13, 2000, now Pat. No. 7,103,640, and a continuation-in-part of application No. 09/503,441, filed on Feb. 14, 2000, now abandoned, and a continuation-in-part of application No. 09/367,461, filed on Aug. 13, 1999, now abandoned, and a continuation-in-part of application No. 09/111,896, filed on Jul. 8, 1998, now abandoned.

(60) Provisional application No. 60/277,408, filed on Mar. 19, 2001, provisional application No. 60/209,070, filed on Jun. 2, 2000.

(51) **Int. Cl.**
*G06F 15/16* (2006.01)

(52) **U.S. Cl.** ........................ **709/217**; 709/226; 709/232

(58) **Field of Classification Search** ................ 718/105; 709/203, 206, 217, 207, 223, 226, 230, 232, 709/235, 241, 242
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,553,261 A | 11/1985 | Froessl |
| 4,636,858 A | 1/1987 | Hague |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| EP | 0 568 161 A1 | 1/1992 |

(Continued)

OTHER PUBLICATIONS

Communication relating to the results of the Partial International Search Report for PCT Application No. PCT/US01/18013 dated Apr. 15, 2002.

(Continued)

*Primary Examiner*—Paul H. Kang
(74) *Attorney, Agent, or Firm*—Brinks Hofer Gilson & Lione

(57) **ABSTRACT**

A system and method for storing and retrieving location information across a network is disclosed. The system and method utilize a transfer protocol configured to transport an identifier/location relationship to allow one or more locations to be associated with an identifier in the location store of a location server, where the identifier represents a unique entity and the location represents a location of data pertaining to the identifier. The location server contains programming logic operative to provide responses to location queries and capable of scaling a plurality of location servers according to system performance and logistical requirements.

**31 Claims, 17 Drawing Sheets**



Appx18850

US 7,233,978 B2

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,728,978 | A | 3/1988 | Inoue et al. |
| 4,800,488 | A | 1/1989 | Agrawal et al. |
| 4,825,406 | A | 4/1989 | Bean et al. |
| 4,835,372 | A | 5/1989 | Gombrich et al. |
| 4,914,571 | A | 4/1990 | Baratz et al. |
| 5,008,700 | A | 4/1991 | Okamoto |
| 5,124,814 | A | 6/1992 | Takahashi et al. |
| 5,193,185 | A | 3/1993 | Lanter |
| 5,208,623 | A | 5/1993 | Takahashi |
| 5,291,399 | A | 3/1994 | Chaco |
| 5,319,401 | A | 6/1994 | Hicks |
| 5,347,600 | A | 9/1994 | Barnsley |
| 5,384,643 | A | 1/1995 | Inga et al. |
| 5,414,841 | A | 5/1995 | Bingham et al. |
| 5,455,648 | A | 10/1995 | Kazami |
| 5,475,817 | A | 12/1995 | Waldo et al. |
| 5,479,654 | A | 12/1995 | Squibb |
| 5,499,113 | A | 3/1996 | Tsuboi |
| 5,522,077 | A | 5/1996 | Cuthbert et al. |
| 5,537,547 | A | 7/1996 | Chan et al. |
| 5,550,981 | A | 8/1996 | Bauer et al. |
| 5,551,027 | A | 8/1996 | Choy et al. |
| 5,557,790 | A | 9/1996 | Bingham et al. |
| 5,560,005 | A | 9/1996 | Hoover et al. |
| 5,576,952 | A | 11/1996 | Stutman et al. |
| 5,579,067 | A | 11/1996 | Wakabayashi |
| 5,610,653 | A | 3/1997 | Abecassis |
| 5,617,570 | A | 4/1997 | Russell et al. |
| 5,625,841 | A | 4/1997 | Dawkins et al. |
| 5,649,247 | A | 7/1997 | Itoh et al. |
| 5,664,170 | A | 9/1997 | Taylor |
| 5,669,029 | A | 9/1997 | Fyson et al. |
| 5,724,575 | A | 3/1998 | Hoover et al. |
| 5,740,428 | A | 4/1998 | Mortimore et al. |
| 5,764,889 | A | 6/1998 | Ault et al. |
| 5,764,906 | A | 6/1998 | Edelstein et al. |
| 5,774,670 | A | 6/1998 | Montulli |
| 5,781,725 | A | 7/1998 | Saito |
| 5,784,565 | A | 7/1998 | Lewine |
| 5,802,518 | A | 9/1998 | Karaev et al. |
| 5,809,161 | A | 9/1998 | Auty |
| 5,809,331 | A | 9/1998 | Staats et al. |
| 5,809,495 | A | 9/1998 | Loaiza |
| 5,813,006 | A | 9/1998 | Polnerow et al. |
| 5,848,246 | A | 12/1998 | Gish |
| 5,864,482 | A | 1/1999 | Hazama |
| 5,872,973 | A | 2/1999 | Mitchell et al. |
| 5,875,302 | A | 2/1999 | Obhan |
| 5,903,889 | A | 5/1999 | de la Huerga et al. |
| 5,907,837 | A | 5/1999 | Ferrel et al. |
| 5,913,210 | A | 6/1999 | Call |
| 5,915,240 | A | 6/1999 | Karpf |
| 5,918,214 | A | 6/1999 | Perkowski |
| 5,920,702 | A | 7/1999 | Bleidt et al. |
| 5,940,844 | A | 8/1999 | Cahill et al. |
| 5,950,173 | A | 9/1999 | Perkowski |
| 5,961,610 | A | 10/1999 | Kelly et al. |
| 5,966,705 | A | 10/1999 | Koneru et al. |
| 5,974,124 | A | 10/1999 | Schlueter, Jr. et al. |
| 5,974,409 | A | 10/1999 | Sanu et al. |
| 5,978,773 | A | 11/1999 | Hudetz et al. |
| 5,987,519 | A | 11/1999 | Peifer et al. |
| 5,995,965 | A | 11/1999 | Experton |
| 6,032,175 | A | 2/2000 | Fletcher et al. |
| 6,047,332 | A | 4/2000 | Viswanathan et al. |
| 6,055,544 | A | 4/2000 | DeRose et al. |
| 6,058,193 | A | 5/2000 | Cordery et al. |
| 6,092,189 | A | 7/2000 | Fisher et al. |
| 6,108,787 | A | 8/2000 | Anderson et al. |
| 6,131,095 | A | 10/2000 | Low et al. |
| 6,154,738 | A | 11/2000 | Call |
| 6,188,766 | B1 | 2/2001 | Kocher |
| 6,201,931 | B1 | 3/2001 | Cipolla et al. |
| 6,202,070 | B1 | 3/2001 | Nguyen et al. |
| 6,209,095 | B1 | 3/2001 | Anderson et al. |
| 6,212,280 | B1 | 4/2001 | Howard, Jr. et al. |
| 6,377,986 | B1 | 4/2002 | Philyaw et al. |
| 6,418,441 | B1 | 7/2002 | Call |
| 6,438,652 | B1* | 8/2002 | Jordan et al. ............... 711/120 |
| 6,463,454 | B1* | 10/2002 | Lumelsky et al. .......... 718/105 |
| 6,466,980 | B1* | 10/2002 | Lumelsky et al. .......... 709/226 |
| 6,578,068 | B1* | 6/2003 | Bowman-Amuah ......... 709/203 |
| 6,711,408 | B1* | 3/2004 | Raith ........................ 455/440 |
| 2002/0112048 | A1 | 8/2002 | Gruyer et al. |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 889 422 A2 | 1/1999 |
| EP | 0 919 912 A2 | 6/1999 |
| WO | WO 86/05610 | 9/1986 |
| WO | WO 98/15910 | 4/1998 |
| WO | WO 98/00624 | 7/1998 |
| WO | WO 98/31138 | 7/1998 |
| WO | WO 00/03526 | 1/2000 |

### OTHER PUBLICATIONS

Bourke D G et al: "Programmable Module and Circuit for Machine-Readable Unique Serial Number" IBM Technical Disclosure Bulletin, vol. 27, No. 4A, Sep. 1, 1984 pp. 1942-1944.

Kleinholz L et al: "Supporting Cooperative Medicine: The Bermed Project" IEEE Multimedia, vol. 1, No. 4, Dec. 21, 1994 pp. 44-53.

"Method for Network Naming and Routing" IBM Technical Disclosure Bulletin, vol. 37, No. 9, Sep. 1, 1994 p. 255.

"Minimizing Locking To Access Global Shared Data", IBM Technical Disclosure Bulletin, pp. 619-622, Feb. 1995.

"A robust software barcode reader using the Hough transform", Muniz, R., Junco, L.; Otero, A., Abstract, 1999 Int'l Conf. On Information Intelligence and Systems (Oct. 31 to Nov. 3, 1999).

"In-Fab identification of silicon wafers with clean, laser marked barcodes", Fresonke, D., Abstract, 1994 IEEE/Semi Advanced Semiconductor Manufacturing Conference and Workshop (Nov. 14 to Nov. 16, 1994).

"Applications of barcode technology in automated storage and retrieval systems", Sriram, T.; Vishwanatha Rao, K.; Biswas, S.; Ahmed, Abstract, Proceedings of the 1996 IEEE IECON 22nd Int'l Conf. On Industrial Electrodes (Aug. 5 to Aug. 10, 1996).

Claims for U.S. Appl. No. 09/111,896, filed Jul. 8, 1998 entitled System And Method For Establishing And Retrieving Data Based On Global Indices.

Claims for U.S. Appl. No. 09/503,441, filed Feb. 14, 2000 entitled Automated Image Archiving System.

Claims for U.S. Appl. No. 09/367,461, filed Aug. 13, 1999 entitled Automated Image Archiving System.

Callaghan V L et al., "Structures and Metrics for Image Storage and Interchange" Journal of Electronic Imaging, vol. 2, No. 2, Apr. 1, 1993, pp. 126-137.

"Method for Network Naming and Routing" IBM Technical Disclosure Bulletin, vol. 37, No. 9, Sep. 1, 1994, p. 255.

"Service Location in an Open Distributed Environment," Beitz et al., Second International Workshop on Services in Distributed and Networked Environments, IEEE Comput. Soc., Jun. 1995, pp. 28-34.

Baer, Tony, "Tales from the Network", Computerworld Healthcare Journal, www.computerworld.com/news/1996/story/0,11280,14557,00.html, pp. 1-9, Oct. 1, 1996.

* cited by examiner

# FIG. 1



# FIG. 2



# FIG. 3



Case: 1:18-cv-08175 Document #: 690-3 Filed: 10/05/23 Page 6 of 36 PageID #:30429

# FIG. 4



# FIG. 5





FIG. 6



FIG. 7

FIG. 8



FIG. 9

FIG. 10

Case: 1:18-cv-08175 Document #: 690-3 Filed: 10/05/23 Page 10 of 36 PageID #:30433



FIG. 11

FIG. 12



FIG. 13

FIG. 14



FIG. 15

# FIG. 16



Case: 1:18-cv-08175 Document #: 690-3 Filed: 10/05/23 Page 14 of 36 PageID #:30437

Appx18862

# FIG. 17A

| 0 | | | | | | | | 1 | | | | | | | | | 2 | | | | | | | | | 3 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 0 | 1 |

| NDTP_RDR_RSP (8) | RESERVED |
|---|---|
| NDTP REQUEST IDENTIFIER | |
| HASH LIST LENGTH (ROUND4(n0) + 4 + ... + ROUND4(nm) + 4) | |
| REPLICATION SET LIST 0 LENGTH (ROUND4(n0) + 4 + ... + ROUND4(nm) + 4) | |
| NDTP SERVER URL0 LENGTH (n0) | |
| NDTP SERVER URL0 DATA | |
| URL0 BYTE nm-1 | PADDING 0 |
| NDTP SERVER URL1 . . . | |
| URLm BYTE nm-1 | PADDING |
| REPLICATION SET LIST 1 LENGTH (ROUND4(n0) + 4 + ... + ROUND4(nm) + 4) | |
| | |
| REPLICATION SET LIST 1 DATA . . . | |
| REPLICATION SET LIST m BYTE nm-1 | PADDING |

101



FIG. 17B



FIG. 18

FIG. 19

FIG. 20

Case: 1:18-cv-08175 Document #: 690-3 Filed: 10/05/23 Page 17 of 36 PageID #:30440



FIG. 21

NETWORK DISTRIBUTED TRACKING
DISTRIBUTED RECORD RETRIEVAL

Appx18865



FIG. 22

FIG. 23



FIG. 24

# FIG. 25



# FIG. 26



Appx18868

US 7,233,978 B2

1

## METHOD AND APPARATUS FOR MANAGING LOCATION INFORMATION IN A NETWORK SEPARATE FROM THE DATA TO WHICH THE LOCATION INFORMATION PERTAINS

### RELATED APPLICATIONS

This application claims the benefit of provisional patent application Ser. No. 60/209,070 filed Jun. 2, 2000 and provisional application Ser. No. 60/277,408 filed Mar. 19, 2001; and this application is a continuation-in-part of each of the following non-provisional U.S. patent applications: application Ser. No. 09/661,222 entitled NETWORK DISTRIBUTED TRACKING WIRE TRANSFER PROTOCOL, filed on Sep. 13, 2000 now U.S. Pat. No. 7,103,640; application Ser. No. 09/503,441 entitled AUTOMATED SYSTEM FOR IMAGE ARCHIVING, filed Feb. 14, 2000 now abandoned; application Ser. No. 09/367,461 entitled AUTOMATED SYSTEM FOR IMAGING ARCHIVING, filed Aug. 13, 1999 now abandoned; and application Ser. No. 09/111,896 entitled SYSTEM AND METHOD FOR ESTABLISHING AND RETRIEVING DATA BASED ON GLOBAL INDICES, filed on Jul. 8,1998 now abandoned, wherein the entirety of each of these provisional and non-provisional applications is incorporated herein by reference.

### FIELD OF THE INVENTION

This invention relates generally to the storage and retrieval of information, and in particular, to a system and method for managing global search and retrieval of information across a network.

### BACKGROUND

Data records can reside in many different places. In existing retrieval systems and methods, a client seeking information sends a request to a server. Typically, only files that are registered with that server are returned. Disadvantageously, the search is also usually restricted to a local, identified system. The search is thus conducted only where the server knows in advance to look.

Another disadvantage of known retrieval systems is the difficulty in accessing data in different forms. Current retrieval systems are typically designed to search for data in limited forms. One example is where a client requests files based on a subject, like a person's name. Search results for this type of search may only retrieve text files of peoples' names. Another problem in current retrieval systems is that the client may receive text and image files in the search results, but cannot seamlessly access the image files. Yet another problem in current retrieval systems is that video and sound files related to the request may not even be found in the search results. For example, a doctor might be able to retrieve medical records on a specific patient, but cannot view MRI or X-Ray results associated with that record.

A distributed database is one where data is stored and retrieved among multiple machines connected by a network. Typically, each machine in which some portion of the data in a distributed database may reside is called an application server. One commonly asked question in an application server environment is: Where is data associated with a particular entity in a distributed database? The data location is a key question when a distributed database has highly dynamic, and even spontaneous, data distribution properties.

2

In networked environments where there are a large number of data repositories and any particular entity does not have data in all of the data repositories, a mechanism is needed that would permit queries to be directed only at data repositories with relevant information. It would also be beneficial to permit membership in the set of data repositories itself to be highly dynamic. Such a system would support on-the-fly addition and removal of data repositories from the topology of a distributed database seamlessly and without the need to reprogram the database.

Another challenge faced in networked environments is scaling system capabilities in a manner sufficient to handle variable demand for resources. A system and method for scaling resources to accommodate demands for those resources is also desirable.

### BRIEF SUMMARY

In view of the above, the invention provides a system and method for managing data, using a transfer protocol, in a network environment. According to one aspect of the invention, a system for managing location information and providing location information to data location queries comprises a transfer protocol configured to manipulate an identifier, and at least one location associated with the identifier, wherein the identifier uniquely specifies an entity and wherein each data location specifies a location of data in a network pertaining to the entity. The system also includes a location server containing location information corresponding to at least one entity that is formatted according to the transfer protocol, where the location of data relates to an application server in the network. The system further includes programming logic stored on the location server that is responsive to a location query identifying a desired entity to return a location message. The location message includes one or more locations associated with the desired entity.

According to another aspect of the invention, a method of handling location queries in a network having a plurality of location servers containing location information correlating each of a plurality of unique identifiers with at least one location is disclosed. The method includes receiving a location query from a client requesting the location of data relevant to an entity identified in the query. The queried location server sends a location response message to the client if the queried location server contains information relevant to the entity identified in the query. The location server sends a redirect message to the client if it does not contain location information relevant to the entity identified in the query, where the redirect message comprising a list of location servers containing information relevant to the entity identified in the query.

In another aspect of the invention, a method of scaling at least one of location server capacity and transaction rate capability in a system for storing and retrieving location information over a network using a transfer protocol is disclosed. The method includes providing a transfer protocol configured to transport and manipulate an identifier and a location, the location specifying the location of data in the network corresponding to the identifier, and providing a first location server storing location information formatted according to the transfer protocol. Upon receipt of an identifier and location from a first client, where the location represents a location of an application server in the network containing data stored by the first client related to an entity represented by the identifier, the location is stored in a location store at the first location server. A portion of the

US 7,233,978 B2

3

identifiers and respective location associations in the first location server are transferred to a second location server when a performance criterion of the first location server reaches a predetermined performance limit.

According to another aspect of the invention a database is disclosed. The database includes a computer readable medium containing a plurality of index designations, where each index designation represents of one of a plurality of identifiers, and where each identifier uniquely identifies an entity. The database also contains a plurality of locations, where each of the locations is associated with at least one of the plurality of index designations and represents a location of information relevant to an identifier represented by an index designation. A location store having a table containing the plurality of index designations and associated locations is stored in the computer readable medium, as well as an indexing function operative to map each of the plurality of identifiers to a respective one of the plurality of index designations.

These and other features and advantages of the invention will become apparent upon a review of the following detailed description of the presently preferred embodiments of the invention, when viewed in conjunction with the appended drawings.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a system block diagram according to a preferred embodiment.

FIG. 2 is a block diagram of a location suitable for use in the system of FIG. 1.

FIG. 3 is a block diagram of an alternative embodiment of the location of FIG. 2.

FIG. 4 is a block diagram of an NDTP server suitable for use in the system of FIG. 1.

FIG. 5 is a block diagram of an NDTP server topology according to a preferred embodiment.

FIG. 6 is a block diagram of an alternative NDTP server topology.

FIG. 7 is an example of multiple outstanding protocol requests.

FIG. 8 is a layout of one presently preferred string format.

FIG. 9 is a layout of one presently preferred NDTP_GET message.

FIG. 10 is a layout of one presently preferred NDTP_GET RSP message.

FIG. 11 is a layout of one presently preferred NDTP_PUT message.

FIG. 12 is a layout of one presently preferred NDTP_PUT_RSP message.

FIG. 13 is a layout of one presently preferred NDTP_DEL message.

FIG. 14 is a layout of one presently preferred NDTP_DEL_RSP message.

FIG. 15 is a layout of one presently preferred NDTP_UPD message.

FIG. 16 is a layout of one presently preferred NDTP_UPD_RSP message.

FIG. 17 is a layout of one presently preferred NDTP_RDR_RSP message, where FIG. 17(a) shows a server table layout, and FIG. 17(b) shows a redirect function layout.

FIG. 18 is a system diagram showing an NDTP server constellation configuration and exemplary data flow paths.

FIG. 19 is a system diagram showing a client-centric NDTP server constellation approach for redirection.

FIG. 20 is a system diagram showing a server-centric NDTP server constellation approach for redirection.

4

FIG. 21 is a system block diagram showing a multi-server implementation environment of the transfer protocol of the invention.

FIG. 22 is a block diagram of a splitting process in an NDTP server cluster.

FIG. 23 illustrates an embodiment of a content management/object management system configuration incorporating an NDTP server network.

FIG. 24 illustrates an embodiment of a vehicle tracking system incorporating an NDTP server.

FIG. 25 illustrates an embodiment of a mobility management application incorporating an NDTP server.

FIG. 26 illustrates an embodiment of a location store format for the NDTP server of FIG. 25.

DETAILED DESCRIPTION OF THE
PRESENTLY PREFERRED EMBODIMENTS

The following terms are used to describe the operation of the presently preferred distributed database system. A network distributed tracking protocol (NDTP) is a transfer protocol having the capability to manipulate location information used to efficiently track the location of information associated with an individual entity in the distributed database system. An "entity identifier" or an "identifier" is a unique encoding, which may be a string in one embodiment, with which zero or more data location specifiers are associated in an NDTP server. A "data location" or "location" is an encoding, for example a string, that is a member of a set of associations with an identifier in an NDTP server. An "NDTP client" or a "client" is a network-attached component that initiates add, delete, lookup and update of identifier/location mappings, or associations, from an NDTP server with NDTP request messages. An "NDTP server" or a "server" is a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to NDTP request messages from clients. The term "Network Byte Order" is the ordering of bytes that compose an integer of larger than a single byte as defined in the Internet Protocol (IP) suite. Preferably, Network Byte Order specifies a big-endian, or most significant byte first, representation of multibyte integers. In this specification a byte is preferably composed of eight bits.

FIG. 1 shows one basic topology of a preferred network 10 implementing a preferred embodiment of the distributed database system. The distributed database system 10 includes at least one NDTP server 12, at least one client 14, and, in one embodiment, an application server 16. An application server 16 is deployed for given purposes, such as a distributed database, instant messaging, phone routing, distributed content management, geo-location services and etc. As will be explained in greater detail below, the distributed database system preferably allows clients 14 to efficiently locate information through queries to the NDTP servers 12. Using the NDTP protocol, the NDTP servers maintain location information in the form of a list of location associations with an entity. The location may be address information for the application server(s) containing information relevant to the identifier or address information for the application server(s) through which data relevant to the identifier may be accessed. In one embodiment, when a client queries the NDTP server for information pertaining to an entity, the NDTP server preferably returns a list of all locations for the specified entity. The client then can directly access the various locations, relieving the NDTP server of any further involvement in the transaction and allowing the NDTP server to handle more queries.

US 7,233,978 B2

Alternatively, the location may also be one or more pieces of data identifying the physical location of the entity identified by the identifier. In embodiments where the location on the NDTP server is a physical location of the entity identified by the identifier (e.g. a geo-location service), no application servers 16 may be necessary because the location information on the NDTP server(s) may be the endpoint of the client query.

When the locations returned by an NDTP server to a client are of address information of one or more application servers, these application servers 16 may be any type of mechanism accessible by a client system. As shown in FIG. 2, a location, such as an application server 16 containing a location-enabled service or router table, may include an NDTP application 18 for receiving and reporting NDTP references. The application server 16 running the location-enabled service or router table preferably supports the client-server interactions. Any of a number of existing location-enabled services, such as Universal Resource Identifier (URI)—Universal Resource Locator (URL) mappings in distributed content management, or router table formats may be operated on the application server 16.

FIG. 3 illustrates an embodiment where the location is a data repository 24 composed of an application server 22 and an NDTP application 20 associated with a persistent storage mechanism 26 such as a disk drive, for managing client-server interaction. In an alternative embodiment, the location in FIG. 2 may consist of a routing table on the application server 16. In this alternative embodiment, the NDTP application 18 performs location interactions and the routing table routes services to appropriate destinations. Similarly, the client 14 may be any mechanism capable of communicating with the NDTP server. For example, a client 14 may consist of a PC-based computer, computer network, personal digital assistant (PDA), telephone, car messaging center, and so on.

The NDTP server 12 illustrated in FIG. 1 is preferably a network server configured to answer the question: Where is data associated with a particular entity in a distributed database system? This is in contrast to the question of what is the data associated with a particular entity in the distributed database system that must be answered by a typical distributed database mechanism. The NDTP server is built upon a location store data structure. Large databases store large amounts of data, but the NDTP server is only concerned with the location of that data, rather than the endpoint referent data itself.

Referring to FIG. 4, the NDTP server 12 includes a network front end 34, RAM storage 36, and non-volatile storage 38. The non-volatile storage 38 may be a disk drive that is in communication with, or integral with, the NDTP server hardware. The network front end 34 includes a memory manager that is preferably logic operative to divide a large contiguous memory area into small, fixed sized chunks, for example 128 octets. These fixed sized chunks are used to build both strings, with linked lists of chunks used to represent strings that do not fit within a single chunk, and mapping lists, with linked lists of chunks to represent mapping lists that have more elements than fit in a single chunk. The network front end also includes a transaction protocol, such as transaction control protocol/Internet protocol (TCP/IP). The NDTP server 12 preferably maintains the state of its mappings in the non-volatile storage 38. An indexed location store is maintained in RAM 36 that contains a table of index designations, where the identifiers are mapped to one or more locations in the location store. The indexed location store may be indexed by a table imple-

mented through an efficient function, such as hash function, b-tree function or t-tree function. Additionally, an NDTP server map identifying any other NDTP server locations for the specific network and the set of associations contained in each respective NDTP server is maintained in RAM, persistent storage, or preferably both RAM and persistent storage.

In one embodiment, a NDTP server 12 will read the state of its mapping sets from disk storage to service requests from clients, and once it starts servicing requests, the only action it will perform to disk storage is to record each NDTP update transaction as it is processed. In other embodiments, the state of the NDTP server mapping sets may be maintained in RAM. In yet other embodiments, the server mapping sets are maintained in RAM and persistent storage. The records written to the NDTP server log file refer to associations in the NDTP server location store using a pointer that defines a reference to an existing location. In one embodiment, the record looks like:

```
typedef struct ss__log__map {
    ss__i__t op;          /* opcode, LOG__MAP */
    ss__i__t rec;         /* rec pointer (previously allocated chunk */
    ss__i__t to;          /* to pointer (string) */
}   ss__log__map__t;
```

The ss_i_t type is the natural unsigned integer for the platform on which the NDTP server is being run. For example, it is a 32-bit integer on Intel (IA32) platforms, and a 64-bit integer on UltraSPARC platforms.

If the NDTP_PUT results in extending the linked list of mapping pointers with a new memory chunk, the record is somewhat different:

```
typedef struct ss__log__new__map {
    ss__i__t op;          /* opcode, LOG__NEW__MAP */
    ss__i__t from;        /* from pointer (in string or rec) */
    ss__i__t rec;         /* rec pointer (new rec) */
    ss__i__t to;          /* to pointer (string) */
}   ss__log__new__map__t;
```

The log record for an NDTP_DEL update is similar to the one for an NDTP_PUT;

```
typedef struct ss__log__unmap {
    ss__i__t op;
    ss__i__t from;        /* from pointer (key cstr) */
    ss__i__t to;          /* to pointer (data cstr) */
}   ss__log__unmap__t;
```

Each time a new location is created in the NDTP server location store, a new string log file entry is written into the log file:

```
typedef struct ss__log__string {
    ss__i__t op;          /* opcode, LOG__STRING */
    ss__i__t len;
    ss__i__t chunks[ ];
    ss__log__str__t s;
}   ss__log__string__t;
```

US 7,233,978 B2

7 8

where the ss_log_str type is similar to the ndtp_str_t, except that the len field is an ss_i_t instead of a uint32_t:

```
typedef struct ss__log__str__t {
        ss__i__t len;
        uint8__t data[ ];
}    ndtp__str__t;
```

The transactional nature of NDTP protocol means that the response to an update request is not returned until request has completed, including being committed to nonvolatile storage. The NDTP server **12** combines the log file writes of multiple NDTP update transactions by adding each log file record to a log file write buffer **46** until either the buffer becomes full, or the network front end requests that one or all log file write buffers **46** be flushed to disk. The NDTP server **12** preferably maintains more than one log file buffer so that its performance at high transaction rates becomes insensitive to the high latency of individual file write operations. To prevent unbounded log file growth, the NDTP server will periodically write its entire current state to a new log file, close the old log file, and then begin the update logging process in the new log file.

Implementing the NDTP protocol specified below, if there are a large number of data repositories and other types of application servers in a network and any particular entity does not have data in all of them, the NDTP server permits queries to be directed only at pertinent data repositories and application servers. The NDTP server also preferably permits membership in the set of repositories and application servers itself to be highly dynamic and even spontaneous. The NDTP server supports on-the-fly addition and removal of data repositories and application servers from its deployed topology.

The NDTP server **12** may be implemented on any of a number of standard computer platforms including, for example, PC-based platforms having 64 Megabytes of RAM, and a PENTIUM-type processor operating at 450 MHz on a 100 Mbit Ethernet connection. Additionally, as illustrated in FIGS. **5** and **6**, the NDTP server may be a network of NDTP servers configured in any number of ways. For example, FIG. **5** illustrates a flat NDTP server topology using clustering, or a distributed topology using replication, where each of the NDTP servers **12** in the cluster may contain a different portion of a pool of associated identifier and location information. In another alternative embodiment, a hierarchical NDTP server topology, such as the NDTP server tree **52** shown in FIG. **6**, may be utilized. In the NDTP server tree **52** topology, each node **54** may be an individual NDTP server **12**, a cluster **50** of NDTP servers, an NDTP server tree or any combination of these arrangements.

Network Distributed Tracking Protocol (NDTP)

The Network Distributed Tracking Protocol (NDTP) efficiently tracks the location of data associated with an individual entity in a distributed database. NDTP is a transactional protocol, which means that each operation within NDTP consists of a request message from an NDTP client to an NDTP server, followed by an appropriate response message from the NDTP server to the NDTP client.

The NDTP server treats the identifier as an unstructured stream of octets, which is assumed to be unique to a particular entity. The precise structure of the NDTP identifier and the mechanism for ensuring its uniqueness are a function of the application in which the NDTP server is used. In a customer oriented application, the NDTP identifier might

be a unique customer identifier, for example, a Social Security Number, in either printable or binary integer form, as is appropriate to the application. NDTP also defines a location to specify an association with a particular identifier. Multiple connections of locations with identifiers may be used concurrently.

As with identifiers, the NDTP server treats locations as unstructured streams of octets. The structure of a location is a function of the application in which the NDTP server is used. For example, a location might be an Internet machine name, and a TCP/IP port number for a relational database server, or an HTTP Universal Resource Locator (URL), or some concatenation of multiple components.

The NDTP server efficiently maintains and dispenses one to many relationships between identifiers and locations. In other words, an identifier may be associated with any number of locations. In embodiments where the location information relates to locations of application servers containing data or routing information for finding data, the NDTP server is updated to indicate an association between the identifier and the application server's location when data for a particular identifier is added to an application server. When a query is performed for an identifier, the NDTP server supplies the set of application servers in which data may be found for that identifier.

General NDTP Mechanics

The protocol of the invention is designed to provide maximum transaction throughput from both the NDTP server and associated clients. The design goal is realized through two design principles:

1. NDTP messages should preferably be as short as possible to maximize the rate of NDTP transactions for a given network communication bandwidth.
2. NDTP messages should preferably be structured for efficient processing on existing machine architectures.

Design Optimizations.

In keeping with other network protocol standards including TCP/IP, multioctet integer quantities in NDTP are preferably encoded using the big endian integer interpretation convention, as set forth above. In one embodiment, NDTP fields are preferably represented in binary format and aligned on 32-bit boundaries.

To overcome network latency, NDTP is designed to support asynchronous operation, where many requests may be sent to an NDTP server before a response from any of them is received.

Each NDTP message is preceded by a fixed size, 12-octet header, using the preferred data structure:

```
typedef struct ndtp__hdr {
        uint8__t op;              /* opcode */
        uint8__t pad[3];
        uint32__t id;             /* transaction identifier */
        uint32__t size;           /* total request size
                                     following the header */
}    ndtp__hdr__t;
```

where:
op:
    NDTP message numerical operation code.

| NDTP__GET: | get request |
|---|---|
| NDTP__GET__RSP: | get response |

US 7,233,978 B2

9

-continued

| NDTP_PUT: | put request |
| NDTP_PUT_RSP: | put response |
| NDTP_DEL: | delete request |
| NDTP_DEL_RSP: | delete response |
| NDTP_RDR_RSP: | request redirection |
| NDTP_UPD: | update |
| NDTP_UPD_RSP: | update response |

id:

Client supplied operation request used to distinguish responses from multiple outstanding NDTP asynchronous requests. Each "_RSP" message echoes the id field of the associated request.

size:

Size, in octets of the remainder of the NDTP message. The size field should preferably be a multiple of 4 octets.

Variably sized portions of NDTP messages are preferably defined with a size field rather than some other delimiter mechanism to facilitate efficient reading of NDTP messages.

The variably sized portions of NDTP messages are composed of zero or more NDTP strings:

```
typedef struct ndtp_str {
    uint32_t len;
    uint8_t data[ ];
} ndtp_str_t;
```

Note that the C struct definitions in this document are schematic, and not necessarily fully compliant structures in the C programming language. Specifically, arrays denoted in this document with "[]" imply a dimension which is only known dynamically and this indefinite array size specifier is not allowed in C struct definitions. Note also the following:

len:

the number of significant octets of data following the len field in the data area.

data:

len octets of data, followed by up to 3 octets of padding, to ensure that the total length of the NDTP string structure is a multiple of 4 octets.

The padding octets are not included in the len field.

Because variable sized portion NDTP messages are composed of zero or more NDTP strings and NDTP records preferably occupy an even multiple of 4 octets, this ensures that the "size" field of NDTP message headers will preferably be a multiple of 4 octets.

Protocol Structure

An example of multiple outstanding NDTP requests and the use of request identifiers is shown in FIG. 7. NDTP preferably has a simple, stateless request response structure. Each request message 60 sent by a client 14 has a corresponding response message 62 returned by the server 12. To maximize server throughput and use of available network bandwidth, NDTP is asynchronous in nature. Many requests 60 from a single client 14 may be outstanding simultaneously, and responses 62 may or may not be returned from the server 12 in the order in which the requests 60 were issued. Each NDTP request 60 contains an NDTP request identifier 64 that is returned in the NDTP response 62 for the associated request 60. An NDTP client 14 uses a unique NDTP request identifier 64 for each NDTP request 60 that is outstanding at the same time to an NDTP server 12 if it wishes to correlate responses with requests.

10

There are four basic operations preferably supported by the NDTP: add a location association, delete a location association, get location associations, and update a location association or associations. The response to adding a location association is a simple acknowledgement. If the location is already associated with the identifier, adding the association has no effect, but the request 10 is still acknowledged appropriately. In other words, the NDTP add operation is idempotent. The response to deleting a location association is a simple acknowledgement. If the location is not currently associated with the identifier, deleting the association has no effect, but the request 60 is still acknowledged appropriately. In other words, the NDTP delete operation is idempotent. The response to getting one or more locations is a list of one or more locations presently associated with an identifier. If no location associations currently exist, a list of length zero is returned. The response to updating a location association for an identifier is a simple acknowledgement. As the NDTP update operation is functionally a combination of the NDTP add and delete operations, the NDTP update operation is also idempotent.

Message Formats

NDTP messages 60, 62 preferably have a regular structure that consists of a message operation code, followed by a request identifier 64, followed by a length (in bytes) 66 followed by zero or more strings 68 as shown in FIG. 8. As those skilled in the art will appreciate, NDTP message formats are preferably independent of the network transport layer used to carry them. NDTP preferably defines mappings of these messages 60, 62 onto TCP and UDP transport layers (described in detail below), but other mappings could also be defined and it is likely that these NDTP message formats would not require change. For example, the notation ROUND4(X) means X, rounded up to the next multiple of 4.

Integer Format

Multibyte integers in NDTP messages are represented in network byte order; using the big-endian convention. In other words, the most significant byte of a multibyte integer is sent first, followed by the remainder of the bytes, in decreasing significance order.

String Format

Strings in NDTP are represented as counted strings, with a 32-bit length field 66, followed by the string data 68, followed by up to 3 bytes of padding 70 to make the total length of the string representation equal to ROUND4 (length). This layout is shown diagrammatically in FIG. 8.

NDTP_GET Format

The NDTP_GET message has a message operation code 72 of 2, and a single NDTP string 74 which is the identifier string for which to get associated locations. This layout is shown diagrammatically in FIG. 9.

NDTP_GET_RSP Format

The NDTP_GET_RSP message has a message operation code 76 of 3, and zero or more strings 78 that are the locations currently associated with the requested identifier. This layout is shown diagrammatically in FIG. 10.

NDTP_PUT Format

The NDTP_PUT message has a message operation code 80 of 4, and two NDTP strings 82, 84. The first string 82 is the identifier for which to add a location association, and the second string 84 is the location to add. This layout is shown diagrammatically in FIG. 11.

US 7,233,978 B2

11

NDTP_PUT_RSP Format

The NDTP_PUT_RSP message has a message operation code **86** of 5, and zero NDTP strings. This layout is shown diagrammatically in FIG. **12**.

NDTP_DEL Format

The NDTP_DEL message has a message operation code **88** of 6, and two NDTP strings **90**, **92**. The first string **90** is the identifier from which to delete a location association, and the second string **92** is the location to delete. This layout is shown diagrammatically in FIG. **13**.

NDTP_DEL_RSP Format

The NDTP_DEL_RSP message has a message operation code **94** of 7, and zero NDTP strings. This layout is shown diagrammatically in FIG. **14**.

NDTP_UPD Format

The NDTP_UPD message **93** has an operation code **95** of 9 and three NDTP strings. The first string **96** is the identifier from which to update the location association. The second string **97** is the location to delete. The third string **98** is the location to add. This layout is shown diagrammatically in FIG. **15**.

NDTP_UPD_RSP Format

The NDTP_UPD_RSP message **99** has an operation code **100** of 10 and zero NDTP strings. This layout is shown diagrammatically in FIG. **16**.

A general description of the usage and operation of these protocol messages is provided below.

NDTP_GET Transaction

The NDTP_GET message contains a single NDTP string which is the identifier for which associated data locations are requested.

```
typedef struct ndtp_get {
    ndtp_hdr_t hdr;
    ndtp_str_t key;
} ndtp_get_t;
```

The NDTP_GET_RSP message contains zero or more NDTP strings which are the locations associated with the NDTP identifier:

```
typedef struct ndtp_get_rsp {
    ndtp_hdr_t hdr;
    uint32_t rsps;
    ndtp_str_t values[ ];
} ndtp_get_rsp_t;
```

NDTP_PUT Transaction

The NDTP_PUT messages contains two NDTP strings which are (1) the NDTP identifier and (2) the NDTP location which is to be associated with the NDTP identifier.

```
typedef struct ndtp_put {
    ndtp_hdr_t hdr;
    ndtp_str_t key;
    ndtp_str_t data;
} ndtp_put_t;
```

12

The NDTP_PUT_RSP message has no NDTP strings, and simply indicates that the requested identifier/location association was added:

```
typedef struct ndtp_put_rsp {
    ndtp_hdr_t hdr;
} ndtp_put_rsp_t;
```

The requested identifier/location association is added in addition to any other associations already maintained by the NDTP server. If the requested identifier/location association is already in effect, the NDTP_PUT still succeeds and results in an NDTP_PUT_RSP message.

NDTP_DELETE Transaction

The NDTP_DEL message contains two NDTP strings which are (1) the NDTP identifier and (2) the NDTP location which is to be unassociated with the NDTP identifier:

```
typedef struct ndtp_del {
    ndtp_hdr_t hdr;
    ndtp_str_t key;
    ndtp_str_t data;
} ndtp_del_t;
```

The NDTP_DEL_RSP message has no NDTP strings, and simply indicates that the requested identifier/location association was deleted.

```
typedef struct ndtp_del_rsp {
    ndtp_hdr_t hdr;
} ndtp_del_rsp_t;
```

If the requested identifier/location association is not in effect, the NDTP_DEL still succeeds and results in an NDTP_DEL_RSP message.

NDTP_RDR_RSP Message

NDTP supports a distributed server implementation where the NDTP client selects the appropriate server from a table of servers based upon a distribution function computed from the identifier. This distribution function is preferably a standard hash function, for example the hashpjw function presented by Aho, Sethi and Ullman in their text Compilers, Principles, Techniques and Tools. Alternatively, when interest so dictates, NDTP allows applications to provide a customized function as an alternative to a standard hash function.

The NDTP client can determine the size of the NDTP server table, which may have changed, and then update its local copy of the NDTP server table and attempt the NDTP transaction again, this time directed at the correct NDTP server. An NDTP redirection mechanism (described in detail below) preferably permits a client to store permanently only a single NDTP server address, and learn the complete NDTP server table size and contents from the NDTP_RDR_RSP message from the first NDTP request the client performs for which the identifier does not reside on a well-known server.

NDTP_UDP Transaction

The NDTP_UPD message is functionally a combination of the NDTP_PUT and NDTP_DEL messages described above. The NDTP_UPD_RSP message is also functionally

US 7,233,978 B2

13

the same as the NDTP_UPD_RSP and NDTP_DEL_RSP messages, where there is simply an indication that an identifier/location association update was made.

Network Front End

The NDTP server network front end preferably maximizes NDTP transaction throughput including concurrent NDTP requests from a single client as well NDTP requests from multiple concurrent clients.

Network Communication Mechanism

NDTP defines a transaction oriented protocol, which can be carried over any of a variety of lower level network transport protocols. TCP and UDP are currently supported, however any of a number of other protocols are also supportable.

TCP/IP: TCP/IP provides a ubiquitously implemented transport which works effectively on both local area and wide area networks. An NDTP client using TCP/IP preferably connects with the NDTP server at an established TCP port number, and then simply writes NDTP request messages through the TCP/IP connection to the server, which then writes NDTP response messages back to the client through the same TCP/IP connection in the reverse direction.

UDP/IP: For isolated NDTP transactions, depending upon the application and network infrastructure in use, it is beneficial to have the NDTP server employ UDP/IP, which is a widely available connectionless datagram protocol.

However, UDP/IP does not support reliable data transfer, or any congestion control mechanism. This means that NDTP clients using UDP/IP must implement reliability and congestion control maintaining transaction timeouts and performing exponential retry backoff timers, precisely analogous to the congestion control mechanism implemented by Ethernet, and other well known UDP protocols. Those skilled in the art will note that the NDTP protocol is stateless from the standpoint of the NDTP server, which means that there is no congestion control or reliability burden on the server; it is all implemented in a distributed manner by the NDTP UDP/IP clients. Still Higher Performance (ST): Both TCP/IP and to a lesser degree UDP/IP suffer from high host CPU overhead. Like the relatively long latency of TCP/IP, this host CPU consumption is considered just the "cost of doing business" where TCP/IP provides ubiquitous connectivity. If an NDTP server were running in a more constrained environment, where ubiquitous connectivity was not required, its absolute performance could be improved substantially by using a different protocol that is optimized to reduce CPU overhead and latency, such as the Scheduled Transfer (St) protocol.

NDTP Query Processing

In one embodiment, the NDTP server network front end preferably services NDTP query requests in a FIFO style by reading the NDTP_GET message, performing the lookup for the identifier in the NDTP server location store, and writing the NDTP_GET_RSP message. Each NDTP query is independent of any other NDTP transactions (other queries or updates), so multiple NDTP queries may be processed simultaneously on multiprocessor machines. The NDTP server permits this by not performing multiprocessor locking in the NDTP query processing path.

NDTP Update Processing

To maintain high performance on NDTP updates, the NDTP server network front end preferably supports multiple concurrent asynchronous update transactions. Each update is preferably performed automatically to avoid creating an

14

inconsistent state in the location store. All NDTP updates are serialized through the location store mutator critical code sections.

When an NDTP update is processed, a call is made to the location store mutation function, which returns immediately indicating either that the mutation is complete, or that the completion will be signaled asynchronously through a callback mechanism. For updates which are not immediately completed, the network front end maintains a queue of NDTP updates for which it is awaiting completion. When completed, the network front end writes the NDTP update response messages for all completed updates back to the clients.

Multiple Connection Handling

The NDTP server network front end may be conditionally compiled to use either of two standard synchronous I/O multiplexing mechanisms, select or poll, or to use threads to prevent blocking the server waiting for events on individual connections. The threaded version of the NDTP server network front end preferably creates two threads for each NDTP connection, one for reading and one for writing.

TCP Mapping

NDTP is preferably carried on TCP in a standard manner. An NDTP/TCP client opens a connection with a server on a well-known port. The well-known TCP and UDP port numbers can be selected arbitrarily by the initial NDTP implementer. Port numbers that do not conflict with existing protocols should preferably be chosen. The client sends NDTP requests 60 to the server 12 on the TCP connection, and receives responses 62 back on the same connection. While it is permissible for a single client 14 to open multiple NDTP/TCP connections to the same server 12, this practice is discouraged to preserve relatively limited connection resources on the NDTP server 12. The asynchronous nature of NDTP should make it unnecessary for a client 14 to open multiple NDTP/TCP connections to a single server 12.

If protocol errors are detected on an NDTP/TCP connection, the NDTP/TCP connection should be closed immediately. If further NDTP/TCP communication is required after an error has occurred, a new NDTP/TCP connection should be opened. Some examples of detectable protocol errors include: Illegal NDTP message operation code; Nonzero String Area Length in NDTP_PUT_RSP or NDTP_GET_RSP; Inconsistent String Area Length and String Length(s) in NDTP_GET, NDTP_GET_RSP, NDTP_PUT, NDTP_DEL or NDTP_UPD; and Unexpected NDTP request identifier by client.

Due to the reliable nature of TCP, NDTP/TCP servers 16 and clients 12 need not maintain any additional form of operation timeout. The only transport errors that can occur will result in gross connection level errors. A client 12 should assume that any NDTP requests 10 for which it has not received responses 14 have not been completed. Incomplete operations may be retried. However, whether unacknowledged NDTP requests 10 have actually been completed is implementation dependent.

UDP Mapping

Unreliable Datagram Protocol (UDP) provides connectionless, unacknowledged datagram transmission. The minimal protocol overhead associated with UDP can deliver extremely high performance if used properly.

NDTP/UDP clients 14 send UDP datagrams with NDTP request messages 60 to a well-known UDP port (see above). NDTP/UDP servers 12 return NDTP response messages 62 to the client 14 selected local UDP port indicated in the

US 7,233,978 B2

15

NDTP/UDP datagram containing the requests **60**. NDTP/UDP does not require any form of connection or other association to be established in advance. An NDTP interchange begins simply with the client request message **60**.

For efficiency, the mapping of NDTP onto UDP permits multiple NDTP messages to be sent in a single UDP datagram. UDP datagrams encode the length of their payload, so when a UDP datagram is received, the exact payload length is available. The recipient of an NDTP/UDP datagram will read NDTP messages from the beginning of the UDP datagram payload until the payload is exhausted. Thus, a sender of an NDTP/UDP datagram is free to pack as many NDTP messages as will fit in a UDP datagram.

NDTP/UDP client **14** implementations that use the NDTP request identifier **64** for antialiasing should ignore (i.e., skip) NDTP messages within a NDTP/UDP datagram with invalid NDTP request identifier **64** values. Client **14** or server **12** NDTP/UDP implementations detecting any other protocol error should also preferably discard the remainder of the current NDTP/UDP datagram without processing any further NDTP requests from that datagram. Some examples of such detectable errors include: Illegal NDTP message operation code, Nonzero String Area Length in NDTP_PUT_RSP or NDTP_GET_RSP, Inconsistent String Area Length and String Length(s) in NDTP_GET, NDTP_GET_RSP, NDTP_PUT Or NDTP_DEL, and Inconsistent NDTP message length and UDP datagram length.

Because NDTP/UDP messages are limited to the length of a single UDP datagram payload, NDTP/UDP cannot be used to transfer long NDTP messages. For example, it would be difficult to send an NDTP_GET message with NDTP/UDP for a 64 K byte identifier.

Those skilled in the art will appreciate that network congestion is a highly dynamic property that is a function of network traffic from all sources through a network link and will vary over time over any given network path. An NDTP/UDP client **14** implementation can recover from network congestion by switching to NDTP/TCP after several failed retries using NDTP/UDP. Failure due to network congestion may be indistinguishable from failure due to UDP packet size limitations, but since the recovery strategy is the same in both cases, there is no need to distinguish these cases.

NDTP Redirection

NDTP handles NDTP server scaling with the NDTP's redirection mechanism, which is managed through an NDTP server **12**, or set of such servers. This redirection mechanism allows arbitrary distribution of the data set across completely independent machines. The set of machines managing the NDTP server data set may be referred to as an NDTP server cluster **50**, as shown in FIG. **5**. The NDTP redirection mechanism exploits this by permitting the distribution of identifiers to location mappings across members of an NDTP server cluster. An advantage of distributing an NDTP server data set across independent machines is that both capacity and transaction rate scale can be increased. In one embodiment, each additional machine in an NDTP server cluster **50** linearly increases capacity, by adding main and secondary storage, and transaction rate, by adding processing power and network bandwidth (assuming a properly scalable network infrastructure is employed).

Each NDTP server **12** maintains a copy of the NDTP server map. An NDTP server will check each request it receives and verify that it is intended for itself. If it is not, it will respond to the client **14** with an NDTP Redirection

16

Response message (NDTP_RDR_RSP), instead of responding with the normal operation completion message.

A client may misdirect a NDTP request because the NDTP server cluster may have been reconfigured since the client last obtained a copy of the NDTP server map. Thus, the NDTP_RDR_RSP message includes a complete copy of the current NDTP server map with which the client may determine the correct NDTP server for the given NDTP request.

In essence, the NDTP server maintains authoritative copies of the NDTP server map, whereas NDTP clients may have out-of-date copies of the NDTP server map. This property permits efficient reconfiguration of the NDTP server cluster. With the redirect message, an NDTP client can determine the size of the NDTP server table, which may have changed, and then update its local copy of the NDTP server table, and attempt the NDTP transaction again, this time directed at the correct NDTP server.

The NDTP redirection mechanism permits a client permanently to store only a single NDTP server address, and learn the complete NDTP server table size and contents from the NDTP_RDR_RSP from the first NDTP request the client performs which the identifier does not reside on the well known server. The NDTP backbone topology can change dynamically in a similar way to application server topology. Preferably, any time the cluster is reconfigured, only the NDTP servers are updated, rather than the (potentially) unbounded number of clients in the network.

The NDTP client can start out with an NDTP server map containing a single, well known, NDTP server entry: If the well-known NDTP server is not the NDTP server which is managing the portion of the NDTP server data set containing the identifier in the client request, an NDTP_RDR_RSP will be returned, and the client can update its local copy of the NDTP server map. Once a client has received a new NDTP server map, it will use it for the lifetime of the client application, or until it receives a new NDTP server map. The client may also put the most current NDTP server map into a persistent store, so that new invocations of the client application, or other clients of the same network, can begin operation without even a single NDTP_RDR_RSP.

If the client's saved NDTP server map becomes out-of-date, the server will return an updated NDTP server map the first time a client sends a NDTP request to an incorrect NDTP server. If a client NDTP request times out for some reason, this might mean that a machine in the current NDTP server map has been removed from the NDTP server cluster. In this case, to get the current NDTP server map the client may either (1) return to its base-line NDTP server map, containing the single well known NDTP server, or (2) direct the request to any other NDTP server in its current NDTP server map. Whether received directly, or by a map update via NDTP_RDR RSP, the client will obtain the desired location specifiers with at most two NDTP transactions.

The ability to scale NDTP service beyond a single server requires a mechanism to distribute portions of the identifier/location association set across multiple NDTP servers. The presently preferred embodiment for accomplishing this is to define a well-known function of the identifier and use this function to select from a set of NDTP servers. NDTP clients will preferably apply this well-known function to the identifier for each NDTP request, and send the NDTP request to the indicated NDTP server. This technique will effectively partition the set of all identifier/location associations across the NDTP servers. Each NDTP server will only maintain the portion of the total association set which corresponds to its particular identifiers. This NDTP server redirection mechanism permits construction of NDTP server clusters. It is

US 7,233,978 B2

17

reasonable to expect that the identifier index function will be defined when an NDTP server instantiation is implemented, but the actual list of NDTP servers will change from application to application and within a single application throughout the lifetime of the system.

In one embodiment, each of the clients and NDTP servers are programmed with a well-known function and the redirection message, as shown in FIG. **17**(*a*) carries of table of NDTP server URLs. The NDTP_RDR_RSP message **101** has a message operation code of 8, and a description of the system that the client should send its message to. In one embodiment, the system is described by a list of strings, where each string is an NDTP URL (e.g. ndtp://server.name.com:24500).

If there is more than one list in the outer list, then the client is to select the appropriate inner list to send a message to by applying the following well-known function to the identifier and using the function result as an index into the NDTP server table. In one preferred embodiment, the well-known function applied is the hashpjw function presented by Aho, Sethi and Ullman in their text Compilers, Principles, Techniques and Tools:

```
uint32_t
hash (uint8_t *s, uint32_t slen, uint32_t size)
{
    uint32_t g;
    uint32_t i;
    unit32_t h = 0;
    uint8_t c;
    for (i = 0; i < slen; i++) {
        c = s [i];
        h = (h << 4) + c;
        g = (h & 0xf0000000);
        if (g) {
            h   = g >> 24;
            h   = g;
        }
    }
    return h % size;
}
```

In the above code sequence, the parameter size is the size of the hash table (the number of elements in the NDTP server URL table in the NDTP_RDR_RSP message), and is preferably a prime number. Those skilled in the art will appreciate that the same NDTP server may appear multiple times in the NDTP server URL table. For example, if the server URL table has 2039 elements, by putting one NDTP server URL in the first **1019** table elements, and a second NDTP server URL in the second **1020** table elements, the responsibility for the index will be split roughly in half.

A second variant of the NDTP_RDR_RSP function mechanism specifies that a general function description will be sent to the NDTP client in the NDTP_RDR_RSP message. The NDTP client will apply this function to the identifier and the output of the function will be the NDTP server URL to which to send NDTP requests for the particular identifier. The advantage of this technique over the well-known function approach is that it allows application-specific partitions of the identifier space. This can permit useful administrative control. For example, if General Electric manages all identifiers beginning with the prefix "GE", a general function can be used to make this selection appropriately. The disadvantage of using a general function is it may be less efficient to compute than a well-known function.

18

There are a variety of possible mechanisms for sending function descriptions. NDTP is expected to be applied in environments that make extensive use of the Java programming platform. Therefore the NDTP_RDR_RSP mechanism preferably uses a feature of the Java programming language called "serialized representation" to communicate generalized function in the NDTP_RDR_RSP message. A serialized form of a Java object is a stream of bytes that represents the precise state of the object, including its executable methods. For example, the Java Remote Method Invocation (RMI) mechanism uses serialized objects to send executable code to a remote platform for execution. The NDTP_RDR_RSP message contains the serialized form of an object implementing this Java interface:

```
interface NDTPRedirect Function {
    String selectServer(byte[ ] identifier);
}
```

The format of the NDTP_RDR_RSP message **103** with a Java Serialized form of the NDTP redirection function is specifically identified in FIG. **17**(*b*).

After the NDTP client has received a new server list, the client will direct further NDTP requests based on this updated NDTP server list until the NDTP server configuration changes again. An NDTP client may even save the current NDTP server list in non-volatile storage so that it can immediately select the correct NDTP server even after application or system restarts. Another possible alternative is for a client to remember only a single, well-known NDTP server, and update its NDTP server list every time the client restarts. These alternatives may be implemented as desired to accommodate design goals for a particular system.

Server Constellations

The NDTP server organization also allows NDTP servers to be combined in various ways to build server constellations that offer arbitrary server performance scalability and administrative control of the location of positions of the identifier/data location relation mappings. FIG. **18** illustrates a basic transaction flow according to a preferred embodiment where a client **112** communicates NDTP protocol messages with an NDTP server constellation **110** (which may be one or more NDTP servers) and separately transacts with an application server **114**. The basic communication flow in FIG. **18** may represent a client **112** adding, deleting, or updating an identifier/location association(s), and in turn adding, deleting, or updating corresponding data. The communication flow may represent a client **112** requesting an identifier/location association(s) from the NDTP server, which may be a server constellation construed in either of two forms (see FIGS. **19** and **20** ), and then querying directly based on the identifier/location association(s) received from the NDTP server. NDTP server constellations preferably have two basic organizational paradigms: Client-Centric and Server-Centric.

Client-Centric Approach

Referring to FIG. **19**, a single client (not shown) asks a server **120***a* in the server constellation **110** for operations that the client desires executed (represented by arrow **1** in FIG. **19**). As discussed above, if the client does not receive the data requested, it will receive a redirection response message (NDTP_RDR_RSP) from the contacted server **120***a* (arrow **2** ). The client then uses the information it

US 7,233,978 B2

19

receives to ask another server 120*b* for the operations the client wants to initiate (arrow 3). A successful response from the second server 120*b* is then sent to the client (arrow 4).

Server-Centric Approach

FIG. 20 shows the server constellation 110 characterizing "server-centric" functionality. In this figure, an NDTP server 130*a* (server0) receives a request 132*a* from a client (not shown). The server 130*a* (server0) passes the request to a second server 130*b* (server1), which is an appropriate server for the process, and the second server 130*b* returns a response 134*a* to the first server 130*a* (server0). If the second server 130*a* (server1) was not appropriate, it could pass the request to another server (not shown), and so on. Each NDTP server 130*a,b* will combine the results of NDTP requests 132*a,b* it has performed of other NDTP servers 130*a,b* with whatever responses 134*a,b* it generates locally for the original NDTP request 132*a*, and the combined response 134 *b* will be with the appropriate response for the original NDTP request 132 *a*.

An important aspect of this topology is that it pushes processing emphasis toward servers 130*a,b* rather than toward clients. Since location/identifier processing can be centralized, administration of the indices can be administered more conveniently in certain cases.

Hybrid Constellations

The simplest NDTP server constellation is a single server, and the protocol is designed to permit massive scale with a single or simple server constellation. Highly configurable installations are possible using "client-centric" or "server-centric" techniques. NDTP server constellations 110 composed of more than one NDTP server may use any combination of the two approaches for performance optimization and administrative properties. Client-centric and server centric approaches can be used to build NDTP server clusters, NDTP server trees, NDTP server trees of NDTP server clusters, or any other useful configuration.

Topology: Hierarchical and Clustered

Hierarchical and clustered topologies may be created using a server-centric or client-centric approach. One illustration of a cluster topology 50 is shown in FIG. 5. A mixed topology containing hierarchical and clustered elements is shown in FIGS. 6 and 21. The primarily hierarchical topology of the embodiment of FIG. 21 can allow for a single administrative entity 102 to manage the NDTP sever cluster. An NDTP server hierarchy 100, such as illustrated in FIG. 21, permits identifier/location association data to be owned and physically controlled by many different entities.

Splitting & Coalescing Data Sets

The NDTP redirection mechanism discussed above offers flexibility in NDTP server cluster configuration with preferably little impact on clients. However, the NDTP server cluster itself must execute several steps to reconfigure the NDTP server data load. Methods for adding or removing an NDTP server from a running NDTP server cluster include splitting some portion of the data set from a running NDTP server cluster into one or more NDTP servers to be added to the cluster; coalescing some portion of the data set to a remaining NDTP server cluster; and propagating updated NDTP server maps efficiently to all NDTP servers in an NDTP server cluster. Preferably, these methods minimize interruption of service. Large batch-style updates are preferably avoided using the splitting and coalescing algorithm discussed below to handle large scale reconfiguration. When reconfiguring NDTP server clusters, splitting and coalescing problems for an NDTP server are handled by

20

checkpointing the current data set state and loading it into another instance of an NDTP server. In the case where a data set will be split, a set of identifiers is transferred to another NDTP server. In the case where a data set is coalesced, several NDTP server states are loaded on a single NDTP server cumulatively.

Consider an example of splitting, as shown in FIG. 22, in which a given NDTP server cluster 140 having at least two NDTP servers 12 needs to reconfigure the distribution of identifier/location data among NDTP servers. If the identifier space needs to be split, whether for local policy reasons initiated by an administrator, or based on automatically monitored performance criteria such as transaction rate, storage capacity and etc., the splitting process begins by identifying the set of the data on Server 1, that will be transferred to Server 2. Referring to FIG. 22, Server 1 initially contains a total set of data consisting of Set A 142 and Set B 144. Assuming Server 1 has identified Set B as the data that needs to be split out to Server 2, Server 1 first checkpoints the data in Set B. Server 1 continues to operate normally with respect to Set A and will update (perform any of the NDTP add, delete, or update functions) without interruption. Server 1 also creates new set of data, Set C 146, which accumulates all operations directed to Set B 144 since the checkpoint of Set B 146 took place. Server 1 then copies Set B 144 to Set B' 148 on Server 2. After the copying of Set B 144 to Set B' 148 is complete, Server 1 freezes operations on Set C 146 and copies it to Set C' 150 on Server 2. Operation on Set B' 148 and Set C' 150 is then resumed on Server 2 and Sets B and C 144,146 are deleted from Server 1.

Preferably, the only interruption to the NDTP server activity in Server 1 or Server 2 is limited to the Set C and the time it takes to complete the copy step of Set C 146 to Set C' 150 while Server 1 freezes operations to Set C. Operations on the remaining data are preferably unaffected throughout the splitting process. NDTP lookup operations do not affect the checkpoints that are saved or loaded. Furthermore, if more than one NDTP server is already operating in the cluster, only the affected subset of the NDTP servers in an NDTP server cluster are interrupted during this process; the remainder of the NDTP server continues to operate undisturbed. An advantage that splitting and coalescing provides is the redistribution of identifier space without requiring reindexing, which is more expensive computationally.

When reconfiguring an NDTP server cluster, the new NDTP server map must be propagated to all NDTP servers in the cluster so that accurate NDTP redirection messages can be sent. An asynchronous mechanism is preferably used to supply the new NDTP server map. Preferably, the NDTP server transferring the data set will broadcast the new NDTP server map to all other NDTP servers in the cluster over its network connection, such as a TCP connection. In one embodiment, each server may maintain an internal table holding all server locations in memory. Preferably, server map size is selected for a likely maximum number of machines in the NDTP server and is a prime number suitable for use with a well-known function. In one embodiment, a server may appear more than one time on the server map. For example, if the initial NDTP server map size is established at 1023, and only a single NDTP server will be used to form the NDTP server cluster so that the single NDTP server machine appears 1023 times in the NDTP server map.

After splitting and coalescing one method of transferring the updated server map to other servers is to use a data structure containing a list or URL's with ranges of identifiers

US 7,233,978 B2

21

associated with each URL. In another embodiment, the new server map may be carried in a message having the same properties and format as the NDTP_RDR_RSP message (see FIG. 17(a)) but having a message code identifying the contents as a server-to-server transmission.

If an NDTP server is added by splitting an existing portion of the data set without changing the NDTP server map size, only the new and old NDTP servers need immediately know about the modification of the NDTP server map. The NDTP servers uninvolved in the split will forward all requests for the data set now existing on either the new or the old NDTP server. The old NDTP server will then return an NDTP_RSP_RDR with the new NDTP server map, when responding to requests for the data set that now exists on the new NDTP server. A new NDTP server map will eventually be propagated to all NDTP servers using the NDTP server map propagation mechanism. The NDTP redirection mechanism allows this propagation to be asynchronous to the actual NDTP server cluster reconfiguration. In one preferred embodiment, the server map is transmitted from a server involved in a splitting or coalescing operation to all other servers in a cluster.

Removing NDTP Servers from Server Clusters

The most efficient way to remove NDTP server machines from an NDTP server cluster includes ensuring either sending clients redirects or aliasing the NDTP server. Using redirects, the removed NDTP server machine remains a citizen of the NDTP server cluster, does not manage any particular data set, and simply responds with NDTP_RDR_RSP requests with the new NDTP server map. In effect, this simply returns a forwarding address. Using aliasing, the network address of the removed NDTP server is assigned as an alias to a remaining, active member of the NDTP server cluster.

The methods for splitting data on NDTP servers and removing NDTP servers entirely permit flexibility for coalescing data in NDTP servers. If, for example, an NDTP server needs to transfer some of its data due to performance limitations (physical storage capacity limits, transaction rate limitations, etc.), the target NDTP server for receiving the transferred data set may already contain an active data set. Preferably, copying a subset of data from a first server to a second server already actively processing its own data proceeds according to the splitting process as described above. Utilizing the NDTP server operations and system configuration flexibility described above, numerous applications of the preferred data location system are contemplated.

Content Management

Referring to FIG. 23, a geographically dispersed network of clients 152, NDTP servers 154 and application servers 156 is shown. Each of the clients, NDTP servers and application servers may each represent one or multiple systems. The application servers 156 contain substantive content in one or more forms (text, graphics, etc.) to which the clients 152 require access. The NDTP servers may maintain tables of identifiers, where each identifier represents one or more instances of a specific file, and the associated location or locations of that file. The identifier may be a Universal Resource Identifier (URI) and the location may be a URL for the specific application server 156 at which the substantive content may be accessed, or any other addressing convention. A client at a Paris location 158 may request the location of information relating to an identifier from the local NDTP cluster 154 and receive a URL for an application server 156 residing in a Chicago

22

location 160. The information for the URI maintained at the Chicago URL is preferably cached at the client 152 in the Paris location on a per instance basis such that the file is available for the client in Paris for the duration of that client's needs. In one embodiment, the NDTP server cluster in the Paris location preferably maintains a record of the number of requests for that particular URI and, if the URI is the subject of a predetermined number of queries, the frequently requested content at the URL in Chicago is automatically transferred to an application server in the Paris location 158 or copied to an application server in the Paris location. Using the NDTP delete, add, or update operations, the NDTP server clusters in Paris and Chicago preferably update the location information for the URI and asynchronously propagate the new server maps to the remaining NDTP servers.

Object Management

In another embodiment, the same geographical arrangement of data and clients applies to object management, where the object is a programming element or file. Examples of some objects include C++ objects or portions of programming toolkits that various geographically dispersed clients may wish to access in executing a program. By assigning each object a unique identifier and maintaining the location information in NDTP servers, efficient transfer of the object may be achieved and accurate accounting of where the object has been, or currently resides, is obtainable. In particular, embodiments of the present invention are well suited to handle high transaction volume for tracking the objects.

Tracking and Sensing

The NDTP protocol and network configurations discussed above may be applied to any one of a number of physical object (animal, telecommunications devices, troop location, package, family member, part, product and etc.) tracking applications. Referring to FIG. 24, one embodiment of a vehicle tracking application is shown. A shipping company 170, which may be any number of moving company, airborne delivery or ground delivery services, may track company vehicles 172 in a delivery territory 174 in order to maintain delivery fleet status or optimize fleet deployment to, for example, select the best vehicle to pick-up materials at designated pick-up location 175. A dispatcher 176 may access an NDTP server 178 having a location store 180 of information containing identifiers 182 corresponding to individual vehicles 172 and a list of locations 184 associated with the identifier for each vehicle. In one embodiment, the vehicles may be automobiles and the identifier assigned to the vehicles may be the unique vehicle identification number (VIN) assigned by automobile manufacturers to the automobiles they produce.

The location store 180 may be maintained such that only the most recent geographic location (e.g. latitude and longitude) is associated with a vehicle, or the table may be maintained to continuously receive current location information for each vehicle at predetermined intervals so that vehicle travel history, speed, heading and other types of information may be obtained with the location information for a vehicle. In one embodiment, the vehicles 172 may each be equipped with a Global Positioning System (GPS) receiver and a transceiver that is programmed to automatically broadcast position information, or any other location identifying technology. The broadcasts may be picked up through a network, such as a cellular network 186 and transmitted to the NDTP server 178. The broadcasts contain the vehicle identifier and geographic information, such as

US 7,233,978 B2

23

latitude/longitude or any other geographic measure, that is then appended to the appropriate portion of the indexed table **180**. An advantage of the NDTP server application in the vehicle tracking example illustrated in FIG. **24** is that the NDTP server performance may be used to track large numbers of vehicles at high update rates.

Mobility Management, With and Without Presence

In another embodiment, the NDTP protocol and network configurations discussed above may be applied to mobility management applications. Additionally, the mobility management applications may include the ability to indicate whether a device is available for interaction ("presence"), where device availability is tracked in addition to the physical location of a device. For example, as illustrated in FIG. **25**, an NDTP server **190** may maintain a set of identifier/location associations on the physical location and availability of portable devices belonging to a particular user. The portable devices **192** may be, in one embodiment, any type of cellular enabled device, or other wireless mobile device, such as personal digital assistants (PDA), notebook computers with cellular modems, mobility-enabled wrist watches, mobile telephones, and etc. The portable devices **192** preferably include location service enabled software **193**, such as standard plug-in software modified to translate NDTP and the service protocol of the third party tracking mechanism. In the embodiment of FIG. **25**, a third party tracking mechanism, such as a mobile network tower **194**, communicates with an NDTP server **190** to update the whereabouts and accessibility of a person through one or more portable devices. In FIG. **25**, the mobile network tower **194** communicates with the NDTP server via the portable device. In other embodiments, either the third party tracking mechanism or the portable device **192** may be modified, through a standard API, to directly communicate with the NDTP server. In yet another embodiment, a proxy server (not shown) may provide protocol translation functionality to allow the third party tracking mechanism and/or the portable device to communicate directly with the NDTP server **190** without the need to modify the third party tracking system or the portable device.

As illustrated in FIG. **26**, the location store **196** maintained on the NDTP server **190** may be configured to have identifiers **198** such as a person's name, associated with locations **200** which may be a device address **202** paired with a presence (availability) **204** indicator. Whenever a portable device **192** is activated, the mobile network tower **194** will inform the NDTP server **190** of the existence of the portable device and its availability. In the given example, a "1" represents an active device and a "0" represents an inactive device. Each time a portable device associated with a person's identifier is activated (and/or deactivated depending upon implementation), the NDTP server location store **196** will be updated by the mobile network tower **194** with the device address. The device address may be in the form of electronic address or other type of location. Using this system, a party attempting to contact the person or entity represented by the identifier "Alice" in the location store **196** may access the NDTP server to receive the address for the most recently activated device, the address for all active devices, and/or addresses for all devices associated with "Alice".

Generic Naming and Addressing

The NDTP system and protocol described above may provide a specialized database designed to solve general naming and addressing needs. NDTP is designed for use in the larger context of a distributed database system including, but not limited to, addressing and namespace services. As such, it supports an architecture in which information about where data associated with particular application entities can

24

be managed and obtained independently of the data itself. One way to understand this is as a highly dynamic domain name service (DNS) for data. DNS maintains a mapping between names and machines. NDTP and its associated servers maintain a mapping between identifiers and locations. The identifier/location mapping maintained by NDTP servers is much more dynamic (suitable for frequent updates), than the domain name/IP address mapping maintained by DNS. NDTP may be viewed in this respect as fully generalized name service suitable for any kind of service and not restricted to a specialized service.

Mobile Telephone Tracking and Dynamic Telephone Numbers

In other applications of the NDTP protocol and system discussed above, mobile telephone tracking and dynamic telephone number applications may be implemented. With respect to mobile telephone tracking, an NDTP server location store may use the electronic serial number (ESN) of, for example, cellular phones as identifiers, and the cellular tower translation encoding or latitude longitude of the phone as the location. Advantages of tracking mobile phone location through an NDTP server may include speed of information access and the ability to construct an audit trail showing where a cell phone has traveled. In another embodiment, a cellular telephone customer may be mapped to a new service provider by mapping the cell phone ESN to an appropriate location of an instruction set that will convert the cellular telephone customer's telephone number to a new service provider. In this manner, the cellular telephone customer may switch providers without having to obtain a new telephone number.

With respect to dynamic telephone number functionality, a telephone system organized by NDTP would permit telephone service customers to create and delete unique communication roles freely, for any purpose. For example, a customer may create a new communication role identifier to give to a service provider, such as an auto mechanic, to permit contact during the service. After service completion, the customer may delete the communication role identifier, thereby preventing unwanted subsequent contact, such as telemarketing solicitation. In another embodiment, this communication role identifier property can be employed to dynamically control customer-initiated contact. Telephone-based service providers, such as customer relationship management, computer support, medical services, etc., can dynamically control customer initiated contact. For example, a customer with an active case could dial a unique communication role identifier which would be routed directly to the appropriate support specialist until the incident is resolved. The person reached by the customer's unique communication role identifier can be changed by the service provider as the service cycle progresses. After incident resolution, the service provider may delete the communication role identifier, thereby preventing the customer from gaining additional, inappropriate access to support specialists. The dynamic telephone number application of NDTP may be used on various systems, including voice over Internet protocol (VOIP) systems, to allow users to readily map and unmap single use, or limited use, addresses to a desired communication path.

As described above, a method and system for managing data location information in a network has been disclosed having an easily scaleable architecture that permits rapid operation and flexibility for expansion and reconfiguration of service. The system is based on a Network Distributed Tracking Protocol that runs on top of any stream (e.g. TCP) or datagram (e.g. UDP) network transport layer. With NDTP, the system supports a network service that efficiently manages mappings from each individual identifier (definable

US 7,233,978 B2

25

using any format, size, encoding, etc.), to one or more locations (which are also definable using any format, size, encoding, etc.). In one embodiment, the identifiers and locations may be formatted as strings. NDTP permits clients to manipulate identifier/location associations, and request the current set of locations for an identifier from protocol servers. The servers in the network may be reconfigured to change the data set currently stored in one or more servers in response to performance goals or limitations.

Regardless of the expected system context of NDTP in a distributed database, those skilled in the art will appreciate that NDTP can be used for any application in which one-to-one or one-to-many associations among identifier and location associations are to be maintained and accessed on a network.

It is to be understood that a wide range of changes and modifications to the embodiments described above will be apparent to those skilled in the art, and are contemplated. It is therefore intended that the foregoing detailed description be regarded as illustrative, rather than limiting, and that it be understood that it is the following claims, including all equivalents, that are intended to define the spirit and scope of the invention.

We claim:

1. A system having a plurality of location servers for managing location information and providing location information to location queries, the system comprising:

a first location server containing a first set of location information corresponding to at least one entity, the location information comprising an identifier and at least one location string associated with the identifier, wherein the identifier identifies an entity and the location string specifies a location of data pertaining to the entity

a second location server comprising a second set of location information, wherein at least a portion of the second set of location information differs from the first set of location information; and

programming logic stored on each of the location servers responsive to a location query identifying a desired entity to return a location message, the location message comprising at least one location of data pertaining to the desired entity, if the location server receiving the location query contains location information for the desired entity.

2. The system of claim 1, wherein the at least one location comprises a plurality of geographic locations, each of the geographic locations representing a position of the entity at a different time.

3. The system of claim 1, wherein the programming logic further comprises logic responsive to the location query to return one of a location message or a redirect message, wherein the location server receiving the query returns the location message if the queried location server contains location information for the desired entity, and wherein the queried location server returns a redirect message if the queried location server lacks location information for the desired entity, the redirect message comprising information for finding a location server known to have location information relevant to the location query.

4. The system of claim 3, wherein the information for finding the location server known to have location information relevant to the location query comprises a list of location servers and a corresponding list of each of the entities having location information on the location servers.

5. The system of claim 1, wherein each of the location servers stores at least a portion of the location information on a persistent storage device.

26

6. The system of claim 1, wherein the location information in the location server is maintained in an indexed location store indexed by a hash table.

7. The system of claim 6, wherein the location query identifying the desired entity comprises a unique identifier for the desired entity, and wherein the programming logic stored on the location server further comprises programming logic for applying an index function to the unique identifier to retrieve at least a portion of the location information associated with the unique identifier in the indexed location store.

8. The system of claim 7, wherein the location query is received at a location server in a first node and wherein the redirect message comprises a list of at least one other location server in a node other than the first node that may have location information relevant to the location query.

9. The system of claim 1, wherein the plurality of location servers are arranged in a network topology having a plurality of nodes organized in a logical hierarchy, wherein each node comprises at least one location server and wherein each node is connected to at least one other node in the logical hierarchy.

10. A system having a plurality of location servers for managing location information and providing location information to location queries, the system comprising:

a plurality of location servers containing location information corresponding to a plurality of entities, the location information formatted according to a transfer protocol configured for manipulating location information, and comprising at least one application server address, wherein the plurality of location servers are arranged in a cluster topology such that each location server contains a unique set of location information of an aggregate set of the location information; and

programming logic stored on each of the plurality of location servers responsive to a location query for a desired identifier to return one of a location message, wherein a queried location server returns a location message if the queried location server contains location information for the desired identifier, and a redirect message if the queried location server does not contain location information relevant to the desired identifier, wherein the redirect message comprises information for finding a location server having location information related to the desired identifier.

11. The system of claim 10, wherein the location information comprises geographic location information.

12. The system of claim 10, wherein the location information comprises network address information.

13. The system of claim 12, wherein the network address information comprises a network address of a data repository containing data pertaining to the desired identifier.

14. A method of handling location queries in a network, the network comprising a plurality of location servers, each location server containing a unique set of location information of an aggregate set of location information correlating each of a plurality of identifiers with at least one location, the method comprising:

receiving a location query from a client at one of the plurality of location servers, the location query requesting an entity's location;

sending a location response message to the client if the queried location server contains location information relevant to an entity identified in the query, the location response message comprising location information

US 7,233,978 B2

27

28

identifying at least one application server containing information relevant to the entity identified in the query; and

sending a redirect message to the client if the queried location server does not contain data location information relevant to the entity identified in the query, the redirect message comprising information for finding a location server storing the entity identified in the query.

15. The method of claim 14, further comprising applying information in the location query from the client to an indexing function to determine if the queried location server contains location information relevant to the entity identified in the query.

16. The method of claim 15, wherein each of the plurality of location servers comprises an indexed table of identifiers and associated locations, and wherein applying information in the location query comprises applying an identifier in the location query to a hash function.

17. A method of scaling at least one of capacity and transaction rate capability in a location server in a system having a plurality of location servers for storing and retrieving location information, wherein each of the plurality of location servers stores unique set of location information of an aggregate set of location information, the method comprising:

providing a transfer protocol configured to transport identifier and location information, the location information specifying the location of information related to the identifier;

storing location information formatted according to the transfer protocol at a first location server;

receiving an identifier and a location relevant to the identifier at the first location server;

storing the received location in a location store at the first data location server, the location store comprising a plurality of identifiers, each identifier associated with at least one location, wherein the received location is associated with the received identifier in the location store; and

transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit.

18. The method of claim 17, wherein receiving an identifier and a location comprises receiving the identifier and the location at the first location server from an application server, wherein the location comprises an address for the application server.

19. The method of claim 17, wherein receiving an identifier and a location comprises receiving the identifier and the location at the first location server from a physical object, wherein the identifier identifies the physical object and wherein the location comprises a geographic location for the physical object.

20. The method of claim 19, wherein the physical object comprises a vehicle.

21. The method of claim 19, wherein the physical object comprises a portable telecommunications device.

22. The method of claim 17, wherein transferring a portion of the identifier and location associations comprises:

identifying a portion of identifier and location associations on the first location server to be transferred to the second location server and identifying a data set state of the identified portion at an initial time;

copying a data set for the identified portion corresponding to the identified data set state from the first location server to the second location server and maintaining a second data set containing changes to the identified portion since the initial time;

identifying a data set state for the second data set;

ceasing operation of the first location server with respect to the identified portion and copying the second data set to the second location server, wherein the second data set corresponds to the identified data set state for the second data set; and

initiating operation of the second location server for the identified portion of identifiers and location associations.

23. The method of claim 17, wherein the performance criterion comprises an amount of available persistent storage space in the first location server.

24. The method of claim 17, wherein the performance criterion comprises a transaction rate limit.

25. The method of claim 17, wherein the transaction rate limit comprises a processor speed limit.

26. The method of claim 17, wherein the transaction rate limit comprises a network connection bandwidth limit.

27. The method of claim 17, further comprising transmitting a location server map from the first location server, the location server map comprising information identifying the second location server and a list of identifiers associated with the second location server.

28. The method of claim 27, wherein the first and second location servers are part of a location server cluster comprising a plurality of location servers, and wherein transmitting the location server map comprises transmitting the location server map to each of the plurality of data location servers asynchronously.

29. The method of claim 27, wherein transmitting a location server map comprises transmitting the location server map to a client in response to query received at the first location server from the client regarding an identifier that is not resident on the first location server.

30. The method of claim 17, wherein transferring a portion of the identifiers and associated locations to a second location server when a performance criterion of the first data location server reaches a predetermined performance limit further comprises monitoring the performance criterion and automatically transferring the portion of identifiers and associated locations when the first location server reaches the predetermined limit.

31. A system for managing location information and providing location information to location queries, the system comprising:

a location server operating in accordance with a transfer protocol, the transfer protocol comprising instructions for manipulating an identifier and at least one location associated with the identifier, wherein the identifier uniquely specifies an entity and wherein each location specifies a location of data in a network pertaining to the entity, the location server containing location information corresponding to at least one entity and formatted according to the transfer protocol, and wherein the location of data for the location comprises an application server in communication with the network; and

programming logic stored on the location server responsive to a location query identifying a desired entity to return a location message, the location message comprising locations associated with the desired entity, wherein the location server returns the location message if the location server contains location information for the desired entity.

* * * * *

US007233978C1

## (12) EX PARTE REEXAMINATION CERTIFICATE (12366th)
# United States Patent
### Overton et al.

(10) **Number:** US 7,233,978 C1

(45) **Certificate Issued:** Aug. 17, 2023

(54) **METHOD AND APPARATUS FOR MANAGING LOCATION INFORMATION IN A NETWORK SEPARATE FROM THE DATA TO WHICH THE LOCATION INFORMATION PERTAINS**

(75) Inventors: **John K. Overton**, Chicago, IL (US); **Stephen W. Bailey**, Andover, MA (US)

(73) Assignee: **KOVE IO, INC.**, Chicago, IL (US)

**Reexamination Request:**
No. 90/019,034, Nov. 19, 2021

**Reexamination Certificate for:**
Patent No.: **7,233,978**
Issued: **Jun. 19, 2007**
Appl. No.: **09/872,736**
Filed: **Jun. 1, 2001**

### Related U.S. Application Data

(63) Continuation-in-part of application No. 09/661,222, filed on Sep. 13, 2000, now Pat. No. 7,103,640, and a continuation-in-part of application No. 09/503,441, filed on Feb. 14, 2000, now abandoned, and a continuation-in-part of application No. 09/367,461, filed on Aug. 13, 1999, now abandoned, and a continuation-in-part of application No. 09/111,896, filed on Jul. 8, 1998, now abandoned.

(60) Provisional application No. 60/277,408, filed on Mar. 19, 2001, provisional application No. 60/209,070, filed on Jun. 2, 2000.

(51) **Int. Cl.**
| | |
|---|---|
| *G06F 15/16* | (2006.01) |
| *H04L 61/4552* | (2022.01) |
| *G06F 16/955* | (2019.01) |
| *G06F 16/58* | (2019.01) |
| *H04L 9/40* | (2022.01) |
| *H04L 67/50* | (2022.01) |
| *H04L 67/1001* | (2022.01) |
| *H04L 67/1008* | (2022.01) |
| *H04L 69/00* | (2022.01) |
| *H04L 69/329* | (2022.01) |

(52) **U.S. Cl.**
CPC .......... *H04L 61/4552* (2022.05); *G06F 16/58* (2019.01); *G06F 16/9566* (2019.01); *H04L 9/40* (2022.05); *H04L 67/535* (2022.05); *H04L 67/1001* (2022.05); *H04L 67/1008* (2013.01); *H04L 67/10015* (2022.05); *H04L 69/26* (2013.01); *H04L 69/329* (2013.01)

(58) **Field of Classification Search**
None
See application file for complete search history.

(56) **References Cited**

To view the complete listing of prior art documents cited during the proceeding for Reexamination Control Number 90/019,034, please refer to the USPTO's Patent Electronic System.

*Primary Examiner* — Joshua D Campbell

(57) **ABSTRACT**

A system and method for storing and retrieving location information across a network is disclosed. The system and method utilize a transfer protocol configured to transport an identifier/location relationship to allow one or more locations to be associated with an identifier in the location store of a location server, where the identifier represents a unique entity and the location represents a location of data pertaining to the identifier. The location server contains programming logic operative to provide responses to location queries and capable of scaling a plurality of location servers according to system performance and logistical requirements.

**At the time of issuance and publication of this certificate, the patent remains subject to pending reexamination control numbers 90/019,109 and 90/019,162 filed Aug. 31, 2022 and Feb. 27, 2023 respectively. The claim content of the patent may be subsequently revised if a reexamination certificate issues from the reexamination proceedings.**



US 7,233,978 C1

# EX PARTE
# REEXAMINATION CERTIFICATE

THE PATENT IS HEREBY AMENDED AS INDICATED BELOW.

AS A RESULT OF REEXAMINATION, IT HAS BEEN DETERMINED THAT:

The patentability of claims **3**, **6**, **10**, **14**, **17**, **23**, **24** and **30** is confirmed.

Claims **1** and **31** are cancelled.

Claims **2**, **4**, **5**, **7-9**, **11-13**, **15**, **16**, **18-22** and **25-29** were not reexamined.

\* \* \* \* \*

Appx18884

# Oracle teaches a hierarchical architecture, not a "cluster topology" which enables "redirect message"



**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Kove IO, Inc., | Civil Action No. 1:18-cv-08175 |
| Plaintiff, | Hon. Matthew F. Kennelly |
| v. | Jury Trial Demanded |
| Amazon Web Services, Inc., | |
| Defendant. | |

**PLAINTIFF KOVE IO, INC.'S OPPOSITION TO AWS'S MOTION FOR SUMMARY
JUDGMENT AND CROSS MOTIONS FOR SUMMARY JUDGMENT
<u>AND TO EXCLUDE</u>**

Appx19574

AWS does not assert that Dr. Goodrich's explanation of why ███████ that ██████ ████████████ are stored on ███████████ fails to raise a genuine dispute of material fact, nor could AWS reasonably do so.

For the same reason, even under AWS's incorrect interpretation of "location server" in the '170 and '640 patents, summary judgment must be denied because the evidence shows that DDB infringes when the ████████████████████████████ as discussed above. In other words, even if a location server needed to contain an identifier string to satisfy the '170 and '640 limitations, fact issues nonetheless preclude summary judgment because the facts just discussed show that DDB meets this (incorrect) limitation.

## II. AWS's Request for a New Claim Construction Fails: There Was No Prosecution History Disclaimer.

AWS's primary noninfringement theory is based on its request that the Court change the claim construction that has been operative for years. It requests the Court reopen long-since closed claim construction based on alleged prosecution history disclaimer that occurred after claim construction in this case. AWS cannot meet its heavy burden to prove "clear and unmistakable" prosecution history disclaimer, and thus there is no basis for reopening claim construction.

Prosecution history disclaimer exists to prevent a patentee from giving up claim scope to secure a patent, only to later seek to recapture that scope to prove infringement by claiming that an accused product practices the disclaimed scope. Under this doctrine, although a patentee is normally entitled to the full scope of its claim language, the patentee may disavow or give up some of that scope during prosecution (if "clear and unmistakable"). That is, a patentee cannot *dis*claim scope unless they claimed that scope in the first place. Merely distinguishing the prior art is not enough. If, for instance, a patent claims a cylindrical shape, and the examiner cites prior art with a square shape, the patentee would distinguish the prior art on the ground it was not cylindrical.

24

That is not a disclaimer. The patent never claimed a square shape, so there is nothing to disclaim. The patentee was simply distinguishing the prior art.

So too here. AWS contends that when, in reexaminations of its patents, Kove distinguished prior art because it did not have the "'non-hierarchical' structures" required by the patents, it was disclaiming hierarchical structures. But that which is not claimed cannot be disclaimed. Kove expressly stated and made clear in the reexaminations that the claim language at issue required non-hierarchical structures, so hierarchical prior art did not read on the claim limitations—just as square prior art does not read on cylindrical claim language. AWS has failed to show that the claims ever had scope that included hierarchical structures—and it cannot because they do not— much less that there was clear and unmistakable disavowal by Kove.

AWS merely points to places in the reexamination record where Kove said "non-hierarchical," but it omits the surrounding language making clear that the existing claim limitation can only be read to require a non-hierarchical topology. Kove pointed out that the claims *as written* refer only to non-hierarchical topology, and thus the prior art does not meet the claim limitations. The examiner agreed and issued the patents on that basis. Kove never disclaimed scope.

AWS's proposed new claim constructions expose its overreach in trying to change the claim language as a gambit to evade infringement. It asks the Court to add language to a part of the claim not even at issue during reexamination regarding "non-hierarchical," then points to "hierarchy" in *unaccused* aspects of its products (S3 and DynamoDB) to argue noninfringement. Tellingly, it never says the *accused* portions are hierarchical. Put differently, AWS's theory points to irrelevant hierarchical features in a bid to secure noninfringement, while ignoring the actually accused non-hierarchical features—and it wants a construction that will facilitate that tactic.

Indeed, AWS's proposed claim constructions wander so far afield of disclaimer that it now

25

seeks revised constructions of other limitations that have nothing to do with the supposed prosecution history at issue. It simply slides in a host of new constructions with hardly any discussion. AWS fails to show any reason to reopen claim construction, how its constructions are tethered to the alleged disclaimer, or how importing new limitations is appropriate.

Accordingly, AWS's proposed new constructions should be rejected. It has failed to meet its heavy burden of demonstrating prosecution history disclaimer.

### A. Facts Relating to Reexamination of the Kove Patents

The table below shows the reexaminations relevant here.

| Reexam Control No. | Patent | Challenged Claims | Result |
|---|---|---|---|
| 90/019,036 ('036 reexam) | '640 patent | 17-18 and 24 | All claims determined patentable |
| 90/019,035 ('035 reexam) | '170 patent | 1-2, 6, 8-9, 12 and 15 | All claims determined patentable |
| 90/019,034 ('034 reexam) | '978 patent | 1, 3, 6, 10, 14, 17, 23, 24, 30, and 31 | Claims 17, 23, 24, 30 determined patentable without substantive reexamination; Claims 1 and 31 canceled; Remaining determined patentable |

All challenged claims of the '640 and '170 patents were subjected to substantive reexamination. The Patent Office issued Office Actions in each reexam, identifying the prior art and reasons why the Office believed the art rendered the claims unpatentable. ASMF ¶ 1. Kove responded to the Office Actions, detailing why the claims are distinguishable from the prior art. *Id.* ¶ 2. The Patent Office agreed and upheld the patentability of all claims.

For the '978 patent, not all challenged claims were substantively reexamined. ASMF ¶ 2. The Patent Office found claims 17, 23, 24, and 30 patentable before any response from Kove. *Id.* ¶ 3. The remaining claims (1, 3, 6, 10, 14, and 31) were subject to the reexamination, and Kove submitted a response only as to them. *Id.* The Patent Office upheld the patentability of claims 3,

26

Appx19612

6, 10, and 14, and issued a final rejection as to claims 1 and 31. *Id.*[11]

### 1. '640 patent ('036 reexam)

The Patent Office undertook substantive reexamination of whether claims 17, 18, and 24 are obvious over prior art, including Oracle Names Admin Guide ("ONAG").[12] Claim 17, as an example, recites:

> 17. A system for retrieving data location information for data stored in a distributed network, the system comprising:
>
> a plurality of data repositories configured to store data, wherein the data is associated with a respective identifier string in each data repository;
>
> a data location server network having a plurality of data location servers, each of the plurality of data location servers containing location string associated with respective identifier strings and each of the plurality of data location servers having computer executable code configured to execute the following steps:
>
> in response to receiving a data location request from a client to retrieve a location string associated with an identification string provided in the data location request, transmitting a redirect message to the client if the identification string is not associated with a location string at the data location server, wherein the redirect message contains information for use by the client to calculate a location of a different data location server in the plurality of data location servers, wherein the different data location server contains the location string.

In responding to the Patent Office's rejections, Kove explained that its claims include limitations that distinguish them from ONAG. Kove argued that ONAG teaches a system that "depends on a hierarchical structure where a client can only query the node immediately 'above' or 'below' it in the 'tree.'" ASMF ¶ 4. Kove contrasted ONAG's "hierarchical tree" with the requirements of claims 17 and 18, which contain limitations allowing:

> [a] client [to] send a query to any server in the network—not just its local region, as taught by Oracle Admin (see Oracle Admin, p. 190). If the queried server does not have the requested information, that server (as are all servers in the data location server network) is configured to return a message to the client containing information that the client can then

---

[11] Claims 1 and 31 are no longer asserted in this case.

[12] Limitations present in claim 18 are also present in claim 24, which depends from it.

use to calculate the location of the server that does have the requested information.

*Id.* Kove identified the limitations distinguishing the claims from ONAG's hierarchy:

> Claims 17 and 18 require that "***each of the plurality of data location servers*** having computer executable code ***[be] configured to***" carry out specific activity. In particular, each location server must be able to "transmit[] a redirect message to the client if the identification string is not associated with a location string at the data location server, wherein the ***redirect message contains information for use by the client to calculate a location of a different data location server*** in the plurality of data location servers, ***wherein the different data location server contains the location string***."

*Id.* (emphasis in original). Using terminology that contrasted what the claim limitations require with ONAG's hierarchical structure, Kove explained that the claims' "**non-hierarchical cluster composition is expressly claimed** in claims 17 and 18 through the requirement that 'each' (i.e., all) of the data location servers be similarly configured to respond to a client request with the aforementioned information." *Id.* ¶ 5 (emphasis added). Similarly, Kove argued that ONAG "lacks the non-hierarchical structure required to enable every server in the network to return information useable by the client to locate the server that contains the requested information," pointing to the "each of the plurality of data location servers" and "redirect message" requirements of claims 17 and 18. Each time, Kove used "non-hierarchical" as a synonym for the patent's claim limitations describing that topology.

Kove's response also included a declaration from Dr. Goodrich, stating:

> Claims 17 and 18 both require 'each' data location server in the claimed data location network have computer executable code 'configured to execute' certain steps, including transmitting a redirect message to the client containing information for use by the client to calculate the location of the location server that contains the location string. **It is my opinion that a POSA at the time of this invention would understand this limitation to require a nonhierarchical cluster configuration as taught by the '640 patent**.

ASMF ¶ 6 (emphasis added).[13] Dr. Goodrich confirmed that a POSA would understand the

---

[13] A "POSA" or "POSITA" is a person of ordinary skill in the art. Dr. Goodrich was explaining how such a person would understand the claim language. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc) (Generally, the words of a claim should be given their ordinary and customary

28

limitations to mean non-hierarchical topology.

The Patent Office confirmed the patentability of all reexamined claims, reasoning that "[t]he cited prior art fail to teach individually or in combination" the limitations of the claims requiring a "redirect message." ASMF ¶ 7.

### 2. '172 patent ('035 reexam)

The Patent Office conducted substantive reexamination of '172 patent claims 1, 2, 6, 8, 12, and 15 to determine whether they are obvious over prior art, including ONAG.[14] Claim 1, as an example, recites:

> 1. A system for managing data stored in a distributed network, the system comprising:
>
> a data repository configured to store a data entity, wherein an identifier string identifies the data entity; and
>
> a data location server network comprising a plurality of data location servers, wherein data location information for a plurality of data entities is stored in the data location server network, at least one of the plurality of data location servers includes location information associated with the identifier string, each one of the plurality of data location servers comprises a processor and a portion of the data location information, the portion of the data location information included in a corresponding one of the data location servers is based on a hash function used to organize the data location information across the plurality of data location servers, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string.

In responding to the Office's rejections, much like it did for the '640 patent, Kove identified specific limitations from each independent claim that differentiates them from ONAG, pointing out that the limitations cannot be met by ONAG's hierarchical tree topology:

- "**[C]laim 1** requires data location information to be portioned and organized across the data location servers in the network based on a hash function. **A hash function necessarily organizes data in a non-hierarchical manner**, meaning claim 1 can only be accomplished

---

meaning, [which is] "the meaning that the term[s] would have to a person of ordinary skill in the art in question at the time of the invention . . . ." (cleaned up)).

[14] Claims 1, 6, and 15 are independent claims. Claim 2 depends from claim 1; and claims 8 and 12 depend from claim 6 from claim 18.

through the cluster configuration taught by the specification." ASMF ¶ 8.

- "**Claim 6's non-hierarchical configuration is embodied [by]** [sic] the requirement that the location server must be able to return a 'redirect message' where 'the redirect message compris[es] a list of at least one other location server known to have the location information for the desired entity.' This limitation cannot be met in hierarchical configurations such as Names Server because location servers in tree-structures do not necessarily know which other server has the desired information." ASMF ¶ 8 (emphasis added).

- "**Claim 15 contains a similar requirement** that location servers in the network be capable of returning 'redirect messages' identifying other servers in the network with the desired information. This is embodied in the limitation 'the redirect message identifying which of the plurality of location servers includes the location information.' . . . [T]he redirect message limitations, as recited by claims 6 and 15, demonstrate that claims 6 and 15 **recite a non-hierarchical cluster configuration**." ASMF ¶ 8 (emphasis added).

Kove also submitted a declaration from Dr. Goodrich that stated, "It is my opinion that a **POSITA** at the time of this invention **would understand claims 1, 6, and 15**, through various limitations in each of the claims, **to require a non-hierarchical cluster** configuration as taught by the '170 patent." ASMF ¶ 9 (emphasis added). As with the '640 patent, Dr. Goodrich confirmed that the claims' plain language requires non-hierarchical topology.

The Patent Office confirmed the patentability of all reexamined claims, and identified the limitations requiring "redirect message" and the "each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string" as not being disclosed in the prior art. ASMF ¶ 10.

### 3. '978 patent ('034 reexam)

The Patent Office confirmed the patentability of '978 patent claims 17, 23, 24, and 30, and engaged in substantive reexamination of claims 1, 3, 6, 10, 14, and 31 to determine whether they are obvious over prior art, including ONAG.[15] Claim 10, as an example, recites:

10. A system having a plurality of location servers for managing location information and

---

[15] Claims 1, 10, 14, 17, and 31 are independent claims. Claims 3 and 6 depend from claim 1; and claims 23, 24 and 30 depend from claim 17. Claims 1 and 31 are no longer asserted.

providing location information to location queries, the system comprising:

a plurality of location servers containing location information corresponding to a plurality of entities, the location information formatted according to a transfer protocol configured for manipulating location information, and comprising at least one application server address, wherein the plurality of location servers are arranged in a cluster topology such that each location server contains a unique set of location information of an aggregate set of the location information; and

programming logic stored on each of the plurality of location servers responsive to a location query for a desired identifier to return one of a location message, wherein a queried location server returns a location message if the queried location server contains location information for the desired identifier, and a redirect message if the queried location server does not contain location information relevant to the desired identifier, wherein the redirect message comprises information for finding a location server having location information related to the desired identifier.

Here too, Kove pointed to the limitations in the claims responsible for the structural configurations of each claim's location servers:

- "Independent claims 10 and 14 and dependent claim 3 require, **expressly or impliedly, a non-hierarchical cluster configuration of locations servers in a network**. For example, claim 10 recites "the plurality of location servers are arranged in a cluster topology such that each location server contains a unique set of location information of an aggregate set of the location information […] programming logic stored on each of the plurality of location servers responsive to a location query for a desired identifier to return one of a location message […] a redirect message if the queried location server does not contain location information relevant to the desired identifier, wherein the redirect message comprises information for finding a location server having location information related to the desired identifier." As such, claim 10 explicitly recites that the location servers are arranged in a cluster topology. Furthermore, claim 10 requires each location server be configured to transmit a redirect message comprising information to for finding a location server having location information. Therefore, **these limitations require a non-hierarchical cluster configuration**." ASMF ¶ 11 (emphasis added).

- "**Claim 14's non-hierarchical configuration** is embodied in the requirement that the location server must be able to receive a location query from a client and return a "redirect message to the client if the queried location server does not contain data location information relevant to the entity identified in the query, the redirect message comprising information for finding a location server storing the entity identified in the query." ASMF ¶ 11 (emphasis added).

- "**Claim 3 contains a similar requirement** that location servers in the network be capable of returning "redirect messages" where the "redirect message comprising information for finding a location server known to have location information relevant

Appx19617

to the location query." Therefore, the redirect message indicates with specificity and certainty which data location server in the network contains the location information for the desired entity. **A hierarchical configuration does not enable nodes to have such knowledge**." ASMF ¶ 11 (emphasis added).

Dr. Goodrich also submitted a declaration where he stated, "**It is my opinion that a POSITA** at the time of this invention **would understand** claims 3, 10, and 14, through various limitations in each of the claims, **to require a non-hierarchical cluster configuration** as taught by the '978 patent," thus confirming that the claim's plain language requires a non-hierarchical topology. ASMF ¶ 12 (emphasis added).

The Patent Office confirmed the patentability of all challenged claims except claims 1 and 31, which were finally rejected.[16] The Office specifically identified the limitations that distinguished the claims over the prior art as the bases for patentability. ASMF ¶ 13.

## B. AWS Falls Far Short of Its Burden to Establish Disclaimer.

As the party alleging disclaimer, AWS bears the burden of establishing it. *Epistar Corp. v. Int'l Trade Comm'n*, 566 F.3d 1321, 1334 (Fed. Cir. 2009). Disclaimer arises where a patentee "disavows the full scope of the claim term during prosecution." *Duncan Parking Techs., Inc. v. IPS Grp.*, 914 F.3d 1347, 1364 (Fed. Cir. 2019). A patentee may, through arguments made during prosecution, "narrow the literal scope of an *otherwise more expansive claim limitation*." *Trading Techs. Int'l, Inc. v. Open E Cry, LLC*, 728 F.3d 1309, 1322 (Fed. Cir. 2013) (emphasis added). For prosecution disclaimer to apply, "the alleged disavowing actions or statements made during prosecution [must] be both clear and unmistakable." *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d

---

[16] Claims 1 and 31, which do *not* have limitations requiring non-hierarchical topologies, were never argued as being distinguishable from ONAG for this reason. ASMF ¶ 16. These claims were rejected as unpatentable over ONAG, consistent with the Patent Office's confirmation of claims that *do* have limitations requiring non-hierarchical topologies. This underscores that these limitations are the basis for confirming the claims that have them, *i.e.*, the difference between patentable and not patentable claims are the limitations that define the non-hierarchical topologies.

1353, 1359 (Fed. Cir. 2017). "Where the alleged disavowal is ambiguous, or even amenable to multiple reasonable interpretations, we have declined to find prosecution disclaimer." *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045 (Fed. Cir. 2016) (cleaned up).

In short, the claim language must claim something within its scope before it can be disclaimed. Here, the claim language unambiguously requires non-hierarchical topologies, meaning topologies that are hierarchical cannot invalidate them. Kove's statements to the Patent Office made this clear. In explaining why the language never encompassed the prior art in the first place, Kove was not disclaiming the "literal scope" of the claims, *Trading Techs.*, 728 F.3d at 1322—it was not giving up anything it previously claimed.

### 1. Kove's statements regarding "non-hierarchical" configurations described the claim scope—they did not disclaim it.

The literal scope of the claims at issue is unaffected by Kove's statements to the Patent Office about location server configuration because those statements *described* the claims' scope, rather than narrowing the claims to less than what they otherwise would have been. As Kove consistently explained to the Patent Office in each of the three reexams, the claims require location servers to have certain capabilities. *Supra* § II.A. It further explained that, in contrast to ONAG's hierarchical topologies, the claims have limitations that cannot be met with hierarchical topologies. *Id.* Describing the claims as "non-hierarchical" was simply Kove's shorthand way of contrasting what its claim limitations require with what ONAG discloses—it was crystal clear that what Kove meant by "non-hierarchical" was exactly what the claims already said. Kove never argued (or implied) that its claims could be read to *include* hierarchical topologies or that Kove was disavowing them for the sake of overcoming ONAG. Dr. Goodrich confirmed Kove's descriptions, telling the Patent Office that a person of ordinary skill in the art at the time of the invention would have understood the various limitations to require a non-hierarchical

33

Appx19619

configuration. ASMF ¶ 15. AWS has never disputed this.

A brief analogy crystallizes the issue. Assume a claim recites a system comprising a bulb that radiates light at a frequency of 400-484 THz and a wavelength of 620-750 nm. A person of ordinary skill in that art would understand the limitations to require red light, even though the claim never uses the word "red." "Red" in this context then means "light having a frequency of 400-484 THz and a wavelength of 620-750 nm." In distinguishing a prior art reference that discloses blue light, the patentee may explain that its claim requires light that is "not blue." This is not "disclaiming" blue light because the full scope of the claim never included light that is blue (rather, it excluded it because blue light would not meet the requirements of the claim). Just so here. To distinguish ONAG's "hierarchical" configuration, Kove explained that specific limitations dictate that the claims are "not hierarchical," much in the same way that the frequency and wavelength requirements dictate the claimed light is "not blue."

Disclaimer brooks no ambiguity—Kove's intent to disavow claim scope must be clear. That which is not claimed cannot be disclaimed, and AWS has not shown that the full scope of Kove's claims ever allowed the types of "hierarchies" it says Kove disavowed. The record is clear that Kove described its claims using convenient terminology so as to avoid endless, unhelpful, verbatim repetition of the claim's words; what those words describe is a non-hierarchical topology. AWS comes nowhere near showing that Kove clearly and unambiguously disclaimed scope. *Avid Tech.*, 812 F.3d at 1045 ("Where the alleged disavowal is ambiguous, or even amenable to multiple reasonable interpretations, we have declined to find prosecution disclaimer.").

### 2. Kove did not make any statements (let alone disclaimers) about claims 17, 23, 24 or 30 of the '978 patent.

AWS contends that Kove's reexam statements resulted in disclaimers across all 17 asserted claims. But the Patent Office found claims 17, 23, 24, and 30 of the '978 patent to be patentable

at the outset. Dkt. 690-31 at 5 ("Claims 17, 23, 24, and 30 are found patentable as discussed below."). That finding preceded any submission by Kove about any claim of the '978 patent. In fact, in its response, Kove "thank[ed] the Office for confirming patentability of these four claims" and went on to address "the rejections *as to the remaining claims*." ASMF ¶ 16 (emphasis added). So the statements AWS cites in alleging disclaimer could not have been about these claims, and Kove cannot have "clearly and unambiguously" disavowed some part of their scope.

AWS's only argument in support of disclaimer is that Dr. Goodrich did not "provide a clear opinion either way on whether [these claims] require a 'non-hierarchical cluster configuration.'" Mot. 9 n.29. How this amounts to disclaimer—which the law requires to be "clear and unmistakable"—AWS does not say. *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1063–64 (Fed. Cir. 2016) (alleged infringer bears the burden of proving "a 'clear and unmistakable' disclaimer that would have been evident to one skilled in the art"). "Instead," AWS says, Dr. Goodrich "argues that Kove didn't make statements concerning those five claims in Reexamination No. 90/019,034." Mot. 9 n.29. This only proves Kove's point: Having been silent as to these claims, Kove cannot be said to have clearly and unmistakably disclaimed anything about them. *Mass. Inst. of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1120 (Fed. Cir. 2016) (rejecting disclaimer argument based on statements made "in the context of different claims that did not include the terms" at issue); *see also Vanguard Prods. Corp. v. Parker Hannifin Corp.*, 234 F.3d 1370, 1372 (Fed. Cir. 2000) (affirming district court's refusal to read limitations relating to alleged disclaimer from one claim into another). AWS therefore fails, as a matter of law, to prove disclaimer as to claim 17, 23, 24, and 30 of the '978 patent.

### 3. Kove's statements regarding "non-hierarchical" did not apply to claim 6 of the '978 patent.

AWS contends that Kove's statements in the '978 patent reexam also limited claim 6. In

35

Appx19621

addition to there being no disclaimer for the reasons explained above, the statements AWS relies on pertain only to claims 3, 10, and 14. Kove called out the claims by number:

- "Independent claims 10 and 14 and dependent claim 3 require, expressly or impliedly, a non-hierarchical cluster configuration of locations servers in a network." ASMF ¶ 17.

- "Claim 14's non-hierarchical configuration is embodied in the requirement that the location server must be able to receive a location query from a client and return a "redirect message to the client if the queried location server does not contain data location information relevant to the entity identified in the query, the redirect message comprising information for finding a location server storing the entity identified in the query." ASMF ¶ 17.

- "Claims 3 contains a similar requirement that location servers in the network be capable of returning "redirect messages" where the "redirect message comprising information for finding a location server known to have location information relevant to the location query." ASMF ¶ 17.

Kove never made (and AWS does not cite) any statements about "non-hierarchical" in relation to claim 6 of the '978 patent and therefore cannot be said to have made any disclaimers to that effect. ASMF ¶ 17.

### C. AWS's Proposed Constructions Are Far Afield from Kove's Reexam Statements, Illustrating That This Is Not a Question of Disclaimer.

AWS's only basis for asking the Court to reopen claim construction is its incorrect assertion that disclaimer altered the claims' ordinary scope. Absent disclaimer, there is no reason to construe (or reconstrue) any claim term, and the Court need not consider AWS's proposed constructions. AWS's desired eleventh-hour changes to the claim language are untethered to Kove's statements in the prosecution history. That underscores that AWS's arguments are not really about disclaimer, but rather a gambit to escape infringement by importing new claim limitations.

Claim construction begins with "the language of the claims themselves." *Grace Instrument Indus., LLC v. Chandler Instruments Co.*, 57 F.4th 1001, 1008 (Fed. Cir. 2023). "A claim term's ordinary and customary meaning, as understood by persons skilled in the relevant technology, is the default meaning." *Abbott Labs. v. Church & Dwight Co., Inc.*, 2008 WL 5387848, at *2 (N.D.

Ill. Dec. 22, 2008); *accord Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (en banc). A patent's prosecution history (here, the reexamination) "can reveal 'an intentional disclaimer, or disavowal, of claim scope by the inventor,' resulting in a claim that is narrower than its language might otherwise suggest." *Green Pet Shop Enters. v. Maze Innovations, Inc.*, 2016 WL 7451629, at *3 (N.D. Ill. Dec. 28, 2016) (Kennelly, J.) (quoting *Phillips*, 415 F.3d at 1316). Disavowal cannot be found "absent clear intent by the patentee." *Id.* (citing *Epistar*, 566 F.3d at 1334). Statements in the prosecution history must be considered in the context of the claim terms discussed and do not apply to other claim terms. *Vanguard*, 234 F.3d at 1372 (affirming the district court's refusal to read limitations relating to alleged disclaimer from one claim into another); *see also Mass. Inst. of Tech.*, 839 F.3d at 1120 (rejecting disclaimer argument based on statements made "in the context of different claims that did not include the terms" at issue).

It bears emphasizing that this is not ordinary claim construction, which was completed long ago in February 2021. AWS's only basis for reopening claim construction is the alleged prosecution disclaimer in the interim. Because there was no disclaimer, there is no reason to revisit claim construction, and none is provided. AWS's disclaimer argument rests on the erroneous supposition that because the specification refers to both nonhierarchical and hierarchical structures, Kove "disclaimed" hierarchical structures when it described its claims as "non-hierarchical." *See* Mot. 11-12. But what is in the *specification* has nothing to do with prosecution history estoppel or the disclaimer doctrine. As Judge Rich famously said, "the name of the game is the claim."[17] The universe of what can be disclaimed is limited to what is claimed. That the specification includes concepts beyond what the claims say is immaterial.

---

[17] Giles S. Rich, *The Extent of the Protection and Interpretation of Claims—American Perspectives*, 21 Int'l Rev. Indus. Prop. & Copyright L. 497, 499 (1990).

1. "network"/"system"

| Term | Court's Construction | AWS's Proposed Construction |
|------|---------------------|---------------------------|
| network/system | (not previously construed) | network/system **arranged in a non-hierarchical, cluster topology** |

AWS's proposed construction shows how it is seeking to import a limitation untethered to the alleged disclaimer. The terms *network* and *system* were not the subject of Kove's statements regarding "non-hierarchical," let alone the subject of unambiguously disclaimed scope.

Taking "system" first, the term appears only in the preambles of certain claims,[18] and the parties agree that those preambles are not limiting. ASMF ¶ 18. Non-limiting preambles do not impact claim scope, making it unnecessary to construe them. *See Bio-Rad Labs., Inc. v. 10X Genomics Inc.*, 967 F.3d 1353, 1369 (Fed. Cir. 2020) ("[A] preamble is generally not limiting unless there is 'clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art.'"). The Court can reject AWS's construction for this reason alone. Additionally, AWS does not explain why Kove's reexam statements could plausibly (let alone unmistakably) limit entire claim "systems," which includes far more than just the limitations Kove's statements were describing.

For example, claim 17 of the '640 patent claims, "A *system* for retrieving data location information for data stored in a distributed network, the *system* comprising . . . ." The claim then recites the elements that compose the system, including the limitation "each of the plurality of data location servers having computer executable code configured to execute . . . ," followed by another limitation specifying how the claimed location servers respond to client requests by providing a "redirect message" that is required to contain particular information.

In the reexam, Kove explained that the claim's "non-hierarchical cluster composition is

---

[18] Claims 1-13, 17, and 31 of the '978 patent; claims 1-14 of the '170 patent; and claims 17-25 of the '640 patent.

expressly claimed . . . through the requirement that 'each' (i.e., all) of the data location servers be similarly configured to respond to a client request with the aforementioned information." ASMF ¶ 19. Kove's statements are therefore directed only to those limitations, not the "system" as a whole (which comprises *every* limitation in the claim). AWS never addresses these issues and does not attempt to link this term to its disclaimer argument.

AWS's proposed construction of "networks" fares no better. It should be rejected for at least two reasons: First, AWS contends that all instances of "network" that appear in the claims should be equally limited, but "network" is not consistently used among the claims. Sometimes it appears in non-limiting preambles, which are not amenable to construction.[19] Second, as with "system," AWS fails to explain why it believes Kove's alleged disclaimers pertain to the term "network," when the record is clear that Kove was describing other limitations. Taking claim 17 of the '640 patent as an example, "network" appears in the body of the claim in the element "a data location server network having a plurality of data location servers." But Kove's statements regarding "non-hierarchical cluster compositions" refer to "the [claim's] requirement that 'each' (*i.e.*, all) of the data location servers be similarly configured to respond to a client request with the aforementioned information." ASMF ¶ 19. Kove was not talking about the "network" at all.

AWS's noninfringement arguments reveal its true purpose for trying to limit *system* and *network* to "non-hierarchical cluster topologies": AWS wants to argue that if there is "hierarchy" *anywhere* in AWS's "network" or "system"—even if unrelated to Kove's infringement theory—it does not infringe. Mot. 16-21 (relying on purportedly hierarchical "product," "structure," "data storage," "storage system," "each and every server," "components," and "metadata"). This contorted non-infringement theory has nothing to do with what Kove was discussing with the

---

[19] Claims 1, 10, 17, and 18 of the '640 patent have non-limiting preambles; claim 14 of the '978 is only limiting after the word "comprising", such that "network" is not a limiting term. Dkt. 382, Ex. B at 1.

examiner. The only aspects of the claims that are "non-hierarchical" are already embodied in the particular limitations that claim them. If AWS's products meet those limitations, they infringe. AWS cannot escape infringement by asking the Court to transform a descriptive phrase into a broad disclaimer that radically alters the scope of Kove's claims in ways it could not possibly have intended. The Court should deny AWS's requested constructions.

### 2. "location server"

| Term | Court's Construction | AWS's Proposed Construction |
|---|---|---|
| location server | a network-attached component that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients | a network-attached component that maintains, **for satisfying every request for the location of data on a network,** a set of **at least one of (1)** identifier/location mappings **or (2) information about the location of such mappings** that are modified or returned in response to **all** location request messages from clients |

AWS asks the Court to adopt this construction, but it spends no time advocating for it. The totality of AWS's argument about this term is a summary statement asking the Court to

> construe the asserted claims to require: (1) location servers in non-hierarchical, cluster structures, where each location server (2) contains the relevant location information, or information to locate the relevant location information, and (3) can resolve the request in two or fewer steps.

Mot. 11. AWS provides no supporting analysis; it does not discuss the claim language, the intrinsic record, or anything else. AWS does not point to any allegedly disclaiming statements about the need to "*satisfy[] every request for the location of data on a network*" or that require a location server to be for "*all* location request messages." Nor does it explain why it would be necessary to add "(2) information about the location of such mappings" to the Court's construction when any claim that requires its location server to have that limitation already expressly includes that limitation. KSMF ¶ 8 (identifying redirect claims). There is no basis to accept AWS's

construction.[20]

### 3. "providing"/"determining"/"retrieving" location information "return"/"sending"/"transmitting" a redirect message

| Terms | Court's Construction | AWS's Proposed Construction |
|---|---|---|
| providing determin[e/ing] retrieving location information or servers | (not previously construed) | providing, without performing any request iterations, . . . location information<br><br>determin[e/ing], **without performing any request iterations**, . . . location servers<br><br>retrieving **in two steps or fewer request iterations** location information |
| return sending transmit[s/ing] a redirect message | (not previously construed) | return/sending/transmit[s/ting] a redirect message without performing any request iterations |

AWS spends even less time supporting its constructions for this series of terms than it did "location server." There is no rationale for accepting any of them. AWS has not proved disclaimer, citing only a single instance where Kove used the term "iterations":

> The structured relationships of the invention allow clients to access data in distributed environments through a non-hierarchical, limitlessly scalable, server structure that enables retrieval of requested information in not more than two iterations.

Mot. 12. This isolated sentence is anything but a clear, unmistakable, and intentional disavowal of claim scope, much less one that supports AWS's constructions. AWS's constructions are also confusing and lack intrinsic support. What is a "request iteration"? The term is not used anywhere else, and AWS offers no definition. Similarly, in AWS's "without performing any request iterations" language, it is unclear what "request iterations" AWS would disallow. Do the claims' original scopes include them? Where is Kove supposed to have excluded them? And as for

---

[20] Notably, none of AWS's noninfringement arguments in its summary judgment motion depend on this proposed construction.

"retrieving *in two steps or fewer request iterations* location information," that term appears only in claim 17 of the '978 patent—a claim that was never discussed during reexam and therefore cannot be subject to any allegation of disclaimer. *See supra* pp. 26-27, 30. These terms also do not feature in AWS's noninfringement arguments, perhaps explaining its lack of attention to supporting them. The Court should decline to construe any of them.

**III.    Summary Judgment Is Not Warranted Under AWS's Proposed New Constructions.**

Even AWS's proposed new constructions cannot save it from having to face a jury; fact issues still preclude summary judgment. AWS's argument under its preferred construction begins with misdirection: Right off the bat, it says: "But 'a non-hierarchical, cluster topology' *isn't present* in the accused S3 and DDB products—instead, their structures are hierarchical." Mot. 17 (emphasis added). That argument relies on facts outside of what is accused. Kove has shown (through Dr. Goodrich) that non-hierarchical cluster topologies *are present* in both S3 and DDB. AWS does not disagree. Instead, what AWS is really arguing is that *all* topologies present in S3 and DDB must be non-hierarchical in order for there to be infringement. That argument is contrary to well-settled patent law that says if a claim reads on just a part of an accused device (*i.e.*, if there is evidence of *some* non-hierarchical topologies), the device infringes. The existence of other things (like hierarchical structures) that are not part of the accused functionality does not matter and does not preclude infringement.

A reasonable jury could accept Dr. Goodrich's ample and detailed explanation of how AWS's products infringe even under its proposed new constructions. ASMF ¶¶ 22-23, 25-26, 28.

**A. "Geographical Hierarchies"—Even If They Exist—Do Not Preclude Infringement Under AWS's Proposed New Construction.**

AWS argues that S3 and DDB do not infringe because they are organized into "geographic hierarchies." Mot. 17. AWS explains that S3 and DDB servers are physically located in different

**KOVE'S MOTION FOR SUMMARY JUDGMENT AND TO EXCLUDE**

Kove is entitled to summary judgment on several of AWS's defenses. "Summary judgment is the proverbial put up or shut up moment in a lawsuit," yet AWS has nothing to show for defense after defense that it is continuing to press. *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021). For starters, the Court already decided patent eligibility, rejecting AWS's 35 U.S.C. § 101 defense as a matter of law; AWS should not be permitted to resurrect it for trial. Next, AWS falls far short of carrying its burden on its equitable estoppel, waiver, and inequitable conduct defenses; no reasonable jury could find in its favor. AWS's obviousness-type double patenting argument fares no better; its expert's opinions are both conclusory and (as far as can be gleaned from what little support he provides) rest on an application of the wrong legal standard, making them both insufficient to clear the summary judgment hurdle and inadmissible to boot. Finally, AWS fails to qualify several of its invalidity references are prior art, requiring summary judgment on the invalidity theories that rely on those references.

## I.      AWS's § 101 Defense Fails as a Matter of Law.

This Court has already determined as a matter of law that three of the asserted claims are patent eligible under 35 U.S.C. § 101. Dkt. 110. There is no reason to distinguish the remaining claims, and AWS has not attempted to do so. AWS nonetheless insists on putting its § 101 defense to the jury. Kove's LR 56.1(a)(2) Statement ("KSMF") ¶ 1. This Court should adhere to its earlier decision—which correctly applied controlling precedent to a purely legal issue—and grant summary judgment for Kove on AWS's § 101 defense.

The Supreme Court applies a two-step test to determine patent eligibility under § 101. *Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 217-18 (2014). The first step asks whether the claims as a whole "are directed to" a "patent-ineligible concept[]," such as an abstract idea. *Id.* at 217. Step one is "a legal question that can be answered based on the intrinsic evidence"—that is, the

four corners of the patent, and nothing more. *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1372-74 (Fed. Cir. 2020); *see Athena Diagnostics, Inc. v. Mayo Collaborative Servs., LLC*, 915 F.3d 743, 750 (Fed. Cir. 2019) ("based on both the written description and the claims"). "If the focus of the claim is a specific and concrete technological advance," the *Alice* "inquiry ends and the claim is eligible." *ADASA Inc. v. Avery Dennison Corp.*, 55 F.4th 900, 908 (Fed. Cir. 2022); *accord McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312 (Fed. Cir. 2016) ("If the claims are not directed to an abstract idea, the inquiry ends.").

That is the case here, as this Court has already decided. In denying AWS's Rule 12(b)(6) motion, the Court ruled that the claims are not directed to an abstract idea and are therefore eligible at step one. Dkt. 110 at 20. There was no need then, and no need now, to proceed to step two.

## A. The Court's Ruling That the Claims Are Eligible Should Stand.

### 1. The Court rejected AWS's § 101 defense as a matter of law.

AWS litigated and lost its § 101 arguments in its Rule 12(b)(6) motion. Dkt. 36. The Court concluded that the claims at issue were "directed to a specific improvement in the way networks operate," not "to an abstract idea," and so were eligible at step one. Dkt. 110 at 14 (Pallmeyer, C.J.) (cleaned up). The Court thus did not "proceed to the second step of the *Alice* analysis." *Id.* at 20 (citing *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1355-36 (Fed. Cir. 2016)).

Every move in the Court's analysis confirms that it was answering a legal question, and no more. Applying binding precedent, the Court found that "not only do the patents' specifications explain how they improve on prior systems; the asserted claims also 'focus on the specific asserted improvement in computer capabilities' and are not simply directed to 'an "abstract idea" for which computers are involved merely as a toll.'" Dkt. 110 at 12 (quoting *Enfish*, 822 F.3d at 1335-36).

For starters, the Court rejected AWS's "dismissive characterization" of claim 1 of the '170 patent: That claim, the Court said, "is not directed at simply storing and locating information in

57

different places." Dkt. 110 at 12-13. Rather, it is "directed to a specific network architecture that employs multiple location servers that organize location information based on a distributed hash table," and that "architecture functions differently than—and improves upon—conventional systems." *Id.* So too for the other claims at issue. The Court explained that claim 18 of the '640 patent covers a network architecture similar to the '170 patent's claim 1, with "one critical component: a 'redirect message' from one data location server that permits the client to determine the location of a different data location server." *Id.* at 13. Focusing on the claim language, the Court rejected AWS's contrary characterization as involving "such a high level of abstraction" that it ran afoul of controlling precedent and was "untethered from the language of the claim[]" to boot. *Id.* (quoting *Enfish*, 822 F.3d at 1337). Likewise for claim 17 of the '978 patent. As the Court recognized, that claim "enables . . . on-the-fly addition and removal of data repositories, which makes possible the distributed network's growth in scale." *Id.* at 13-14 (cleaned up).

## 2. There is no reason to reconsider the Court's purely legal ruling.

Unfazed by the Court's ruling, AWS has stated that it intends to maintain its § 101 defense for trial, claiming that events following the Court's order rejecting it "may impact that defense, including at least for reasons detailed in Mr. Greene's expert report." KSMF ¶ 1. Neither Mr. Greene's report nor anything else provides any reason to upend the law of this case.

The Rule 12(b)(6) decision is, of course, an interlocutory order under Rule 54(b). Fed. R. Civ. P. 54(b); *see Galvan v. Norberg*, 678 F.3d 581, 587 n.3 (7th Cir. 2012). Reconsideration of interlocutory orders is nonetheless governed "by the doctrine of the law of the case." *Pickett v. Prince*, 207 F.3d 402, 407 (7th Cir. 2000); *see also Galvan*, 678 F.3d at 587. Under that doctrine, reconsideration is appropriate only when "there is a compelling reason, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous." *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571-72 (7th Cir. 2006). Said another way, the doctrine serves as a

presumption against "reopening a decided issue." *Galvan*, 678 F.3d at 587.

That presumption is especially strong where, as here, the Court is asked to reconsider a previously assigned judge's decision. *E.g.*, *Fujisawa Pharm. Co. v. Kapoor*, 115 F.3d 1332, 1339 (7th Cir. 1997) ("The doctrine of the law of the case requires the second judge . . . to abide by the rulings of the first judge unless some new development, such as a new appellate decision, convinces him that his predecessor's ruling was incorrect."); *see also Brengettcy v. Horton*, 423 F.3d 674, 680 (7th Cir. 2005) ("Generally speaking, a successor judge should not reconsider the decision of a transferor judge at the same hierarchical level of the judiciary . . . ."). After all, "litigants have a right to expect consistency even if judges change." *Galvan*, 678 F.3d at 587.

To be sure, the § 101 issue is now presented through the lens of summary judgment, not Rule 12(b)(6). But the legal question at step one remains the same. Facts come into the picture only at step two, which asks whether the "elements of the claim" contain "an 'inventive concept' sufficient to 'transform' *the claimed abstract idea* into a patent-eligible application." *Alice*, 573 U.S. at 221 (emphasis added); *see also, e.g.*, *Yu v. Apple Inc.*, 1 F.4th 1040, 1045 (Fed. Cir. 2021) (same); *Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1378 (Fed. Cir. 2015) (step two implicates factual questions, such as whether the claims require more than "conventional, routine and well understood applications in the art"). And there is no way to get to step two without first identifying an abstract idea at step one. *Supra* pp. 56-57. In short, step two's fact questions have nothing to do with step one's purely legal inquiry. Given this Court's holding that the asserted claims are "not directed to an abstract idea at step one, there [is] no set of facts that [AWS] could . . . adduce[] at trial to change that conclusion." *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d 1317, 1321 (Fed. Cir. 2020). Reversing the Court's step one holding is AWS's only way to prevail.

59

AWS offers no suitable reason for reconsideration; nothing whatsoever has changed. The Court carefully and correctly applied binding precedent. *See* Dkt. 110 at 8-11. AWS does not argue that the law has changed. Nor have the asserted patents' claims and specifications changed. And without a relevant change, there is no reason to reconsider. *See, e.g.*, *Galvan*, 678 F.3d at 587.

AWS's own argument for reconsideration confirms the point. AWS touts Mr. Greene's report as new information, KSMF ¶ 1, but in fact his § 101 analysis merely repackages the same arguments AWS already made and this Court rejected. *See, e.g.*, KSMF ¶¶ 2-5; *see also* Dkt. 38 at 5-8, 11, 12. Summary judgment is no place for rehashing those issues.

For example, Mr. Greene says the '978 patent's claim 17 "fails at step one" because it "describes generalized location services . . . and transport protocols." KSMF ¶ 2. AWS made and lost that same argument before. *See* Dkt. 38 at 5-8; Dkt. 110 at 17. Similarly, Mr. Greene recycles AWS's unsuccessful card catalog analogy. He argues, for instance, that using "'identifiers' to store and locate resources can be implemented in other mediums" such as "a library's card catalogue with identifiers for authors and shelving location." KSMF ¶¶ 3-5. The Court disagreed:

> [T]here are several problems with this analogy . . . . Defendant's suggested rewrite [of the claims] ignores the patents' specifications, which make clear that the invention is aimed at improving computer network storage. As explained above, conventional storage systems used hierarchical indices that could limit growth and slow down searches. It is not clear that this is a problem encountered by libraries or that the distributed card catalogue system in Defendant's rewrite would provide any improvement for them.

Dkt. 110 at 16. Moreover, anything Mr. Greene has to say on the facts is irrelevant to, and thus cannot justify reopening, step one's purely legal inquiry. *See Ericsson*, 955 F.3d at 1321; KSMF ¶ 6 (Mr. Greene discussing what is "routine, well-understood, and conventional," a step two issue). Nothing has changed, and so there is no reason to revisit the Court's decision.

## B. Regardless, AWS's § 101 Defense Cannot Survive Summary Judgment.

Kove is entitled to summary judgment rejecting AWS's § 101 defense as to all asserted

60

claims. As discussed, the Court correctly determined that claim 1 of the '170 patent, claim 18 of the '640 patent, and claim 17 of the '978 patent are patent eligible. Dkt. 110 at 12-20. AWS offers no separate basis for challenging any other asserted claim. KSMF ¶ 7. AWS therefore cannot meet its burden to establish that the remaining claims are invalid. *See* 35 U.S.C. § 282(a) (patents are presumed valid); *Microsoft Corp. v. i4i Ltd. P'ship*, 564 U.S. 91, 95 (2011) (challenger bears burden to prove ineligibility by clear and convincing evidence).

AWS's silence is understandable. The remaining independent claims are eligible for much the same reason as the previously adjudicated claims are. For example, similar to claim 18 of the '640 patent, claim 17 of the '640 patent, claims 10 and 14 of the '978 patent, and claims 6 and 15 of the '170 patent all also include a "redirect message" from one data server that permits the client to determine the location of a different data location server, when a location server fails to include the location information for the requested data. KSMF ¶ 8. The Court explained that the "redirect message" is a "critical component" to claim 18 and "is essential because it makes possible the distributed network architecture disclosed in the patents-in-suit"—which the Court concluded was an improvement in computer capabilities, not an abstract idea. Dkt. 110 at 12-13. And the dependent claims are by definition eligible when the independent claims from which they depend are eligible. *See Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1346 n.1 (Fed. Cir. 2017).

II.     **AWS Lacks Evidence of Equitable Estoppel, Waiver, or Inequitable Conduct.**

Discovery revealed nothing that could meet the governing legal standards for AWS's equitable estoppel, implied waiver, and inequitable conduct affirmative defenses, but AWS continues to maintain them. Kove is therefore entitled to summary judgment on these defenses.

A. **AWS Cannot Establish Equitable Estoppel.**

To prove equitable estoppel, AWS must show by a preponderance of the evidence that Kove, "through misleading conduct, led [AWS] to reasonably infer that [Kove] [did] not intend to

61

Appx19647

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

| | |
|---|---|
| KOVE IO, INC., | Civil Action No. 1:18-cv-08175 |
| Plaintiff, | Hon. Matthew F. Kennelly |
| v. | Jury Trial Demanded |
| AMAZON WEB SERVICES, INC., | |
| Defendant. | |

**EXPERT REPORT OF JOSEPH B. GREENE REGARDING
INVALIDITY OF U.S. PATENT NOS. 7,103,640, 7,233,978, AND 7,814,170**

Appx20537

Case: 1:18-cv-08175 Document #: 709-42 Filed: 11/15/23 Page 12 of 25 PageID #:38667

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

260.     When determining whether a specification contains adequate written description, I understand that one must make an objective inquiry into the four corners of the specification from the perspective of a POSITA. A patentee may rely on information that is well-known in the art for purposes of meeting the written description requirement. However, when the four corners of the specification contradict information that the patentee alleges is well-known to a POSITA, such information doesn't demonstrate that the patentee possessed the claimed invention. In addition, a description that merely renders the invention obvious does not satisfy the written description requirement.

## VIII.   THE ASSERTED CLAIMS CLAIM UNPATENTABLE SUBJECT MATTER.

261.     As part of this report, I have also been asked to provide my opinion on whether the asserted patents are invalid under 35 U.S.C. § 101 under *Alice*[313] and *Mayo*.[314] I understand that early on in this case, before discovery, Kove's limiting statements in reexamination, testimony by the inventors, and the Court's claim constructions, the Court ruled on this issue, denying Amazon's motion to dismiss and finding that the claims were not ineligible under 35 U.S.C. § 101. However, after being informed of the relevant standards for making this determination and taking the intervening developments into account, it is my opinion that the asserted patents are invalid under 35 U.S.C. § 101.

262.     I have been informed that when performing an analysis of invalidity under 35 U.S.C. § 101 under *Alice* and *Mayo*, two steps must be met for a finding of invalidity. First, it must be shown that the claims at issue are directed to a patent-ineligible concept, such as a law of nature, abstract phenomenon, or abstract idea. And second, if step one is met, it must be shown that the

---

[313] *Alice Corp. Pty. Ltd. v. CLS Bank Intern.*, 573 U.S. 208 (2014).
[314] *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012).

Page **115**

Appx20547

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

claims contain no inventive concept. It is my opinion that the asserted patents meet both steps and are therefore invalid for at least this reason.

263. I have been informed that step one is met if, for example, the claims simply consist of generalized steps to be performed on a computer using conventional computer activity. It is my opinion that the asserted claims consist of generalized steps performed on generic and conventional computers. For example, claim 17 of the '978 patent describes generalized location services (yellow) and transport protocols (green):

> 17. A method of scaling at least one of capacity and transaction rate capability in a location server in a system having a plurality of location servers for storing and retrieving location information, wherein each of the plurality of location servers stores unique set of location information of an aggregate set of location information, the method comprising:
>
> providing a transfer protocol configured to transport identifier and location information, the location information specifying the location of information related to the identifier;
> storing location information formatted according to the transfer protocol at a first location server;
>
> receiving an identifier and a location relevant to the identifier at the first location server;
>
> storing the received location in a location store at the first data location server, the location store comprising a plurality of identifiers, each identifier associated with at least one location, wherein the received location is associated with the received identifier in the location store; and
>
> transferring a portion of the identifiers and associated locations to a second data location server when a performance criterion of the first location server reaches a predetermined performance limit.

264. As shown above, the '978 Patent claims include a generic "location server" and "location stores" that only "store and retrieve location information." And the patent specification

Page **116**

Appx20548

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

confirms that the functions performed by the claimed servers "may be implemented on any of a number of standard computer platforms."[315]

265.     And this is further supported by the Court's claim construction of "location server." The Court construed this term as "**network-attached component** that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients."[316] And in its ruling, the Court further cautioned construing the term to a specific kind of server.[317] As such, in light of the patent's specification and the Court's claim construction order, a POSITA would understand that these "location servers" and "location stores" could be implemented on any conventional, standard, and well-known computer or server.

266.     It is also my opinion that the functions claimed relate to the abstract idea of receiving and storing location information based on some undefined "predetermined" "criterion." The claims and the specification vaguely state a "criterion" or "protocol" in which the storing and retrieving is performed. And that dependent claims include examples, such as available storage space and transaction rate limit,[318] does not clarify the issue as these parameters are innate in any resource storage system. For example, if a single drawer in a file cabinet was full of files, then it would be normal to move files to accommodate new files. Or if certain files were constantly accessed more than others, it would be likely to store those in a more readily accessible place for convenience.

---

[315] '978 Patent, Col. 7:36-38.
[316] Dkt. No. 484.
[317] "[I]t would be improper to limit the construction of "location server" with the use of "NDTP."" *Id.* at 21.
[318] *See, e.g.,* '978 Patent, claims 23 and 24.

Page **117**

**HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY**

267. And other than the reliance on "identifiers," no other guidance is given on how this data storage paradigm is implemented. The idea of using an "identifier" to store and locate resources can be implemented in other mediums, due to its abstract nature. One example is a library's card catalogue with identifiers for authors and shelving locations. The '978 Patent claims simply takes this abstract idea of sorting data by identifiers and place it on generic computers.

268. And the same is seen in the '170 patent. Below is claim 1 of the '170 patent identifying the same generic computer components (yellow) with the addition of a generic "processor" (green):

> 1. A system for managing data stored in a distributed network, the system comprising:
>
> a data repository configured to store a data entity, wherein an identifier string identifies the data entity; and
>
> a data location server network comprising a plurality of data location servers, wherein data location information for a plurality of data entities is stored in the data location server network, at least one of the plurality of data location servers includes location information associated with the identifier string, each one of the plurality of data location servers comprises a processor and a portion of the data location information, the portion of the data location information included in a corresponding one of the data location servers is based on a hash function used to organize the data location information across the plurality of data location servers, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string.

269. But as explained above, a POSITA would understand the claimed data storing and retrieving functions could be implemented on any conventional, standard, and well-known computer or server. And like the '978 Patent, implementation is based on a vague and generic method, an undefined "hash function." But hash functions are a simple mathematical function for

Page **118**

Appx20550

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

mapping, correlating, and organizing data. And it is my understanding that abstract mathematical formulas are generally considered abstract in a 101 analysis.

270. And the Court's construction of this term confirms this understanding. In its claim construction order, the Court construed the term "based on a hash function used to organize the data location information across the plurality of data location servers . . . based on the hash function applied to the identifier string" as "the portion of the data location information included in a corresponding one of the data location servers is based on a hash function that maps identifier strings to one or more of the data location servers, and each one of the data location servers is configured to determine the at least one of the plurality of data location servers based on the hash function applied to the identifier string."[319] But as the Court's order provides, this construction broadly describes the mathematical purpose of hash functions, to map one set of data points (identifier strings) to another set of data points (data location servers).[320] And this can further be seen in the Court's construction of "hash table" as an undefined generic hashing function well-known in the art.[321] As such, it is my opinion that the '170 patent claims are also directed to a patent-ineligible concept.

271. And the '640 patent claims fair no better as they are substantively identical to the '170 patent claims. Claim 18 of the '640 patent is shown below, highlighting the same identification of generic computer components (yellow) with "computer executable code" (green):

---

[319] Dkt. No. 484.
[320] *Id.* at 24-30.
[321] Accepting the parties' construction of "hash table" as "a data structure that stores values in a table, where values are stored and retrieved by applying a hash function to an input and using the function result as an index into the table." *Id.* at 30-31.

Page **119**

Appx20551

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18. A system for retrieving data location information for data stored in a distributed network, the system comprising:

a data repository configured to store data, wherein the data is associated with an identifier string;

a client responsive to a data query to query a data location server for location information associated with the identifier string;

a data location server network comprising a plurality of data location servers, at least one of the plurality of data location servers containing location information associated with the identifier string, wherein each of the plurality of data location servers comprises computer executable code configured to execute the following steps in response to receiving a data location request from the client:

if the data location server contains the location string associated with the identification string provided in the data location request, the data location server transmits location information for use by the client to calculate a location of the data associated with the identification string;

if the data location server does not contain the location string associated with the identification string, the location server transmits a redirect message to the client, wherein the redirect message contains redirect information for use by the client to calculate a location of a different data location server in the plurality of data location servers, wherein the different data location server contains the location string.

272. Like the '170 and '978 patents, the '640 patent relies on the use of conventional, standard, and well-known computers or servers. And again, the implementation is an undefined "computer executable code" that performs the same abstract idea of storing and retrieving location based on location identifiers. The only primary difference in the '640 patent is the inclusion of a redirect message. But this is similarly abstract as a pointer to other storage locations within a storage system is a general idea that would be implemented in storage systems of varying mediums. For example, looking again at a library card catalogue, if a given item's

Page **120**

Appx20552

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

location isn't written on a particular card, there would likely be information guiding the reader to another card to inspect. As such, it is my opinion that the '640 patent claims are also directed to a patent-ineligible concept.

273. As stated before, I have been informed that when the first step is met, by showing that the asserted claims are directed to a patent-ineligible concept, a second inquiry of "inventive concept" must be performed to determine validity under 35 U.S.C. § 101. And it is my understanding that the inclusion of a conventional computer or network components is insufficient to meet the requirements of an inventive concept. And in the case of all three Asserted Patents, it is my opinion that there is no inventive concept beyond the abstract idea of storing and retrieving resources through a method of correlated identifiers.

274. As explained above, the asserted claims point to generic "servers" and "processors" capable of storing and retrieving resources. And a POSITA would understand that these claimed functions are performed in conventional, standard, and well-known computers or network components. As such, the inclusion of these generic computer and network components can't be the "inventive concepts" necessary to meet the requirements for validity under 35 U.S.C. § 101.

275. And as discussed above, the claimed data storage and retrieval methods can't be the inventive concept either. In all three instances, the patent simply states that the resource to location correlation is done by some undefined "protocol," "hash," or "code." And as explained above, a POSITA would understand that this resource to location correlation would be implemented by a well-known method, such as a hashing function. The specifications themselves

Page **121**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

acknowledge that hashing was well known in the art, referencing the "hashpjw function presented by Aho, Sethi and Ullman in their text *Compilers, Principles, Techniques and Tools*."[322]

276.    Further, as outlined above in Section II.C, inventor John Overton has admitted that many of the routine, well-understood, and conventional limitations were not inventive:

- Transport Protocols[323]

- Configuring Servers[324]

- Processors[325]

- Client-Server Relationships[326]

- Server Clusters[327]

- Database Storage[328]

- Distributed Databases[329]

- Data Queries and Responses[330]

- Location Services & Servers[331]

- Directory Services & Servers[332]

- Location Queries & Responses[333]

---

[322] '170 Patent at 15:15-19; '640 Patent at 15:1-20; '978 Patent at 17:19-40.
[323] 5/17/23 J. Overton Dep. Tr., at 684:11-13.
[324] 5/17/23 J. Overton Dep. Tr., at 687:8-11.
[325] 5/17/23 J. Overton Dep. Tr., at 686:10-12.
[326] 5/17/23 J. Overton Dep. Tr., at 686:1-9.
[327] 5/17/23 J. Overton Dep. Tr., at 696:6-11.
[328] 5/17/23 J. Overton Dep. Tr., at 724:8-10.
[329] 5/17/23 J. Overton Dep. Tr., at 670:20-671:5.
[330] 5/17/23 J. Overton Dep. Tr., at 724:17-22.
[331] 5/17/23 J. Overton Dep. Tr., at 671:17-21.
[332] 5/17/23 J. Overton Dep. Tr., at 728:12-14.
[333] 5/17/23 J. Overton Dep. Tr., at 726:15-17.

Page **122**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

- Identification Strings[334]

- Hashkeys[335]

- Hash Functions[336]

277.    And the network architecture type required to implement the Asserted Claims cannot be the inventive concept either. The patents' specifications require a hierarchical server structure to implement the claimed inventions.[337] And despite this disclosure, Kove has taken the position that only a non-hierarchical server structure is capable of implementing the Asserted Claims.[338] Further, it is my understanding that .[339] But regardless of the server structure architecture Kove claims its patents cover, it is undisputed that these server structure types were well-known and traditional in the field.[340] As such, any claimed server architecture by Kove can't be the inventive concept necessary to overcome the second step of a 35 U.S.C. § 101 analysis.

---

[334] 5/17/23 J. Overton Dep. Tr., at 725:17-19.
[335] 5/17/23 J. Overton Dep. Tr., at 726:1-14.
[336] 5/17/23 J. Overton Dep. Tr., at 725:20-22.
[337] *See, e.g.,* '640 Patent, 14:28-31, 16:14-38, 17:22-24, 17:61-18:16, 18:36-58; '170 Patent, 14:43-46, 16:32-56, 17:38-42, 18:9-30, 18:49-19:4; '978 Patent, 7:37-53; 19:38-48.
[338] *See, e.g.,* August 4, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,036 ('640 patent) at 23; August 11, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,035 ('170 patent) at 25-26; September 28, 2022 Patent Owner's Reply to Office Action in *Ex Parte* Reexamination, in Reexamination No. 90/019,034 ('978 patent) at 35-36.
[339] *See, e.g.,* 05/17/2023 J. Overton Dep. Tr. at 793:3-7.
[340] *See, e.g.,* '640 Patent, 16:15-19 ("While the NDTP server topology supported by the server redirection mechanism described above and shown in FIGS. 9(a) and 9(b) is an extremely powerful and **general scaling technique, suitable for diverse topology deployments**.")(emphasis added).

Page **123**

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

278.     As explained above, it is my opinion that the asserted claims are directed to a patent-ineligible concept and doesn't contain an inventive concept. Therefore, it is my opinion that the asserted claims are invalid under a 35 U.S.C. § 101 *Alice* analysis.

## IX.     CLAIMS 3, 6, 10, 14, 17, 23, 24, AND 30 OF THE '978 PATENT ARE INVALID FOR DOUBLE PATENTING.

279.     It is my opinion that claims 3, 6, 10, 14, 17, 23, 24, and 30 of the '978 Patent are invalid for double-patenting. It is my understanding that if a later-expiring patent is obvious in light of an earlier-expiring patent, the later-expiring patent is invalid for obviousness-type double patenting. In other words, if a later expiring patent is merely an obvious variation of an invention disclosed and claimed in the reference patent, the later expiring patent is invalid. And it is my opinion that the '978 Patent is invalid for obviousness-type double patenting. The '978 Patent is directed to the same invention as the '640 and '170 Patents and expires later.

280.     Kove asserts eight claims of the '978 Patent, claims 3, 6, 10, 14, 17, 23, 24 and 30. And it is my opinion that all eight claims are invalid for obviousness-type double patenting in view of the '640 and '170 Patents.

281.     The '640 patent application was filed on September 13, 2000, and claims priority to Patent Application No. 09/111,896, filed on July 8, 1998, and was issued with a 640-day term extension under 35 U.S.C. § 154(b). As such, it is my understanding that the '640 patent expired on April 8, 2020. The '170 patent application was filed on February 13, 2006, and is a continuation-in-part of the same Patent Application No. 09/111,896. And though it received a 749-day extension, a terminal disclaimer relative to the '640 Patent was filed. As such, it is my understanding that the '170 Patent therefore expired on the same date as the '640 Patent, on April 8, 2020. The '978 patent application was filed on June 1, 2001. It is also a continuation-in-

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | |
|---|---|
| *In re*: Reexam of U.S. Patent No. 7,233,978 | Confirmation No.: 3927 |
| Control No. 90/019,034 | Art Unit: 3992 |
| Filed: November 19, 2021 | Examiner: CAMPBELL, Joshua D. |
| For: **Method and Apparatus For Managing Location Information In a Network Separate From The Data To Which The Location Information Pertains** | Atty. Docket: |

**Patent Owner's Reply to Office Action in *Ex Parte* Reexamination**

*Mail Stop "Ex Parte* **Reexam"**
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner:

Patent Owner hereby replies to the Office Action dated June 28, 2022, issued in the above-captioned *ex parte* reexamination. The due date for reply is September 28, 2022, based on the Office's granting of a petition for an extension of time. No additional fees are believed to be necessary, however, to prevent abandonment of this reexamination, please contact the undersigned representative for payment information.

1

Appx24409

Control No. 90/019,034
Atty. Dkt. No.

network object name and network object type to attempt to identify the network object. Therefore, the network object name alone does not uniquely identify a single entity (e.g., network object). [*Id.*, *see also* Goodrich Decl., ¶¶ 30-34; 44-51].

Furthermore, ONAG queries identify all of the network objects that match a given name. [ONAG, 129]. ONAG may identify multiple network objects using a single identifier, therefore, the identifier does not uniquely identify a single entity (e.g., network object). [Goodrich Decl., ¶¶ 30-34; 44-51].

**2.    Servers in hierarchically structured networks do not "know" what's contained in other servers throughout the network**

Oracle Names depends on a *hierarchical* structure. Figure 2-1 depicts a client-server connection in Oracle Names:



Figure 2 – 1  Components of a Network Using Oracle Names with the Dynamic Discovery Option

**ONAG, Figure 2-1 (p. 32)**

Figure 2-1 of ONAG (depicted above) and Fig. 18 (reproduced below) of the '978 patent illustrate the differences between Oracle Names and the '978 patent:

33

Control No. 90/019,034
Atty. Dkt. No.



FIG. 18

While these depictions may look similar at a high level, they obscure the critical differences between ONAG and the claimed invention of the '978 patent. These differences become apparent when the "network" is examined to see *how servers and their relationships are structured*:



**Patent Owner's Figure C**

Oracle Names depends on a *hierarchical* structure where a client can only query to the node immediately "above" or "below" it in the "tree." If the queried server does not have the requested information, that server forwards the query to the next higher node and so on until it reaches the root server. The root server, if it has the desired information registered, will

34

Control No. 90/019,034
Atty. Dkt. No.

forward the request down successive nodes until it arrives at the server last known to have the information. As the example in Fig. C-4 shows, and as explained on pages 190-192 of ONAG, even a modestly sized environment with a handful of servers may take numerous iterations to return a query.[2] [Goodrich Decl., ¶¶ 52-57].

The Name Servers in ONAG's hierarchical configuration do not have any knowledge of what is stored in other Names Server in the network, beyond their direct children. [ONAG, p. 191]. If a queried server or its direct children do not have the requested information, the server knows only to forward a query to the next Names Server up the tree. *Names Servers are ignorant as to what information other Names Servers beyond their direct children may have and have no way of finding out.* This was the common and accepted configuration at the time of the invention. [Goodrich Decl., ¶¶ 52-57]. .

In contrast, independent claims 10 and 14 and dependent claim 3 of the '978 patent require networks with *non-hierarchical* (or "cluster") configurations of location servers that enable each server in the server network to *know* which location server contains the location(s)of the desired data. For example, if a queried server receives a request for the data locations associated with a particular identifier but does not have it, that server will return a message to indicating which other server in the network contains the requested information. This configuration "collapses" the hierarchical composition of Oracle Names, making it entirely different in practice and principle from what ONAG discloses. ONAG in no way teaches or suggests something so fundamentally different from the architecture of the Oracle Names system. [Goodrich Decl., ¶¶ 35-43, 52-57].

### 3. ONAG lacks the non-hierarchical cluster structure required to satisfy the requirements of independent claims 10 and 14 and dependent claim 3

Independent claims 10 and 14 and dependent claim 3 require, expressly or impliedly, a non-hierarchical cluster configuration of locations servers in a network. For example, claim 10 recites "**the plurality of location servers are arranged in a cluster topology** such that each location server contains a unique set of location information of an aggregate set of the

---

[2] ONAG cautions that a "network can have no more than five well-known Names Servers, that is, Names Servers that use the Dynamic Discovery Option." [ONAG., pp. 28, 32, 60].

Control No. 90/019,034
Atty. Dkt. No.

location information […] **programming logic stored on each of the plurality of location servers responsive to a location query** for a desired identifier to return one of a location message […] a redirect message if the queried location server does not contain location information relevant to the desired identifier, **wherein the redirect message comprises information for finding a location server having location information related to the desired identifier**." As such, claim 10 explicitly recites that the location servers are arranged in a cluster topology. Furthermore, claim 10 requires each location server be configured to transmit a redirect message comprising information to for finding a location server having location information. Therefore, these limitations require a non-hierarchical cluster configuration. [Goodrich Decl., ¶¶ 35-43, 52-57]. These limitations cannot be met in hierarchical configurations such as Names Server because *each* location server in tree-structures *do not necessarily store* information for finding the location server having the desired location information. [*Id*]. Turning off request forwarding, as taught by ONAG, does not enable servers in the Names network to meet this limitation [*see infra,* pp. 28-29 and 44-45]. [Goodrich Decl., ¶¶ 35-43, 52-57].

Claim 14's non-hierarchical configuration is embodied in the requirement that the location server must be able to receive a location query from a client and return a "**redirect message to the client** if the queried location server does not contain data location information relevant to the entity identified in the query, **the redirect message comprising information for finding a location server storing the entity identified in the query**." [Goodrich Decl., ¶¶ 35-43, 52-57]. . Similar to claim 10, these limitations cannot be met in hierarchical configurations such as Names Server because location servers in tree-structures *do not necessarily store* information for finding the location server having the desired location information. [*Id*]. Furthermore, these limitations cannot be met in hierarchical configurations such as Names Server because location servers in tree-structures do not receive a location query from a client and return a redirect message to the client. [*Id*]. Turning off request forwarding, as taught by ONAG, does not enable servers in the Names network to meet this limitation [*see infra,* pp. 28-29 and 44-45]. [Goodrich Decl., ¶¶ 35-43, 52-57].

Claims 3 contains a similar requirement that location servers in the network be capable of returning "redirect messages" where the "**redirect message** comprising information for finding a location server **known to have location information relevant to the location**

36

Control No. 90/019,034
Atty. Dkt. No.

**query**." Therefore, the redirect message indicates with specificity and certainty which data location server in the network contains the location information for the desired entity. A hierarchical configuration does not enable nodes to have such knowledge. [Goodrich Decl., ¶¶ 35-43, 52-57]. Accordingly, the redirect message limitations, as recited by claim 3, demonstrate that claim 3 recite a non-hierarchical cluster configuration. [*Id*].

ONAG does not teach or suggest the aforementioned limitations. ONAG's Figure C-4 (reproduced below) depicts the process by which a client sends a request for information to the Names Service network:



**ONAG, Figure C-4 (p. 191)**

ONAG describes the process of requesting information in a Names Service network as: "1. The client sends request to preferred Names Server in its local region (DR1). 2. The preferred Names Server in DR1 issues request for the Names Servers authoritative for the destination server (in region DR2.1). 3. The root Names Server does not have the answer (because root only knows about its direct child regions), but forwards the request to a Names Server in region DR2. 4. The receiving server in DR2 forwards the request to a Names Server in region DR2.1. 5. The name is retrieved from its authoritative Names Server in DR2.1. 6. The names Server in region DR2 caches the answer and returns it to the root. 7. The root caches the answer and returns it to the preferred Names Server in region DR1. 8. The preferred Names Server caches the answer and returns it to the client. 9. The client establishes a connection to the destination server." [*Id*].

37

Appx24445

Control No. 90/019,034
Atty. Dkt. No.

ONAG teaches that if a queried server does not have the requested information, that server forwards the request to the next server up the hierarchy until one is able resolve the request; if none can, the process errors out. [*Id.,* 190-192]. Oracle Names requires traversals up and down the hierarchical tree in order to resolve a request and return a response. [*Id*]. ONAG indicates its compatibility with DNS-based systems by disclosing:

> Many companies already have global naming standards for their PC LANs, large hosts, or mail systems. If such policies exist, you can use them as the basis for the Oracle Names naming model. Using the same structure leverages the investment in the education users already have with global names.
>
> For example, many companies with TCP/IP networks use the Domain Name Service (DNS) model for communication on the worldwide Internet. In this model, all naming models are hierarchical from a set of base domains such as:
>
> • COM - commercial organizations
>
> • EDU - educational institutions
>
> • MIL - military
>
> • ORG – organizations
>
> Individual companies are then assigned domains within which to build their naming model (for example, ACME.COM). To adapt any example in this book to the DNS Internet model, add a single high-level domain, such as COM (or other stem). For organizations which are on the Internet, and therefore already have one or more DNS domains, the sensible choice is to align their Oracle naming domains with their DNS domains.

*Id.,* 56-57.

Like DNS, Oracle Names is dependent on its network paths. Names Servers do not have any knowledge of which Names Server contains the address to the requested network service (beyond itself and its direct children) nor is anything taught about *any* (much less *every*) Names Server being configured to determine the location of the requested information. ONAG's hierarchical structure does not enable a given Names Server the ability to know or determine what is stored in every Names Server in the network. [Goodrich Decl., ¶¶ 35-43, 52-57]. ONAG's disclosures referring to disabling or turning off "name request forwarding,"

38

Control No. 90/019,034
Atty. Dkt. No.

which the Examiner points to as teaching the redirect message, as recited in independent claims 10 and 14 and dependent claim 3, are inapposite. [*Id*].

> **a)** *Setting "name request forwarding" to "off" in ONAG does not disclose the "redirect message" limitations of claims 6 and 15*

Disclosures relating to setting "name request forwarding" to "off" in ONAG neither teaches nor suggests that Names Servers are configured provide with *any* information to determine which Name Server contains the requested information. As discussed previously and more fully below (*infra*, pp. 44-45), turning off "forwarding" in Oracle Names does not somehow enable a server to know which other server in the network has the requested information. All that happens when forwarding is turned off is that the queried server, instead of forwarding the query onto the next server, simply tells the querying server what that next server is. Using Fig. C-4 above to illustrate, the client queries DR1:



If DR1 does not have the information, it forwards the query to ROOT. If ROOT does not have the information (and its direct children do not have the information) and its "forwarding" capabilities are "off," it cannot forward the query to DR2, as it otherwise would have done. Instead, ONAG teaches that ROOT returns a message to DR1 identifying DR2, which *can* have the requested information *or not*. In other words, ROOT simply tells DR1 the next server it would otherwise have queried had its forwarding not been turned off. DR2 may or may not have the requested information – ROOT has no way of knowing. Because ROOT does not know one way or another, the Oracle system does not meet the knowledge requirement of the claims.

39

Control No. 90/019,034
Atty. Dkt. No.

In order to satisfy the requirements of independent claims 10 and 14 and dependent claim 3, Names Service would have to abandon its "tree" composition that is the center of its organizational structure in favor of a non-hierarchical one where any given server is able to return either the requested information or information useable by the client to locate the server with the requested information. Nothing in ONAG states or suggests that such elimination of hierarchical structures would be desirable. [Goodrich Decl., ¶¶ 35-43, 52-57].

### F. ONAG and OracleSG do not render claims 1 and 31 obvious

#### 1. Claim 1

For ease of reference, claim 1 is reproduced below:

> **[1.pre]** A system having a plurality of location servers for managing location information and providing location information to location queries, the system comprising:
>
> **[1.a]** a first location server containing a first set of location information corresponding to at least one entity, the location information comprising an identifier and at least one location string associated with the identifier,
>
> **[1.b]** wherein the identifier identifies an entity and the location string specifies a location of data pertaining to the entity
>
> **[1.c]** a second location server comprising a second set of location information, wherein at least a portion of the second set of location information differs from the first set of location information; and
>
> **[1.d]** programming logic stored on each of the location servers responsive to a location query identifying a desired entity to return a location message,
>
> **[1.e]** the location message comprising at least one location of data pertaining to the desired entity, if the location server receiving the location query contains location information for the desired entity.

##### a) The combination of ONAG and Oracle SG do not teach or suggest an "identifier" that uniquely identifies a single entity, as required by claim 1

40

Appx24448

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | |
|---|---|
| *In re*: Reexam of U.S. Patent No. 7,233,978 | Confirmation No.: 3927 |
| Control No. 90/019,034 | Art Unit: 3992 |
| Filed: November 19, 2021 | Examiner: CAMPBELLK, Joshua D. |
| For: **Method and Apparatus For Managing Location Information In a Network Separate From The Data To Which The Location Information Pertains** | Atty. Docket: |

# DECLARATION OF MICHAEL T. GOODRICH, PH.D.

For example, many companies with TCP/IP networks use the Domain Name Service (DNS) model for communication on the worldwide Internet. In this model, all naming models are hierarchical from a set of base domains such as:

- COM – commercial organizations

- EDU – educational institutions

- MIL – military

- ORG – organizations

Individual companies are then assigned domains within which to build their naming model (for example, ACME.COM). To adapt any example in this book to the DNS Internet model, add a single high-level domain, such as COM (or other stem). For organizations which are on the Internet, and therefore already have one or more DNS domains, the sensible choice is to align their Oracle naming domains with their DNS domains.

(Oracle Admin, 56-57).

55. In this regard, ONAG describes a system that is built on top of DNS or Names Service. Like DNS or Names Service, ONAG relies on traversing network paths and relationships organized in a hierarchical tree structure.

56. Oracle Admin's hierarchical configuration is foundationally different from the non-hierarchical cluster configuration required by claims 3, 10, and 14. An important distinction is that, unlike the non-hierarchical cluster configuration required by claims 3, 10, and 14, the Names Servers in Oracle Admin's hierarchical structure does not allow for data location information to be portioned and organized across the Names Servers based on a hash function. Furthermore, Oracle Admin's hierarchical structure does not enable each and every Names Server to be configured to determine the location of the requested location information (e.g., the specific data location server storing the location information).

57. Another important distinction is, unlike the non-hierarchical cluster configuration required by claims 3, 10, and 14, ONAG Names Servers do not have information about what is

17

stored by other Names Server in the hierarchy outside of their direct children. Therefore, ONAG Names Servers cannot determine with certainty which Names Server stores the requested location information. For instance, as excerpted above, the "**root only knows about its direct child regions**." Oracle Names Servers are also not configured to transmit such information directly back to the client.

## IX. A PERSON OF ORDINARY SKILL IN THE ART (POSITA) WOULD NOT BE MOTIVATED TO MODIFY ONAG WITH ORACLESG TO SATISFY THE REQUIREMENTS OF CLAIMS 1 AND 31

58. It is my opinion a POSITA would not turn to Oracle Admin and/or OracleSG to achieve the requirements of claims 1 and 31. As stated above, claims 1 and 31 recite the term "identifier." The location queries claimed in claims 1 and 31 include, expressly or impliedly, identifiers identifying entities. Furthermore, the term "identifier" is construed as uniquely identifying a *single* entity.

59. As further stated above, ONAG does not teach or suggest an "identifier" that *uniquely* identifies a *single* entity.

60. OracleSG also does not teach or suggest an "identifier" that uniquely identifies a single entity. OracleSG further discloses "synonyms," but these "are merely alternative names for tables." (OracleSG at p. 181). OracleSG teaches that "synonyms" can be public or private; hence, synonyms are not disclosed in OracleSG as being unique identifiers. Indeed, by disclosing the synonyms may be "private or public", and given an example using non-unique synonyms, a POSITA would understand that synonyms will, in general, not be unique identifiers, since individual user's private synonyms with the same name can refer to different tables. (OracleSG, 189). That is, the same synonym may be associated with the multiple databases,

18

tables, or views. (*Id*). Therefore, the synonym is not unique to the database, table, or view. (OracleSG, 189).

61. As an initial matter, in my opinion, a POSITA would not be motivated or find it obvious to modify ONAG with OracleSG to achieve the limitations of claims 1 and 31 because OracleSG is deficient for the same reasons as ONAG.

62. Furthermore, in my opinion, a POSA would not be motivated or find it obvious to modify ONAG and/or OracleSG to use identifiers that uniquely identify a single entity because ONAG and/or OracleSG use private or public names or links for network objects differently than the '978 patent uses identifiers. In contrast to the '978 patent, which uses identifiers to locate the data distributed in a network, ONAG and/or OracleSG allow for users to create public or private names or links for individual network objects so that the respective users may locate the respective network objects based on their personal needs and requirements. (*See e.g.,* ONAG, 54, 100, 110, 128-129; OracleSG, 189-190).

63. For example, a corporation implementing ONAG and/or OracleSG may have multiple departments, including Human Resources (HR) and Tax. The users of the HR department may need to readily locate an employees database including HR information and the users of the Tax department may need to readily locate a different employees database including tax information. In this scenario, the HR department may assign the employees database including HR information the name or link "Employees" and the Tax department may also assign the employees database including tax information the name or link "Employees."

64. ONAG and/or OracleSG teaches that both departments may use the same name to point to different databases because it allows both departments to access their respective databases using the name or link. ONAG and/or OracleSG allow the same name or link to point

19

to different network objects because ONAG and/or OracleSG do not use the network object's name or link to uniquely identify the network object. Rather, ONAG and/or use a combination of multiple parameters, including a network object name or link, type of network object, user information, etc., when attempting to identify and locate the network object. (*See e.g.,* ONAG, 54, 100, 110, 128-129; OracleSG, 181, 189-190).

65.     Therefore, a POSITA would not find it obvious or be motivated to modify ONAG and/or OracleSG to use identifiers that uniquely identify a single entity because doing so would prevent users of ONAG and/or OracleSG from using the private or public names or links as intended by ONAG and/or OracleSG.

66.     Moreover, a POSITA would not have had reasonable expectation of success to modify ONAG with OracleSG to meet the claim requirements of claims 1 and/or 31. As stated above, ONAG and OracleSG allow users to assign public or private names or links to network objects. (*See e.g.,* ONAG, 54, 100, 110, 128-129; OracleSG, 181, 189-190). ONAG and/or OracleSG do not prevent the use of non-unique names or links for different network objects.

67.     Modifying ONAG and/or OracleSG to impose a restriction of an identifier uniquely identifying a single entity would involve changing the functionality of public and private names or links, as provided by ONAG and/or OracleSG. In this regard, using identifiers that uniquely identify a single entity would require substantially reconstructing ONAG and/or OracleSG such that the same private and public names or links are restricted from being used for two different network objects. Therefore, in my opinion, a POSITA would not have had reasonable expectation of success to modify ONAG with OracleSG to meet the claim requirements of claims 1 and/or 31.

68.     Furthermore, in my opinion, modifying ONAG and/or OracleSG to use identifiers

20

Appx24648

that uniquely identify a single entity would change the principle operation underpinning ONAG and/or OracleSG.

69. As described above, ONAG and/or OracleSG use private or public names or links to allow users to assign names or links to network objects based on the users' personal needs or requirements. This allows users' to readily locate a single network object using the private or public names or links. Therefore, requiring identifiers to uniquely identify a single network object would prevent users using ONAG and/or OracleSG from assigning any name or link based on their needs or requirements. As such, imposing such a restriction would change the principle operation underpinning ONAG and/or OracleSG.

## X.  A PERSON OF ORDINARY SKILL IN THE ART (POSITA) WOULD NOT BE MOTIVATED TO MODIFY ONAG WITH ORACLESG AND/OR MCGARVEY TO SATISFY THE REQUIREMENTS OF CLAIMS 3, 10, and 14

70. In my opinion, a POSITA would not be motivated or find it obvious to modify ONAG with OracleSG to satisfy the requirements of the term "identifier," as recited in claims 10 and 14, based on the reasons stated above. McGarvey is not relied upon and does not teach or suggest an "identifier" that uniquely identifies a single entity.

71. Furthermore, as stated above, claims 3, 10, and 14 require that the location servers are arranged in a non-hierarchical cluster configuration.

72. At the time of the invention of the '978 patent, conventional distributed data collection systems implemented DNS or Names Service systems, which rely on hierarchical structures. ONAG is similar to DNS, and as described in Oracle Admin, borrows the DNS system to allow clients to search for network addresses of network services. (*See e.g.,* Oracle Admin, 56-57 and 190-192).

21

73. ONAG's disclosures reflect the prevailing view at the time of the invention that hierarchical, tree-like data structures were necessary to manage the storage and retrieval of large quantities of data. *See, e.g.,* ONAG at p. 56 (highlighting added):

> For example, many companies with TCP/IP networks use the Domain Name Service (DNS) model for communication on the worldwide Internet. In this model, all naming models are hierarchical from a set of base domains such as:
>   • COM - commercial organizations
>   • EDU - educational institutions
>   • MIL - military
>   • ORG – organizations

74. In one instance, ONAG expressly discouraged the use of "flat" structures in situations where the number of services is not small (e.g., greater than 100) and the "likelihood of future growth of network services" is not minimal. (Oracle Admin., p. 40).

75. ONAG does not contemplate a non-hierarchical cluster configurations that allow for the aforementioned features of claims 3, 10, and 14. OracleSG and Rajani do not either.

76. OracleSG is not useful in motivating a POSITA to arrive at the claims of the '978 patent. OracleSG "focuses on the job of a database administrator" ("DBA") and describes the functions of Oracle Products "as background material to understand how to deal with problems and why things work the way they do." OracleSG at p. 19. OracleSG recommends using "Oracle Network Manager" to generate the network configuration files for SQL*Net version 2, but rather than disclosing a tool to perform a "translation between the easy names and the exact server", OracleSG teaches that this burden "falls on the DBA". (OracleSG, 86-87). A POSITA would understand that this is a high-level characterization of part of the job description of a DBA, not a motivation to combine Oracle tools.

22

77. Claim 10 explicitly requires that the location servers are arranged in a cluster configuration. Claim 10 further requires that each location server be configured to transmit a redirect message and the redirect message include information to find the location server having the desired location information. In this regard, in my opinion, claim 10 requires that information is used to find the location server having with the desired location information with certainty.

78. Claim 14 requires that each location server be configured to transmit a redirect message to a client. Like claim 10, the redirect message includes information to find the location server having the desired location information. As such, in my opinion, claim 14 requires that information is used to find the location server having with the desired location information with certainty.

79. Claim 3 requires that requires that each location server be configured to transmit a redirect message. The redirect message includes information for finding the location server *known* to have the desired location information. As such, claim 3 requires that the information allow for finding the location server known to have the desired location information with specificity and certainty.

80. ONAG does not teach or suggest a redirect message that includes information that can be used to determine with specificity or certainty the Names Server that contains the requested location information.

81. Oracle Admin's "turning forwarding off" feature does not allow a Names Server to determine the location server that contains the requested location information. Rather, ONAG indicates that forwarding can be turned off for a Names Server. (Oracle Admin, 190-192). If that Names Server is queried, the queried Names Server returns information about the next

23

Appx24651

Names Server that *can* handle the query. (Oracle Admin, 190-192). The queried Names Server does not know with any certainty which Names Server contains the requested location information. (Oracle Admin, 190-192).

82. Oracle Admin's hierarchical structure discourages such an implementation. In a hierarchical structure like Oracle Admin, each node contains address information about its parent and child nodes. The nodes do not know what information is *stored* in the other nodes in the network outside of its direct children. The hierarchical structure requires traversing up and down the hierarchical-tree to retrieve the requested location information. *See, e.g.,* Oracle Admin., 190-192 (the "root only knows about its direct child regions" and queries have to traverse a path in the tree hierarchy).

83. ONAG does not enable clients to redirect queries and does not teach or suggest transmitting a redirect message to a client. For example, ONAG states, "If FORWARDING_AVAILABLE is set to off, any clients who rely directly on that Names Server will be unable to resolve foreign names. *Clients are not capable of redirecting their requests as Names Servers would.* Their requests will fail at that point, even if other Names Servers are listed in the NAMES.PREFERRED_SERVERS configuration parameter." (*Id.,* 137) (emphasis added). Therefore, ONAG limits the client's capabilities to transmitting a names resolution request, receiving a network address for a network service from a Names Server, and connecting to the network service using the network address. (*See e.g.,* Oracle Admin, 30-32, 52-54, 190-192). As such, a POSITA would not understand ONAG to teach allowing clients to receive redirect messages, as required by claim 14.

84. Furthermore, a POSITA would understand that *each* Names Server is not configured to transmit a redirect message because ONAG prevents clients from redirecting its

24

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| *In re*: Reexam of U.S. Patent No. 7,814,170 | Confirmation No.: 7078 |
| Control No. 90/019,035 | Art Unit: 3992 |
| Filed: November 19, 2021 | Examiner: WASSUM, Luke S. |
| For: **Network Distributed Tracking Wire Transfer Protocol** | Atty. Docket: KOVE-170EPR035 |

# DECLARATION OF MICHAEL T. GOODRICH, PH.D.

proceeding because the claims are expired.

25. Furthermore, it is my understanding that the parties in the co-pending litigation, who are the Patent Owner and the requestor that requested reexamination, have agreed on the constructions of certain claim terms (*see* NPL 42 in an Information Disclosure Statement (IDS) filed July 12, 2022), and the Court in the Northern District of Illinois overseeing the litigation has issued a claim construction Order regarding other terms (*Id.*, NPL 43).

26. I have reviewed these claim constructions and have been asked to adopt them in rendering my opinions in this Declaration.

27. As recited by the plain language of claims 1, 6, and 15 and their dependent claims, and in light of the various relationships set forth in their respective claim constructions, the terms "data," "entity," "location," "location information," and "identifier string" are distinct from one another. (*See e.g.*, NPL42; NPL43; '170 patent, 2:17-21; 17:6-11; and 20:17-21).

## VI.   CLAIMS 1, 6, and 15

28. It is my opinion that a POSITA at the time of this invention would understand claims 1, 6, and 15, through various limitations in each of the claims, to require a non-hierarchical cluster configuration as taught by the '170 patent.

29. Specifically, claim 1 recites "**each one of the plurality of data location servers** comprises […] a portion of the data location information [for a plurality of entities]." Claim 1 also recites "**each one of the data location servers is configured to determine** the at least one of the plurality of data location servers [that contains the location information associated with the identifier string] based on the hash function applied to the identifier string."

30. A POSITA at the time of this invention would understand the aforementioned limitations of claim 1 connotes a non-hierarchical cluster configuration as taught by the '170 patent. (*See*

9

*e.g.*, '170 patent, 16:21-31; 18:9-21). One reason for this understanding is that a hash function necessarily organizes data in a non-hierarchical manner. For example, a POSITA would understand that determining a server based on a hash function, as shown, *e.g.*, in the '170 Patent at 15:12-36, is a non-hierarchical, clustering approach, since the determination is based on the value of a pseudo-random function, not a tree hierarchy. Indeed, the '170 Patent discloses a hash-function embodiment at 15:4-16:30 and then distinguishes this from a hierarchical server topology, stating, "While the NDTP server topology supported by the server redirection mechanism described above and shown in FIGS. 9(a) and 9(b) is an extremely powerful and general scaling technique, suitable for diverse topology deployments, some applications might still benefit from a specifically hierarchical server topology." *Id.* at 16:33-38. Another reason is that requiring every location server in the server network be configured to determine which server contains the sought after location information connotes a flat, non-hierarchical structure, where every server is similarly capable of identifying the server with the requested information, thus obviating the need for any hierarchy. *See, e.g., id.* at 16:21-27 (which expressly discloses an embodiment of "The NDTP server redirection mechanism" based on "server clusters" to "the identifier string hash function").

31. Claim 6 recites a "redirect message compris[es] a list of at least one other location server *known* to have the location information for the desired entity." Claim 15 includes a similar requirement that "the redirect message identifying which of the plurality of location servers includes the location information." Therefore, the redirect message, as recited by claims 6 and 15, must contain information identifying with specificity and certainty which data location server in the network contains the location information for the desired entity. A

10

hierarchical structure does not enable its nodes to have any such knowledge. For example, see the '170 Patent at 16:21-27 (which expressly discloses an embodiment of "The NDTP server redirection mechanism" based on "server clusters" to "the identifier string hash function"). Further, a POSITA would be aware that hierarchical server configurations do not, in general, allow a server to perform an immediate redirection to another server known to contain specific information (such as the location information for a given identifier). For instance, as shown in the hierarchical organization shown in Fig. C-4 of the Oracle Admin reference, the DR1 node is three hops away from the DR2.1 node; hence, it has no immediate knowledge of what is stored at the DR2.1 node.



Oracle Admin., Fig. C-4

32. Oracle Admin teaches that nodes in the Names Server hierarchical structure only have knowledge of their direct children. (Oracle Admin, p. 151, 191). This limited knowledge does not allow any server in the Names Server network to have information that identifies with specificity which other server contains the desired location information. *See, e.g.,* my summary of Oracle Names below.

33. Therefore, a POSITA at the time of this invention would understand that the "redirect

11

"message" limitations of claims 6 and 15, in view of the specification's disclosures, claim a non-hierarchical cluster network configuration as taught by the '170 patent. (*See e.g.,* '170 patent, 16:21-31; 18:9-21).

## VII.  ORACLE NAMES

34. Oracle Admin discloses a fundamentally different configuration than the '170 patent.

35. Specifically, Oracle Admin describes the Oracle Names system.  Oracle Names allows for assigning aliases to network services in a network.  (Oracle Admin, 30-32; 52-54).  A client device may query a Names Server for the network address of a network service using the network service's alias.  (*Id.*)

36. Oracle Admin relies on a hierarchical structure where any given node only knows about its direct children, such that requests and responses can only be made between nodes immediately "above" or "below."  (Oracle Admin, 190-192).  Figure C-4 depicts an example of an Oracle Names network:



37. Oracle Admin provides the following description of how a request is sent and information is returned in a Names system: "1.  The client sends request to preferred Names Server in its local region (DR1).  2.  The preferred Names Server in DR1 issues request for the Names

12

Servers authoritative for the destination server (in region DR2.1). 3. The root Names Server does not have the answer (**because root only knows about its direct child regions**), but forwards the request to a Names Server in region DR2. 4. The receiving server in DR2 forwards the request to a Names Server in region DR2.1. 5. The name is retrieved from its authoritative Names Server in DR2.1. 6. The names Server in region DR2 caches the answer and returns it to the root. 7. The root caches the answer and returns it to the preferred Names Server in region DR1. 8. The preferred Names Server caches the answer and returns it to the client. 9. The client establishes a connection to the destination server." (Oracle Admin, 191, emphasis added).

38. Oracle Admin describes a configuration that is akin to conventional Domain Names Service (DNS) or Names Service systems. In fact, Oracle Admin touts its compatibility with DNS by disclosing:

> Many companies already have global naming standards for their PC LANs, large hosts, or mail systems. If such policies exist, you can use them as the basis for the Oracle Names naming model. Using the same structure leverages the investment in the education users already have with global names.
>
> For example, many companies with TCP/IP networks use the Domain Name Service (DNS) model for communication on the worldwide Internet. In this model, all naming models are hierarchical from a set of base domains such as:
>
> • COM – commercial organizations
>
> • EDU – educational institutions
>
> • MIL – military
>
> • ORG – organizations
>
> Individual companies are then assigned domains within which to build their naming model (for example, ACME.COM). To adapt any example in this book to the DNS Internet model, add a single high-level domain, such as COM (or other stem). For organizations which are on the Internet, and therefore already have one or more DNS domains, the sensible choice is to align their Oracle naming domains with their DNS domains.

13

(Oracle Admin, 56-57).

39. In this regard, Oracle Admin describes a system that is built on top of DNS or Names Service. Like DNS or Names Service, Oracle Admin relies on traversing network paths and relationships organized in a hierarchical tree structure.

40. Oracle Admin's hierarchical configuration is foundationally different from the non-hierarchical cluster configuration required by claims 1, 6, and 15. An important distinction is that, unlike the non-hierarchical cluster configuration required by claim 1 its dependent claims, the Names Servers in Oracle Admin's hierarchical structure does not allow for data location information to be portioned and organized across the Names Servers based on a hash function. Furthermore, Oracle Admin's hierarchical structure does not enable each and every Names Server to be configured to determine the location of the requested location information (e.g., the specific data location server storing the location information).

41. Another important distinction is, unlike the non-hierarchical cluster configuration required by claims 6 and 15 and their dependent claims, Oracle Admin Names Servers do not have information about what is stored by other Names Server in the hierarchy outside of their direct children. Therefore, Oracle Admin Names Servers cannot determine with certainty which Names Server stores the requested location information. For instance, as excerpted above, the "**root only knows about its direct child regions**." Oracle Names Servers are also not configured to transmit such information directly back to the client.

## VIII. A PERSON OF ORDINARY SKILL IN THE ART (POSITA) WOULD NOT BE MOTIVATED TO MODIFY ORACLE ADMIN WITH ORACLESG, MCGARVEY, AND/OR RAJANI

### A. Claim 1

42. It is my opinion a POSITA would not turn to Oracle Admin, OracleSG, and Rajani to achieve

14

**IN THE UNITED STATES PATENT AND TRADEMARK OFFICE**

| | |
|---|---|
| *In re*: Reexam of U.S. Patent No. 7,233,978 | Confirmation No.: 3927 |
| Control No. 90/019,034 | Art Unit: 3992 |
| Filed: November 19, 2021 | Examiner: CAMPBELL, Joshua D. |
| For: **Method and Apparatus For Managing Location Information In a Network Separate From The Data To Which The Location Information Pertains** | Atty. Docket: |

**Patent Owner's Reply to Office Action in *Ex Parte* Reexamination**

***Mail Stop "Ex Parte* Reexam*"***
Attn: Central Reexamination Unit
Commissioner for Patents
P.O. Box 1450
Alexandria, VA 22313-1450

Commissioner:

Patent Owner hereby replies to the Office Action dated June 28, 2022, issued in the above-captioned *ex parte* reexamination. The due date for reply is September 28, 2022, based on the Office's granting of a petition for an extension of time. No additional fees are believed to be necessary, however, to prevent abandonment of this reexamination, please contact the undersigned representative for payment information.

1

Appx25177

Control No. 90/019,034
Atty. Dkt. No.

Lewis and Grimshaw at § 1, 2, 6 (7/12/2022 IDS, NPL cite no. 9); "Consistent Hashing and Random Trees: Distributed Caching Protocols for Relieving Hot Spots on the World Wide Web" by Karger et al. at § 1 (7/12/2022 IDS, NPL cite no. 7); "Load Management in Distributed Video Servers" by Venkatasubramanian and Ramanathan at §§ 1.1 (7/12/2022 IDS, NPL cite no. 16); "Distributed Web Caching System with Consistent Hashing" by Sherman at Abstract, §§ 1.1-1.2 (7/12/2022 IDS, NPL cite no. 13); "Web Caching with Consistent Hashing" by Karger, Sherman, et al. at Abstract, § 1 (7/12/2022 IDS, NPL cite no. 8); "Locating Copies of Objects Using the Domain Name System" by Kangasharju et al. at Abstract, § 1 (7/12/2022 IDS, NPL cite no. 6); "Resource Location in Very Large Networks" by Partha Dasgupta at §§ 3.4, 3.5 (7/12/2022 IDS, NPL cite no. 17); Dynamic Load Balancing on Web-server Systems by Valeria Cardellini et al., IEEE Internal Computing, vol. 3, no. 3, pp. 28-39 at § 1, 2, 4 (7/12/2022 IDS, NPL cite no. 3); "Distributed cooperative Web servers" by Baker and Moon at Abstract, § 1, 2 (7/12/2022 IDS, NPL cite no. 1); Paul Albitz and Cricket Liu, DNS and BIND, O'Reilly & Associates, Inc., 3rd ed. 1998 at Preface, § 1 7/12/2022 IDS, NPL cite no. 18, which was mistakenly identified as "Dasgupta" in the SB-08, but was submitted to the Office with the IDS); U.S. Patent No. 6,212,521 to Minami at 1:37-3:35 (7/12/2022 IDS, U.S. Pat. cite no. 8); U.S. Patent No. 6,430,618 to Karger at 1:31-6:19 (7/12/2022 IDS, U.S. Pat. cite no. 11); U.S. Patent No. 6,553,420 to Karger at 1:36-6:26 (7/12/2022 IDS, U.S. Pat. cite no. 20); U.S. Patent No. 6,807,632 to Carpentier at 1:22-4:23(7/12/2022 IDS, U.S. Pat. cite no. 19).

Much has also been written about the unlikelihood of the inventions of the asserted claims. *See, e.g., Resource Location in Very Large Networks* by Partha Dasgupta ("Dasgupta") §§ 3.4, 3.5 (*see* 7/12/2022 IDS, NPL cite no. 17). Dasgupta observed that "[w]hile such networks" as the Internet and telephone systems "are quite common, what is not so common is completely scalable, non-hierarchical naming that is independent of the entities location or affiliations." *Id*. at 156 (Abstract). According to Dasgupta, this problem "has been studied in many contexts," but "most results are not scalable for really large worldwide networks." *Id*. For example, Dasgupta discusses known technologies, such as "The Domaine Name System (DNS)," "Amoeba," "The V System," "Clouds," "Locus," "Clearinghouse," and "Galaxy," but finds them limited in terms of scalability because they rely on hierarchical naming. *Id*. at 157-158. While Dasgupta advocates for a non-hierarchical naming system to achieve "a scalable

75

name service" and suggests that such solutions "may actually be implementable (or desirable)," Dasgupta observes that "[t]he bad news is that we have been unable to come up with a straightforward algorithmic solution to this problem, that is scalable and fault tolerant and works with feasible complexity." *Id*. at 159. Dasgupta initially posits that "such a algorithmic solution indeed may not exist." *Id*. Dasgupta ultimately concludes that "[t]here is no straightforward solution" and proffers only a "workable" solution with "plenty of room for improvement." *Id*. at 162.

### 3. Commercial success

Entities, including AWS, use the asserted claims in products accused of infringing claims 17, 18, and 24, like Amazon Web Services DynamoDB, and have had substantial commercial success. For example, DynamoDB customers include companies with extremely large-scale data storage and data management needs, including household names like Netflix (video entertainment streaming), Zoom (video conferencing platform), Disney (Disney+ video entertainment streaming), Dropbox (cloud-based data storage), Snap Inc. (Snapchat messaging ap), CapitalOne (mobile banking apps), Amazon (workflow engines for order fulfillment), and many others. Exhibit C (https://aws.amazon.com/dynamodb/customers/). Entities have written that "[m]any of the world's fast-growing enterprises use Amazon's DynamoDB service to manage their big data," including "[e]nterprises such as Airbnb, Toyota, Capital One, and many more." Exhibit D (https://www.contino.io/insights/aws-dynamodb). Reasons for this significant commercial success include "DynamoDB's cost-effective, high performance, throughput, lower latency, and reduced cost of ownership." *Id*. DynamoDB is regarded as "one of the most popular cloud-based NoSQL database services," which "provides reliable, scalable, and highly available databases to users with millisecond range latency at any scale." Exhibit E (https://dynobase.dev/dynamodb-use-cases/). DynamoDB is said to be popular in (and has "revolutionized") a wide range of industry segments (described as "most industries worldwide"), including the "Gaming Industry" (e.g., improving multiplayer gaming), "Transportation Industry" (e.g., improving vehicle tracking), "Entertainment Industry" (e.g., improving customization of user experience), "Social Media Industry" (e.g., improving ability to feed information in real time), and "Retail Industry" (e.g., improving resiliency and persistence of shopping experience). *Id*. AWS boasts that "DynamoDB is popular with developers building serverless applications." Exhibit F (https://aws.amazon.com/getting-

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Kove IO, Inc., | Civil Action No. 1:18-cv-08175 |
| Plaintiff, | Hon. Matthew F. Kennelly |
| v. | Jury Trial Demanded |
| Amazon Web Services, Inc., | |
| Defendant. | |

**PLAINTIFF KOVE IO, INC.'S LR 56.1(b)(3) STATEMENT OF ADDITIONAL
MATERIAL FACTS IN SUPPORT OF PLAINTIFF'S OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Under Federal Rule of Civil Procedure 56 and Local Rule 56.1(b)(3), Plaintiff Kove IO, Inc. ("Kove") submits the following Additional Statement of Material Facts in support of Kove's Opposition to Defendant's Motion for Summary Judgment.

## Claim Construction

1. All challenged claims of the '640 and '170 patents were subjected to substantive reexamination, and the Patent Office issued Office Actions in each reexam, identifying the prior art and reasons why the Office believed the art rendered the claims unpatentable. Ex. 130 (90019035_2022-05-11_NFOA); Ex. K133 (90019036_2022-05-04_NFOA).

2. Kove responded to the Office Actions, detailing why the claims are distinguishable from the prior art, Ex. K131 (90019035_2022-08-11_Response); Ex. K134 (90019036_2022-08-04_Response), and the PTO agreed and upheld the patentability of all claims.

Appx25411

(2023-07-06 EX. D to Opening Expert Report of Goodrich); Ex. K54 ¶¶ 113-118, 141, 159, 187, 234, 261, 300, 324, 349 (2023-07-06 EX. E to Opening Expert Report of Goodrich).

26. As for ▇▇▇, Kove does not allege that they are location servers in claims with non-hierarchical structures, *see* Ex. K53 ¶¶ 77, 111, 207, (2023-07-06 EX. D to Opening Expert Report of Goodrich), and Kove only maps ▇▇▇ to the "location server" for claims 17, 23, 24, and 30 of the '978 patent, which Kove contends encompass both hierarchical and non-hierarchical structures. Ex. K53 ¶¶ 127, 131, (2023-07-06 EX. D to Opening Expert Report of Goodrich).

27. Grama's infringement rebuttal report provides, for the first time, that the accused products do not infringe because ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Ex. K59 ¶¶ 336-337 (2023-08-18 Grama Expert Report), and his only support for his ▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇, Ex. K59 ¶ 336, n397 (2023-08-18 Grama Expert Report) ((citing AWS_SRC_CODE_000000157)), which was not included in AWS's non-infringement contentions, , which do not disclose this theory, ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇ and do not cite the source code AWS now relies on. *Compare* Ex. K158 (2023-03-21 AWS 2nd Amended Final Non-Infringement Contentions (DDB excerpt)) with Ex. K59 ¶ 336-337 (2023-08-18 Grama Expert Report (advancing new theory)).

28. Goodrich explains in his report that the person of ordinary skill in the art would understand the alleged location servers in S3 and DDB — ▇▇▇▇▇▇▇▇▇▇▇, respectively — to be non-hierarchical:





Ex. K53 ¶ 121 (2023-07-06 EX. D to Opening Expert Report of Goodrich); *see also id.* at ¶¶ 118-123.



Ex. K54 ¶ 116 (2023-07-06 EX. E to Opening Expert Report of Goodrich); *see also id.* at ¶¶ 113-118; *id.* at ¶¶ 82, 109, 121, 131, 146, 165, 191, 195, 199 (identifying ████████ as location servers in each asserted claim), and Dr. Grama does not dispute his reasoning. *See* Ex. K59 ¶¶ 329-339, 349-364 (2023-08-18 Grama Expert Report).

MATERIAL SUBJECT TO PROTECTIVE ORDER REDACTED

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| KOVE IO, INC., <br><br> *Plaintiff,* <br><br> v. <br><br> AMAZON WEB SERVICES, INC., <br><br> *Defendant.* | Case No. 1:18-cv-8175 <br><br> ███████████ |

**AMAZON'S REPLY IN FURTHER SUPPORT OF MOTION
FOR SUMMARY JUDGMENT AND RESPONSE TO
KOVE'S MOTION FOR SUMMARY JUDGMENT**

Alan M. Fisch
*alan.fisch@fischllp.com*
R. William Sigler
*bill.sigler@fischllp.com*
Jeffrey M. Saltman *(pro hac vice)*
*jeffrey.saltman@fischllp.com*
Lisa N. Phillips *(pro hac vice)*
*lisa.phillips@fischllp.com*
FISCH SIGLER LLP
5301 Wisconsin Avenue NW, Suite 400
Washington, D.C. 20015
202.362.3500

*Attorneys for Amazon Web Services, Inc.*

Appx25468

**TABLE OF CONTENTS**

ARGUMENT IN FURTHER SUPPORT OF AMAZON'S MOTION ......................................... 1

I.  Kove's Disclaimers Continue to Warrant Summary Judgment of Non-Infringement of All 17 Asserted Claims. ....................................................................... 3

    A.  Kove Confirms That Construing the Asserted Claims as Amazon Requested Would Be Substantively Correct and Helpful to the Jury. ................. 3

    B.  Construing the Asserted Claims as Amazon Requested Is Necessary to Hold Kove to Its Disclaimers. .............................................................. 5

    C.  Kove's Argument That Disclaimers Could Only Apply to 12 of 17 Asserted Claims Contradicts the Undisputed Facts Kove Admitted. .................. 8

    D.  Kove's Arguments Based on a Chart of Proposed Constructions That Amazon Served a Year Ago Lack Merit. ............................................. 13

    E.  Kove Fails to Raise a Dispute of Material Fact on Whether S3 and DDB Employ the Required "Non-Hierarchical" Configuration. ............................... 17

II.  Summary Judgment of Non-Infringement Remains Warranted Under the Current Constructions. ................................................................................. 22

    A.  S3 Doesn't Infringe Under the Current Constructions. ................................. 22

    B.  DDB Doesn't Infringe Under the Current Constructions. .............................. 26

III.  Kove's Response Confirms That Summary Judgment on Both Willfulness and Enhanced Damages Is Warranted. ....................................................... 29

    A.  Pre-Suit Willfulness ...................................................................... 29

        1.  Kove's Response Ignores the Case Law Amazon Cited, Further Confirming There's No Genuine Dispute of Material Fact Here. ............ 30

        2.  Kove Cites No Evidence Raising a Genuine Dispute of Material Fact on Knowledge of the Patents. ........................................... 32

        3.  Kove's "Head in the Sand" Theory Fails to Raise a Dispute of Material Fact on Knowledge of Infringement. ......................................... 34

        4.  Kove's Cited Cases Are Inapposite. ............................................. 36

    B.  Post-Complaint Willfulness ............................................................. 37

        1.  Kove Doesn't Acknowledge, Much Less Respond to, Any of Amazon's Arguments on Post-Complaint Willfulness. ........................... 37

        2.  Kove's Cited Cases Are Inapposite. ............................................. 39

ii

C.     Kove Waived Any Opposition to Amazon's Request for Summary Judgment on § 284 Enhanced Damages. .......................................................... 41

OPPOSITION TO KOVE'S CROSS MOTION FOR SUMMARY JUDGMENT ..................... 43

I.     Developments in the Record Justify Further Consideration of the Asserted Claims' Eligibility. ..................................................................................................... 43

II.     Issues of Material Fact Preclude Summary Judgment on Equitable Estoppel, Waiver, and Inequitable Conduct. .................................................................. 46

      A.     Equitable Estoppel and Waiver .......................................................... 47

      B.     Inequitable Conduct ............................................................................ 48

III.     Mr. Greene's Double Patenting Opinions Are Admissible and Summary Judgment on Double Patenting Is Inappropriate. ........................................... 50

IV.     Each Reference Mr. Greene Relies on Is Prior Art and Summary Judgment of Validity Is Inappropriate. .............................................................................. 54

CONCLUSION .......................................................................................................................... 60

iii

such damages under *Halo*. Accordingly, Kove has waived its opposition to Amazon request for summary judgment on § 284 enhanced damages. And Amazon is entitled to summary judgment on that issue, independent of any decision or verdict on willfulness.

<u>**OPPOSITION TO KOVE'S CROSS MOTION FOR SUMMARY JUDGMENT**</u>

At every turn, Kove's cross-motion ignores both governing law and the case record. Indeed, Kove's ineligibility arguments eschew relevant Federal Circuit guidance about the importance of claim construction in § 101 determinations, and overstate the Court's limited prior decision at the pleading stage. Likewise, Kove's arguments on Amazon's equitable defenses ignore that the discovery record shows there are at least material factual disputes on intent. And Kove's arguments on double-patenting and prior art invalidity defenses fair no better, with Kove taking a single paragraph of Amazon's expert's report out of context and mischaracterizing the applicable legal standards. Because the record is replete with evidence sufficient to support Amazon's challenged defenses, the Court should deny Kove's cross-motion for summary judgment.

**I. DEVELOPMENTS IN THE RECORD JUSTIFY FURTHER CONSIDERATION OF THE ASSERTED CLAIMS' ELIGIBILITY.**

Under the Supreme Court's *Alice* test, a patent's claims are ineligible under 35 U.S.C. § 101 if they're directed to an abstract idea without being transformed by an "inventive concept."[198] This Court applied the *Alice* test to three of Kove's asserted claims almost four years ago, when it denied Amazon's motion to dismiss on the grounds that the challenged claims weren't directed to an abstract idea. Kove argues that this decision, made before discovery, claim construction, or multiple reexaminations concerning each asserted claim, precludes the Court from later considering eligibility. But that's incorrect. As the Federal Circuit explained in *Pfizer, Inc. v. Teva Pharms.,*

---

[198] *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 221 (2014).

*USA, Inc.*, "a conclusion of law…is subject to change upon the development of the record."[199] Because patent eligibility "is a question of law based on underlying facts,"[200] this Court should consider all relevant developments before making any final eligibility decision.

Courts regularly revisit eligibility decisions made at the 12(b)(6) stage to account for new evidence in the record. For example, in *Personalized Media Communications, LLC v. Apple, Inc.*, the Eastern District of Texas reached the "purely legal conclusion" at the motion to dismiss stage that the asserted patent "does not claim an abstract idea."[201] Like Kove, the plaintiff argued that the initial § 101 opinion barred the defendant from "re-litigating" the issue because "there [we]re no changes in law, claim constructions, or facts that justify revisiting this determination."[202] But the court disagreed, finding that intervening developments in the factual record, including claim construction, discovery, and expert reports, were likely to inform its eligibility analysis.[203]

Intervening developments in the factual record of this case should inform the Court's eligibility analysis, as well. Key developments include Dr. Overton's admissions at deposition that many limitations of the patents-in-suit weren't inventive,[204] Kove's assertion of fourteen additional claims,[205] Kove's statements limiting claim scope to survive reexamination, and the parties' expert reports. In addition, Judge Pallmeyer construed the asserted claims after ruling on the § 101 motion. And Amazon's request in its motion for summary judgment for further claim constructions

---

[199] 429 F.3d 1364, 1377 (Fed. Cir. 2005).

[200] *Athena Diagnostics, Inc. v. Mayo Collaborative Servs.*, LLC, 915 F.3d 743, 749 (Fed. Cir. 2019).

[201] No. 2:15-cv-1366, 2021 WL 2696561, at *2 (E.D. Tex. Jan. 29, 2021), *adopted*, 2021 WL 2697610 (E.D. Tex. Mar. 13, 2021).

[202] 2021 WL 2696561, at *2.

[203] *Id.* at *3.

[204] *E.g.*, Dkt. 700-42 at ¶ 276.

[205] *E.g.*, Dkt. 700 at ¶ 4.

44

based on Kove's limiting statements to the Patent Office is also now pending.

Federal Circuit law teaches that such construction is a critical element for a full and proper § 101 analysis. Indeed, the Federal Circuit advises that it is "ordinarily…desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis, for the determination of patent eligibility requires a full understanding of the basic character of the claimed subject matter."[206] Here, the Court recognized this principle in a prior order, stating that Amazon's defenses—including ineligibility—"may turn on the interpretations of the disputed claim terms."[207] And the construed terms are also a meaningful part of the fourteen asserted claims that the Court has yet to consider. For instance, Kove used three of them—"client," "location," and "location server"—to summarize six of the additional independent claims in its motion.[208]

Mr. Greene, Amazon's invalidity expert, took these "intervening developments into account" when rendering his opinions that the claims of the asserted patents are invalid under § 101.[209] For example, Mr. Greene opined that Kove's patent claims are directed to an abstract idea because "a POSITA would understand that these 'location servers' and 'location stores' could be implemented on any conventional, standard, and well-known computer or server." This opinion, he explained, was reached "in light of…the Court's claim construction order" and "supported by the Court's claim construction of 'location server.'"[210] And Mr. Greene likewise considered Dr. Overton's admission "that many of the [asserted patents'] routine, well-understood, and conventional limitations were not inventive" when reaching his opinion that the asserted claims are

---

[206] *Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Canada (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012).

[207] Dkt. 484 at 2 (discussing Amazon's defenses more than 20 months after denying motion to dismiss).

[208] *See* Dkt. 382 & 484 (claim construction); Dkt. 699 at 61.

[209] *See*, *e.g.* Dkt. 700-42 at ¶ 261.

[210] *Id*. at ¶ 265.

45

directed to a patent-ineligible concept and don't contain an inventive concept.[211]

Mr. Greene's opinions further show that genuine issues of material fact preclude summary judgment. As the Seventh Circuit explained in *United States v. Brown*, expert testimony exists "to assist the trier of fact to…make a factual determination in cases in which intelligent evaluation of facts is often difficult or impossible without the application of some specialized knowledge."[212] For this reason, this court previously recognized in *Chamberlain Grp., Inc. v. Lear Corp.* that granting summary judgment in the face of an expert's "reasoned explanations" would require the court to "weigh conflicting evidence."[213] Because "[s]ummary judgment is not an appropriate occasion for weighing the evidence," such reasoned opinions necessarily preclude it.[214]

Mr. Greene's expert opinion, claim construction, and other developments in the record preclude summary judgment on Amazon's § 101 defense, and Kove's motion for summary judgment on it should be denied.

## II.     ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON EQUITABLE ESTOPPEL, WAIVER, AND INEQUITABLE CONDUCT.

Kove seeks summary judgment on Amazon's equitable estoppel, waiver, and inequitable conduct defenses because it argues that the record can't support an inference of intent. But that's incorrect, as genuine disputes of material fact remain on that element. For example, the parties dispute whether Kove intentionally failed to mention the asserted patents to Amazon when discussing AWS services (including DynamoDB) in 2017-2018 and whether the inventors

---

[211] *Id.* at ¶¶ 276, 278.

[212] 32 F.3d 236, 239 (7th Cir. 1994); *see also Novartis Corp. v. Ben Venue Labs., Inc.*, 271 F.3d 1043, 1051 (Fed. Cir. 2001) (observing that sufficiency of factual basis underlying expert report is governed by regional circuit, because it "is not a matter peculiar to patent law").

[213] *Chamberlain Grp., Inc. v. Lear Corp.*, 756 F. Supp. 2d 938, 954 (N.D. Ill. 2010).

[214] *Id.* at 954–55 (quoting *Dowden v. Polymer Raymond, Inc.*, 966 F.2d 1206, 1207 (7th Cir. 1992)).

46

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KOVE IO, INC., <br><br> Plaintiff, <br><br> v. <br><br> AMAZON WEB SERVICES, INC., <br><br> Defendant. | Civil Action No. 1:18-cv-08175 <br><br> Judge Matthew F. Kennelly <br><br> Jury Trial Demanded <br><br> ███████████ |

**AMAZON WEB SERVICES, INC.'S ADDITIONAL STATEMENT
OF MATERIAL FACTS**

Under Federal Rule of Civil Procedure 56 and Local Rule 56.1(b)(3), Defendant Amazon Web Services, Inc. ("Amazon") submits this Additional Statement of Material Facts in support of its Opposition to Plaintiff's Cross Motion for Summary Judgment.

**Patent Eligibility Under § 101**

1.      When the Court denied Amazon's April 5, 2019 motion to dismiss, it noted that Kove's complaint "specifically identif[ied] only one [claim] from each patent," and therefore "addresse[d] only the three identified claims": claim 18 of the '640 patent, claim 1 of the '170 patent, and claim 17 of the '978 patent.[1] Since then, Kove has asserted fourteen additional claims: 17 and 24 of the '640 Patent, claims 2, 6, 8, 12, and 15 of the '170 Patent, and claims 3, 6, 10, 14, 23, 24, and 30 of the '978 Patent.[2]

2.      In August and September of 2022, Kove made limiting statements about the scope of the asserted claims in the '034, '035, and '036 Reexaminations that narrowed the scope of the

---

[1] Dkt. 110 at 1, 3–5.

[2] *E.g.*, Dkt. 687-4 at 2; Dkt. 687 at ¶ 4.

Appx26112

claims to survive the reexaminations of the Asserted Patents.[3]

3. During his May 2023 deposition, inventor John Overton admitted that many of the Asserted Patents' routine, well-understood, and conventional limitations were not inventive.[4] For example, Dr. Overton testified:

> Amazon Atty: Do you believe you invented the distributed database?
>
> Overton: I do not.
>
> Amazon Atty: And name servers existed before your patents; right?
>
> Overton: Yes.
>
> Amazon Atty: And we already talked about DNS existed before your patents; right?
>
> Overton: Yes.
>
> Amazon Atty: So you didn't invent name servers; correct?
>
> Overton: That's correct.
>
> Amazon Atty: You didn't invent DNS; right?
>
> Overton: Yes, that is correct.
>
> Amazon Atty: Okay. You didn't invent the idea of separating data from its location; did you?
>
> …
>
> Overton: I don't think so.[5]

4. Amazon's invalidity expert Mr. Greene took the aforementioned events, as well as the Court's claim constructions, into account when rendering his opinion that the Asserted Patents are ineligible under 35 U.S.C. § 101. Mr. Greene's July 2023 report states:

> I understand that early on in this case, before discovery, Kove's limiting statements in reexamination, testimony by the inventors, and

---

[3] Ex. 84 (7/3/2023 J. Greene Expert Report) at ¶ 105 (citing Dkt. 687-35 (8/11/2022 Reply to Office Action in Reexam. No. 90/019,035) at 25); Dkt. 687-37 (8/4/2022 Reply to Office Action in Reexam. No. 90/019,036) at 23; Dkt. 687-32 (8/28/2022 Reply to Office Action in Reexam. No. 90/019,034) at 36.

[4] Dkt. 700-42 (7/3/2023 J. Greene Expert Report) at ¶ 276 (citing Ex. 85 (5/17/23 J. Overton Dep. Tr.) at 670:20-671:5, 671:17–22, 684:11–13, 686:1–12, 687:8–11, 696:6–11, 724:8–10, 724:17–22, 725:17–22, 726:1–17, 728:12–14).

[5] Ex. 85 (5/17/2023 J. Overton Dep. Tr.) at 671:3–21.

2

the Court's claim constructions, the Court ruled on this issue, denying Amazon's motion to dismiss and finding that the claims were not ineligible under 35 U.S.C. § 101. However, after being informed of the relevant standards for making this determination and taking the intervening developments into account, it is my opinion that the asserted patents are invalid under 35 U.S.C. § 101.[6]

5.      Mr. Greene analyzed the asserted patents under the Supreme Court's *Alice* test.[7] In his step one analysis, Mr. Greene relied on the Court's December 2021 Claim Construction Order.[8] His report states, for example:

> It is my opinion that the asserted claims consist of generalized steps performed on generic and conventional computers. For example, claim 17 of the '978 patent describes generalized location services…and transport protocols….[9] And this is further supported by the Court's claim construction of "location server." The Court construed this term as "**network-attached component** that maintains a set of identifier/location mappings that are modified or returned in response to location request messages from clients.' And in its ruling, the Court further cautioned construing the term to a specific kind of server. As such, in light of the patent's specification and the Court's claim construction order, a POSITA would understand that these "location servers" and "location stores" could be implemented on any conventional, standard, and well-known computer or server.[10]

6.      In his step two analysis, Mr. Greene relied on evidence including Dr. Overton's deposition testimony. His report states, for example:

> And in the case of all three Asserted Patents, it is my opinion that there is no inventive concept beyond the abstract idea of storing and retrieving resources through a method of correlated identifiers….[11] In all three instances, the patent simply states that the resource to location correlation is done by some undefined "protocol," "hash," or "code." And as explained above, a POSITA would understand

---

[6] Dkt. 700-42 at ¶ 261.

[7] *Id*. at ¶ 262.

[8] Dkt. 484.

[9] Dkt. 700-42 at ¶ 263.

[10] *Id*. at ¶ 265 (emphasis in original).

[11] *Id*. at ¶ 273.

that this resource to location correlation would be implemented by a well-known method, such as a hashing function….[12] Further, as outlined above in Section II.C, inventor John Overton has admitted that many of the routine, well-understood, and conventional limitations were not inventive: [including] transport protocols…[and] hash functions[.][13]

**Amazon's Equitable Estoppel and Waiver Defenses**

7. Kove CEO John Overton became generally aware of Amazon S3 on or around March 14, 2006 and Amazon DynamoDB on or around January 18, 2012.[14]

8. Kove considered filing a patent infringement lawsuit against Amazon as early as November 2014.[15] Dr. Overton testified:

> Amazon Atty: When did Kove first consider filing a patent infringement lawsuit against Amazon?
>
> Overton: I don't know the specific date, but I think we considered some of that as early as maybe 2015, maybe. Again, I'm going by recollection. That can be fraught with error, but I think that's about the timeframe.[16]

Dr. Overton further testified:

> Amazon Atty: So at this time in November 2014 you and Mr. Bailey had a meeting with attorneys Rob Dellenbach and Edward King about infringement litigation; correct?
>
> …
>
> Overton: Yes.[17]

And Dr. Bailey testified:

> Amazon Atty: You testified earlier, Mr. Bailey, that the work you have done for John Overton or his companies since late 20- -- 2014 has included looking at technologies that potentially relate to the --

---

[12] *Id.* at ¶ 275.

[13] *Id.* at ¶ 276.

[14] Dkt. 701-23 at 28 (Kove's Seventh Objections and Responses to Amazon's First Set of Interrogatories).

[15] *See* Dkt. 687 at ¶ 96.

[16] Ex. 86 (5/16/2023 J. Overton Dep. Tr.) at 228:2–9.

[17] *Id.* at 240:21–241:5.

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Kove IO, Inc., | Civil Action No. 1:18-cv-08175 |
| Plaintiff, | |
| | Hon. Matthew F. Kennelly |
| v. | |
| Amazon Web Services, Inc., | Jury Trial Demanded |
| Defendant. | |

**PLAINTIFF KOVE IO, INC.'S REPLY IN SUPPORT OF
CROSS-MOTIONS FOR SUMMARY JUDGMENT AND TO EXCLUDE**

## TABLE OF CONTENTS

|  |  | Page |
|---|---|---|
| Introduction | | 1 |
| Argument | | 1 |
| I. | Kove Is Entitled to Summary Judgment on Patent Eligibility. | 1 |
| II. | AWS Fails to Identify Facts Satisfying the Legal Standards for Equitable Estoppel, Waiver, and Inequitable Conduct. | 4 |
| | A. Equitable Estoppel: Mere Silence Is Insufficient. | 4 |
| | B. Implied Waiver: Kove Undisputedly Had No Duty to Disclose. | 5 |
| | C. Inequitable Conduct: AWS Cannot Meet the Exacting Standard for Intent. | 6 |
| III. | Kove Is Entitled to Summary Judgment on Obviousness-Type Double Patenting. | 7 |
| IV. | Because AWS Fails to Qualify Multiple References as Prior Art, Kove Is Entitled to Summary Judgment, and Mr. Greene's Associated Opinions Are Inadmissible. | 11 |
| | A. Mr. Greene's *Ipse Dixit* About BIND 8.1 and Cache Resolver Is Inadmissible. | 11 |
| |   1. BIND 8.1: AWS cannot now change its asserted reference to DNS generally | 11 |
| |   2. Cache Resolver: Attorney argument cannot save Mr. Greene's opinions. | 13 |
| | B. Boukobza, Karger '618, and Karger '420 Are Not Prior Art Under Any Properly Disclosed Theory. | 15 |
| | C. AWS Lacks Sufficient Evidence That Steen Was Publicly Accessible. | 16 |
| V. | Kove's Cross-Motion to Exclude Should Be Granted. | 16 |
| | A. Dr. Grama Cannot Contradict the Court's Construction of "Location." | 16 |
| |   1. AWS forfeited any response to Kove's argument. | 17 |
| |   2. AWS's new theory is not disclosed in Dr. Grama's report. | 17 |
| | B. Dr. Grama's DynamoDB Opinions Apply the Wrong Construction. | 19 |
| | C. AWS's New "███████" Theory Should Be Excluded. | 20 |
| Conclusion | | 20 |

**INTRODUCTION**

From summary judgment to *Daubert* to disclosure issues, AWS's response has a common thread:  AWS repeatedly ignores Kove's arguments and declines to defend its previous positions in favor attacking strawmen and injecting a host of new theories into this case long after the deadline to disclose them.  The merits are no better for AWS.  In the end, the challenged defenses are indefensible; the expert opinions, inadmissible; and the new theories, inexcusable.

To be clear, AWS did not confine its new arguments to its response to Kove's motions; the parts of its brief replying in support of AWS's motions are similarly rife with new, and thus forfeited, arguments.  But because Kove understands that the authorized scope of this brief is limited to replying in support of Kove's motions, not a sur-reply, it does not address AWS's reply arguments here but would welcome an opportunity to brief those arguments if helpful to the Court.

**ARGUMENT**

**I.      Kove Is Entitled to Summary Judgment on Patent Eligibility.**

This Court already considered and rejected AWS's § 101 defense as a matter of law. Dkt. 110; *see* Dkt. 699 at 57-58.  Under controlling precedent, that ruling is law of the case and should not be reconsidered absent a "compelling reason, such as a change in, or clarification of, law that makes clear that the earlier ruling was erroneous." *Santamarina v. Sears, Roebuck & Co.*, 466 F.3d 570, 571-72 (7th Cir. 2006).

AWS does not dispute any of that.  Dkt. 714 at 43-46.  Instead, it suggests that the Federal Circuit has held that decisions like this one are "subject to change upon the development of the record." *Id.* at 43-44 (quoting *Pfizer, Inc. v. Teva Pharms., USA, Inc.*, 429 F.3d 1364, 1377 (Fed. Cir. 2005)).[1]  That is both incorrect and irrelevant.  Whether to reconsider is a matter of Seventh

---

[1] *Pfizer* merely holds that it was "prudent to address" an issue that need not otherwise be decided on interlocutory appeal because it was "subject to change" as the record developed. *See* 429 F.3d at 1377.

1

Circuit law. *Bd. of Trs. of Bay Med. Ctr. v. Humana Mil. Healthcare Servs., Inc.*, 447 F.3d 1370, 1374 (Fed. Cir. 2006). Besides, as Kove said from the outset, there is no categorical ban on reconsideration; there is just no reason to reverse course here. Dkt. 699 at 58-60.

Similarly, AWS's account of the magistrate judge's decision in *Personalized Media Communications, LLC v. Apple, Inc.*, 2021 WL 2696561 (E.D. Tex. Jan. 29, 2021), *adopted*, 2021 WL 2697610 (E.D. Tex. Mar. 13, 2021), is incomplete. There, the court concluded that, under "non-binding Second Circuit guidance," there is no categorical bar to revisiting step one. *Id.* at *2-3 & n.2. But the court stood by its step one eligibility determination because the defendant "fail[ed] to present any evidence that causes [the] Court to question [its previous] finding." *Id.* at *3. So too here. AWS offers no reason to reach a different result, much less one that passes muster under the governing Seventh Circuit standard. *See* Dkt. 699 at 57-60.

All AWS offers in support of reconsideration is a handful of "intervening developments in the factual record." Dkt. 714 at 44. But it never explains how reconsideration would change the result; it provides no argument that the claims are ineligible beyond those the Court already rejected. *See id.* at 43-46. It has thus forfeited any such argument. *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014). Regardless, AWS is wrong on the merits.

**New Claims.** To be sure, there are more claims at issue now than there were at the time the Court rejected AWS's § 101 argument. But as Kove explained, the new claims are eligible for the same reasons as the ones the Court already addressed. Dkt. 699 at 61. AWS does not dispute that point. *See* Dkt. 714 at 43-46. For good reason: Nine of the new claims involve the same "redirect" functionality the Court already addressed. *See* Dkt. 110 at 12-13; '978 patent claims 3, 10, 14; '170 patent claims 6, 8, 9, 12, 15; '640 patent claim 17. The only other independent claim ('978 patent claim 6) is eligible for the same reasons the Court gave for claim 1 of the '170 patent;

2

it is "directed to a specific network architecture that employs multiple location servers that organize location information based on a [hash function]." Dkt. 110 at 12-13. And the five claims that depend from those the Court already ruled on are necessarily also eligible. *See Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1346 n.1 (Fed. Cir. 2017).

**Claim Construction.** Next, AWS suggests that claim construction "is a critical element for a full and proper § 101 analysis," such that intervening claim construction decisions mean that the Court should revisit § 101. Dkt. 714 at 45. Not so. AWS's own case refutes its point. *Compare Bancorp Servs., LLC v. Sun Life Assurance Co. of Can. (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("[C]laim construction is not an inviolable prerequisite to a validity determination under § 101."), *with* Dkt. 714 at 45 & n.206 (citing *Bancorp* for the proposition that claim construction is "often necessary" to decide § 101 issues). *See also Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018) (claim construction, if any, needed for the § 101 analysis "may well be less than a full, formal claim construction" even when disputed). Regardless, AWS never says how any intervening (or even desired) construction would have changed anything. Dkt. 714 at 45. Now was the time to do so. *Weaver v. Champion Petfoods USA Inc.*, 3 F.4th 927, 938 (7th Cir. 2021) ("put up or shut up moment" (attribution omitted)).

None of the Court's constructions, *see* Dkt. 484 at 35, affect its legal ruling that the claims are not directed to an abstract idea. As the Court explained, the claims are "directed to a specific network architecture that employs multiple location servers that organize location information based on a distributed hash table," and that "architecture functions differently than—and improves upon—conventional systems." Dkt. 110 at 12-13; Dkt. 699 at 58. Even AWS's proposed new constructions would not change the step one analysis—and AWS does not argue otherwise.

**Dr. Overton's Testimony.** Dr. Overton's alleged testimony that certain limitations were

3

Appx26134

not inventive, *see* Dkt. 714 at 44 & n.204 (citing Dkt. 700-42 ¶ 276), is beside the point. At most, his discussion of what was "well-understood, routine, and conventional" could be relevant to step two. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1367-68 (Fed. Cir. 2018). But step two comes into play only where the claims fail step one. Dkt. 699 at 56-57 (collecting cases). Because the Court already held that the claims are eligible at step one, any testimony about step two is irrelevant.

**Mr. Greene's Opinions.** AWS's expert's opinions are equally irrelevant. AWS identifies only Mr. Greene's assertion that certain limitations "could be implemented on any conventional, standard, and well-known computer or server." Dkt. 714 at 45 & n.210 (quoting Dkt. 700-42 ¶ 265). That is a step two issue and thus provides no reason to revisit step one. *Berkheimer*, 881 F.3d at 1367. And to the extent Mr. Greene means to weigh in on step one, he says nothing new; the Court already rejected the same arguments. Dkt. 699 at 60. AWS's cited cases are irrelevant. *See* Dkt. 714 at 46. Because step one is purely legal, there is no fact dispute for Mr. Greene to weigh in on. *Ericsson Inc. v. TCL Commc'n Tech. Holdings*, 955 F.3d 1317, 1321 (Fed. Cir. 2020).

## II. AWS Fails to Identify Facts Satisfying the Legal Standards for Equitable Estoppel, Waiver, and Inequitable Conduct.

### A. Equitable Estoppel: Mere Silence Is Insufficient.

AWS's equitable estoppel argument—which is based solely on the theory that Kove did not mention its patents to AWS before filing a lawsuit—is irreconcilable with controlling precedent. It is black-letter law that mere silence is not enough; the party asserting estoppel must prove that "some other factor" transformed the silence into "misleading conduct." *High Point SARL v. Sprint Nextel Corp.*, 817 F.3d 1325, 1330 (Fed. Cir. 2016); Dkt. 699 at 62.

AWS does not seriously dispute the point. Aside from attempting to pass off Kove's example of facts that could satisfy the test as Kove's statement of the test, AWS ignores Kove's binding precedent. *Compare* Dkt. 714 at 47, *with* Dkt. 699 at 62. The one Federal Circuit case

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KOVE IO, INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 18 C 8175** |
| | ) | |
| **AMAZON WEB SERVICES, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**ORDER REGARDING TRIAL TIME LIMITS**

MATTHEW F. KENNELLY, District Judge:

The Court has determined to set reasonable limits on the amount of time for the parties to present their claims and defenses during the trial, to prevent delay, ensure efficient presentation of the evidence and arguments, avoid unnecessary, cumulative, and repetitive evidence and arguments, and minimize undue burden on the jurors. It is well-established that a court has the authority to impose reasonable time limits on the parties at trial. *See* Fed. R. Civ. P. 16(c)(4) & (15); Fed. R. Evid. 611(a).

The Court has developed a significant amount of familiarity with the case from its direct supervision of the case for the last 22 months and from dealing with extensive briefing on numerous motions relating to discovery and motions for summary judgment and to exclude evidence, as well as discussions with the parties during the numerous status, discovery-related, and other hearings held in the case. Based on this and the parties' representations regarding the anticipated length of trial, the Court allocates a total of 44 hours to the trial, not counting jury selection, which the Court expects will take no more than half a day. This is based on an assumption of a 5-hour trial day and thus amounts to (together with jury selection) a two-week trial. The Court believes that

this will provide the parties with a reasonable and sufficient amount of time to present evidence and argument supporting their claims and defenses.  (As indicated below, however, the actual trial day likely will include closer to 6 hours of court time.)

Trial will be held on the following dates, to the extent needed:  April 1-5 and April 8-12, 2024, as needed.  The trial day typically will extend from 9:00 a.m. to 12:00 or 12:30 p.m. and from 1:00 or 1:30 p.m. (depending on the start time for the lunch break) to 5:00 p.m., with mid-morning and mid-afternoon breaks as needed.  The Court reserves the right to start or end earlier or later than these times on any given day and will do its best to advise counsel in advance.

The Court will allocate half of the trial time to the plaintiff and half to the defendant (22 hours per side).  Time will count against a side's allocation whenever it is questioning a witness, arguing an objection or other matters to the Court, making an opening statement or closing argument, or otherwise presenting its case.  Time spent arguing evidentiary or other *in limine* matters not determined prior to the start of the trial, including the Court's review of written submissions on such matters, also will count against a side's allocation.  The Court also reserves the right to count any time spent after the start of the trial arguing jury instruction issues.

Each side's opening statement is limited to no more than 60 minutes.  Each side's closing argument is limited to no more than 90 minutes; plaintiff may allocate his closing argument time between opening and rebuttal as it wishes.  These amounts count against the parties' total time allocation, and each party is reminded that it need not use the entirety of the time allocated for opening statement and closing argument.

If a party intends to read or play deposition testimony before the jury, this may require the Court to rule on objections to designated testimony.  The reading and

2

Appx26196

playing of deposition testimony will, of course, constitute trial time. Time will count against a side's allocation for all testimony that side has designated to be read or played. The parties are directed to confer prior to the presentation of any deposition testimony to attempt to agree upon how the time spent reading or playing the deposition should be allocated between them. In this regard, the Court encourages the parties to do their best to pare down deposition testimony to significant and non-repetitive matters. In addition, all time the Court spends before or during trial considering each party's objections to deposition testimony is time that would be spent in court were the witnesses being presented live. For this reason, that time will count against the side making the objection, unless and to the extent that the Court determines that the party designating the objected-to testimony has designated testimony of limited probative value or that is otherwise unduly repetitive or cumulative, in which case the time will count against the side that designated the objected-to testimony.

The Court reserves the right to adjust the total time and each side's allocation upward or downward for good cause. Good cause to reduce the allocation may include, among other things, rulings made hereafter barring or limiting claims, precluding opinion witness testimony, and excluding or limiting evidence via *in limine* rulings and rulings made during trial. In addition, good cause to adjust an allocation downward may include, among other things, presenting unduly cumulative testimony or evidence, unduly presenting evidence of minimal probative value, or making unwarranted objections to testimony or exhibits.

With regard to exhibits, the Court orders the parties to confer to attempt to pare down their exhibit lists, resolve foundational objections to exhibits by stipulation or otherwise, and attempt to narrow objections to exhibits to the extent reasonably

3

possible.  This is in both sides' mutual interest, as time spent during trial laying foundations and arguing foundational objections will count against the parties' allocated trial time.  The Court reserves the right to impose an overall limit on the number of exhibits introduced by each side.

Further particulars of the rules for time allocation may be addressed at or before the trial.

In addition, as the Court has previously advised, it will exercise its authority pursuant to Federal Rule of Evidence 611 to require that each witness will be called only once and will not be recalled later in the case, except to rebut evidence offered later that the party wishing to recall the witness could not reasonably have anticipated. Consistent with this directive, there will be no restriction on the scope of cross-examination of a witness called by an adverse party.  In addition, examination of a witness beyond redirect (beyond "recross," for a witness called by an adverse party) will not be permitted absent a showing at sidebar—for which the requesting party will be charged time—that the immediately preceding examination by the other side raised new points that the party has been unable to address adequately.

To minimize interruptions in the jury's receipt of evidence, the Court will limit the number and extent of sidebar conferences while the jury is present in the courtroom.  If a party anticipates that a matter may come up during a witness's testimony that will require discussion outside the jury's presence, the party should raise the matter beforehand at a break.  Where this does not occur, and discussion outside the jury's presence is requested or is necessary, the Court may require the testimony to proceed while holding to the next break the issue to be discussed.

Finally, the Court expects and directs counsel for both sides to advise witnesses,

Appx26198

before they testify, regarding *in limine* rulings that may impact the witness's testimony—

in particular, rulings that preclude or limit admission of evidence about which the witness

might otherwise testify.

Date: February 9, 2024

MATTHEW F. KENNELLY
United States District Judge

5